# EXHIBIT 14

# In The Matter Of:

## *INTELLECTUAL VENTURES I LLC*
## *v.*
## *MOTOROLA MOBILITY, LLC*

---

## *RANDY H. KATZ, Ph.D. - Vol. 1*
### *July 17, 2013*

---

**MERRILL CORPORATION**
LegaLink, Inc.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

Page 30

1    A. I did not.
2        MR. SANDERS: Objection to form.
3    BY MR. ALBERTI:
4    Q. Did you review the file history of the inter
5    partes reexamination of '450 patent?
6        MR. SANDERS: Objection, form.
7        THE WITNESS: I did.
8    BY MR. ALBERTI:
9    Q. Before this case, had you ever heard of Malibu
10   Networks?
11   A. No.
12   Q. Had you ever heard of Jacob Jorgensen?
13   A. No.
14   Q. Have you ever heard of Dr. Jerry Gibson?
15   A. No.
16   Q. Did you review Dr. Gibson's CV?
17   A. I do not recall doing so, actually. I can't
18   recall doing that.
19   Q. Well, I'll ask anyways, but since you didn't
20   review his CV, I'm assuming you don't question his
21   credentials in this case.
22   A. No, I do not.
23   Q. Do you know anyone at the UCSB engineering
24   school?
25   A. I do.

Page 31

1    Q. Who do you know there?
2    A. Herb Kroemer, Nobel Laureate, in the Materials
3    Science department, as well as in Electrical and
4    Computer Engineering. One of my former students, Ben
5    Zhao, is a Computer Science faculty member there. His
6    wife, Heather Zheng, and several other colleagues, some
7    of whom were former students at Berkeley who are now on
8    the faculty there.
9    Q. Do they have a reputable Electrical
10   Engineering/Computer Science department?
11   A. They do.
12   Q. You reviewed Dr. Gibson's report on issues of
13   validity in this case?
14   A. I did.
15   Q. Are there any new opinions that you arrived to
16   after reviewing Dr. Gibson's report?
17   A. No new opinions.
18   Q. You also reviewed Mark Seely's report that we
19   discussed, true?
20   A. Yes.
21   Q. And outside of the issues surrounding claim
22   construction, are there any new opinions that you
23   arrived to after reviewing Mr. Seely's report?
24   A. No.
25   Q. Let's start with claim construction. So if we

Page 32

1    turn to Mr. Seely's report. And I want to do this
2    because he's got a nice chart in here, which should make
3    it easy for us to go through some of these terms. And
4    again, the chart starts on page 10. And you'll see
5    there's two terms that are listed next to each other.
6    Well, there's a term on the left-hand side of the chart
7    followed by "Plaintiff IV's Proposed Construction," then
8    "Defendant Motorola's Proposed Construction." Do you
9    see that?
10   A. I do.
11   Q. And for a couple of these terms, you'll see in
12   parens, "See discussion of amendment below" where
13   there's been an amendment. If you take a look, for
14   example, on page 11.
15   A. Yes, I see that.
16   Q. Okay. So, and we'll, we'll go to the
17   amendments when we get there, but I just want to sort of
18   start in order.
19       First, with the CP -- I'll call it a CPE term,
20   "subscriber customer premise equipment stations," do you
21   see that?
22   A. I do.
23   Q. Do you agree with IV's proposed construction
24   in this, for this term?
25   A. I do not.

Page 33

1    Q. In particular, what is your problem with IV's
2    proposed construction?
3    A. I feel that the use of the term "telephone
4    network" is too restrictive.
5    Q. Other than that, are there any significant
6    problems with the construction other than the telephone
7    network issue?
8    A. I think the main, my main focus on, on the
9    meaning of this term is the notion of connecting
10   equipment to a communications network.
11   Q. Do you agree with Motorola's proposed
12   construction as listed in this table?
13   A. I do.
14   Q. About how many patent cases have you been
15   involved with in your career?
16   A. I would say approximately a dozen.
17   Q. Are you familiar with the principle that a
18   patentee can be his own lexicographer?
19       MR. SANDERS: Objection, form.
20       THE WITNESS: I'm not an attorney, so I'm not
21   sure about that.
22   BY MR. ALBERTI:
23   Q. Are you aware of -- I'll try to restate it.
24       Are you aware of a principle where if a
25   patentee defines something in a patent specification

