EXHIBIT 6

# Redacted In Its Entirety

EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

              Plaintiffs,

          v.

MOTOROLA MOBILITY LLC,

              Defendant.

C.A. No. 11–cv-00908 (SLR)

## DECLARATION OF DR. MARTIN RINARD

1.  My name is Martin Rinard, Ph.D., and I have provided opinions in this matter as an expert in the area of distributed systems that, in the case of U.S. Patent No. 7,810,144 ("the '144 patent") can be used to transfer files.  I have previously provided an opinion in this case on May 17, 2013, and have given deposition testimony on June 21, 2013.

2.  I am over the age of majority and competent to give the statements contained in this Declaration, and if called upon to testify, would do so consistently with what is recorded in this Declaration.

3.  It is my opinion that the claim term **"generating, at the first device, a unique transaction identifier that identifies a transfer of the single combined file"** is ambiguous.  It is my understanding that because the term is ambiguous and cannot be construed, the term may be indefinite under the applicable patent laws.  I provide no legal opinion in this declaration. Instead, I explain how the written specification of the '144 patent and the knowledge of a person

of ordinary skill in the art does not resolve the ambiguity created by the '144 patent disclosure as it pertains to this claim phrase.

4. What follows is consistent with the opinions I provided in my May 17, 2013 Report and June 21, 2013 testimony.

5. The written specification of the '144 patent *does not disclose a transaction identifier*, unique or not, generated at any device. In the '144 patent, a file transfer is a transaction ("According to another embodiment, a transaction count increases after each successful file transfer, and no further transfers are permitted when a predetermined number of transactions is reached." 30:51-54).

6. The written specification of the '144 patent does disclose a variety of identifiers other than transaction identifiers, for example unique identifiers for registered users ("E-mail addresses are used to create unique identifiers for each registered user for file routing and billing purposes." 3:37-39), PC identifiers ("Later, at a predetermined time, a control module initiates a connection with the destination PC via an appropriate communications pathway, identifies the sending PC by its name and destination address, ..." 12:1-4; "Upon receiving a call, the receiving PC answers and reads a data stream from the modem to determine the sending PC identifier "18:39-41), and update identifiers associated with new software versions "Automatic updates is accomplished by transmitting, along with the new release version computer program, (1) an update identifier in the file list header for the packet that differentiates the update packetfrom other types of received files;" (29:43-47). The written specification does not, however, disclose a "transaction identifier," unique or not.

7. Source code listings, specifically Appendices A-D, were submitted with the '144 written patent specification. Several data structures in these source code listings contain a "Transaction

ID" field, which contains a number. At each computer the "Transaction ID" starts at 1 when the software starts up, and is then incremented on successive transactions. This "Transaction ID" is therefore not unique. Specifically, 1) different computers will use the same "Transaction ID" for different transactions and 2) when the software is restarted on the same computer, or the computer is rebooted, different transactions from the same computer will use the same "Transaction ID."

8.   A person of ordinary skill in the art of the '144 patent as of the date of the alleged invention would understand "unique transaction identifier" to refer to information that uniquely identifies the transaction among all other transactions in the system. A person of ordinary skill in the art would also understand how to obtain such unique transaction identifiers using any one of a variety of mechanisms. These unique transaction identifiers, however, would be absolutely unique in that no two transactions in the system would ever have the same transaction identifier.

9.   This is at odds with the disclosure of the '144 patent and anything identified in the '144 patent as comprising a transaction identifier. Indeed, as discussed both above and further below, the '144 patent does not teach the use of any such unique transaction identifier.

10. The "Transaction IDs" in the source code listings submitted with the '144 patent specification are not absolutely unique. This fact suggests that the inventors were only in possession of non-unique transaction identifiers. I note that comments in the source code listings submitted with the written patent specification identify that the "name" field of the "PBEFIXED" and "PBE" data structures should be unique. See, for example: "char name[32]; /* cannot be blank, should be unique */" at page 315 of the submitted source code listings. The source code listings contain no comments indicating that the "Transaction ID" discussed above should be unique. And in fact, as discussed above, the "Transaction ID" is not unique.

11. A person of ordinary skill in the art of the '144 patent at the time of the alleged invention would understand the term "unique transaction identifier" to refer to absolutely unique transaction identifiers. As discussed above, the "Transaction IDs" in the attached source code, however, are not absolutely unique and neither the patent nor the attached source code listings provides any guidance as to how unique a transaction identifier must be to be a "unique transaction identifier" as that term is used in the '144 patent.

12. I also note that the '144 patent specification discloses components of the disclosed system, for example log entries and confirmation receipts, that Plaintiffs may argue are unique to specific file transfers. There is no indication in the specification of the '144 patent that these components are intended to serve as the claimed "unique transaction identifiers." I further note that Plaintiffs' proposed claim construction for the claim term "unique transaction identifier" is "a unique name, number or symbol that identifies a transaction." Neither the written specification of the '144 patent nor the attached source code listings explicitly identify any "name, number or symbol" as the "unique transaction identifier." Nor have I been able to identify any such name, number, or symbol – the components discussed above, for example, comprise multiple pieces of information such as times, dates, file structure, file name, electronic fingerprints (hashes) of transported files, and file characteristics. They are not a name, number or symbol.

13. Plaintiffs may argue that the disclosed "hashes" of transported files, which are a number, are the claimed "unique transaction identifier." This argument is without merit. Such hashes are not unique because different files may have the same hash. Plaintiffs may argue that, even though different files may have the same hash, the probability is low enough so that the hash is somehow unique enough to be the claimed "unique transaction identifier." The '144 patent

provides no indication of what would make a "unique transaction identifier" that is not unique, unique enough.

14. Plaintiffs may argue that the disclosed packet names are the claimed "unique transaction identifier." This argument is without merit. The patent discloses that the packet names are either selected by the user (see, for example, "Clicking on a Description box 66 results in a user prompt 68 which permits the user to name the file packet and add a text message that will be sent along with the selected files" 21:35-37) or selected using a random number generator (see, for example, "If the Description box 66 is not checked, no user prompt 68 is displayed, and the packet is created with a standard message and a random number as a name" 21:64-66). If the user selects the packet name, there is no guarantee that the user will choose unique packet names. If the system uses the random number generator to select the name, there is no guarantee that the generated random name will be unique. Plaintiffs may argue that, even though the generated random name may not be unique, it is somehow unique enough to be the claimed "unique transaction identifier." The '144 patent provides no indication of what would make a "unique transaction identifier" that is not unique, unique enough.

15. Because there is no written description or disclosure of any hypothetical level of uniqueness, any interpretation of the claim term "unique transaction identifier" as requiring some level of uniqueness is not supported by the specification of the '144 patent or the attached source code listings.

16. I so declare the forgoing to be true and accurate to the best of my knowledge this 8th day of August, 2013.

Martin Rinard, Ph.D.

# EXHIBIT 8

REDACTED

IN ITS

ENTIRETY

EXHIBIT 9

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC
Jacob Jorgensen                                    March 6, 2013

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3
     INTELLECTUAL VENTURES I, LLC and    )
 4   INTELLECTUAL VENTURES II, LLC,      )
                                         )
 5              Plaintiffs,              )
                                         )
 6         -vs-                          )  No. 1:11-cv-908-SLR
                                         )
 7   MOTOROLA MOBILITY, LLC,             )
                                         )
 8              Defendant.               )
                                         )
 9                                       )

