

FIG. 18A

FIG. 18B

START

CONFIGURE N CONTENTION MINI-SLOTS IN EACH UPLINK FRAME — 1810

ALLOW FOR M ACCESS PRIORITY CLASSES AT AP — 1815

EACH HOST WITH STACK LEVEL 10 AND ACCESS PRIORITY $i$ TRANSMITS ACCESS REQUEST WITH PROBABILITY $P_i$ — 1860

RECEIVE ACCESS REQUESTS AT AP — 1825

1830 — UNCOLLIDED REQUEST IN CURRENT MINI-SLOT?

NO → PERFORM CONFLICT RESOLUTION AT MOBILES — 1840

YES

GRANT ACCESS TO HOST MAKING REQUEST — 1835

GRANT ACCESS TO "WINNING" HOST — 1845

1850 — MORE MINISLOTS TO EXAMINE?

YES

NO



FIG. 19



FIG. 20



FIG. 21

FIG. 22



U.S. Patent        Sep. 5, 2000        Sheet 34 of 34        6,115,390

FIG. 23



6,115,390

**1**

## BANDWIDTH RESERVATION AND COLLISION RESOLUTION METHOD FOR MULTIPLE ACCESS COMMUNICATION NETWORKS WHERE REMOTE HOSTS SEND RESERVATION REQUESTS TO A BASE STATION FOR RANDOMLY CHOSEN MINISLOTS

This application claims priority under Title 35, United States Code §120 from Provisional Application Serial No. 60/061,790, filed Oct. 14, 1997, and Provisional Application Serial No. 60/077,741, filed Mar. 12, 1998. This application is one of seven applications having the same Detailed Description and assignee that were filed on the same date, the seven related applications being application Ser. Nos.: 09/083,675, 09/083,677, 09/084,072, 09/083,792, 09/083,762 and 09/083,759.

### FIELD OF THE INVENTION

The present invention relates to a medium access control (MAC) protocol, known as an "on-demand multiple access fair queuing" system, for application in a wireless communications network system. In particular, the invention relates to a method for conflict resolution among remote hosts competing for transmission bandwidth in time and frequency division half- and full-duplex multiple access wireless networks.

### BACKGROUND OF THE INVENTION

Wireless services, such as cellular voice and data and wireless LANs, are expected to enjoy rapid growth in the years to come. Third generation wireless networks designed to carry multimedia traffic are currently under intensive research, with the major goals being to provide seamless communications, high bandwidth availability, and guaranteed Quality of Service (QoS) without any location or mobility constraints.

FIG. 1 depicts a prior art wired network for data exchange. Shown are the three existing business entities whose equipment, working in concert, is typically utilized today to provide remote internet access through modems to user computers. User computers **2** and user modems **4** constitute end systems. The first business entity shown in FIG. 1 is the telephone company (telco) that owns and operates the dial-up plain old telephone system (POTS) or integrated services data network (ISDN). The telco provides a transmission medium in the form a public switched telephone network (PSTN) **6** over which bits or packets can flow between users and the other two business entities.

The second business entity shown in FIG. 1 is the internet service provider (ISP). The ISP deploys and manages one or more points of presence (POPs) **8** in its service area, to which end users connect for network service. An ISP typically establishes a POP in each major local calling area in which the ISP expects to have subscribers. The POP **8** converts message traffic from the PSTN **6** into a digital form to be carried over intranet backbone **10**, which is either owned by the ISP or leased from an intranet backbone provider such as MCI, Inc. An ISP typically leases fractional or full T1 or T3 lines from the telco for connectivity to the PSTN. The POPs **8** and the ISP's media data center **14** are connected together over the intranet backbone **10** through router **12A**. The data center **14** houses the ISP's web servers, mail servers, accounting, and registration servers, enabling the ISP to provide web content, e-mail, and web hosting services to end users. Future value-added services may be

**2**

added by deploying additional types of servers in the data center **14**. The ISP maintains router **12A** in order to connect to public internet backbone **20**. In the existing model for remote access, end users typically have service relationships with both their telco and their ISP, usually getting separate bills from each. End users access the ISP and, through the ISP, public internet **20**, by dialing the nearest POP and running a communication protocol known as the Internet Engineering Task Force (IETF) point-to-point (PPP) protocol.

The third business entity shown in FIG. 1 is a private corporation which owns and operates its own private intranet **18**, accessed through router **12B**. Corporate employees may remotely access corporate network **18** (e.g., from home or while on the road) by making POTS/ISDN calls to corporate remote access server **16** and running the IETF PPP protocol. For corporate access, end users pay only for the cost of connecting to corporate remote access server **16**. The ISP is not involved. The private corporation maintains router **12B** in order to connect an end user to either corporate intranet **18** or public internet **20**.

End users currently pay the telco for both the cost of making phone calls and the cost of a phone line into their home. End users also must pay the ISP for access to the ISP's network and services. Today, internet service providers offer internet access services, web content services, e-mail services, content-hosting services, and roaming to end users. Because of low margins and lack of market segmentation based on features and price, ISPs are looking for value-added services to improve margins. In the short term, equipment vendors want to be able to offer solutions to ISPs that enable them to offer faster access, virtual private networking (the ability to use public networks securely as private networks and connect to intranets), roaming consortiums, push technologies, and specific Quality of Service. In the longer term, it is desired to offer voice over internet and mobility. ISPs will then be able to use these value-added services to escape from the low margin straitjacket. Many of these value-added services fall into the category of network services and can be offered only through the network infrastructure equipment. Other value-added services fall into the category of application services which require support from the network infrastructure, while still others do not require any support from the network infrastructure. In particular, services like faster access, virtual private networking, roaming, mobility, voice, Quality of Service, and QoS-based accounting all need enhanced network infrastructure.

Wireless communications networks have the advantage of being able to extend the reach of wired networks. However, achievable bandwidths in wireless networks frequently lag behind those available in wired networks. Wired broadband systems like asynchronous transfer mode (ATM) are capable of providing services with different QoS (e.g., constant bit rate (CBR), variable bit rate (VBR), and available bit rate (ABR)) for enhanced support of multimedia applications. It is desired to extend such services to wireless networks. Research on merging ATM and wireless networks is therefore currently underway in many institutions and research laboratories. Many fundamental issues, affecting everything from the access layer to the transport layer, are being studied. Besides use of ATM as a transmission format at the air interface of a wireless network, ATM is also being considered for the wired infrastructure of cellular systems. Such a wired ATM infrastructure would be capable of supporting multiple access air interface technologies (e.g., CDMA, TDMA, etc.).

6,115,390

**3**

In a wireless network that supports multimedia traffic, an efficient channel access protocol needs to be maximize the utilization of the limited wireless spectrum while still supporting the quality of service requirements of all traffic. Several well-known channel access protocols are currently used in wireless data systems, such as Slotted Aloha, PRMA, etc. Slotted Aloha is a simple protocol but, because it does not attempt to avoid or resolve collisions between data users, its theoretical capacity is just 0.37. In addition, Slotted Aloha is unsuitable for efficient transmission of variable-length packets.

Reservation-based protocols attempt to avoid and resolve collisions by dynamically reserving channel bandwidth for users needing to send packets. Typically, in such protocols a channel is divided into slots which are grouped into frames of N slots. A slot can be further subdivided into k minislots. Normally, $N_1$ of the slots will be used for reservation purposes while the remaining $N–N_1$ slots are data slots. The users that need to send packets send a reservation request packet in one of the $M=N_1*k$ minislots. If the reservation request packet is successful, then the user will be allocated a certain number of data slots until the user or the base station releases the reservation. If the reservation request packet is not successful, the user will use a conflict resolution method to retransmit the reservation request until it is successfully transmitted.

A multiple access protocol for hybrid fiber-coax networks has been proposed by Doshi et al. in "A Broadband Multiple Access Protocol for STM, ATM, and Variable Length Data Services on Hybrid Fiber-Coax Networks," Bell Labs Technical Journal, Summer 1996, pp. 36–65. While sharing many issues with the wireless environment, this protocol does not completely address the unique problems encountered in the design of a wireless access scheme, such dealing with retransmissions over an error-prone wireless link and establishment of the transmission power level needed to ensure proper packet delivery. While this scheme does propose the idea of contention reservation slots, it does not provide a flexible scheme wherein the number of contention slots can be varied dynamically based on queue size information.

Karol et al have proposed a "Distributed-Queuing Request Update Multiple Access" scheme (DQRUMA) [Karol et al, "An efficient demand-assignment multiple access protocol for wireless packet (ATM) networks," Wireless Networks 1, pp. 267–279, 1995]. This wireless access scheme does not allow new users to contend for bandwidth during the conflict resolution period or utilize the reservation slot contention success rate during the previous round to adjust backoff time. This scheme also does not utilize a fair queuing technique, and hence does not make use of service tags to fairly allocate bandwidth between competing sources.

An important topic in designing a channel access protocol is selection of the scheduling techniques used to set the transmission order of uplink and downlink packets. A number of schedulers which are all variations on fair queuing have been proposed for wired networks [See, e.g., S. J., Golestani, "A Self-Clocked Fair Queuing Scheme For Broadband Applications", Proceedings of IEEE Infocom, 1994; Parekh and Gallagher, "A Generalized Processor Sharing Approach To Flow Control In Integrated Services Networks: The Single Node Case", IEEE/ACM Transactions On Networking, 1(3):344–357, June 1993; L. Zhang, "Virtual Clock Algorithm", Proceedings of ACM Symposium, pp 1224–1231, 1992]. These all have the effect of providing access to a share of bandwidth as if each service class has its own server at its given rate.

**4**

The Weighted Fair Queuing scheme of Parekh and Gallagher is difficult to implement, so the Self-Clocked Fair Queuing (SCFQ) scheme was proposed by Golestani. For SCFQ, the service tag is computed as;

$$F_k^i = \frac{L_k^i}{r_k} + \max(F_k^{i-1}, \hat{u}(a_k^i)) \qquad (1)$$

where $\hat{u}(t)$ is the service tag of the packet in service at time t, $F_k^i$ is the service tag for the $i^{th}$ packet from class k with $F_k^0=0$ for all k, $L_k^i$ is the length of the $i^{th}$ packet of class k, $r_k$ is the relative weight assigned to class k, and $a_k^i$ is the arrival time of the $i^{th}$1 packet of class k. Packets are then served in the order of these tag values. The algorithm of Golestani is designed for wired networks, however, and must be modified if it is to function in a wireless environment. In particular the algorithm of Golestani does not address either how to handle transmission scheduling when the server (base station) does not have complete information about the size of the queues because they are remotely located or how to handle retransmission of lost packets.

Lu et al (University of Illinois) have proposed an "Idealized Weighted Fair Queuing" algorithm [Lu et al, "Fair Scheduling in Wireless Packet Networks," Sigcom '97] that is designed to accommodate the special needs of wireless networks. This scheme requires full knowledge of the channel state (i.e. whether it is good or bad), something that is not generally available in a real network. It also does not change the service tags of packets that do not transmit successfully, leading to a complicated retransmission process, and drops packets from lagging flow, rather than only when there is a buffer overflow.

Another wireless access scheme, proposed by R. Kautz in "A Distributed Self-Clocked Fair Queuing Architecture For Wireless ATM Networks", 1997 International Symposium on Personal Indoor and Mobile Radio Communications, utilizes a polling system instead of a reservation and piggybacked reservation approach. Polling schemes generally have poorer performance in terms of delay and bandwidth usage as compared to reservation access schemes. In addition, the scheme of Kautz changes service tag values only for those packets transmitted in error, causing the QoS at all remotes to suffer because the packets of all the remotes are delayed by retransmission of the lost packet.

## SUMMARY

The present invention is an aspect of an on-demand multiple access (ODMA) method with a fair queuing (FQ) service discipline (referred to as ODMAFQ) for efficient utilization of the limited bandwidth available in wireless communications networks. In this method, a bursty source sends a channel access packet to reserve bandwidths for future transmissions whenever a packet has arrived at an empty queue, while a constant bit rate source is made to undergo contention only once, during connection set-up. A distributed self-clocked fair queuing service discipline is used to determine the transmission order of various uplink sources, allowing diverse QoS to be provided.

In one aspect of the invention, remote hosts make bandwidth requests to the base station (AP) via uplink access request messages. These messages are partitioned into one or more reservation minislots in which remote hosts make their access requests. The number of reservation minislots available in any particular uplink message may be dynamically changed based on the percentage of idle minislots and the total uplink queue length.

6,115,390

5

A collision occurs for any access request where two or more remote hosts have transmitted a request in the same reservation minislot. The status of a minislot is also declared to be a collision if interference causes corruption of data in the slot. At the AP, the RF energy in a reservation minislot is estimated. If there is no energy present, then the minislot status is declared IDLE. The status of a minislot is SUC-CESS if RF energy has been detected in the slot, a preamble in that slot is not corrupted, and a frame check sequence (FCS) in the slot indicates no errors. The status of a contention slot is declared to be COLLIDED if RF energy has been detected in the slot, and either the preamble in that slot is corrupted or a frame check sequence (FCS) in the slot indicates error.

Two new conflict resolution methods are disclosed. In these methods, the AP broadcasts the outcome of each contention cycle in each reservation minislot to all wireless nodes via a downlink broadcast message. Each wireless node is characterized by a stack level, and only wireless nodes with a stack level equal to zero are permitted to transmit access request packets. Nodes with a stack level greater than zero are regarded as backlogged. At the end of a time slot, each wireless node changes stack level based on the outcome of a transmission in that time slot. These methods allow newly active wireless nodes to join in with those wireless nodes already having stack level 0 during any particular conflict resolution period.

In both methods, a wireless node waiting to access the AP or send new data sets its stack level to 0 and enters the request state. If the stack level of the node is 0, the node randomly picks a reservation minislot for transmission of an access request and transmits the access request. If the outcome of the request is SUCCESS, and the queue at the node is empty, the node transmits the current packet and exits the request state, returning to the waiting state. If the queue at the node is not empty, then, after receiving a transmit permit from the AP, the node transmits the current packet along with a piggybacked reservation request for transmission of the next packet in its queue, continuing to transmit packets with piggybacked reservation requests after receiving transmit permits until the queue is empty, at which point it transmits the remaining packet, exits the request state, and returns to the waiting state. If the outcome of the reservation request was not SUCCESS, the node participates in a random draw to learn whether to increment its stack level by 1 or leave its stack level at 0. If the stack level remains at 0, the node again randomly picks a reservation minislot for transmission of an access request and transmits the access request. If the stack level is incremented, the stack level will not be 0.

In one of the new conflict resolution methods, if the stack level of any wireless node is not 0, then if the outcome of the previous reservation request was COLLIDED, the node increments its stack level by 1. If the outcome of the previous reservation request was not COLLIDED, the node decrements its stack level by 1. It can be seen from this that a node that loses the random draw is forced to wait out at least three contention slot opportunities before it can make a new access request.

The other new conflict resolution method is a modifica-tion of the first. In this method, the modem in each wireless node is again characterized by a stack level, and only wireless nodes with a stack level equal to zero are permitted to transmit access request packets. Modems with stack level greater than zero are regarded as backlogged. If the stack level of any wireless node is not 0, then if the outcome of all the reservation requests during the previous cycle was

6

COLLIDED for greater than or equal to some threshold, the node increments its stack level by 1. If the outcome for the previous reservation request was not COLLIDED, the node decrements its stack level by 1.

It is a general object of the present invention to provide a remote host with bandwidth on demand in a wireless net-work. It is a further general object of the present invention to provide a method to efficiently resolve conflicts between remote hosts competing for the limited bandwidth available in a wireless network.

BRIEF DESCRIPTION OF THE DRAWINGS

The invention is described in detail in the following description of preferred embodiments with reference to the following figures, wherein:

FIG. 1 is a schematic diagram of a prior art network;

FIG. 2 is a schematic diagram of a network according to an aspect of the present invention;

FIGS. 3 and 4 are frame diagrams showing example downlink and uplink frame structures for a frequency divi-sion half-duplex embodiment of the invention;

FIG. 5 is a frame diagram of the synchronized downlink and uplink frame structures for a frequency division full-duplex embodiment of the invention;

FIG. 6A illustrates a frame having a general MAC layer downlink broadcast subframe, according to an example embodiment of an aspect of the present invention;

FIG. 6B depicts a broadcast or multicast downlink frame format;

FIG. 6C depicts a beacon message format for the embodi-ment of FIG. 6B;

FIG. 6D depicts a transmit permit format for the embodi-ment of FIG. 6B;

FIG. 6E depicts a transmit schedule format for the embodiment of FIG. 6B;

FIG. 6F depicts a broadcast or multicast payload format for the embodiment of FIG. 6B;

FIG. 7A illustrates a frame having a downlink unicast sub-frame, according to an example embodiment of the present invention;

FIG. 7B illustrates a flow control frame format for a downlink unicast data subframe, according to an example embodiment of the present invention;

FIG. 7C illustrates a data frame format for a downlink unicast data subframe, according to an example embodiment of the present invention;

FIG. 7D depicts a unicast sub-frame concatenated to the back of a broadcast sub-frame;

FIG. 8A illustrates a frame format for an uplink trans-mission frame, according to an example embodiment of the present invention;

FIG. 8B depicts the asynchronous transfer region of the frame of FIG. 8A;

FIG. 8C depicts an uplink frame having reservation minislots according to an embodiment of the present inven-tion;

FIG. 8D illustrates a frame format for a reservation minislot, according to an example embodiment of the present invention;

FIG. 8E illustrates a frame format for a pure acknowl-edgment uplink frame, according to an example embodi-ment of the present invention;

FIG. 8F illustrates a frame format for a pure data uplink unicast frame, according to an example embodiment of the present invention;

6,115,390

7

FIG. 8G illustrates a frame format for a combined acknowledgment and data uplink frame, according to an example embodiment of the present invention;

FIG. 8H illustrates a frame format for a combined acknowledgment, data, and "more" uplink frame, according to an example embodiment of the present invention;

FIG. 9A depicts a time line showing the tags of packets at time t=0 in an example embodiment of the present invention;

FIG. 9B depicts a time line showing the tags of packets at time t=3 just before the packets from session 3 arrive in the example of FIG. 9A;

FIG. 9C depicts a time line showing the tags of packets at time t=3 just after the nine packets from session 3 arrive in the example of FIG. 9A;

FIG. 9D depicts a time line showing the tags of packets at time t=4.5 in the example of FIG. 9A;

FIG. 10 is an illustration of dynamic adjustment of the uplink/downlink ratio, according to one embodiment of the present invention;

FIG. 11 is a schematic illustration of the operation of the paging capability of one embodiment of the present invention;

FIGS. 12A–12D are flowcharts depicting different methods that may be utilized to dynamically change the number of reservation minislots according to one embodiment of the present invention;

FIG. 13A is a flowchart illustrating the overall MAC protocol operation, as viewed by a remote host, according to one embodiment of the present invention;

FIG. 13B is a flowchart illustrating the overall MAC protocol operation, as viewed by the base station, according to one embodiment of the present invention;

FIGS. 14A–14C are flowcharts illustrating three contention resolution methods according to embodiments of the present invention;

FIG. 15A is a flowchart illustrating an embodiment of the method for sharing bandwidth of the present invention;

FIG. 15B is a flowchart illustrating an alternate embodiment of the method for sharing bandwidth of the present invention;

FIG. 16 is a flowchart illustrating assignment of packet service tags according to one embodiment of the present invention;

FIG. 17 is a flowchart illustrating establishment of the power level for uplink data transmission according to an aspect of the method of the present invention;

FIG. 18A is a flowchart illustrating an embodiment of a method for access control according to the present invention;

FIG. 18B is a flowchart illustrating an alternate embodiment of a method for access control according to the present invention;

FIG. 19 is a flowchart illustrating an embodiment of a method for control of admission of remote hosts according to the present invention;

FIG. 20 is a flowchart illustrating an embodiment of a method for admission of new connections based on measured quantities according to an aspect of the present invention;

FIG. 21 is a flowchart illustrating an embodiment of a method for overload control in a network according to an aspect of the present invention;

8

FIG. 22 is a block diagram of the On-Demand Multiple Access Scheme with Fair Queuing of the present invention; and

FIG. 23 is a flowchart illustrating the operation of the multiple access scheme of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

As previously discussed, it is an object of the present invention to provide a wireless packet-switched data network for end users that avoids the public switched telephone network and provides end users of the wireless network with remote roaming capability. These and other objects are achieved in a wireless data network that includes a home mobility switching center, a foreign mobility switching center, a base station (access point) and an end user. The home mobility switching center includes a home registration server and a home inter-working function. The foreign mobility switching center includes a serving registration server and a serving inter-working function. The base station includes a proxy registration agent. The end user modem includes a user registration agent. The user registration agent is coupled to the proxy registration agent, the proxy registration agent is coupled to the serving registration server, and the serving registration server is coupled to the home registration server.

The proxy registration agent includes a module for sending an advertisement containing a care-of-address upon receipt of a solicitation from the user registration agent. The user registration agent includes a module for incorporating user identity information and the care-of-address into a registration request upon receipt of the advertisement, as well as a module for sending this registration request to the proxy registration agent. The proxy registration agent further includes a module for forwarding to the serving registration server any registration request received from any user.

The serving registration server includes a foreign directory module for determining a home registration server address, a module for encapsulating the registration request and incorporating serving registration server identity information and the encapsulated registration request into a radius access request when the home registration server address is determined, and a module for sending the radius access request to the home registration server. The home registration server includes a home directory module for authenticating the serving registration server identity information, a module for forming an inter-working function (IWF) request from the radius access request when the serving registration server identity information is authenticated, and a module for sending the inter-working request to the home inter-working function.

As seen in the embodiment of a network utilizing the present invention depicted in FIG. 2, end systems (remote hosts) 232 (for example, a portable Windows 95 personal computer) connect to wireless network 230 via external or internal modems. These modems allow end systems 232 to send and receive medium access control (MAC) frames over air link 234. If used, an external modem may be attached to PC or other end system 232 via a wired or wireless link. External modems are generally fixed, and could be co-located with roof top-mounted directional antennae. External modems may be connected to the user's PC using any appropriate linking method, including any of following types of links: universal serial bus, parallel port, infra-red, 802.3, or even an ISM radio link. Internal modems send and

6,115,390

9

receive MAC frames over the air link and are preferably PCMCIA cards that are plugged into the laptop's backplane using a small omni-directional antenna.

Wide-area wireless coverage is provided by base stations (access points) 236. The range of coverage provided by base stations 236 depends on factors like link budget and capacity. Base stations are typically installed in cell sites by personal communication services (PCS) wireless service providers. Base stations 236 multiplex end system traffic from their coverage area to the system's mobile switching center (MSC) 240 over wire line or wireless microwave backhaul network 238.

