## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| INTELLECTUAL VENTURES I, LLC and )<br>INTELLECTUAL VENTURES II, LLC, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>MOTOROLA MOBILITY, LLC, )<br>)<br>Defendant. )<br>) | Civ. No. 11-908-SLR |

Brian E. Farnan, Esquire, of Farnan LLP, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Margaret Elizabeth Day, Esquire, Ian N. Feinberg, Esquire, David L. Alberti, Esquire, Clayton Thompson, Esquire, Marc C. Belloli, Esquire, Sal Lim, Esquire, and Yakov Zolotorev, Esquire of Feinberg Day Alberti & Thompson, LLP.

Jack B. Blumenfeld, Esquire and Stephen J. Kraftschik, Esquire of Morris, Nichols, Arsht, & Tunnel, LLP, Wilmington, Delaware. Counsel for Defendant. Of Counsel: William H. Boice, Esquire, Candice Decaire, Esquire, Steven Moore, Esquire, Alton Absher III, Esquire, and Carl Sanders, Esquire of Kilpatrick Townsend & Stockton LLP.

**MEMORANDUM OPINION**

Dated: January 2, 2014
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

On October 6, 2011, plaintiff Intellectual Ventures I, LLC and Intellectual

Ventures II, LLC (collectively "IV") filed suit in this district against defendant Motorola

Mobility, Inc. ("Motorola") alleging infringement of six patents: U.S. Patent Nos.

7,810,144 (the "144 patent"), 6,412,953 (the "953 patent"), 7,409,450 (the "450 patent"),

7,120,462 (the "462 patent"), 6,557,054 (the "054 patent"), and 6,658,464 (the "464

patent"). (D.I. 1) Motorola answered the complaint and asserted a counterclaim for

declaratory judgment of non-infringement and invalidity of the patents-in-suit on

December 13, 2011. (D.I. 10) IV answered Motorola's counterclaims on January 6,

2012. (D.I. 13)

IV I and II are limited liability companies organized and existing under the laws of

the State of Delaware, with their principal place of business in Bellevue, Washington.

(D.I. 1 at ¶¶ 1-2) IV I owns the '144, '450, '054, and '464 patents. (*Id.* at ¶¶ 10, 14, 18,

20) IV II is the exclusive licensee of the '953 patent and owns the '462 patent. (*Id.* at

¶¶ 12, 16) Motorola is a corporation organized and existing under the laws of the State

of Delaware, with its principal place of business in Libertyville, Illinois. (*Id.* at ¶ 3) It

makes, manufactures, and/or sells the accused products. (*Id.* at ¶ 28)

Presently before the court are Motorola's motions for summary judgment of

invalidity and non-infringement of the patents-in-suit. (D.I. 230; D.I. 252) The court has

jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

## II. STANDARDS OF REVIEW

1

## A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more

than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," a factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 411 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 411 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

### B. Claim Construction

Claim construction is a matter of law. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1330 (Fed. Cir. 2005) (en banc). Claim construction focuses on intrinsic evidence - the claims, specification and prosecution history - because intrinsic evidence is "the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996); *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). Claims must be interpreted from the perspective of one of ordinary skill in the relevant art at the time of the invention. *Phillips*, 415 F.3d at 1313.

Claim construction starts with the claims, *id.* at 1312, and remains centered on the words of the claims throughout. *Interactive Gift Express, Inc. v. Compuserve, Inc.*,

3

256 F.3d 1323, 1331 (Fed. Cir. 2001). In the absence of an express intent to impart

different meaning to claim terms, the terms are presumed to have their ordinary

meaning. *Id.* Claims, however, must be read in view of the specification and

prosecution history. Indeed, the specification is often "the single best guide to the

meaning of a disputed term." *Phillips*, 415 F.3d at 1315.

## C. Infringement

A patent is infringed when a person "without authority makes, uses or sells any

patented invention, within the United States . . . during the term of the patent." 35

U.S.C. § 271(a). A two-step analysis is employed in making an infringement

determination. *See Markman*, 52 F.3d at 976. First, the court must construe the

asserted claims to ascertain their meaning and scope. *See id.* Construction of the

claims is a question of law subject to de novo review. *See Cybor Corp. v. FAS Techs.*,

138 F.3d 1448, 1454 (Fed. Cir. 1998). The trier of fact must then compare the properly

construed claims with the accused infringing product. *See Markman*, 52 F.3d at 976.

This second step is a question of fact. *See Bai v. L & L Wings, Inc.*, 160 F.3d 1350,

1353 (Fed. Cir. 1998).

"Direct infringement requires a party to perform each and every step or element

of a claimed method or product." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373,

1378 (Fed. Cir. 2007), *overruled on other grounds by* 692 F.3d 1301 (Fed. Cir. 2012).

"If any claim limitation is absent from the accused device, there is no literal infringement

as a matter of law." *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247

(Fed. Cir. 2000). If an accused product does not infringe an independent claim, it also

4

does not infringe any claim depending thereon. *See Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989). However, "[o]ne may infringe an independent claim and not infringe a claim dependent on that claim." *Monsanto Co. v. Syngenta Seeds, Inc.*, 503 F.3d 1352, 1359 (Fed. Cir. 2007) (quoting *Wahpeton Canvas*, 870 F.2d at 1552) (internal quotations omitted). A product that does not literally infringe a patent claim may still infringe under the doctrine of equivalents if the differences between an individual limitation of the claimed invention and an element of the accused product are insubstantial. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 24 (1997). The patent owner has the burden of proving infringement and must meet its burden by a preponderance of the evidence. *See SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations omitted).

When an accused infringer moves for summary judgment of non-infringement, such relief may be granted only if one or more limitations of the claim in question does not read on an element of the accused product, either literally or under the doctrine of equivalents. *See Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005); *see also TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369 (Fed. Cir. 2002) ("Summary judgment of noninfringement is . . . appropriate where the patent owner's proof is deficient in meeting an essential part of the legal standard for infringement, because such failure will render all other facts immaterial."). Thus, summary judgment of non-infringement can only be granted if, after viewing the facts in the light most favorable to the non-movant, there is no genuine issue as to whether the accused

5

product is covered by the claims (as construed by the court). *See Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999).

"[A] method claim is not directly infringed by the sale of an apparatus even though it is capable of performing only the patented method. The sale of the apparatus is not a sale of the method. A method claim is directly infringed only by one practicing the patented method." *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed. Cir. 1993). Therefore, "an accused infringer must perform all the steps of the claimed method, either personally or through another acting under his direction or control." *Akamai Technologies, Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1307 (Fed. Cir. 2012).

With respect to apparatus claims, "to infringe a claim that recites capability and not actual operation, an accused device 'need only be capable of operating in the described mode.'" *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (citing *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991). However, if an apparatus claim requires "software [to] be configured in a particular way to infringe," infringement does not occur merely because the apparatus could be used in an infringing fashion. *Finjan*, 626 F.3d at 1204-05.

For there to be infringement under the doctrine of equivalents, the accused product or process must embody every limitation of a claim, either literally or by an equivalent. *Warner-Jenkinson*, 520 U.S. at 41. An element is equivalent if the differences between the element and the claim limitation are "insubstantial." *Zelinski v. Brunswick Corp.*, 185 F.3d 1311, 1316 (Fed. Cir. 1999). One test used to determine

6

"insubstantiality" is whether the element performs substantially the same function in

substantially the same way to obtain substantially the same result as the claim

limitation. *See Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608

(1950). This test is commonly referred to as the "function-way-result" test. The mere

showing that an accused device is equivalent overall to the claimed invention is

insufficient to establish infringement under the doctrine of equivalents. The patent

owner has the burden of proving infringement under the doctrine of equivalents and

must meet its burden by a preponderance of the evidence. *See SmithKline*

*Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 889 (Fed. Cir. 1988) (citations

omitted).

## D. Invalidity

### 1. Anticipation

Under 35 U.S.C. § 102(b), "[a] person shall be entitled to a patent unless the

invention was patented or described in a printed publication in this or a foreign country .

. . more than one year prior to the date of the application for patent in the United

States." The Federal Circuit has stated that "[t]here must be no difference between the

claimed invention and the referenced disclosure, as viewed by a person of ordinary skill

in the field of the invention." *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927

F.2d 1565, 1576 (Fed. Cir. 1991). In determining whether a patented invention is

explicitly anticipated, the claims are read in the context of the patent specification in

which they arise and in which the invention is described. *Glaverbel Societe Anonyme v.*

*Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1554 (Fed. Cir. 1995). The prosecution

7

history and the prior art may be consulted if needed to impart clarity or to avoid ambiguity in ascertaining whether the invention is novel or was previously known in the art. *Id.* The prior art need not be *ipsissimis verbis* (i.e., use identical words as those recited in the claims) to be anticipating. *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984).

A prior art reference also may anticipate without explicitly disclosing a feature of the claimed invention if that missing characteristic is inherently present in the single anticipating reference. *Continental Can Co. v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). The Federal Circuit has explained that an inherent limitation is one that is necessarily present and not one that may be established by probabilities or possibilities. *Id.* That is, "[t]he mere fact that a certain thing may result from a given set of circumstances is not sufficient." *Id.* The Federal Circuit also has observed that "[i]nherency operates to anticipate entire inventions as well as single limitations within an invention." *Schering Corp. v. Geneva Pharms. Inc.,* 339 F.3d 1373, 1380 (Fed. Cir. 2003). Moreover, recognition of an inherent limitation by a person of ordinary skill in the art before the critical date is not required to establish inherent anticipation. *Id.* at 1377.

An anticipation inquiry involves two steps. First, the court must construe the claims of the patent in suit as a matter of law. *Key Pharms. v. Hercon Labs Corp.,* 161 F.3d 709, 714 (Fed. Cir. 1998). Second, the finder of fact must compare the construed claims against the prior art. *Id.* A finding of anticipation will invalidate the patent. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 147 F.3d 1374, 1378 (Fed. Cir. 1998).

### 2. Obviousness

8

"A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a). Obviousness is a question of law, which depends on underlying factual inquiries.

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or non-obviousness of the subject matter is determined.

"[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR*, 550 U.S. at 418. Likewise, a defendant asserting obviousness in view of a combination of references has the burden to show that a person of ordinary skill in the relevant field had a reason to combine the elements in the manner claimed. *Id*. at 418-19. The Supreme Court has emphasized the need for courts to value "common sense" over "rigid preventative rules" in determining whether a motivation to combine existed. *Id*. at 419-20. "[A]ny need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *Id*. at 420. In addition to showing that a person of ordinary skill in the art would have had reason to attempt to make the composition or device, or carry out the claimed process, a defendant must also demonstrate that "such a person would have had a reasonable expectation of success in doing so." *PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1360 (Fed. Cir. 2007).

9

A combination of prior art elements may have been "obvious to try" where there existed "a design need or market pressure to solve a problem and there [were] a finite number of identified, predictable solutions" to it, and the pursuit of the "known options within [a person of ordinary skill in the art's] technical grasp" leads to the anticipated success. *Id*. at 421. In this circumstance, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id*. Federal Circuit precedent has also established that "[s]tructural relationships may provide the requisite motivation or suggestion to modify known compounds to obtain new compounds," and that particular types of structural similarity can give rise to a case of prima facie obviousness. *Genetics Institute, LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1312 (Fed. Cir. 2011) (citing *In re Deuel*, 51 F.3d 1552, 1558 (Fed. Cir. 1995)).

A court is required to consider secondary considerations, or objective indicia of non-obviousness, before reaching an obviousness determination, as a "check against hindsight bias." *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063 (Fed. Cir. 2012). "Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17–18 (1966).

"Because patents are presumed to be valid, *see* 35 U.S.C. § 282, an alleged infringer seeking to invalidate a patent on obviousness grounds must establish its obviousness by facts supported by clear and convincing evidence." *Kao Corp. v.*

*Unilever U.S., Inc.*, 441 F.3d 963, 968 (Fed. Cir. 2006) (citation omitted).  In conjunction

with this burden, the Federal Circuit has explained that,

> [w]hen no prior art other than that which was considered by
> the PTO examiner is relied on by the attacker, he has the
> added burden of overcoming the deference that is due to a
> qualified government agency presumed to have properly
> done its job, which includes one or more examiners who are
> assumed to have some expertise in interpreting the
> references and to be familiar from their work with the level of
> skill in the art and whose duty it is to issue only valid patents.

*PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1304 (Fed. Cir. 2008) (quoting

*Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984)).

### 3. Enablement and written description

The statutory basis for the enablement and written description requirements, 35

U.S.C. § 112 ¶1, provides in relevant part:

> The specification shall contain a written description of the
> invention, and of the manner and process of making and
> using it, in such full, clear, concise, and exact terms as to
> enable any person skilled in the art to which it pertains, or
> with which it is most nearly connected, to make and use the
> same . . . .