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 70

1  THE WITNESS: So let me, let me try and
2  understand the example that we're considering. Two
3  different base stations, two different subscribers,
4  within range of both base stations?
5  BY MR. ALBERTI:
6  Q. Yes. Assuming, again, that I'm only going to
7  talk to my AT&T base station and you're only going to
8  speak to your Verizon base station. So let's, let me
9  first frame, frame the issue this way.
10      You would agree that those two base stations,
11  even though they're speaking -- providing different
12  frequency bands to their respective customers, they are
13  sharing bandwidth, true?
14  A. Sorry. Sharing bandwidth among whom at this
15  point?
16  Q. Well, I had asked you before whether you would
17  consider AT&T and Verizon to be sharing wireless
18  bandwidth even though each has their own assigned
19  frequency bands to provide to their customers, and --
20  A. Within, within one base station.
21  Q. Yes.
22  A. I think was the example that we had before.
23  And, and my answer was that within the totality of
24  capacity, you know, to pump information or voice or
25  whatever, it is being -- that, that capacity is being

Page 71

1  shared between the AT&T customers and the Verizon
2  customers. That, that is what I believe I said.
3  Q. Okay.
4  A. And we're now considering another example with
5  two base stations. But my question was, to understand
6  the scenario that we're talking about, to kind of come
7  back to a physical principle of radio communication, if
8  I have two base, two base stations that can hear each
9  other and they are both communicating on the same
10  frequencies, they -- basically, two nearby base stations
11  share the ability to encode information into the
12  frequency range that they're operating in. And
13  there's -- if they're both communicating in the same
14  frequency at the same time, they will conflict with each
15  other.
16      So the reason to bring that up is that there
17  is a fixed capacity that you can encode in the sort of
18  frequency ranges. So I'm a little confused about the
19  possibility of interference if the base stations are
20  close by, as opposed to if they're far apart.
21  Q. Yeah, and I'm sorry, maybe my example wasn't
22  specific enough. But I believe in my first example
23  where we had Verizon and AT&T we agreed that they were
24  speaking on completely separate frequency bands.
25  A. Uh-huh.

Page 72

1  Q. Did you follow that?
2  A. So, so there's no communication possible from
3  one base station to the other in a conflicting
4  frequency.
5  Q. No.
6  A. Okay.
7  Q. In that situation, would you say the base
8  stations are sharing wireless bandwidth?
9  A. So I think I still would say that they're
10  sharing wireless bandwidth for the following reason,
11  that in the union of the frequencies between the two
12  base stations, there is a total capacity for carrying
13  information. And one, one base station could transmit
14  at a higher power and, or it could have a greater
15  frequency range and so support a larger number of
16  customers than the other one.
17      There are ways of slicing and dicing sort of
18  the fixed totality of bandwidth that's available in the
19  union of the two base stations. So in that sense, it's
20  like a pie that's being sliced up and, you know, you
21  have half the pie and I have half the pie. Are we not
22  sharing the pie?
23  Q. And then now let me go to my final
24  hypothetical with this, is if in that same scenario
25  where you have two base stations, each with a fixed and

Page 73

1  mutually exclusive bandwidth, and we have two cell
2  phones speaking to the two different base stations. Are
3  the two cell phones in that example sharing wireless
4  bandwidth?
5  MR. SANDERS: Objection to form.
6  THE WITNESS: I have to admit, my mind
7  wondered a little bit there, so could we go through that
8  example again?
9  BY MR. ALBERTI:
10  Q. So we have our two base stations, each
11  providing a fixed frequency band that is, that are
12  mutually exclusive, okay. We'll say one is AT&T and one
13  is Verizon. And we have now two cell phones, one
14  speaking to the AT&T base station and one speaking to
15  the Verizon base station. In that example, would you
16  say that the two cell phones are sharing wireless
17  bandwidth?
18  A. Again, I would say the answer is yes, because
19  I go back to my analogy with the pie. The pie is
20  divided in half, half -- so there's the pie. The pie is
21  the thing being shared. We divide it in half and say
22  this half is the Verizon side and this is the AT&T side.
23  And I think, if I understood your example, we're taking
24  another slice out of that and saying -- is it Dave?
25  Q. Yes.