10

11

12         VIDEOTAPED DEPOSITION OF

13              JACOB JORGENSEN

14              March 6, 2013

15

16      Taken before JODIE BARRINGER MYERS

17      Certified Shorthand Reporter

18      State of California

19      CSR License #3820

20

21

22

23

24

25
```

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC

Jacob Jorgensen                                                    March 6, 2013

Page 54

1    A.    No. I don't.
2    Q.    Do you know if it was ever commercialized?
3    A.    I don't believe it was. No.
4    Q.    And was it also demo'd at the trade show we
5    talked about before?
6    A.    No.
7    Q.    Was it demo'd anywhere?
8    A.    I don't recall.
9    Q.    And was it essentially the same product only it
10   operated in the 2.4 range, rather than the 5.8 range?
11   A.    Yeah. Exactly.
12   Q.    All right. Other than those two -- were there
13   any other Malibu Networks products that related to the
14   invention described in the 450?
15   A.    To my knowledge, there were only two products
16   that we were working on. One was the 5.8, and one was
17   2.4.
18   Q.    And you say we were working on. I understand
19   there was a team of engineers who wrote code.
20         With whom else were you working on these
21   products?
22   A.    What do you mean by "who else"? Are you
23   talking about corporate entities? Are you talking about
24   engineers?
25   Q.    Well, let's start with individuals. Were there

Page 55

1    other individuals at Malibu Networks with whom you
2    worked in developing these products, the 5.8 and the
3    2.4?
4    A.    Besides engineers?
5    Q.    By engineers, are you referring to the
6    engineers who wrote source code?
7    A.    We had a number of people working for us in
8    engineering. Some were source code, some were modem
9    designers, some were chip designers. All sorts of
10   engineers.
11   Q.    So by category, if not by name, we have
12   engineers who wrote source code; we have engineers who
13   designed modems. And I'm sorry. What was the third
14   one, category?
15   A.    Chip designers.
16   Q.    Chip designers.
17         Were there any other -- were there any
18   individuals who had particular responsibility for
19   development of these products besides yourself?
20   A.    Um, there were other management people who had
21   related management responsibilities for developing a
22   product component. I'm not sure that answers your
23   question.
24   Q.    I guess my understanding is -- am I
25   understanding correctly that management people had

Page 56

1    responsibility for particular product components?
2    A.    Yes.
3    Q.    Were you responsible for particular product
4    components?
5    A.    My responsibilities varied with the progress of
6    the company. But I was primarily involved with managing
7    the development of networking software, that would
8    function to optimize the quality of service of data in
9    the system.
10   Q.    When you say quality of service, what do you
11   mean?
12   A.    Quality of service relates to different aspects
13   of data that depend on the type of data that is being
14   dealt with. It could mean timing.  It could mean
15   bandwidth characteristics.  Could be the liability of
16   transmission characteristics.
17   Q.    Okay.
18   A.    It's a difficult concept to define.
19   Q.    Okay.
20         So do I understand correctly the definition of
21   quality of service would vary depending on the type of
22   data you're talking about?
23   A.    Yes.
24   Q.    With a particular type of data -- I'll give you
25   an example -- for uploading a spreadsheet.  Are you able

Page 57

1    to define the quality of service for that data type?
2         MR. ALBERTI:  Objection, vague.
3         THE WITNESS:  Yeah.  I'm not sure if that
4    particular examples works for me.
5    Q.    MS. DECAIRE:  I'll pick a different example.
6         If the data type is email, are you able to
7    define -- again, I'm working from, you told me the
8    quality of service has different aspects and depends on
9    data type.
10        I'm trying to figure out if for particular data
11   types, there are rules. Can we define quality of service
12   in the context of a particular data type. I just asked
13   about email.
14        MR. ALBERTI:  Objection, vague.
15        THE WITNESS:  I could offer an example of
16   voice-over IP.
17   Q.    MS. DECAIRE:  That would be helpful. Thank you.
18   A.    Where typical voice-over IP protocols may
19   require the transmission of a data packet once every 30
20   milliseconds or so, as an example.
21        So providing adequate quality of service in
22   that occasion would be insuring that that next packet is
23   transmitted in the required interval.
24   Q.    All right. So how would you determine whether
25   you were optimizing quality of service in the context of

15 (Pages 54 to 57)

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC
Jacob Jorgensen                                    March 6, 2013

## Page 58

1  voice-over IP?
2  A.     Has to do with looking at packet headers,
3  identifying the type of data being transmitted, and
4  doing an -- and making sure the system behaves in an
5  optimal fashion for that particular data.
6  Q.     I think my question was, how do you know that
7  you've got the system behaving in an optimal manner for
8  voice-over IP data?
9  A.     How do I know?
10 Q.     Is there a particular criteria that lets you
11 know you've achieved that goal?
12 A.     Sure.  If the voice at the other end is
13 intelligible, that would be an indication that you did a
14 good job.
15 Q.     Okay. All right.
16        And you said something about looking at packet
17 headers and identifying the type of data. We were
18 talking about the particular example of voice-over IP,
19 and optimizing quality of service.
20        Can you explain what looking at the packet
21 headers and identifying the type of data, how that
22 relates to the quality of service we were discussing?
23        MR. ALBERTI: Objection, vague.
24        THE WITNESS: Well, there are a lot of details
25 that are involved in doing that. It's been a long time.

## Page 59

1  Q.     MS. DECAIRE:  Can you remember any of them?
2  A.     One can identify the type of data, as I
3  mentioned before. And the system can then respond by
4  behaving appropriately, according to the type of data in
5  that packet.
6  Q.     Okay.
7        I think when we started down this road, I was
8  asking about responsibility for product components by
9  particular members of the management team. And you had
10 said that you were primarily responsible for networking
11 software to optimize the quality of service. Particular
12 data types.
13        And again, I am not trying to be difficult. But
14 I'm trying to figure out or to see if you know how one
15 determines whether the quality of service for any
16 particular data type has been optimized. I think for
17 voice-over IP, you told me if the voice is intelligible
18 at the other end. Is that true?
19 A.     Uh-huh.
20 Q.     Are you able to think of another example? My
21 spreadsheet was not a good one.
22 A.     Well, random example. An FTP file download. If
23 the file is intact at the other end, they're not missing
24 -- there are no errors, that would be an indication of
25 adequate quality of service, for that particular data

## Page 60

1  type.
2  Q.     You're saying adequate quality of service. Is
3  adequate quality of service the same thing as optimizing
4  quality of service?
5  A.     Seems like a fine line. One could achieve
6  adequate -- I'm not sure that the distinction is -- if
7  there is any actual distinction between optimal and
8  adequate in this case.
9  Q.     Okay. All right.
10        In terms of other product components -- and
11 again, we're talking about these Malibu Networks
12 products, the 5.8 and the 2.4 -- are you able to recall
13 other management people and for what product components
14 they were responsible?
15 A.     I could potentially reconstruct it, but I don't
16 remember it offhand now, no.
17 Q.     What would you need to do to reconstruct it?
18 A.     I'd have to go back and look at my list of
19 employees.
20 Q.     We may be able to do that. If we go back to
21 Jorgensen 2, we're back on the list of requests. If you
22 look at request number 6, it asks about documents and
23 things regarding marking of patent numbers on any
24 products.
25        Do you know whether any of your patent numbers

## Page 61

1  in the telecommunications area had been affixed to any
2  products?
3  A.     Well, when you say product, to me product
4  implies commercialization; and we never got to
5  commercialization. So I don't believe this really
6  applies.
7  Q.     And when you say we, we're talking about Malibu
8  Networks; correct?
9  A.     Yes.
10 Q.     Am I understanding correctly that there is no
11 other entity with which you were involved that
12 commercialized products that related to the invention
13 described in the 450 patent?
14 A.     That's correct.
15 Q.     Request number 7, if you look at it, relates to
16 journals, papers, publications, relating to the subject
17 matter of the 450 patent.
18        Did you look for any papers that you authored
19 that related to this subject matter?
20 A.     Did I look for? No, because there weren't any.
21 Q.     Okay.
22        We talked a little bit about what you described
23 as the iterative process that you collaborate in
24 generally with respect to patent applications on which
25 you're the inventor. Am I understanding that you do not

16 (Pages 58 to 61)

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC

Jacob  Jorgensen                                          March 6, 2013

Page 106

1    Q.     Why not?
2    A.     Because the CPE, as we described it, included
3    the wireless components required to communicate. And
4    that can be part of a mobile device, as an example. But
5    if it's a stationary device such as a PC or laptop, it's
6    probably not. At least not when we were thinking about
7    this.
8    Q.     But did I understand correctly that a
9    stationary modem could be a CPE?
10   A.     Yes.
11   Q.     Okay. What are the essential characteristics
12   that define a CPE in this context?
13   A.     It would be the RF components, and the
14   management of packet flow from the RF portion of the
15   device to the networking connect.  Ethernet connect,
16   would be an example.
17   Q.     Okay. All right. Anything else?
18   A.     Anything else?
19   Q.     Anything else that is required for a device to
20   be a CPE in this context?
21   A.     In what context?
22   Q.     In the context of this Malibu Networks system
23   we've been talking about.
24   A.     Well, most of the time the CPE also had other
25   parts that would include management, software, so that

Page 107

1    it could be remotely managed, if necessary. Or
2    provisioned or, you know, updated.
3         So there are other portions of the CPE in
4    there, besides just the strictly RF portion and the
5    networking portion.
6    Q.     We started on this because you had told me that
7    a PC could not be a CPE, because it lacked, as I
8    understood it, the RF components.
9    A.     Right. Unless it had, you know, an RF card like
10   say, in it, that did the RF portion of it. Yeah.
11   Q.     Okay. And we had started on this whole thing by
12   me asking about traffic flows.
13        The sentence goes on to say: "...identifies
14   traffic flows based in part on data in packet headers,
15   at levels 4 through 7."
16        What do you understand is being referred to
17   here with levels 4 through 7?
18   A.     It's the standard networking protocol model.
19   You find that in most networking textbooks, to describe
20   the different layers involved.
21   Q.     Is it the OSI stack?
22   A.     Yes.
23   Q.     Packet headers.  What is your understanding of
24   what a packet header is?
25   A.     In TCPIP, the Internet protocol, it's a

Page 108

1    well-defined portion of data, of the packet, that
2    describes some qualities or some related data about the
3    payload.
4    Q.     So if we have a packet, a packet is comprised
5    of a packet header and a payload?
6    A.     Yes.
7    Q.     Before I forget, you had mentioned devices
8    behind the CPE. I think an example was a PC; another
9    example was a handheld, although a handheld could also
10   be a CPE.  Are you able to give me other examples of
11   devices behind the CPE?
12   A.     Well, let's see. There is a laptop. There is --
13   there could be a desktop computer. Could be a server.
14   Could be a router.  Could be a switch. Could be a number
15   of different networking devices.
16   Q.     Okay. All right.
17        And this sentence, "The system identifies
18   traffic flows based in part on data in packet headers at
19   level 4 through 7," do you recall whether you were
20   discussing identification of traffic flows on the basis
21   of all of the headers from levels 7 through 4?
22   A.     No. We recognized that different types of
23   traffic would -- you know, TCPIP traffic would require
24   different packet header levels to be analyzed.  I don't
25   remember the exact specifics of how that decision was

Page 109

1    made in real time.
2         But it was, you know, either the entire set or
3    some subset of, I think is what we intended.
4    Q.     You just don't remember which it was?
5    A.     No.
6    Q.     You know, up at the top of the next page, 5819,
7    down in the corner, the first full paragraph talks about
8    using hierarchical class based queueing.
9         Is queueing the same thing as identifying
10   separate traffic flows?
11   A.     No.
12   Q.     What is the difference?  Or what is queueing, I
13   guess we'll start with?
14   A.     Well, queueing is a technical term in this
15   context. Alone, it describes the sequential order of
16   some quantity such as packets or data. So it's an
17   ordering of.
18   Q.     Okay. All right.
19        The third sentence down, it starts with the
20   emergence of real-time packet applications.  It says,
21   "Bandwidth alone is not sufficient to guarantee quality
22   of service."
23        I think this relates back to what we were
24   talking about a few minutes ago when you said that the
25   Malibu Networks system was aimed at other QoS qualities

28 (Pages 106 to 109)

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC
Jacob Jorgensen                                        March 6, 2013

**Page 110**

1 that were not adequately accounted for by the ATM switch
2 technology.
3      Am I understanding that correctly?
4      MR. ALBERTI:  Objection.  Vague.
5      THE WITNESS:  That is a complicated questions.
6 Maybe you can break that down for me.
7 Q.    MS. DECAIRE:  That is okay.  We don't need to do
8 that.
9      If we go down to the second paragraph up from
10 the bottom of the page, it says, "In order to allocate
11 and manage bandwidth, latency and jitter --" and I
12 understood earlier, latency and jitter were two of the
13 characteristics or qualities that you told me were not
14 adequately accounted for by ATM switch technology.  Is
15 that correct?
16 A.    Not necessarily.  Right.
17 Q.    All right.
18      So in order to manage these qualities, the
19 framework of class hierarchies is established by the
20 system.
21      Do you know what that means, the framework of
22 class hierarchies that is established by the system?
23 A.    No. I don't recall specifically what I meant by
24 that.
25 Q.    Do you know if it relates back to the

**Page 111**

1 identification of traffic flows based on data and packet
2 headers at levels 4 through 7?
3 A.    It may. I don't know.
4 Q.    You don't know one way or the other sitting
5 here today?
6 A.    No.
7 Q.    Final paragraph on that page 5, which is 5819
8 in the corner, it says, "Arriving packets are mapped
9 into classes utilizing packet header information and
10 user profile information."
11      Do you know what arriving packets, do you know
12 what packets that refers to?
13 A.    Packets -- well, the portion of the system that
14 is providing direction or information to the MAC layer
15 receives a packet.
16      Now the packet can be received from a client's
17 side CPE device, or it could be from the base station,
18 from a network, you know, the network side.
19      So it's not specific to, you know, one side of
20 the network or the other.  So arriving packets just means
21 packets that are coming into the system from whatever
22 source.
23 Q.    Is it packets that are coming into the base
24 station?
25 A.    Or from the client's side.  It's the same

**Page 112**

1 mechanism being used on both sides.
2 Q.    So when I say arriving into the base station,
3 your understanding, that is being from the network side?
4 A.    Right. And from the client's side, it would be
5 from the client-generated applications.
6 Q.    From client-generated applications through the
7 CPE to the base station?
8 A.    Right.
9 Q.    You said -- basically, it's packets that are
10 arriving to the portion of the system that is providing
11 direction to the MAC layer; is that correct?
12 A.    Uh-huh.
13 Q.    What is the portion of the system that is
14 providing direction to the MAC layer?
15 A.    What is?  Well, it has to do with the
16 definition of a MAC layer.
17      In general terms, we're talking about the part
18 of the system that is structuring payloads to be
19 transmitted over wireless, in a manner that follows the
20 direction of this particular portion of the system.
21 Q.    Okay. When you say this particular portion,
22 you're talking about the MAC layer?
23 A.    No.
24 Q.    No?
25 A.    No.

**Page 113**

1      This part of the system that is sensing the QoS
2 requirements.
3 Q.    That is the same part of the system that is
4 identifying the traffic flows?
5 A.    Yes. Well, yes.
6 Q.    Just to be complete, what is the MAC layer?
7 A.    Media Access Control. That is one of the
8 layers.
9 Q.    This portion of the system that structures
10 payloads to be transmitted in a manner that conforms to
11 this QoS system, where is that in the stack?
12 A.    Repeat the question please.
13 Q.    I may be twisting your words. I've understood
14 there to be a portion of the Malibu Networks system that
15 structures payloads to be transmitted that are going to
16 go down to the MAC layer, in a manner that follows this
17 QoS system.
18 A.    Right.
19 Q.    Where is that portion of the Malibu Networks
20 system in terms of the stack?
21 A.    Oh, it's not contained in one of those layers.
22 Diagrammatically speaking, one could create a vertical
23 box, beside all of the different layers, because input
24 from different layers is going into this vertical box,
25 and processing is occurring. And then instructions leave

29 (Pages 110 to 113)

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC

Jacob Jorgensen                                          March 6, 2013

| Page 114 | Page 116 |
|---|---|

Page 114

1    that to be directed at the MAC layer.
2         So I wouldn't say it's segregated to a
3    particular layer.
4    Q.    So as packets are working their way down from
5    the application layer, down --
6    A.    Well, the data for decision-making emanates
7    from multiple layers. It's not a question of working
8    down the layers.
9    Q.    Okay. So the data for decision-making emanates
10   from multiple layers. The decision-making, you mean the
11   identifying of traffic flows?
12   A.    No. The actual sequencing, the structure of the
13   payload that will be transmitted.
14   Q.    When you say the structure of the payload that
15   will be transmitted, are you talking about the payload
16   of individual packets, or group of packets?
17   A.    No. The payload of a MAC layer. So the MAC
18   layer may transmit data from just one packet or multiple
19   packets. And if so, the order of the packets may be
20   changed, depending on the processing that occurred. So
21   that is what I mean by structure.
22        So it would be which packets and what order.
23   Q.    And the decision as to which packets and in
24   what order is made on the basis of data from all of the
25   multiple layers?

Page 115

1    A.    Right.
2    Q.    How does that data come to the MAC layer?
3    A.    It's this process -- this process is occurring
4    in real time. The data gathering that is gathering the
5    packet header information, identifying the flows,
6    understanding what their QoS requirements are, and then
7    creating a structure of data for the next payload.
8    Q.    Okay.
9    A.    So it's a separate process.
10   Q.    All right.
11   A.    And it's occurring in real time.
12   Q.    And this process is mapping the arriving
13   packets into classes?
14   A.    No.
15   Q.    No?
16   A.    It's more fine-grained than that.
17        Classes usually implies two or three or four
18   groups of priorities, such as exists in the ATM world.
19   Here we're talking about, you know, much finer
20   gradations. And it would be incorrect to to call them
21   priorities, because priority implies a time element.
22        It's not necessarily a result of just a time
23   implementation. May be other factors.
24        So we don't really talk about priority, because
25   of the fact that it's already got a definition that is

Page 116

1    misleading, if applied to this system.
2    Q.    Okay. Okay.
3         And these other qualities that you're talking
4    about, are they -- they track back to the application
5    from which the data is coming?
6    A.    Sometimes they may. Yes.
7    Q.    And other times they're dictated by some
8    other --
9    A.    Well, we may not have information available in
10   the packet to do that.
11   Q.    Okay.
12   A.    In the header. Sorry.
13   Q.    Okay.
14        At the beginning of the next page, page 6, it's
15   5820, Bates labels. At the top it says, "Once a flow is
16   mapped to a class..." I know we've talked about the
17   system identifying traffic flows based in part on data
18   at packet headers, at least in levels 4 through 7.
19        We've talked about arriving packets that are
20   mapped into classes using the packet header information.
21   A.    Yes.
22   Q.    So my understanding, we've got two different
23   things: A packet is identified as belonging to a
24   particular traffic flow, but it's also mapped to a
25   class. Correct?

Page 117

1         MR. ALBERTI:  Objection to form.
2         THE WITNESS: Objection, what?
3         MR. ALBERTI:  To form.