At mobile switching center 240, packet data inter-working function (IWF) 252 terminates the wireless protocols for this network. IP router 242 connects MSC 240 to public internet 244, private intranets 246, or to internet service providers 247. Accounting and directory servers 248 in MSC 240 store accounting data and directory information. Element management server 250 manages the equipment, which includes the base stations, the IWFs, and the accounting/directory servers 248. The accounting server 248 collects accounting data on behalf of users and sends the data to the service provider's billing system. In a preferred embodiment, the interface supported by the accounting server 248 sends the accounting information in American Management Association (AMA) billing record format over a TCP/IP (transport control protocol/internet protocol) transport to a billing system (not shown in FIG. 2).

In the typical wireless network in which the present invention is utilized, each cell has a base station and a number of remote hosts (nodes), with or without additional wired hosts. Remote hosts/nodes can include any device capable of communication with the base station over a wireless link. Fixed-length packets arrive at the remote hosts ("remotes") at either a constant rate (CBR traffic) or according to various bursty random processes. The packets are buffered at the remotes until they are transmitted uplink to the base station, according to the channel access scheme. The base station broadcasts downlink packets that are destined for one or more of the remotes within its cell. Uplink and downlink communications are time-multiplexed on a single frequency channel in order to allow dynamic sharing of uplink and downlink bandwidths. The scheme of the invention can also be used for frequency division half-duplex (FDHD) and frequency division full duplex (FDFD) systems. The base station uses a variant of the Self-Clocked Fair Queuing algorithm of Golestani for scheduling the order of packet transmission from both remote hosts (remote queues) and wired hosts (local queues).

The On-Demand Multiple Access Fair Queuing (ODMAFQ) scheme of the invention is a time-slotted system in which a request access channel and a packet transmission channel are formed on a slot-by-slot basis. Time slot duration is chosen based on the particular system implemented. As an example, this might be equal to the time needed to transmit an ATM cell payload plus radio- and MAC-specific headers. The multiplexing of uplink and downlink traffic is based on time division duplex (TDD) for TDD and FDHD systems. Remotes that have packets to send transmit access requests via the request channel to the base station. The exact manner that each remote makes such a request is dependent on whether the remote's traffic is bursty or constant bit rate.

Transmissions on the request channel are on a multiple access basis. Upon receiving a successful access request, the base station updates appropriate entries in a Request Table.

10

The Request Table contains an entry for every remote and wired host in the cell. Each entry contains the remote/wired host identification tag and an associated field containing the service tag, with a tag value of −1 preferentially being used to indicate that the particular host has no more packets to transmit. Since wired hosts are local to the base station, they do not need to execute the request access process.

The base station schedules transmission of its uplink and downlink traffic and allocates bandwidth dynamically, based on traffic characteristics and QoS requirements as well as the current bandwidth needs of all supported hosts. A service tag is used to schedule the transmission order of the packets from the hosts, with the current queue information of all wired hosts being always known to the base station and the queue information of the remotes being sent to the base station through reservation requests. Reservation requests are either piggybacked on an already-scheduled uplink transmission or sent to the base station via the request access channel in contention mode.

An embodiment of the ODMAFQ scheme is depicted in FIG. 22. Remote hosts 2210 request access to the base station 2212 via the request access channel 2220. Successful requests are sent to the scheduler 2230, which notifies 2232 both the remotes 2210 and the wired hosts 2240 of when it will be their turn to transmit. When the time comes, a particular remote 2210 transmits 2234 a packet via the transmission channel 2250. If the remote has additional packets to be transmitted, it also piggybacks 2252 a reservation request for the next packet on the current packet being transmitted 2234 via the transmission channel 2250, thus avoiding the need to transmit a request 2212 in contention mode via the request access channel 2220 for the next packet.

As illustrated in the flowchart of FIG. 23, when a packet arrives at a remote with an empty buffer queue 2310, if the source is not bursty 2314, i.e. provides a relatively continuous flow of packets or other data, the remote makes an access request and informs the base station (access point) of its packet arrival rate and connection duration time 2320. Once an acknowledgment (ACK) 2324 and transmit permit 2328 are received from the base station, the remote sends the first packet 2330 in the timeslot specified by the transmit permit. The base station will continue to provide the remote with transmit permits 2328 until the connection duration time is over 2332. Only one access request is required for the entire duration of the connection.

In contrast, when a packet arrives at a remote with an empty buffer queue 2310 from a bursty source 2314, i.e. a source with a highly discontinuous rate of flow of packets or other data, the remote makes an access request in contention mode 2350 via the uplink request access (RA) channel, which consists of multiple reservation minislots. The access request from a remote includes the remote's identity, which has been assigned at call setup or call handoff. When the base station successfully receives a transmit request from a remote, it updates the corresponding entry in the Request Table to indicate that the remote with that identity has packets to transmit and then broadcasts an acknowledgment over the downlink channel. The remote waits to receive the ACK 2354 and a transmit permit 2358. At the time of packet transmission, the remote determines if there are additional packets remaining in its queue 2362. If there are none, the packet is sent normally 2366. However, if there are additional packets awaiting transmission 2362, the remote piggybacks a bandwidth reservation request for the next packet onto the current packet when it is sent 2370. This piggy-backing serves as a contention-free reservation request, thus

6,115,390

11

only packets arriving at a remote with an empty buffer trigger a remote to send an access request.

Described herein, in conjunction with FIGS. 3–9D, is illustrative examples of the frame formats for a medium access control (MAC) scheme for an Internet access system according the principals of the present invention, including extensions for frequency division half-duplex (FDHD) mode and frequency division full-duplex (FDFD) mode. The On-Demand Multiple Access Fair Queuing (ODMAFQ) scheme described in conjunction with FIG. 23 can therefore be used to provide network control in both frequency division half-duplex and full-duplex modes. It is to be understood that the frame formats presented are examples only, and that other frame formats known to one of ordinary skill in the art of the invention and suitable for wireless transmission are contemplated by the inventor.

In both FDHD and FDFD modes, the access point (AP) transmits to the remote hosts at a downlink frequency f1 while the remote nodes transmit to the AP at an uplink frequency f2. FIGS. 3 and 4 show the downlink and uplink frame structure, respectively, for the FDHD case. Note that the length of downlink and uplink transmission times need not be the same. For example, if traffic characterization indicates that a 4:1 ratio of downlink to uplink transmission time (downlink transmission being longer than uplink transmission) is optimal, then optimal performance will generally be seen with the allocation of a downlink frame size of 4x ms and an uplink frame size of x ms.

As seen in FIG. 3, the downlink frame for the FDHD scheme of the invention may include physical layer overhead, such as some combination of guard and/or preamble bits 310 (which may be used as synchronizing bits), a medium access control (MAC) header 312, various control messages such as certain types of beacon messages 314, transmit permits 320, minislot information for the next uplink frame 350, and transmit schedules 322, acknowledgments (ACKs) for the reservation of minislots in previous uplink frame 330, acknowledgments for the data sent in the previous uplink frame 340, broadcast/multicast data messages 360, unicast data messages 380, and a frame check sequence (FCS) 355 for each preceding data message. Not all fields and messages are necessarily found in each downlink frame. For example, a downlink frame may consist of just the transmit permits, acknowledgments for reservation minislots, and unicast messages.

Some control messages are preferably part of the broadcast message 360, which may include such things as load metric, information about reservation minislots, flow control information, acknowledgments, and power management parameters. The load metric information can be as simple as the number of remote nodes registered with the AP, or may be more sophisticated, such as the equivalent number of active remote nodes. The load metric can be used for admission control and load-balancing among APs. The minislots information describes the number of reservation minislots present in the next uplink frame, if any, and their locations. The flow control information contains the connection cookie (identity) and an Xon/Xoff indication.

The acknowledgment 340 for uplink unicast traffic can be as simple as acknowledgment bits that are part of the broadcast message, or may be more sophisticated, such as separate unicast messages which specify the connection identity and the sequence number of the message to be acknowledged. In the former case, if the uplink transmission uses a frame structure with N fixed basic slots, then at most only N acknowledgment bits are needed. For the latter case,

12

it is necessary for each message to have a separate frame check sequence (FCS). Note that, due to the "hidden terminal problem," all the frames transmitted need to be acknowledged.

The data slots 380 include transmissions from multiple remote nodes. The transmission from each remote node includes guard bits, preamble bits, frame control bits, acknowledgments, and/or data messages. One of the frame control bits is a "more" bit that is used to indicate that the remote node has more data to transmit. Alternatively, the number of remaining bytes or number of fixed size packets left to be transmitted may be particularly specified, rather than just through use of a "more" bit.

As seen in FIG. 4, the FDHD uplink frame generally will consist of a contention period 410 and a contention-free period 415. The contention period 410 includes one or more contention slots, each of which can be either a contention data slot 420 or a contention reservation slot 422. The contention-free period 415 consists of acknowledgments 440 for previous downlink dataslots and multiple data slots 480 and 486. If desirable, these contention slots 420 and 422 may be spread uniformly across the whole frame rather than clustered together. Each contention reservation slot 422 may be further subdivided into k subslots 430, called reservation minislots. Each minislot 430 is long enough to contain the identity of a remote node, generally around 30 bytes. Contention slots 420 may be utilized as dataslots for transmitting small data packets. The contention-free period 415 may include pure ACK frames 440, pure data frames 480, and/or combination frames 486 having both data 488 and ACK 490 portions.

The number of minislots 430 may be dynamically changed. If, for example, there are k minislots in a contention reservation slot 422 and N total contention slots, N1 of which are reservation slots 422 containing a total of N1*k minislots, then the remaining (N–N1) slots are currently contention data slots. If there are a minimum and maximum number of reservation minislots desired for the system, the number of available reservation minislots can be dynamically changed based on the percentage of idle minislots and the total uplink queue length. Several methods for dynamically changing the number of minislots are described later in conjunction with FIGS. 12A–12D.

In order to assign different priorities to the remote nodes attempting to gain access to the system, the $M_1=N1*k$ minislots (where N1 is the number of contention reservation slots) may be divided into various groups. For example, a group of remote nodes with MAC addresses within a certain range may only be allowed to randomly access up to $M_2$ minislots (where $M_2<M_1$), whereas a higher priority group of remote nodes with MAC addresses within another range may be allowed to randomly access up to $M_1$ minislots. Alternatively, priority classes may be assigned to nodes based on connection identity rather than MAC address. A priority assignment feature could be particularly useful, for example, for emergency-response organizations, such as hospital or police staff, and could be achieved through the provision of wireless modems that have a higher priority of access than regular wireless modems. This feature could also be sold as a service class to customers who are willing to pay more for a higher access priority.

As depicted in FIG. 5, uplink frames 502 and 512 in Frequency Division Full-Duplex (FDFD) mode are synchronized with the downlink frames 562 and 572. As seen in FIG. 5, uplink frames 502 are shown as viewed from the wireless modem, uplink frames 512 are shown as viewed

6,115,390

13

from the AP, downlink frames **562** are shown as viewed from the AP, and downlink frames **572** are shown as viewed from the wireless modem. In FIG. **5**, the AP has previously sent downlink frame n to the wireless modem. After it received it after a propagation delay T$_{pc}$. In response, after end system processing time T$_{cpc}$, the wireless modem sends uplink frame n **504**, which is received **514** by the AP at propagation delay T$_p$ **520** later. Meanwhile, the AP has already begun transmission of downlink frame n+1 **564**.

In order for there to be enough time for the modems at the respective remote nodes to act on information in the transmit permits (for example, after receipt of downlink frame n, in the immediately following uplink frame), an offset of O$_u$ uplink transmission time is specified, where the end system processing time, T$_{cpc}$, in a wireless modem is assumed to be smaller than O$_u$. Uplink frame n+1 **506** from the wireless node therefore begins at an O$_u$ transmission time after receipt at the node of the last bit of the (n+1)st downlink frame **574** from the AP. The offset, O$_u$, and frame duration, ƒd, should be chosen so that the modems receive and process the feedback of the contention slots, such as the transmit permits received from the previous downlink frame, before the beginning of the next uplink frame. The frame size, ƒd, is such that ƒd≧2T$_p$+T$_{AP}$+T$_{cpc}$+T$_R$, where T$_p$ **520** is the propagation delay, T$_{AP}$ **540** is the AP processing time, T$_{cpc}$ **550** is the end system processing time, T$_R$ **530** is the transmit permit transmission time, and O$_u$≧T$_{cpc}$.

Therefore, in FIG. **5**, the AP is already transmitting downlink frame n+1 **564** when the wireless modem begins transmission of uplink frame n **504**. The wireless modem is already receiving **514** downlink frame n+1 at the time it begins sending uplink frame n **504**. The AP receives **544** uplink frame n at a time T$_R$ **530**+T$_{AP}$ **540** before it begins transmission of downlink frame n+2 **566**, which is received **576** at propagation delay T$_p$ **520** later by the wireless modem. The wireless modem transmits uplink frame n+1 **506** at end system processing time T$_{cpc}$ **550** later, and it is received **516** at the AP after propagation delay T$_p$ **520**. Similar synchronization occurs for the transmission **508** and receipt **518** of uplink frame n+2 and the transmission **568** and receipt **578** of downlink frame n+3.

The basic downlink MAC frame structure is a frame composed of several subframes. A super-frame made up of an integral number of frames can also be defined. The duration of a frame depends on the actual physical transmission rate, for example it might be fixed at 2 ms, and the number of subframes contained in a frame can be varied. If there are no stringent delay requirements, then the subframes can be of variable lengths. Otherwise, to meet the stringent delay requirements of certain sources, it is better to divide each frame into a synchronous transfer region (STR) and an asynchronous transfer region (ATR), so that those sources with such delay requirements can receive a fixed bandwidth during each frame Each of the regions may be further subdivided into basic slots.

FIG. **6A** is an illustration of an embodiment of the frame format of a general MAC layer downlink broadcast subframe according to the present invention. This example MAC frame has a 17-byte MAC header **620**, a frame body **622**, and a 2- or 4-byte frame check sequence (FCS) **624**, as well as Physical Layer Overhead **601** (guard and preamble bits). The MAC header **620** typically contains at least frame control bits, source and destination MAC addresses, and frame duration. The MAC header embodiment of FIG. **6A** includes a one-byte frame control (FC) field **602**, a 2-byte frame duration field **630**, a 6-byte source MAC address **632**, a 6-byte destination MAC address **634**, and a 2-byte

14

sequence control field **636** further subdivided into a 12-bit sequence number and a 4-bit fragment number. Obviously, any other MAC format would be suitable, depending on the type of handoffs required. The frame format will preferably be implemented in whatever manner makes the system most efficient.

The one-byte frame control field **602** of the embodiment of FIG. **6A** includes a 2-bit protocol version identifier **604**, a one-bit "more fragment" indication **606**, a one-bit "retransmission" indication **608**, a one-bit Xon/Xoff signal **816**, a one-bit encryption on/off flag (WEP) **614**, a one-bit "more data" indication **612**, and a one-bit flag for power management on/off **610**. If all these fields are not needed, any remaining bits may be reserved for future use. Other implementations are of course feasible and contemplated by the inventor.

A broadcast or multicast downlink frame format according to the present invention is depicted in FIG. **6B**. In the particular embodiment of FIG. **6B**, the frame body **622** contains a beacon message **640**, acknowledgments for previous uplink reservation minislots **626**, transmit permits **650**, transmit schedules **660**, a broadcast/multicast message **670**, and acknowledgments for previous uplink data **628**. The frame body **622** is followed by a frame check sequence **624** and preceded by a MAC header **620** comprised of a one-byte frame control (FC) field **602**, a 2-byte frame duration field **630**, a 6-byte source MAC address **632**, a 6-byte destination MAC address **634**, and a 2-byte sequence control field **636**.

FIG. **6C** depicts the format of the beacon message **640** of FIG. **6B** (**314**, FIG. **3**). The beacon message body **641** generally contains a message length field, the AP identity (referred to as ESS-ID and BSS-ID in Institute of Electrical and Electronics Engineers (IEEE) standard 802.11), the transmit power level, beacon interval, a timestamp, load metric, an optional FCS, and capability information. Beacon message capability information may include such information as the FDFD/FDHD option, the maximum number of admitted users, the maximum payload size, security option (such as whether encryption is being used or what encryption formats are supported), maximum number of retransmissions, ratio of downlink/uplink transmission time, uplink frame size, size of minislot, Quality of Service (QoS) features, etc. Load metric information, if present, generally contains the number of associated remote nodes. The beacon message body **641** is preceded by type **642** "Control" and subtype **644** "Beacon" fields.

FIG. **6D** depicts the transmit permit format **650** (**320**, FIG. **3**) of the embodiment of FIG. **6B**. The transmit permit body **651** is preceded by type **652** "Control" and subtype **654** "Transmit Permit" fields. In this embodiment, the transmit permit body **651** contains a message length indicator **655** plus a number of transmit permits **656**. Each 3-byte transmit permit **656** contains the identity of the remote node or connection **657**, the start time or slot **658**, and the duration that the remote node or connection is allowed to transmit **659** (end slot). In the example depicted, the Message Length **655** is 6 bytes, meaning there are two transmit permits **656** following. The first transmit permit **656** is for remote node **657** #3, which may start transmission at start slot **658** #1 and may transmit through end slot **659** #2. The second transmit permit **656** is for remote node **657** #5, which may start transmission at start slot **658** #3 and may transmit through end slot **659** #5. Different "Type" and "Subtype" labels may be used for the transmit permits of those wireless modems to which the AP sends both downlink unicast data and transmit permits. Subframes combining transmit permits and

6,115,390

15

schedules are preferably sent after the pure transmit permits and before any pure transmit schedules.

FIG. 6E depicts the transmit schedule format of the embodiment of FIG. 6B. The optional transmit schedules 661 (322, FIG. 3) allow remote nodes or connections that are associated with the AP to power down if no more data is scheduled to be sent to them. The transmit schedule body 661 is preceded by type 662 "Control" and subtype 664 "Transmit Schedule" fields. The transmit schedules 661 can take one of two forms. The first form is simple, e.g. a bitmap having a "1" to indicate the presence of unicast data for that remote node or connection, so that, for example "01000000010" would indicate that the frame contains unicast data for the second, third, and eleventh of twelve remote nodes. The second possible form is more sophisticated, containing, for example, a remote node or connection ID, the start time, and the duration that the node is allowed to transmit (the same as the data contained in a transmit permit).

FIG. 6F depicts the broadcast or multicast payload format 670 (360, FIG. 3) of the embodiment of FIG. 6B. The payload body 671 can contain a wide variety of data messages or control information and is preceded by a type field 672 and a subtype field 674. These fields will vary according to the content of the payload body 671, for example if the payload body 671 contains the number of contention minislots and their positions, the type 672 is "Control" and the subtype 674 is "Contention Minislot Information," whereas if the payload body 671 contains a broadcast message from a wireless hub, type 672 will be "Data" and subtype 674 will also be "Data."

FIG. 7A depicts an example embodiment of a frame format of a downlink unicast sub-frame 700 according to the present invention. Examples of unicast subframes are control messages, such as association response frames and flow control request frames, and data messages, with acknowledgments and/or "more data" information. The "more data" information can be as simple as one bit in the Frame Control 702 subfield of the MAC header, or may be more particularly expressed as the number of remaining bytes to be transmitted. The example downlink unicast subframe 700 depicted in FIG. 7A has a MAC header 701 having a one-byte Frame Control subfield 702, a 2-byte Frame Duration field 704, a 6-byte Source MAC Address 706, a 6-byte Destination MAC Address 708, and a 2-byte Sequence Control field 710. The remainder of the downlink unicast subframe 700 is comprised of the unicast data body 720 and a frame check sequence (FCS) 712.

FIG. 7B depicts an example embodiment of a flow control frame format for a downlink unicast data sub-frame according to the present invention. In the particular embodiment of FIG. 7B, the unicast data body 720 has a Type field 722 "Control" and Subtype field 724 "Flow Control", followed by a Connection Identity (CC) field 726. Data field 730 follows, containing an Xon/Xoff bit.

FIG. 7C depicts an example embodiment of a data frame format for a downlink unicast data subframe according to the present invention. In the embodiment of FIG. 7C, unicast data body 720 contains one or more of the following fields: Data 744, ACK 746 and "More Data" 748. If present, More Data field 748 can be as simple as a 1-bit flag or may give the remaining number of bytes. ACK field 746, if present, may take the form of a sequence number or a bitmap. Data body 720 starts with a Type field 740 "Data" and a Subtype field 742 that can have the values "Data", "Data+ACK", "Data+ACK+More", or "ACK", depending on the composition of the fields following.

16

If there is only one connection per wireless modem, then unicast sub-frames may be concatenated so that they are attached to the back of a broadcast subframe without the cost of source MAC address field overhead, as shown in FIG. 7D. The frame of FIG. 7D is comprised of a unicast subframe 700 concatenated with a broadcast subframe 750. Broadcast subframe 750 is comprised of a 6-byte Source MAC Address 752, a 6-byte Destination MAC Address 754, a one-byte Frame Control subfield 756, a 2-byte Frame Duration field 758, a 2-byte Sequence Control field 760, a broadcast data field 762, and a frame check sequence (FCS) 764. Unicast subframe 700 is comprised of a 6-byte Destination MAC Address 708, a one-byte Frame Control subfield 702, a 2-byte Frame Duration field 704, a 2-byte Sequence Control field 710, Type field 722, Subtype field 724, Connection Identity 726, data field 730, and a frame check sequence (FCS) 712. Frame Control field 702 in the unicast subframe 700 is optional, generally being included if the bits in the Frame Control field can be expected to change frequently. If the Frame Control field of the unicast subframe can be expected to be relatively static, it will frequently be omitted except on the specific occasions it is required.

For synchronization purposes, the AP may schedule the downlink broadcast and unicast subframes in such a way that the total broadcast and unicast subframe transmission time falls within an x ms frame structure, where x is generally 2 ms. However, for uplink transmission, uplink communication from the wireless modem is in burst mode and subject to collision in any case where more than one modem transmits in a given time window. Such a collision can be detected only at the AP. Each transmission burst also necessarily involves some physical layer overhead.

To accommodate these factors, as shown in FIG. 8A, a frame structure has been defined for uplink transmission which allows for better synchronization while providing the ability to achieve stringent delay requirements for synchronous traffic. Each uplink frame is of duration x ms, with a 2 ms frame being used in the example presented. Each x ms frame is subdivided into a MAC header 808, a synchronous transfer region (STR) 810, and an asynchronous transfer region (ATR) 812. The synchronous transfer region 810 includes data slots for carrying synchronous CBR-like constant bit rate traffic. Each synchronous data slot in the STR 810 of the example embodiment of FIG. 8A is 27 bytes long with a 16-byte payload field.

As shown in FIG. 8B, the asynchronous transfer region 812 is divided into N data slots, with each basic slot being equivalent to a data slot for transmitting a fixed-size packet, for example, an asynchronous transfer mode (ATM) cell. Each basic slot can be a contention reservation slot 820, in which case it is further subdivided into k minislots 822. For example, a contention reservation slot 820 might consist of 63 bytes with each minislot 822 being 15 bytes. Basic slots can also be contention data slots 824 or reserved data slots 826.