"The enablement requirement is met where one skilled in the art, having read the

specification, could practice the invention without 'undue experimentation.'" *Streck, Inc.*

*v. Research & Diagnostic Systems, Inc.*, 665 F.3d 1269, 1288 (Fed. Cir. 2012) (citation

omitted).  "While every aspect of a generic claim certainly need not have been carried

out by the inventor, or exemplified in the specification, reasonable detail must be

provided in order to enable members of the public to understand and carry out the

invention." *Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997).

11

The specification need not teach what is well known in the art. *Id.* (citing *Hybritech v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986)). A reasonable amount of experimentation may be required, so long as such experimentation is not "undue." *ALZA Corp. v. Andrx Pharms., Inc.*, 603 F.3d 935, 940 (Fed. Cir. 2010).

"Whether undue experimentation is needed is not a single, simple factual determination, but rather is a conclusion reached by weighing many factual considerations." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1378 (Fed. Cir. 2009) (citing *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988). The Federal Circuit has provided several factors that may be utilized in determining whether a disclosure would require undue experimentation: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the patent; (3) the presence or absence of working examples in the patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims. *In re Wands*, 858 F.2d at 737. These factors are sometimes referred to as the "*Wands* factors." A court need not consider every one of the *Wands* factors in its analysis, rather, a court is only required to consider those factors relevant to the facts of the case. *See Streck, Inc.*, 655 F.3d at 1288 (citing *Amgen, Inc. v. Chugai Pharm. Co., Ltd.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991)).

The enablement requirement is a question of law based on underlying factual inquiries. *See Green Edge Enters., LLC v. Rubber Mulch Etc., LLC*, 620 F.3d 1287, 1298-99 (Fed. Cir. 2010) (citation omitted); *Wands*, 858 F.2d at 737. Enablement is

12

determined as of the filing date of the patent application. *In re '318 Patent Infringement Litigation*, 583 F.3d 1317, 1323 (Fed. Cir. 2009) (citation omitted). The burden is on one challenging validity to show, by clear and convincing evidence, that the specification is not enabling. *See Streck, Inc.*, 665 F.3d at 1288 (citation omitted).

A patent must also contain a written description of the invention. 35 U.S.C. § 112, ¶ 1. The written description requirement is separate and distinct from the enablement requirement. *See Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2011). It ensures that "the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed." *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005). The Federal Circuit has stated that the relevant inquiry – "possession as shown in the disclosure" – is an "objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art. Based on that inquiry, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Ariad*, 598 F.3d at 1351.

This inquiry is a question of fact: "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* (citation omitted). While compliance with the written description requirement is a question of fact, the issue is "amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *Id.* at 1307 (citing *Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1072-73 (Fed. Cir. 2005)).

## III. DISCUSSION

For each of the patents-in-suit, the court will discuss any necessary claim construction as it relates to those infringement and invalidity issues identified in the pending summary judgment motions.

### A. The '144 Patent

The '144 patent, entitled "File Transfer System for Direct Transfer Between Computers," was filed on April 7, 2009 and issued on October 5, 2010. It is a continuation of application no. 10/657,221, filed on September 9, 2003, which is a continuation of application no. 10/167,697, filed on June 13, 2002, which is a continuation of application no. 09/694,472, filed on October 24, 2000, which is a continuation of application no. 09/190,219, filed on November 13, 1998, which claims priority to provisional application no. 60/065,533, filed on November 13, 1997.

The '144 patent "relates to transferring computer files electronically from one location to another, and more particularly to electronic transfer of computer files directly between two or more computers or computing devices." ('144 patent, 2:4-7) IV alleges that Motorola's products infringe independent claims 10, 26, and 41. Claim 10 teaches a method for transferring files. Claims 26 and 41 teach a communications device. Claims 10 and 26 are reproduced below.

> 10. A method for transferring files from a first device to a second device over a communications network, comprising:
>
> displaying, on the first device, a collection of file identifiers, wherein each file identifier represents a selectable file;
>
> receiving, at the first device, a user selection of at least one file identifier representing a file selected to be transferred to the second device;

14

displaying, on the first device, a collection of destinations identifiers, wherein each destination identifier represents a remote device having a numbered destination address on a circuit switched or packet switched network;

receiving, at the first device, a user selection of at least one destination identifier as selection of the second device;

displaying, on the first device, a data entry field in which a text message can be entered;

receiving, at the first device, the text message;

encapsulating, at the first device, the text message with the selected file into a single combined file;

generating, at the first device, a unique transaction identifier that identifies a transfer of the single combined file;

transferring, from the first device to the second device, the single combined file, including:

sending, to the second device at its numbered destination address, the single combined file;

receiving, at the second device, the single combined file irrespective of user action at the second device;

generating, at the second device, a delivery confirmation message confirming reception of the single combined file;

transmitting, from the second device to an authenticating device of the communications network, the delivery confirmation message; and

generating, at the authenticating device, a delivery report that indicates a delivery event and a time of the delivery event;

providing, at the second device, an alert indicating reception of the single combined file;

displaying, on the second device, an identification of the first device in relation to at least one of the selected file or the associated text file, wherein the identification includes at least one of a communications address of the first device, a name of the first device, or a username associated with the first device; and

15

displaying, on the second device, at least a portion of content of the
selected file or the text message.

(*Id.* at 38:46-39:25)

26. A communications device, comprising:

a processor; and

a memory that stores at least one program usable to control
the communications device,

wherein the communications device is configured to:

display a collection of file identifiers, wherein each file
identifier represents a selectable file;

receive a user selection of at least one file identifier
representing a file selected to be transmitted to a second
device, wherein each of the communications device and the
second device includes functionally equivalent instruction
sets that enable file transfer between the communications
device and the second device;

display a collection of destinations identifiers, wherein each destination
identifier represents a remote device having at least one of an Internet
Protocol (IP) address or a telephone number;

receive a user selection of at least one destination identifier as selection
of the second device;

display a data entry field in which a text message can be entered;

receive the text message;

associate the text message to the selected file as a text file; and transmit
the selected file and the associated text file, absent non-transient
intermediate storage of the selected file on an intervening
communications device of the communications network, to the second
device which is configured to:

receive the selected file and associated text file absent initiation of
retrieval of the selected file from the intervening communications device
by the second device and absent user action at the second device;

detect reception of the selected file and the associated text file;

provide an alert in response to the reception of the selected file and the
associated text file;

display an identification of the communications device in relation to the
selected file and associated text file, wherein the identification includes at

16

> least one of a communications address of the communications device, a name of the communications device, or a username associated with the communications device; and display at least a portion of content of the selected file and associated text file.

(*Id.* at 41:42-42:20)

### 1. Limitations of the '144 patent[1]
#### a. The transferring and transmitting limitations in claims 10 and 26

There are two inventive aspects of the transferring and transmitting steps[2] of the

asserted claims. One aspect (disclosed, e.g., in claims 1 and 26) requires that the

communications device transfer the selected file "absent non-transient intermediate

storage of the selected file on an intervening communications device of the

communications network." The second aspect (disclosed, e.g., in claims 10 and 26)

requires that the step of transferring files from a first device to a second device includes

the receipt, "at the second device, [of] the single combined file irrespective of user

action at the second device." Although the specification and file history distinguish the

prior art on both grounds,[3] it is not necessary for each claim to embrace all aspects of

---

[1]Motorola claimed that certain limitations were indefinite and did not brief its positions on these terms, instead reserving its arguments for trial. These terms include: (1) "to uniformize a light;" (2) "wherein the scattering pattern is gradually condensed from the incident plane towards the reflective side plane;" (3) "detachable handset;" (4) "substantially larger." (D.I. 224 at 29, n.14; *Id.* at 44, n.20) IV contends that its constructions of these terms should be adopted because Motorola waived any argument to the contrary by not addressing them. (D.I. 235 at 1) The court agrees with IV.

[2]"[T]ransferring, from the first device to the second device, the single combined file" is recited in claim 10, while "transmit the selected file and the associated text file" is recited in claim 26.

[3]Figure 1 explains that the invention "enables direct transfer of electronic files between such interconnected PCs 10 without requiring login to each other PC 10, and

17

the invention.  Therefore, the proper construction of the limitation at issue in claim 10 is

a broad one, as suggested by IV:  "Delivering the single combined filed from the first

device to the second device," as further limited by the claim language that follows,

"irrespective of user action," i.e., the user need not log-in to a server and download the

selected file.  The proper construction of the disputed language in claim 26 includes the

above limitation, as well as that relating to "non-transient intermediate storage,"

construed to mean "without permanently storing the selected file on any

communications device between the first and second devices."

> ### b. "Receive the selected file and associated text file absent initiation of retrieval of the selected file from the intervening communications device by the second device and absent user action at the second device"

The court adopts Motorola's construction, "the second device, i.e., the receiving

device, does not request delivery from the intervening communications device nor

does the user request delivery from the intervening communications device."  Claim 26,

by its plain language, indicates that the second device does not initiate retrieval of the

file.  Direct transfer, initiated at the request of the receiving device, is disclosed in the

specification at columns 28:5-29:30.  The specification makes clear that transfers

initiated by the receiving device are "requested" transfers.  (*See* '144 patent, 28:5-

29:30)  Claim 26 does not disclose this embodiment.  Moreover, that the second device

may act as the sending device with respect to the delivery confirmation, as IV contends

---

.

without intermediate storage of files on an intervening computer." ('144 patent, 10:61-
11:1)  The patent discusses further limitations of both systems at columns 2:40-4:64.

(D.I. 235 at 5), does not preclude a construction designating the second device as the receiving device in this limitation, which contemplates transfer of a selected file.

### c. "Delivery report"

The court adopts IV's construction, "data indicating delivery of the single combined file." This construction is consistent with the language of the claims, which recites "generating, at the authenticating device, a delivery report that indicates a delivery event and a time of the delivery event" (claim 10) and "generate a delivery report that indicates a delivery event and a time of the delivery event (claim 41)." ('144 patent, 39:13-15, 46:15-16) There is no requirement that the data be available at the sending device. The court declines to read limitations from preferred embodiments into the claims. (See id. at 18:63-20:33)

### d. "Authenticating device of the communications network"

The court construes this term as "a third-party authenticating device within the communications network that generates a delivery report." This is consistent with the claims and the specification. Claim 10 requires that the second device transmit the delivery confirmation message to an authenticating device of the communications network. "[A] delivery report that indicates a delivery event" is then generated at the authenticating device. (Id. at 39:10-15) Claim 41 is also consistent with this construction as it requires that

> the second device [be] configured to . . . transmit to an
> authenticating device of the communications network, the
> delivery confirmation message . . . display at least a portion
> of content of the selected file or the text message, wherein
> the authenticating device is configured to generate a delivery
> report . . . .

19

(*Id.* at 45:18-46:16)

The specification further explains that "[t]he receipt file is returned from the recipient to the sender directly or through a third party authenticator . . . ." (*Id.* at 19:4-6) "[I]f the requested confirmation is designated by the sender to be returned through a third party authenticator, the control module on the recipient PC creates a pending event for return of the confirmation receipt file to the sending PC through the third party authenticator . . . ." (*Id.* at 19:38-42)

### 2. Infringement

#### a. Claims 10 and 41

IV asserts that Motorola's products[4] infringe claims 10, 26, and 41 of the '144 patent. Motorola contends that its products do not infringe claims 10 and 41[5] because use of the accused products to send a Multimedia Messaging Service (MMS) message does not perform the limitations of: (1) "transferring [sending], from the first device to the second device;" (2) encapsulating the message into a "single combined file;" and

---

[4]The accused Motorola phones for the '144 patent are: Atrix 2, Atrix 4G, Atrix HD, Admiral, Electrify, Electrify 2, Electrify M Photon 4G, Photon Q 4G LTE, Defy XT, XT886, XPRT, Titanium, Triumph, i886, Milestone X, i867, Rambler, Bali, i576, Quantico, Brute i680, Brute i686, Clutch i475, i412, and Theory. (D.I. 267 at 2, n.1)

[5]Specifically, that the "transferring, from the first device to the second device, the single combined file" and "send the single combined file to the second device at its numbered destination address" limitations of claims 10 and 41, respectively, are not met. The "sending" limitation was not construed, but Motorola asserts broadly that the patent only relates to direct transfer of files from a first to a second device. (*See* D.I. 224 at 2-7; D.I. 267 at 2)

(3) generating a "delivery report."  (D.I. 253 at 2)[6]  With respect to the "single combined file" limitation, Motorola argues that the accused protocol data unit (PDU) created during the encapsulation process is neither a file nor the equivalent of a file and, therefore, cannot infringe this limitation.  (D.I. 253 at 4)  Claims 10 and 41 require that "the text message [be encapsulated] with the selected file into a single combined file."  (See '144 patent, 38:64-65, 45:13-14)

In support of its contentions, Motorola asserts that IV's expert agreed that the PDU is not a file (D.I. 253 at 4), but a reading of the testimony indicates he only explained that a PDU is not saved in a file directory structure.  (D.I. 254, ex. 4 at IA833 at 154:24-155:2)  Additionally, Motorola cites to the MMS Wireless Application Protocol to assert that the generation of a file in sending an MMS message is not mandatory, and the PDU is simply a data structure that transports the information to the MMSC.[7]  (D.I. 253 at 4; see D.I. 254, ex. 8 at IA883-85)  The protocol describes the "content and encodings of the PDUs for the multimedia messaging service."  (D.I. 254, ex. 8 at IA883)  It explains that "[t]he multimedia messaging PDUs consist of MMS headers and a message body," and the "message body consists of multipart/related structures . . . including multimedia objects . . . as well as optional presentation parts."[8]  (Id. at IA884)  Figure 1 depicts a conceptual model of how multimedia content and presentation

---

[6]The court does not consider Motorola's arguments for the "transferring" and "delivery report" limitations, as Motorola has only provided evidence under its proposed constructions, which the court has not adopted.