19 (Pages 70 to 73)

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 82

1  up. It's one of my award papers. Somewhere around
2  2000, I think. Looking in the wrong place. Sorry about
3  that. I can't seem to find it. There we go. Oh.
4      Actually, yes, this isn't the paper I was --
5  sorry. This isn't the paper I was actually thinking
6  about, so I'm not sure when I wrote this. I do see that
7  it was based on a presentation I made in September 1997.
8      Q. And do you see there's a quote from
9  January 1998 Wired magazine. I believe it's the second
10 quote listed on the page.
11     A. I see that.
12     Q. So would it be fair to say that it was at
13 least in sometime 1998 or later?
14     A. Yes.
15     Q. Okay. So it was, in general, around the time
16 of the '450 patent. Fair?
17     A. Yes.
18        MR. SANDERS: Objection to form.
19        THE WITNESS: Around generally the time.
20 BY MR. ALBERTI:
21     Q. Okay.
22     A. Given that the time is in dispute.
23     Q. So if we turn to page 10. We were talking
24 before about the Internet and communication between end
25 nodes and the Internet, true?

Page 83

1      A. I'm sorry. Could you repeat that?
2      Q. Before our break, we were speaking about
3  communicating between end nodes on the Internet.
4      A. Yes.
5      Q. Do you remember that?
6      A. Yes.
7      Q. So in your section 4.2, where you talk about
8  "Strengths and Weaknesses of Internet Technology," you
9  say, "A key underlying assumption of the Internet is
10 that end nodes are intelligent and have the ability to
11 execute the TCP/IP protocol stack." True?
12     A. That's what I wrote.
13     Q. And that's a correct statement, right?
14     A. Yes.
15     Q. When we were talking about sequencing, I want
16 to direct your attention to the second paragraph, first
17 sentence -- second paragraph, second sentence. It
18 reads, "The Internet achieves its robust communications
19 through packet switching and store-and-forward routing."
20 Do you see that?
21     A. I do.
22     Q. And when I asked about packet switching, you'd
23 agree that the Internet uses packet-switching protocol
24 to communicate, true?
25     A. Well, for example, the Internet was able to

Page 84

1  span ATM networks, as a concrete example, and that uses
2  something different than packet switching as an
3  underlying technology. It uses cell switching instead.
4  So the exclusivity of the use of the term "Internet" is
5  a little bit at dispute in my mind.
6      Q. So if you were to change the sentence, the
7  second sentence in the second paragraph to be more
8  precise, how would you do that?
9      A. I would say, "The Internet's Internet protocol
10 achieves its robust communication through packet
11 switching and store-and-forward routing."
12     Q. Would you agree that it is not necessary to
13 create a circuit between end points before communicating
14 using the Internet protocol?
15        MR. SANDERS: Objection, form.
16        THE WITNESS: I'm sorry. Could you state that
17 just one more time?
18 BY MR. ALBERTI:
19     Q. Sure. Do you agree that it's not necessary to
20 create a circuit between two end points on the Internet
21 before they can begin communicating with each other?
22        MR. SANDERS: Objection, form.
23        THE WITNESS: At the level of the Internet
24 protocol, it is not required that a connection be
25 established. It's possible to communicate using a

Page 85

1  connectionless approach.
2  BY MR. ALBERTI:
3      Q. Would you agree that that is different from a
4  circuit-switched protocol?
5      A. I would say a connectionless approach is
6  different from a connection-oriented approach.
7      Q. And circuit switching would be a
8  connection-oriented approach.
9      A. Yes.
10     Q. The next sentence reads, "Information is sent
11 in small units, packets, which may be routed differently
12 from each other, and which may arrive at their
13 destination out of order."
14        And would you agree that that is true for a
15 packet-switching protocol?
16     A. This, of course, is within the contents, in
17 the context of the Internet's IP protocol, which I will
18 agree is a packet-switching protocol.
19     Q. So you would agree with that statement as it
20 applies to a packet-switching protocol, but not a
21 circuit-switching protocol.
22        MR. SANDERS: Objection, form.
23        THE WITNESS: The issue with circuit switching
24 and out-of-order delivery I think are orthogonal issues.
25 So I think you could have a circuit-switched protocol