4         MS. DECAIRE: It's a lawyer thing.
5         THE WITNESS:  I'm not sure I follow what you
6    said.
7    Q.    MS. DECAIRE:  I don't either, which is why I'm
8    asking.
9    A.    I'm not making a distinction in the use -- in
10   this first paragraph where the word "class" is used,
11   that is not to be distinguished from -- how do I explain
12   this? Let me go back.
13   Q.    Okay.
14   A.    So a class in this case, I believe, from what
15   I'm reading here, does not necessarily mean priority,
16   like first priority, second priority, third priority.
17   Those are different classes. No. It's more like, is it
18   jitter sensitive?  Is it FTP download, where we have to
19   have absolute accuracy?  Is it, you know, random HTTP
20   traffic that is not that important?  Does it belong to a
21   customer with a low SLA class?  So it doesn't matter
22   what -- much what we do, because they're paying, you
23   know, a low subscription rate for the service, or
24   something like that.
25        So class in this definition is not a strictly-

Huseby, Inc.                                    www.huseby.com
555 North Point Center, E., #403, Alpharetta, GA 30022      (404) 875-0400

MMA0245

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC

Jacob Jorgensen                                                     March 6, 2013

Page 118

1  defined set of criteria. It's more a relative comparison
2  of treatment.
3  Q.    Okay. And it's treatment related to quality of
4  service considerations?
5  A.    Right.
6  Q.    And those considerations are on at least some
7  level application specific; correct?
8  A.    Yes.
9  Q.    Well, now we get down to the first sentence in
10  the next paragraph.
11        It says, "A selector mechanism is utilized to
12  sequence packets into queues maintained by the MAC
13  layer."
14  A.    Where are you reading?
15  Q.    The very next paragraph on page 6,. It's 5820
16  at the bottom.
17        It says, "A selector mechanism is utilized to
18  sequence packets into queues maintained by the MAC layer
19  for transmission across the wireless medium. Queues do
20  not map one-to-one to classes."
21        So now we've got traffic flows; we've got
22  classes that I understand in the context of the Malibu
23  Networks project to be related to quality of service
24  parameters. And now we've got selector mechanism, that
25  sequences packets into queues maintained by the MAC.

Page 119

1        Does that selector mechanism operate on the
2  basis of traffic flows or classes, or both, or something
3  else?
4  A.    So I believe what I may have been addressing
5  here -- and I'm not recalling specifically -- is that
6  the -- once the packets -- packet headers have been
7  analyzed and classified, in other words, their
8  characteristics -- their salient characteristic have
9  been identified for QoS purposes, once that analysis
10  phase has been completed, there is then a mechanism that
11  operates on constructing the payload, based on those
12  parameters.
13        So I believe that may be what selector
14  mechanism is addressing.
15  Q.    And the selector mechanism would be immediately
16  before the MAC layer? Yes?
17  A.    Building the payload in the MAC layer, yes.
18  Q.    So it's building the payload portion of the MAC
19  PDU?
20  A.    Yes.
21  Q.    And this analysis phase precedes the selector
22  mechanism, necessarily?
23  A.    They're all operating concurrently. But for a
24  given packet, yes.
25  Q.    I'm sorry. That was imprecise.

Page 120

1        In this analysis phase, packet headers are
2  analyzed, and packets are classified in terms of which
3  of the classes they belong to, in this context, where
4  class is not determined on the basis of priority, but
5  rather on the basis of QoS characteristics? Correct?
6  A.    Yes.
7  Q.    Okay. All right.
8        Before we plow through the rest of this, it's
9  probably a good time for a break, if that is okay with
10  you.
11        MR. ALBERTI:  That sounds fine.
12        MS. DECAIRE:  Is that all right with you?
13        THE WITNESS:  Yeah.
14        VIDEOGRAPHER:  Off the record at 12:26.
15          (Noon recess taken.)
16        VIDEOGRAPHER:  Back on the record at 1:56.
17  Q.    MS. DECAIRE:  Okay. Before we took a lunch
18  break, we were looking at the document entitled "The
19  Malibu Networks, WINAAR System Architecture," beginning
20  Bates numbers 5815. I have labeled it Jorgensen 5.
21        I had focused on the text in the Section 4
22  called Quality of Service Considerations. And I want to
23  make sure I'm understanding correctly what we talked
24  about.
25        My understanding was that information in the

Page 121

1  layer -- in a packet at layer 4, TCP packet, the system
2  uses information in the TCP packet to identify a traffic
3  flow. Is that correct?
4  A.    Yeah.
5  Q.    So this is to -- this creates traffic flows on
6  the basis of information that is in the TCP packets?
7  A.    It doesn't create them. It is informed about
8  what the traffic flows are.
9  Q.    It identifies them.
10        And then the packets that are in those traffic
11  flows are further classified according to QoS
12  characteristics?
13  A.    Categorized, or there is information that is
14  obtained, describing the QoS requirements.
15  Q.    And then we had looked at the page that is page
16  6, 5820, and it talks about the selector mechanism. And
17  the selector mechanisms uses information about the
18  traffic flow, and this class, or categorization, to put
19  packets in queues at the MAC layer?
20  A.    Into which is used to structure the MAC layer.
21  The payload of the MAC layer.
22  Q.    It's used to structure the payload of the MAC
23  layer. Okay.
24        Are the MAC packets created at the same time as
25  this queueing process, before it, after it?

31 (Pages 118 to 121)

MMA0246

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC
Jacob Jorgensen                                           March 6, 2013

Page 122

1    A.    There are no MAC packets. They're just
2    transmitted as data in the MAC layer. So there is no
3    encapsulation that occurs.
4    Q.    Does the MAC layer add a header to the packet?
5    A.    No.
6    Q.    It does not. Okay. All right.
7         Skipping over Section 5, which is the security,
8    and looking at Section 6, which is entitled "System
9    Architecture and Design," and we're still in Jorgensen
10   5. First sentence, "The Malibu Networks system consists
11   of a wireless access point..." I understand that to be
12   the base station; correct?
13   A.    Uh-huh.
14   Q.    "...and fixed user CPE stations."
15        What does it mean to add "fixed user CPE
16   stations"?
17   A.    This is describing the first system. This is
18   not like a patent application, or we're worried about
19   scope. We're just describing what we have, and the
20   intended demo environment for this is, you know, a fixed
21   CPE.
22   Q.    And I guess what is a fixed CPE?
23   A.    Meaning it's meant to be in a home or office,
24   not a mobile environment, because it has an AC plug in
25   it.

Page 123

1    Q.    Okay.
2         On the next page, which is page 8 of the
3    document, it says 5822 at the bottom.
4         It lists key software components. It includes a
5    radio link manager and an application and data link
6    manager. The next paragraph describes the radio link
7    manager, as comprised mostly of a specially designed MAC
8    layer.
9         Are you able to explain to me what the radio
10   link manager is, and what it does?
11   A.    In very general terms, because I don't remember
12   the fine details of it, but the idea is that the MAC
13   layer is a tightly structured framework that contains
14   data, but also contains areas for communications between
15   the CPE device and the base station device, and you
16   know, doing housekeeping and status updates and such
17   things as that.
18   Q.    Okay.
19   A.    So in other words, we created the configuration
20   of the MAC layer. We did not borrow from some premade
21   MAC layer.
22   Q.    So is the radio link manager, it is the MAC
23   layer which Malibu Networks specially designed to
24   account for these special quality of service factors?
25   A.    In part.

Page 124

1    Q.    It's more than just the MAC layer?
2    A.    Right.
3    Q.    What is the application and data link manager?
4    Is that one level up?
5    A.    Frankly, I don't remember.
6    Q.    Okay. You know, I'll mark -- there is another
7    version of this document that might help.
8    Q.    I am marking as Jorgensen 6 a document entitled
9    "Malibu Networks, WINAAR System Architecture." It's also
10   dated June 16th, 1998. It's Bates labeled Jorgensen
11   005835 through 5843.
12        (Defendant's Exhibit J6 marked.)
13   Q.    MS. DECAIRE:  I ask you to take a look at this.
14   It looks to me like -- what number? Sorry.
15        Can you look at the exhibit sticker? I think I
16   may have put the wrong number on it. Yeah. It should be
17   6. My apologies.
18        This looks to me to be a red-lined version of
19   Jorgensen 5 that we were just looking at. And it's got
20   some additional figures or images in it.
21        Do you recognize this?
22   A.    Yes.
23   Q.    Is the red-lining yours?
24   A.    I don't remember.
25   Q.    Okay.

Page 125

1         Do you remember adding the figures? There is a
2    figure 1.1 and a figure 5.2.
3    A.    Well, I remember the figure 1.1. It's an eye
4    chart. It's very small.
5         Yes. I remember that also.
6    Q.    If you look at the figure 5.2, if I achieve the
7    proper distance here, I see that there is a square
8    corresponding to the radio link manager, and it is
9    immediately to the left of the wireless MAC layer
10   engine. We talked earlier about a selector.
11        The selector mechanism, where is that in this
12   diagram?
13   A.    Let me see. I guess in this diagram, it would
14   have to be part of that wireless MAC layer engine.
15   Q.    Okay. All right.
16        And I see in this diagram, the application and
17   data link manager is on the bottom row; it's one row
18   underneath the wireless MAC layer engine, and the radio
19   link manager.
20        Does that help you to recall at all what that
21   application and data link manager is?
22   A.    No. At this point I can only guess.
23   Q.    If you go back to figure 1.1, which is a little
24   better, but not a lot, do you remember this figure?
25   A.    Yes.

32 (Pages 122 to 125)

INTELLECTUAL VENTURES, ET AL. v. MOTOROLA MOBILITY, LLC
Jacob Jorgensen                                                    March 6, 2013

Page 126

1   Q.    Did you create this?
2   A.    Yes, I did.
3   Q.    Are you able to walk me through it?
4   A.    Well, I think the key component of this
5   diagram, I think the whole reason for this diagram is
6   that vertical IP flow box, that I mentioned previously,
7   where data from different packet layers, packet headers,
8   are gathered and used to guide the operation of the MAC
9   layer.
10  Q.    And the data gathered in these two vertical IP
11  flow boxes that are on either side of the stack, the
12  data flows into the MAC layer where it is used to
13  identify traffic flows?
14  A.    The data from the vertical box is symbolic of
15  the gathering of the relevant IP packet header data.
16  That data is used as a resource in creating the
17  structure of the particular MAC layer data payload.
18  Q.    And is it used in the manner we previously
19  discussed where traffic flows are identified, classes
20  are created, and then that information is used to create
21  queues? And all of that factors into creating the MAC
22  layer payload?
23        MR. ALBERTI:  Objection, vague.
24        THE WITNESS:  Not necessarily queues. There is
25  an assumption that queues are involved, and they may not

Page 127

1   be. For one.
2   Q.    MS. DECAIRE:  Okay. Okay.
3   A.    And I'm not sure about the rest of your
4   question.
5   Q.    And I'm sorry to belabor this. I just want to
6   make sure that we understand.
7         Does the identification of traffic flows happen
8   on the basis of information that is collected in the --
9   I understand this is a symbolic statement. The
10  identification of traffic flows happens on the basis of
11  information that has been selected at these top four
12  layers of the stack; correct?
13  A.    Yes.
14  Q.    And then that information about traffic flow
15  factors into structure in the MAC payload; correct?
16  A.    Yes.
17  Q.    All right.  And likewise -- I don't want to say
18  the prioritization -- but the classification or
19  categorization that happens on the basis of QoS
20  characteristics also factors into structuring the
21  payload at the MAC level?
22  A.    What do you mean, also? I thought that that
23  was the intent of the first statement you made.
24  Q.    Sorry. I'm differentiating between identifying
25  traffic flows and classifying or categorizing.

Page 128

1   A.    So there are different stages. I mean, first of
2   all, the system needs to identify flows. And then it
3   analyzes them, and then it categorizes them, and then
4   uses that information to structure the payload.
5   Q.    Okay. All right. Thank you.
6         I don't know. If you look at figure 5.2, if I
7   try to identify where in this diagram the invention
8   that is described in the 450 packet is present, would it be
9   in that wireless MAC layer engine?
10        MR. ALBERTI:  Objection, calls for legal
11  conclusion, calls for expert testimony.
12        THE WITNESS:  I'm not sure I would -- this is
13  not meant to be a definitive system schematic. It's
14  meant to represent areas of software that are utilized.
15  So it doesn't mean to represent a flow model or anything
16  like that.
17  Q.    MS. DECAIRE:  Okay. That makes sense. All
18  right.
19        Earlier when we looked at the 450 patent, we
20  had looked at the face of it, and you said you
21  remembered the provisional application that is cited
22  there. And I'm going to mark as Jorgensen 7 a document
23  that I believe to be a copy of that provisional
24  application.
25        (Defendant's Exhibit J7 marked.)

Page 129

1   Q.    MS. DECAIRE:  We'll ask you to take a look at
2   that and and see if you recognize it.
3   A.    No.
4   Q.    You do not recognize this document?
5   A.    Who is --
6   Q.    That was going to be my next question.
7   A.    Who is that?
8   Q.    Who is Ahmadreza Rofougaran?
9   A.    I have no idea.
10  Q.    If you look at the document on the upper edge
11  of the right side, there is a stamp that has a bar
12  stamp. It says U.S. PTO, and then it has 60/092452. If
13  you compare that number to the number of the provisional
14  application that is listed on the face of the 450
15  patent, they do match; correct?
16  A.    They seem to.
17  Q.    The same number appears on the left side, and a
18  much easier to read format.  If you look at that stamp
19  on the right side or top left, there is a date, July
20  10th, 1998.
21  A.    Uh-huh.
22  Q.    Is that -- does that comport with your memory
23  of the timeframe during which you filed the provisional
24  application?
25  A.    I don't really remember. It's conceivable.

33  (Pages 126 to 129)

# EXHIBIT 10

REDACTED

IN ITS

ENTIRETY

# EXHIBIT 11

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 12

# In The Matter Of:

*INTELLECTUAL VENTURES I LLC*
*v.*
*MOTOROLA MOBILITY, LLC*

_____

*RANDY H. KATZ, Ph.D. - Vol. 1*
*July 17, 2013*

_____

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 70

1       THE WITNESS: So let me, let me try and
2  understand the example that we're considering. Two
3  different base stations, two different subscribers,
4  within range of both base stations?
5  BY MR. ALBERTI:
6       **Q. Yes. Assuming, again, that I'm only going to**
7  **talk to my AT&T base station and you're only going to**
8  **speak to your Verizon base station. So let's, let me**
9  **first frame, frame the issue this way.**
10      **You would agree that those two base stations,**
11 **even though they're speaking -- providing different**
12 **frequency bands to their respective customers, they are**
13 **sharing bandwidth, true?**
14      A. Sorry. Sharing bandwidth among whom at this
15 point?
16      **Q. Well, I had asked you before whether you would**
17 **consider AT&T and Verizon to be sharing wireless**
18 **bandwidth even though each has their own assigned**
19 **frequency bands to provide to their customers, and --**
20      A. Within, within one base station.
21      **Q. Yes.**
22      A. I think was the example that we had before.
23 And, and my answer was that within the totality of
24 capacity, you know, to pump information or voice or
25 whatever, it is being -- that, that capacity is being

Page 71

1  shared between the AT&T customers and the Verizon
2  customers. That, that is what I believe I said.
3       **Q. Okay.**
4       A. And we're now considering another example with
5  two base stations. But my question was, to understand
6  the scenario that we're talking about, to kind of come
7  back to a physical principle of radio communication, if
8  I have two base, two base stations that can hear each
9  other and they are both communicating on the same
10 frequencies, they -- basically, two nearby base stations
11 share the ability to encode information into the
12 frequency range that they're operating in. And
13 there's -- if they're both communicating in the same
14 frequency at the same time, they will conflict with each
15 other.
16      So the reason to bring that up is that there
17 is a fixed capacity that you can encode in the sort of
18 frequency ranges. So I'm a little confused about the
19 possibility of interference if the base stations are
20 close by, as opposed to if they're far apart.
21      **Q. Yeah, and I'm sorry, maybe my example wasn't**
22 **specific enough. But I believe in my first example**
23 **where we had Verizon and AT&T we agreed that they were**
24 **speaking on completely separate frequency bands.**
25      A. Uh-huh.

Page 72

1       **Q. Did you follow that?**
2       A. So, so there's no communication possible from
3  one base station to the other in a conflicting
4  frequency.
5       **Q. No.**
6       A. Okay.
7       **Q. In that situation, would you say the base**
8  **stations are sharing wireless bandwidth?**
9       A. So I think I still would say that they're
10 sharing wireless bandwidth for the following reason,
11 that in the union of the frequencies between the two
12 base stations, there is a total capacity for carrying
13 information. And one, one base station could transmit
14 at a higher power and, or it could have a greater
15 frequency range and so support a larger number of
16 customers than the other one.
17      There are ways of slicing and dicing sort of
18 the fixed totality of bandwidth that's available in the
19 union of the two base stations. So in that sense, it's
20 like a pie that's being sliced up and, you know, you
21 have half the pie and I have half the pie. Are we not
22 sharing the pie?
23      **Q. And then now let me go to my final**
24 **hypothetical with this, is if in that same scenario**
25 **where you have two base stations, each with a fixed and**

Page 73

1  **mutually exclusive bandwidth, and we have two cell**
2  **phones speaking to the two different base stations. Are**
3  **the two cell phones in that example sharing wireless**
4  **bandwidth?**
5       MR. SANDERS: Objection to form.
6       THE WITNESS: I have to admit, my mind
7  wondered a little bit there, so could we go through that
8  example again?
9  BY MR. ALBERTI:
10      **Q. So we have our two base stations, each**
11 **providing a fixed frequency band that is, that are**
12 **mutually exclusive, okay. We'll say one is AT&T and one**
13 **is Verizon. And we have now two cell phones, one**
14 **speaking to the AT&T base station and one speaking to**
15 **the Verizon base station. In that example, would you**
16 **say that the two cell phones are sharing wireless**
17 **bandwidth?**
18      A. Again, I would say the answer is yes, because
19 I go back to my analogy with the pie. The pie is
20 divided in half, half -- so there's the pie. The pie is
21 the thing being shared. We divide it in half and say
22 this half is the Verizon side and this is the AT&T side.
23 And I think, if I understood your example, we're taking
24 another slice out of that and saying -- is it Dave?
25      **Q. Yes.**

19 (Pages 70 to 73)

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 74

1    A. Dave gets this slice and Randy gets this
2 slice. We're still sharing the pie.
3    Q. Okay. Let's move on to our next term,
4 "packet-centric protocol." Let's start with the term
5 "protocol." What's a protocol?
6    A. A protocol is a, a set of standard ways of
7 interfacing, of handshaking, to accomplish a particular
8 function. A protocol could be the way in which you do a
9 medical diagnosis or something like that. But it's a
10 standard sequence, a standard set of operations followed
11 in a standard sequence to accomplish a particular task.
12    Q. Would you agree, a protocol is not a physical
13 thing?
14    A. I guess, what do you mean by a "physical
15 thing"?
16    Q. Device.
17    A. A protocol is not a device.
18    Q. Have you heard of the term "circuit-switched
19 protocol"?
20    A. I have.
21    Q. What is a circuit-switched protocol?
22    A. A circuit-switched protocol would be one that
23 establishes a connection between end points for the
24 purposes of communication exchange between those two end
25 points.

Page 75

1    Q. You've heard of the term "packet-switched
2 protocol"?
3    A. I have.
4    Q. What is a packet-switched protocol?
5    A. A packet-switched protocol, there's a couple
6 of, couple of pieces to that.
7    The packet is a way of taking a large set of
8 information to be communicated and dividing it up into
9 more primitive elements to be communicated in a
10 sequence. So a packet is like a subset of the
11 communication. And a packet-switched protocol is one
12 which allows, allows the end points to exchange
13 information on a packet-by-packet basis.
14    Q. Would you agree that in a packet-switched
15 protocol, the packets do not necessarily need to be sent
16 and received in a specific sequence in order to
17 communicate information?
18    A. Well, it depends on, on what we are describing
19 as a packet-switched protocol.
20    Q. In your understanding of packet-switched --
21 can you give me an example of what a packet-switched
22 protocol is.
23    A. Well, an example of a packet-switched protocol