Each uplink frame in the present example has at least C contention slots available for pure contention. Out of these C contention slots, $N_1$ are converted into reservation minislots for bandwidth reservations. The rest of the $C-N_1$ contention slots are data contention slots 824 used for transmitting short bursty messages that do not need a reservation. C and $N_1$ can be varying. The AP may convert unused contention data slots 824 into additional reservation minislots 822. As previously discussed, the number of reservation minislots 822 can be fixed or may be dynamically varying. The reservation minislots can also be clustered in a portion of the frame or spread throughout the

6,115,390

17

frame. The AP broadcasts the number of contention slots available, the number of reservation minislots, and their positions in the next uplink frame in its preceding downlink frame.

The reserved data slots **826** in FIG. 8B are meant either for fixed protocol data units (PDUs), such as ATM PDUs, or for variable length PDUs. The transmission burst for an ATM PDU includes a 53-byte ATM cell, a MAC header, and the physical layer header. One reserved data slot **826** is allocated for the transmission of each ATM PDU. The transmission burst for variable length (VL) PDUs includes a variable length payload, plus the same overhead as required for an ATM PDU. For variable length PDUs, it is desirable to minimize segmentation, so each AP allocates as many contiguous reserved data slots **826** for VL PDUs as possible.

Since contention is wasteful, there will ideally be a field in the reserved transmission burst for requesting additional reserved data slots without going through contention. When a scheduling discipline that makes use of queue length information (e.g., a self-clocked fair queuing discipline) is used, the next packet size or the number of remaining packets of fixed size is specified in order to reserve bandwidth for future data transmissions from that source. When a First Come-First Serve or Round Robin queuing discipline is used, then the "more" bit in the frame control field of the MAC header may be utilized for the same purpose.

In an uplink frame, constant bit rate transmission, if any, is in a fixed synchronous transfer region (STR) slot position determined at connection set-up time. For new asynchronous transmissions, the wireless node modem selects one of the available contention minislots **822** randomly, and requests bandwidth for ATM/VL bursts to be sent in a subsequent frame. A "new" asynchronous transmission is defined as the arrival of new packets to a connection with an empty queue. The AP then identifies collisions and notifies the wireless modems of the collision/success status of their reservation requests via the reservation minislot acknowledgment fields in the next downlink frame. A typical uplink frame is shown in FIG. 8C, including reservation minislots **822**, ACKs **832** for data received in the previous downlink frame, and uplink reserved data fields **826**. The AP schedules the ATM/VL slots for the next uplink frame according to the dictates of the service (queuing) discipline that has been implemented. This information is sent to the modems at the remote nodes via the downlink frame in the transmit permits and schedules (not shown, refer to FIG. 3).

FIG. 8D depicts an example frame format for the uplink frame reservation minislot **822** of FIG. 8C. The frame has a small MAC header **840** that contains only a Source MAC Address and a 2-byte Sequence Control field, followed by a Connection Identity (CC) field **842** and a Frame Check Sequence (FCS) **844**.

FIG. 8E depicts an example frame format for a pure acknowledgment uplink frame. In this format, a full MAC header **848** is followed by a Type field **850** "Data" and a Subtype field **852** "ACK", a Connection Identity (CC) field **854**, a Sequence Number ACK field **856**, and an FCS **858**.

FIG. 8F depicts an example frame format for a pure data uplink unicast frame. In this format, a full MAC header **860** is followed by a Type field **862** "Data" and a Subtype field **864** "Data", a Connection Identity (CC) field **854**, a data field **866**, and an FCS **858**. FIG. 8G depicts an example frame format for a combined acknowledgment and data uplink frame. In this format, a full MAC header **870** is followed by a Type field **872** "Data" and a Subtype field **874** "Data+ACK", a Connection Identity (CC) field **854**, a data

18

field **876**, a Sequence Number ACK field **878**, and an FCS **858**. FIG. 8H depicts an example frame format for a combined acknowledgment, data, and "more" uplink frame. In this format, a full MAC header **880** is followed by a Type field **882** "Data" and a Subtype field **884** "Data+ACK+More", a Connection Identity (CC) field **854**, a data field **886**, a Sequence Number ACK field **888**, a More Data field **890** and an FCS **858**.

The above described embodiments adapt the IEEE 802.14 standard to provide special messages for implementation of access control and admission of the remote nodes into the network. As a specific example, a system with uplink bandwidth 2.56 Mbps has a ramp up time 4 us, preamble of 32 symbols (25.0 us assuming QPSK), and turn-off time 4 us. These parameters lead to the requirements of a guard time of 20 bits at each end of a physical layer PDU and a preamble of 64 bits. In this system, a 2 ms uplink frame corresponds to 640 bytes. Assuming that the frame consists of both an STR and an ATR and that each basic slot in the STR is 27 bytes long, then a frame with one STR slot can also have, for example, 10 reservation minislots (with each basic slot being converted to 5 reservation minislots), 2 data contention slots, and 5 reserved data slots for ATM PDUs or VL PDUs.

As illustrated in FIG. 11, a downlink broadcast/multicast message may be used for paging request messages. The paging request and associated response messages are designed to enable a PC on a wired network to call another PC over the wireless network. Paging request messages are useful for alerting a wireless modem that a wired host or another wireless modem is interested in communicating with it. The wireless modem whose ID is contained in a received paging request message responds with a paging response message, as well as with a connection request if there is currently no connection between the wireless modem and the Access Point. Paging capability requires a location server, which may be co-located with a PPP server if desired. The method would normally be used when the PC accessed via the wireless network has no IP address through which it may be more efficiently accessed.

As illustrated in FIG. 11, in order to allow PC2 **1102** to initiate a call to PC1 **1104** which is attached to a wireless modem **1106**, a paging request message is defined. The initiating PC (PC2) **1102** sends a Call_Initiate message **1110** to a location/PPP server **1112** which identifies the home registration server **1116**. The home registration server **1116** then identifies the proper WH/IWF and relays **1118** the Call_Initiate message to the AP **1120**. Next, the AP **1120** sends a paging request **1130** to the wireless modem **1106** with which PC1 **1104** is associated. Finally, the wireless modem **1106** relays **1132** the Call_Initiate message to PC1 **1104**.

To accept the call, PC1 **1104** sends a Call_Accept message **1140** to the wireless modem **1106**, simultaneously with a Connect_Request message. The wireless modem **1106** then sends a paging response **1142** to the AP **1120**, which relays **1144** the message to the WH/IWF **1116**. The wireless modem **1106** also relays the Connect_Request message to the AP **1120**, which similarly relays it to the WH/IWF **1116**. The WH/IWF **1116** sends a Connect_Reply message **1145** to PC1 **1104** and then relays a Call_Accept message **1146** back to the location server **1112**. Finally, the location server **1112** relays **1148** the Call_Accept message to PC2 **1102**.

The ODMAFQ scheme is capable of providing priority access within the same message stream from each user. Priority access will generally give important control mes-

6,115,390

19

sages a higher priority than data messages. Some important control messages which might be transmitted by a wireless modem in a reservation slot include: (a) Association Request, for requesting association of the wireless modem with an Access Point, (b) Connect Request, for requesting a connection set-up, (c) Paging Response, for responding to a Paging Request, and (d) Bandwidth Request, for requesting bandwidth allocation after having been silent for a while. The various types of possible messages may also be assigned correspondingly different priorities for differing Qualities of Service. In general, Association Request, Connect Request, and Paging Response messages would be expected to have a higher priority than data messages. As an example, if the service provider wishes to admit more users, Bandwidth Request messages should then be given lower priority than Connect Request and Paging Response messages, allowing for faster connection set-ups. Among data messages, voice signals carried over RTP/UDP packets, for example, would generally be given higher priority than tcp/ip data packets.

A fragmentation/reassembly mechanism has been defined in order to allow for fragment retransmission. The AP and wireless modem will generally fragment the MAC layer service data unit (SDU) if it exceeds the maximum payload size or if it exceeds the remaining space available in a downlink or uplink frame. Alternatively, a fragmentation threshold may be defined beyond which the MAC SDU will be fragmented. Each fragment has a sequence control field. All fragments belonging to the same SDU carry the same 12-bit sequence number, but are assigned different fragment numbers. A "More Fragment" bit in the frame control field is then set for all fragments except the last, indicating that there are additional fragments still to follow. The fragments are then sent in order of lowest to highest fragment number.

To meet the in-sequence delivery requirement, both the AP and the wireless modem make sure that all the fragments of the same SDU are transmitted before a new SDU is transmitted. Only those fragments that are lost are retransmitted. To prevent endless transmission delay (with concomitant transmission backlog), a particular source (wireless modem or AP) maintains a MAC SDU transmission timer which is started the moment a MAC SDU is passed to the MAC layer. When the timer exceeds the pre-established MAC SDU lifetime, all remaining fragments will be discarded by the source, and no attempt is made to complete the transmission of the MAC SDU.

To prevent endless waiting for permanently lost fragments, the destination station reconstructs the MAC SDU by combining the fragments in order of the fragment number of the sequence control field. If the destination station receives a fragment with the "more fragment" bit set, it knows that it has not yet received a complete MAC SDU. As soon as the destination station receives a fragment having a clear "more fragment" bit, it will reassemble the MAC SDU and pass it to a higher layer.

The destination station (such as a wireless modem or AP) maintains a receive MAC SDU timer which is initiated upon receiving the first fragment of a MAC SDU. The destination station should preferably have at least 3 timers for receiving three MAC SDUs simultaneously. The destination station then discards all received fragments of any MAC SDU for which a receive timer is not maintained. When the receive MAC SDU timer exceeds the pre-established receive MAC SDU life time, all fragments will be discarded. If additional fragments are received after the receive MAC SDU timer expires, the fragments are acknowledged and then discarded. The destination station also discards any duplicate fragment received, but still sends an acknowledgment in response.

20

The MAC protocol operation in the multiple access scheme includes the following steps: Uplink transmission power level establishment, uplink initial contention, uplink conflict resolution, uplink bandwidth allocation, AP downlink bandwidth allocation, contention status notification via the downlink control field, and scheduling of uplink transmissions via transmit permits. In particular, for constant rate traffic, each modem informs the AP of the packet arrival rate during connection setup, in order that only one access request is required for the whole duration of the connection.

The overall ODMAFQ MAC protocol operation is illustrated in the flowcharts of FIGS. 13A and B. As seen from a remote host, FIG. 13A, after establishment of the power level for uplink transmission **1310**, the remote hosts participate in uplink initial contention **1315** during which each remote with packets to send requests access to the AP. If some of these access requests collide **1320**, in that they are submitted in the same reservation minislot, the colliding remote hosts participate in uplink conflict resolution **1325**. Otherwise, the AP proceeds to allocate uplink bandwidth **1330** among the remote hosts requesting access, followed by allocation of bandwidth for its own downlink transmission **1335**. Each remote host waits to receive a transmit permit **1337** during a subsequent downlink transmission and, upon receiving one, transmits a waiting packet from its queue. If the queue at a remote is not then empty **1338**, the remote returns to waiting for additional transmit permits **1337**, otherwise it waits for new packets to arrive **1339**.

As illustrated in FIG. 13B, the AP monitors activity in received contention reservation slots **1360**. When it receives a successful access request **1365**, the AP sends reservation acknowledgments (ACKs) **1370** and adds the newly successful remotes to the scheduled list **1375**. Whether or not there have been new successful access requests **1365**, the AP also monitors the uplink dataslots **1380** as long as the scheduled list is not empty, and when it receives a successfully transmitted packet **1385**, it replies with a data ACK **1390**. The AP then schedules its downlink packets **1340**, schedules the uplink transmissions **1345** of the successfully contending remote hosts, issues the associated transmit permits **1350**, and then transmits downlink data packets **1355**, after which it returns to monitoring activity in the contention reservation slots **1360**.

It may be desirable to allow for an optional channel holding feature whereby each queue can remain empty for a short while without the Access Point releasing the bandwidth reservation. This allows high priority users to remain in the base station's reserved bandwidth list for an allotted amount of time before it is released, encouraging low latency of real-time packets (i.e. little or no delay for packets of time-sensitive data such as voice communications) by avoiding all the setup signaling messaging required for channel reservation. Utilizing this feature, when a queue is empty, a timer is triggered at the wireless modem. As long as new packets arrive at the wireless modem before this timer expires, the wireless modem does not need to make a new access request. At the AP, if this feature is turned on, then the AP will still allocate a transmit permit for one data slot to this particular wireless modem every alternate uplink frame, even if the last uplink data transmission from the wireless modem has indicated that the queue is empty. The AP will also start a timer. When the timer expires and the AP has not received new packets from that wireless modem, then the AP will remove the wireless modem from the reserved bandwidth list. This channel holding feature is particularly useful if the bandwidth reservation process takes a while to complete, allowing low latency for real-time

MMA0616

6,115,390

21

packets that, while not arriving back-to-back, are not so far apart as to warrant a separate bandwidth reservation request via contention for each data packet. However, for bursty sources that do not need this channel holding feature, when a packet arrives to find an empty buffer, the modem will still send an access request to the AP via one of the contention minislots.

As illustrated in FIG. **17**, the uplink power level for data transmission between the base station and several remote hosts in a wireless network employing ODMAFQ may be established during the initial access request message of the remote host. The method used is similar to that used for Code Division Multiple Access (CDMA) International Standard IS95 Channel Power Control. If the uplink transmission power level between a particular remote host and the AP has been stored at a previous time **1710**, the stored level is used for uplink data transmission **1715**. Otherwise, the remote host first transmits a short connection request message at an initial power level that is set relative to the nominal open loop power level **1720**. If the remote host's first transmission is unsuccessful and therefore no acknowledgment is received **1730** from the AP, the power level is incremented by a power increment amount which may be predetermined **1740**, the connection request is renewed at the new power level **1750**, and the steps of transmitting and incrementing are repeated until the transmission is successful. The power level at which transmission is finally successful is then stored **1735** and used for further data transmission **1715** between that remote host and the base station.

In the preferred embodiment, uplink initial contention utilizes the following scheme. If there are M minislots available for contention in the next uplink frame, then an initial (first time) contention message is transmitted in accordance with the following:

1. A random number, x, is generated at the remote node modem from a uniform distribution over 1 through M, and

2. The initial contention message is transmitted in the xth minislot in the next uplink frame.

If desired, carrier sensing can also be used during initial contention. Before transmission, the channel is sensed. If access priority is implemented, instead of choosing a random number between 1 and M, the wireless modem then chooses between 1 and $I_i$ where $I_i$ is the threshold for users of class i, where a lower value indicates a higher priority, i.e., $I_{i+1} < I_i$. If, however, the contention message is not a contention reservation minislot request message, but rather is a contention data slot message, then the message is transmitted in the next contention data slot.

More than two access priority classes may be offered. As previously discussed, the uplink frame includes $N_1$ minislots. If, for example, if there are p access priority classes, each class having access priority i (where a smaller number means a higher priority) can send contentions in the minislots ranging from 1 to $I_i$, where $I_1 = N_1$, $I_{i+1} \leqq I_i$. A strict usage priority can be implemented on top of this access priority scheme, so that when an AP receives a connection request that has a higher usage priority, it can disconnect an existing connection of a lower usage priority by sending a disconnect request frame to the wireless modem that supports the connection.

Collision occurs in a contention slot when two or more wireless modems transmit in the same minislot. Also, if interference causes corruption of data in a contention slot, the slot status is declared to be a COLLISION. As previously described, there are 2 types of contention slots in an uplink frame: (1) a reservation slot containing minislots for band-

22

width request messages, and (2) a data slot containing uplink short bursty messages in contention superslots. At the AP, the RF energy in an uplink contention time slot is estimated. If there is no energy present, then the contention slot is declared IDLE. The status of a contention slot is declared to be SUCCESS if all the following hold true: 1) RF energy has been detected in the slot, 2) a preamble in that slot is not corrupted, and 3) a frame check sequence (FCS) in the slot indicates no errors. The status of a contention slot is declared to be COLLISION if RF energy has been detected in the slot, and at least one of the following holds true: 1) the preamble in that slot is corrupted or 2) a frame check sequence (FCS) in the slot indicates error.

FIG. **18A** illustrates an embodiment of a method for access control according to an aspect of the present invention. N contention reservation minislots are configured in each uplink frame **1810**. The N minislots are organized into a plurality of access priority classes, each class having a different priority. The AP is configured to allow m access priority classes **1815**. Each remote host of access priority class i, randomly picks **1820** one contention minislot and transmits an access request, the contention minislot picked being in a range from 1 to $N_i$ where $N_{(i+1)} < N_i$ and $N_1 = N$. The base station receives **1825** the access requests and sequentially examines the received contention minislots. If the minislot currently being examined contains an uncollided request **1830**, the AP grants access **1835** to the remote host corresponding to the uncollided access request. If the minislot currently being examined contains a collided request **1830**, the AP will not send an ACK, causing the affected remote nodes to perform conflict resolution **1840**. After the conflict resolution period, the AP grants access to the "winning" remote host **1845**. Meanwhile, if more minislots remain to be examined **1850**, the AP continues to check minislots for collisions **1830**, either granting access to successful requesting hosts **1835** or awaiting the outcome of conflict resolution **1840**.

FIG. **18B** is a flowchart illustrating an alternate embodiment of a method for access control according to an aspect of the present invention organized into a plurality of access priority classes, each with a different priority. N contention reservation minislots are configured in each uplink frame **1810**. The N minislots are organized into a plurality of access priority classes, each class having a different priority. The AP is configured to allow m access priority classes **1815**. Each remote host of access priority class i and with a stack level that equals 0, then transmits an access request with a probability $P_i$ where $P_{(i+1)} < P_i$ and $P_1 = 1$ **1860**. The base station receives **1825** the access requests and sequentially examines the received contention minislots. If the minislot currently being examined contains an uncollided request **1830**, the AP grants access **1835** to the remote host corresponding to the uncollided access request. If the minislot currently being examined contains a collided request **1830**, the AP will not send an ACK, causing the affected remote nodes to perform conflict resolution **1840**. After the conflict resolution period, the AP grants access to the "winning" remote host **1845**. If more minislots remain to be examined **1850**, the AP continues to check minislots for collisions **1830**, either granting access to successful requesting hosts **1835** or awaiting the outcome of conflict resolution **1840**.

IDLE, SUCCESS and COLLISION status information is conveyed back to the wireless modems. The AP places the slot status information in the downlink reservation acknowledgment field. There are three alternative preferred conflict resolution methods that may be used. The first method is

6,115,390

23

suggested in the IEEE 802.14 standard, and is described along with two new methods below. Simulation results show that the second method described provides a better access delay.

In the first conflict resolution method, suggested in IEEE standard 802.14, each wireless node that wishes to transmit randomly picks one of the reservation minislots. if a collision is indicated, a modem that was affected by the collision retransmits based on a random binary-exponential back-off method. This backoff method operates in accordance with the following:

1. The modem generates a random number, I, uniformly distributed between 0 and $2^j-1$, where j is the number of collisions that the modem experienced for the packet it is attempting to transmit. If j is larger than 10, then I is selected from a uniform distribution between 0 and $2^{10}-1$.

2. The modem skips the next I-1 contention slot opportunities of the same kind (either minislot or data contention slot), and then retransmits its previously collided packet in the next immediate contention slot opportunity.

The operation of this method is depicted in FIG. **14A**. A wireless node waiting to access the AP randomly picks **1402** a reservation minislot in which to transmit an access request. If the node is affected by a collision **1404**, the node generates **1408** the random number I and skips **1410** the next I-1 contention slot opportunities of the same kind. The node than retransmits **1412** the access request for the collided packet at the next immediate contention slot opportunity. If the node is not affected by a collision **1404**, then if the queue at the node is empty **1405**, the node transmits **1406** the packet and returns to the waiting state **1402**. If the queue at the node is not empty **1405**, then, after receiving a transmit permit from the AP, the node transmits **1407** the current packet along with a piggybacked reservation request for transmission of the next packet in its queue, continuing to transmit packets with piggybacked reservation requests **1407** after receiving transmit permits until the queue is empty **1405** and the final packet has been transmitted **1406**, after which the node returns to the waiting state **1402**.

In the second and third methods, the AP broadcasts the outcome of each contention in the reservation minislots to all wireless nodes via a downlink broadcast message. In the second method, the modem in each wireless node is characterized by a stack level, and only wireless nodes with a stack level equal to zero are permitted to transmit access request packets. Modems with a stack level greater than zero are regarded as backlogged. For example, when there are M reservation minislots, each remote node at stack level 0 can randomly pick one of the M minislots. At the end of a timeslot, wireless node i changes stack level based on the outcome of a transmission in that time slot. This method allows newly active wireless nodes to join in with those existing wireless nodes having stack level 0 during a particular conflict resolution period. Each wireless node in a request state increments its stack level by one if it does not transmit an access request packet and receive a negative acknowledgment (e.g., that there was a collision) from the base station (AP). On the other hand, a wireless node decrements its stack level by one if it receives a positive acknowledgment from the base station, indicating successful transmission of an access request. Each wireless node that participates in the access request transmission randomly "flips a coin" to determine whether its stack level stays at level 0 or is incremented by one upon receiving a negative acknowledgment from the base station.

24

The rules of the second method are:

1. When a wireless node first wishes to gain access to the network or has gained access and wishes to send new data, it is placed in a request state and assigned a stack level of zero.

2. When there are M reservation minislots, each wireless node in a request state randomly picks one of the M reservation minislots to be its assigned minislot in which to transmit an access request packet.

3. When the wireless node is characterized by a stack level equal to zero, it transmits an access request packet; however, when the remote node is characterized by a stack level other than zero, it does not transmit an access request packet.

4. At the end of the time slot, each wireless node changes its stack level based on the outcome (either COLLIDED, IDLE or SUCCESS) of an access request, as reported for its assigned minislot in the reservation acknowledgment field of a downlink message from the access point.

   A. A wireless node that sent an access request and received a SUCCESS outcome will be removed from the request state.

   B. A wireless node that sent an access request and received a COLLIDED outcome will either increment its stack level by one or leave its stack level at zero depending upon the outcome of a random draw.

   C. A wireless node that is in the request state and did not send an access request (i.e., a node backlogged with stack level>0) will increment its stack level by one if the outcome reported in the reservation acknowledgment field for the assigned minislot is COLLIDED.

   D. A wireless node that is in the request state and that did not send an access request (i.e., a node backlogged with stack level>0) will decrement its stack level by one if the outcome reported in the reservation acknowledgment field for the assigned minislot is SUCCESS.

The operation of this method is depicted in FIG. **14B**. A wireless node waiting to access the AP or send new data **1432** sets its stack level to 0 and enters the request state. If the stack level of the node is 0 **1434**, the node randomly picks **1436** a reservation minislot for transmission of an access request and transmits the access request. If the outcome of the request is SUCCESS **1438**, and the queue at the node is empty **1439**, the node transmits **1440** the current packet and exits the request state, returning to the waiting state **1432**. If the queue at the node is not empty **1439**, then, after receiving a transmit permit from the AP, the node transmits **1441** the current packet along with a piggybacked reservation request for transmission of the next packet in its queue, continuing to transmit packets with piggybacked reservation requests **1441** after receiving transmit permits until the queue is empty **1439**, at which point it transmits the remaining packet **1440**, exits the request state, and returns to the waiting state **1402**.