[7]An intermediary computer called the MMS relay/server ("MMSC").

[8]The presentation part contains instructions on how the multimedia content should be rendered to the display and speakers on the terminal.

information can be encapsulated into a single message.  (*Id.*)[9]

IV cites to the same MMS protocol to contend that the PDU is a text message

inputted by a user of an accused phone encapsulated together with a photo selected by

the user, i.e., the text message and the selected file. (*See* D.I. 267 at 4; D.I. 268 at

IVA1366-67) Both parties' experts also cite to a book written by Motorola's expert to

come to contradictory conclusions.  (D.I. 254, ex. 5 at IA837-38 at ¶ 7; D.I. 268 at

IVA1290)  The court concludes that, if this issue is a matter of fact, then there certainly

are genuine issues of material fact.[10]  If, however, it is a matter of claim construction,[11]

the parties must submit their proposed constructions to the court before trial.

### b.  Claim 26

Motorola contends that when an MMS is sent to an accused phone, the second

device "initiat[es] . . . retrieval of the selected file from the intervening communications

device" (the MMSC), which claim 26 expressly prohibits.  (D.I. 275 at 6)  In support of

its motion, Motorola cites to documents explaining the initiation process.  Specifically,

upon receipt of an MMS message, the MMSC sends a notification consisting only of

---

[9]Motorola also argues that the '144 patent makes clear that what is sent is **a file** because: (1) claims 10 and 41 expressly require it; (2) the specification confirms it by describing selecting a preexisting file where "the **file structure** resident at the transmitting PC is replicated at the receiving PC for each sent file" (*see* '144 patent, 20:60-21:5); and (3) the specification's only discussion of the file that is sent is of a compressed file having the specific file extension ".zip." (*Id.* at 22:1-3)

[10]The court similarly finds a genuine issue of material fact with respect to claims 10 and 41 under the doctrine of equivalents.  As direct infringement is a requirement for a finding of indirect infringement, and there exist genuine issues of material fact with respect to whether Motorola directly infringed claims 10 and 41 of the '144 patent, the court does not consider these contentions.

[11]For the limitation "single combined file."

22

MMS headers to the receiving device. (D.I. 254, ex. 8 at IA885)  The recipient device then initiates the process by establishing a data connection by submitting a WSP/HTTP GET.req retrieval request or postpones the retrieval to a later stage by sending a notification response indication – M-notifyresp.ind. (*Id.*, ex. 3 at IA820-826)  "The operation for retrieval of the MM message by the MMS Client from the MMS Proxy-Relay is built upon the normal WSP/HTTP GET functionality." (*Id.* at IA825)[12] Motorola's expert opines that "the retrieval request initiated by the receiving device contains the URI that indicates the location of the Multimedia Message stored on the MM relay/server. . . . This is the same whether the phone is configured to automatic download or not." (D.I. 254, ex. 5 at IA842-844 at ¶¶ 30-34) (*see* ex. 3 at IA821, 825) ("The MMS Client SHALL initiate the retrieval activity by utilizing the URI that was delivered to it in the M.Notification.ind message . . . .")

In opposing Motorola's motion, IV argues that the initiation limitation is met because MMS devices use a push form of communications and, thus, the MM.Notification.ind step initiates retrieval. (D.I. 267 at 11-12)  In support of its argument, IV cites to the Wireless Application Protocol MMS Client Transactions specification, which states "[t]he M.Notification.ind message SHALL be sent by the MMS Proxy-Relay to the MMS Client using the WAP PUSH framework . . . ." (D.I 268 at IVA1391)  This document, however, further explains that "[t]he information conveyed

_____

[12]From the section entitled, "MMS Client Fetching Message from MMS Proxy-Relay."

23

SHALL include an . . . URI that will be used to actually retrieve the message in a subsequent operation by the MMS Client." (*Id.*)

The court finds that, under its claim construction, which prohibits initiation of retrieval by the second device, IV has failed to identify a genuine issue of material fact with respect to claim 26.[13] Motorola's motion is granted in part and denied in part with respect to the '144 patent.

### 3. Invalidity

Motorola asserts that claims 10, 14, 15, 26, 29, 30, and 41 of the '144 patent are invalid for a number of reasons. (D.I. 231 at 1) First, Motorola contends that, if the claims are not limited to direct file transfer, the claims are invalid for failing to satisfy the written description and enablement requirements of 35 U.S.C. ¶ 112 because the '144 patent provides no support for intermediate file storage. (*Id.* at 2) Motorola also contends that the '144 patent was anticipated by U.S. Patent No. 5,379,340 (the "340 patent") to Overend. (*Id.* at 5)

### a. Written description

In support of its written description argument (D.I. 231 at 2; D.I. 232, ex. 1 at IA2 at ¶ 4), Motorola cites to a preferred embodiment in the specification where the file transfer system enables direct transfer of electronic files "without intermediate storage

---

[13] The court similarly finds no genuine issue of material fact with respect to claim 26 under the doctrine of equivalents. Initiation of retrieval by a second device does not perform the function in a substantially similar way as a second device that has nothing to do with the retrieval process even though the end result – the file transfer – is the same.

24

of files on an intervening computer." ('144 patent, 10:62-11:1)[14] Motorola also points to two communication mechanisms for file transfer – direct transfer from a sender PC to a recipient PC using UDP and TCP/IP communication mechanisms, and direct PSTN transfer from a sender PC to a recipient PC using modem protocols – arguing that intermediate storage is not mentioned at all. (D.I. 231 at 2; D.I. 232, ex. 1 at IA5-6 at ¶¶ 11-14; see '144 patent at 13:57-18:63)

The specification, however, does contemplate file transfer using a communications pathway such as the Internet. ('144 patent, 10:25-40) Specifically,

> Fig 1 shows that the PCs 10 may be connected to and may use one communications pathway (e.g., the Internet), another communications pathway (e.g., the public switched telephone network PSTN), or more than one communications pathway (e.g., Internet and PSTN), simultaneously.

(Id. at 10:30-35) Motorola asserts that no person of skill in the art would understand transfer over the Internet to mean storing files on intervening computers, and the inventors repeatedly disparaged such transfer where the file was stored on an intervening computer. (D.I. 231 at 3; see '144 patent, 2:35-44, 3:2-28) And, even so, use of the Internet only means that packets may be transiently stored during routing but has nothing to do with intermediate storage of files. (D.I. 231 at 3; '144 patent, 11:62-65, 18:25-27)[15]

---

[14]This same embodiment discloses that the direct file transfer is enabled "without requiring login to each other PC" – another feature of the prior art which was disparaged. (Id.)

[15]IV's expert confirmed that files are broken into packets during transfer over the Internet. These packets are queued on the router and are not reassembled into the file

25

IV contends that this constitutes a teaching by the specification of file transfer by temporarily allowing the storage of files on intermediate computers. (D.I. 250 at 2; D.I. 268 at IVA2-3 at ¶ 4) IV's expert asserts that one of ordinary skill in the art would understand that transferring files over the Internet uses a method known as "packet switching" as confirmed by the recitation of a "packet switched network" in claims 10, 37, and 41 of the '144 patent. Without citing to the specification, he further explains that "packet switching features delivery of packets through intermediate computers over a shared network, such as the Internet," at which point the packets are "buffered and queued on intermediate computers depending on the traffic load in the network." (D.I. 268 at IVA2-3 at ¶ 4)[16]

There exists a genuine issue of material fact with respect to the disclosure of file transfer over the Internet and whether this constitutes an adequate disclosure to ensure that the patentee had possession of the claimed invention at the time of the application.

### b. Enablement

Motorola contends that, given the repeated disparagement of mediated file transfer, the '144 patent does not enable the full scope of the claims, which was construed by the court to include file transfer with intermediate storage. (See D.I. 231 at 4; '144 patent, 2:40-4:64)[17] In support of its contentions, Motorola asserts that in the

_____

at this point. (D.I. 225, ex. 1 at MMA2-3 at 37:18-40:2)

[16]Motorola's expert confirmed that packets go through a router. (D.I. 268 at IVA0024-30 at 30:3-36:10)

[17]The specification explains that "there is a need for a system to provide immediate and secure assured delivery of documents from sender to recipient which

26

only description of file transfer using the Internet, the inventors stated the invention "enables direct transfer of electronic files between such interconnected PCs . . . without intermediate storage of files on an intervening computer." (D.I. 231 at 5; '144 patent, 10:65-11:1)  For this reason, the specification directs the skilled artisan away from intermediate file storage and does not enable the full scope of the claims. (D.I. 231 at 5)

In opposing Motorola's motion, IV contends that the '144 patent is enabled because both parties' experts agree that the specification teaches file transfer systems in which the packets of the selected file are transiently stored on an intervening communications device, such as a router, as the packets travel through the Internet. (D.I. 250 at 4)  In response to Motorola's teaching away argument, IV contends that the disparaged prior art systems are those that permanently – not transiently – store files on intermediate devices. (*Id.* at 4; D.I. 268 at IVA3 at ¶ 5)  IV argues that the key difference between the claimed invention and the prior art is that, in the patent, the selected file is sent to the receiving device, instead of an intermediary computer where the file is permanently stored and the intended recipient must retrieve the file by logging in and downloading the file. ('144 patent, 3:20-27, 4:60-64, 5:18-26, 10:25-40, 10:65-67)

Although "the specification need not necessarily describe how to make and use every embodiment of the invention," where the full scope of the claims includes multiple

---

retains the positive aspects of the prior art, but does not suffer from its shortcomings." ('144 patent, 6:21-24)  The court notes that a prior art system requiring login procedures to retrieve the file was also included in the disparaged text. (*See id.* at 2:40-4:64)

27

embodiments, one skilled in the art must be able to make and use such embodiment at the time of the patent's effective filing date. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 481 F.3d 1371, 1380 (Fed. Cir. 2007) (finding that claims were invalid for lack of enablement because the specification taught away from a claimed embodiment, and testimonial evidence was given that such system could not have been produced at the time of filing) (internal citations omitted). As above, there exists a genuine issue of material fact with respect to the disclosure of file transfer over the Internet and whether this constitutes an adequate disclosure such that one skilled in the art, having read the specification, could practice the invention without undue experimentation.

### c. Anticipation by the '340 patent

Motorola contends that the prior art '340 patent anticipates the asserted claims or, alternatively, renders certain claim limitations obvious when combined with other prior art. (D.I. 231 at 5) The '340 patent describes a file transfer system "enabling a user to 'post' a text message into the system, secure in the knowledge that it will eventually be dispatched to the intended recipient and its receipt will be acknowledged." (D.I. 232, ex. 4 at IA76 at 1:49-53) The parties dispute whether the following limitations are disclosed by the '340 patent: 1) the "single combined file;" (2) the "authenticating device;" (3) "irrespective of user action;" and (4) the "data entry field." (D.I. 231 at 7)

The '340 patent does not teach "an authenticating device" under the court's construction, which requires that the authenticator be a third-party device. The '340 patent expressly states:

> When the message is received, the CPU 10B of the
> receiving station 1B generates an acknowledgment

28

> message which is transmitted back via the telephone line 70
> through the receiving modem 60B to the transmitting modem
> 60A, and is logged and stored by the transmitting station
> CPU 10A."