22 (Pages 82 to 85)

### Page 86

1 that could, in principle, deliver packets out of order.
2 So I don't see those -- circuit switched implying
3 impossible to receive things out of order.
4 BY MR. ALBERTI:
5     Q. Would you agree, though, that in a
6 circuit-switched protocol, the packets would be routed
7 along the same circuit, as opposed to being routed
8 differently from each other, as we have in the Internet
9 protocol?
10         MR. SANDERS: Objection to form.
11         THE WITNESS: Could you, could you say that
12 again? I'm sorry.
13 BY MR. ALBERTI:
14     Q. Would you agree that information sent in a
15 circuit-switched network between two end points would be
16 routed along the same circuit?
17         MR. SANDERS: Objection to form.
18         THE WITNESS: Routed along the same circuit,
19 yes. The question is whether the circuit is a physical
20 circuit or a virtual circuit.
21 BY MR. ALBERTI:
22     Q. In the context of ATM, is it a virtual circuit
23 between two end points that carries information?
24     A. That didn't sound -- I couldn't quite parse
25 that as a question.

### Page 87

1     Q. In the context of ATM, does communication that
2 is sent between two end points travel along a virtual
3 circuit?
4     A. It can travel along a virtual circuit. It can
5 travel along a switched virtual circuit. It can travel
6 along a permanent virtual circuit, and so on. So it can
7 travel on multiple kinds of things. In fact, you can
8 implement ATM on top of IP.
9     Q. So would you call ATM a packet-switching
10 protocol?
11     A. I would.
12     Q. Would you call it a circuit-switching
13 protocol?
14     A. I would.
15         MR. SANDERS: Objection to form.
16 BY MR. ALBERTI:
17     Q. Would you call it the unification of packet-
18 and circuit-switching protocol?
19     A. Is that what I wrote? Would it be a good idea
20 to read this section before you ask any more questions?
21 I'm sorry. Where, actually, are we?
22     Q. I believe in -- well, starting on page 9
23 there's a paragraph, the last paragraph, that begins on
24 that page and carries over to the next page. You refer,
25 I believe, to ATM as a unification of packet and circuit

### Page 88

1 switching.
2     A. In the form of ATM.
3     Q. Yeah.
4     A. I see that, that I did write that.
5     Q. Do you agree with that?
6     A. I wrote it; I agree with it.
7     Q. If we turn to page 12. You'll see there's a
8 section 4.4, "ATM: The Grand Convergence"?
9     A. I see that section.
10     Q. Okay. I want to direct your attention to --
11     A. Would you mind if I read the section before
12 you asked the questions --
13     Q. Oh, please do.
14     A. -- about it?
15     Q. Please do.
16     A. It is the case that we're looking at a
17 document which is very likely to have been written 15 or
18 more years ago and which I did not review for today's
19 deposition, so. If you're going to ask questions about
20 it, I think I should read it. And so the questions will
21 be targeted towards section 4.4?
22     Q. Yes.
23     A. Okay.
24     Q. Only 4.4.
25     A. Okay, great. I won't read the whole 15-page

### Page 89

1 thing or whatever.
2     Q. Okay.
3         MR. SANDERS:: Objection to form.
4         THE WITNESS: Okay.
5 BY MR. ALBERTI:
6     Q. So under the subheading "Strengths," you
7 write, "One of ATM's key strengths is its virtual
8 circuit concept, with call set-up in advance of data
9 transmission."
10         What do you mean here by "virtual circuit
11 concept"?
12     A. The idea of a virtual circuit is that we will
13 establish a connection between communicating end points
14 over a sequence of paths that will not be dedicated to
15 that communication but will be shared by other
16 contemporaneous communications. So therein lies the
17 virtual idea. It appears to the sender that it has a
18 dedicated path from sender to receiver and return, but
19 it actually is shared amongst, or elements of that path
20 can be shared amongst simultaneous communicating
21 entities.
22     Q. When you say simultaneous communicating
23 entities, are you referring to two end points, are
24 you...?
25     A. I'm sorry. Ask your question --