24 would be the transmission protocol of the Internet.
25    Q. Would you agree in TCP/IP that the specific

Page 76

1 sequence that packets are received do not necessarily
2 need to be in the order that they were sent in order to
3 be able to communicate information?
4    A. I would say that the sequence of packets that
5 are delivered above the TCP layer are in sequence. So
6 for something built upon the TCP protocol, the packets
7 would appear in sequence, which I think is not what you
8 said.
9    Q. Well, I think the question was in TCP/IP, the
10 sequence that packets are received at an end point do
11 not necessarily need to be the same sequence that they
12 were transmitted from a different end point in order to
13 be able to communicate information.
14    MR. SANDERS: Objection to form.
15    THE WITNESS: And I think I disputed that.
16 BY MR. ALBERTI:
17    Q. So in the Internet, if I send an email using
18 TCP/IP, the packets have to leave in a specific sequence
19 from my computer and be received in the exact same
20 sequence by the receiving computer?
21    A. What you just said is something different.
22 You said previously that -- you described the end point.
23 And the end point for TCP is the email application that
24 lives on top of TCP and its session interface. So have
25 you ever received an email message where you received

Page 77

1 the, "Yours truly, Randy" before you received the "Dear
2 David." No. At least I've never received such a thing
3 in my experience.
4    So to the point of that end point, and the
5 output from the processing of the TCP protocol, what is
6 delivered as the result of the TCP protocol to
7 applications running on top of the TCP protocol would be
8 the sequence of data arrived in the same sequence in
9 which it was sent.
10    Q. Of course. I think it may be my, my -- again,
11 my question wasn't precise enough. But if we call the
12 end points just the actual computers and not the
13 application layer sitting on top of TCP/IP, but actually
14 the actual physical layer from one computer to another
15 computer -- are you following me so far?
16    A. So I think our -- but that's not, what you
17 just described isn't TCP.
18    Q. Well, would you agree that packets that are
19 communicated over the Internet are communicated using
20 TCP/IP protocol?
21    A. I agree with that statement, yes.
22    Q. So if there are packets communicated using the
23 TCP/IP protocol from, say, computer A, my computer, to
24 computer B, your computer, do they have to be sent and
25 received in the exact same order in order to be able to

20 (Pages 74 to 77)

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 78

1  communicate information?
2      A.  But -- sorry.  But what protocol are we
3  talking about being used in order to deliver those
4  packets?
5      Q.  Well, I thought we, I thought we had agreed
6  that packets can be communicated over the Internet using
7  TCP/IP.
8      A.  Yes, I agree with that statement.
9      Q.  So the packets, again, if we're just talking
10 about packets that had been encoded using TCP/IP and
11 communicated from computer A to computer B, the way that
12 they get from computer A to computer B may differ on a
13 packet-by-packet basis, true?
14     A.  The way in which packets go from one computer
15 to another computer does not involve TCP.
16     Q.  Okay.  Fine.  But you agree that those packets
17 do include information encoded using TCP/IP.
18     A.  Include information encoded using TCP, yes, I
19 agree with that.
20     Q.  So you would agree -- first of all, is TCP/IP
21 packet-switched?
22     A.  TCP --
23         MR. SANDERS:  Objection, form.
24         THE WITNESS:  TCP/IP is a packet protocol.
25 It's possible to implement TCP on a variety of

Page 79

1  underlying communication mechanisms, including circuit
2  switched mechanisms.
3  BY MR. ALBERTI:
4      Q.  Is TCP/IP packet-switched or circuit-switched?
5         MR. SANDERS:  Objection to form.
6         THE WITNESS:  I would say that the Internet
7  protocol IP is packet-switched.
8  BY MR. ALBERTI:
9      Q.  Would you agree, again, that packets sent from
10 my computer to your computer over the Internet that have
11 been encoded using TCP/IP do not have to follow the same
12 path?
13     A.  I, I'm a stickler for, for the correct use of
14 the terminology here, and I cannot agree with what you
15 just said with respect to TCP/IP.
16     Q.  So what would be wrong with that statement?
17     A.  I think what you are describing is the IP
18 protocol can deliver packets out of sequence.
19     Q.  Does TCP/IP use the IP protocol?
20     A.  It uses the IP protocol as a lower layer upon
21 which TCP can be constructed, but is not exclusively
22 necessary to implement it upon.
23     Q.  Is IP a packet-switched protocol?
24     A.  I would say IP is a packet-routing protocol.
25 I think that would be a more appropriate term.

Page 80

1      Q.  Would you agree that packets sent from my
2  computer to your computer using the IP packet-routing
3  protocol do not have to be sent and received in the same
4  order?
5      A.  As . . .?  As sent?
6      Q.  Yeah.  They do not have to be received in the
7  same order as sent in order to, for our two computers to
8  communicate information.
9         MR. SANDERS:  Objection.
10        THE WITNESS:  I would agree that a sequence of
11 packets sent from one computer to another computer using
12 the IP routing protocol do not need to arrive in the
13 same sequence as sent.
14 BY MR. ALBERTI:
15     Q.  I think we're about out of tape, so --
16     A.  Okay.
17     Q.  -- let's take our next break.
18     A.  Thank you.
19        THE VIDEOGRAPHER:  This marks the end of tape
20 number one.  Going off the record, the time is 11:04.
21        (Recess)
22        THE VIDEOGRAPHER:  This marks the beginning of
23 tape number two.  Back on the record, the time is 11:15.
24 BY MR. ALBERTI:
25     Q.  So since you like to be precise, I think, I

Page 81

1  have a way that might speed up our conversation a little
2  bit.
3         I'm going to mark our next exhibit.  This will
4  be Exhibit 6.  It is an article entitled "Beyond Third
5  Generation Telecommunications Architectures:  The
6  Convergence of Internet Technology and Cellular
7  Telephony," Randy H. Katz.
8         (Exhibit 6 marked)
9  BY MR. ALBERTI:
10        Do you recognize this article?
11     A.  I wonder who that guy is.
12        Just as a preamble before you go into this, is
13 there anything I can put aside for a moment?
14     Q.  Sure.  You can put aside -- I would keep the,
15 the table with the definitions in it.  And you can put
16 aside everything else.
17        First of all, do you recognize the article?
18     A.  I do.
19     Q.  Is this an article that you wrote?
20     A.  It is.
21     Q.  Is this an article you wrote in the 1998 time
22 frame?
23     A.  I'm trying to remember exactly when it
24 appeared.  I know that somewhere in this collection of
25 documents was my CV.  So let me go and, I can look it

21 (Pages 78 to 81)

Page 106

1  partitioning it in two different places . . .
2      **Q.  Let me ask it this way.  When you reviewed the**
3  **prior art, did you consider that a header and a payload**
4  **had to be stored in adjacent memory cells in order for a**
5  **prior art reference to satisfy the claim language?**
6      A.  I don't think I really considered that in my
7  review of the prior art.
8      **Q.  So to the extent that that didn't happen, you**
9  **wouldn't say that it wouldn't read on the claim, true?**
10      MR. SANDERS:  Objection to form.
11      THE WITNESS:  Well, you know, again, it's sort
12  of -- "bundles of data, each structured with a header
13  and a payload, organized for transmission over the
14  shared wireless bandwidth."  I guess there is a range of
15  ways of organizing.
16  BY MR. ALBERTI:
17      **Q.  What is a packet header?**
18      A.  A packet header, by -- I think a good analogy
19  of what a packet header is is consider a letter to be
20  written and the sort of information you would include on
21  the envelope in order to ensure that the contents of the
22  letter were delivered:  Destination, who it's intended
23  for, maybe even first class versus air mail versus
24  surface mail.  So the key elements being who sent it and
25  where is it going, combined with other information

Page 107

1  associated with the successful delivery of that piece of
2  information.
3      **Q.  If you turn to page 19 of your report.**
4  **Appears that there's an actual definition of packet**
5  **header that I'll ask you about.**
6      A.  Okay.  Page 19.  Let's make sure I've
7  got . . . It's divided into two pieces.  Page 19.
8      **Q.  Paragraph 52.  You see there's a definition of**
9  **packet header?**
10      A.  I do.  And I think that's consistent with what
11  I just said as an analogy:  Identify the data carried
12  within the packet, the source, the destination, the
13  sender, the receiver, and other information related to
14  the way it is to be transmitted -- first class, you
15  know, book rate; how a receiver should process the
16  packet on receipt.  Think of cash on delivery or some
17  such thing, or signature required, "or information to
18  confirm the packet was received successfully."  Whatever
19  that's called, registered mail.
20      **Q.  Here you talk about a "portion" of the packet.**
21  **Does it matter whether the portion is at the front of**
22  **the packet or the back of the packet to be considered a**
23  **header?**
24      A.  I don't consider that an important
25  distinction.

Page 108

1      **Q.  As far as where it exists within the packet,**
2  **it's not necessarily important to be determined whether**
3  **or not it's a header, true?**
4      A.  Headers are, are an element of the protocol
5  specification of where to look within a bundle of data
6  to find the header.  Once we agree on where it is, it
7  could be at the front, at the back, or in the middle.
8      **Q.  And it could be adjacent to the payload or**
9  **potentially stored somewhere else.**
10      A.  That is a little harder to agree to because
11  the, the way that networking works, it's, it's all a
12  question of offsets, you know, sort of step offsets from
13  where the thing begins.  Bytes 0 through 63 are the
14  header and byte 64 is where the payload begins.  I mean,
15  it's not that there's some kind of pointer that says the
16  header is here and the payload is here as, you know,
17  kind of different addresses or something like that.
18  That's not how it's normally done.
19      **Q.  It's possible to do it that way, though.**
20      A.  I guess, you know, hypothetically, anything is
21  possible.  It's hard, hard to exclude anything.  But in
22  the vast history of protocol definition, that is not how
23  it is certainly commonly done.
24      **Q.  When you say "specified by a transmission**
25  **protocol," what do you mean by that?**

Page 109

1      A.  A transmission protocol, that's in reference
2  to a protocol involved in the transmission of data from
3  sender to receiver, from source to destination.  I
4  would, I would -- you know, that involves at a level
5  within the network routing, as well as application
6  delivery, various levels represent transmission.  But
7  what it's about is a protocol sufficient information to
8  deliver data from one point in the network to its
9  destination point.
10      **Q.  Does it matter if the transmission protocol**
11  **specifies something as a header as opposed to something**
12  **else in your determination of whether or not it's a**
13  **packet header?**
14      A.  Generally, the headers are examined by
15  elements in the network to provide the necessary
16  transmission function to figure out what to do.  And the
17  payload for that layer of the network is not examined,
18  at least traditionally.  So the protocols are defined
19  traditionally to process headers and ignore payload.
20      **Q.  If you had a protocol, for instance, that**
21  **decided to call a header a footer and put it at the end**
22  **of a packet, and it had all the other characteristics of**
23  **a packet header, would you say that it's no longer a**
24  **packet header because the protocol specifies it as a**
25  **footer?**

28 (Pages 106 to 109)

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 110

1     MR. SANDERS:  Objection to form.
2     THE WITNESS:  It's possible to have packet
3  headers that are actually at the end of the packet.  I
4  don't know why they don't call them footers.  So I think
5  the sort of terminological distinction you're making,
6  hard to disagree with.
7     Nevertheless, the key aspect is a given level
8  of the network, or shall we say given specification of a
9  protocol, knows, because it's been agreed upon in
10  advance and standardized, where to look in the protocol
11  to find the information it needs to act on the delivery
12  of the packet.
13  BY MR. ALBERTI:
14     **Q.  Is there a limitation as to how large a packet**
15  **header can be?**
16     A.  It can't be larger than the packet.
17     **Q.  Is there a limitation on how large a packet**
18  **can be?**
19     A.  There are technical limitations on how large
20  packets can be.  They cannot be of infinite size or, for
21  that matter, a very, very large size.
22     **Q.  When you say "technical limitations,"**
23  **specifically what do you refer to?**
24     A.  The way in which the protocols are defined,
25  they will specify a limit to how large the -- if we use

Page 111

1  the term "transmission unit," the bundle of data, how
2  big the bundle of data can be.
3     An example would be in the Ethernet world,
4  it's I believe, something in the range of 1500 bytes,
5  binary characters, long.  It's just a spec that says a
6  packet can't be longer than this.
7     A packet header will be well defined within a
8  protocol.  Each one of the fields will be defined.  And
9  so, you know, the packet headers are traditionally not
10  of variable length.  They're of a fixed length and a
11  well defined pattern to the information that's in them.
12     But I can't quite remember, are we talking
13  about packet header or packet.  But packets cannot be,
14  you know, because of protocol and technical limitations,
15  cannot be of any, any arbitrarily large size.  There are
16  limits to how big they can be.
17     **Q.  Are those limits based on hardware**
18  **characteristics of systems that will carry the packets?**
19     A.  They represent a specification and constraint
20  on the underlying hardware system.
21     So, for example, if we, if we limit a packet
22  to be sent over, let's say Ethernet, to something like
23  1500 bytes, that is important information to
24  implementers to know how big buffers can be, how big --
25  they can't be 1400 bytes because they might receive a

Page 112

1  packet that's 1500 bytes.  So these things are agreed
2  upon in advance as to what the upper bound is, as a
3  guideline for effective implementation.
4     **Q.  Do you ever have a situation where a packet in**
5  **an upper layer has a maximum size that is larger than a**
6  **maximum size of a packet in a lower layer?**
7     A.  All the time.
8     **Q.  What do you do in that situation?**
9     A.  You break up the larger item.  You think of it
10  as a molecule.  You break up the molecule into smaller
11  constituent atoms.  And just as an atom can be broken up
12  electrons, neutrons, and protons, the same thing is true
13  at another level; it can be broken up even more.  And at
14  the level of the electron, it can be broken up into
15  quarks or charms or whatever they call it.  So it's
16  all -- at every level, the way in which you can get very
17  large things to be supported by the network is to turn
18  it into a sequence of smaller things at an appropriate
19  layer.
20     **Q.  You would agree in the situation where you**
21  **have a higher level packet of a large size that has to**
22  **get broken up by a lower layer into smaller packets,**
23  **that the smaller packets don't necessarily need to be**
24  **stored in sequence, true?**
25     MR. SANDERS:  Objection to form.

Page 113

1     THE WITNESS:  There's a lot of words that were
2  in there, and they didn't map onto my precise
3  understanding of networking technology.  So maybe we
4  want to kind of parse that out a little by, piece by
5  piece.
6     So one clarifying question I have is you said
7  something about higher level packet.  Can you be a
8  little bit more precise of what you mean?
9  BY MR. ALBERTI:
10     **Q.  I believe I asked you a question that at a**
11  **higher layer, you can have a packet size that can have a**
12  **certain maximum that is larger than the maximum package**
13  **size of a lower layer in the stack.**
14     A.  Yes.  That was an earlier question, yes.
15     **Q.  So if we have a packet at such a higher layer**
16  **that has to get broken up by a lower layer, the lower**
17  **layer isn't required to store the packets in the exact**
18  **same sequence as it received -- as it broke them up from**
19  **the higher layer?**
20     A.  Store.  There is buffering that occurs, so
21  there is at least storage of part of the higher level
22  thing.  I, I guess I'm not quite understanding the
23  distinction that you're, you're, you are drawing here
24  between higher layer protocol or packet, and lower
25  layer.  I understand something is bigger, mapped into

Merrill Corporation - San Francisco
(800) 869-9132                                    www.merrillcorp.com/law

MMA0298

RANDY H. KATZ, Ph.D. - 7/17/2013

Page 118

1  a protocol, shall we say.
2          Generally, in the sort of networking art, the
3  information necessary for a protocol to operate is
4  associated with packet headers.  And so it seems that
5  this "one or more fields within a packet that are
6  specified as being header fields by a communications
7  protocol" does a more precise job of defining what
8  constitutes the header, because it's qualifying it by
9  the communications protocol.
10     **Q.  So you would agree that in the new**
11  **construction -- first of all -- let me strike that.**
12         **You agree more with the new construction than**
13  **the old construction.**
14     A.  I agree with the new construction.  I'm, I'm
15  satisfied that it is more precise.
16     **Q.  So under the new construction, the one or more**
17  **fields have to be specified as being header fields by**
18  **the communication protocol.**
19     A.  Right.
20     **Q.  If it's specified as being a footer field, it**
21  **wouldn't qualify.**
22     A.  As I said, you know, again, the terminology is
23  not so much about headers, you know, header meaning it's
24  at the front.  It's about well specified within the
25  packet where are those fields.

Page 119

1      **Q.  Well, you know --**
2      A.  And that's generally called a header, whether
3  it's at the back or at the front or in the middle.  It's
4  just you know where precisely to look to find that
5  information.
6      **Q.  So because you like to be precise, I want to**
7  **get your opinion on, what precisely is a header field?**
8      A.  The header field is the information processed
9  by a communications protocol that is necessary to -- for
10  it to be able to perform its functionality of achieving
11  communication between sending and receiving entities.
12     **Q.  Is that a precise definition of a header**
13  **field?**
14     A.  It's as precise as I can come up with at 15
15  minutes after 12 before lunch.
16     **Q.  We'll, we'll -- I promise that we'll break**
17  **after this.  So --**
18     A.  Okay, okay.
19     **Q.  -- you know, and I don't want to --**
20     A.  I'm trying to be --
21     **Q.  -- I don't want to rush you.**
22     A.  I am trying to be precise.
23     **Q.  This will be the last --**
24     A.  I'm sorry.  I'm also talking over you, sorry.
25     **Q.  That's okay.  And again, we'll move on after**

Page 120

1  **this, but I just kind of wanted to wrap up this one**
2  **issue so we can go have lunch, but . . .  And let me**
3  **just reread what you said so I can make sure that we're**
4  **on the same page here.**
5          **A header field is the information processed by**
6  **a communications protocol that is necessary to -- for it**
7  **to be able to perform its functionality of achieving**
8  **communication between sending and receiving entities.**
9      A.  So the "it" refers to the communication
10  protocol, and the fields are exclusive of the payload.
11     **Q.  And just to be sure, I thought you mentioned**
12  **earlier that you could have a header that's encapsulated**
13  **within a payload.**
14         MR. SANDERS:  Objection, form.
15         THE WITNESS:  What I said before, you know,
16  there's, there's this notion in the networking world of
17  layers upon layers and protocols wrapped in other
18  protocols.  So for a given, a protocol at a given layer,
19  its headers are well defined and processed by the
20  communications protocol for that layer.
21         There can be embedded in the payload
22  subpackets, if you would, with their own headers and
23  payload, which are processed and appropriate for a
24  higher layer protocol.  That's -- there are layers of
25  communication protocols.  There's not one communication

Page 121

1  protocol.  There's IP and on top of it is TCP, or ATM
2  and on top of it TCP.  So these are examples of the kind
3  of Russian doll inside Russian doll.
4          So in my effort to be precise, when I say a
5  communications protocol, it's not that there is "the"
6  communications protocol, or only one communications
7  protocol.  Maybe to be more precise, for a
8  communications protocol at a given layer of the network,
9  it processes the header fields to achieve its function
10  of communicating between sending point and receiving
11  point.
12     **Q.  The protocol will typically define portions of**
13  **the header as different fields of the header.**
14     A.  Yes.
15     **Q.  Those would be the header fields.**
16     A.  Yes.
17         MR. ALBERTI:  Why don't we take our lunch
18  break.
19         MR. SANDERS:  Sounds good.
20         THE WITNESS:  Thank you.
21         THE VIDEOGRAPHER:  Going off the record, the
22  time is 12:20.
23         (Lunch recess)
24         THE VIDEOGRAPHER:  Back on the record, the
25  time is 1:11.

31 (Pages 118 to 121)

EXHIBIT 13



Microsoft Press

# Computer Dictionary

Third Edition

**Microsoft** Press

PUBLISHED BY
Microsoft Press
A Division of Microsoft Corporation
One Microsoft Way
Redmond, Washington 98052-6399

Copyright © 1997 by Microsoft Corporation