If the outcome of the reservation request **1436** was not SUCCESS **1438**, the node participates in a random draw **1444** to learn whether to increment **1448** its stack level by 1 or leave **1446** its stack level at 0. If the stack level remains **1446** at 0, the node again randomly picks **1436** a reservation minislot for transmission of an access request and transmits the access request. If the stack level is incremented **1448**, the stack level will not be 0 **1434**. If the stack level of any remote node is not 0 **1434** then if the outcome of the previous reservation request was COLLIDED **1450**, the

6,115,390

25

node increments **1452** its stack level by 1. If the outcome for the previous reservation request was not COLLIDED **1450**, the node decrements **1454** its stack level by 1.

The third conflict resolution method is a modification of the second. In the third conflict resolution method, the modem in each wireless node is again characterized by a stack level, and only wireless nodes with a stack level equal to zero are permitted to transmit access request packets. Modems with stack level greater than zero are regarded as backlogged. The rules of the third method are:

1. When a wireless node first wishes to gain access to the network or has gained access and wishes to send new data, it is placed in a request state and assigned a stack level of zero.

2. When there are M reservation minislots, each wireless node in a request state randomly picks one of the M reservation minislots to be its assigned minislot in which to transmit an access request packet.

3. When the wireless node is characterized by a stack level equal to zero, it transmits an access request packet; however, when the remote node is characterized by a stack level other than zero, it does not transmit an access request packet.

4. At the end of the time slot, each wireless node changes its stack level based on the outcome (either COLLIDED, IDLE or SUCCESS) of all access requests as reported in the reservation acknowledgment fields of a downlink message from the Access Point.

   A. A wireless node that sent an access request and received a SUCCESS outcome will be removed from the request state.

   B. A wireless node that sent an access request and received a COLLIDED outcome will either increment its stack level by one or leave its stack level at zero depending on the outcome of a random draw.

   C. A wireless node that is in the request state and that did not send an access request (i.e., a node backlogged with stack level>0) will decrement its stack level by one if the outcomes of all access requests reported in at least 80% (or some other predefined threshold) of the reservation acknowledgment fields is either SUCCESS or IDLE. Otherwise, the remote node will increment its stack level by one.

   D. When the backlogged modem's stack level is decremented to zero, the modem randomly picks one of the M minislots (or the $I_j$ minislots if access priority is implemented) to resend its request.

The operation of this method is depicted in FIG. **14C** and is similar to that of the method of FIG. **14B**. A wireless node waiting to access the AP or send new data **1432** sets its stack level to 0 and enters the request state. If the stack level of the node is 0 **1434**, the node randomly picks **1436** a reservation minislot for transmission of an access request and transmits the access request. If the outcome of the request is SUCCESS **1438**, and the queue at the node is empty **1439**, the node transmits **1440** the current packet and exits the request state, returning to the waiting state **1432**. If the queue at the node is not empty **1439**, then, after receiving a transmit permit from the AP, the node transmits **1441** the current packet along with a piggybacked reservation request for transmission of the next packet in its queue, continuing to transmit packets with piggybacked reservation requests **1441** after receiving transmit permits until the queue is empty **1439** and it has transmitted the remaining packet **1440**, after which it exits the request state, and returns to the waiting state **1402**.

If the outcome of the reservation request **1436** was not SUCCESS **1438**, the node participates in a random draw

26

**1444** to learn whether to increment **1484** its stack level by 1 or leave **1446** its stack level at 0. If the stack level remains **1446** at 0, the node again randomly picks **1436** a reservation minislot for transmission of an access request and transmits the access request. If the stack level is incremented **1848**, the stack level will not be 0 **1434**. If the stack level of any remote node is not 0 **1434**, then if the outcome of all the reservation requests during the previous cycle was COLLIDED **1460** for greater than or equal to some THRESHOLD percentage, the node increments **1462** its stack level by 1. If the outcome for the previous reservation request was not COLLIDED **1460**, the node decrements **1464** its stack level by 1.

Note that, due to the hidden terminal problem, all the frames transmitted need to be acknowledged. Acknowledgment messages should not be sent in contention mode. Transmit schedules and transmit permits are therefore used as a mechanism to acknowledge downlink MAC unicast frames. When a wireless modem receives a downlink broadcast frame, it first interprets the transmit schedules and transmit permits. If it is not that wireless modem's turn to transmit data, and the wireless modem is the recipient of a unicast frame (i.e., the wireless modem's ID is found in the transmit schedules), then the wireless modem schedules an acknowledgment message for the unicast frame in the immediately following uplink frame. All acknowledgment messages are sent first, before any of the data messages allowed by the transmit permits. For those wireless modems that receive both transmit permits and unicast messages in the downlink frame, a different transmit permit is issued to allow these modems to piggyback their acknowledgments onto the back of their uplink data transmissions. In order to acknowledge uplink unicast frames, the AP either schedules a unicast acknowledgment message or piggybacks the acknowledgment message onto the downlink data transmission.

As previously mentioned, the number of reservation minislots available may be dynamically changed. If, for example, there are k minislots in a contention reservation slot and N total slots, N1 of which are reservation slots containing a total of N1*k minislots, then the remaining (N−N1) slots are data slots. If NUM_RA_MIN and NUM_RA_MAX are the minimum and maximum number, respectively, of reservation minislots desired for the system, the number of available reservation minislots can be dynamically changed based on the percentage of idle minislots and the total uplink queue length.

Four methods have been developed for dynamic adjustment of the total number of reservation minislots available to the remote nodes for making access requests. In each of these methods, the total uplink queue length at any time is 'q', the percentage of minislots that are idle at any time is 'idle', the number of minislots in a frame at any time is 'no_mini', and the number of noncontention data slots in a frame at any time is 'no_slots'. The base station (AP) is the arbiter of how quickly the number of available minislots is changed. At every iteration of the decision process, the base station broadcasts the number of available reservation minislots to the remote nodes. The base station's decision is based on the results of one of these methods. For each method, the assumption is made that the remote nodes have piggybacked uplink queue length information to the base station during their uplink data transmissions.

A software implementation of method 1 for the dynamic adjustment of the number of reservation minislots is given below and is also illustrated pictorially in the flowchart of FIG. **12A**.

6,115,390

27

```
If((q > HIGH_THRESH) && (idle > IDLE_THRESH1)) {
        If(State!=1) {
            no_mini=no_mini-k;
            no_slots=no_slots+1;
            State=1
            }
        }
    If((q < LOW_THRESHOLD) && (idle > IDLE_THRESH2)){
        If(State=1) {
            no_mini=no_mini+k;
            no_slots=no_slots-1;
            State=0
        }
    }
```

As shown in FIG. 12A, if the total uplink queue length is greater than a high threshold (HIGH) 1201, then if the percentage of idle minislots (IDLE) is not greater than a first idle threshold (IDLE1) 1202, the number of minislots (N) is left unchanged. If, however, the percentage of idle minislots is greater than the first idle threshold 1202, and the state is not "1" 1203 (meaning that the number of minislots was not just decreased), the number of minislots in the frame is decreased 1204 by some k, the number of dataslots (SLOTS) in the frame is increased by 1, and the state is set to "1". If the total uplink queue length is not greater than the high threshold 1201, then if the total uplink queue length is less than a low threshold (LOW) 1205, and the percentage of idle minislots is not less than a second idle threshold (IDLE2) 1206, the number of minislots is left unchanged. If, however, the percentage of idle minislots is less than the second idle threshold 1206, and the state is "1" 1207 (meaning that the number of minislots was just decreased), the number of minislots in the frame is increased 1204 by k, the number of dataslots in the frame is decreased by 1, and the state is set to "0". In all four methods, the threshold values and the value of k may be prespecified if desired.

A software implementation of method 2 for the dynamic adjustment of the number of reservation minislots is given below and is also illustrated pictorially in the flowchart of FIG. 12B. In the methods of FIGS. 12B and 12D, HIGH2>HIGH1 and LOW2>LOW1.

```
If((q > HIGH2) && (idle > IDLE_THRSH1)) {
        If(State==0) {
            no_mini=no_mini-2k;
            no_slots=no_slots+2;
            State=2
            }
        else if(State==1) {
            no_mini=no_mini-k;
            no_slots=no_slots+1;
            State=2
            }
        }
    else if((q > HIGH1) && (idle > IDLE_THRSH1)) {
        If(State==0) {
            no_mini=no_mini-k;
            no_slots=no_slots+1;
            State=1
            }
        }
    If((q < LOW1) && (idle < IDLE_THRESH2)) {
            If(State>0) {
            If(State=1) {
            no_mini=no_mini+k;
            no_slots=no_slots+1;
            State=0;
            }
```

-continued

28

```
        else {
            no_mini=no_mini+2k;
            no_slots=no_slots-2;
            State=0;
            }
            }
        }
    else if((q < LOW2) && (idle < IDLE_THRESH2)) {
            If(State==2) {
            no_mini=no mini+k;
            no_slots=no_slots-1;
            State=1
            }
        }
    }
```

As shown in FIG. 12B, if the total uplink queue length is greater than a first high threshold HIGH2)1210, then if the percentage of idle minislots is not greater than a first idle threshold 1211, the number of minislots is left unchanged. If, however, the percentage of idle minislots is greater than the first idle threshold 1211, and the state is "0" 1212 (meaning that the number of minislots was just increased), the number of minislots in the frame is decreased 1213 by 2k, the number of dataslots in the frame is increased by 2, and the state is set to "2". If the state is "1" 1214, the number of minislots in the frame is decreased 1215 by k, the number of dataslots in the frame is increased by 1, and the state is set to "2".

In the method of FIG. 12B, if the total uplink queue length is not greater than the first high threshold 1210, then if the the total uplink queue length is greater than a second high threshold (HIGH) 1220, and the percentage of idle minislots is not greater than the first idle threshold 1217, the number of minislots is left unchanged. If, however, the percentage of idle minislots is greater than the first idle threshold 1217, and the state is "0" 1218, the number of minislots in the frame is decreased 1219 by k, the number of dataslots in the frame is increased by 1, and the state is set to "1".

If the total uplink queue length is not greater than the first high threshold 1210 and the second high threshold 1220, but is also not lower than both a first (LOW1) 1221 and second (LOW2) 1222 low threshold, the number of minislots is left unchanged. If, however, the total uplink queue length is not greater than the second high threshold 1220, is not lower than the first low threshold 1221, but is lower than the second 1222 low threshold, then if the percentage of idle minislots is less than a second idle threshold 1223, and the state is "2" 1224 (meaning that the number of minislots was just decreased), the number of minislots in the frame is increased 1225 by k, the number of dataslots in the frame is decreased by 1, and the state is set to "1".

If the total uplink queue length is not greater than the second high threshold 1220 and is lower than the first low threshold 1221, then if the percentage of idle minislots is less than the second idle threshold 1226, and the state is not "0" 1224, then if the state is "1 " 1228, the number of minislots in the frame is increased 1230 by k, the number of dataslots in the frame is decreased by 1, and the state is set to "0", while if the state is "2", the number of minislots in the frame is increased 1229 by 2k, the number of dataslots in the frame is decreased by 2, and the state is set to "0".

A software implementation of method 3 for the dynamic adjustment of the number of reservation minislots is given below and is also illustrated pictorially in the flowchart of FIG. 12C.

6,115,390

29

```
If((q > HIGH_THRESH) && (idle > IDLE_THRESH1)) {
    If(no_mini > NUM_MINI_MIN) {
        no_mini=no_mini-k,
        no_slots=no_slots+1;
    }
}

If((q < LOW_THRESHOLD) && (idle < IDLE_THRESH2)) {
    If(no_mini < NUM_MINI_MAX) {
        no_mini=no_mini+k,
        no_slots=no_slots-1,
    }
}
```

As shown in FIG. 12C, if the total uplink queue length is greater than a high threshold **1240**, then if the percentage of idle minislots is not greater than a first idle threshold **1241**, the number of minislots is left unchanged. If, however, the percentage of idle minislots is greater than the first idle threshold **1241**, then if the number of minislots is greater than the minimum number of minislots allowed (MIN) **1242**, the number of minislots in the frame is decreased **1243** by k and the number of dataslots in the frame is increased by 1. If the total uplink queue length is not greater than a high threshold **1240**, then if the the total uplink queue length is less than a low threshold **1244**, and the percentage of idle minislots is not less than a second idle threshold **1245**, the number of minislots is left unchanged. If, however, the percentage of idle minislots is less than the second idle threshold **1245**, and the number of minislots is less than the maximum number of minislots allowed (MAX) **1246**, the number of minislots in the frame is increased **1247** by k and the number of dataslots in the frame is decreased by 1.

A software implementation of method 4 for the dynamic adjustment of the number of reservation minislots is given below and is also illustrated pictorially in the flowchart of FIG. **12D**.

```
If((q > HIGH2) && (idle > IDLE_THRESH1)) {
    If(no_mini > NUM_MINI_MIN) {
        no_mini=no_mini-2k,
        no_slots=no_slots+2;
    }
}
else if((q > HIGH1) && (idle > IDLE_THRESH1)) {
    If(no_mini > NUM_MINI_MIN) {
        no_mini=no_mini-k,
        no_slots=no_slots+1,
    }
}
If((q < LOW1) && (idle < IDLE_THRESH2) {
    If(no_mini < NUM_MINI_MAX) {
        no_mini=no_mini+2k;
        no_slots=no_slots-2;
    }
}
else if((q < LOW2) && (idle < IDLE_THRESH2)){
    If(no_mini < NUM_MINI_MAX) {
        no_mini=no_mini+k;
        no_slots=no_slots-1;
    }
}
```

As shown in FIG. **12D**, if the total uplink queue length is greater than a first high threshold **1250**, then if the percentage of idle minislots is not greater than a first idle threshold **1251**, the number of minislots is left unchanged. If, however, the percentage of idle minislots is greater than the first idle threshold **1251**, and the number of minislots is greater than a minimum number of minislots allowed **1252**, the number

30

of minislots in the frame is decreased **1253** by 2k and the number of dataslots in the frame is increased by 2. If the total uplink queue length is not greater than the first high threshold **1250**, then if the the total uplink queue length is greater than a second high threshold **1254**, and the percentage of idle minislots is not greater than the first idle threshold **1255**, the number of minislots is left unchanged. If, however, the percentage of idle minislots is greater than the first idle threshold **1255**, and the number of minislots is greater than the minimum number of minislots allowed **1256**, the number of minislots in the frame is decreased **1257** by k and the number of dataslots in the frame is increased by 1.

In the method of FIG. **12D**, if the total uplink queue length is not greater than the first high threshold **1250** and the second high threshold **1254**, but is also not lower than both a first **1258** and second **1262** low threshold, the number of minislots is left unchanged. If, however, the total uplink queue length is not greater than the second high threshold **1254**, is not lower than the first low threshold **1258**, but is lower than the second **1262** low threshold, then if the percentage of idle minislots is less than a second idle threshold **1263**, and the number of minislots is less than the maximum number allowed **1264**, the number of minislots in the frame is increased **1265** by k and the number of dataslots in the frame is decreased by 1.

If the total uplink queue length is not greater than the second high threshold **1254** and is lower than the first low threshold **1258**, then if the percentage of idle minislots is less than the second idle threshold **1259**, and the number of minislots is less than the maximum number allowed **1260**, the number of minislots in the frame is increased **1261** by 2k and the number of dataslots in the frame is decreased by 2.

The role of the AP in responding to uplink bandwidth requests from modems, whether they arrive in pure reservation minislots or in piggybacked form, is to control uplink transmission in order to achieve a balance between high bandwidth efficiency and excellent quality of service (QoS) management. While QoS requirements for constant bit rate CBR traffic are extremely important and stringent, they are relatively liberal for traditional data traffic. One goal of the bandwidth allocation scheme in the AP is therefore to take advantage of these diverse QoS requirements in order to achieve a high degree of statistical multiplexing. In order to determine how the AP should transmit downlink traffic from various connections, the AP requires a downlink scheduling system. Similarly, in order to coordinate the uplink transmissions from associated wireless modems, the AP requires a system for scheduling the uplink transmission opportunity of each wireless modem. The scheduling systems can be as simple as round-robin, strict priority, or a first come-first serve algorithm, or may alternatively be more complex, such as a fair queuing algorithm. As discussed previously, a number of schedulers which are all variations on fair queuing have been proposed.

The uplink scheduling system is not required to be the same as the downlink scheduling system, however, for a simple embodiment, one may elect that they be the same. Obviously, a scheduling system is desired that provides Quality of Service to end users. As in ATM networks, different service classes can be defined to cater to the diverse QoS needs of different applications. The possible service classes include: constant bit rate (CBR), real-time and non-real-time variable bit rate (RT VBR, NRT VBR), unspecified bit rate (UBR), and available bit rate (ABR). In order to meet the QoS requirements of different service classes, there needs to be a method for allocation of bandwidth and buffer resources that does not require statically prioritizing one over the other.

6,115,390

## 31

In order for the AP to perform downlink and uplink scheduling in the case where the wireless modems are geographically distributed, a mechanism is needed for the wireless modems to pass relevant information to the base station, which is the only location that has a complete view of all transmission queues (i.e., transmission queues for both wired and wireless hosts). There are at least two alternative ways to compute the service tags for all hosts associated with the access point. In these methods, the wired hosts, with which the associated wireless modems are communicating, are assumed to be permanently associated with the access point. In one method, the base station can broadcast the system virtual time and the assigned shares of service classes to each of the wireless modems. Then, each wireless modem computes its own service tag and informs the base station of it via a request access packet or by piggybacking on the data transmission. Alternatively, the wireless modem can simply inform the base station of its queue size (again via a request access packet or by piggybacking on data transmission), and the base station can compute the service tag for each wireless modem as well as for the wired hosts. The second method is more efficient in terms of downlink bandwidth utilization, since the base station does not have to transmit the assigned service shares (which may be dynamically varying) to each wireless modem.

An embodiment of the first method is illustrated in FIG. 15A. The base station broadcasts a system virtual time **1510** to the remote hosts. Each remote host computes a service tag value **1515** for each of its newly arrived packets, then transmits **1520** the smallest tag value to the base station. Transmit permits are then assigned **1530** at the base station based on the service tag values received from the remote hosts and the available data slots. The transmit permits are broadcast to the remote hosts **1540**, and then packets are received from the remotes **1540** in the order specified by the transmit permits. If a packet is lost or is received having errors **1545**, the sending remote is made aware of this problem either through notification by the AP or through failure to receive an ACK from the AP in response. The sending remote then recomputes the service tag values of all its queued packets **1550**, including the packet whose transmission failed. This procedure continues until all the scheduled packets have been examined **1555**, after which the system again broadcasts the current virtual time **1510**.

An embodiment of the second method is illustrated in FIG. 15B. A packet count is transmitted **1560** from each remote host to the base station, each packet count representing either the number of fixed-sized packets or the length of a variable-length packet to be transmitted from the remote host to the base station. The base station computes **1565** the service tag values for each remote host; assigns transmit permits **1530** based on the service tags of the remote hosts and the available data slots, and broadcasts the transmit permits to the remotes **1535**. Packets are received from the remotes **1540** in the order specified by the transmit permits. If a packet is lost or received having errors **1545**, the AP recomputes the service tag values for that remote host **1570**. This procedure continues until all the scheduled packets have been examined **1555**, after which the remote hosts again transmit their packet counts **1560** to the base station.

In the methods of FIGS. 15 A and B, should transmitted packets be lost, the base station (access point) or wireless modem recomputes new service tag values for all queued packets based on the current system virtual time. In an alternative embodiment, the AP or wireless node maintains a packet queue and a head-of-line tag. In this scheme, if a packet is lost, only the head-of-line tag needs to be changed.

## 32

Once the head-of-line packet has been transmitted successfully, the rest of the queued packets will automatically receive the correct tag (the recomputed head-of-line tag plus appropriate increments). This alternative embodiment has the advantage of using less cpu. Retransmitting in a polling system is discussed generally in R. Kautz "A Distributed Self-Clocked Fair Queuing Architecture For Wireless ATM Networks", 1997 International Symposium on Personal Indoor and Mobile Radio Communications. Kautz does not, however, discuss the technique of the present invention for recomputing tag values when packets are lost.

A method for recomputing service tags after loss of a packet is clearly of great importance in a wireless system, where such losses are commonplace. For the half-duplex case, both the uplink and downlink queues at the access points are managed as if they are sharing the same bandwidth, i.e., as if there is only one system virtual time. For the full-duplex case, separate system virtual times for the uplink and the downlink traffic may be used. It might also be desirable to have remote hosts divided into one or more separate groups for purposes of downlink transmission, with each group having a different priority and receiving a different system virtual time. Once a modem receives an acknowledgment to its initial access request, it waits until it receives a transmit permit from the AP. Each time the modem transmits a packet, it also indicates whether it has more packets in its buffer. This piggybacking serves as a contention-free bandwidth reservation request for the modem.

Calculation of service tags is illustrated in FIG. 16. First the AP calculates the service tag increment **1610** for each remote node based on each nodes assigned service share. Each nodes packets are then assigned service tags **1612** according to the applicable fair queuing algorithm. Packets are then serviced **1614** according to the order of the assigned service tags. If packets arrive from a node that previously had an empty queue **1616**, the packets of the newly transmitting node are assigned service tags **1618** starting from the tag of the packet currently in service plus the service tag increment of that node. If an error occurs in the transmission of a packet **1620**, the service tag of that packet is reassigned **1622** to be the current tag plus the service tag increment for that node. The remaining packets for that node will then receive new service tags **1622** that will be the previous service tag plus the node's service tag increment. This can be performed either through direct recomputation of all the service tags for that node, or through the recomputation of the head-of-line tag, if present. In the head-of-line tag case, once the head-of-line packet is transmitted successfully, the rest of the queued packets for that node will then automatically receive the correct tag. Note that the service tags of all the other nodes will remain unaffected by the retransmission of a packet for this node, meaning that the QoS experienced by the other nodes will not suffer.

In the preferred embodiment of an aspect of the invention, the order in which the access point sends transmit permits to all associated wireless modems is based on the self-clocked fair queuing algorithm described above. The order in which the access point serves the various downlink connections is also based on the self-clocked fair queuing algorithm. For example, a system may have a capacity of 16 units and 3 sessions with session-ids 1, 2, 3, and session shares $r_1=1$, $r_2=2$, and $r_3=3$, respectively. If, for computation simplicity, the length of the packets of any session is always L=8, each packet will take 0.5 time units to be transmitted. The service tag increment:

6,115,390

33

$$\frac{L}{r_i}$$

is then 8, 4, and 2 for sessions 1, 2, and 3, respectively. If, at time t, session 1 has 4 packets, session 2 has 8 packets, and session 3 does not become backlogged until t=3, then, according to equation (1), the packets of session 1 receive the service tags 8, 16, 24, and 32. Similarly, the packets of session 2 receive the service tags 4, 8, 12, 16, 20, 24, 28, and 32.