(D.I. 232, ex. 4 at IA78 at 5:42-47) As Motorola concedes, in the '340 patent, the

sending device, and not a third-party device, generates the delivery report and acts as

the authenticating device. (D.I. 231 at 8)[18] Motorola's motion is denied.[19]

## B. The '953 Patent

The '953 patent, "Illumination Device and Image Projection Apparatus

Comprising the Device," was filed October 1, 1999 and issued July 2, 2002. It is a

divisional application of application no. 09/205,634 filed on December 3, 1998. The

'953 patent discloses "an illumination device comprising a light source and an

illumination uniformizing means which uniformizes the light emitted from the light

source." ('953 patent, 3:10-12) Independent claim 1 recites:

> 1. An illumination device, comprising:
>
> a light source, comprising an array of a plurality of light
> emitting devices;

---

[18]Because the court also finds a genuine issue of material fact with respect to the
"receiving the single combined file irrespective of user action at the second device"
limitation, it does not consider Motorola's contention that, if claims 10 and 41 require a
third-party authenticator, the '340 patent combined with the Coffey reference renders
this limitation obvious. (See D.I. 231 at 12)

[19] Additionally, any dependent claims are not anticipated by the '340 patent.
Motorola's contention that the '340 patent renders dependent claims 15 and 30 obvious
(D.I. 231 at 11) is also not considered. This argument required that the '340 patent
have first anticipated claims 10, 26 and 41, which the court does not find to be proven
at this stage in the litigation.

29

an illumination uniformizing means disposed in front of the light source to uniformize a light emitted from the light source, the illumination uniformizing means comprising:

an incident plane, the light emitted from the light emitting device array is incident therefrom;

a bottom plane, comprising a scattering pattern thereon;

a projection plane opposite to the bottom plane, wherein:

the light incident from the incident plane being scattered by the scattering pattern, while the light incident from the incident plane being totally reflected between positions of the bottom plane other than the scattering pattern and the projection plane; and

a reflective side plane opposite to the incident plane, wherein the scattering pattern is gradually condensed from the incident plane towards the reflective side plane; and

a polarization converter, disposed between the illumination uniformizing means and a light valve, to polarize the light from the illumination uniformizing means into a polarized light.

(*Id.* at 9:38-10:8)

### 1. Limitations of the '953 patent

#### a. "A polarization converter . . . to polarize the light from the illumination uniformizing means into a polarized light"

The court adopts Motorola's construction, "an element that allows light of only

one polarization to pass through and transforms the polarization of the residual

light to obtain the one polarization that may pass through."  This construction is

consistent with the plain language of the claim and the specification.  Although the term

polarization converter is found in the third, fourth and fifth embodiments, these are the

only instances that the term is discussed in the patent.  (*Id.* at 5:36-8:21)

Specifically, the description of the third embodiment indicates that "[t]he

additional element is a polarization converter 410 disposed between the light valve 320

30

and the illumination uniformizing means 310." (*Id.* at 5:42-45) This is consistent with the claim language which requires that the polarization converter be "disposed between the illumination uniformizing means and a light valve." (*Id.* at 10:5-8) The description of the third embodiment further explains that "the light unacceptable to the light valve 320 is converted into an acceptable type of polarized light to the light valve 320, so that the light emitted from the light source can be fully utilized." (*Id.* at 5:45-48) Where the light valve only accepts a P-polarized light, and the scattered light comprises both P- and S-polarized light, the S-polarized light cannot be utilized at all. (*Id.* at 5:63-6:1) The polarization converter, therefore, converts the unusable S-polarized light into P-polarized light to be accepted by the light valve and fully utilized. (*Id.* at 6:1-15)[20]

### b. A light source, comprising an "array of a plurality of light emitting devices"

The court construes this term as an "arrangement of a plurality of adjacent light emitting devices." This construction is consistent with the intrinsic evidence. Although the specification indicates that "[t]he light source comprises . . . field emission display (FED), and cold cathode fluorescence lamp (CCEL)" – singular light sources – this language is concerned with the types of elements in the light source and does not limit an array of such elements to mean one light emitting device. (*See* '953 patent, 3:12-15) Claim 2, not currently at issue but similarly telling as to the correct construction of the term, also recites the types of "light emitting devices" that may be employed. (*See*

---

[20]This construction does not render claims 11 and 12 superfluous as it only requires a polarization converter, not a specific type of polarization converter as more specifically discussed in the preferred embodiments. (*Id.* at 5:36-8:21)

*id.* at 10:9-13)

During prosecution, the examiner found that U.S. Patent No. 5,828,488 (the "488 patent") to Ouderkirk anticipated original claim 1. (D.I. 215 at JA1204) The examiner cited the light source of Ouderkirk, "Fig 2, 30" as comprising "an array of a plurality of light emitting devices 'Fig 3, 21.'" (*Id.*) Figure 2, element 30 is a lamp and Figure 3, element 21 is a field emission display. (*Id.*) To distinguish from Ouderkirk and overcome the rejection, applicants amended the claims to add the "gradually condensed" limitation. (*Id.* at JA1358-59) Neither the specification nor the prosecution history, however, would indicate to one of ordinary skill in the art that any one single device of the types listed in the specification or claim 2 would constitute an "array of a plurality of light emitting devices."

### 2. Infringement

#### a. The limitation "disposed between the illumination uniformizing means and a light valve"

Motorola contends that the rear polarizer in its devices[21] is part of the light valve[22] itself and, thus, cannot be "disposed between the illumination uniformizing means and a light valve" as required by the claim. (D.I. 253 at 23-24)[23] In support of its contention, Motorola cites to its Materials or Methods Specification for an Active Matrix Liquid Crystal Display (LCD), which describes the LCD as being constructed of a top glass

---

[21]IV alleges this rear polarizer to be the "polarization converter" claimed.

[22]IV notes that Motorola has never proposed that the term "light valve" be construed.

[23]The patent refers to an example of a light valve as an LCD. (*See* D.I. 254, ex. 19 at ¶ 10; *see also* '953 patent, 3:18-22; Fig. 2A, 3:46-47)

32

plate, top and bottom polarizers . . . ." (D.I. 254, ex. 20 at IA961) IV's expert, Dr. Cairns, admitted that all of the components of the light valve, including the rear polarizer, are packaged together as a single unit. (See D.I. 254, ex. 18 at IA944 at 169:6-25, 172:4-13, 173:16-24)

In opposing Motorola's motion, IV asserts that each of Motorola's accused phones has a rear or bottom polarizer located between the LCD panel and its light guide (the illumination uniformizing means). (D.I. 267 at 22; D.I. 268 at IVA1399-1400 at ¶¶ 14-16) To come to this conclusion, Dr. Cairns disassembled each of the 14 accused phones. (D.I. 268 at IVA1433-1446, ex. D) Additionally, the Director of Motorola's Display Design Center confirmed that the rear or bottom polarizer is between the TFT glass (LCD panel) and the light guide. (D.I. 268 at IVA 1463-1473)[24] Although Motorola contends that the rear polarizer is in fact beneath the TFT glass but within the light valve (D.I. 275 at 12), its non-infringement argument raises genuine issues of material fact, in particular with respect to the proper characterization of "light valve" vis a vis the components of an LCD.[25]

### b. The limitation "polarization converter"

Motorola asserts that the rear polarizer of an LCD panel alleged to infringe does not transform the polarization of residual light and, therefore, cannot meet this limitation. (D.I. 253 at 22) In support of its contention, Motorola cites to deposition

---

[24]In response to questions about assembly drawings for each of seven different display module assemblies. (D.I. 268 at 1403-1432)

[25]If this is a matter of claim construction, the parties will be required to construe the term "light valve" for the court's consideration prior to trial.

testimony and a declaration of its expert, Dr. Timothy J. Drabik, to state that rear polarizers are typically polyvinyl alcohol absorptive polarizers that simply absorb light of the unwanted polarization, and that IV did not attempt to establish otherwise. (*Id.* at 23) Dr. Drabik's report, however, only generally discusses what is typical in the industry and does not support a conclusion that Motorola's products do not contain a polarization converter as required by the asserted claim. (D.I. 254, ex. 19 at IA951-52 at ¶¶ 4-7) Motorola, therefore, has failed to meet its burden on summary judgment to demonstrate that there are no genuine issues of material fact.

### c. Doctrine of equivalents

Motorola contends that IV's attempt to use the doctrine of equivalents is improper because the all-limitations rule would be violated by IV's vitiation of the "disposed between" limitation which requires three separate components – an illumination uniformizing means, a polarization converter, and a light valve. (D.I. 275 at 14)[26] As above, there similarly exist genuine issues of material fact regarding whether the claimed "polarization converter" is considered "disposed between the illumination uniformizing means and a light valve" even if, as Motorola contends, the polarizer is a component of the claimed light valve.

Motorola also argues that IV cannot assert infringement under the doctrine of equivalents because IV narrowed the claim during prosecution of the '953 patent. Applicants received a § 112, second paragraph rejection for failing to particularly point

---

[26] "The additional element is a polarization converter 410 disposed between the light valve 320 and the illumination uniformizing means 310." ('953 patent, 5:42-45)

out and distinctly claim the subject matter regarded as the invention.  (D.I. 254, ex. 21

at IA962, ex. 22 at IA978)  In response to the rejection, applicants added the words

"uniformizing" and deleted the words "acceptable for the light means:"

> [A] polarization converter, disposed between the illumination
> **uniformizing** means and a light valve, to polarize the light
> from the illumination **uniformizing** means into a polarized
> light [acceptable for the light means].

(D.I. 254, ex. 22 at IA0978)  Motorola contends that this additional language narrowed

the claim and, therefore, prosecution history estoppel applies such that IV cannot raise

an infringement argument under the doctrine of equivalents.  (D.I. 275 at 15)

Prosecution history estoppel may apply to an amendment under § 112 if the

"amendment is necessary and narrows the patent's scope – even if only for the purpose

of better description." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535

U.S. 722, 737 (2002).  The Court, in *Festo*, cautioned that the subject matter

surrendered by the narrowing amendment must be examined, and rejected adopting a

complete bar to a patent holder asserting infringement under the doctrine of

equivalents. *Id.* at 737-38 (explaining that "[t]he Court has consistently applied the

doctrine in a flexible way, considering what equivalents were surrendered during a

patent's prosecution, rather than imposing a complete bar that resorts to the very

literalism the equivalents rule is designed to overcome.").  As the "claims of equivalence

[are] for aspects of the invention that have only a peripheral relation to the reason the

amendment was submitted," IV is not barred from asserting infringement under the

doctrine of equivalents. *See id.* at 738.  Motorola's motion is denied as to the '953

patent.

35

### 3. Invalidity

Motorola argues that the '953 patent's asserted claim 1 is invalid as either: (1) anticipated by U.S. Patent No. 6,559,911 (the "911 patent") to Arakawa; (2) obvious by combining the '911 patent with Kawai and/or Mizayaki; or (3) obvious by combining Ouderkirk with Mukasa. (D.I. 231 at 13-21)

#### a. Anticipation by the '911 patent

The '911 patent is directed to a back light for use in an LCD-type display. (See D.I. 232, ex. 7 at IA127 at 1:14-16) IV contends that the '911 patent fails to disclose the following four limitations and, therefore, cannot anticipate claim 1: (1) "a light source comprising an array of a plurality of light emitting devices;" (2) "a polarization converter;" (3) a scattering pattern "gradually condensed from the incident plane towards the reflective side plane;" and (4) the claimed "reflective side plane." (D.I. 250 at 12-16)

The court finds a genuine issue of material fact regarding the disclosure of the claimed polarization converter. The '911 patent discloses a polarization light splitting film that includes an optical rotation selection layer that reflects one of the right and left circular polarization components of incident light and transmits the other component of the light. The film also includes a quarter-wave plate. The transmitted light is converted into linearly polarized light at the quarter-wave plate and is emitted from the polarization light splitting film as linearly polarized light. (See D.I. 232, ex. 7 at IA128 at 4:10-4:29) Motorola cites to columns 6:32-40 to support its assertion that the polarization converter is in fact disclosed by the '911 patent. (D.I. 261 at 6)

When an unpolarized light beam is incident on the optical

36

> rotation selection layer 1 from below, one of the right and left
> circularly polarized components of the incident light beam is
> reflected and the other component is transmitted through the
> optical rotation selection layer 1.  The circularly polarized
> light transmitted through optical rotation selection layer 1
> becomes a linearly polarized light beam through the
> quarter-wave layer 2 and is emitted from the polarization
> light splitting film 10.