Page 110

1  MR. SANDERS: Objection to form.
2  THE WITNESS: It's possible to have packet
3  headers that are actually at the end of the packet. I
4  don't know why they don't call them footers. So I think
5  the sort of terminological distinction you're making,
6  hard to disagree with.
7  Nevertheless, the key aspect is a given level
8  of the network, or shall we say given specification of a
9  protocol, knows, because it's been agreed upon in
10  advance and standardized, where to look in the protocol
11  to find the information it needs to act on the delivery
12  of the packet.
13  BY MR. ALBERTI:
14  Q. Is there a limitation as to how large a packet
15  header can be?
16  A. It can't be larger than the packet.
17  Q. Is there a limitation on how large a packet
18  can be?
19  A. There are technical limitations on how large
20  packets can be. They cannot be of infinite size or, for
21  that matter, a very, very large size.
22  Q. When you say "technical limitations,"
23  specifically what do you refer to?
24  A. The way in which the protocols are defined,
25  they will specify a limit to how large the -- if we use

Page 111

1  the term "transmission unit," the bundle of data, how
2  big the bundle of data can be.
3  An example would be in the Ethernet world,
4  it's I believe, something in the range of 1500 bytes,
5  binary characters, long. It's just a spec that says a
6  packet can't be longer than this.
7  A packet header will be well defined within a
8  protocol. Each one of the fields will be defined. And
9  so, you know, the packet headers are traditionally not
10  of variable length. They're of a fixed length and a
11  well defined pattern to the information that's in them.
12  But I can't quite remember, are we talking
13  about packet header or packet. But packets cannot be,
14  you know, because of protocol and technical limitations,
15  cannot be of any, any arbitrarily large size. There are
16  limits to how big they can be.
17  Q. Are those limits based on hardware
18  characteristics of systems that will carry the packets?
19  A. They represent a specification and constraint
20  on the underlying hardware system.
21  So, for example, if we, if we limit a packet
22  to be sent over, let's say Ethernet, to something like
23  1500 bytes, that is important information to
24  implementers to know how big buffers can be, how big --
25  they can't be 1400 bytes because they might receive a

Page 112

1  packet that's 1500 bytes. So these things are agreed
2  upon in advance as to what the upper bound is, as a
3  guideline for effective implementation.
4  Q. Do you ever have a situation where a packet in
5  an upper layer has a maximum size that is larger than a
6  maximum size of a packet in a lower layer?
7  A. All the time.
8  Q. What do you do in that situation?
9  A. You break up the larger item. You think of it
10  as a molecule. You break up the molecule into smaller
11  constituent atoms. And just as an atom can be broken up
12  electrons, neutrons, and protons, the same thing is true
13  at another level; it can be broken up even more. And at
14  the level of the electron, it can be broken up into
15  quarks or charms or whatever they call it. So it's
16  all -- at every level, the way in which you can get very
17  large things to be supported by the network is to turn
18  it into a sequence of smaller things at an appropriate
19  layer.
20  Q. You would agree in the situation where you
21  have a higher level packet of a large size that has to
22  get broken up by a lower layer into smaller packets,
23  that the smaller packets don't necessarily need to be
24  stored in sequence, true?
25  MR. SANDERS: Objection to form.

Page 113

1  THE WITNESS: There's a lot of words that were
2  in there, and they didn't map onto my precise
3  understanding of networking technology. So maybe we
4  want to kind of parse that out a little by, piece by
5  piece.
6  So one clarifying question I have is you said
7  something about higher level packet. Can you be a
8  little bit more precise of what you mean?
9  BY MR. ALBERTI:
10  Q. I believe I asked you a question that at a
11  higher layer, you can have a packet size that can have a
12  certain maximum that is larger than the maximum package
13  size of a lower layer in the stack.
14  A. Yes. That was an earlier question, yes.
15  Q. So if we have a packet at such a higher layer
16  that has to get broken up by a lower layer, the lower
17  layer isn't required to store the packets in the exact
18  same sequence as it received -- as it broke them up from
19  the higher layer?
20  A. Store. There is buffering that occurs, so
21  there is at least storage of part of the higher level
22  thing. I, I guess I'm not quite understanding the
23  distinction that you're, you're, you are drawing here
24  between higher layer protocol or packet, and lower
25  layer. I understand something is bigger, mapped into