All rights reserved. No part of the contents of this book may be reproduced or transmitted
in any form or by any means without the written permission of the publisher.

Library of Congress Cataloging-in-Publication Data
Microsoft Press Computer Dictionary. -- 3rd ed.
    p.   cm.
  ISBN 1-57231-446-X
  1. Computers--Dictionaries.   2. Microcomputers--Dictionaries.
  I. Microsoft Press.
QA76.15.M54  1997
004'.03--dc21                                          97-15489
                                                          CIP

Printed and bound in the United States of America.

    5  6 7 8 9   QMQM   2 1 0 9 8

Distributed to the book trade in Canada by Macmillan of Canada, a division of Canada Publishing
Corporation.

A CIP catalogue record for this book is available from the British Library.

Microsoft Press books are available through booksellers and distributors worldwide. For further
information about international editions, contact your local Microsoft Corporation office. Or contact
Microsoft Press International directly at fax (425) 936-7329.

Macintosh, Power Macintosh, QuickTime, and TrueType are registered trademarks of Apple Computer,
Inc. Intel is a registered trademark of Intel Corporation. DirectInput, DirectX, Microsoft, Microsoft
Press, MS-DOS, Visual Basic, Visual C++, Win32, Win32s, Windows, Windows NT, and XENIX are
registered trademarks and ActiveMovie, ActiveX, and Visual J++ are trademarks of Microsoft
Corporation. Java is a trademark of Sun Microsystems, Inc. Other product and company names
mentioned herein may be the trademarks of their respective owners.

**Acquisitions Editor:** Kim Fryer
**Project Editor:** Maureen Williams Zimmerman, Anne Taussig
**Technical Editors:** Dail Magee Jr., Gary Nelson, Jean Ross, Jim Fuchs, John Conrow, Kurt Meyer,
              Robert Lyon, Roslyn Lutsch

**.net** \'dot´net´, ´N-E-T´\ *n.* In the Internet's Domain Name System, the top-level domain that identifies addresses of network providers. The designation .net appears at the end of the address. *See also* DNS (definition 1), domain (definition 3). *Compare* .com, .edu, .gov, .mil, .org.

**NET** \'net´\ *n.* **1.** Short for Internet. **2.** Short for Usenet.

**net address** \'net´ ə-dres´\ *n.* **1.** A World Wide Web address (URL). *See also* URL. **2.** An e-mail address. **3.** The DNS name or IP address of a machine. *See also* DNS (definition 1), IP address.

**NetBEUI** \'net´B-E-U-I´\ *n.* Short for NetBIOS Enhanced User Interface. An enhanced version of the NetBIOS protocol for network operating systems, originated by IBM for the LAN Manager server and now used with many other networks. *See also* LAN Manager, NetBIOS.

**NetBIOS** \'net´bī´ōs, net´B-I-O-S´\ *n.* An application programming interface (API) that can be used by application programs on a local area network consisting of IBM and compatible microcomputers running MS-DOS, OS/2, or some version of UNIX. Primarily of interest to programmers, NetBIOS provides application programs with a uniform set of commands for requesting the lower-level network services required to conduct sessions between nodes on a network and to transmit information back and forth. *See also* application programming interface.

**NetBIOS Enhanced User Interface** \'net´bī´ōs en-han´st yoo´zər in´tər-fās´\ *n.* See NetBEUI.

**NetBSD** \'net´B-S-D´\ *n.* A free version of the BSD UNIX operating system developed as a result of the BSD UNIX operating system. Running on a wide variety of hardware platforms, and is nearly POSIX compliant. *See also* BSD UNIX, POSIX.

**net-god** \'net´ god-god´\ *n.* A highly respected person on the Internet community.

**nethead** \'net´hed´\ *n.* **1.** A person who uses the Internet as if addicted to it. **2.** A Grateful Dead fan who participates in the rec.music.gdead newsgroup or some other forum dedicated to that band.

**netiquette** \'net´ə-ket´, net´a-ket´\ *n.* Short for network etiquette. Principles of courtesy observed in sending electronic messages, such as in e-mail and Usenet postings. The consequences of violating netiquette include being flamed and having one's name placed in the bozo filter of one's intended audience. Disapproved-of behavior includes gratuitous personal insults, posting of large amounts of irrelevant material, giving away the plot of a movie, television show, or novel without warning; posting offensive material without encrypting it; and excessive cross-posting of a message to multiple groups without regard to whether the group members are likely to find it interesting. *See also* bozo filter, flame.

**netizen** \'net´ə-zən\ *n.* A person who participates in online communication through the Internet and other networks, especially conferencing and chat services, such as Internet news or Fidonet. *Compare* lurker.

**NetPC** \'net´P-C´\ *n.* A computer platform specification created by Microsoft and Intel in 1996 for systems that use Windows NT and application programs, rather than applications located on the client computer.

**net personality** \'net´ pur´sə-nal´ə-tē\ *n.* A slang term for a person who has attained some degree of celebrity on the Internet.

**net-police** \'net´pə-lēs´\ *n.* Persons (usually self-appointed) who try to enforce their understanding of the "rules" that apply to conduct on the Internet. Their activities may be directed toward users who violate the state of netiquette, spammers who send unsolicited advertising as e-mail or to newsgroups, or even people who post "politically incorrect" comments in newsgroups or mailing lists. *See also* netiquette, spam.

**Netscape Navigator** \'net´skāp nav´ə-gā´tər\ *n.* The most widely used family of Web browsers programs, made by Netscape Corporation. Versions of Netscape Navigator are available for the Windows 3.1, Windows 95, Windows NT, and Macintosh platforms, and for many varieties of UNIX. Netscape Navigator, which is based on NCSA's Mosaic Web browser, was one of the first commercially available Web browsers. *See also* Mosaic, Web browser.

**Netscape Server Application Programming Interface** \'net´skāp sur´vər ap´lə-kā´shən prō´gram-ing in´tər-fās´\ *n.* The set of conventions for a plug-in that provides programming in NetScape. *See* NSAPI.

**Netspeak** \'net´spēk´\ *n.* The set of conventions for writing English in e-mail, IRCs, and newsgroups. Netspeak is characterized by acronyms such as IMHO (or ROFL) and clarifying devices such as emoticons and emoticons. Use of Netspeak should be governed by netiquette. *See also* emoticon, IMHO, IRC, netiquette, ROFL.

**Net surfing** \'net´ sur´fing\ *n.* The practice of exploring the Internet without a specific goal in mind. The concept of Net surfing is similar to (and probably derived from) "channel surfing" in reference to watching television.

**net-top box** \'net´top´ boks´\ *n.* A type of personal computer with a reduced number of components that is built primarily to provide a low-cost access terminal to the various services available on the Internet, such as e-mail, Web access, and other connectivity. These machines, which are under development, will not have locally addressable hard disks or installable programs, but will obtain any necessary materials for the user from somewhere on a network to which the net-top box is connected. *Compare* Java terminal, NetPC.

**Net TV** \'net´ T-V´\ *n.* See Internet television.

**NetWare** \'net´wâr\ *n.* Novell's LAN operating system. NetWare runs on many different hardware platforms and network configurations.

**network** \'net´wurk\ *n.* A group of computers and associated devices that are connected by communications facilities. A network can involve permanent connections, such as cables, or temporary connections made through telephone or other communication links. A network can be as small as a local area network consisting of a few computers, printers, and other devices, or it can consist of many small and large computers distributed over a vast geographical area. *See also* local area network, wide area network.

**network adapter** \'net´wurk ə-dap´tər\ *n.* An expansion card or other device used to connect a computer to a local area network.

**network address translation** \'net´wurk ə-dres´ trans-lā´shən\ *n.* See NAT.

**network administrator** \'net´wurk ad-min´ə-strā´tər\ *n.* The person in charge of operations on a data-communication network. The duties of a network administrator can be broad and might include such tasks as installing new workstations and other devices, adding and removing individuals from the list of authorized users, archiving files, overseeing password protection and other security measures, monitoring usage of shared resources, and handling malfunctioning equipment. *See also* system administrator.

**network architecture** \'net´wurk ´ar´kə-tek´chər\ *n.* The underlying structure of a computer network, including hardware, functional layers, interfaces, and protocols, used to establish communication and ensure the reliable transfer of information. Network architectures are designed to provide both philosophical and physical standards for the complexities of establishing communications links and transferring information without conflict. Various network architectures include the internationally accepted seven-layer ISO Open Systems Interconnection (OSI) model and IBM's Systems Network Architecture (SNA). *See also* ISO/OSI model, SNA.

**network card** \'net´wurk ´kärd´\ *n.* See network adapter.

**network control program** \'net´wurk ´kən-trōl´ prō´gram\ *n.* A program that usually resides in a communications controller and takes over communications tasks such as routing, error control, line control, and polling (checking terminals in which data records can be as small) leaving the main computer free for other functions. *See also* communications controller. *Acronym:* NCP (N-C-P).

**network database** \'net´wurk ´dā´tə-bās´\ *n.* **1.** A database containing the addresses of other users in the network. **3.** In information management, a type of database in which data records can be related to one another in more than one way. A network database is similar to a hierarchical database in the

# EXHIBIT 14

REDACTED
IN ITS
ENTIRETY

# EXHIBIT 15

# THE COMPACT OXFORD ENGLISH DICTIONARY

SECOND EDITION

COMPLETE TEXT
REPRODUCED MICROGRAPHICALLY

Library

AUG 0 4 2006

Kilpatrick Stockton LLP
Atlanta



**OXFORD**
UNIVERSITY PRESS

OXFORD

UNIVERSITY PRESS

Great Clarendon Street, Oxford OX2 6DP

Oxford University Press is a department of the University of Oxford.
It furthers the University's objective of excellence in research, scholarship,
and education by publishing worldwide in

Oxford New York

Auckland Bangkok Buenos Aires Cape Town Chennai
Dar es Salaam Delhi Hong Kong Istanbul Karachi Kolkata
Kuala Lumpur Madrid Melbourne Mexico City Mumbai Nairobi
São Paulo Shanghai Taipei Tokyo Toronto

Oxford is a registered trade mark of Oxford University Press
in the UK and in certain other countries

Published in the United States
by Oxford University Press Inc., New York

The Compact Edition of the Oxford English Dictionary (First Edition) © Oxford University Press 1971
The Compact Edition of the Oxford English Dictionary—A Supplement to the Oxford English Dictionary
© Oxford University Press 1987
The Oxford English Dictionary (Second Edition) © Oxford University Press 1989

The Compact Oxford English Dictionary (Second Edition) first published 1991
Reprinted 1992, 1993, 1994, 1996, 1998, 1999, 2000, 2002, 2004

ISBN 0-19-861258-3

All rights reserved. No part of this publication may be reproduced,
stored in a retrieval system, or transmitted, in any form or by any means,
without the prior permission in writing of Oxford University Press,
or as expressly permitted by law, or under terms agreed with the appropriate
reprographics rights organization. Enquiries concerning reproduction
outside the scope of the above should be sent to the Rights Department,
Oxford University Press, at the address above

You must not circulate this book in any other binding or cover
and you must impose this same condition on any acquirer

For the suggestion of making available the Oxford English Dictionary in compact form
the publishers are indebted to Mr Albert Boni of Readex Microprint Corporation
whose Compact Edition of the British Museum Catalogue and other reference works
pioneered this method of publication

British Library Cataloguing in Publication Data
Data available

Library of Congress Cataloging in Publication Data
Data available

Printed in the United States of America
on acid-free paper

873

The drops distill'd from Clinos convert to blood. **1700** DRYDEN *Fables, Cinyras & M.* 342 Her solid bones convert to solid wood.

**f.** *Rugby Football.* To kick a goal from (a try); also *absol.* Similarly in *N. Amer. Football,* to complete a goal after scoring (a touchdown). Also in *Assoc. Football,* etc., to score a goal, basket, from (a penalty kick, free throw, etc.). **1896** *Field* 12 Dec. 957/2 Bell, with a very fine place kick, converted the try. **1900** *Ibid.* 17 Nov. 772/2 Douglass.. gained a try, Franks converting. **1919** E. B POULTON *Ronald Poulton* 179 Ronald gained two tries, both converted by Turner. **1932** *N.Y. Times* 4 Dec. 11. 1/6 Wolf, replacing Mauney for the purpose of converting the try for a point, kicked wide. **1950** *Sport* 22–28 Sept. 4/4 He has handed over the responsibility of taking penalty kicks to left-back 'Jock' Ferrier, who converted a spot-kick last Saturday. **1961** G. SMITH *Business of Loving* iii. 124 Hammond converted and Shallerton came back as if berserk. **1970** *Globe & Mail* (Toronto) 25 Sept. 33 3 Peter Dittman converted twice, Ted Jankowski kicked a 45-yard single. **1985** *Times* 5 Dec. 30/1 Oxford's only answer was an 80th-minute penalty converted by Aldridge.

**2.** *intr.* To be able to be changed to (now usu. *into*) a different form, so as to perform a different functions; to be convertible. **1934** *Head & Son Catal.: Better Furnit.* 16 Child's chair.. converts to high chair. **1969** *Sears Catal.* 86 Stroller converts to carriage. **1980** *Freemans Catal.* Spring & Summer 1006 Four seater settee easily converts into a double bed.

**3.** *trans.* Hence, in many technical uses in *Manuf.*

**a.** *Steel Manuf.* To turn (iron) into steel. Cf. CONVERTER 3 b.

**1837** WHITTOCK *Bk. Trades* (1842) 225 The steel employ'd for files.. undergoes a longer process in the conversion.. it is said to be doubly converted. **1875** URE *Dict. Arts* III. 899 Thin bars of iron are much sooner converted than thick ones.

**b.** *Ship-building.* (a) To reduce (timber) from the rough state into pieces of nearly the required shape and size. (b) To change (a vessel) from one class to another by alteration of size or rig. **1862** LD. BROUGHMAN *Brit. Const.* xx. 393 Most of the steam-vessels.. could be converted easily into men-of-war. **1865** *Dockyard Accts. (Blue Bk.* 8. 465–1) There is a great excess of sifful timber.. resulting from + larger quantity of rough timber having been converted.

**c.** *Fire-arms.* To change (e.g. a muzzle-loader) to a breech-loader).

**1864** KNIGHT *Dict. Mech.,* From among the various competing plans for converting the Enfield rifle of the English service into a breech-loader, that of Snider was adopted.

**d.** *Watch-making.* (See quots.)

**1884** F. J. BRITTEN *Watch & Clockm.* 67 A converted *watch* is one in which an escapement of a different kind has been substituted for the original one. *Ibid.,* In converting a watch from a verge to a lever.

**e.** *Building.* To make structural alterations in or to. Also *intr.*

**1805** *Times* 7 Nov. 4/4 Two substantial Brick Houses.. converted into a roomy warehouse. **1937** M. SHARP *Nutmeg Tree* viii. 233 It was the cloak-room arrangements.. They're going to begin converting next month. **1939** M. SPRING RICE *Working-Class Wives* viii. 196 It is immediately practicable to 'convert' a large number of existing dwelling-into.. homes for small families. **1959** G. M. WILSON *Shadows on Landing* i. 7 She had the place converted after the war.

**III.** To change by substituting something of equivalent purport or value.

**†13.** To turn *into* (another language); translate, render. *Obs.*

**1538** STARKEY *England* i. iv. 136 Hyt ys necessary.. to haue hyt converted into our tong. **1573** (*title*) *Eneidos of Virgill.. converted into English Meeter* by T. Phaer. **1651** HOBBES *Leviath.* III. xxxiii. 204 The seventy Interpreters that converted the Bible into Greek.

**14.** *Arith.* To reduce to a different denomination; to 'turn into'. *Obs.*

**1594** BLUNDEVIL *Exerc.* III. II. xiv. (ed. 7) 397 The difference of the Longitudes converted into minutes. **1660** WILLSFORD *Scales Comm.* 47 The common rule of Three.. by which means any one thing may be converted into the species of another, in respect of value or quantity.

**15.** To change by substitution of something of equivalent value; *spec.* in *Law,* to change (actually or constructively) the quality of property (see CONVERSION 16 b), a from real to personal *vice versa* a, b as between partners.

**1793** S. C. Cox in W. P. Williams *Rep.* III. 22 The court was of opinion that upon the construction of the will the real estate was converted into personalty for all the purposes of the will. **1827** JARMAN *Powell's Devises* II. 57 Until the trustees should think proper to convert the property. **1849** G. SPENCE *Equit. Jurisd. Ct. Chanc.* II. 235 Where money is devised to be laid out in land, the same principle applies as where land is directed to be converted into money. **1866** SIR N. LINDLEY *Partnership* (1888) 334 It is competent for partners by agreement amongst themselves to convert that which was partnership property into the separate property of an individual partner. **1867** SMILES *Huguenots Eng.* x. (1880) 161 Those who possessed goods and movables, made haste to convert them into money.

**convert** (kǫnvɜ́ːt), *a.* and *sb.* Also 6 conuart. [app. f. CONVERT *v.;* perh. by abbreviation of *converted,* but possibly partly due to CONVERSE *sb.³,* a. F. *convers:* cf. sense 2.]

**A.** *adj.*

**I.** = CONVERTED 2. Now *rare.*

**1623** BACON *Hen. VII,* Wks. (Bohn) 387 John Osbeck, a convert Jew. **1711** SHAFTESB. *Charac.* (1737) III. 78 By means of a convert emperor, the heathen church-lands.. became transla'd to the Christian clergy. **1822** J. H. SMITH *Rejected Addr., Archit. Atom* (Rtldg.) 128 When convert Christians read No sacred writings but the Pagan creed.

**† 2.** *convert brother, sister* = CONVERSE *sb.²* 2. *Obs.*

**1639** GLAPTHORNE *Wit in Const.,* More mony., Than would our convert-sisters build ten almes houses. **1693** tr. *Emilianne's Hist. Monast. Ord.* xix. 179 The Convert Brothers shall recite.. seventy seven times the Lord's Prayer.

**B.** *sb.*

**1.** A person converted to, or brought to embrace and profess, any religious faith or doctrine.

**1561** T. NORTON *Calvin's Inst.* iii. 191 [They] appoint certaine dayes to their newe converters, during the which they must exercise themselues in penance. **1611** BIBLE *Isa.* i. 27 Zion shall be redeemed with iudgement, and her conuerts with righteousnesse. **1680** BUTLER *Rem.* (1759) I. 167 A Convert's but a Fly, that turns about After his Head's pull'd off, to find it out. **1704** NELSON *Fest. & Fasts* (1730) 17 An early Convert to Christianity. **1794** PALEY *Evid.* II. i. 278 Converts properly so called, that is.. adults voluntary embracing Christianity. **1876** J. H. NEWMAN *Hist. Sk.* I. i. 87 In Sogdiana and Khorasan they had become converts to the Mahometan faith.

**b.** *transf.* A person brought over to any opinion, belief, or party.

**1641** W. HAKEWILL *Libertie of Subject* 3, I did forsake my former opinions as erroneous, and do now embrace the contrary.. and so am now become a convert. **1665** BOYLE *Occas. Refl.* ii. v. (1675) 144 If.. our new convert shall consider things of this Nature. **1771** JUNIUS *Lett.* liv. 282, A convert to triennial parliaments. **1859** SMILES *Self-Help* iv. 89 For some time, he did not make a single convert, and gained nothing but.. abuse.

**† 2.** = CONVERSE *sb.²* 2. *Obs.*

**1577** HOLINSHED *Chron.* II. 356 One of his owne seruants did conspire with a conuert of that abbeie.

**† 3.** That which has undergone conversion; that into which anything is turned. *Obs. rare.*

**1680** WARHAM *Alb. Eng.* vi. xxxi. (1612) 147 When his sudden eies admyr'd the strong-built forme-Convert Deriued from his Side, [Adam's rib 'converted' into Eve.]

**4.** *Canadian Football.* [f. sense 11 of the vb.]. A goal completed by kicking the ball between the goal posts, or by running the ball over the goal line, after a touchdown.

**1950** *Toronto Daily Star* 23 Oct. 19/3 Fred Wilmot booted four converts. **1958** [*see safety touch* n. SAFETY 11]. **1968** *Globe & Mail* (Toronto) 11 July 32/4 Mann, whose punting average was 43 yards in 13 attempts, also kicked five converts. **1983** *Ibid.* 10 Oct. C4/2 The actual kicks – punts, field goals, kickoffs and converts – get the attention because they are easily quantified.

**5.** *Comb.* (in sense 1).

**1938** *Lond. Mag.* 300 A Missioner in Ireland, and a very busy Convert-Monger.

**converted** (kǫnvɜ́ːtid), *ppl. a.* [f. CONVERT *v.* + -ED¹.]

**† 1.** Turned, turned back; cf. CONVERSION 3. **1618** CHAPMAN *Hesiod* II. 434 Fifty days after heaven's converted heat.. Then grows the nauigable season fit.

**2.** That has been brought over to a religious faith or profession, whether from a different religion or from irreligious life.

**1649** BP. HALL *Episc.* I. v. 21 Countenancing and incouraging the converted Governours of the Church. **1667** W. HUBBARD *Narrative* II. 79 One Converted Indian that reuealed the Plot. **1762–71** H. WALPOLE *Vertue's Anecd. Paint.* (1786) III. 198 Of all his works, Sir Godfrey was most proud of the converted Chinese at Windsor. **1851** *Missionary* I. 207 A brother and a sister, the former a converted, the latter a heathen, native. Mod A converted prize-fighter. The preacher was a converted Jew.

**3.** Changed into something else; see CONVERT *v.* 12, + b. Reduced; see 14.

**1594** BLUNDEVIL *Exerc.* III. II. xiv. (ed. 7) 397 The summe of the two converted longitudes added together is 1247. **1865** *Dockyard Accts* (Blue Bk. 8. 465–1) The curvature and bevelling required in a large portion of the converted timber. **1875** URE *Dict. Arts* III. 895 Cemented or converted steel.. is produced by the carbonisation of wrought iron. **1884** [*see* CONVERT *v.* 12 d].

**c.** *spec.* Of a building (see CONVERSION 12 e, CONVERT *v.* 12 e).

**1888** KIPLING *Phantom Rickshaw* (1889) 32 It was my business to live in *das-*bungalows.. I lived in 'converted' ones – old houses officiating as *das-*bungalows. **1924** P. MACDONALD *Rasp* viii. 110 She perceived No. 14 to be a 'converted' house. A great black building that might once have housed a merchant prince, but was now the warren of retired grocers, oddities, solicitors, and divorcees. **1959** F. DONALDSON *Child of Twenties* 143, A very attractive small flat.. a converted L-shaped London drawing-room.

**d.** *Rugby Football.* (See CONVERT *v.* 11 f.)

**1907** A. H. BASKERVILLE *Mod. Rugby Football* 1. 12 A converted try.. equals 5 points. **1927** [*see* CONVERSION 11 d].

**4.** *Logic.* See CONVERT *v.* 4 b.

**1636** tr. *Hobbes's Elem. Philos.* I. iv. 37 Changing the Propositions, into converted Propositions equipollent to them. **1847** A. DE MORGAN *Formal Logic* iv. 71 Each universal proposition has converted contronominals for its affirmative forms. **1851** [*see* EXPOSITA]. **1870** [*see* CONVERTEND].

**convertend** (kǫnvə·tend). *Logic.* [ad. L. *convertend-us,* -um to be converted, gerundive

pple. of *convertĕre* to CONVERT.] The name given by Hamilton to the proposition to be converted, or as it stands before conversion; see CONVERT *v.* 4 b.