FIG. 9A shows the service tags of the packets of this example at time t=0. The packets of session 1 with service tag 8 **902**, service tag 16 **904**, service tag 24 **906**, and service tag 32 **908** are interleaved with packets **912, 914, 916, 918, 920, 922,** and **924** from session 2. Packet **910** from session 2, having service tag 4, is currently in service.

FIG. 9B shows the service tags of the remaining queued packets at time t=3, just before the packets from session 3 arrive. Packet **918** from session 2, having service tag 20, is currently in service. FIG. 9C shows the service tags of the packets at time t=3, just after the 9 packets **930, 932, 934, 936, 938, 940, 942, 944** and **946** from session 3 arrive. Note that the service tag for the first packet **930** of session 3 starts at 22 because, when the packets arrive, the service tag of the packet currently being served was 20. Thus, for a service tag increment of 2, the first packet **930** from session 3 will receive service tag 22. Subsequent packets from session 3 then have service tags of 24, 26, 28, etc.

FIG. 9D shows the service tags of the remaining queued packets at time t=4.5. The transmission of the packet **906** with service tag 24 from session 1 has errors. The access point therefore recomputes a new service tag of 32 for this packet **950**, which needs to be retransmitted. The access point also recomputes the service tags of the remaining packets from session 1, which in this case only affects one other packet **952** (**908** in FIG. 9C), which receives a new service tag of 40. In this way, the retransmission of a packet from a particular session does not affect the Quality of Service of other sessions.

When the remote host PC wants data services, it sends a connect message to the wireless modem. Upon receiving this message, the wireless modem monitors the broadcast frame that is being continuously sent by the AP. The beacon message is part of this broadcast frame and provides timing information, the ESS-ID of the Network, the BSS-ID of the AP, information about the contention slots, the load metric of the AP, etc. The wireless modem then chooses the AP with which it wants to associate and sends a MAC layer associate request frame. Since association request frames are sent in contention mode, collisions may occur. A wireless modem needs to retransmit the association request frame if it does not receive an association response frame from the AP. After a maximum number of retries, the wireless modem will send a connect fail message to the remote host PC, indicating that the wireless modem cannot associate with an AP at this time.

Upon receiving an associate request frame from a wireless modem, after the AP has successfully authenticated the wireless modem, it sends an association response frame with a status code "successful" to the network layer. Authentication is performed at the network layer. When a user requests a connection via the wireless modem, the connection request is forwarded by the access point to the wireless hub. The wireless hub then authenticates the user. If the user is successfully authenticated, a unique connection cookie is provided by the wireless hub to the access point. If it is desirable to provide different QoSs to different connections

34

from the same user, then different connection cookies are assigned to the same user; similarly, if it is desirable to provide different QoSs to different users (albeit potentially from the same wireless modem), then each user is given a different connection identity.

If the wireless modem cannot be successfully authenticated, then an association response frame with an appropriate reason code will be sent. Different reason codes can be defined to cover each of the possible different reasons for the failure to associate. If it is desired to combine the MAC layer registration with the network layer registration, the association request frame should contain sufficient login information to enable the AP to send a network layer registration packet to the requesting wireless hub. In this case, the AP will not send the association response frame until it receives a further response from the wireless hub.

If the MAC layer registration is not combined with the network layer registration, then the AP can relay the MAC layer registration to the wireless hub before sending the association response frame. The separation of MAC layer registration and network layer registration is useful if it is desired that the network software be reusable for other physical implementations. Also, if different users are using the same wireless modem to make different connection requests, then the wireless modem may need to make only one MAC layer registration, but may still need to make multiple network layer registrations. If there is only one user for each wireless modem, then combination of MAC layer with network layer registration helps to reduce the number of airlink frames during the registration process.

Upon receipt of a reconnect message from the remote host PC, a wireless modem reassociates with an access point via the following procedure:

1. The wireless modem transmits a reassociation request frame to the access point;
2. If the reassociation response frame is received with a status code of "successful", the wireless modem transmits a reconnect success message to the PC;
3. If the reassociation response frame is received with a status code other than "successful", the wireless modem transmits a reconnect fail message to the PC.

The access point operates as follows in order to support the reassociation of stations:

1. Whenever a reassociate request frame is received from a station and the station is authenticated, the access point transmits a reassociation response with a status value indicating "successful";
2. If the status value is "successful", the connection cookie assigned to the station is included in the response;
3. When the reassociation is successful, the access point updates its MAC filter table appropriately. The access point also informs the wireless hub of this reassociation;
4. If the reassociation request is not successful, the access point transmits a reassociation response with an appropriate reason code to the wireless modem.

If for some reason, either the PC or the access point wants to disassociate with the other, a disconnect request frame is sent. The PC sends a disconnect message to the wireless modem, triggering the wireless modem to send a disconnect request frame to the access point. The access point responds with a disconnect response frame that indicates the success or failure of the disconnect effort initiated by the PC. The wireless modem relays this response back to the PC via a disconnect response message.

6,115,390

35

In some circumstances, such as overloading or when higher priority is given to other users, an access point may need to disassociate a particular wireless modem that had previously been associated with that access point. In that case, the access point sends a disassociate request message to the wireless modem. The wireless modem responds to the access point with a disassociation response frame and then relays the disassociation message to all PCs attached to the wireless modem. An access point can also disconnect a particular connection using via a disconnect request message which is relayed to the PC via the wireless modem. For wireless modems that support more than one PC, a disassociation request message is not used unless it is desired to disable the whole wireless modem.

Based on a list of access points with which the wireless modem can communicate, the modem decides which AP to associate with by choosing the AP that best meets the following criteria (in decreasing priority order):

1. best signal to interference ratio, RSSI and SNR.

2. least loaded (i.e. having the smallest number of equivalent associated users).

3. requires the least power to communicate with.

The uplink/downlink transmission time ratio can be dynamically adjustable. A way to implement this utilizes a "more" bit or uplink queue size information that is piggybacked on the uplink data transmission. The access point, upon receiving this information from all remote nodes currently active within the cell/sector, will then have complete information on the total uplink/downlink queue size and can use this information to dynamically adjust the uplink/downlink ratio based on the total uplink/downlink queue size information. One simple way to do this is to use a threshold-based technique: when the total uplink/downlink queue size ratio drops below k1, the Access Point sets the uplink/downlink ratio to s1; when the total uplink/downlink queue size ratio increases beyond k2 (k2>k1), the Access Point sets the uplink/downlink ratio to s2 (s2>s1). At the present time, traffic characterization seems to suggest that a ratio of 4:1 is appropriate.

As seen in FIG. 10, frame 1010 has four reservation minislots 1012, two uplink slots 1020, 3 downlink slots 1030, and beacon message 1040. Beacon message 1040 contains information specifying the total number of slots and the number of downlink slots that will be present in the next frame 1050. Frame 1050 reflects this information, having the same number of reservation minislots 1012 (4), but 3 uplink slots 1020, and 2 downlink slots 1030, plus a new beacon message 1060 which specifies the uplink/downlink transmission time ratio for the next frame, etc.

For the PCs flow control, the wireless modem sets high and low buffer occupancy thresholds for each direction (uplink/downlink) and monitors the buffer occupancy. When the buffer occupancy for the uplink traffic hits the high threshold, a flow control signal (Xoff) is sent to the PC from the wireless modem. When the buffer occupancy for the uplink traffic drops below the low threshold (after previously exceeding the high threshold), the wireless modem will send an 'Xon' signal to the PC. When the buffer occupancy for the downlink traffic hits the high threshold, the wireless modem sets the Xon/Xoff bit in the frame control field to "on" at the time it sends a message to the access point. A zero-length message will be sent if there is no uplink frame to be sent. Such a frame will be considered a high priority control frame.

For the Frequency Division Half-Duplex version, both the wireless modem and the access point maintain a memory for buffering both uplink and downlink messages. For the

36

Frequency Division Full-Duplex version, the AP maintains a buffer for both uplink and downlink messages. Typical buffer sizes would be 100 Kbytes at both the modem and the AP for FDHD and 200 Kbytes at the AP for FDFD. The buffers of the wireless modem are typically partitioned into a ratio of $k_1:1$ between the downlink and uplink traffic.

The access point buffers are also partitioned into a $k_2:1$ ratio of downlink to uplink traffic. Again, traffic characterization seems to suggest that a ratio of 4:1 (downlink capacity being 4 times greater than uplink capacity) is appropriate. When the downlink buffer occupancy hits the high threshold, the access point sends an 'Xoff' message to the wireless hub. When the downlink buffer occupancy hits the low threshold (after previously exceeding the high threshold), it sends an 'Xon' message to the wireless hub. When the uplink buffer occupancy hits the high threshold, the access point sets the 'Xon' bit in the frame control field at the time it sends the next broadcast frame to all associated wireless modems. When the uplink buffer occupancy hits the low threshold (after previously exceeding the high threshold), the access point will clear the 'Xoff' bit in the frame control field at the time it sends the next broadcast frame. In addition, a more sophisticated flow control scheme is used by the access point to keep track of the buffer occupancy of each wireless modem (in either direction) and to send a Xon/Xoff MAC frame to a specific wireless modem for a high uplink buffer threshold violation or inform the wireless hub of the appropriate connection ID for a high downlink buffer threshold violation.

An aspect of the invention is capable of supporting admission control. When a PC user submits a connection request via the wireless modem, the connection request is converted into a network layer registration message that is transmitted across the airlink to the AP. The AP needs to make a decision as to whether to admit this new connection request. The admission control technique can be simple, such as admitting any new connection request if the total number of connections admitted is less than a maximum number. A simple admission control technique cannot guarantee quality of service to all admitted users, however, and may not result in high bandwidth utilization.

Other admission control techniques may therefore be better than the simple scheme. A specific admission control program may even utilize a combination of several techniques. For example, where each connection request specifies a delay requirement, a bandwidth requirement, and a traffic descriptor, the AP may first compute various performance metrics (e.g. total bandwidth consumed, average delay) in order to determine whether admission of the new connection could cause a failure to meet the Quality of Service of those admitted connections. If the Quality of Service of all admitted connections can be maintained with the admission of the new connection, the new connection will be admitted. Otherwise, the new connection request will be denied. The equivalent bandwidth-based admission technique described by K. M. Rege in "Equivalent Bandwidth and Related Admission Criteria for ATM Systems—A Performance Study," International Journal of Communication Systems, Vol. 2, pp. 181–197 (1994) may be used with minor modifications for handling this problem in a wireless environment. For example, Rege assumes there is only one bandwidth requirement and set of QoS requirements. Here, the method of Rege is extended to support multiple bandwidth requirements and different QoS requirements for uplink/downlink. Adjustment to the bandwidth requirement based on the radio distance (and hence the potential FER that may be experienced) between the wireless modem and the AP is also supported.

6,115,390

37

In another example, each connection request specifies the average bit rate required and a traffic burstiness factor. The AP collects information about the number of bytes sent by each connection in either direction for a certain period of time. The AP also measures a burstiness factor for the connection traffic in either direction. Based on this measured information, the AP is able to determine the potential average connection bit rate in either direction (uplink/downlink) and the burstiness factor of each connection. The AP then computes an equivalent number of admitted connections. When a new connection request arrives, the AP calculates whether the new equivalent number of admitted connections exceeds a specified threshold. If the threshold is exceeded, the connection request is denied. Otherwise, it is accepted.

The measured quantities can be various metrics related to interference. If this is an interference limited system rather than a bandwidth limited system, then, in order to see if the new connection should be admitted, the AP continuously measures a Frame Error Rate (FER) metric for each remote host based on the interference measured. An implementation of this method for admitting new connections based measured quantities in a wireless network is illustrated in FIG. 20. An uplink Frame Error Rate, an average uplink bit rate, a burstiness factor of the uplink traffic, and a packet loss rate are measured 2010 at the base station for each remote host. A downlink Frame Error Rate, an average downlink bit rate, a burstiness factor of the downlink traffic, and a packet loss rate are measured at each admitted remote host 2015, and then the downlink FER is sent 2020 to the base station. This procedure is continuous 2025, allowing all remote hosts currently admitted to send their measured FER to the base station. The reporting process may be either periodic or triggered. In an alternate embodiment, each remote also sends the measured average downlink bit rate, traffic burstiness factor, and packet loss rate to the base station.

An equivalent bandwidth based on average and peak bit rates of the connection, the burstiness factor of the traffic, and the packet loss rate of each connection is computed 2030 at the base station for each remote host. These computations are continuously updated from new information received 40 from the remote hosts and are used by the base station to compute an equivalent number of connections 2040 already admitted. If a new connection is requested 2045, the base station considers the effect of the average rate and packet loss rate requested by the requested connection and, based on the equivalent bandwidth, computes 2050 whether Quality of Service of all admitted connections can be maintained even if the new connection is admitted. If QoS is maintainable 2055, the new connection will be admitted 2060; if not, the new connection will be denied admission 2065.

A strict usage priority admission criterion can also be implemented. For example, if there are two user priority classes, class 1 and class 2, the system might admit at most $K_1$ users of lower priority class 2 and a total number of users $M (M \geq K_1)$. When an AP receives a connection request from a new user of class 1, it makes a decision based on the current total number of associated users, $k_m$. If $k_m \leq M$, it admits the new user of class 1. Otherwise, it checks to see if it can disconnect any class 2 users. If it can, then it disconnect a class 2 user and admits the new class 1 user.

In this usage priority admission scheme, there are two ways of admitting lower priority users. If the system performance requirement is such that it is appropriate to disconnect lower priority users after they are admitted, then lower priority users are admitted as long as the total number of associated users is less than M. However, if a new class 1 user appears, the AP will send a disconnect message to one

38

of the admitted class 2 users in order to admit the new class 1 user. In one embodiment, a "least recently used" technique is used to identify the admitted class 2 user that the AP will disconnect.

If the system performance requirement is such that it is inappropriate to disconnect lower priority users after they are admitted, then the AP admits class 2 users in the following manner: If $k_m < M$ and the new user is of class 2, then the AP determines if the number of associated users of class 2, $l_m$, is such that $l_m < K_2$. If $l_m < K_2$, then the new user of class 2 will be admitted. Otherwise, the new user of class 2 will not be admitted. This approach can be extended to multiple priority classes.

FIG. 19 is a flowchart illustrating this embodiment of a method for control of admission of remote hosts according to an aspect of the present invention. The network of the embodiment of FIG. 19 supports at least two priority classes of remote hosts, and has both a maximum total number of admitted remote hosts, and a maximum number of admitted lower priority remotes. When the base station receives 1910 a connection request from an unadmitted remote host, it determines 1915 whether the host belongs to the higher priority class. If so, then if the total number of admitted remote hosts is less than the maximum total number of remote hosts 1920, the unadmitted higher priority host will be admitted 1925. If the total number of admitted remote hosts is not less than the maximum total number of remote hosts 1920, then if none of the already admitted remote hosts is of the lower priority class 1930, the requesting host will be refused admission 1935. If one of the already admitted hosts is of the lower priority class 1930, and it has indicated at the time it was admitted that it may be disconnected 1940, the lower priority class remote host will be disconnected 1945 so that the requesting remote host from the higher priority class may be admitted 1925. In one embodiment, the least recently used remote host of the lower priority class, will be the one preferentially disconnected. If the connection request received at the base station 1910 is from an unadmitted remote host belonging to a lower priority class 1915, then if the total number of admitted remote hosts is less than the maximum allowable 1950, and the requesting lower priority remote host indicates that it can be disconnected prematurely 1955, the lower priority host will be admitted 1925. If the total number of admitted remote hosts is less than the maximum 1950, and the unadmitted lower priority remote host indicates that premature disconnection is inappropriate 1955, then the lower priority remote host will only be admitted 1925 if the number of already admitted lower priority hosts is less than some threshold 1960, otherwise the requesting lower priority host will be refused admission 1935, just as if the total number of admitted users was not less than the maximum allowable 1950.

In an alternate embodiment of this admission control technique, lower priority class users (e.g. class 2 users) are admitted if the total number of currently associated users of all classes is less than a second threshold, normally lower than the threshold for higher priority users, rather than being based partially (as a second threshold) on the number of currently associated users of that lower priority class. In this embodiment, if the total number of currently associated users is less than $Q_i$ (with $Q_{i+1} < Q_i$ and $Q_i = M$), then the new user from priority class i will be admitted.

In one embodiment, the AP collects the following information for each connection: (i) the average rate used, (ii) the last time the connection used the network, (iii) frame error rate, and (iv) packet loss rate. Overload control methods then allow this AP to disconnect users of a lower priority

6,115,390

39

during congestion. Alternatively, instead of disconnecting users of a lower priority, they may be redirected to other nearby APs that have a lower load.

If the downlink/uplink buffer occupancy has exceeded the high threshold, the access point will, in a preferred embodiment, determine if this is caused by a specific connection or a group of connections. If it is caused by a specific connection, the access point will send a flow control signal to the connection to prevent it from sending more data. In addition, the access point may reduce the bandwidth shares allocated to any users who have indicated during the connection set-up that they can tolerate a variable allocated bandwidth.

If the measured downlink frame error rates for many connections are seen to be increasing, then the AP may be experiencing an increased interference level from other access points. All admitted users may generally be classified into two categories: those which allow service interruptions and those which do not. When there is congestion due to an increased interference level, the access point may elect to disconnect the class of admitted users that permit service interruption in order that more bandwidth may be allocated to the remaining users (more bandwidth being available providing a consequently greater number of opportunities for retransmission).

If only a specific connection is experiencing a high downlink frame error rate, then the access point may elect to disconnect other connections if the connection experiencing bad performance is of a higher priority. For example, when a specific high priority connection is experiencing a high uplink frame error rate, the access point may disconnect other users in order to give more bandwidth to the higher priority connection. If a majority of all associated connections experience high uplink frame error rates, the AP may instead send a congested signal to a wireless hub which can coordinate the actions of other access points, such as by sending signals to these access points to inhibit them from admitting new users and dropping lower priority users.

There may also be occasions when there is a sudden increase in short bursty messages. Short packets queued up for so long, in either the uplink or downlink queue at the access point, that they exceed the time-to-live value allocated for them will be thrown away, resulting in an increase in packet loss rate due to the processing bottleneck at the access point. Under such an overload situation, the access point may elect to temporarily disconnect some users of a lower priority. Other combinations of the possible actions discussed would also be suitable, the exact combination being decided by the base station depending on the particular congestion conditions observed in the network.

A particular embodiment of a method for overload control is illustrated in the flowchart of FIG. 21. As seen in FIG. 21, an uplink Frame Error Rate is continuously measured 2110 at the base station for each remote host based on an average uplink bit rate, a burstiness factor of uplink traffic, and a packet loss rate. Similarly, a downlink Frame Error Rate is measured at each remote host 2115 based on the average downlink bit rate, the burstiness factor of the downlink traffic, and the packet loss rate and then each FER is sent 2120 to the base station. This procedure is continuous 2125, allowing all remote hosts currently admitted to send their FER to the base station. If an overload condition exits, flow-control messages are sent between at least one of the remote hosts and the base station in order to control data flow 2130. Packets at the base station having a delay exceeding a time-to-live threshold 2135 are then discarded 2140, and connections with a Frame Error Rates that has

40

exceeded a frame error rate threshold for a specified time 2145 and that have indicated that their connections can be interrupted 2150 are disconnected 2155.

To obtain a particular quality of service, each connection request contains the following information: bandwidth requirement, delay requirement, a "loss tolerable/non-tolerable" flag, a "service interruption allowed" flag, acceptable packet loss rate, and a traffic descriptor which consists of peak data rate, average data rate, and a potential burstiness factor for each direction, uplink and downlink. For example, a connection that specifies a delay requirement of 20 ms and "loss tolerant" will have its packet thrown away if the message it sends or is supposed to receive sits in the queue at the wireless modem or the access point for more than 20 ms. If the user specifies a delay requirement but classifies itself as "loss non-tolerant", then packets intended for that user will not be thrown away until there is a buffer overflow. The bandwidth requirement, delay requirement, packet loss rate, and the traffic descriptor are all used in the admission control technique.

A data security feature can be implemented using any of the methods known in the art. One example would be to adapt the Institute of Electrical and Electronics Engineers (IEEE) standard 802.11 wired Local Area Network (LAN) equivalent approach. The wired equivalent privacy (WEP) feature is defined in the 802.11 standard to protect authorized users of a wireless LAN casual eavesdropping. Payload encryption is not be turned on unless the WEP option is turned on. Each service provider assigns a shared key to all users, in addition to a user-unique key. The keys are periodically modified, with the effectiveness of the security feature depending on the length of the key chosen and the frequency with which the key is changed.

Although preferred embodiments of novel access control, admission control and conflict resolution schemes are described above, these embodiments are intended to be illustrative only and therefore not limiting. Modifications and variations may be made by persons skilled in the art in light of the above teachings and it is therefore to be understood that such changes made in the particular embodiments of the invention disclosed are within the scope and spirit of the invention as defined by the appended claims. Having thus described the invention with the details and particularity required by the patent laws, what is claimed and desired to be protected by Letters Patent is set forth in the appended claims.

What is claimed is:

1. A method for conflict resolution among remote hosts in a wireless communications network, said network having a base station and a plurality of remote hosts, said base station and said remote hosts exchanging data via downlink and uplink frames respectively, each of said remote hosts having a respective uplink queue and being characterized by a stack level value indicative of whether or not said remote host has data in said queue for transmission to said base station, the method comprising the steps, in combination, of:

configuring at least one of said uplink frames to include at least one reservation minislot for sending an access request for permission for uplink data transmission from a requesting one of said remote hosts to said base station;

assigning a stack level of "0" to each of said remote hosts that has received data for transmission to said base station at said respective uplink queue if said uplink queue was empty at the last time of uplink access request transmission and putting said remote host into a request state;

6,115,390

41

at any of said remote hosts that are in a request state, have a respective stack level value equal to "0", and did not transmit data during the last uplink data transmission, randomly picking a respective one of said reservation minislots;

transmitting an access request to said base station in said respective picked one of said reservation minislots from each respective one of said remote hosts;

determining at said base station a transmit status for each of said reservation minislots, said transmit status for a particular one of said reservation minislots being SUCCESS, IDLE, or COLLIDED depending respectively on whether said particular reservation minislot contained a successful access request, no access request, or an access request that was corrupted or in error;

transmitting from said base station a downlink acknowledgment message indicating the transmit status of each of said reservation minislots;

receiving at said plurality of remote hosts said acknowledgment message;

for each of said remote hosts that transmitted one of said access requests, randomly setting said respective stack level value of said remote host to one of "1" or "0" when said transmit status for said respective picked one of said reservation minislots received in said acknowledgment message indicates COLLIDED; and

for each of said remote hosts that transmitted one of said access requests, removing said remote host from said request state if said transmit status for said respective picked one of said reservation minislots received in said acknowledgment message indicates SUCCESS and said uplink queue at said remote host will be empty after the next uplink data transmission;

at each of said remote hosts having a respective stack level value greater than "0", inspecting said received acknowledgment message and counting the total number of said reservation minislot transmit statuses that indicate SUCCESS;

at each of said remote hosts having a respective stack level value greater than "0", decrementing said respective stack level value if said total number of reservation minislot transmit statuses equaling SUCCESS or IDLE is greater than or equal to a threshold value; and

at each of said remote hosts having a respective stack level greater than "0", incrementing said respective stack level value if said total number of reservation minislot transmit statuses equaling SUCCESS or IDLE is less than a threshold value.