(D.I. 232, ex. 7 at IA129 at 6:32-40)

IV's expert explains that the film does not meet the dual functions of the

polarization converter, because it does not change the "unusable" polarized light into

the polarization that can be used, rather it reflects the "unusable" polarized light and

converts it into unpolarized light in the diffusion layer.  (D.I. 268 at IVA640-41 at ¶¶

15-16)  Columns 8:47-58 of the '911 patent state:

> In addition, with the diffusion layer 5, reflected light can be
> re-used in the polarization light splitting film itself. . . . The
> reflected circularly polarized wave is scattered in the
> diffusion layer and changed into unpolarized light, and the
> unpolarized light returns to the optical rotation selection
> layer.

(D.I. 232, ex. 7 at IA130 at 8:47-58)

The court concludes that, under its construction of a polarization converter, IV

has raised a genuine issue of material fact as to whether the '911 patent discloses the

conversion of the unusable light reflected by the optical rotation selection layer from

one linear polarization to another.  Accordingly, the court does not address whether the

'911 patent, when combined with Kawai and/or Miyazaki, renders the '953 patent

obvious as Motorola does not contend that either Kawai or Miyazaki disclosed the

claimed polarization converter.  (See D.I. 231 at 17-19)

37

### b. Obviousness by combining Ouderkirk with Mukasa

IV contends that Ouderkirk[27] fails to teach: (1) a light source comprising an array of a plurality of light emitting devices; (2) a reflective side plane; and (3) a gradually condensed scattering pattern.  (D.I. 250 at 17; D.I. 268 at IVA646-48 at ¶¶ 25-29)  IV further contends that Mukasa fails to teach a light source comprising an array of a plurality of light emitting devices.  (D.I. 268 at IVA647-48 at ¶¶ 25, 30)  If either Mukasa or Ouderkirk teach the claimed limitation, "a light source comprising an array of a plurality of light emitting devices," and one of ordinary skill would have been motivated to combine the two references, the '953 patent is invalid for obviousness.[28]

During prosecution, the examiner found that the U.S. counterpart to Ouderkirk (the '488 patent) anticipated original claim 1.  (D.I. 215 at JA1204)  The examiner cited the light source of the '488 patent, "Fig 2, 30" and "Fig 3, 21" as teaching "an array of a plurality of light emitting devices." (Id.)  Figure 3, 21 refers to an electroluminescent panel or a field emission display.  (D.I. 232, ex. 14 at IA285 at 5:16; D.I. 215 at JA1204)

Mukasa is a Japanese Unexamined Patent Application Publication published on January 14, 1991.  (D.I. 232, ex. 15)  Although Mukasa discloses the use of a single light source, Mukasa provides that it was known in the art to use multiple lamps to attain

---

[27]International application published under the Patent Cooperation Treaty, application no. PCT/US94/14814.  (D.I. 232, ex. 14 at IA279)

[28]IV does not provide arguments for the limitations "a reflective side plane" and "a gradually condensed scattering pattern."  (D.I. 250 at 17-18; D.I. 268 at 646-49 at ¶¶ 25-31)

38

uniform brightness satisfying the limitation "an array of a plurality of light emitting

devices." (Id. at IA323)

> A light source 2 is disposed along the edge . . . . In addition
> to fluorescent lamps that are in wide use, it is advantageous
> from a practical standpoint to use a thin-diameter cold
> cathode tube for the light source 2, because this will
> decrease the thickness of the backlight device as a whole
> and will suppress the influences of temperature on the liquid
> crystal display (LCD) panel.

(Id.)

Motorola contends that a skilled artisan would have been motivated to combine

the two references, because Ouderkirk describes techniques for improving illumination

uniformity exhibited by an optical display (D.I. 232, ex. 14 at IA284 at 5:21-22, IA321 at

41:1-5), and Mukasa seeks to solve the same problem by providing a gradually

condensed scattering pattern. (Id., ex. 15 at IA324) IV's only argument in response is

that one skilled in the art would not have been motivated to combine the two references

because Mukasa teaches away from this combination. Mukasa explains that, "[w]hen

lamps are provided in a plural number of locations in order to attain uniform brightness,

a large number of lamps are required for increased surface areas, which leads to high

costs." (Id.) Mukasa only warns of increased costs and not problems with attaining

uniform brightness, a stated objective of the invention. (See id.)

An invention, however, "may be obvious in light of the prior art, even though it

may not appear to be economically viable at the moment." Kimberly-Clark Worldwide,

Inc. v. First Quality Baby Prods., LLC, 900 F. Supp. 2d 903, 914-15 (E.D. Wis. 2012)

(citing Orthopedic Equip. Co., Inc. v. U.S., 702 F.2d 1005, 1013 (Fed. Cir. 1983))

(explaining that "the fact that the two disclosed apparatus would not be combined by businessmen for economic reasons is not the same as saying that it could not be done because skilled persons in the art felt that there was some technological incompatibility that prevented their combination."). The warning of increased costs, therefore, does not teach away from combining the two references as IV contends. Accordingly, the court concludes that combining Ouderkirk and Mukasa renders the '953 patent obvious. Motorola's motion is granted as to the '953 patent.

### C. The '054 Patent

The '054 patent, "Method and System for Distributing Updates by Presenting Directory of Software Available for User Installation That Is Not Already Installed on User Station," was filed April 20, 2000 and issued April 29, 2003. It is a continuation of application no. 08/982,157 filed on December 1, 1997, which is a continuation of application no. 08/641,010, filed on April 29, 1996, which is a continuation-in-part of application no. 08/251,824, filed on May 31, 1994, which is a continuation of application no. 08/251,724 filed on May 31, 1994.

The invention relates to "a method and corresponding system for distributing updates for a plurality of different products to a plurality of uncoordinated user stations via a non-proprietary network." ('054 patent, 1:30-34) Independent claims 1 and 31 are representative of the claims in dispute and are reproduced below.

> 1. A computer implemented method for distributing software from a remote computer system to a user station, the method comprising:
>
> responsive to an identification of software already installed on the user station, presenting a directory of software

40

available for installation on the user station and not already installed on the user station;

sending to the remote computer system over a communications network a selection of software for distribution to the user station, wherein the selection of software is selected by a user at the user station responsive to the directory; and

receiving from the remote computer system over the communications network software indicated by the selection.

(*Id.* at 60:49-64)

31. A computer implemented method for distributing software from a remote computer system to a user station, the method comprising:

Presenting, at the user station, as a function of an identification of software already installed on the user station, a directory of software available for installation on the user station;

sending to the remote computer system over a communications network a selection of software for distribution to the user station, wherein the selection of software is selected at the user station as a function of the directory; and

receiving from the remote computer system over the communications network software indicated by the selection.

(*Id.* at 62:48-63)

### 1. Limitations of the '054 patent

#### a. "Presenting a directory of software [updates] available for installation on the user station"

The court construes this term as "displaying a directory of software [updates] available for installation on the user station." The plain language of the limitation indicates that a directory of software is available for installation on the user station.

41

Motorola seeks to add the additional limitation to the term, "but not displaying any software [updates] not available for installation on the user station." (D.I. 208 at 3-4) In the absence of an express intent to impart different meaning to claim terms, the terms are presumed to have their ordinary meaning. *Interactive Gift Express, Inc.*, 256 F.3d at 1331. A negative limitation will not be imparted to the claim term absent support in the specification or prosecution history. *Omega Engineering Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322-23 (Fed. Cir. 2003).

Motorola points to the specification at columns 18:52-19:6 to support its proposed construction. (D.I. 224 at 37) This section, entitled "Open-Ended Fetch of a Supplementary News Magazine Object," describes "[o]pen-ended access to supplemental information objects not described in the original information product can be obtained by providing in the original product means to fetch a directory of added features." ('054 patent, 18:52-55) Motorola also points to the background of the invention, which indicates that the "present invention relates to a method and corresponding system for distributing updates for a plurality of different products to a plurality of uncoordinated user stations via a non-proprietary network." (*Id.* at 1:30-33) Although this intrinsic evidence provides support for the construction that the user station must display software available for installation, it does not provide support for the negative limitation that Motorola now seeks to impose. Importantly, the limitation "and not already installed on the other user station" is expressly included in asserted claims 1, 91, 121, 181, 256, 271, 286, 316, and 362 below.

42

### b. "Presenting a directory of software [updates] available for installation on the user station and not already installed on the user station"

The court construes this term as "displaying a directory of software [updates]

available for installation on the user station but not displaying any software [updates]

already installed on the user station." This construction is consistent with the claims

and the specification. Motorola, as above, seeks to add a negative limitation "or

otherwise not available for installation on the user station" without proper support in the

specification.

### 2. Infringement

#### a. Claims reciting a "directory of software [updates] available for installation on the user station"

Motorola contends that the use of Google Play[29] does not provide "a directory of

software available for installation on the user station," as recited in asserted

independent claims 31, 61, 151, 211 and 241,[30] because each of the directories

identified by IV[31] includes software that is not available for installation on the user

station. (D.I. 253 at 26-27) Because the court has construed the term as "displaying a

---

[29]IV contends that Motorola indirectly infringes the asserted claims of the '054 patent by providing smartphones on which the Google Play store application is installed, thereby inducing or contributing to the performance of the claimed methods when users of those smartphones use Google Play to download or update software applications. (D.I. 253 at 26)

[30]The asserted claims are 1-5, 9-15, 31-35, 39-45, 61-65, 69, 70-75, 91-95, 99-105, 121-125, 129-35, 151-55, 159-65, 181-85, 189-95, 211-15, 219-25, 241-45, 249-60, 264-75, 279-90, 294-300, 316-20, 324-30, 362-66, and 370-76. (D.I. 253 at 26)

[31]IV identified the "Top Free" and the "Installed" and "All" Tabs in the "My Apps" Section as infringing the asserted claims. (D.I. 253 at 27-29)

directory of software [updates] available for installation on the user station," and Motorola's arguments focus on the fact that each display includes software unavailable for installation as well, Motorola has failed to satisfy its burden of persuasion on summary judgment. There exists a genuine issue of material fact with respect to infringement of claims 31, 61, 151, 211 and 241.

### b. Claims reciting a "directory of software . . . not already installed on the user station"

A genuine issue of material fact exists as to claims 1, 91, 121, 181, 256, 271, 286, 316, and 362 as well. Motorola contends that the "My Apps" page that IV contends to be the "Updates directory" lists both applications that need updates and applications that are up to date. (D.I. 253 at 28-30; D.I. 275 at 16) IV contends that the "Updates" directory excludes software that is "not available for installation." (D.I. 267 at 28) The "Updates" directory resides under the Installed tab in Google Play and shows only software updates available for installation. (See D.I. 268 at IVA1128-33)

In support of its contention, Motorola merely points to IV's expert report, which includes screen shots and the explanation, "[l]ikewise, applications which are up to date are shown separately under a different header 'Up to date'" within the My apps directory. (D.I. 254, ex. 24 at IA982 at ¶ 354) Although the "Up to date" and the "updates" directories may be within the My apps directory, absent more evidence, Motorola has not carried its burden of persuasion on summary judgment.

### c. Claims reciting "sending . . . a selection of software updates . . . wherein the selection of software updates is selected by a user as a function of the directory"

44

Motorola contends that its products do not meet this step, recited in claims 151, 181, and 211, because its functionality only allows a user to select one item at a time and the claim requires more than one update to be sent. (D.I. 253 at 30)  In support of its contention, Motorola again cites to IV's expert report, which states that "a user selects applications or application updates for download from the one or more directories presented in Google Play . . . . The selection is accomplished via a virtual button which when clicked will display a page from which the user may update an application with available updates or download a previously installed application." (D.I. 254, ex. 24 at IA984-87, ¶¶ 386-87, 390)  The report then provides an example of a "details page" for the selected app "displayed in Google Play once the user has selected an application to update." (Id.)

Aside from this conclusory argument, however, Motorola fails to identify any evidence that affirmatively indicates that this limitation is not met.  A genuine issue of material fact exists for asserted claims 151, 181 and 211.  Motorola's motion for summary judgment of non-infringement is denied with respect to the '054 patent.[32]

### 3. Invalidity

Motorola asserts that the 168 asserted claims of the '054 patent are invalid as anticipated by Motorola's own prior art – U.S. Patent No. 6,026,366 (the "366 patent") to Grube. (D.I. 231 at 21)  IV disputes whether the '366 patent discloses distributing

---

[32]Motorola contends that it does not indirectly infringe the '054 patent.  (D.I. 250 at 31)  As direct infringement is a requirement for a finding of indirect infringement, and there exist genuine issues of material fact with respect to whether Motorola directly infringes the '054 patent, the court does not consider these contentions.