Page 122

1  BY MR. ALBERTI:
2  Q. I want to move on to the next term, which is
3  on page 18.
4  A. Uh-huh.
5  Q. The term is, "allocating is responsive to at
6  least one field in the packet header." Did you discuss
7  the amended change of this term before Mr. Seely's
8  expert report?
9  A. No.
10 Q. When did you first become aware of the amended
11 change to this term?
12 A. When I reviewed Mr. Seely's report.
13 Q. Before you reviewed Mr. Seely's report, did
14 you take any issue with Motorola's earlier construction
15 of this term?
16 A. I did not.
17 Q. Are you familiar with the concepts of
18 interference and fading in -- we'll wait for the
19 ambulance to go by.
20    Are you familiar with the terms "interference"
21 and "fading" in the field of wireless communications?
22 A. I am.
23 Q. How do interference and fading affect wireless
24 communications?
25 A. Both of them would be what, technically would

Page 123

1  be called "impairments" to the wireless channel. They
2  would be things that make it more difficult to
3  successfully traverse a wireless link with data.
4  Q. Can you explain interference and how that
5  would impair a wireless channel?
6  A. So two -- let's, let's kind of set this up as
7  kind of a little bit of an example.
8     Suppose that A wishes to communicate over
9  wireless channel to B, and C wishes to communicate over
10 wireless channel with D. If they are using, for
11 example, the same frequencies but sending different
12 information, the information being sent, based on the
13 spatial proximity -- you know, the geography matters in
14 this kind of stuff, how close they are, in the space
15 between buildings and, you know, many, many
16 considerations of the physical world -- the signal from
17 C heading to D could also be in part heard by B
18 listening to A.
19    So remember we were talking before about
20 analog carrier waves. So what happens when at point B,
21 receiving a communication from A, where the wave is on
22 an upslope, it's simultaneously receiving a signal of,
23 let's say, equal strength from C intended for D but
24 heard at B, where it's a valley. If they were really of
25 equal strength and completely synchronized in time you

Page 124

1  would get nothing; they add up. And so what typically
2  happens is more of the, a weaker signal is heard
3  compared to a stronger signal, and it kind of degrades
4  it and it makes it more difficult for the receiver to
5  extract the information content from that. So that's an
6  example of interference.
7  Q. Is interference a challenge in designing a
8  wireless communication system?
9  A. It is.
10 Q. Can you explain what fading is.
11 A. Fading is also an aspect of the physical
12 reality of wireless communication that the power of the
13 signal represented, for example, in its strength or
14 amplitude of that wave form sort of gets degraded or
15 smaller the longer the distance from the transmitter.
16 And it goes by a so-called inverse square law. So if
17 you go one step, the signal is half its strength; if you
18 go two steps, it's a quarter of its strength; if you go
19 three steps, it's an eighth of its strength, and so on.
20 So if you are close, if A and B are close, it's not much
21 of an effect; if A and B are far away, it may not be
22 possible for B to extract information from the analog
23 carrier that's carrying it sent from A.
24 Q. What is multipath fading?
25 A. Multipath fading is kind of a combination of

Page 125

1  interference and this fading phenomenon that we just
2  talked about. In the real world, signals are, are
3  bouncing off of surfaces and building sides and going
4  down streets. And so signal A can send its, its analog
5  carrier to B modulated with the digital information that
6  it wants to send. And that wave form can also bounce
7  off a building by a different path, and a little bit
8  later than the main path, arrive at the receiver. So
9  this business about bouncing and reflecting kind of
10 delays the signal so that an earlier version of the
11 signal arrives at kind of like a later point in time,
12 interfering with the signal arriving at that later point
13 in time. And that's multipath.
14 Q. Are fading and multipath fading challenges in
15 designing a wireless system?
16 A. They are.
17 Q. Let's turn now to your invalidity report,
18 Exhibit 1.
19 A. Could I put away Exhibit 4 at this point --
20 Q. Yes, you can put away Exhibit 4 for the time
21 being.
22 A. Okay.
23 Q. I'd like to first direct your attention to
24 page 10, paragraph 27 of your invalidity report.
25 A. Page 10, which paragraph?