**1837–8** SIR W. HAMILTON *Logic* I (1860) I. 256 The original or given proposition is called the Converted or Converse.. It would be better to call [it] the Convertend.. This language I shall use. *Ibid.* I. 257. **1870** JEVONS *Elem. Logic* x. (1889) 82 In order that the converse or converted proposition shall be inferred from the convertend.

**converter** (kǫnvɜ́ːtǝ(r)). Also *erron.* -tor. [f. CONVERT *v.* + -ER¹.]

**1.** One who converts (another) to any faith, opinion, or party; one who makes converts.

**1570–6** LAMBARDE *Peramb. Kent* (1826) 2 The messengers of Pope Gregory (who were converters of the people). **1552** SPARKE *Prim. Devot.* (1663) 150 He becomes a converter of the gentile. **1726** CAVALLIER *Mem.* i. 3 These unmerciful Converters began with ravaging and destroying all that the Protestants had, in their Houses. **1828** PUSEY (*title*) The Church the Converter of the Heathen.

**2. a.** One who converts or changes one thing into another; one who turns a thing to another purpose or to his own use.

**1533** TINDALE *Supper of Lord* Wks. III. 261 Let our couetous conuerters chop and change bread and wine, till we there feel, are, and taste neither bread nor wine. **1687** N. JOHNSTON *Assur. Abbey Lands* 26 A converter of Ecclesiastical Money to his own use. **1825** *Men. Monthly Mag.* XLII 520 Modern converters of field-sports into butcheries.

**b.** *spec.* (a) One whose business it is to 'convert' rough timber; see CONVERT *v.* 12 b; (b) one whose business it is to convert iron into steel; (c) 'In the cotton-goods trade, one who takes unbleached gray cloth and converts it into the finished product' (Funk's Standard Dict., 1928).

**1838** *Naval Chron.* XXV. 88 One of the timber-convertors of the dock-yard. **1875** URE *Dict. Arts* II. 898 Résumé.. fine [brought] the process of conversion to any degree of perfection.. The first principle laid down by him are now the guide of the converter. **1881** *Mechanic* 3198 Buyers and converters of all kinds of English timber. **1959** *Listener* 5 Nov. 768/1 Is the horizontal structure a weakness with yarn spinners selling to cloth manufacturers and manufacturers selling to converters who deal with separate finishers to complete the cloth for final use?

**3. a.** An apparatus for converting one thing into another.

**1889** *Nature* 24 Oct. 631 A vessel, called a converter.. whose use is to propel the water to resolve itself into steam.

**b.** *Steel Manuf.* A large vessel or retort, made of iron and lined with some refractory material (usually a kind of siliceous stone call *ganister),* in which molten pig-iron is converted into steel by the Bessemer and other processes; called BESSEMER. Also, a retort used for Bessemerizing copper ores.

**1867** *Mech. Mag. Stor* 10 Sept. 7 The converters can thus be worked with liquid iron direct from the blast furnaces, the iron remaining perfectly liquid during the short time of transit. **1883** *Harper's Mag.* Aug. 334/2 The Bessemer [process].. decarbonizes melted iron in huge converters by forcing an air stream through it. **1897** *Daily News* 4 Jan. 2/1, 18,300 ounces of gold, contained in other converter bars.. cast and refined copper, or bullion. **1908** *Westm. Gaz.* 22 Aug. 9/1 The works, which consist of three blast furnaces and two converters, are capable of treating 10,000 tons of ore per month. **1958** *Everyman's Encycl.* III. 754/2 Converter, iron retort used in the Bessemer process of making steel, and for obtaining metal from matte (metal sulphides).

**c.** *Electr.* An apparatus for converting high-tension into low-tension electricity. Also, a device for changing current of one kind into current of another kind; see TRANSFORMER 2 b.

**1888** [see TRANSFORMER 2 b]. **1889** *Pall Mall G.* 23 Jan. 6/1 The mains are underground, and.. the current generated is of high tension. At each house lighted, the current is changed into low tension by means of converters. **1890** C. W. VINCENT in *19th Cent.* Jan. 147 In electric lighting.. induction coils of converse construction are employed.. the primary coil being of fine wire, and the secondary or induction coil of the thicker wire. These coils convert high-tension into low-tension electricity, and under the name of 'converters' are already in use in several electric lighting systems. **1906** GOODCHILD & TWENEY *Technol. & Sci. Dict.* 783/1 Another class of transformers are more often termed converters or rotary converters; they are used in the transformation of alternate currents to continuous currents (or *vice versâ),* or for changing the voltage of continuous currents. **1911** *Encycl. Brit.* XVIII. 512/2 The converter cannot advantageously be used to control the power factor by variation of the field strength. *Ibid.,* The synchronous converter finds its chief use in electric traction. **1958** *Spectator* 1 Aug. 167/2 The car radio, which does not need a converter and runs direct from the car battery.

**d.** A cigar machine. *U.S.*

**1942** U.S. *War Dep. Techn. Man.* 11–180 (*title*) Converter M-209. **1955** C. OSBORNE *Marauders* (1960) v. 167 A label upon each unlabelled M-209 converter by the radio operators, whose transmissions were far more likely to be to blame for unintelligible messages than the little cipher machine

**e.** *Computers.* (See quot. 1959¹.)

**1959** TOMPKINS & WAKELIN *High-Speed Computing Devices* xv. 386 An analog-to-digital converter is a device which accepts instantaneous values of electrical quantities and expresses them in discrete numerical form. *Ibid.* 393 A digital-to-analog converter employed in the Bell Telephone Laboratories p.c.m. system makes use of the exponential decay characteristics of the RC circuit. **1951** M.

EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

INTELLECTUAL VENTURES I LLC and
INTELLECTUAL VENTURES II LLC,

Plaintiffs,

v.

MOTOROLA MOBILITY LLC,

Defendant.

C.A. No. 11–cv-00908 (SLR)

## DECLARATION OF TIMOTHY J. DRABIK, Ph.D.

1.   My name is Timothy J. Drabik and I have submitted expert reports in this action on several occasions. Of relevance here, I submitted a report on the invalidity of U.S. Patent No. 6,412,953 ("the '953 patent") and a report on the invalidity of U.S. Patent No. 7,120,462 ("the '462 patent") on May 17, 2013.  I also submitted reports on non-infringement of the '953 patent and the '462 patent on June 7, 2013, and a report addressing secondary considerations of non-obviousness on June 14, 2013. I was subsequently deposed on those reports on June 28, 2013.

2.   I am over the age of majority and competent to give the statements contained in this Declaration, and if called upon to testify, would do so consistently with what is recorded in this Declaration.

3.   I have previously explained the concepts of polarization of light and the phenomenon of birefringence in my May 17 report.  I stand behind that discussion and incorporate it here.  Of specific note, I recount several important discussions relevant to the interpretation of the term

"polarization converter" as it appears in claim 1 of the '953 patent.  Specifically, it is my opinion that a polarization converter, as detailed in the '953 patent, must both allow light of acceptable polarization to pass through and, through other mechanisms, transform or convert the light of unacceptable polarization to light of acceptable polarization.

4.   First, a polarizer is nothing more than a component that passes light in a way that is sensitive to optical polarization.  The following figure depicts this:



5.   This figure explains how the component waves of light can be filtered out by polarizers to permit only acceptable light to pass.  This does no transformation or conversion of the light.  Rather, it merely prevents components of light to pass through.  No one of skill in the art would consider this a converter of anything.  The same is still true of, for e.g. a reflective polarizer, which sends the unwanted polarization and desired polarization in different directions, because it does not convert the unwanted to the desired polarization.

6.   Second, I agree with the Oxford English Dictionary's definition of "converter" and specifically find its use concerning electrical current being changed from one kind to another to be directly applicable to the use of the term converter in claim 1.

7.   As the '953 patent makes clear, the polarization converter changes the light that is not acceptable to the LCD panel ("light valve") into an acceptable polarization.  5:41-48.  The rationale for such a transformation is readily apparent to a skilled artisan because if merely a polarizer were used, light of the unacceptable polarization would not contribute to LCD panel illumination.  This creates an inefficient system.  The '953 patent makes clear that use of a polarization converter improves efficiency.  3:26-32.

8.   The language of claim 1 – "disposed between the illumination uniformizing means and a light valve, to polarize the light form the illumination uniformizing means into a polarized light" – explains the location of the polarization converter and reinforces its dual roles.

9.   The polarization converter must be between the light guide ("uniformizing means") and the LCD panel ("light valve") so that when the acceptable light reaches the back of the LCD panel only the correct polarization of light is present.  A reading that would simply allow any polarizing element to be a polarization converter would ignore both the word converter as well as the express teachings of the '953 patent to increase efficiency by transforming the unacceptable polarization into the acceptable polarization.

10. I have previously explained in my May 17 report for the '462 patent that IV's proposed construction does not provide any guidance as to how to partition computational functions between primary and less than primary computational functions of the system. I stand behind that discussion and incorporate it here. Moreover, in my opinion there is no support in the

intrinsic record for the '462 patent for ranking or distinguishing between primary and less than primary computational functions of the system.

11. I so declare under penalty of perjury the forgoing to be true to the best of my knowledge, this 9th day of August, 2013.

Timothy J. Drabik

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC, | Civil Action No. 1:11-cv-00908-SLR |
| Plaintiffs, | |
| v. | |
| MOTOROLA MOBILITY LLC, | |
| Defendant. | |

**EXPERT REPORT OF JASON NIEH REGARDING
INFRINGEMENT OF U.S. PATENT NOS. 6,557,054 AND 6,658,464**

1

devices under either claim construction.

                i)          **Infringement Under IV's Claim Construction**

      346.     As discussed elsewhere in this report, all of the accused devices include versions of the Google Play application, which presents a list of software applications or "apps" available to be set up on the device and not already set up.  To accomplish this, Google Play presents different screens (or "fragments") to the user.  The general operation of Google Play is explained to the user in Motorola user guides, such as the following example from the Electrify M user guide, Ex. 10 to the Rudraradhya deposition:



      347.     Google Play presents its users with a number of listings of applications and/or updates for applications.  The listings specifies the availability of software to be

MMA0318

set up for operation on the user station by showing different virtual buttons that communicate the software's availability to be set up. For example, the following screen-shot is of a Photon Q 4G LTE phone, which shipped with Google Play version 3.5.19 and auto-updates when launched by user to the latest 4.1.6 version:



348.    This screenshot, which is generally representative of how listings of applications are presented in earlier versions of Google Play that shipped on the accused devices, shows software, such as the Facebook Messenger application in the upper left corner, with a virtual button labeled "Free." This specifies the availability of this software to be set up for operation on the user station and further shows that it is not already set up for operation on the user station. This can be seen in contrast with another application, such as the Skype software, which has a virtual button labeled "Installed." This software program is therefore shown as not available for installation as it is already set up for operation on the user's phone. In this manner, IV's construction is satisfied for claims, like asserted claim 1, that do not call out software updates.

MMA0319

349.    Certain asserted claims, like exemplary claim 151 reproduced above, call out "software updates."  All accused devices present a listing of software updates that specifies their availability to be set up for operation on a user station.  The following exemplary screenshot is of a Photon Q 4G LTE phone, which shipped with Google Play version 3.5.19 and auto-updates to the latest 4.1.6 version:



350.    This screenshot, which is generally representative of how listings of application software updates are presented in earlier versions of Google Play that shipped on the accused devices, shows a listing of software updates with virtual buttons labeled "Update."  The label specifies that this is a new version that is available to be set up on the user's phone, but is not yet set up.  In this manner, IV's construction is satisfied for claims, like asserted claim 151, that call out software updates.

351.    The same update-related functionality also satisfies claims, like claim 1, that do not call out software updates.  These claims are infringed because software

updates are software programs that satisfy the "software" limitation.

ii)   **Infringement Under Motorola's Proposed Construction**

352.    In my opinion the limitation at issue is also literally present in all of the accused devices under Motorola's proposed construction, which is "causing the user station to display a list of software [updates] available for installation on the user station that does not include any software [updates] already installed on the user station."  To the extent that this construction does not require a list of software [updates] that is populated exclusively with applications that are not installed, it is met for the same reasons as under IV's construction.  If it requires such an exclusive list, it is still literally met at least by the accused devices, which implement just such exclusive lists showing available updates.

353.    For devices shipping with Google Play versions above 3.0 (at least the Photon 4G, Electrify, Atrix 2, Admiral, Atrix HD, Electrify 2, Defy XT, Photon Q 4G LTE, Electrify M and XT886), the MyApps page presents the user with several listings of applications installed on the user's device.  At least one of the listings exclusively groups the applications for which updates are available and not installed under an Updates header, as shown in the screenshot below:

MMA0321



354.   Likewise, applications which are up to date are shown separately under a different header, "Up to date":



355.   Notably, the separateness of these two lists is further emphasized by the fact that each list is sorted in alphabetical order.  In this manner, Google Play displays exclusive lists showing "software [updates] available for installation on the user station

77

# EXHIBIT 18

REDACTED

IN ITS

ENTIRETY

# EXHIBIT 19

UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,075 | 08/16/2012 | 7,120,462 | 3059.020REX2 | 9873 |

100766          7590          06/11/2013
NOVAK DRUCE + QUIGG LLP
1000 Louisiana Street, 53rd Floor
Houston, TX 77002

| EXAMINER | |
|---|---|
| AHMED, SALMAN | |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 06/11/2013 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

MMA0327

| Transmittal of Communication to Third Party Requester *Inter Partes* Reexamination | Control No. | Patent Under Reexamination |  |
|---|---|---|---|
|  | 95/002,075 | 7,120,462 |  |
|  | Examiner | Art Unit |  |
|  | SALMAN AHMED | 3992 |  |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

KILPATRICK TOWNSEND & STOCKTON LLP
TWO EMBARCADERO CENTER
EIGHTH FLOOR
SAN FRANCISCO, CA 94111-3834

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination prceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

| | Control No. | Patent Under Reexamination |
|---|---|---|
| **ACTION CLOSING PROSECUTION**<br>**(37 CFR 1.949)** | 95/002,075 | 7,120,462 |
| | Examiner | Art Unit |
| | SALMAN AHMED | 3992 |

-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --

**Responsive to the communication(s) filed by:**
Patent Owner on <u>03 December, 2012</u>
Third Party(ies) on _____

Patent owner may once file a submission under 37 CFR 1.951(a) within <u>1</u> month(s) from the mailing date of this Office action. Where a submission is filed, third party requester may file responsive comments under 37 CFR 1.951(b) within 30-days (not extendable- 35 U.S.C. § 314(b)(2)) from the date of service of the initial submission on the requester. **Appeal <u>cannot</u> be taken from this action.** Appeal can only be taken from a Right of Appeal Notice under 37 CFR 1.953.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

## PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☒ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

## PART II. SUMMARY OF ACTION:

1a. ☒ Claims <u>1-3,8-10 and 14-29</u> are subject to reexamination.
1b. ☐ Claims _____ are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☒ Claims <u>1-3 and 8-10</u> are confirmed. [Unamended patent claims]
4. ☒ Claims <u>14-29</u> are patentable. [Amended or new claims]
5. ☐ Claims _____ are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____      ☐ are acceptable      ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:   ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
   ☐ been received.    ☐ not been received.    ☐ been filed in Application/Control No _____
10. ☐ Other _____

MMA0329

Application/Control Number: 95/002,075                                          Page 2
Art Unit: 3992

## DETAILED ACTION

1.      This Office action addresses claims 1-3, 8-10 and 14-29 (of which claims 1-3 and

8-10  are original claims and claims 14-29 are newly added) of United States Patent

Number  7,120,462 (Kumar) in response to Patent Owner's (hereinafter PO) response

dated 12/3/2012.


### *Third Party Response*

**MPEP 2666.05(II) states:**

If, upon [a] second submission, the comments [made by the third party requester]

are still not proper, the comments will be returned to the third party requester with an

explanation of what is not proper, and at that point the comments can no longer be

resubmitted... To the extent that 37 CFR 1.947 provides that the third party requester

"may once" file written comments, that provision is hereby waived to the extent of

providing the third party requester the one additional opportunity to remedy a comments

paper containing merits-content that goes beyond what is permitted by the rules; 37

C.F.R. 1.947 is not waived to provide any further opportunity in view of the statutory

requirement for special dispatch in reexamination.

Any replacement comments submitted in response to the notification must be

strictly limited to (i.e., must not go beyond) the comments in the original (returned)

comments submission. No comments that add to those in the returned paper will be

considered for entry.<

Application/Control Number: 95/002,075                                    Page 3
Art Unit: 3992

Third Party's submission on 5/30/2013 does not appear to be limited to the comments in the original (returned) comments submission dated 1/2/2013. Some examples of which are shown in the following table:

| Original (returned) Comments dated 1/2/2013 | Second submission of Comments dated 5/30/2013 |
|---|---|
| Section IV.A.i "Newly added claim 14" at page 10 covers claim 14 related to Boyle over Smith Rejection. This section consists of 10 lines of text. | Related Section III.A.i "Newly added claim 14" related to Boyle over Smith Rejection expands over pages 6-9. |
| Section IV.A.ii "Newly added claim 15" at pages 10-11 covers Boyle over Smith Rejection. This section consists of 11 lines of text. | Related Section III.A.ii "Newly added claim 15" related to Boyle over Smith Rejection consists of 21 lines of text in pages 10-11. |
| Section IV.A.iii "Newly added claim 22" at pages 11-12 covers Boyle over Smith Rejection. This section consists of 11 lines of text. | Related Section III.A.iii "Newly added claim 22" related to Boyle over Smith Rejection consists of 22 lines of text in pages 11-12. |
| Section IV.A.iv "Newly added claim 24" at pages 12-14 covers Boyle over Smith Rejection. This section consists of 30 lines of text. | Related Section III.A.iv "Newly added claim 24" related to Boyle over Smith Rejection consists of 41 lines of text in pages 12-14. |

Application/Control Number: 95/002,075                                          Page 4
Art Unit: 3992

| Section IV.A.v "Newly added claim 25" at page 14. | Related Section III.A.v "Newly added claim 25" has additional 9 lines of text in page 14, which are not in original comments. |
|---|---|
| Section IV.A.vi "Newly added claim 26" at pages 14-15. | Related Section III.A.vi "Newly added claim 26" has additional 9 lines of text in page 15, which are not in original comments. |
| Section IV.A.vii "Newly added claim 27" at pages 15-16. | Related Section III.A.vii "Newly added claim 27" has additional 9 lines of text in page 17, which are not in original comments. |