2. The method of claim 1, wherein the total number of said reservation minislots in any of said uplink frames is dynamically adjustable based on the percentage of IDLE ones of said reservation minislots and the total of said uplink queue lengths at all of said remote hosts.

3. The method of claim 1, further including the steps of:

piggybacking a reservation request on the next uplink data transmission from each of said remote hosts that transmitted one of said access requests, if said transmit status of said respective picked one of said reservation minislots received in said acknowledgment message indicates SUCCESS and said uplink queue at said remote host will not be empty after the next uplink data transmission from said remote host; and

continuing to piggyback a reservation request on all subsequent uplink data transmissions from any of said

42

remote hosts that previously piggybacked a reservation request until said uplink queue at said remote host will be empty after the next uplink data transmission from said remote host.

4. A method for conflict resolution among remote hosts in a wireless communications network, said network having a base station and a plurality of remote hosts, said base station and said remote hosts exchanging data via downlink and uplink frames respectively, each of said remote hosts having a respective uplink queue and being characterized by a stack level value indicative of whether or not said remote host has data in said queue for transmission to said base station, the method comprising the steps, in combination, of

configuring at least one of said uplink frames to include at least one reservation minislot for sending an access request for permission for uplink data transmission from a requesting one of said remote hosts to said base station;

assigning a stack level of "0" to each of said remote hosts that has received data for transmission to said base station at said respective uplink queue if said uplink queue was empty at the last time of uplink access request transmission and putting said remote host into a request state;

at any of said remote hosts that are in a request state, have a respective stack level value equal to "0", and did not transmit data during the last uplink data transmission, randomly picking a respective one of said reservation minislots;

transmitting an access request to said base station in said respective picked one of said reservation minislots from each respective one of said remote hosts;

determining at said base station a transmit status for each of said reservation minislots, said transmit status for a particular one of said reservation minislots being SUCCESS, IDLE, or COLLIDED depending respectively on whether said particular reservation minislot contained a successful access request, no access request, or an access request that was corrupted or in error;

transmitting from said base station a downlink acknowledgment message indicating the transmit status of each of said reservation minislots;

receiving at said plurality of remote hosts said acknowledgment message;

for each of said remote hosts that transmitted one of said access requests, randomly setting said respective stack level value of said remote host to one of "1" or "0" when said transmit status for said respective picked one of said reservation minislots received in said acknowledgment message indicates COLLIDED;

for each of said remote hosts that transmitted one of said access requests, removing said remote host from said request state if said transmit status for said respective picked one of said reservation minislots received in said acknowledgment message indicates SUCCESS and said uplink queue at said remote host will be empty after the next uplink data transmission;

at each of said remote hosts having a respective stack level value greater than "0", inspecting said received acknowledgment message for the one of said transmit statuses corresponding to the one of said reservation minislots which said remote host most recently picked and used to make an access request;

at each of said remote hosts having a respective stack level value greater than "0", decrementing said respec-

6,115,390

43

tive stack level value when said most recently picked
reservation minislot transmit status indicates SUC-
CESS or IDLE; and

at each of said remote hosts having a respective stack
level greater than "0", incrementing said respective
stack level if said reservation minislot transmit status
indicates COLLIDED.

5. The method of claim 4, wherein the total number of
said reservation minislots in any of said uplink frames is
dynamically adjustable based on the percentage of IDLE
ones of said reservation minislots and the total of said uplink
queue lengths at all of said remote hosts.

6. The method of claim 4, further including the steps of:

piggybacking a reservation request on the next uplink data
transmission from each of said remote hosts that trans-
mitted one of said access requests, if said transmit
status of said respective picked one of said reservation
minislots received in said acknowledgment message
indicates SUCCESS and said uplink queue at said
remote host will not be empty after the next uplink data
transmission from said remote host; and

continuing to piggyback a reservation request on all
subsequent uplink data transmissions from any of said
remote hosts that previously piggybacked a reservation
request until said uplink queue at said remote host will
be empty after the next uplink data transmission from
said remote host.

7. A method for conflict resolution among remote hosts in
a wireless communications network, said network having a
base station and a plurality of remote hosts, said base station
and said remote hosts exchanging data via downlink and
uplink frames respectively, each of said remote hosts having
a respective uplink queue and being characterized by a stack
level value indicative of whether or not said remote host has
data in said queue for transmission to said base station, the
method comprising the steps, in combination, of:

configuring at least one of said uplink frames at at least
one of said remote hosts to include at least one reser-
vation minislot for sending an access request for per-
mission for uplink data transmission from said remote
host to said base station;

assigning a stack level of "0" at any of said remote hosts
that has received data for transmission to said base
station at said respective uplink queue if said uplink
queue was empty at the last time of uplink access
request transmission and putting said remote host into
a request state;

at at least one of said remote hosts that is in a request state,
has a respective stack level value equal to "0", and did
not transmit data during the last uplink data
transmission, randomly picking one of said reservation
minislots;

transmitting an access request to said base station in said
picked one of said reservation minislots from said
remote host for determination at said base station of a
transmit status for each of said reservation minislots,
said transmit status for a particular one of said reser-
vation minislots being SUCCESS, IDLE, or COL-
LIDED depending respectively on whether said par-
ticular reservation minislot contained a successful
access request, no access request, or an access request
that was corrupted or in error;

receiving at said remote host a downlink acknowledgment
message from said base station indicating the transmit
status of each of said reservation minislots;

at any of said remote hosts that transmitted one of said
access requests, randomly setting said respective stack

44

level value of said remote host at one of "1" or "0"
when said transmit status for said picked one of said
reservation minislots received in said acknowledgment
message indicates COLLIDED;

at any of said remote hosts that transmitted one of said
access requests, removing said remote host from said
request state if said transmit status for said picked one
of said reservation minislots received in said acknowl-
edgment message indicates SUCCESS and said uplink
queue at said remote host will be empty after the next
uplink data transmission;

at any of said remote hosts having a stack level value
greater than "0", decrementing said stack level value if
the total number of reservation minislot transmit sta-
tuses equaling SUCCESS or IDLE is greater than or
equal to a threshold value; and

at any of said remote hosts having a stack level value
greater than "0", incrementing said stack level value if
said total number of reservation minislot transmit sta-
tuses equaling SUCCESS or IDLE is less than a
threshold value.

8. A method for conflict resolution among remote hosts in
a wireless communications network, said network having a
base station and a plurality of remote hosts, said base station
and said remote hosts exchanging data via downlink and
uplink frames respectively, each of said remote hosts having
a respective uplink queue and being characterized by a stack
level value indicative of whether or not said remote host has
data in said queue for transmission to said base station, the
method comprising the steps, in combination, of:

receiving an access request for permission for uplink data
transmission at said base station from any of said
remote hosts that has received data for transmission to
said base station at said respective uplink queue, has a
stack level of "0", is in a request state, and did not
transmit data during the last uplink data transmission,
said access request being received in a randomly picked
one of a plurality of reservation minislots configured in
one of said uplink frames;

determining at said base station a transmit status for each
of said reservation minislots, said transmit status for a
particular one of said reservation minislots being
SUCCESS, IDLE, or COLLIDED depending respec-
tively on whether said particular reservation minislot
contained a successful access request, no access
request, or an access request that was corrupted or in
error; and

transmitting from said base station a downlink acknowl-
edgment message indicating the transmit status of each
of said reservation minislots, said downlink acknowl-
edgment message being received and responded to at
said plurality of remote hosts in the following manner;

for any of said remote hosts that transmitted one of said
access requests, said stack level value of said remote
host is randomly set to one of "1" or "0" when said
transmit status for said picked one of said reservation
minislots received in said acknowledgment message
indicates COLLIDED;

for any of said remote hosts that transmitted one of said
access requests, remote host is removed from
said request state if said transmit status for said
picked one of said reservation minislots received in
said acknowledgment message indicates SUCCESS
and said uplink queue at said remote host will be
empty after the next uplink data transmission;

for any of said remote hosts having a stack level value
greater than "0", said stack level value is decre-

6,115,390

**45**

mented if the total number of reservation minislot transmit statuses equaling SUCCESS or IDLE is greater than or equal to a threshold value; and

for any of said remote hosts having a stack level value greater than "0", said stack level value is incremented if said total number of reservation minislot transmit statuses equaling SUCCESS or IDLE is less than a threshold value.

**9.** A method for conflict resolution among remote hosts in a wireless communications network, said network having a base station and a plurality of remote hosts, said base station and said remote hosts exchanging data via downlink and uplink frames respectively, each of said remote hosts having a respective uplink queue and being characterized by a stack level value indicative of whether or not said remote host has data in said queue for transmission to said base station, the method comprising the steps, in combination, of:

configuring at least one of said uplink frames at at least one of said remote hosts to include at least one reservation minislot for sending an access request for permission for uplink data transmission from said remote host to said base station;

assigning a stack level of "0" at any of said remote hosts that has received data for transmission to said base station at said respective uplink queue if said uplink queue was empty at the last time of uplink access request transmission and putting said remote host into a request state;

at at least one of said remote hosts that is in a request state, has a respective stack level value equal to "0", and did not transmit data during the last uplink data transmission, randomly picking one of said reservation minislots;

transmitting an access request to said base station in said picked one of said reservation minislots from said remote host for determination at said base station of a transmit status for each of said reservation minislots, said transmit status for a particular one of said reservation minislots being SUCCESS, IDLE, or COLLIDED depending respectively on whether said particular reservation minislot contained a successful access request, no access request, or an access request that was corrupted or in error;

receiving at said remote host a downlink acknowledgment message from said base station indicating the transmit status of each of said reservation minislots;

at any of said remote hosts that transmitted one of said access requests, randomly setting said stack level value of said remote host at one of "1" or "0" when said transmit status for said picked one of said reservation minislots received in said acknowledgment message indicates COLLIDED;

at any of said remote hosts that transmitted one of said access requests, removing said remote host from said request state if said transmit status for said picked one of said reservation minislots received in said acknowledgment message indicates SUCCESS and said uplink queue at said remote host will be empty after the next uplink data transmission;

at any of said remote hosts having a stack level value greater than "0", inspecting said received acknowledgment message for the one of said transmit statuses corresponding to the one of said reservation minislots which said remote host most recently picked and used to make an access request;

at any of said remote hosts having a stack level value greater than "0", decrementing said stack level value

**46**

when said most recently picked reservation minislot transmit status indicates SUCCESS or IDLE; and

at any of said remote hosts having a stack level value greater than "0", incrementing said stack level value if said reservation minislot transmit status indicates COLLIDED.

**10.** A method for conflict resolution among remote hosts in a wireless communications network, said network having a base station and a plurality of remote hosts, said base station and said remote hosts exchanging data via downlink and uplink frames respectively, each of said remote hosts having a respective uplink queue and being characterized by a stack level value indicative of whether or not said remote host has data in said queue for transmission to said base station, the method comprising the steps, in combination, of:

receiving an access request for permission for uplink data transmission at said base station from any of said remote hosts that has received data for transmission to said base station at said respective uplink queue, has a stack level of "0", is in a request state, and did not transmit data during the last uplink data transmission, said access request being received in a randomly picked one of a plurality of reservation minislots configured in one of said uplink frames;

determining at said base station a transmit status for each of said reservation minislots, said transmit status for a particular one of said reservation minislots being SUCCESS, IDLE, or COLLIDED depending respectively on whether said particular reservation minislot contained a successful access request, no access request, or an access request that was corrupted or in error; and

transmitting from said base station a downlink acknowledgment message indicating the transmit status of each of said reservation minislots, said downlink acknowledgment message being received and responded to at said plurality of remote hosts in the following manner:

for any of said remote hosts that transmitted one of said access requests, said stack level value of said remote host is set at one of "1" or "0" when said transmit status for said respective picked one of said reservation minislots received in said acknowledgment message indicates COLLIDED;

for any of said remote hosts that transmitted one of said access requests, said remote host is removed from said request state if said transmit status for said respective picked one of said reservation minislots received in said acknowledgment message indicates SUCCESS and said uplink queue at said remote host will be empty after the next uplink data transmission;

for any of said remote hosts having a stack level value greater than "0", said received acknowledgment message is inspected for the one of said transmit statuses corresponding to the one of said reservation minislots which said remote host most recently picked and used to make an access request;

for any of said remote hosts having a stack level value greater than "0", said stack level value is decremented when said most recently picked reservation minislot transmit status indicates SUCCESS or IDLE; and for any of said remote hosts having a stack level value greater than "0", said stack level value is incremented if said reservation minislot transmit status indicates COLLIDED.

*   *   *   *   *

EXHIBIT 35

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| **INTELLECTUAL VENTURES I LLC and INTELLECTUAL VENTURES II LLC,**<br><br>  **Plaintiffs,**<br>**v.**<br><br>**MOTOROLA MOBILITY LLC,**<br><br>  **Defendant.** | **Case No. 1:11-cv-908-SLR** |

---

### DECLARATION OF DR. RANDY HOWARD KATZ

---

MMA0630

1.     My work address is 465 Soda Hall, RadLab, Computer Science Division, Electrical Engineering and Computer Science Department, University of California, Berkeley, California 94720-1776.   Defendant Motorola Mobility LLC ("Motorola Mobility") retained me in the above-referenced litigation.  I am over the age of eighteen and am a citizen of the United States.

2.     I am submitting this declaration, which sets out the opinions to which I would testify, if asked, in support of Motorola Mobility's Sur-Reply Claim Construction Brief with respect to U.S. Patent No. 7,409,450 (the "'450 Patent").

3.     I have extensive educational and professional experience in the fields of computer science and engineering, particularly with respect to networking technologies relevant to the '450 Patent, which is more fully set out in paragraphs 2-10 of my expert report on the invalidity of the '450 Patent, served on May 17, 2013

4.     I have reviewed Figures 15A and 16A of the '450 Patent and their corresponding description in the specification and understand it to disclose a process for allocating bandwidth based on information read from one or more fields of a packet's header.  Figure 15A, which is reproduced below, shows a flow diagram for a downlink flow scheduler at a base station.

2



5.      The portions of the specification describing this figure explain that the "Packet Header Identification" block, labeled 1502, identifies IP flows received from a data network based on packet headers' contents. '450 Patent, 62:13-15.  The process involves receiving a packet and buffering it in block 1510.  *Id*. at 62:16-28.  After the packet is buffered, its header is extracted and parsed.  *Id*. at 62:28-29.  After extracting the header information and parsing it, the packet header identification component (1502) attempts to match the extracted header information to data flow information stored in an IP flow identification table to determine if the packet corresponding to the extracted header information is associated with any of the IP flows in the table.  *Id*. at 29-36.  If a match is found, the packet is associated with the identified flow based on the matching packet header information.  *Id*.  The packet is then scheduled for transmission according to the identified IP flow after passing to blocks 1530, 1540, 1546, and finally to block 1562 where the packet is queued for transmission.  In this instance, information read from a packet header is used to match the packet with a flow and its quality of service requirements, which allows the packet to be scheduled for transmission.  *Id*. at 63:1-3, 63:48-49, 64:8-9, 64:24-

3

MMA0632

37, 64:60-65.  Thus, in the case where a packet belongs to a previously-identified flow, the downlink scheduler disclosed in Figure 15A allocates bandwidth and system resources responsive to information read from the packet's header.  And in the case where a packet does not belong to a known flow, the packet header information is further analyzed to setup a new flow and assign quality of service requirements to the flow so that its packets may be scheduled for transmission.  *See, e.g., Id.* at 62:38-63, 63:13-43, 63:60-64:4, 64:14-22, 64:32-46.  Again, this process allocates wireless bandwidth and system resources based on information read from one or more fields in a packet's header.

6.     Figure 16A shows a process very similar to the one shown in Figure 15A, however, in this case, the process is for uplink traffic.  Figure 16A is reproduced in its entirety below.



7.     As with the downlink scheduled described above, the uplink scheduler includes a "Packet Header Identification" block, labeled 1602, which identifies IP flows based on packet headers' contents.  *Id.* at  67:23-38.  The process involves receiving a packet and buffering it in block 1610.  *Id.* at 68:9-13.  After the packet is buffered, its header is extracted and parsed.  *Id.* at

4

MMA0633

68:11-13.  After extracting the header information and parsing it, the packet header identification component (1602) attempts to match the header information to data flow information stored in an IP flow identification table to determine if the packet corresponding to the extracted header information is associated with any of the IP flows in the table.  *Id*. at 68:17-24.  As with the downlink scheduler, if a match is found, the packet is associated with the identified flow based on the matching packet header information.  *Id*.  The packet is then scheduled for transmission according to the identified IP flow after passing to blocks 1630, 1640, 1646, and finally to block 1662 where the packet is queued for transmission.  In this instance, information read from a packet header is used to match the packet with a flow and its quality of service requirements, which allows the packet to be scheduled for transmission.  *Id*. at 68:22-24, 68:46-48, 69:23-24, 69:48-49, 69:52-55.  Thus, in the case where a packet belongs to a previously-identified flow, this embodiment allocates bandwidth and system resources responsive to information read from the packet's header.  And in the case where a packet does not belong to a known flow, the packet header information is further analyzed to setup a new flow and assign quality of service requirements to the flow so that its packets may be scheduled for transmission.  *See, e.g., Id*. at 62:38-63, 63:13-43, 63:60-64:4, 64:14-22, 64:32-46.  Again, this process allocates wireless bandwidth and system resources based on information read from one or more fields in a packet's header.

8.     I note that while the '450 Patent describes that a coaxial cable may serve as a waveguide, this is not a characteristic confined only to coaxial cables.  Other cables may serve as a waveguide, including non-metallic cables such as fiber optic cables.  In fact, if the medium includes a wire, its ability to serve as a waveguide is essentially no limitation at all as to the type of wire that may be used.

9.     I understand that IV has asserted that in the case where a single CPE is coupled to a base station that the wireless bandwidth is not "shared."  This is incorrect.  When a CPE couples to a base station, each of those devices needs to share the communications medium, such as by transmitting to each other at different times or on different frequencies.  When two devices are

5

both attempting to use the same medium, particularly to communicate with each other, they necessarily share it.

Dated:          September 6, 2013

Dr. Randy Howard Katz

MMA0635

EXHIBIT 36

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **INTELLECTUAL VENTURES I LLC and** | ) | **Case No. 1:11-cv-908-SLR** |
| **INTELLECTUAL VENTURES II LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **MOTOROLA MOBILITY LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**Declaration of Dr. Brian Von Herzen Regarding the
Claim Construction of U.S. Patent Nos. 6,557,054 and 6,658,464**

I, Brian Von Herzen, Declare as follows:

## I.     Introduction and Qualifications

1.     I have been engaged by Motorola Mobility LLC as an expert in the area of network updates.

2.     I previously submitted reports on invalidity and non-infringement of U.S. Patent No. 6,557,054 and 6,658,464, at issue in this matter, as well as a declaration on invalidity of these patents.  I submit this Declaration in support of Motorola's sur-reply brief on claim construction; it sets out my opinions with respect to certain claim construction issues, as explained below.

3.     My education and experience are detailed in my previous expert reports, which are herein incorporated by reference.

4.     As explained in my previous report, a person of ordinary skill in the art at the time of the alleged invention would have a Bachelor of Science Degree and one to two years of programming experience.  IV's expert proffered a similar level of ordinary skill, but contended that one would have two or more years of experience in software design or computer programming, including experience with computer applications, computer networking, and user interfaces.  *See* May 17, 2013 Nieh Expert Report at ¶ 28.  My conclusions would not change even if Dr. Nieh's formulation of the level of ordinary skill in the art were adopted.

## II.    The '054 Patent

### A.     Motorola's Proposed Claim Construction Does Not Render Superfluous the Claim Language Reciting "and Not Already Installed on the User Station."

5.     I understand that each asserted independent claim of the '054 patent recites the step of presenting a directory of software (or software updates) available for installation on the

1

user station.[1]  I further understand that most, but not all, asserted independent claims recite the additional limitation that the directory is limited to software not already installed on the user station.[2]

6.     I also understand that Motorola has proposed construing the term "presenting a directory of software [updates] available for installation on the user station" to mean "displaying a directory of software [updates] available for installation on the user station but not displaying any software [updates] not available for installation on the user station."[3]  I further understand that IV contends that the plain and ordinary meaning of this term would encompass a directory that includes software (or software updates) that are ***not available for installation*** on the user station.[4]

7.     I understand that IV further contends that the additional limitation "and not already installed on the user station" would be rendered superfluous under Motorola's proposed construction.[5]  Based on these arguments set forth by IV, I understand IV's position to be that software "available for installation on the user station" is coextensive with software "not already installed on the user station."  In other words, I understand IV's position to be that any software available for installation on the user station is also not already installed on the user station. Conversely, I understand IV's position to be that any software that ***is*** already installed on the user station ***cannot be*** available for installation on the user station.

---

[1] IV contends that Motorola infringes independent claims 1, 31, 61, 91, 121, 151, 181, 211, 241, 256, 271, 286, 316, and 362 of the '054 patent, each of which includes the step of presenting a directory of software available for installation on the user station.

[2] Claims 1, 91, 121, 181, 256, 271, 286, 316, and 362 each include the "and not already installed" language.

[3] Motorola's Responsive Brief on Claim Construction at 36-39.

[4] *See* IV's Opening Brief on Claim Construction at 31-32; IV's Reply Brief on Claim Construction at 16-17.

[5] *See* IV's Opening Brief on Claim Construction at 32; IV's Reply Brief on Claim Construction at 17.

MMA0638

8.      I disagree with these positions taken by IV.  One of skill in the art at the time of the purported invention would understand that in some circumstances, software that is already installed may also be available for installation.  For example, it is well known that some software can be reinstalled.  Reinstallation can be performed for various reasons, such as to correct an error in a previous installation or to modify settings.  Thus, one of skill in the art would understand that claim language reciting a directory of software available for installation may in some circumstances encompass a directory that includes software already installed—as long as that already installed software can be reinstalled from that directory.

9.      Further, one of skill in the art at the time of the purported invention would understand that not all software (or software updates) that are "not already installed" would also be "available for installation."  One of skill in the art would recognize that, in some instances, more may be required in order for software not already installed to be available for installation. For example, software that is in an incompatible format (e.g., software compiled for a Macintosh but presented to a PC user) would not be "available for installation on the user station."  Also, software that is not available from its publisher at the time would also not be "available for installation on the user station."