"updates," and further contends that the '366 patent is not entitled to a priority date earlier than the '054 patent's alleged priority date.[33] (*Id.*) It is

> well settled that where a patent purports on its face to be a 'continuation-in-part' of a prior application, the continuation-in-part application is entitled to the filing date of the parent application as to all subject matter carried over into it from the parent application, whether for purposes of obtaining a patent or subsequently utilizing the patent disclosure as evidence to defeat another's right to a patent.

*In re Klesper,* 397 F.2d 882, 885 (C.C.P.A. 1968) (citations omitted). Accordingly, the court must first determine whether this subject matter has been carried forward as Motorola alleges.

The '366 patent issued from a continuation-in-part (CIP) of an application claiming priority to an abandoned application filed on September 22, 1993 (the "grandparent application"). (D.I. 231 at 22; D.I. 250 at 19) Motorola argues that both the grandparent application and the '366 patent include the concept of "updates" in terms of "complimenting software," as software that "fills up, completes, or makes perfect." (D.I. 231 at 22; D.I. 232, ex. 17 at IA338-40 at ¶¶ 8-16) IV responds that Motorola cannot show that the '366 patent is entitled to claim priority to the abandoned 1993 grandparent application because the '366 patent issued from the '502 application, filed on October 14, 1997, as a CIP of the grandparent application. (D.I. 250 at 18-19) As a CIP, the '502 application introduced substantial new matter not found in the grandparent and is only entitled to the grandparent's filing date if the "specific subject

---

[33]Motorola disagrees that the '054 patent is entitled to the September 30, 1993 priority date that IV claims but, for the limited purpose of this motion, it does not dispute IV's assertion. (D.I. 231 at 21, n.13)

matter" relied upon as allegedly anticipatory is carried over from the grandparent. (*Id.*

at 19)

The grandparent application discloses the term "software updates:"

> Upon receiving the network information, the host computer
> may determine that a specific network has an old version of
> a software application and transmits, over the RF channel,
> information to the network that a new version of the software
> application is available and how much that would cost.  If the
> user wants the **update**, a message is sent, over the RF
> channel, to the host computer indicating the desire to
> purchase the **updated software**.  In response, the **updated
> software** is transmitted, over the RF channel, to the network
> which can be immediately used.[34]

(D.I. 232, ex 17 at IA339; *Id.*, ex. 20 at IA488-89, 8:29-9:9) (emphasis added)  The

grandparent application further discloses "customer information" as including "updates

of software applications, free software, pricing information, and enhancements of

existing software applications."  (D.I. 232, ex. 17 at IA340 at ¶¶ 12-13; *Id.*, ex. 20, IA485

at 5:30-33)  Motorola's expert argues that updates of software applications, free

software, and enhancements of existing software applications would fit into the category

of complimenting software as recited in the '366 patent and described below. (D.I. 232,

ex. 17 at IA0340, ¶ 13)

The following passages are illustrative of the '366 patent's meaning of the term

"complimenting software."[35]

_____

[34]In his expert report, Dr. Von Herzen annotated how this example discloses the
limitations of the independent claims of the '054 patent.

[35]Patent Applicant Gary Grube submitted a declaration during the '054
reexamination proceedings in support of requester, stating that the phrase
"complimenting" software is a typographical error and the intended phrase is

> With such growth, it may be difficult to maintain current
> software within the network due to the frequent occurrence
> of software and hardware updates. In addition,
> notwithstanding the availability of office-type combinations of
> software, such as Microsoft Office, it may be difficult to
> maintain software in the network that **compliments** other
> software in the network due to the frequency at which new
> software is being made available to the public. For example,
> if a network contains a drawing software application
> produced by a vendor and that vendor . . . subsequently
> releases a word processing application that permits
> drawings from the drawing application to be imported into
> the word processing application, users of the network must
> keep a watchful eye on all vendors' software releases in
> order to determine that the new word processing application
> exists. If [not] . . ., the new application will not be purchased
> and users of the network may continue to have difficulty
> creating drawings for use in their word processing-generated
> reports.

(D.I. 232, ex. 18 at IA425, 1:39-58) (emphasis added)

IV argues that the above passage denotes software different from what the user

currently has, but that provides complementary capabilities to the user's existing

software.[36] (D.I. 268 at IVA175 at ¶¶ 113-14) IV further argues that the '366 patent

distinguishes between software updates and complimenting software. (*Id.* at ¶¶ 116-

17) To support this contention, IV points to the "in addition" language at 1:41 and the

use of the disjunctive "or" at column 1:59-67. (*Id.*) The patent provides "[t]o update

_____

"complementing" software. He described this as software that completes, makes
whole, or enhances existing software." (D.I. 232 at IA442) IV's expert contends that
there is no evidence that the term "complimenting software" was a drafting error – if it
was, the patentee would have followed the standard procedure to correct it. (D.I. 268 at
IVA174 at ¶ 112) The court agrees with the latter argument.

[36]In the description of the preferred embodiment, the '366 patent refers to
"complimenting software" as "software that compliments the software applications
presently contained within the remote computer." (D.I. 232, ex. 18 at IA425 at 2:49-52)

software **or** provide complimenting software to existing computer networks" and

"[a]lternatively, updates **or** complimenting software may be transmitted over telephone

lines." (D.I. 232 at IA425 at 1:59-67)

> Upon receiving the network information, the host computer
> determines (201) if any computers, or servers, (users) are in
> need of software **(complimenting software) that
> compliments the software applications presently
> contained within the computer or server.** The host
> computer may determine that a computer or server is in
> need of **complimenting software** when the host computer
> determines that a software application (e.g., a spreadsheet
> application) that **compliments** another software application
> (e.g., a word processing application) is not contained in the
> network information received from the server or computer.

(D.I. 232, ex. 18 at IA426 at 4:33-43) (emphasis added) IV's expert contends that to

one of ordinary skill a spreadsheet application does not complete, make whole or

enhance a word processing application. (D.I. 268 at IVA176 at ¶ 115)

After conducting a comparison of the use of "complimenting software" in the '366

patent and the use of software updates in the grandparent application, the court has

determined that the two do not connote the same meaning. The '366 patent

distinguishes the two terms and uses the term "complimenting software" to apply to

different software that is not in fact a newer version of that already found on the

computer. The '366 patent, therefore, is not entitled to the priority date of the

grandparent application and does not qualify as prior art to the '054 patent. Motorola's

motion is denied.[37]

---

[37] IV also contends that all of the '366 patent passages alleged by Motorola to
disclose the "directory" limitation of the '054 patent are absent from the grandparent
application or have been substantially rewritten in the CIP to describe "complimenting

### D. The '464 Patent

The '464 patent, "User Station Software That Controls Transport, Storage, and

Presentation of Content from a Remote Source," was filed April 20, 2000 and issued

December 2, 2003. It is a continuation of application no. 08/641,010 filed on April 29,

1996, which is a continuation-in-part of application no. 08/251,724 filed on May 31,

1994. The invention "solves the problem of enabling simple, economical and prompt

mass distribution of electronic information products." ('464 patent, 5:12-14) Claims 1

and 20 are at issue. Independent claim 1 is reproduced below.

> 1. A software product for use at a user station, the user station including a processor and a storage device, the software product comprising computer executable instructions that, when executed by the processor:
>
> enable a user at the user station to select content from each of a plurality of independent publishers;
>
> effect transport of the selected content from each of the plurality of publishers to the user station over a communications network and, without user intervention, effect storage of the transported content to the storage device such that the content is retained on the storage device upon shutting down of the user station and/or deactivation of the software product; and
>
> effect presentation of the stored content to the user at the user station with a user interface that is customized to the respective publishers.

(*Id.* at 60:39-55)

### 1. Limitations of the '464 patent

#### a. "Content"

software." (D.I. 250 at 19)

The court construes this term as "any form of electronic information."  Motorola

argues that the term refers to multimedia information such as video and digital images,

while IV contends that the meaning encompasses any type of electronic content, which

would include software applications.  (D.I. 210 at 34; D.I. 224 at 40)  The specification

explains that software applications use content ('464 patent, 31:6-22), and also

expressly includes other types of electronic information in its definition of content:

> The coded URL may carry with it a web package identifier . .
> . depending on the variety of access modes and richness of
> content structure to be supported. . . . Such mechanisms are
> very effective **for what might be regarded as passive
> content such as text, images and even multimedia
> retrieved by the user** . . . but greater difficulties may arise
> with dynamic, changeable content, for example cases of
> client-server interaction needed for forms handling, searches
> image map selections, JAVA (trademark) applets and push-
> pull content.

(*Id.* at 46:40-50)

### b. "Effect presentation . . . with a user interface that is customized to the respective publishers"

The court construes this term to mean "display user-selected content in a

manner specific to the publisher/source of the content."  The patent does not require

that the software product itself present the stored content with a customized user

interface, but that it contain instructions that, when executed, allow the display of a user

interface that has been customized to the respective publisher by the publisher or

source of the content.

This construction is consistent with the claims and specification.  The

specification explains that "added flexibility in use of the inventive product . . . enables

the publisher to offer fully customized user interfaces for use with multiple, or any one

51

of multiple server and network services which do not provide for such customization."
(*Id.* at 24:54-60) Online service providers "generally provide similar types of services
with nearly standard functions and similar user interfaces," but "[u]se of creative
typography, layout, graphics, and other artistic elements to offer the presentation quality
and variety typical of print media is desired by publishers using this medium." (*Id.* at
24:1-14) "The application-specific configuration . . . selects either a standard user
interface . . . or an application-controlled user interface." (*Id.* at 10:4-11)

## 2. Infringement

IV has accused Motorola of infringing claims 1-8, 16-17, 19-27, 35-36, and 38 of
the '464 patent because Motorola sells handsets on which Google Play is installed.
(D.I. 253 at 32) Motorola contends that Google Play does not infringe the asserted
claims because it is not a software product that "effect[s] presentation . . . of the stored
content . . . with a user interface that is customized to the respective publishers
[services]." (*Id.* at 33) In particular, Motorola contends that Google Play does not
provide a user interface that is customized to the independent source of the
downloaded application. (*Id.*) As explained above, the court has found no requirement,
as Motorola contends, that the software product provide the customized user interface,
only that the software product (Google Play) display the user interface that is
customized to the respective publishers.

In support of its position, Motorola cites to IV's expert's report, which states that
"[t]he computer code is consistent with control of the user interface being exercised by
a launched application . . . ." (D.I. 254, ex. 24 at IA990-91 at ¶ 460) Motorola argues

52

that this is a concession that it is the downloaded application itself, not Google Play, that provides the customized user interface for the application (D.I. 275 at 17), but fails to provide any evidence to show that Google Play does not meet the limitation.

In opposing Motorola's motion, IV contends that Google Play infringes the limitation, even under Motorola's construction,[38] because Google Play itself, through its "application details" page, launches and presents applications to the user. (D.I. 267 at 33) In support of its contentions, IV cites to its expert's report discussing the WeatherBug Elite app, which is downloaded on an accused Motorola phone using Google Play and leads to the display of an application details page within Google Play. (D.I. 268 at IVA1169-70 at ¶ 30) Motorola does not respond to this argument in its briefing, instead relying on the above alleged concession to argue that this claim limitation is not met. A genuine issue of material fact exists with respect to this limitation.

With respect to the "content" limitation, Motorola contends that Google Play permits users to download or update software applications, which Motorola distinguishes from "content." (D.I. 253 at 34) Because the court has not limited the term "content" to mean only multimedia information as proposed by Motorola, and Motorola's only non-infringement arguments focus on its own construction of the limitation, it has failed to satisfy its burden of persuasion on summary judgment.

Similarly, Motorola's contention that Google Play does not "enable a user at the user station to select content from each of a plurality of independent publishers" also

_____

[38] I.e., the software product itself must provide the customized user interface.

53

fails, because it is premised on Motorola's construction of "content." (See D.I. 253 at 35)  Because Motorola has not provided evidence to show that Google Play does not meet this limitation as construed by the court, its summary judgment motion is denied as to the '464 patent.[39]

### 3. Invalidity

Motorola contends that all limitations of the asserted claims of the '464 patent are disclosed by U.S. Patent No. 4,654,799 (the "799 patent") to Ogaki and/or the '799 patent combined with Reynolds 1993.[40]  (D.I. 231 at 25)  The '799 patent, which describes a software vending system that allows users to submit software programs for evaluation and distribution, issued on March 31, 1987.  (D.I. 232, ex. 21)  IV contends that the '799 patent does not disclose the limitations of: (1) effecting transport of the selected content to the user station; (2) effecting storage of the transported content; and (3) effecting presentation of the stored content at the user station with a user interface that is customized to the respective publishers/services.  (D.I. 250 at 23; D.I. 268 at IVA186-91 at ¶¶ 253-63)

IV's primary argument centers on the assertion that the '799 patent does not disclose transporting content, over a communications network, which is **selected by**

---

[39]Accordingly, there exists a genuine issue of material fact with respect to IV's contentions that Motorola infringes under a doctrine of equivalents theory.  Motorola also contends that it does not indirectly infringe the '464 patent.  (D.I. 253 at 36)  As direct infringement is a requirement for a finding of indirect infringement, and there exist genuine issues of material fact with respect to whether Motorola directly infringed the '464 patent, the court does not consider these contentions.