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 126

1  Q. I'm sorry. Yes, paragraph 27.
2  A. Twenty-seven.
3  Q. For shorthand, I believe all the experts in
4  this case have thus far labeled the elements of claim 1
5  element A and element B. Element A begins "coupling one
6  or more subscriber customer premise equipment (CPE)
7  stations," and element B begins, "allocating said
8  wireless bandwidth and system resources." And you've
9  listed elements at 1-A and 1-B in paragraph 27. Do you
10 see that?
11 A. I do.
12 Q. For ease of reference, is it okay if we're
13 going to talk about the first limitation of claim 1
14 we'll call it 1-A, and the second we'll call 1-B?
15 A. I'm okay with that.
16 Q. Now, on page 9 and then carried over on
17 page 10, you have summarized your invalidity opinions
18 under the "Summary of Opinion" section 3. Do you see
19 that?
20 A. I do.
21 Q. So I want to first start with your
22 anticipation opinions, which appear summarized in
23 paragraph 25, subsection (d). Do you see that?
24 A. I do.
25 Q. Is it correct that for anticipation, you have

Page 127

1  identified three references that in your opinion
2  anticipate some or more of the asserted claims of the
3  '450 patent?
4  A. Was -- I'm sorry, was -- it didn't sound like
5  a question. But I may have missed the . . .
6  Q. The preamble. The preamble was, "Is it
7  correct."
8  A. Oh, okay.
9  Q. That for anticipation, you have identified
10 three references that in your opinion anticipate some or
11 more of the asserted claims of the '450 patent.
12 A. Yes.
13 Q. Those three references, the first one is SWAN,
14 the second one is Sylvain, and the third one is the '417
15 application, correct?
16 A. Correct.
17 Q. In addition to your anticipation opinions, in
18 paragraph 25, subsection (e), you have listed a
19 collection of obviousness type references. Do you see
20 that?
21 A. I do.
22 Q. And does the bullet point list provide an
23 accurate summary, specifically the bullet point list in
24 paragraph 25, subsection (e), of your obviousness
25 opinions concerning the claims of the '450 patent?

Page 128

1  A. It does.
2  Q. Are you familiar with the principle of
3  inherency?
4  A. No.
5  Q. Do you understand that for anticipation, you
6  can point to things that are expressly disclosed and
7  that there may be things that you consider inherently
8  disclosed?
9  A. I'm sorry. Could you repeat that?
10 Q. In rendering your anticipation --
11 A. Anticipation.
12 Q. -- opinion, did you point to anything that was
13 expressly disclosed as support for meeting claim
14 element 1-A or 1-B?
15 A. I believe that I did in each one of these
16 references.
17 Q. Are you familiar with a principle where
18 something may not be expressly disclosed but it may be
19 inherently disclosed?
20 A. Maybe if you explain that a little bit more or
21 give me an example, I can agree to that. I'm not
22 familiar -- I'm not recollecting the legal terminology
23 that you're currently using.
24 Q. In order -- well, actually, I think it might
25 be in your report. So let's --

Page 129

1  A. I know.
2  Q. -- take a look.
3  A. There is a section in there, legal principles.
4  So we're talking about anticipation.
5  Q. Right. So if you start at paragraph 18, if
6  you look at the last sentence on page 5 of that
7  paragraph, and if you read that to yourself, and then
8  I'll ask you a question.
9  A. Okay. I understand, I understand this, this
10 sentence and was not aware that it was called the
11 principle of inherency or, or -- if that was the term
12 that you had used.
13 Q. If you look on to the next sentence, it says,
14 "I understand that a prior art reference inherently
15 discloses a claim limitation if the limitation is
16 necessarily present in the reference."
17 A. Yes.
18 Q. So do you understand -- let me state this
19 differently.
20    How do you understand that principle to, to
21 apply?
22 A. That the, the reference has to have the
23 elements of the claim language disclosed in it, and it
24 must be in the reference; or it can be inferred as
25 necessarily having to be in that reference because of