| Section IV.A.viii "Newly added claim 28" at page 16. | Related Section III.A.viii "Newly added claim 28" has additional 9 lines of text in pages 17-18, which are not in original comments. |
| Section IV.A.ix "Newly added claim 29" at pages 16-17. | Related Section III.A.ix "Newly added claim 29" has additional 9 lines of text in pages 18-19, which are not in original comments. |

These are some of the examples of how Third Party's submission does not appear to be limited to the comments in the original (returned) comments submission.

Application/Control Number: 95/002,075                                             Page 5
Art Unit: 3992

As such, according to MPEP 2666.05 (II) any replacement comments submitted in

response to the notification must be strictly limited to (i.e., must not go beyond) the

comments in the original (returned) comments submission. No comments that add to

those in the returned paper will be considered for entry.

As such, according to MPEP 2666.05, the comments are being returned to the

third party requester with an explanation of what is not proper, and the comments can

no longer be resubmitted.

### Response to Arguments of Patent Owner

### C1.  Arguments regarding "a detachable handset unit sized for handheld grasping" as recited by independent claim 1 (pages 25-28):

#### Patent Owner's argument:

Patent Owner argues that the recited portable processing device of claim 1

includes "a detachable handset unit sized for handheld grasping," The detachable

handset unit, as claimed, therefore must be a handheld device. The Microsoft Computer

Dictionary defines the term "handheld" in the context of a computer. Specifically, the

definition for "handheld computer" is "[a] computer small enough to be held in one hand

while being operated with the other hand." (See Nassi Decl., ¶19.) (citing MICROSOFT

COMPUTER DICTIONARY 225 (3rd ed. 1997).) The same definition for "handheld" is

applicable to a handheld handset unit. (Nassi Decl., ¶19.) Thus, a detachable handset

Application/Control Number: 95/002,075                                                    Page 6
Art Unit: 3992

unit sized for handheld grasping is a detachable handset unit small enough to be held in

one hand while being operated with the other hand. (Nassi Decl., 71i 8.) This

construction is consistent with description of handheld handset units in the specification.

The specification describes devices that "perform quite well as handheld computing and

communication devices." ('462 Patent, 1:45-46.) The exemplary devices include smart

cell phone devices such as "the Model PDQ-800 from Qualcomm, Incorporated" and

"the Model R380 from Ericsson, Incorporated." ('462 Patent, 1:40-45.) As explained in

the '462 Patent, "to allow handheld grasping these units had to be kept small .,, ," ('462

Patent, 1:49-50.) For example, the detachable handset unit is "sized to be carried in a

pocket like an average cell phone." ('462 Patent, 5:20-21.)

**Examiner's Response:**

Examiner submits that the '462 Patent, 1:19-26 states:

TECHNICAL FIELD                                                   15

The present invention relates in general to portable pro-
cessor based devices that provide computing, communica-
tion or entertainment functionality. More particularly, the
present invention pertains to portable processor based       20
devices operable while being held in its user's hand and
providing communications, organizer and/or entertainment
functions, such as cellular telephones, palm-sized organiz-
ers, and MP3 players, and to portable processor based
devices providing general computing capabilities, such as    25
laptop or handheld personal computers (PC's). More specifi-
cally, the present invention relates to systems that detachably
mate a plurality of portable processor based devices to
provide their combined functionality in an integrated struc-
ture.                                                         30

The cited section appears to explain the invention being <u>marrying</u> of portable
device that (1) can be hand held, used for communication like cell phones, organization
capability like organizers and entertainment like MP3 players <u>with</u> (2) general computing
capabilities like laptop computers or handheld personal computers (PCs). Examiner
submits that handset unit does not require that *it be held in one hand and operated in
the other*.  Although, specification of '462 patent states in column 5, lines 14-20 that
handset unit is "small enough" to be carried in a pocket like an average cell phone,
however, such description is not part of the claim language.

Examiner respectfully disagree with the Patent Owner's assertion that the
detachable handset unit, as claimed, therefore must be a handheld device. The claim
language states "a detachable handset unit sized for handheld grasping". The word
"handheld device" is not part of the claim language. Therefore, the definition for
"handheld computer" being "[a] computer small enough to be held in one hand while
being operated with the other hand" is not limiting the scope of the claim language "a
detachable handset unit sized for handheld grasping". Examiner further submits that
anyone of the following handheld unit may be <u>sized for handheld grasping</u>: PDA,
TABLET, CELLPHONE, NETBOOK, LAPTOP etc. Therefore, Examiner submits that
that the word "handheld" in claim 1 modifies "grasping," ; it does not modify "computer,"
and describes the type of grasping (i.e. handheld grasping) for which the device is used
- holding it in one's hands, Examiner respectfully submits that, '462 specification seems
to define the handset unit to be small enough to be carried in a pocket like an average
cell phone; however, that is not part of the claim language. In response to applicant's

Application/Control Number: 95/002,075                                           Page 8
Art Unit: 3992

argument that the references fail to show certain features of applicant's invention, it is

noted that the features upon which applicant relies (i.e., a detachable handset unit sized

for handheld grasping is a detachable handset unit small enough to be held in one hand

while being operated with the other hand) are not recited in the rejected claim(s).

Although the claims are interpreted in light of the specification, limitations from the

specification are not read into the claims.  See *In re Van Geuns*, 988 F.2d 1181, 26

USPQ2d 1057 (Fed. Cir. 1993).

Therefore, Examiner disagrees with the Patent Owner regarding this issue. It is

for the same reasons Boyle does indeed teach the cited limitations.


## C2.  Arguments regarding "a portable docking display unit ... including a first display" as recited in independent claim 1 (pages 28-29):


### Patent Owner's Argument:

Patent Owner argues that nowhere does Boyle disclose that the docking station

itself includes an integrated display. Instead, Boyle discloses that a CRT monitor is

coupled to and placed on. the top of the docking station (Boyle, 5:38-43.) Contrary to

the position taken in the Office Action, providing "increased video display capability" is

not the same as having a display. (Nassi Decl., 24.) The docking station of Boyle

provides the increased video display capability recited in claim 1 of Boyle through a set

of video components, as illustrated in FIG. 21. As explained by Boyle, a "video controller

712 is coupled to bus 702 and controls video data and display for the docking station."

Application/Control Number: 95/002,075                                     Page 9
Art Unit: 3992

(Boyle, 13:22-23.) A VRAM "provides storage for video information prior to its display.

VRAM 714 is coupled through Mux 715 to video digital/analog converter/color look-up

table ...which generates the red, green, and blue analog signals needed 1o drive a

video monitor." (Boyle, 13:26-32) Thus, the increased video display capability is used to

drive a video monitor that is external to the docking station of Boyle.


**Examiner's Response:**

Examiner submits that the claim language states:

> a portable docking display unit dimensioned substantially
> larger than said detachable handset unit, said portable
> docking display unit including a first display and a
> plurality of second circuits, said plurality of second
> circuits not including a central processor and including
> a video interface, and a data input interface, and
> wherein said central processor controls the operation of
> at least one of said second circuits and said first display
> when said detachable handset unit is docked with said
> docking display unit;

The claim language states that "portable docking display unit including a first

display" (emphasis added), which Boyle does not appear to teach. Although "integrated"

is not part of the claim language, however, it is clear from the claim language that

display is part of the portable docking display unit. '462 states that for applications

requiring larger display and keyboard, the detachable handset unit is docked into the

main unit, the docking display unit. Mating electrical connector 36 in docking display unit

30 may therefore connect these signals to auxiliary display 31, auxiliary keyboard 32,

wired communication circuit 33, auxiliary pen-input panel 44, speakers 42 and

microphone 43, and power-jack 35.



FIG-2

However, Boyle appears to teach a portable docking display unit having a video connection that can be coupled with an <u>external</u> display. Boyle clearly states in Abstract that the internal mechanical construction of the docking station allows the user to place a large cathode ray tube display monitor directly <u>atop the docking station</u> without hindering the docking or undocking of the portable computer.



Fig. 5

Therefore, Boyle's docking station does <u>not</u> include a display, rather, a display can be connected to the docking station if desired.

Therefore, Examiner agrees with the Patent Owner regarding this issue.

## C3.  Arguments regarding "a portable docking display unit" as recited in independent claim 1 (pages 29-30):

### Patent Owner's Argument:

Patent Owner argues that the combination of the docking station and external CRT display of Boyle is not <u>"portable."</u> As discussed above, the "computer and the docking station are coupled together using a mechanically triggered electromechanical docking/undocking mechanism." (Boyle, 14:11-14.) The electromechanical docking/undocking mechanism of the docking station includes a docking motor, (Boyle, FIGs. 14-15.) The integration of a motor into the docking station significantly increases the weight of the docking station. (Nassi Decl., ¶29.) Boyle further discloses that the docking station is configured so that a large cathode ray tube (CRT) monitor, up to <u>fifty pounds</u> in weight, can be rested thereon without damaging the docking station or impeding its functioning. (Boyle, 2:40-42; 6:38-42.) (emphasis added.) The docking station of Boyle includes "two cross beams [to] help support the weight" of this large CRT monitor when placed on the top of the docking station. (Boyle, 5:40-42.) Thus, the combined weight of the docking station and CRT monitor of Boyle could exceed 50 lbs. A system having the weight and size of the combination of the docking station and CRT

monitor of Boyle would not be easily carried by a user. (Nassi Decl., ¶30.) A person of

ordinary skill in the art would therefore not consider the combination of the docking

station and CRT of Boyle as being a "portable docking display unit." (Nassi Decl., ¶30.)

### Examiner's Response:

Examiner submits that claim 1 states:

> a portable docking display unit dimensioned substantially
> larger than said detachable handset unit, said portable
> docking display unit including a first display and a
> plurality of second circuits, said plurality of second
> circuits not including a central processor and including
> a video interface, and a data input interface, and
> wherein said central processor controls the operation of
> at least one of said second circuits and said first display
> when said detachable handset unit is docked with said
> docking display unit;

Without getting into the components of the docking station of Boyle, Boyle states

in column 1, lines 26-37, column 2 lines 56-59:

> The dilemma posed to a consumer who desires the
> portability of a notebook computer and the full func-
> tionality of a desktop computer without the need of
> purchasing two separate systems has been recognized 30
> by the computer industry. One known solution is to
> offer a fully capable portable notebook computer which
> can be coupled to a separate stationary unit, the station-
> ary unit frequently having additional data storage such
> as disk drives and additional display capabilities. These 35
> stationary units are commonly known as "docking sta-
> tions".

Therefore, it appears that Boyle's docking station was meant to be a stationary

device; not a non-stationary or portable one. In comparison, '462 patent's handheld unit

and docking unit are both meant to portable as described in column 3:

Application/Control Number: 95/002,075                                        Page 13
Art Unit: 3992

> In general, a portable computing, communication and
> entertainment device in accordance with the present inven-   20
> tion includes a detachable handset unit and a portable
> docking display unit. The detachable handset unit is sized
> for handheld grasping and includes a processor and a
> plurality of first circuits, the processor controlling the opera-
> tion of the first circuits. The portable docking display unit is   25
> dimensioned to receive docking of the detachable handset
> unit and includes a first display and a plurality of second
> circuits. The processor controls the operation of at least one
> of the second circuits and the first display when the detach-
> able handset unit is docked with the docking display unit.   30

Therefore, Examiner agrees with the Patent Owner regarding Boyle's docking

station not being a portable unit. Specifically, the combination of the docking station and

external CRT display of Boyle does not appear to be "portable" as disclosed by Boyle in

column 2, under "Summary of Invention" section and further in column 3:

> 40   The docking station is configured so that a large CRT
> display may be rested thereon without damaging the
> docking station or in any way impeding its functioning.
>
> ...
>
> As the docking station is usually kept in one location,
> it remains coupled to local area networks, the telephone
> system, peripherals and an AC power source. As soon

**D. Arguments regarding claim 3 in view of Boyle and Smith (page 31):**

Patent Owner did not present any new arguments in this section.

**E. Arguments regarding claims 8 and 9 in view of Boyle and Toshiba**

**(pages 31-32):**

Patent Owner did not present any new arguments in this section.

### F.  Arguments regarding claim 10 in view of Boyle and Tao (page 32):

Patent Owner did not present any new arguments in this section.


### *Claim Rejections*

### RLP 5 – Not Adopted

2.      Claims 1 and 2 are rejected under 35 U.S.C. 102(b) as being anticipated by

Boyle et al. (US PAT 5323291, hereinafter Boyle).

        RLP 5 is not adopted for the reasons cited above.


### RLP 6 - Not Adopted

3.      Claim 3 is rejected under 35 U.S.C. 103(a) as being unpatentable over Boyle in

view of Smith.

        RLP 6 is not adopted for the same reasons as RLP 5.


### RLP 7 – Not Adopted

4.      Claims 8 and 9 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Boyle in view of Toshiba.

        RLP 7 is not adopted for the same reasons as RLP 5.


### RLP 8 – Not Adopted

Application/Control Number: 95/002,075                                        Page 15

Art Unit: 3992

5.      Claim 10 is rejected under 35 U.S.C. 103(a) as being unpatentable over Boyle in

view of Tao.

        RLP 8 is not adopted for the same reasons as RLP 5.


### Status of the Claims

6.      Original claims 1-3 and 8-10 are confirmed.

7.      Newly added claims 14-29 are patentable.


### Service of Papers

8.      After the filing of a request for reexamination by a third party requester, any

document filed by either the patent owner or the third party requester must be served on

the other party (or parties where two or more third party requester proceedings are

merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248. See

37 CFR 1.550(t').


### Extensions of Time

9.      Extensions of time under 37 CFR 1.136(a) will not be permitted in inter partes

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an

applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C.

314(c) requires that inter partes reexamination proceedings "will be conducted with

special dispatch" (37 CFR 1.937). Patent owner extensions of time in inter partes

reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time are not

Application/Control Number: 95/002,075                                    Page 16
Art Unit: 3992

available for third party requester comments, because a comment period of 30 days

from service of patent owner's response is set by statute 35 U.S.C. 314(b)(3). Time

periods may be extended only upon a strong showing of sufficient cause.


## Notification of Concurrent Proceedings

10.     The patent owner is reminded of the continuing responsibility under 37 CFR

1.985(a), to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving the 7,120,462 patent throughout the course of this reexamination

proceeding. The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding. See MPEP 2686 and 2686.04.


## Conclusion

11.     **This is an ACTION CLOSING PROSECUTION (ACP)**; see MPEP § 2671.02.
(1) Pursuant to 37 CFR 1.951(a), the patent owner may once file written comments
limited to the issues raised in the reexamination proceeding and/or present a proposed
amendment to the claims which amendment will be subject to the criteria of 37 CFR
1.116 as to whether it shall be entered and considered. Such comments and/or
proposed amendments must be filed within <u>a time period of 30 days or one month
(whichever is longer) from the mailing date of this action</u>.  Where the patent owner files
such comments and/or a proposed amendment, the third party requester may once file
comments under 37 CFR 1.951(b) responding to the patent owner's submission within
<u>30 days from the date of service</u> of the patent owner's submission on the third party
requester.
(2) If the patent owner does not timely file comments and/or a proposed amendment
pursuant to 37 CFR 1.951(a), then the third party requester is precluded from filing
comments under 37 CFR 1.951(b).
(3) Appeal **cannot** be taken from this action, since it is not a final Office action.

Application/Control Number: 95/002,075                                      Page 17
Art Unit: 3992

12.     All correspondence relating to this *inter partes* reexamination proceeding should

be directed:

By EFS:     Registered users may submit via the electronic filing system EFS-Web, at
https://efs.uspto.gov/efile/myportal/efs-registered

*By Mail to:     Mail Stop Inter Partes* Reexam

Attn: Central Reexamination Unit
Commissioner for Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

By FAX to:    (571) 273-9900
Central Reexamination Unit

By hand:     Customer Service Window
Attn: Central Reexamination Unit
Randolph Building, Lobby Level
401 Dulany Street
Alexandria, VA 22314

For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence
(except for a request for reexamination and a corrected or replacement request for
reexamination) will be considered timely filed if (a) it is transmitted via the Office's
electronic filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a
certificate of transmission for each piece of correspondence stating the data of
transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the

examiner, or as to the status of this proceeding, should be directed to the Central

Reexamination Unit at telephone number (571) 272-7705.

    /Salman Ahmed/
Salman Ahmed
Primary Examiner
Central Reexamination Unit - Art Unit 3992
(571) 272-8307

Application/Control Number: 95/002,075                                            Page 18
Art Unit: 3992

Conferees:
/Ovidio Escalante/

/Daniel J Ryman/
Supervisory Patent Examiner, Art Unit 3992

| *Reexamination* | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 95002075 | 7,120,462 |
| | Certificate Date | Certificate Number |
| | | |

| Requester Correspondence Address: | ☐ Patent Owner | ☒ Third Party |
|---|---|---|

KILPATRICK TOWNSEND & STOCKTON LLP
TWO EMBARCADERO CENTER
EIGHTH FLOOR
SAN FRANCISCO, CA 94111-3834

| LITIGATION REVIEW ☒ | /SA/ (examiner initials) | 05/10/2013 (date) |
|---|---|---|
| Case Name | | Director Initials |
| 1:11cv908 Intellectual Ventures I Llc et al v. Motorola Mobil | | |
| | | |
| | | |
| | | |
| | | |

| COPENDING OFFICE PROCEEDINGS | |
|---|---|
| TYPE OF PROCEEDING | NUMBER |
| | |
| | |
| | |
| | |

| | |
|---|---|
| | |

Equivalent of Form PTO/SB/08b (7-09)

| Substitute for form 1449/PTO | | | | Complete if Known | |
|---|---|---|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY PATENT OWNER** *(Use as many sheets as necessary)* | | | | Control Number | 95/002,075 |
| | | | | Filing Date | August 16, 2012 |
| | | | | First Named Inventor | Rajendra KUMAR |
| | | | | Art Unit | 3992 |
| | | | | Examiner Name | AHMED, Salman |
| Sheet | 1 | of | 1 | Attorney Docket Number | 3059.020REX2 |

| NON PATENT LITERATURE DOCUMENTS | | | |
|---|---|---|---|
| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published | T[2] |
| | NPL1 | "Apple Macintosh Monitor Specification," accessed at http://www.everymac.com/monitors/apple/classic_monitors/specs/apple_mac_color_disp.html, dated October 31, 2012. | |
| | NPL2 | "Apple PowerBook Duo 210 Technical Specifications," accessed at http://www.everymac.com/systems/apple/powerbook_duo/specs/mac_powerbook_duo210.html, dated October 31, 2012. | |
| | NPL3 | "Apple PowerBook Duo 230 Technical Specifications," accessed at http://www.everymac.com/systems/apple/powerbook_duo/specs/mac_powerbook_duo230.html, dated October 31, 2012. | |
| | NPL4 | "Apple PowerBook Duo Dock II Technical Specifications," accessed at http://www.everymac.com/systems/apple/powerbook_duo/specs/mac_powerbook_duodock_ii.html, dated October 31, 2012. | |
| | NPL5 | "Microsoft Press Computer Dictionary," Third Edition, Microsoft Corporation, published 1997; pages 225 and 373. | |
| | NPL6 | "Newton's Telecom Dictionary," 10th Edition, published 1996; page 556. | |
| | NPL7 | "Phones: Ericsson R380 World," Review & Rating, PCMag.com, published April 24, 2001. | |
| | NPL8 | "PowerBook Duo Dock: User's Guide," Apple Computer, Inc., published 1993. | |
| | | | |
| | | | |