## III.    The '464 Patent

### A.      "Content," as Recited in the Independent Claims of the '464 Patent, is Distinct from Software Applications.

10.     I understand that IV is asserting two independent claims of the '464 patent against Motorola: claims 1 and 20.  Each of these claims recites a "software product" that allows a user to select content, download and store content, and present content with a customized user interface.

3

11.     I understand that IV contends that "content" can include software programs.  IV's interpretation is incorrect and inconsistent with the understanding of one of skill in the art.  In fact, one of skill in the art would understand that Motorola's proposed construction for "content" ("data representing multimedia information, such as images, audio, or video")[6] is correct and thus "content" is distinct from software applications.

12.     I further understand that IV contends that "software is data that can represent multimedia information."[7]  This statement is incorrect and contrary to the understanding of one of skill in the art.  Rather, one of skill in the art would recognize that software consists of executable computer instructions, and that data and multimedia information are distinct from software.  While software can (and often does) interact with data and multimedia information, one of skill in the art would readily recognize that software is different from the data and multimedia information with which it interacts.

13.     Col. 30:49-54 of the '464 patent recites: "Level 0 enables a user to retrieve remote information objects such as information product content or software updates, or send in information objects such as product registrations, or orders or inquiries, in an automatic, unattended manner after initiating the communications process with, for example, a single mouse click."

14.     IV contends that this passage equates software with "content."  I disagree, and one of skill in the art would not understand that this passage equates software with "content."  In fact, one of skill in the art would understand that this passage distinguishes software from "content."

---

[6] Motorola's Responsive Brief on Claim Construction at 40-41.

[7] IV Reply Brief on Claim Construction at 19.

4

15.     The passage at col. 30:49-54 of the '464 patent provides two examples of "remote information objects" that can be retrieved: "information product content" as well as "software updates."   One of skill in the art would recognize that this list of retrievable objects is separated by "or" as used here in its disjunctive meaning.   Similarly, this passage provides a list of three types of objects that can be sent in: "product registrations," "orders," and "inquiries."   Again, these items in the list are distinct examples separated by "or" in its disjunctive meaning.

**B.     The "Software Product" Recited in the Claims of the '464 Patent Must Provide the Recited "User Interface."**

16.     Each of the asserted independent claims of the '464 patent (claims 1 and 20) recites a "software product" that "effect[s] presentation of the stored content to the user at the user station with a user interface that is customized to the respective [publishers] / [services]."

17.     I understand that, in asserting this claim against Motorola, IV contends that the "user interface" need not be provided by the recited "software product."   IV's interpretation is incorrect and inconsistent with the understanding of one of skill in the art.   Contrary to IV's position, one of skill in the art would understand that the software product provides the user interface that effects presentation of the stored content.

18.     In fact, a software product cannot effect presentation of content with a customized user interface *without* providing a customized user interface.   Under IV's erroneous interpretation, the content itself can provide the customized user interface.   However, the plain language of the claim recites that the *software product* "effect[s] presentation . . . with a user interface that is customized . . . ."   One of skill in the art would be familiar with software products available at the time of the purported invention that were used to effect presentation of

5

content to users.  Such software products (e.g., the Mosaic web browser, Adobe Acrobat Reader) provided a user interface.

19.     Thus, one of skill in the art would understand the claim language of claims 1 and 20 to require the software product—not the content itself—to provide the recited user interface.

**IV.     Conclusion**

20.     I hereby declare under penalty of perjury that all statements made herein are of my own knowledge and are true.

Executed this 6th day of September, 2013.

**Brian Von Herzen, Ph.D.**

6

EXHIBIT 37

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 13-cv-61358—ROSENBAUM/HUNT

INTELLECTUAL VENTURES I, LLC, *et al.*

      Plaintiffs,

vs.

MOTOROLA MOBILITY LLC,

      Defendant.

_____/


### PLAINTIFF INTELLECTUAL VENTURES I LLC AND INTELLECTUAL VENTURES II LLC'S OPPOSITION TO DEFENDANT MOTOROLA MOBILITY LLC'S MOTION TO TRANSFER

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................. 1

II.  LEGAL STANDARDS ..................................................................................... 2

III. ARGUMENT .................................................................................................... 4

   A.   Numerous Factors Favor Keeping This Case Before This Court ........................... 4

     1.   Judicial Economy ...................................................................................... 4

     2.   Locus Of Operative Facts ........................................................................ 10

     3.   Plaintiffs' Choice of Forum ...................................................................... 13

     4.   Convenience of Parties ............................................................................ 15

     5.   Convenience of the Witnesses and Availability of Process ............................. 18

     6.   Location of Documents ............................................................................ 19

   B.   The Remaining Factors Are Neutral .................................................................... 19

IV.  CONCLUSION ............................................................................................... 19

MMA0644

CASE NO.: 13-cv-61358-ROSENBAUM/HUNT

## TABLE OF AUTHORITIES

Page

**Cases**

*Amazon.com v. Cendant Corp.*,
  404 F. Supp. 2d 1256 (W.D. Wash. 2005) ..................................................... 10

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
  2007 WL 3458987 (S.D. Fla. Nov. 14, 2007) ............................................. 3, 7

*Credit Bureau Servs. v. Experian Info. Solutions, Inc.*,
  2012 WL 6102068 (S.D. Fla. Dec. 7, 2012 ................................................... 13

*Howell v. Tanner*,
  650 F.2d 610 (5th Cir. 1981) ...................................................................... 13

*In re Ricoh Corp.*,
  870 F.2d 570, 573 (11th Cir. 1989) ............................................................... 3

*Ins. Co. of N. Am. v. Levin*,
  2011 WL 1398473 (S.D. Fla. Mar. 28, 2011) ........................................... 3, 13

*Manuel v. Convergys Corp.*,
  430 F.3d 1132 (11th Cir. 2005) ..................................................................... 3

*Mason v. SmithKline Beecham Clinical Labs.*,
  146 F. Supp. 2d 1355 (S.D. Fla. 2001). .......................................................... 3

*Micron Tech., Inc. v. Mosaid Techs., Inc.*,
  518 F.3d 897 (Fed. Cir. 2008) ....................................................................... 9

*Micron Technology, Inc. v. Rambus, Inc.*,
  645 F.3d 1311 (Fed. Cir. 2011) ..................................................................... 2

*Microspherix, LLC v. Biocompatibles, Inc.*,
  WL 3113932 (S.D. Fla. Jan. 24, 2012) .................................................... 3, 14

*Microspherix, LLC*,
  2012 U.S. Dist. LEXIS 8359 ....................................................................... 10

*Motorola Mobility, Inc. v. Microsoft Corp.*,
  804 F. Supp. 2d 1271 (S.D. Fla. 2011) .............................................. 2, 3, 11

*Motorola Mobility, LLC v. Apple, Inc.*,
  2012 WL 3113932 (S.D. Fla. July 31, 2012) ..................................... passim

MMA0645

*Myers v. Pan American World Airways, Inc.*,
   388 F. Supp. 1024 (D.P.R. 1974)........................................................................ 18

*Omega Patents, LLC v. Lear Corp.*, 2009
   WL 1513392 (M.D. Fla. Jan. 23, 2009)............................................................. 14

*Piper Aircraft Co. v. Reyno*,
   454 U.S. 235 (1981)............................................................................................. 2

*Promex, LLC v. Perez Distrib. Fresno, Inc.*,
   2010 WL 3452341 (S.D. Fla. Sept. 1, 2010) .................................................... 18

*Ricoh Co. v. Honeywell, Inc.*,
   817 F. Supp. 473 n.17 (D.N.J. 1993) ................................................................ 10

*Robinson v. Giamarco & Bill, P.C.*,
   74 F.3d 253 (11th Cir.1996) ............................................................................. 13

*Robinson v. Giarmarco & Bill. P.C.*,
   74 F.3d 253 (11th Cir. 1996) .............................................................................. 3

*Stewart Organization, Inc. v. Ricoh Corp.*,
   487 U.S. 22 (1988).............................................................................................. 2

*Stiefel Labs., Inc. v. Galderma Labs., Inc.*,
   588 F. Supp. 2d 1336 (S.D. Fla. 2008) ................................................... 13, 18, 19

*Thermal Techs., Inc. v. Dade Serv. Corp.*,
   282 F. Supp. 2d 1373 (S.D. Fla. 2003) ............................................................... 3

*Trace-Wilco. Inc. v. Symantec Corp.*,
   2009 U.S. Dist. LEXIS 13646, 2009 WL 455432 (S.D. Fla. Feb. 23, 2009) ............... 10

**Statutes**
35 U.S.C. § 299........................................................................................... 1, 6, 9

MMA0646

Plaintiffs Intellectual Ventures I LLC and Intellectual Ventures II LLC ("IV")

respectfully submit this Opposition to Defendant Motorola Mobility, LLC's Motion to Transfer

Venue to the District of Delaware (Dkt. No. 26).

## I.    INTRODUCTION

Despite bearing the burden of showing that the balance of *nine* transfer factors *strongly*

*favors* transfer to Delaware, Motorola only contends that two factors favor transfer, the primary

one of which—judicial economy—actually weighs against transfer.  Most of the other transfer

factors—the locus of operative facts, plaintiffs' choice of forum, location of relevant documents,

convenience of the parties and witnesses, and the availability of process—favor keeping this case

here.   The remaining two—the relative means of the parties and this forum's familiarity with the

law—are neutral.  Motorola's motion to transfer therefore should be denied.

Motorola apparently contends that judicial economy weighs in favor of transfer to

Delaware because IV has asserted four of the seven patents at issue here against other parties in

Delaware.  But IV has not asserted three of the seven patents at issue here in Delaware, or

anywhere else for that matter.  The four overlapping patents are not even all asserted in the same

Delaware case, and each such case also has many other patents at issue.  There would be no

efficiency in coordinating or consolidating discovery in this case with any of those Delaware

cases, and the cases cannot be consolidated for trial as a matter of law, 35 U.S.C. § 299.

In fact, the only Delaware case with which this case could be consolidated for trial is the

case between IV and Motorola.  But that case involves none of the patents asserted here. And

because that case already involves six patents, and because fact discovery closed three months

ago and trial is set only five months from now, it is highly unlikely that the Delaware court

would consolidate the two cases to convert a six-patent case into a 13-patent case to be tried in

MMA0647

January. This is particularly true when Motorola already moved to have the six-patent Delaware case split into two three-patent cases, but that request was denied.

Motorola also denigrates its own significant ties to this district, ties that are likewise significant to this dispute. Motorola itself filed a number of actions here, including two patent matters, and successfully defeated at least one transfer motion based on its ties to this District. Motorola does not dispute that its Plantation facility, which is one of only three Motorola "primary facilities" in the United States and where at least some of the infringing technology in the accused product was researched, developed, and marketed, is in this District. Motorola does not dispute that some of the people associated with the accused product, whether its current or former employees, are in this District. Motorola does not dispute that there are documents and evidence related to the accused product in or accessible from this District. As a result, this District is a more appropriate venue for this dispute than Delaware, and Motorola's motion to transfer should be denied.

## II.     LEGAL STANDARDS

The Federal Circuit reviews motions to transfer under regional circuit law. *Micron Technology, Inc. v. Rambus, Inc.,* 645 F.3d 1311, 1331 (Fed. Cir. 2011). Thus, Eleventh Circuit precedent controls.

Section 1404(a) vests a district court with discretion "to adjudicate motions to transfer according to an individualized, case by case consideration of convenience and fairness." *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 23 (1988) (quoting *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964); *see also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 253-54 (1981) ("District courts were given more discretion to transfer under § 1404(a) than they had to dismiss on grounds of forum non conveniens") (citation omitted)); *Motorola Mobility, Inc. v. Microsoft*

*Corp.*, 804 F. Supp. 2d 1271, 1275 (S.D. Fla. 2011). Courts in the Eleventh Circuit employ a

two-step process in deciding a motion to transfer. *Thermal Techs., Inc. v. Dade Serv. Corp.*, 282

F. Supp. 2d 1373, 1376 (S.D. Fla. 2003). First, the court must decide whether the action could

have been brought in the venue to which transfer is sought. *Id.* Second, the court determines

whether convenience and the interest of justice require transfer to the requested forum. *Id.* In

making this second determination, courts consider the following factors:

> (1) the convenience of the witnesses; (2) the location of relevant documents and
> the relative ease of access to sources of proof; (3) the convenience of the parties;
> (4) the locus of operative facts; (5) the availability of process to compel the
> attendance of unwilling witnesses; (6) the relative means of the parties; (7) a
> forum's familiarity with the governing law; (8) the weight accorded a plaintiff's
> choice of forum; and (9) trial efficiency and the interests of justice, based on the
> totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n.1 (11th Cir. 2005).

The burden of establishing entitlement to transfer rests on the moving party. *In re Ricoh*

*Corp.*, 870 F.2d 570, 573 (11th Cir. 1989). Motorola must establish that these factors ***strongly***

***favor transfer***. This burden can only be met when the "balance of convenience of the parties

'strongly favors' the defendant." *Microspherix, LLC v. Biocompatibles, Inc.*, No. 11-80813,

2012 WL 3113932 (S.D. Fla. Jan. 24, 2012) (citing *Robinson v. Giarmarco & Bill. P.C.*, 74 F.3d

253, 260 (11th Cir. 1996)); *Ins. Co. of N. Am. v. Levin*, No. 10-60130, 2011 WL 1398473 at *3

(S.D. Fla. Mar. 28, 2011) (stating same); *Carrizosa v. Chiquita Brands Int'l, Inc.*, No. 07-60821,

2007 WL 3458987, at *3 (S.D. Fla. Nov. 14, 2007). Moreover, Motorola must meet its burden

based on specific and particular facts, not rote or conclusory arguments. "Defendants moving for

transfer have a heightened burden as they must prove with particularity the inconvenience caused

by plaintiff's choice of forum." *Mason v. SmithKline Beecham Clinical Labs.*, 146 F. Supp. 2d

1355, 1359 (S.D. Fla. 2001).

MMA0649

## III.  ARGUMENT

The parties agree that the first prong of the transfer analysis is met because this action could have been brought in Delaware.  But the second prong factors overwhelmingly weigh against transfer.  Motorola's motion to transfer should be denied on that basis.

### A.  Numerous Factors Favor Keeping This Case Before This Court

IV will show that most of the transfer factors weigh against transfer, including at least one of the only two factors Motorola claims support transfer.

#### 1.  Judicial Economy

Motorola lumps together four Delaware lawsuits to suggest that it would be a simple matter to consolidate this case to achieve legal efficiencies, if only this case were transferred to Delaware.  Motorola knows better.  Only four of the seven patents asserted here are even at issue in Delaware, and those four patents are not even pending in the same case or before the same judge (one patent is in two separate cases before one Delaware judge and three patents are in one case before another).  And none of the patents at issue here are at issue in the fourth Delaware case, the case between IV and Motorola, and the six patents asserted there involve technologies only partially related to those accused here.

The first Delaware case, *Intellectual Ventures I LLC v. Canon, Inc.*, No. 11-792 ("*Canon*"), involves only one of the seven patents at issue here (the '960 patent) and eight other patents not asserted against Motorola.  *See, generally, Canon* Docket, attached as Exhibit 1; *Canon* Compl, attached as Exhibit A to Def. Motion (D.E. 26-1).  Judge Robinson is presiding over *Canon* and trial is set for April 20, 2014.  *See* Ex. 1, April 4, 2012, Text Order.

The second Delaware case, *Intellectual Ventures I LLC v. Nikon Corp.*, No. 11-1025 ("*Nikon*"), also involves only one patent asserted here, again the '960 patent, and four other

MMA0650

patents. *See, generally, Nikon* Docket, attached as Exhibit 2; *Nikon* Compl, attached as Exhibit B to Def. Motion (D.E. 26-2). *Nikon* is also before Judge Robinson, and trial is set for April 29, 2015. *See* Scheduling Order, Dkt. No. 46, attached as Exhibit 3.

The third Delaware case, *Intellectual Ventures I LLC v. AT&T Mobility*, et al, No. 12-193 ("*AT&T*"), is before Judge Stark. *See, generally, AT&T* Docket, attached as Exhibit 4; *AT&T* Compl, attached as Exhibit C to Def. Motion (D.E. 26-3). That matter involves three of the seven patents at issue here (the '793, '073, and '392 patents) and twelve other patents, none of which are at issue there. Judge Stark ordered the matter be severed into eight trials after the Court has issued its claim construction ruling. March 26, 2013 Order, *AT&T*, Dkt. No. 59, attached as Exhibit 5. The cases will have a claim construction hearing on May 2, 2014, after which time the Court will then set the remaining dates, including dates for trial. Ex. 4, August 2, 2013 Text Order, *AT&T*, Dkt. No. 73.

Motorola is not a party to any of these cases. Rather, the case that Intellectual Ventures brought against Motorola (No. 11-908, "*Motorola Delaware*") involves six patents that are not asserted in any other Delaware case and are not asserted here. *See, generally, Motorola Delaware* Docket, attached as Exhibit 6; *Motorola Delaware* Compl, attached as Exhibit D to Def. Motion (D.E. 26-4). Fact discovery in *Motorola Delaware* closed three months ago, although some individual matters continued past the close of discovery. Ex. 6, April 22, 2012 Text Order. Trial is set for January 2014. Ex. 6, January 17, 2012 Text Order.

Motorola contends that "the Delaware Court would not have to waste resources getting up to speed on the issues in this case" because of the cases already pending in Delaware. Def. Brief at 7. Which Delaware Court? If Motorola means that this case should be combined with *Motorola Delaware*, then the seven patents at issue here would have to be added to the six

patents at issue in that case where discovery has been closed for three months and trial is set for January. And Motorola already moved to separate the six patents pending against it in *Motorola Delaware* into two cases because it claimed that a six patent case was just too complex, a motion that Judge Robinson summarily refused to hear. Email Request for Emergency Relief, *Motorola Delaware* Matter, attached as Exhibit 7. Having argued that a six patent case is too unwieldy, Motorola should not be taken seriously when it now argues that the seven patents at issue here should be consolidated with the six patents already at issue in Delaware to produce a 13 patent case. Would Motorola next argue that a 13 patent case should be split into four cases, so long as they are all in Delaware? What efficiency is there in that?

If Defendant wants this case combined with either *Canon* or *Nikon*, the case against Motorola would still need to be tried separately; it could only be consolidated for pre-trial purposes. 35 U.S.C. § 299. And why would Judge Robinson want to consolidate discovery involving different parties, and different accused technology (i.e., cameras vs. handsets) where only one of the twelve patents that would be in suit (the '960 patent) overlaps? Consolidation with these cases is especially unlikely given the fact that the *Canon* and *Nikon* cases have not been consolidated, even for discovery purposes, and have trial dates a year apart.

Finally, if Motorola wants to combine this case with *AT&T*, then Judge Stark would need to add four new patents to a case already involving twelve others, as well as adding a new defendant to an action that already has eight. And again, the case against Motorola, like the other cases, could only be consolidated for pre-trial purposes, not trial, under 35 U.S.C. § 299, as Judge Stark recognized when he ordered the eight cases severed after *Markman*. Ex. 5. Why would Judge Stark want to further complicate an already complicated case by adding four more patents and a new defendant to a case that already has twelve patents and eight defendants, when

the cases could not be tried together?   Rather than streamlining any case or promoting

efficiency, transfer would add significant burden and complexity to already complex matters—

hardly a model of judicial efficiency.

This Court has rejected a similar argument before, based on arguments Motorola itself

made.   In 2011, Motorola sued Apple in this District as part of a broader patent battle between

Motorola and Apple that included cases in the International Trade Commission, the Western

District of Wisconsin, and the District of Delaware.  Because Apple previously had sued

Motorola on separate patents in Wisconsin, it sought to transfer Motorola's case against it to

Wisconsin.  The Court denied Apple's motion, finding that transferring in a situation such as

this:

> would force [the Court] to contend with an unworkably large number of patents
> that involve technologies that have some similarities but which also have
> significant dissimilarities.  Therefore, it is more likely than not that if transfer
> were ordered, the Wisconsin Court would have to expend extraordinary resources
> learning about the additional patents and the relevant technologies, adjudicating
> pretrial discovery motions, and conducting additional *Markman* hearings, all of
> which likely would significantly delay trial—rather than expedite it.
> *Motorola Mobility, LLC v. Apple, Inc.*, No. 10-23580, Order Denying Transfer, Dkt. No.

85, at 6 (S.D. Fla. May 24, 2011) ("*Motorola v. Apple*"), attached as Exhibit 8.  The same

rationale applies with even more vigor here.  Even where some gains in efficiency could be

realized from transfer to a different venue, the party moving for transfer must demonstrate that

"judicial efficiency gains will 'clearly outweigh' Plaintiffs' choice," and "'strongly favor'

transfer."  *Carrizosa*, 2007 WL 3458987, at *4.  Regardless of overlapping questions of fact and

law, if "specific factual claims" will ultimately predominate, the purported gains in efficiency do

not outweigh the plaintiff's choice of forum and transfer should be denied.  *See id.*  Here,

specific factual claims will predominate because it is Motorola's products and Motorola's

infringement that are at issue in this case (and not the cases with common patents in Delaware),

CASE NO.: 13-cv-61358-ROSENBAUM/HUNT

and IV's choice of forum certainly outweighs any efficiency gain, which would be minimal at best.

Motorola argues that although a Delaware Court would be faced with significant new issues, it would not impose too great a burden because the technologies in *Motorola Delaware* are similar to those at issue here. But other than pointing out that both cases relate to cellular telephones, Motorola points to no similarity in technologies that would justify transfer. Its failure to do so is surprising since that was one of the factors cited by this Court when it denied Apple's motion to transfer and allowed Motorola to pursue its patent infringement case here. The Court there explained that Apple bore the burden of "convincing the Court that the twelve patents implicated in its twelve respective counterclaims are similar enough to those in the Wisconsin action to militate in favor of transfer." Ex. 8, *Motorola v Apple*, Order Denying Transfer, at 5. This could not be satisfied by broad conclusions. "Apple bears the burden of explaining to the Court exactly *how* the [technologies] are similar to those in the Wisconsin patents." *Id.* (emphasis in original). Even though the Court found "some overlap in technology and infringing products," that was not enough. *Id.* There needed to be a specific showing of exactly how the technologies and patents related. Here there is little relation between the seven patents at issue[1] and the six patents at issue in *Motorola Delaware*.[2] Even where the patents do address similar technologies, the specific inventions at issue are distinct.