[40]Dennis Reynolds, "Evaluating Dial-Up Internet Access Options," Internet Librarian, 86-93 (Sept. 1993).

**the user**. (D.I. 250 at 23; D.I. 268 at IVA186-87 at ¶ 255) This argument requires that the content be transported after it is selected. (*See* D.I. 250 at 23-26) The claim, however, does not require this sequence of steps. The '799 patent discloses transporting content over a communications network. (D.I. 232, ex. 21 at IA494, Fig. 4A; *id.* at IA501 at 6:8-23; *id.* at IA504 at 11:39-47) The '799 patent further discloses "effect[ing] storage of the transported content," as it teaches "duplicat[ing] the retrieved program in the blank tape cassette" (*id.* at IA503 at 9:23-29); storing the transported program in hard disk memory (*id.* at IA504 at 11:39-47); and retaining the transported content when the user station is shut down or the software product deactivated. (*See id.* at IA503 at 9:60-65)

With respect to the final limitation at issue, "effect presentation of the stored content at the user station with a user interface that is customized to the respective publishers/services," Motorola contends that it is inherent that users who provide the software programs on the vending system – the independent publishers of that content – necessarily create the user interface for their programs. (D.I. 231 at 27; D.I. 261 at 14; D.I. 232, ex. 17 at IA397-98 at ¶¶ 204-06) Specifically, Motorola asserts that the programs are developed and designed by "a software maniac, amateur fan or any other person." (D.I. 232, ex. 21 at IA503 at 10:17-23)[41] In support of its contentions, Motorola cites to the specification of the '799 patent, which explains:

> Based on the software program stored in the PROGRAM

---

[41]The specification further explains that the "cassette recording/playback device" on the software vending system can be used to "inspect or verify a program bought by the purchaser . . . ." (D.I. 232, ex. 21 at IA500 at 4:36-45)

> DISPLAY RAM 46, the first CPU 44 executes the program
> on the CRT 8, that is, causes the CRT 8 to display the
> contents of the program, e.g., play a video game if the
> selected program is a video game program.

(Id. at IA501 at 6:59-64) Additionally, the specification explains that,

> [u]pon completion of the data transfer to the RAMS 46, 49,
> the first CPU 44 retrieves from the PROGRAM DISPLAY
> RAM 46 demonstration data of the transferred designated
> program. The demonstration data represents an abstract of
> the subject matter of the designated program, e.g., abstract
> views of a video game. According to the retrieved
> demonstration data, demonstration images are provided on
> the screen of the CRT 8 (S15).

(Id. at 8:45-53)

In opposing Motorola's motion, IV argues that a person of ordinary skill in the art

would not conclude that the user interface of the peripheral vending machine was

customizable to an independent publisher as required by claims 1 and 20, much less

used to effect presentation of the stored content to the user at the user station. (D.I.

268 at IVA188 at ¶ 258) IV also cites to case law for the proposition that inherency

"may not be established by probabilities or possibilities." In re Robertson, 169 F.3d

743, 745 (Fed. Cir. 1999) (explaining that "[i]f the prior art reference does not expressly

set forth a particular element of the claim. . . . the extrinsic evidence 'must make clear

that the missing descriptive matter is necessarily present in the thing described in the

reference, and that it would be so recognized by persons of ordinary skill.'"). The court

finds that there exist genuine issues of material fact with respect to this last limitation.

Motorola's motion is denied.

### E. The '450 Patent

56

The '450 patent, "Transmission Control Protocol/Internet Protocol (TCP/IP)

Packet-Centric Wireless Point to Multi-Point (PTMP) Transmission System

Architecture," was filed February 28, 2005 and issued August 5, 2008. It is a

continuation of application no. 09/349,477, filed on July 9, 1999, which claims priority

from provisional application no. 60/092,452 filed on July 10, 1998. Independent claim 1

is reproduced below:

> 1. A method comprising:
> coupling one or more subscriber customer premise
> equipment (CPE) stations with a base station over a shared
> wireless bandwidth using a packet-centric protocol; and
> allocating said wireless bandwidth and system resources
> based on contents of packets to be communicated over said
> wireless bandwidth, wherein the contents of each packet
> include a packet header and wherein the allocating is
> responsive to at least one field in the packet header.

('450 patent, 81:54-62)

### 1. Limitations of the '450 patent

#### a. "Allocating is responsive to at least one field in the packet header"[42]

The court construes this term as "assigning a portion of the shared wireless

bandwidth and a portion of the communications network resources for a particular

transmission on the basis of information responsive to at least one field in the packet

header."

The specification describes reading information from the packet header when

---

[42] IV contends that this term does not require construction and should be given
its plain and ordinary meaning. (D.I. 210 at 48) The court finds this unhelpful to a jury.

determining a data flow for a received data packet. (*See id.*, Figure 15A; 16A include the step "extract data from packet header fields" and then "look for match with existing IP flow") The specification explains that "it is determined whether a data packet of an incoming IP data flow is known to the system, i.e. is 'an existing IP flow', or rather is the first data packet of a new IP data flow, based on fields in a packet header section." (*Id.* at 49:35-38) Further "a new data packet . . . is characterized based on the packet header information to determine the QoS requirements for the IP data flow, and to identify the subscriber CPE station that will receive the IP data flow." (*Id.* at 49:42-46)

The patent prosecution history confirms this construction. Applicant distinguished the invention from the Chuah prior art patent by arguing that Chuah did not teach allocation using packet contents. The Chuah patent taught "allocat[ing] bandwidth dynamically, based on traffic characteristics and QoS requirements as well as the current bandwidth needs of all supported hosts." (D.I. 215 at JA4777-78)

The court does not limit the term to allocation of wireless bandwidth provided by the base station, because allocating bandwidth and system resources is performed in both the downlink (*see* '450 patent, Figs. 8A, 15A-B) and the uplink (*see id.* at Figs. 8B, 16A-B) directions. It can be performed at both the CPE and the base station. (*See also id.* at 47:50-52:4) The court further declines to limit the term "responsive to" to "read from" at least one field in the packet header, which would require that packet header information only be read directly from packet headers. The patent teaches storing header information in source application packet header data tables, 1528 and 1628, which are also accessed and used in the allocation process. (*Id.* at 62:38-43,

58

68:29-31) It also teaches storing and accessing packet headers and related fields in/from IP-Flow identification data tables, 1526 and 1626, which map packet header information to specific IP flows. (*Id.* at 62:29-37, 68:17-24)

### 2. Infringement

IV asserts that Motorola's 3GPP2-compliant handsets that operate on Sprint's network and implement the "Multi-Flow Packet Application" (the "MFPA")[43] infringe claims 1, 2-3, 5, and 8-9 of the '450 patent. (D.I. 253 at 14) IV's expert opined that the accused handsets allocate bandwidth and resources for transmitting data packets by providing "differential treatments"[44] to different data flows with different quality of service ("QoS" requirements). (*See* D.I. 254, ex. 16 at IA929-32 at ¶¶ 91, 177-81) Specifically, that the "treatments are based on the contents of the data packets and are responsive to information contained in [the RLPID field] of the RLP headers . . ." and "bandwidth and resources allocated to the data flows are based on the content of the packets in those data flows . . . ." (*Id.* at ¶ 181)

Motorola contends that the "differential treatments" do not use information read from a packet header field as required by the term "allocating responsive to at least one field in the packet header," because IV relies on an RLPID value allegedly retrieved from "data tables" or "a parallel data structure" outside of the packet header fields. (D.I.

[43]Allegedly to provide "differential treatments" (allocation) to data packets that originate from different data flows.

[44]The four differential treatments that allegedly "result in favorable bandwidth and resource allocation in the Motorola 3GPP2 Products" are: 1) Flush Timer Value; 2) RTCMAC Prioritization Data; 3) RTCMAC T2PInflow; and 4) LoLat and HiCap Modes. (D.I. 254, ex. 16 at ¶ 91)

253 at 16; D.I. 275 at 8)[45]  As Motorola's arguments are not premised on the court's construction but, rather, on one requiring "reading from at least one field in the packet header," Motorola's motion is denied as to the '450 patent.[46]

### 3. Invalidity

Motorola argues that it would have been obvious to one skilled in the art to combine U.S. Patent No. 6,463,096 (the "096 patent") and "Packet Shaper"[47] to prioritize packets by inspecting packet headers to determine what the packets contain, as in the '450 patent. (D.I. 231 at 31)  The '096 patent discloses coupling CPEs and a base station and allocating bandwidth shared among those CPEs by prioritizing packets to be transmitted on the basis of their contents. (D.I. 231 at 30-31; D.I. 232 at IA514 at ¶ 5, IA518-19 at ¶ 10)  Packet Shaper discloses looking into packet header contents to prioritize packets to be communicated.  (Id. at IA514-15 at ¶¶ 4, 6)  IV contends that: (1) the '096 patent is not prior art to the '450 patent; (2) the '096 patent and Packet Shaper in combination do not teach all of the limitations of any claims of the '450 patent; (3) there is no motivation to combine the references; and (4) secondary considerations favor a finding of non-obviousness. (D.I. 250 at 30)

---

[45]Motorola contends that IV's expert has admitted that none of the four "differential treatments" determine the RLPID value by reading any field in the packet header, however, this admission was in response to questions related to whether the handsets determine this field by "looking into" or reading each packet header. (See D.I 254, ex. 15 at IA917, 181:12-183:12, IA918-19, 188:17-190:5, IA920-21, 200:16-201:11, 203:16-204:7; IA923, 213:1-214:6)

[46]As direct infringement is a requirement for a finding of indirect infringement, and there exist genuine issues of material fact with respect to whether Motorola directly infringed the '450 patent, the court does not consider these contentions.

[47]A wired Ethernet box.

60

### a. Whether the '096 patent is prior art to the '450 patent

IV does not dispute that the '096 patent is entitled to a priority date of June 12, 1998, and Packet Shaper is entitled to a priority date of at least that early. (D.I. 232, ex. 24 at IA528 at ¶ 174)  Motorola contends that IV asserted in its sworn interrogatory responses a claimed priority date for the '450 patent of June 16, 1998. (D.I. 231 at 31) It further alleges that, after learning of the '096 patent, IV (without supplementing its interrogatory response) served an expert report opining that the '450 patent was entitled to a priority date of April 17, 1998. (D.I. 232, ex. 24 at IA523-25 at ¶¶ 61-67)[48]

In support of its contention that the priority date is April 17, 1998, IV cites to the declaration of Dr. Jacob W. Jorgensen, inventor of the '450 patent. (D.I. 268 at IVA592 at ¶¶ 4-6)  Dr. Jorgensen supports his declaration as to conception of claims 1-9 with a PowerPoint presentation (entitled "Introduction to the WINAAR™ System Architecture"), which presentation includes metadata bearing a creation date of April 17, 1998. (Id.) He states that "[t]his creation date is consistent with my memory that I conceived of the inventions of the '450 patent in early 1998, at least on or before April 17, 1998." (Id.) The PowerPoint presentation, however, is actually dated January 5, 1999. (Id. at ¶ 6; id. at IVA594)  IV's expert, Dr. Gibson, admitted in his deposition testimony that he is unaware of what changes were made to the PowerPoint from the date it was initially created in April until the date on which it was finalized on January 5, 1999. (D.I. 232, ex. 25 at IA538 at 244:18-245:22)  IV also points to Malibu Networks documents that allegedly indicate that Dr. Jorgensen conceived of his inventions in the first quarter of

---

[48]Motorola has also filed a *Daubert* motion alleging that Dr. Gibson's opinion in this regard is not admissible. (D.I. 213 at 11-14)

1998.[49]

After a review of the pertinent evidence cited by both parties, the court concludes that the '450 patent is not entitled to the April 17, 1998 date. Conception is the "formation in the mind of the inventor, of a definite and permanent idea of the complete and operative invention" and "is complete only when the idea is so clearly defined in the inventor's mind that only ordinary skill would be necessary to reduce the invention to practice, without extensive research or experimentation." *Dawson v. Dawson*, 710 F.3d 1347, 1352 (Fed. Cir. 2013) (citations omitted). An expert's testimony, absent corroborating evidence, is not sufficient to establish priority. *See Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993) ("Conception by an inventor, for the purpose of establishing priority, can not be proved by his mere allegation nor by his unsupported testimony where there has been no disclosure to others or embodiment of the invention in some clearly perceptible form, such as drawings or model, with sufficient proof of identity in time."). Corroborating evidence must be "of a contemporaneous disclosure that would enable one skilled in the art to make the invention." *Dawson*, 710 F.3d at 1352. "An evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Price*, 988 F.2d at 1195.