1616310_1.DOCX

| Examiner Signature | /Salman Ahmed/ | Date Considered | 06/06/2013 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
[1] Applicant's unique citation designation number (optional). [2] Applicant is to place a check mark here if English language Translation is attached.

ALL REFERENCES CONSIDERED EXCEPT WHERE LINED THROUGH. /S.A./

| Search Notes | Application/Control No. | Applicant(s)/Patent Under Reexamination |
|---|---|---|
| | 95002075 | 7,120,462 |
| | **Examiner** | **Art Unit** |
| | SALMAN AHMED | 3992 |

## CPC- SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

## CPC COMBINATION SETS - SEARCHED

| Symbol | Date | Examiner |
|---|---|---|
| | | |

## US CLASSIFICATION SEARCHED

| Class | Subclass | Date | Examiner |
|---|---|---|---|
| | | | |

## SEARCH NOTES

| Search Notes | Date | Examiner |
|---|---|---|
| File history | 9/13/2012 | SA |
| Prosecution history | 9/13/2012 | SA |
| File History | 6/6/2013 | SA |

## INTERFERENCE SEARCH

| US Class/ CPC Symbol | US Subclass / CPC Group | Date | Examiner |
|---|---|---|---|
| | | | |

| | |
|---|---|
| | |

EXHIBIT 20

Redacted

In Its

Entirety

# EXHIBIT 21

REDACTED

IN ITS

ENTIRETY

# EXHIBIT 22

REDACTED

IN ITS

ENTIRETY

EXHIBIT 23

RECEIVED
CENTRAL FAX CENTER
AUG 2 6 2004

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | | |
|---|---|---|---|
| **Applicant:** | *Kumar* | **Examiner:** | *Huy D. Nguyen* |
| **Serial No.:** | *09/719,290* | **Art Unit:** | *2681* |
| **Filed:** | *07 December 2000* | **Date:** | August 26, 2004 |

**For:** PORTABLE COMPUTING, COMMUNICATION AND ENTERTAINMENT
DEVICE WITH CENTRAL PROCESSOR CARRIED IN A DETACHABLE
HANDSET

*Commissioner for Patents*
*P.O. Box 1450*
*Alexandria, VA 22313-1450*

### RESPONSE AF

This letter is responsive to the Office Action mailed 26 May 2004 and is being filed within three months of the mailing date of the current Office action. Please charge any additional fee or fee deficiency to Deposit Account 15-0450.

This response is made under the revisions to 37 CFR 1.121, mandatory from 30 July 2003.

The response has the following parts:

**Amendments to the Specification** – none made;

**Amendments to the Claims** – beginning on page 2;

**Amendments to the Drawings** – none made; and

**Remarks** – beginning on page 5.

MMA0361

Ser. No. 09/719,290                    - 2 -
Response to Office Action of 5/26/04
Atty Docket 117210-27

## AMENDMENTS TO THE CLAIMS

Please amend the claims as they currently stand so that they are in accord with the following listing of the claims:

1.    (Currently Amended)  A portable computing, communication and entertainment device comprising:

a detachable handset unit sized for handheld grasping and including a processor and a plurality of first circuits, said processor controlling the operation of said first circuits;

a portable docking display unit dimensioned to dock with said detachable handset unit, and said portable docking display unit including a first display and a plurality of second circuits, said plurality of second circuits not including a central processor, and wherein said processor controls the operation of at least one of said second circuits and said first display when said detachable handset unit is docked with said docking display unit.

2.    (Original)  A device, as set forth in claim 1, wherein said processor generates control signals, and said portable docking display unit includes a platform dimensioned to accept docking of the detachable handset unit and a first electrical connector for receiving said control signals.

3.    (Previously Presented)  A device, as set forth in claim 2, wherein said portable docking display unit further includes a second electrical connector for removably engaging said first electrical connector when said detachable handset unit and said portable docking display unit are docked.

4.    (Original)  A device, as set forth in claim 3, wherein said detachable handset unit further includes a memory, a wireless communication circuit, an audio interface circuit, a first microphone, a first speaker, and a power supply.

5.    (Original)  A device, as set forth in claim 4, wherein said docking display unit further includes a wired communication circuit and a communication jack.

6.    (Original)  A device, as set forth in claim 5, wherein said docking display unit further includes a second speaker and a second microphone.

Akron - 84285.1

PAGE 4/10 * RCVD AT 8/26/2004 5:03:29 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/0 * DNIS:8729306 * CSID:3308647986 * DURATION (mm-ss):03-02

MMA0362

AUG-26-2004  17:11        HAHN LOESER + PARKS                    3308647986    P.05

Ser. No. 09/719,290                      - 3 -
Response to Office Action of 5/26/04
Atty Docket 117210-27

7.      (Original)  A device, as set forth in claim 6, wherein said docking display unit includes a
power jack.

8.      (Original)  A device, as set forth in claim 7, wherein said docking display unit includes a first
pen-input panel.

9.      (Original)  A device, as set forth in claim 8, wherein said docking display unit is mounted in
a vehicle.

10.     (Original)  A device, as set forth in claim 1, wherein said detachable handset unit includes a
second display.

11.     (Original)  A device, as set forth in claim 10, wherein said detachable handset unit includes a
second pen-input panel.

12.     (Original)  A device, as set forth in claim 11, wherein said detachable handset unit includes a
first keyboard and said docking display unit includes a second keyboard.

13.     (Original)  A device, as set forth in claim 12, wherein said detachable handset unit includes a
jack to connect to an external headphone.

14.     (Original)  A device, as set forth in claim 13, wherein said detachable handset unit includes a
jack to connect to an external headset.

15.     (Original)  A device, as set forth in claim 14, wherein said detachable handset unit includes
at least one of an optical transmitter and an optical transceiver.

16.     (Original)  A device, as set forth in claim 15, wherein said detachable handset unit includes a
Global Positioning System receiver.

17.     (New) A communication and processing device comprising,

Akron - 84285.1

PAGE 5/10 * RCVD AT 8/26/2004 5:03:29 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/0 * DNIS:8729306 * CSID:3308647986 * DURATION (mm-ss):03-02

MMA0363

Case 1:11-cv-00908-SLR-MPT   Document 229-4   Filed 08/16/13   Page 91 of 97 PageID #:
5486
AUG-26-2004  17:12        HAHN LOESER + PARKS

3308647986    P.06

Ser. No. 09/719,290                                    - 4 -
Response to Office Action of 5/26/04
Atty Docket 117210-27

a portable handset for handheld grasping and manipulation of at least one input device
provided thereon, the input device coupled to a processor associated with the handset, and having
a first display associated therewith,

a docking display, to which the handset is selectively docked, wherein the docking display
has a second display which is larger than the first display, being controlled by the processor .

18.    (New) The device of claim 17, wherein the docking display is configured as a clamshell unit
with first and second portions, having an auxiliary display in the first portion and an auxiliary
keyboard in the second portion.

19.    (New) The device of claim 18, wherein the auxiliary display and auxiliary keyboard face one
another when the clam shell unit is in the closed position.

20.    (New) The device of claim 17, wherein the handset comprises a central processor and at least
one interface selected from the group consisting of a video interface, a keyboard interface, a
communication device, a pen-input interface, an audio interface or combinations thereof.

21.    (New) The device of claim 20, wherein the docking display includes at least at least one
interface selected from the group consisting of a video interface, a keyboard interface, a
communication device, a pen-input interface, an audio interface or combinations thereof, wherein
upon docking of the handset, the central processor of the handset controls the at least one interface
of the docking display.

22.    (New) The device of claim 17, wherein the handset comprises a central processor and at least
one interface selected from the group consisting of a video interface, a keyboard interface, a
communication device, a pen-input interface, and interface signals from the at least one interface are
multiplexed.

23.    (New) The device of claim 17, wherein the docking display includes a recesses portion in
which the handset is docked, wherein the handset when docked, is positioned on the back of one of
the portions of the clam shell unit.

24.    (New) The device of claim 17, wherein the docking display is mounted within a vehicle for
selective docking of the handset thereto.

Akron - 84285.1
PAGE 6/10 * RCVD AT 8/26/2004 5:03:29 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/0 * DNIS:8729306 * CSID:3308647986 * DURATION (mm-ss):03-02

MMA0364

Ser. No. 09/719,290                                    - 5 -
Response to Office Action of 5/26/04
Atty Docket 117210-27

## REMARKS

### Claim status

Claims 1-16 were pending in the application at the time of the current Office Action. All stand rejected as being obvious over prior art. Claims 1 is amended herein solely for the purpose of clarifying the claim. Claims 17-24 are added herein to define further aspects of the invention. Claims 1-24 are therefore currently pending in the application.

### Section 102 rejections

There are no present rejections under Section 102.

### Section 103 rejections

In the current Office action, claims 1-5, 10-14, 16 are rejected under 35 U.S.C. 103(a) as being unpatentable over Grewe et al. (U.S. Patent No. 5,625,673), hereafter referred to as "Grewe '673", in view of Jones, Jr. (U.S. Patent No. 5,974,334), hereafter referred to as "Jones '334".

In the current Office action, claims 6-9, 15 are rejected under 35 U.S.C. 103(a) as being unpatentable over Grewe '673 in view of Jones '334 and still further in view of Pardo (U.S. Patent No. 6,266,539) hereafter referred to as "Pardo '539".

Applicants respectfully traverse the foregoing rejections in view of the above pending claims and for reasons set forth hereafter.

Independent claim 1 recites a portable computing, communication and entertainment device comprising a detachable handset unit sized for handheld grasping. The detachable handset unit includes a processor and a plurality of first circuits such that the processor controls the operation of the first circuits. The device also comprises a portable docking display unit dimensioned to receive docking of the detachable handset unit. The portable docking display unit includes a first display and a plurality of second circuits. The plurality of second circuits does **not** include a central processor. When the detachable handset unit is docked to the portable docking display unit, the processor of the detachable handset unit not only controls the first circuits of the detachable handset unit but also controls the operation of at least one of the second circuits and the first display of the portable docking display unit. In the claimed invention, the portable docking display unit can be a "dummy" unit that cannot operate unless the detachable handset unit is docked to the portable docking display

MMA0365

AUG-26-2004  17:12          HAHN LOESER + PARKS

3308647986     P.08

Ser. No. 09/719,290                    - 6 -
Response to Office Action of 5/26/04
Atty Docket 117210-27

unit.  The purpose of docking the detachable handset unit to the portable docking display unit is to
extend the capability of the detachable handset unit to function more like a portable laptop computer,
for example.

MPEP 2173.05(i) states, "The current view of the courts is that there is nothing inherently
ambiguous or uncertain about a negative limitation. So long as the boundaries of the patent
protection sought are set forth definitely, albeit negatively, the claim complies with the requirements
of 35 U.S.C. 112, second paragraph. ... Any negative limitation or exclusionary proviso must have
basis in the original disclosure."

The negative limitation in claim 1 "...said plurality of second circuits not including a central
processor, ..." has basis in the disclosure in at least Fig. 3 which shows a portable docking display
unit 30 and a detachable handset unit 20.  The detachable handset unit 20 shows a central processor
11.  However, the portable docking display unit 30 does not show a central processor.  Also, the
"Summary of the Invention" in the specification states, "For applications requiring larger display and
keyboard, the detachable handset unit is docked into the main unit, the docking display unit.  In this
mode the detachable handset unit provides the processing and the communication power to the
docking display unit." Furthermore, the "Preferred Embodiment for Carrying Out the Invention" in
the specification states, "When mated with a docking display unit, the detachable handset unit
becomes the controller for the entire portable computing, communication and entertainment device."

It is respectfully submitted that neither Grewe '673 nor Jones '334, nor the combination of
the two teach or suggest the claimed invention.  Specifically, Grewe '673 and Jones '334 do not
teach or suggest a detachable handset unit, having a processor, to control the operation of not only
circuits within the detachable handset unit, but also to control the operation of at least one of a
display of the portable docking display unit and circuits of the portable docking display unit when the
handset unit is docked to the docking display unit such that the docking display unit does not have a
central processor of its own, as does the claimed invention.

Instead, Grewe '673 describes interconnecting a PDA with some other accessory to enhance
the PDA. (Abstract) For example, Grewe '673 describes mating a cellular telephone to a PDA
simply to provide communication between the cellular telephone and the PDA. (Fig. 1 and Fig. 2)
The cellular telephone has its own processing capability and can be operated independently of the
PDA.  Likewise, the PDA has its own processing capability and can be operated independently of the
cellular telephone. (column 1, lines 57-64)  Grewe '673 does not teach or suggest, for example,

Akron - 84285.1

PAGE 8/10 * RCVD AT 8/26/2004 5:03:29 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/0 * DNIS:8729306 * CSID:3308647986 * DURATION (mm-ss):03-02

MMA0366

using a processor of the cellular telephone to control operation of any circuitry or display of the
PDA. In the claimed invention, the processor of the handset unit is used to control the operation of at
least one of a display of the portable docking display unit and circuits of the portable docking display
unit. The claimed invention does not have a processor in the portable docking display unit as does
each of the PDA and cellular telephone of Grewe '673. In the claimed invention, when the handset
unit is docked to the portable docking display unit, the processor of the handset unit provides
processing capability for the docking display unit. Similarly, none of the other embodiments
described in Grewe '673 teach or suggest using a processor of a hand-held device to control parts of
another device having a display, when docked.

Jones '334 describes a PDA having a multi-positional handset. The PDA has a base with a
recessed handset cradle and a handset with a shape complementary to the configuration of the cradle.
(column 3, lines 8-19) The handset docks to the PDA base simply to provide power to the handset
(i.e., to charge a battery of the handset). (column 4, lines 11-30) Jones '334 does not teach or
suggest using a processor of the handset to control the operation of any part of the PDA or vice versa.
Jones '334 simply describes docking the handset to the PDA base in a flush configuration for mobile
use, and in a non-flush configuration for office use.

In view of at least the foregoing, it is respectfully submitted that independent claim 1 defines
allowable subject matter. Since claims 2-15 depend either directly or indirectly from claim 1, it is
respectfully submitted that dependent claims 2-15 define allowable subject matter as well.

Applicant respectfully traverses the Examiner taking Official Notice that GPS is very well
known in the art for monitoring the position of an object such that it would have been obvious to one
of ordinary skill in the art to include GPS in a handset that is capable of docking to and controlling
the operation of a portable docking display unit. Applicant has argued above that the device of claim
1 is not obvious. Therefore, the device of claim 1 with GPS is not obvious. Since claim 16 depends
indirectly from claim 1, it is respectfully submitted that dependent claim 16 defines allowable subject
matter.

With respect to new claims 17 – 24, claim 17 also defines the invention to comprise A
communication and processing device with    a portable handset for handheld grasping and
manipulation of at least one input device provided thereon. The input device is coupled to a processor
associated with the handset. the handset further includes a first display associated therewith. The
device also comprises a docking display, to which the handset is selectively docked,. The docking

MMA0367

AUG-26-2004  17:13          HAHN LOESER + PARKS                    3308647986    P.10

Ser. No. 09/719,290                        - 8 -
Response to Office Action of 5/26/04
Atty Docket 117210-27

display has a second display which is larger than the first display, being controlled by the processor of the handset. The prior art of Grewe '673, Jones '334, either alone or in combination, simply do not teach or make obvious the invention as defined in claim 17. Specifically, Grewe '673 and Jones '334 do not teach or suggest a handset unit, having a processor, which is selectively docked with a docking display, and wherein the handset control the operation of the display when the handset unit is docked to the docking display unit. Further, the prior art does not provide a device wherein a handheld unit, the handset, can be docked with a docking display to effectively convert the handset to a laptop or tablet type of PC, with a larger display and auxiliary keyboard providing simpler and more effective use of the processing power of the handset. The dependent claims 18-24 also define clearly distinguishing characteristics of the present invention, which are neither shown nor made obvious by the prior art. It is believed the new claims 17 – 24 are also in allowable condition, and favorable action is requested.

Accordingly, the applicant respectfully requests reconsideration of the rejections based on the arguments made above. After such reconsideration, it is urged that allowance of all claims will be in order.

                                    Respectfully submitted,
                                    Hahn Loeser + Parks, LLP


                                    Scott M. Oldham
                                    Registration No. 32,712

Twin Oaks Estate
1225 West Market Street
Akron, OH 44313-7188
(330) 864-5550
Fax 330-864-7986
smoldham@hahnlaw.com

Akron - 84285.1

PAGE 10/10 * RCVD AT 8/26/2004 5:03:29 PM [Eastern Daylight Time] * SVR:USPTO-EFXRF-1/0 * DNIS:8729306 * CSID:3308647986 * DURATION (mm-ss):03-02

TOTAL  P.10

MMA0368

AUG-26-2004  17:11      HAHN LOESER + PARKS                    3308647986      P.01

Practitioner's Docket No. 117210.27                          *PATENT*    RECEIVED
                                                              CENTRAL FAX CENTER
IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
                                                                 AUG 2 6 2004

In re application of:   Rajendra Kumar
Application No.: 09/719,290               Group No.: 2681
Filed: 12/07/2000                         Examiner: II. Nguyen
For: PORTABLE COMPUTING, COMMUNICATION AND ENTERTAINMENT DEVICE WITH
CENTRAL PROCESSOR CARRIED IN A DETACHABLE HANDSET

> RESPONSE UNDER
> 37 C.F.R. § 1.116
> EXPEDITED PROCEDURE
> EXAMINING GROUP

Mail Stop AF
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

### AMENDMENT OR RESPONSE AFTER FINAL REJECTION–TRANSMITTAL

1.      Transmitted herewith is an amendment after final rejection (37 C.F.R. 1.116) for this
        application.

### STATUS

2.      Applicant is a small entity. A statement was already filed.

---

### CERTIFICATION UNDER 37 C.F.R. §§ 1.8(a)

I hereby certify that, on the date shown below, this correspondence is being:

**MAILING**

☐ deposited with the United States Postal Service in an envelope addressed to the Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.

37 C.F.R. § 1.8(a)                           37 C.F.R § 1.10*

☐ with sufficient postage as first class mail.        ☐ as "Express Mail Post Office to Addressee"
                                                    Mailing Label No. _____ (mandatory)

**TRANSMISSION**

■ facsimile transmitted to the Patent and Trademark Office, (703) 872 9306.

Signature

Date: _3/26/04_

Scott M. Oldham
(type or print name of person certifying)

Amendment or Response After Final Rejection—page 1 of 2

MMA0369

AUG-26-2004  17:11        HAHN LOESER + PARKS

3308647986      P.02

## EXTENSION OF TERM

3.        The proceedings herein are for a patent application and the provisions of 37 C.F.R. 1.136 apply.  Applicant believes that no extension of term is required. However, this conditional petition is being made to provide for the possibility that applicant has inadvertently overlooked the need for a petition for extension of time.

## FEE FOR CLAIMS

4.        The fee for claims (37 C.F.R. 1.16(b)-(d)) has been calculated as shown below:

|  | (Col.1) Claims Remaining After Amendment |  | (Col. 2) Highest No Previously Paid For | (Col. 3) Present Extra | SMALL ENTITY Rate | Addit Fee |
|---|---|---|---|---|---|---|
| Total | 24 | Minus | 20 | = 4 | x $9 = | $36 |
| Indep | 2 | Minus | 3 | = 0 | x $43 = | $0 |
| First Presentation of Multiple Dependent Claim |  |  |  |  | + $145 = | $0 |
|  |  |  |  |  | Total Addit. Fee | $36 |

Total additional fee for claims required $36.00

## FEE PAYMENT

5.        Authorization is hereby made to charge the amount of $36.00 to Deposit Account No. 15-0450.

Charge any additional fees required by this paper or credit any overpayment to Deposit Account No. 15-0450.

Date:    8/26/04

Signature of Practitioner
Scott M. Oldham
Hahn Loeser & Parks LLP
Twin Oaks Estate
1225 West Market Street
Akron, OH 44313-7188
USA

Reg. No.: 32,712
Tel. No.: 330-864-5550
Customer No.: 021324

Amendment or Response After Final Rejection – page 2 of 2

MMA0370