---

[1] Briefly, the '793 patent claims, among other things, a method of sending multimedia and other messages, such that they are properly decoded without user intervention. The '392 patent claims, among other things, a method for network control such that messages are sent and managed based on their level of priority, thus messages with higher priority will have better access to the network. The '960 patent claims, among other things, a touch screen that can display a composite of two images, one being a background or program, and the other representing some button, key, or keyboard that the user can activate while still viewing the other image. The '771 patent claims, among other things, an invention related to a mobile wireless hot spot system. The '784 patent claims, among other things, a method for communicating between

MMA0654

CASE NO.: 13-cv-61358-ROSENBAUM/HUNT

In situations where the proposed transferee forum is a "well-known patent forum," and "has heard cases involving some of the same patents," if there is no ongoing litigation in the proposed transferee forum "requiring consolidation," judicial efficiency does not weigh in favor of transfer. *See Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 905 (Fed. Cir. 2008). Here, the only Delaware case with which this case could be consolidated under 35 U.S.C. § 299, *Motorola Delaware*, does not involve any of the same patents. Thus, this factor weighs strongly in favor of maintaining this action in this District and does not support transfer as Motorola argues. Again, this is particularly true when Motorola already moved to break the *Motorola Delaware* case into two three patent cases and that request was denied. Ex. 7.

---

a station and a device to improve quality and time. The '073 patent claims, among other things, an apparatus and system for encoding and decoding traffic on a network and detecting errors. And the '353 patent claims, among other things, a method and system for determining how much bandwidth is available.

[2] The '144 patent claims, among other things, a file transfer system and method involving the transfer of files from one computing device to another. That invention addresses problems relating to using intermediary computers or devices and the added complexity associated with such intermediaries as one transfers files. While generally related to the same technology as the '793 patent, the two patents claim different inventions and address different problems in the prior art. This is unrelated to any invention at issue here. The '953 patent claims an improved illumination device, such as a screen, and addresses problems relating to high electricity consumption, short life times, and high temperatures. No invention at issue here involves the design of the screen itself. The '450 patent claims, among other things, an improved wireless transmission system directed to, among other things, improving quality of service issues by solving issues with the wireless transmission of TCP/IP packets. The '784 patent builds on this technology but is directed toward more advanced service issues such as providing for secure and sufficient connections between stations and users. The '464 patent claims, among other things, a software product for the automatic distribution of publishable content addressing problems, such as, distributing such content to a high number of subscribers irrespective of network, operating systems, or devices used by each subscriber. There is no invention at issue here related to this. The '054 patent is related to the '464 patent and claims, among other things, a method for distributing software and updates from a remote station to users, and is as unrelated to any invention here as is the '464 patent. Finally, the '462 patent claims, among other things, a portable handset device, such as a smart phone or MP3 player, which can dock with a larger device. No invention at issue here claims anything similar to this.

MMA0655

Motorola's purported concern about "inconsistent verdicts" if this case were to remain here is overblown. To the extent that any decision in any other case would affect this case, the party benefiting from that decision will make this Court aware of that decision with alacrity. And a Delaware judge would be no more bound by a decision of another Delaware judge than would this Court.

### 2. Locus Of Operative Facts

"In patent infringement actions, the preferred forum is 'that which is the center of gravity of the accused activity.'" *Trace-Wilco. Inc. v. Symantec Corp.*, No. 08-80877, 2009 WL 455432, at *2 (S.D. Fla. Feb. 23, 2009) (quoting *Amazon.com v. Cendant Corp.*, 404 F. Supp. 2d 1256, 1260 (W.D. Wash. 2005)). The center of gravity is generally where the operative facts underlying the cause of action occurred, and often in a patent case, this is "where the allegedly infringing product was designed and manufactured, and from where marketing and sales decisions are made." *Microspherix, LLC*, 2012 WL 3113932, at *4, (citing *Trace-Wilco.*, 2009 WL 455432, at *2).

Motorola would have the Court believe the locus of operative facts is a "neutral factor." Def. Br. at 12. But it represented exactly the opposite to this Court in opposing motions by Microsoft and Apple to transfer patent cases Motorola brought here:

> Mobility's facility in Plantation is located at 8000 West Sunrise Boulevard, Plantation, Florida 33322. The Plantation location handles sales operations other than distribution for a ***total of thirty (30%) percent of Motorola Mobility sales*** units, including fifty (50%) percent of the iDEN Worldwide sales. The Plantation location's sales for Motorola Mobility in 2010 were ***$2.055 billion and a total of 15.5 million handsets shipped. Other products such as 3G products are designed and developed at the Plantation location***.

> The Plantation location manages and provides technical support for several Mobility phones, including iDEN phones. ***The Plantation location is the development site for several products, including iDEN and CDMA handsets***.

MMA0656

The Plantation location houses the headquarters for Latin America business for Mobility. ***This organization includes, management, sales, finance, legal, and operations.***

      *      *      *

Plantation is the main Motorola Mobility campus for the design and development of iDEN products, including the development of software for all iDEN products. The i1 IDEN phone was developed at Plantation over a period of 18 months, from January 2009 through June 2010. All of the lead Mobility employees for the product and most of the rest of the employees who worked on the product were located in Plantation. The bulk of the work on the product was carried out in Plantation and included software design work, electrical work, mechanical work, media decision-making, and marketing, including direction of the user interface design.

      *      *      *

Work on the i1 IDEN phone was a priority for the Plantation location. Plantation was the logical choice as the location for development of this product because the Mobility employees with expertise in the IDEN network are located in Plantation. The technology for the i1 IDEN phone grew out of this expertise. ***At peak, about 74 people at the Plantation location were working on the i1 IDEN phone: 39 were software engineers, 14 were electrical engineers, 14 were mechanical engineers, and the balance were working on marketing, quality, and management work. Numerous documents relating to the design, development, testing, and marketing of the i1 phone are located at the Plantation facility.***

*See Motorola Mobility, Inc. v. Apple Inc.*, No. 10-cv-23580, Motorola Opposition to Apple Motion to Transfer (Dkt. No. 47), at 4-6 (S.D. Fla. February 3, 2011) ("Motorola Opp. to Apple Mot. to Trans.") (emphasis added), attached as Exhibit 9; *see also Motorola Mobility, Inc. v. Microsoft Corp.*, No. 10-24063, Motorola Opposition to Microsoft Motion to Transfer (Dkt. No. 74) at 2 (S.D. Fla. June 6, 2011) ("Motorola Opp. to Microsoft Mot. to Trans.") (repeating same), attached as Exhibit 10.

      The iDEN network, iDEN phones, other 3G phones, and other CDMA handsets were all developed at, designed at, or sold from the Plantation facility. Each of these will be the subject of IV's infringement allegations with respect to one or more patents in this case. Motorola told this District that the Plantation facility handles management and sales of smartphones, is responsible for nearly a third of Motorola's sales, earning billions of dollars and shipping

millions of products.[3]  Motorola now casts all that aside, and instead asserts, with little support or factual basis, that "the center of gravity for this case appears to be primarily in Libertyville, Illinois."  Def. Motion, at 12.

But Motorola does, however reluctantly, admit that it has a relevant facility in this district: "While Motorola has a facility in this District, that facility is just one of many that is implicated by this case, and the facility plays a much less significant role than Motorola's primary facility in Libertyville, Illinois."  *Id.*  Again, Motorola offers little factual support that Libertyville is more relevant to this case than Plantation.  While Motorola attaches the Declaration of Raymond Warren (Dkt. No. 26-11), Motorola's Senior Licensing Counsel, to its motion, it is still short on specifics.  In that declaration, Mr. Warren states that only six percent of Motorola's 4300 employees are in Florida and that "the majority of the documents" related to this case is outside Florida, as are the persons responsible for managing discovery.  Warren Decl. at ¶¶ 4-6.  Six percent of Motorola's total employees is more than 250 people.  If necessary witnesses are within those 250, then the percentage is irrelevant.  Similarly, even if "the majority of documents" are outside Florida, it still leaves some, perhaps a significant number, to be found in Florida.  Motorola and Mr. Warren's declaration do not negate that there is some factual nexus between this case and Motorola's operations in Florida.  In any event, even if Libertyville is more crucial than Florida, Motorola is seeking to transfer venue to Delaware, not Illinois.

---

[3] The technology at issue here involves, for example, multimedia messaging service ("MMS technology") implicated by the '793 patent.  Most if not all of Motorola's products, implement MMS technology, including any phones launched out of its Plantation, Florida facility located "just thirty miles from the court house."  Ex. 10, Motorola Opp. to Microsoft Mot. to Trans., at 2.  Similarly, Motorola has stated that it developed its 3G technology at the same facility.  Ex. 9, Motorola Opp. to Apple Mot. to Trans., at 4.  3G protocol standards are implicated by at least the '784 and '073 patents.

MMA0658

There is nothing in Motorola's brief, or anywhere else, to suggest any connection whatsoever between the underlying facts at issue here and Delaware. Where there is "no factual nexus exclusively surrounding" the proposed transferee forum, this factor does not weigh in favor of transfer. *See Stiefel Labs., Inc. v. Galderma Labs., Inc.*, 588 F. Supp. 2d 1336, 1340 (S.D. Fla. 2008). Considering that there indisputably is a factual nexus between this case and this District through Motorola's Plantation facility, this factor weighs in favor of maintaining this action here. *See* Ex. 9, Motorola Opp. to Apple Mot. to Trans., at 16 ("In fact, the only evidence of any factual nexus with either forum is the evidence Mobility has presented of the nexus of this forum with one of the accused products…[t]his factor therefore weighs against transfer.").

### 3. Plaintiffs' Choice of Forum

A plaintiff's choice of forum is accorded considerable deference. Indeed, a "plaintiff's choice of forum should not be disturbed unless it is clearly outweighed by other considerations." *Robinson v. Giamarco & Bill, P.C.*, 74 F.3d 253, 260 (11th Cir.1996) (quoting *Howell v. Tanner*, 650 F.2d 610, 616 (5th Cir. 1981)); *Ins. Co. of N. Am. v. Levin*, No. 10-60130, 2011 WL 1398473 at *2 (S.D. Fla. Mar. 28, 2011).

Motorola argues that this factor deserves no deference because IV is not a resident of the district. But Motorola cites no case for the proposition that a non-resident plaintiff's choice of forum should be disregarded entirely. The amount of deference also depends on the connection between the district and the facts underlying the Plaintiffs' case. "To determine the appropriate amount of weight to be given to [Plaintiff's] choice of forum, the Court must take into account the extent of [Plaintiff's] and Defendants' contacts with the forum, including those relating to the cause of action*." Credit Bureau Servs. v. Experian Info. Solutions, Inc.*, No. 12-61360, 2012 WL 6102068, at *24 (S.D. Fla. Dec. 7, 2012 (internal citations omitted). Thus, two aspects

affect the proper weight given to this factor: whether Plaintiffs are residents and whether the operative facts occurred here. *See Motorola Mobility, Inc. v. Apple Inc.*, No.12-20271, 2012 WL 3113932 (S.D. Fla. July 31, 2012) ("Where the operative facts underlying the cause of action did not occur within the forum chosen by the plaintiff, the choice of forum is entitled to less consideration."); *Microspherix, LLC*, 2012 WL 3113932, at *6 (finding the "Court has a strong interest in adjudicating the instant dispute" when operative facts occurred in the Southern District of Florida despite other facts occurring in the proposed transferee district).  Ultimately, it is Motorola's burden to show that this, and the other factors weighing against transfer, is "clearly outweighed" by other factors. *See Omega Patents, LLC v. Lear Corp.*, No. 07-1422, 2009 WL 1513392, at *4 (M.D. Fla. May 27, 2009) (denying transfer motion and stating that the Eleventh Circuit "continues to credit a Plaintiff's choice of forum, unless clearly outweighed by other considerations," even when the plaintiff is not a resident).

IV demonstrated that operative facts occurred in this district, and Motorola cannot and does not argue that any operative fact occurred in Delaware, the forum to which Motorola seeks transfer.  Rather, Motorola would have the Court believe that Intellectual Ventures is "fleeing" or "running from" Delaware by filing here.  But that is as nonsensical as saying that Motorola is fleeing or running from Delaware when it files here, given that it has filed patent cases in both districts.  Or, alternatively, that Motorola is now "running from" this district.  Indeed, while Motorola was staving off Apple's motion to transfer in the case it filed against Apple here, it simultaneously filed several cases against Apple in Delaware. *Motorola Mobility, Inc. v. Apple. Inc.*, No. 10-867 (D. Del. filed October 08, 2010); *Motorola Mobility LLC v. Apple, Inc.*, No. 12-1053, (D. Del. filed August 17, 2012).  IV's decision to file this suit against Motorola where it has substantial business related to IV's infringement claims, and to file its earlier case where

MMA0660

Motorola is incorporated, does not constitute forum shopping in either instance. IV's choice of this forum for this case should not be disturbed.

### 4.    Convenience of Parties

Motorola would have this Court believe that this factor favors transfer because (1) IV has brought other cases in Delaware and (2) because Motorola's witnesses and connections with this matter are all outside this District. But at best for Motorola, this factor is neutral. Because it is only one of two factors Motorola argues favor transfer (and the other, judicial economy, clearly weighs against transfer), there is no compelling argument to be made that this matter should be transferred.

Although it is good of Motorola to consider IV's convenience, IV would not have brought this action in this District if it presented a significant inconvenience to it. None of IV's witnesses are located in Delaware, none of the inventors on the patents at issue are in Delaware, and none of IV's documents are in Delaware.[4] Any witness that IV will call is equally available in either forum. Motorola argues "IV will not be inconvenienced by a transfer to a forum it has preferred many times in the past." Def. Br. at 9. But the question is not whether IV would be inconvenienced by transfer but whether Delaware would be far more convenient for the parties. It would not.

IV would be prejudiced by transfer. The Court has already issued an order directing the parties to prepare the appropriate papers pursuant to Federal Rule 26 and Local Rule 16.1, (*see* July 12, 2013 Order, Dkt. No. 12), and the parties have already begun meeting and conferring on those matters. Motorola filed a motion to dismiss IV's indirect infringement allegations under

---

[4] To the extent that documents have been produced in other matters and are related to this matter, IV is willing to enter into a cross-use agreement and produce them electronically. Similarly, IV will agree to enter into the same applicable protective orders as in those other matters.

MMA0661

the purported law of this District.  IV is preparing discovery requests and its infringement

contentions.  Pursuant to its practice and the Local Rules, this Court will likely set an expeditious

schedule such that trial will be in the fall of 2014.  This appears to be much sooner than any

pending Delaware matter, other than *Motorola Delaware*, and likely much faster than any new

matter opened in Delaware now.[5]

Motorola's arguments as to its own inconvenience are belied by its earlier representations

to this Court.  When Motorola opposed motions to transfer in the past, it made much of one of its

three U.S. facilities being in this District.  Now Motorola claims that "all of Motorola's financial

and marketing witnesses are located outside of Florida and almost all of its technical witnesses

are located outside of Florida."  Def. Brief at 10.  Notably, Motorola does not say that its

witnesses and documents are in Delaware, and its current representations directly contradict what

Motorola previously explained to the Court:

> Motorola's facility in Plantation facility…handles sales operations (other than
> distribution) for a total of thirty (30%) percent of Motorola sales units…The
> Plantation facility's sales for Motorola in 2010 were $2.1 billion, with a total of
> 15.5 million handsets shipped…***This organization includes management, sales,
> finance, legal, and operations.***

Ex. 10, Motorola Opp. to Microsoft Mot. to Trans., at 2-3 (internal citations omitted) (emphasis

added).

> Despite Apple's assertion that "Motorola has no apparent connection to the
> Southern District of Florida," Mobility's Plantation, Florida location constitutes a
> substantial presence here and is the basis ***for significant ties*** to this District.

Ex. 9, Motorola Opp. to Apple Mot. to Trans., at 1 (emphasis added).

> The Plantation location manages and provides technical support for several
> Mobility phones, including iDEN phones.  The Plantation location is the

---

[5]  As discussed above, *Canon* is set for trial in April 2014, *Nikon is* set for trial in April 2015,
and *AT&T* is set for a claim construction hearing in September 2014, after which the Court will
sever for trial the eight cases consolidated for discovery and *Markman*.

> development site for several products, including iDEN and CDMA handsets. The
> Plantation location houses the headquarters for Latin America business for
> Mobility. This organization includes, management, sales, finance, legal, and
> operations.

*Id.* at 4. To argue now that none of its financial and marketing witnesses are in Florida

defies belief. Even if that were true now, this matter will involve past products and the

sales of such products. Motorola has already explained that nearly a third of its smart

phones were sold out of its Plantation facility; the witnesses related to those sales likely

are still here—either as employees of Motorola or third parties who the Court has

subpoena power over for purposes of trial. Conversely, Motorola has no such operations

in Delaware.

 Motorola fails to satisfy its burden to show why Delaware is more convenient, as

opposed to either Illinois or California to which Motorola does not seek transfer. For example, it

states that "the Motorola personnel responsible for handling and managing its discovery

obligations are located in Libertyville, Illinois or California. None of these individuals are

located in Florida." Def. Brief at 10. They are not located in Delaware either. Thus, Motorola's

witnesses at most will be equally inconvenienced by having to testify in Fort Lauderdale or

Wilmington, Delaware—though the "inconvenience" of having to be in Florida in the winter

might not be so great a burden. In any event, this weighs little on the ultimate outcome because

Motorola can cause its employees to testify at trial here as easily as in in Delaware. "[T]ransfer

may be denied when the witnesses, although in another District, are employees of a party and

their presence can be obtained by that party." *Mason*, 146 F. Supp. 2d at 1361. Moreover, to the

extent that any former Motorola employees that worked in Plantation turn out to be relevant to

this action, the Court will have jurisdiction over those persons and they can be subpoenaed for

trial. Such witnesses could not be compelled to come to trial in Delaware.

-17-

Motorola bears the burden to prove to the Court that a strong balance of the factors favor transfer.  "It is insufficient to state the number of witnesses who will be inconvenienced or to list their names and addresses, the party must show the nature, substance, or materiality of the testimony to be offered by the prospective witnesses or must state generally what is to expected to be proved by such witnesses." Ex. 8, *Motorola v. Apple*, Order Denying Transfer, at 8 (quoting *Myers v. Pan American World Airways, Inc.*, 388 F. Supp. 1024, 1025 (D.P.R. 1974) (internal brackets and ellipse omitted).  As part of that, it must show with particularity what witnesses would be inconvenienced and why.  But nowhere does Motorola identify which witnesses would be inconvenienced, where they are located, or what they would testify about. Its failure to do so disfavors transfer.

### 5.    Convenience of the Witnesses and Availability of Process

Motorola argues that the convenience of the witness and availability of process factors are neutral.  But it is likely that witnesses who work or worked at Motorola's Plantation facility will be called in this matter.  It is more convenient for them to testify here, where they reside, than it would be to testify in Delaware.

And Motorola's recently laid off Florida employees can be compelled to testify in this District if they still live here, but not in Delaware.  As this Court has recognized, trying a case in Florida when non-party witnesses reside here "increases the availability of process to compel the attendance of these potential witnesses." *Promex, LLC v. Perez Distrib. Fresno, Inc.*, No. 09-22285, 2010 WL 3452341 at *11 (S.D. Fla. Sept. 1, 2010); *Steifel Labs., Inc. v. Galderma Labs., Inc.*, 588 F. Supp. 2d 1336, 1340 (S.D. Fla. 2008) ("[W]hen considering [the convenience of non-party witnesses], it is not so much the convenience of the witnesses but the possibility of having their testimony at trial").  Ensuring attendance of non-party witnesses at trial is a more

important consideration than general witness convenience. *See Mason*, 146 F. Supp. 2d at 1361. Thus, these factors favor maintaining this action here.

### 6. Location of Documents

Because parties routinely produce documents electronically, the physical location of documents bears little weight on the final calculation. *See Steifel Labs.*, 588 F. Supp. 2d at 1340; *Mason*, 146 F. Supp. 2d at 1361. Many documents in this matter have been produced to IV in the Northern District of California electronically, and IV will agree to a cross-use agreement as to any documents produced in any other matter that maybe related. Moreover, Motorola cannot contend that there are no relevant documents in this district. Thus, this factor weighs against transfer.

### B. The Remaining Factors Are Neutral

IV agrees with Motorola that the relative means of the parties and the forum's familiarity with governing law are neutral.

## IV. CONCLUSION

Motorola has not met and cannot meet its burden to show the factors "strongly favor" transfer and to do so with particularity. Seven of the nine factors weigh against transfer—some strongly. The remaining two are neutral. For the reasons set forth above, IV respectfully requests that this Court deny Motorola's Motion to Transfer Venue to the District of Delaware.

MMA0665

Date: August 26, 2013

Respectfully submitted,

s/ Lance A. Harke
Lance A. Harke, P.A.
Florida Bar No. 863599
lharke@harkeclasby.com
Sarah Clasby Engel, P.A.
Florida Bar No. 991030
sengel@harkeclasby.com
Howard M. Bushman, P.A.
Florida Bar No. 0364230
hbushman@harkeclasby.com
**HARKE CLASBY & BUSHMAN LLP**
9699 NE Second Avenue
Miami Shores, FL 33138
Telephone:     (305) 536-8220
Facsimile:     (305) 536-8229

OF COUNSEL:

Elizabeth Day, Esq. (*pro hac vice*)
eday@feinday.com
Marc Belloli, Esq. (*pro hac vice*)
mbelloli@feinday.com
**FEINBERG DAY ALBERTI & THOMPSON LLP**
1600 El Camino Real, Suite 280
Menlo Park, CA 94025
Telephone:     650-618-4360
Facsimile:     650-618-4368

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of August, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing documents is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic filing

s/ Lance A. Harke

CASE NO.: 13-cv-61358-ROSENBAUM/HUNT

## SERVICE LIST

Edward M. Mullins
emullins@astidavis.com
Regan N. Kruse
rkruse@astidavis.com
**ASTIGARRAGA DAVIS MULLINS & GROSSMAN, P.A.**
701 Brickell Avenue, 16th Floor
Miami, Florida 33131
Telephone: (305) 372-8282
Facsimile: (305) 372-8202

*Served Via CM/ECF Transmission*

Christopher Schenck
cschenck@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
1420 Fifth Avenue, Suite 4400
Seattle, Washington 98101
Telephone: (206) 467-9600
Facsimile: (206) 623-6793

*Served Via CM/ECF Transmission*

Mitchell G. Stockwell
mstockwell@kilpatricktownsend.com
William H. Boice
bboice@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
1100 Peachtree Street, NE
Suite 2800
Atlanta, GA 30309-4528
Telephone: 404-815-6214

*Served Via CM/ECF Transmission*

Steven D. Moore
smoore@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
Two Embarcadero, Eight Floor
San Francisco, CA 94111
Telephone: 415-273-4741

*Served Via CM/ECF Transmission*

Taylor Ludlam
taludlam@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609
Telephone: 919-420-1705

*Served Via CM/ECF Transmission*

Theodore G. Brown , III
tbrown@kilpatricktownsend.com
**KILPATRICK TOWNSEND & STOCKTON LLP**
1080 Marsh Toad
Menlo Park, CA 94025
Telephone: 650-324-6353

*Served Via CM/ECF Transmission*

MMA0667