The metadata, when combined with the Malibu Networks documents, is not

---

[49]D.I. 268 at IVA440 includes a list of Malibu milestones stating that in Q1 of 1998 the first protocol work started and in Q2 the first patent applications were filed; IVA458 includes a second list of Malibu milestones stating that in Q1 of 1998 the first software design started and in Q2 first patent applications.

sufficient to support Dr. Jorgensen's declaration as to the PowerPoint's contents as of April 17, 1998. More specifically, the date the PowerPoint presentation was started, without any evidence as to the content of the presentation at that time, is not sufficient to demonstrate that there existed, in the mind of the inventor, a definite and permanent idea of the complete invention such that it could be reduced to practice without extensive research or experimentation. Accordingly, the '096 patent is prior art to the '450 patent.

#### b. Obviousness

The '096 patent teaches prioritizing packets on the basis of what they contain (D.I. 232, ex. 26 at IA550 at 6:22-35), but does not disclose examining packet headers. (D.I. 268 at IVA468 at ¶ 351) The parties do not dispute this. Motorola, therefore, contends that combining the '096 patent with a system that discloses inspecting packet headers and packet payload (Packet Shaper), would have been obvious at the time of the '450 patent. (*Id.* at ¶ 352; D.I. 231 at 34; D.I. 232, ex. 23 at ¶ 10) To support its contentions, Motorola cites to a provisional patent application which discusses Packet Shaper. (D.I. 232, ex. 27 at IA554-81) This reference states, "[t]raffic may be classified by type . . . such as whether an IP protocol field in an IP header indicates TCP or UDP," and "a particular instance of traffic may be classified according to its transport layer characteristics, e.g., Internet Protocol port number . . . ." (*Id.* at 560, 573)

IV contends that the '096 patent fails to disclose at least "wherein the allocating is responsive to at least one field in the packet header." (D.I. 250 at 32; D.I. 232, ex. 24 at IA528 at ¶¶ 175-76) Further, it contends that combining the '096 patent with Packet Shaper would not teach all of the limitations of claim 1, because Packet Shaper does

63

not teach the limitation – "allocating is responsive to at least one field in the packet header," as well. (*Id.*)

With respect to Packet Shaper, IV contends that it specifically does not disclose CPEs sharing a wireless bandwidth with a base station, much less allocating the shared wireless bandwidth between a base station and CPEs based on the contents of packets and responsive to a field in the packet header. (D.I. 250 at 32; D.I. 268 at IVA392-95 at ¶¶ 63-65, 72) IV's expert explains that Packet Shaper discloses a wired Ethernet box with no wireless capability and no capability to couple with a wireless base station. (D.I. 268 at IVA384-85 at ¶ 48) For support, he cites to the Packet Shaper Data Sheet to state that the Packet Shaper system had no wireless interface and could not communicate with a telecommunication carrier's base stations or related equipment. (*Id.*; *id.* at IVA471) Although Packet Shaper involves "proactively managing bandwidth allocation" (D.I. 268 at IVA471), Motorola has not presented sufficient evidence to resolve the issue of fact identified by IV, that is, whether such allocation is responsive to a field in the packet header, as required by the '450 patent. Motorola's motion with respect to the '450 patent is denied.[50]

### F. The '462 Patent

The '462 patent, "Portable Computing, Communication and Entertainment Device with Central Processor Carried in a Detachable Handset," was filed December 19, 2005 and issued October 10, 2006. It is a continuation of application no. 09/719,290 filed on April 7, 2000, which claims priority from provisional application no.

---

[50]The court does not reach a determination as to whether the dependent claims are invalid for obviousness.

60/128,138 filed on April 7, 1999. It claims a system that involves: (i) a portable device

referred to in the claims as a "detachable handset" that has a central processor; and (ii)

a "docking display unit" that lacks a central processor. (See '462 patent, 1:19-30, 6:2-

20) The detachable handset can be docked with the docking display unit and when

docked, the central processor in the detachable handset controls the entire system.

(Id.) Independent claim 1 is reproduced below.

> 1. A portable processing device comprising:
>
> a detachable handset unit sized for handheld grasping and
> including a central processor and a plurality of first circuits,
> said processor controlling the operation of said first circuits,
> and said first circuits including at least a video interface, a
> communication interface and a data input interface;
>
> a portable docking display unit dimensioned substantially
> larger than said detachable handset unit, said portable
> docking display unit including a first display and a plurality of
> second circuits, said plurality of second circuits not including
> a central processor and including a video interface, and a
> data input interface, and wherein said central processor
> controls the operation of at least one of said second circuits
> and said first display when said detachable handset unit is
> docked with said docking display unit;
>
> and the docking display unit is fully operable only when the
> detachable handset is docked thereto.

(Id. at 6:2-20)

## 1. Limitations of the '462 patent

### a. "Central processor"

The court construes this term as "the part of a computer system that performs

the primary computational functions, e.g., to control the operation of various circuits."

This construction is supported by the language of claim 1 which indicates that a detachable handset includes "a central processor and a plurality of first circuits, said processor controlling the operation of said first circuits." (*Id.* at 6:3-6) Claim 1 further reads a portable docking display unit including "a first display and a plurality of second circuits, said plurality of second circuits not including a central processor . . . and wherein said central processor controls the operation of at least one of said second circuits and said first display when said detachable handset unit is docked with said docking display unit." (*Id.* at 6:9-18)

The patent prosecution history makes clear that the docking display unit does not have a processor of its own. In distinguishing the Grewe prior art patent, applicant explained:

> In the claimed invention, the processor of the handset unit is used to control the operation of at least one of a display of the portable docking display unit and circuits of the portable docking display unit. The claimed invention does not have a processor in the portable docking display unit as does each of the PDA and cellular telephone of Grewe '673. In the claimed invention, when the handset unit is docked to the portable docking display unit, the processor of the handset unit provides processing capability for the docking display unit.

(D.I. 225, ex. 23 at MMA367) Specifically, Grewe '673 and Jones '334 do not teach or suggest a detachable handset unit having a processor to control the operation of at least one of a display of the portable docking display unit and circuits of the portable docking display unit when the handset unit is docked to the docking display unit.

### b. "Detachable handset"

66

The court construes this term as "a device that can be attached to and detached

from the portable docking display unit and is small enough to be held in one hand." The

'462 patent explains that a problem with past technology was that,

> "[t]o fulfill both mobile computing and communications
> needs, a mobile worker has to carry [multiple devices] – a
> smart phone unit, an organizer, and a laptop unit. . . .
> Consequently there is a need for a device that provides a
> complete solution for mobile computing, communication and
> entertainment . . . .

('462 patent, 2:17-27) Although "[t]he detachable handset unit functions as a wireless

phone unit" (id. at 2:38-39), it also has additional functions. (See id. at 2:52-3:4) "For

applications requiring larger display and keyboard, the detachable handset unit is

docked into the main unit, the docking display unit. In this mode the detachable

handset unit provides the processing and communication power to the docking display

unit." (Id. at 2:44-48) Specifically, the present invention pertains to

> portable processor based devices operable while being held
> in its user's hand and providing communications, organizer
> and/or entertainment functions, such as cellular telephones,
> palm-sized organizers, and MP3 players, and to portable
> processor based devices providing general computing
> capabilities, such as laptop or handheld personal computers
> (PCs).

(Id. at 1:20-26) The detachable handset, therefore, is not limited to a phone.

## 2. Infringement

IV alleges that Motorola's accused phones combined with Motorola's accused

Lapdocks together infringe the '462 patent. (D.I. 253 at 37) Motorola contends that the

accused products do not meet the limitations of the asserted claims to wit: (a) the

central processor in the accused phones does not control both the display and at least

67

one of the circuits of the Lapdocks when they are docked together; and (b) the accused Lapdocks have a central processor. (*Id.*)

In support of its motion for summary judgment, Motorola cites to Dr. Drabik's declaration to assert that a processor in the accused Lapdocks - rather than a central processor in the Motorola accused phones as required by the claims - controls the operation of the Lapdock's display. (D.I. 253 at 37-38; D.I. 254, ex. 19, 955-56 at ¶¶ 15-18) This assertion is conclusory and unsupported by evidence. To the contrary, IV presents evidence that Motorola disclaimed the presence of a central processor in its Lapdock products in its advertisements and technical specifications (D.I. 268 at IVA918, IVA927-28, IVA940-41) Although Motorola contends that the marketing materials, without more, are insufficient to provide a sufficient basis for infringement (D.I. 275 at 18-19), they are enough to represent the existence of a genuine issue of material fact. Motorola's motion, therefore, is denied with respect to non-infringement of the '462 patent.

### 3. Invalidity

Motorola contends that the asserted claims 1-3, 8, and 10-13 of the '462 patent are invalid under § 103 in view of U.S. Patent No. 5,436,857 to Nelson (the "857 patent") and U.S. Patent No. 7,549,007 (the "007 patent") to Smith. (D.I. 231 at 36-37) Although the court does not limit the handset to a phone as IV proposes, the handset must still satisfy the construction "a device that can be attached to and detached from the portable docking display unit and is small enough to be held in one hand," as further limited by the requirement that it include "a central processor [that] controls the operation of at least one of said second circuits and said first display when said

detachable handset unit is docked with said docking display unit." (*See* '462 patent, 6:15-18)

The '857 patent discloses "a processor/memory/disk module which is selectively mated with any one of a number of associated computer base units, such as a portable PC base unit and a desktop PC base unit." (D.I. 232, ex. 29 at IA623 at Abstract) Motorola contends that the module has a central processor that provides the computational functions of the entire system when docked with the docking station, and the docking station does not have a processor but uses the portable module's processor. (D.I. 231 at 37; *see* D.I. 232, ex. 29 at IA626-27 at 2:15-50, 3:10-13) The '007 patent teaches a "portable computer having an interface for direct connection to a portable telephone." (D.I. 232, ex. 31 at IA717 at 11:47-49) Motorola contends that combining the '857 patent and the '007 patent to arrive at the claimed invention is simply a matter of replacing the module in the '857 patent with the phone in the '007 patent. (D.I. 231 at 37)

IV's sole contention, with respect to the limitations of the '462 patent, is that the combination of the two prior art patents does not disclose that a central processor in the handset "controls the operation of at least one of said second circuits and said first display when said detachable handset unit is docked with said docking display unit," as required by the '462 patent. (D.I. 250 at 36)[51] In support of its contention, IV explains that the '007 phone does not control the laptop such that the laptop is inoperable

---

[51]Motorola contends that, despite having submitted a rebuttal report, Dr. Alpert never before addressed this combination in his report or deposition and, therefore, his declaration should be ignored. (D.I. 261 at 19, n.12; D.I. 232, ex. 28 at IA582-620)

69

without insertion of the phone.  (D.I. 268 at IVA692-97; D.I. 232, ex. 31 at IA717 at

11:45-12:19)  The '007 patent discloses that "[p]hysically and electrically connecting the

portable telephone to the portable computer eliminates the need for a cable or tethered

connection between a portable computer and a portable telephone . . . ."  (D.I. 232, ex.

31 at IA717 at 11:61-65)  It provides no indication that the computer does not function

on its own as is required of the docking display unit in the '462 patent.  Additionally, as

there is no indication that the phone in the '007 patent would control the docking display

unit in the '857 patent, there is no motivation to combine[52] a phone used for cable or

tethering connections with a docking display unit to provide its operability.  The court

concludes that there exists a genuine issue of material fact with respect to the invalidity

of the '462 patent.[53]

## V. Conclusion

For the foregoing reasons, the court grants in part and denies in part Motorola's

motions for summary judgment of invalidity and non-infringement of the patents-in-suit.

(D.I. 230; D.I. 252)  An appropriate order shall issue.

---

[52]Motorola contends that using known handheld devices with a portable docking
station would have been obvious, given the '857 patent's teaching that the module can
have functional components of a computer.  (D.I. 231 at 38)  Although its expert states
that one of ordinary skill at the time of the invention would have been motivated to
combine the telephone of the '007 patent with the base unit docking station of the '857
patent, and discusses similar characteristics of the '857 patent's module and the '007
patent's phone, he does not provide any evidence for this argument.  (D.I. 232, ex. 8 at
IA148 at ¶ 38)

[53]The court does not consider the evidence of secondary considerations in light
of its determination.