```
 1                       - VOLUME A -

 2              IN THE UNITED STATES DISTRICT COURT

 3              IN AND FOR THE DISTRICT OF DELAWARE

 4                          - - -

 5
     INTELLECTUAL VENTURES I LLC   :   CIVIL ACTION
 6   and INTELLECTUAL VENTURES      :
     II LLC,                        :
 7                                  :
                    Plaintiffs,     :
 8                                  :
         vs.                        :
 9                                  :
     MOTOROLA MOBILITY LLC,         :
10                                  :
                    Defendant.      :   NO. 11-908-SLR-MPT
11

12                          - - -

13                          Wilmington, Delaware
                            Thursday, January 23, 2014
14                          9:00 o'clock, a.m.

15
                            - - -
16
     BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J., and a jury
17
                            - - -
18

19   APPEARANCES:

20
                 FARNAN LLP
21               BY:  BRIAN E. FARNAN, ESQ.

22
                        -and-
23

24
                            Valerie J. Gunning
25                          Official Court Reporter
```

```
 1    APPEARANCES (Continued):

 2
                   FEINBERG DAY ALBERTI & THOMPSON, LLP
 3                 BY:  ELIZABETH DAY, ESQ.,
                        DAVID ALBERTI, ESQ.,
 4                      MARC BELLOLI, ESQ.,
                        YAKOV ZOLOTOREV, ESQ.,
 5                      NIKOLAS BOHL ESQ.
                        (Menlo Park, California)
 6

 7                      Counsel for Plaintiffs

 8

 9                 MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                   BY:  JACK B. BLUMENFELD, ESQ. and
10                      STEPHEN J. KRAFTSCHIK, ESQ.

11
                            -and-
12

13                 KILPATRICK TOWNSEND & STOCKTON, LLP
                   BY:  WILLIAM BOICE, ESQ. and
14                      CANDICE DECAIRE, ESQ.,
                        (Atlanta, Georgia)
15

16                          -and-

17
                   KILPATRICK TOWNSEND & STOCKTON, LLP
18                 BY: STEVEN MOORE, ESQ.
                        (San Francisco, California)
19

20                          -and-

21
                   KILPATRICK TOWNSEND & STOCKTON, LLP
22                 BY:  D. CLAY HOLLOWAY, ESQ.
                        (Atlanta, Georgia)
23

24                      Counsel for Defendant

25
                            -   -   -
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:00 a.m.)

 5

 6              THE COURT:  Good morning, everyone.

 7              (Counsel respond, "Good afternoon, your Honor.")

 8              THE COURT:  I think I have three issues to talk

 9    to you about.  The first has to do with the schedule.

10    Because I have proceedings scheduled on those Friday

11    afternoons, the best I can do is give you an extra day,

12    which I had planned to take off, but I will give up my day

13    off.  I start a trial the next week, so you each lose two

14    hours, but that's the best I can do.  All right?  So that's

15    the first issue.

16              We printed the new schedule to go into the jury

17    notebooks, but have not put them in yet, waiting to see

18    whether you can use the third or whether we have to go to

19    plan B, of which there is not one, but we have to come up

20    with one.

21              Plaintiffs' counsel?  Ms. Day?

22              MS. DAY:  Your Honor, good morning.  Elizabeth

23    Day on behalf of Intellectual Ventures.  February 3rd is

24    fine with us and we appreciate the Court giving us an

25    additional day to finish this trial.
```

```
1                    THE COURT:  All right.

2                    MR. BOICE:  Good morning, your Honor.  Bill

3    Boice for Motorola Mobility.

4                    The third is fine with us as well.  We

5    appreciate very much the Court giving up that day.

6                    THE COURT:  All right.

7                    MR. BOICE:  Thank you.

8                    THE COURT:  Good.  Thank you very much.  That's

9    issue one.

10                    The second issue is, the lingering issue, the

11   survey, and I have had lots of time to think about it, and

12   it strikes me that, you know, survey by deposition is

13   hearsay.  And I really have come to conclude, I have

14   concluded that if there were any issues about the

15   reliability of Dr. Stewart's survey, they should have been

16   brought up in the context of Daubert, not in the context of

17   my very informal motion in limine very late in the day.

18                    I suspect there wasn't a real issue about his

19   survey because if I had adopted defendant's claim

20   construction, it wouldn't be an issue, but I didn't, and

21   therefore Dr. Stewart's survey became, I think, more

22   relevant than perhaps it seemed during the summary judgment

23   process.

24                    Therefore, I decline to throw out the survey

25   and, quite frankly, although I was trying to come up, as is
```

1    my tendency to try to come up with a middle ground, it

2    struck me yesterday that if I allowed defendant a robust

3    cross and don't allow plaintiff the opportunity to present

4    its best case in the first instance, that that wasn't

5    appropriate either.

6              So the survey will be presented as indicated in

7    its, in Dr. Stewart's expert, and defendant can have at it

8    on cross-examination.

9              All right.  Third issue, summary judgment, or

10   the motion for reconsideration of my sua sponte summary

11   judgment.

12             This is how I think about things.  If you're the

13   movant on summary judgment, I expect you to present to me

14   all the evidence you have of record to demonstrate that you

15   should get a summary judgment.  That's why I decided that

16   the evidence was not substantial enough to go to a jury.

17             If Motorola had not been the movant on that

18   issue, I perhaps would have granted, maybe, the motion for

19   reconsideration, but under the circumstances, when Motorola

20   was the movant and I found their evidence lacking, failing,

21   not substantial enough to go to a jury on summary judgment,

22   I believe my decision to grant sua sponte summary judgment

23   for the plaintiff was correct.  Therefore, the motion for

24   reconsideration is denied.

25             All right.  I think the voir dire, we did add

1   Google.  I will change it to the trial may last up to eight

2   days from today to February 3rd.  I think that's the only

3   change that needs to be made.  And if there are any others,

4   this is the time to do it, before.  Assuming we get enough

5   jurors, we go forward.  It could be even though we wanted

6   ten, we might have to settle for eight if we don't have

7   enough jurors to support ten.  So we'll see how it goes.

8   Unfortunately, Chief Judge Sleet is selecting a jury, too,

9   so I think pickings will be slim.

10          All right.  I think I'm done my spiel.  Is there

11  anything from plaintiffs' counsel that we need to address

12  today?

13          MS. DAY:  Your Honor, just one -- well, I have a

14  couple issues and then my colleague, Mr. Belloli, has a few

15  issues.

16          With respect to the preliminary jury

17  instructions, Intellectual Ventures has withdrawn claims

18  256, 264 and 267 of the '054 patent.

19          THE COURT:  Wait a minute.  I'm sorry.

20          MS. DAY:  We actually have copies for the Court

21  and for the jurors.

22          THE COURT:  Oh.

23          MS. DAY:  That we blacked out the claims.  I was

24  just stating that for the record.

25          THE COURT:  All right.  Good.

1           MS. DAY:  So I will hand those up, if that's

2      okay?

3           THE COURT:  All right.

4           MS. DAY:  Thank you.

5           MR. BELLOLI:  A couple things, your Honor.

6           One, we objected to a couple of their

7      demonstratives in the opening that Motorola is not willing

8      to remove and we think it's subject or material that's

9      inflammatory for no reason.

10          It's basically -- if I could have the Elmo,

11     please.  This slide right here.

12          So what they've done is they have a bunch of

13     slides, and IV, we have just one slide in IV.  And they want

14     to say we don't innovate and show us pushing shopping carts

15     with animations of patents lying in the shopping carts.

16          THE COURT:  I used to have a default rule, but

17     nobody remembers, that if there's a disagreement about a

18     demonstrative in an opening, it didn't come in, period.  I

19     don't make decisions about demonstratives.  So that's the

20     way it has been.  That's the way it will be.  All right.

21          MR. BELLOLI:  The next thing, your Honor, is

22     they've objected to one of our exhibits, and what this

23     exhibit is is a patent application of theirs.

24          THE COURT:  Now, is this for opening or is

25     this --

```
 1              MR. BELLOLI:  Not for opening.  This is one of
 2   the first witnesses.  Later on?
 3              THE COURT:  Well, yes.  I mean, we'll have time
 4   over lunch.  I don't know that -- I want to make sure that
 5   we're ready to get a jury selected and to go forward with
 6   opening statements.  I'm not too concerned about that.  So
 7   we'll address that later or if we have time yet, but let's
 8   stick to defendant's issues, if they have any.
 9              MR. BELLOLI:  We have one final issue and it
10   relates to the opening.
11              THE COURT:  All right.
12              MR. BELLOLI:  We wants to mention licenses.
13   Your Honor had ruled during the Daubert phase that we had
14   demonstrated sufficient nexus for the experts to opine on
15   licensing for commercial success, and they're objecting to
16   us mentioning the licenses in the opening and we'd like your
17   permission to do so.
18              THE COURT:  Well, it's hard for me to tell
19   without knowing how you mention licenses.
20              MR. BELLOLI:  Just the fact --
21              THE COURT:  Just the fact you have licenses?
22              MR. BELLOLI:  Yes.  Just the fact that certain
23   companies are licensed to the patents-in-suit, which is
24   evidence of secondary considerations and nonobviousness.
25              THE COURT:  Which is would you feel compelled to
```

1    tell the jury in the opening before they even know anything

2    about it?

3              MR. BELLOLI:  We'll withdraw it if that's what

4    you would like, your Honor.

5              THE COURT:  I think so.

6              MR. BELLOLI:  Okay.

7              THE COURT:  We'll stay away from controversy in

8    the opening.

9              MR. BELLOLI:  Good.

10             MR. BOICE:  Your Honor, I understand -- it's

11   Bill Boice for Motorola Mobility.

12             I understand your Honor's default rule.  I tried

13   to pare this down very dramatically to what we say in light

14   of our prior discussions, and I'd like to say that

15   Intellectual Ventures buys patents to license or assert

16   against other people, and I have a slide that just says

17   that.  It's just text, and drop out the one that they object

18   to as inflammatory.  But I understood your Honor to say we

19   could say that.

20             THE COURT:  Yes.

21             MR. BOICE:  Okay.

22             THE COURT:  I mean, this is more about

23   demonstrative exhibits in openings.  It wasn't necessarily

24   about the scope of what you can say during trial.  So I

25   didn't hear an objection to that other slide.

1                    MR. BOICE:  All right.

2                    THE COURT:  Obviously, if there's a slide, you

3      can talk about it.

4                    MR. BOICE:  Text is the -- it's the first two,

5      Marc.

6                    MR. BELLOLI:  If the shopping cart is removed,

7      we're okay.

8                    MR. BOICE:  Just the shopping cart?

9                    MR. BELLOLI:  Yes.

10                    MR. BOICE:  Thank you, your Honor.  We do intend

11     to say there were certain, that they buy patents to assert

12     or sue people against existing products, a slide that says

13     that.  Okay?  Thank you, your Honor.

14                    One more.

15                    MS. DAY:  Okay.

16                    MR. BOICE:  Sorry for the tag team, your Honor.

17                    THE COURT:  Oh, that's all right.  I know you've

18     got leagues of people supporting you.

19                    MR. MOORE:  Good morning, your Honor.  Steve

20     Moore for Motorola Mobility.

21                    We have one other issue.  It is related to the

22     issue that Mr. Belloli related to and so we can certainly

23     talk about it at the Court's convenience, but I did want to

24     flag, there's an issue relating not just to that exhibit,

25     but also to the scope of testimony, what we feel is a

1    last-minute attempt to introduce expert testimony that

2    wasn't disclosed, and so we would like to discuss that

3    before the plaintiffs' evidence begins this afternoon.

4                    THE COURT:  All right.  So before the first

5    witness, we've got evidentiary issues?

6                    MR. MOORE:  Yes, ma'am.

7                    THE COURT:  Okay.  Anything else that we need to

8    discuss before we do the preliminaries here?

9                    Ms. Day?

10                   MS. DAY:  Your Honor, in looking at the

11   potential jury pool, and I appreciate perhaps certain of the

12   jurors are not here, but three of the jurors currently work

13   for companies in which IV is currently in litigation with

14   those companies, and so we wanted to raise the issue.

15                   And I'm happy to identify the potential jurors

16   for the Court's information.  We're not sure if that would

17   be a strike for cause, but we wanted to raise the issue

18   before the jurors end up in the jury box.

19                   THE COURT:  Well, I think the only reason is it

20   would be helpful now.  I, frankly, don't know how our jury

21   administrator is divvying up the jurors, and if these three,

22   everyone agrees that they couldn't sit on our jury, maybe we

23   could swap them for three in Chief Judge Sleet's.  I mean, I

24   don't know exactly how that works.  I guess identify them by

25   number.  We can have a quick discussion and we'll take a

1    short break and I will go back and see if that is something

2    that we can work out.

3                    MS. DAY:  Okay.  Thank you, your Honor.

4                    So Juror No. 19, Juror No. 21 and Juror No. 48.

5                    THE COURT:  And have you discussed this with --

6                    MS. DAY:  We have not, your Honor.

7                    THE COURT:  All right.

8                    (Pause while counsel conferred.)

9                    THE COURT:  Is there any consensus about that

10   per chance?

11                   MR. BOICE:  I'm sorry?

12                   THE COURT:  Is there any consensus that these

13   people would be stricken for cause and that if we're short

14   of jurors, we might --

15                   MR. BOICE:  There's not a consensus they would

16   be stricken for cause.  If they're sufficiently low down in

17   the company, by that I mean they don't have a position where

18   they are likely to know about the litigation, they might,

19   but I could understand that there would be an issue there.

20   I think your Honor's decision to wait and see where we are

21   on that is probably the right call on this right now.

22                   THE COURT:  All right.  I think we have some IT

23   folks and there's an issue and they are here to fix it

24   before the trial goes -- before we bring the jury in, and I

25   don't see the jury in the back.

1              Mr. Blumenfeld?

2              MR. BLUMENFELD:  One issue that may be similar

3    to what Ms. Day raised.  Juror No. 2 is at Morris James, and

4    they are, Morris James has a number of matters and has

5    recently had a number of matters adverse to Google, and so I

6    think we'll probably have the same issue there, but I assume

7    that will work itself out.

8              THE COURT:  Yes.  We will be keeping you

9    informed to make sure we have enough.

10             And is everyone agreed that -- I don't know

11   how many we need.  Do I have the numbers, Francesca, in

12   terms of how many excuses for cause?  Oh, okay.  Right now

13   we only have 40 out of 60 jurors here.  We're doing the

14   math here.

15             All right.  So if we have ten, we need 16 for

16   you to use your three peremptory strikes each, which means

17   we have 24 for cause.  Now, that might be plenty, and I

18   guess the question is at what point do we just want to go

19   forward with whoever is here.  If you think 40 is

20   sufficient, then we can go forward pretty soon.  I mean,

21   this is all eating into our trial time, the longer we wait

22   for people to show up.  And certainly if you want eight,

23   well, we have more for cause.

24             MS. DAY:  Your Honor, Intellectual Ventures

25   thinks that 40 is sufficient.

```
 1                    MR. BOICE:  The same for Motorola Mobility, your
 2    Honor.
 3                    THE COURT:  All right.  Well, let me excuse
 4    myself for a minute, let the IT people get in and do their
 5    magic, and we'll let the jury administrator know that we're
 6    ready to go forward.
 7                    All right.  Thank you very much.
 8                    (Short recess taken.)
 9                               -   -   -
10                    (Proceedings resumed after the short recess.)
11                    (The prospective jurors entered the courtroom.)
12                    THE COURT:  All right.  Are we all set here?
13    All right.
14                    Good morning, ladies and gentlemen.  Before I
15    say anything else, we all truly appreciate the efforts you
16    made to get to the courthouse today.  I know it wasn't easy,
17    so thank you very much.  We appreciate your service.
18                    And good morning.  I'm Judge Robinson and I will
19    be presiding over the trial for which a jury is about to be
20    drawn in the case captioned Intellectual Ventures I LLC and
21    Intellectual Ventures II LLC versus Motorola Mobility LLC.
22                    Briefly stated, this is a patent action arising
23    under the patent laws of the United States involving mobile
24    phone technology brought by plaintiffs, who will be referred
25    to as Intellectual Ventures against defendant, Motorola
```

1    Mobility LLC.  I will probably shorthand that to Motorola at

2    some point.

3               The trial may last up to eight days, from today

4    through February 3rd, 2014.  I time my trials, so the

5    attorneys have to complete their trial presentations within

6    these limits.  However, jury deliberations may require you

7    to be present longer than the scheduled eight days.

8               Our longest trial days will run approximately

9    from 9:00 a.m. to 4:30 p.m., except for Fridays, when we

10   will end trial at 12:30 p.m.

11              In light of this brief summary, I will ask you a

12   series of questions, the purpose of which is to, first,

13   enable the Court to determine whether or not any prospective

14   juror should be excused for cause, and, second, to enable

15   counsel for the parties to exercise their individual

16   judgment with respect to peremptory challenges, that is,

17   challenges for which no reason need be given by counsel.

18              If you answer any question yes, and by that I

19   mean in your head, please stand up, and upon being

20   recognized by the Court, state your juror number.  Please be

21   conscious of the fact that other people are going to be

22   shouting out their numbers.

23              I try to go from the wall to the aisle, from

24   front to the back, and it's helpful if I repeat your numbers

25   to make sure that I, in fact, have heard you and recognized

1    your number appropriately.  So be patient.

2              When I've concluded asking all the questions,

3    we're going to ask you to come back to the jury room

4    individually to speak with you about your affirmative

5    response or responses.

6              Ms. Scarpato, would you please administer the

7    oath to the jury.

8              (Jury panel sworn/affirmed.)

9              THE COURT:  And you may be seated.  Thank you

10   very much.

11             Now, hopefully, you were given several lists in

12   the jury assembly room and the first several questions have

13   to do with those lists.

14             The first question has to do with a list of

15   companies, and the first question is:  Have you or a member

16   of your immediate family ever worked for any of those

17   companies?

18             Second question:  Do you or a member of your

19   immediate family now own or have you or any such member ever

20   owned any stock or bonds in any of these companies?

21             Your number, please?

22             JUROR NO. 53:  53.

23             THE COURT:  53.

24             JUROR NO. 49:  49.

25             THE COURT:  49.

1          Next question:  Have you or a member of your

2    immediate family had any dealings with or relied financially

3    in any way on any of these companies?

4          Your number?

5          JUROR NO. 54:  54.

6          THE COURT:  54.

7          Next question:  Have you or a member of your

8    immediate family had any experience with the products of

9    Motorola, for instance, phone, earpiece, set-top box, or

10   otherwise have any strong feelings, positive or negative,

11   toward any of these companies?

12         Yes, ma'am?  Your number?

13         JUROR NO. 30:  30.

14         THE COURT:  30.

15         Yes, sir?

16         JUROR NO. 26:  26.

17         THE COURT:  26.

18         JUROR NO. 53:  53.

19         THE COURT:  53.

20         You've also been given a list of the attorneys

21   and law firms involved in this litigation.  Are you related

22   to or personally acquainted with any of these attorneys?

23         Have you ever been represented by any of these

24   attorneys or other associates or members of the listed

25   law firms or in a case where they represented another

1    party?

2                 Yes, sir?

3                 JUROR NO. 49:  49.

4                 THE COURT:  49.

5                 You've been given a list of the individuals who

6    might appear as witnesses in this case.  Are you related to

7    or personally acquainted with any of these individuals?

8                 And, finally, you've been given a list of

9    subject areas.  Have you or a member of your immediate

10   family ever been educated, employed, trained or have any

11   experience in any of these subject areas?

12                All right.  Let's wait until everyone stands up.

13   Okay.  No. 30?

14                JUROR NO. 30:  Correct.

15                THE COURT:  Yes, sir?

16                JUROR NO. 17:  17.

17                THE COURT:  17.  Someone just shout out here.

18                JUROR NO. 3:  Three.

19                THE COURT:  Three.

20                JUROR NO. 42:  42.

21                THE COURT:  42.

22                JUROR NO. 26:  26.

23                THE COURT:  26.

24                JUROR NO. 19:  19.

25                THE COURT:  19.

```
1              JUROR NO. 39:  39.

2              THE COURT:  39.

3              JUROR NO. 11:  11.

4              THE COURT:  11.

5              JUROR NO. 45:  45.

6              THE COURT:  45.

7              JUROR NO. 54:  44.

8              THE COURT:  44.

9              JUROR NO. 36:  36.

10             THE COURT:  36.

11             The next question:  Do you have any personal
```
12    knowledge of this case or have you read or heard it
13    discussed or have an opinion regarding it?
```
14             JUROR NO. 48:  48.

15             THE COURT:  48.

16             JUROR NO. 53:  53.

17             THE COURT:  53.

18             Have you ever been a plaintiff, a defendant, or
```
19    a witness in a civil lawsuit?  I'm always gratified when no
20    one stands up.
```
21             Next question:  Have you ever served as a juror
```
22    in a civil lawsuit before?
```
23             JUROR NO. 26:  26.

24             THE COURT:  26.

25             JUROR NO. 43:  43.
```

```
 1                 THE COURT:  43.

 2                 JUROR NO. 16:  16.

 3                 THE COURT:  16.

 4                 All right.  Next question:  Do you have any

 5      knowledge about or experience with patents, including

 6      applying for a patent?

 7                 30.  26?

 8                 JUROR NO. 26:  Yes.

 9                 JUROR NO. 9:  Nine.

10                 THE COURT:  Nine.

11                 JUROR NO. 44:  44.

12                 THE COURT:  44.

13                 JUROR NO. 59:  59.

14                 THE COURT:  59.

15                 Next question.  Have you ever worked for a

16      company that had patented products or processes?

17                 A JUROR:  I didn't hear you, your Honor.

18                 THE COURT:  Excuse me?

19                 A JUROR:  I didn't hear you.

20                 THE COURT:  Sorry.  I am soft-spoken.  Have you

21      ever worked for a company that had patented products or

22      processes?  All right.

23                 JUROR NO. 3:  Three.

24                 THE COURT:  Three.

25                 JUROR NO. 42:  42.
```

```
 1                THE COURT:  42.

 2                JUROR NO. 26:  26.

 3                THE COURT:  26.

 4                JUROR NO. 9:  Nine.

 5                THE COURT:  Nine.

 6                JUROR NO. 43:  43.

 7                THE COURT:  43.

 8                JUROR NO. 44:  44.

 9                THE COURT:  44.

10                JUROR NO. 36:  36.

11                THE COURT:  36.

12                JUROR NO. 59:  59.

13                THE COURT:  59.

14                JUROR NO. 48:  48.

15                THE COURT:  48.

16                Have you ever been involved in the development

17      of a new product or process?

18                Nine?

19                JUROR NO. 9:  Nine.

20                THE COURT:  Nine.

21                JUROR NO. 26:  26.

22                THE COURT:  26.  You might be the winner today.

23                JUROR NO. 11:  11.

24                THE COURT:  11.  All right.  Have you or a

25      member of your immediate family ever had any dealings with
```

1     the United States Patent & Trademark Office?  Aha.   Same

2     suspects.  30 and 9.  Right?

3                    JUROR NO. 9:  Nine.

4                    THE COURT:  Next question:  Do you have any

5     strong opinions about the United States patent system?

6                    All right.  Believe it or not, we're down to our

7     last two questions, so if you have any concerns whatsoever

8     about serving as a juror, whether it's a doctor's

9     appointment or whatever, answer one of these yes.  I don't

10    care which one, just pick one, answer yes, so that we can

11    talk to you, so that you are not chosen, and then tell us

12    about, you know, surgery you're having next week.

13                   So the first of these questions is:  Do you have

14    any special disability or problem that would make it

15    difficult or impossible for you to serve as a member of the

16    jury in this case?

17                   Yes, sir?

18                   JUROR NO. 8:  No. 8.

19                   THE COURT:  Eight.  Anyone else?  All right.

20                   Last question:  Do you know of any other matter

21    which you believe should be called to the Court's attention

22    as having some bearing upon your qualifications or ability

23    to sit as a juror or which you think may prevent you from

24    rendering a fair and impartial verdict based solely upon the

25    evidence and my instructions as to the law?

```
1                    JUROR NO. 49:  49.

2                    THE COURT:  49.

3                    JUROR NO. 24:  24.

4                    THE COURT:  24.

5                    JUROR NO. 11:  11.

6                    THE COURT:  11.

7                    JUROR NO. 31:  31.

8                    THE COURT:  31.

9                    JUROR NO. 27:  27.

10                   THE COURT:  27.

11                   JUROR NO. 5:  Five.

12                   THE COURT:  Five.  All right.  We're going --

13   anyone who answered yes to any question, we're going to be

14   calling you back to the jury room just to talk to you about

15   your affirmative response.  We'll call you in numerical

16   order.  While you're sitting here, it's going to take some

17   time, I apologize for that.  But if any of you think you

18   have some concerns about answering a question when you

19   didn't, just let my staff know and we'll talk to you at the

20   end of the list we have so far.

21                   So I need counsel to come back with me and we'll

22   follow up.

23                   (The following occurred in the jury room.)

24                   THE COURT:  The jury is going to be here, so

25   just spread out where you ever want to be.  Pick a side.  It
```

1    will be an intimidating group of people to walk into.

2                All right.  Before I bring them in, I always go

3    over which jurors answered which questions so we start out

4    on the same page and I get corrected if I misheard.  Are you

5    all ready to start the rundown?

6                MS. DAY:  Yes, your Honor.

7                MR. BOICE:  Yes.

8                THE COURT:  I have Juror 3 answering 4 and 9.

9    Juror 5 answering 14.

10               Juror 8 answering 13.

11               Juror 9 answering 8, 9, 10, 11.

12               Juror 11 answering 4, 10, 14.

13               Juror 16 answering 7.

14               Juror 17 answering 4.  Juror 19 answering 4.

15               Juror 24 answering 14.

16               Juror 26 answering 1D, 4, 7, 8, 9, 10.

17               Juror 27 answering 14.

18               Juror 30 answering 1D, 4, 8, 11.

19               Juror 31 answering 14.

20               Juror 36 answering 4 and 9.

21               Juror 39 answering 4.

22               Juror 42 answering 4 and 9.

23               Juror 43 answering 7 and 9.

24               Juror 44 answering 4, 8, 9.

25               Juror 45 answering 4.

Juror 3 - voir dire

 1              Juror 48 answering 5 and 9.

 2              Juror 49 answering 1B, 2B and 14.

 3              Juror 53 answering 1B, 1D and 5.

 4              Juror 54 answering 1C.

 5              And Juror 59 answering 8 and 9.

 6              Does anyone have anything different here?

 7              MS. DAY:  No, your Honor.

 8              THE COURT:  All right.  Generally, I would say

 9    we generally have more people answering one of our last

10    questions.  I was surprised.  And generally, when people

11    answer a last question, I kind of start with that, because

12    if they have surgery next week, it does not matter whether

13    they work for Google or anything else, and I don't want to

14    spend a lot of time on them.  We don't have many of those,

15    but just keep that in mind for those who answered one of the

16    last two questions that way.

17              (The juror entered the jury room.)

18              THE COURT:  Good morning, sir.

19              A JUROR:  Good morning.

20              THE COURT:  You should be Juror No. 3.

21              A JUROR:  Yes.

22              THE COURT:  And you answered two of our

23    questions.  One was about the subject areas.  Can you give

24    us some background on your training?

25              A JUROR:  Yes.  Basically, I'm a retired IT

Juror 3 - voir dire

1     professional.  I spent about 35 years in the business.

2                    THE COURT:  And is there anything more -- did

3     you have a specific focus in your work?

4                    A JUROR:  No.  I worked as a software developer

5     as well as an IT operations manager.

6                    THE COURT:  And how long ago has it been since

7     you've retired?

8                    A JUROR:  I retired two years now.

9                    THE COURT:  Okay.  All right.  Did you work for

10    one company or --

11                   A JUROR:  No.  I worked for about four or five.

12                   THE COURT:  All right.  And the next question --

13    oh, the company that you worked for that had patented

14    products or processes?

15                   A JUROR:  Several of them.  I worked for

16    International paper.  I worked for Kodak and I worked for

17    Playtex.

18                   THE COURT:  But you weren't involved in --

19                   A JUROR:  I was not.

20                   THE COURT:  -- the process itself.

21                   Is there anything about your background that

22    would make it difficult for you to serve as an impartial

23    juror in this case?

24                   A JUROR:  I don't believe so.

25                   THE COURT:  All right.  I will let the lawyers

Juror 3 - voir dire

1    follow up.

2              Anything from plaintiffs' counsel?

3              MS. DAY:  No, your Honor.

4              THE COURT:  Anything from defendant's counsel?

5              MR. BOICE:  Just one.  What type of software

6    were you developing?

7              A JUROR:  Basically, business application

8    software.  Your run-of-the-mill MRP stuff.

9              MR. BOICE:  Okay.  Thank you.

10             THE COURT:  All right.  Thank you very much,

11   sir.

12             A JUROR:  Thank you.

13             (The juror left the jury room.)

14                       -  -  -

15             (The juror entered the jury room.)

16             THE COURT:  Have a seat here.  You should be

17   Juror 5.

18             A JUROR:  I am Juror 5.

19             THE COURT:  You answered one of or last

20   questions about having some concerns about serving as a

21   juror.

22             A JUROR:  I only get reimbursed one day from my

23   job.  I only get one day for any type of jury duty.  I guess

24   that's really the only big issue.

25             THE COURT:  All right.  So it would be a

Juror 5 - voir dire

1    financial hardship for you to serve on a jury?

2                A JUROR:  Yes.  The $40 a day versus what I get

3    paid is just, you know, I can't do it.

4                THE COURT:  Okay.  All right.  Anything from

5    plaintiffs' counsel?

6                MS. DAY:  No, your Honor.

7                THE COURT:  Anything from defendant's counsel?

8                MR. BOICE:  No, your Honor.

9                THE COURT:  Thank you very much.

10               A JUROR:  Okay.  Thank you.

11               (The juror left the jury room.)

12                          -  -  -

13               (The juror entered the jury room.)

14               THE COURT:  Hi, sir.  How are you?

15               A JUROR:  Good morning.

16               THE COURT:  If you could have a seat here.  You

17   should be Juror No. 8.

18               A JUROR:  I am.

19               THE COURT:  And you answered one of our last

20   questions about having a concern about serving as a juror.

21               A JUROR:  Yes.  My concern is that I'm from

22   Lewes.  It's 85 miles away.  And if I had to come for an

23   eight-day series of 170-mile drives, it would certainly be a

24   hardship.  The main reason is that my wife is self-employed.

25   She is a water color instructor at a studio in our home and

Juror 5 - voir dire

1    she would be left without a car.

2            And the last thing is that I am diabetic, and in

3    my bag here I have orange juice and snacks in case I need to

4    have something before a normal break.

5            THE COURT:  All right.  Well, let me just

6    address, with respect to breaks, we do take one about every

7    hour-and-a-half and you will see me having some hard candies

8    as well, so I think we could accommodate that.

9            We do offer jurors the ability to spend the

10   night here so they are not commuting every day, but I'm not

11   confident that really helps you if your wife is left in

12   Lewes without transportation.

13           A JUROR:  Well, we've thought about having her

14   drive me up and leave me here for a number of days and then

15   she could have the car.

16           THE COURT:  Right.

17           A JUROR:  And if I'm called, I will serve, but

18   these are my problems.

19           THE COURT:  Yes.  Okay.  Well, the question, and

20   then I will let counsel talk to you.  Our concern is that

21   you will be so -- well, we want you to focus on the trial.

22   We don't want you to be focusing on your inability to get to

23   your snacks when you need them and that sort of thing.

24           I guess the question is, if we qualified,

25   if we tried to satisfy all of these concerns, do you think

Juror 5 - voir dire

1    you could focus on the evidence presented here in the

2    courtroom?

3              A JUROR:  Yes.

4              THE COURT:  Let's see if the lawyers have any

5    followups.

6              Anything, Ms. Day?

7              MS. DAY:  No questions, your Honor.

8              THE COURT:  Anything, Mr. Boice?

9              MR. BOICE:  I don't either.  Thank you.

10             THE COURT:  All right.  Thank you very much.

11             (The juror left the jury room.)

12                        -  -  -

13             (The juror entered the jury room.)

14             THE COURT:  Hi.  How are you?

15             A JUROR:  Good morning.

16             THE COURT:  If you could have a seat here.

17             A JUROR:  Okay.

18             THE COURT:  You should be Juror 9.

19             A JUROR:  I am.

20             THE COURT:  And you answered a couple of

21    questions, which I suspect are all kind of interrelated.

22             A JUROR:  Yes.

23             THE COURT:  Your experience with patents and

24    knowledge with patents and working for a company and

25    developing new products.

Juror 9 - voir dire

1          A JUROR:  Right.

2          THE COURT:  Can you just give us a background?

3          A JUROR:  Well, actually, I have two.  My

4    husband owns his own company and one of the things he and my

5    son designed was a tree-staking apparatus called the Tree

6    Butler and we do have a patent pending on that.

7               Previous to that, 30 years ago, I worked for a

8    company that did, that imported brass knickknacks, and they

9    actually sued another company for a similar product, and as

10   their marketing director I had to go in and testify during

11   that trial that the items were similar.

12          THE COURT:  Okay.  Well, a couple followups for

13   me and then I will let the counsel ask you.

14          A JUROR:  Okay.

15          THE COURT:  With respect to the patent that's

16   pending, is your family ushering that through or is that --

17   did you hire someone to usher it through?

18          A JUROR:  My husband is doing it.

19          THE COURT:  Okay.

20          A JUROR:  I don't really have a lot to do with

21   it, but I thought I'd better let everybody know.

22          THE COURT:  Oh, sure.  And with respect to your

23   other experience, you said that was 30 years ago?

24          A JUROR:  Yes.

25          THE COURT:  Okay.  All right.  Just wanted to

Juror 9 - voir dire

1  make sure.

2              A JUROR:  Yes.

3              THE COURT:  Is there anything about your present

4  experience or your past experience that would make it

5  difficult for you to sit as an impartial juror in this case,

6  do you think?

7              A JUROR:  No, I don't think so.  Like I said,

8  it's my husband that's doing the guiding of the patent,

9  so -- and sometimes when he talks, I don't listen, but it's

10  just between us.

11              THE COURT:  Yes.  We won't tell him that.

12              A JUROR:  Okay.

13              THE COURT:  All right.  Let me see if the

14  lawyers have any followups.

15              Ms. Day, anything?

16              MS. DAY:  No questions, your Honor.

17              THE COURT:  Mr. Boice, anything?

18              MR. BOICE:  I don't think I do either.  Thank

19  you very much.

20              A JUROR:  Okay.

21              MR. BOICE:  But I was listening.

22              A JUROR:  Good man.  All right.  Thank you.

23              (The juror left the jury room.)

24                        -  -  -

25              (The juror entered the jury room.)

Juror 11 - voir dire

1          THE COURT:  Hi, sir.  How are you?

2          A JUROR:  Hello.  Good.

3          THE COURT:  If you could have a seat here.

4          A JUROR:  Sure.

5          THE COURT:  You should be Juror 11.

6          A JUROR:  I am.

7          THE COURT:  And you answered a few questions,

8    but you answered one of our last questions about having a

9    general concern about serving and I wanted to ask you about

10   that.

11         A JUROR:  I've got a medical procedure scheduled

12   for February 3rd and 4th.

13         THE COURT:  Okay.  And it is not something you'd

14   want to reschedule or could reschedule?

15         A JUROR:  It took me six weeks to get it

16   scheduled to begin with.

17         THE COURT:  Well, six weeks is probably pretty

18   good.

19         A JUROR:  I had that set up before I ever got

20   the summons.

21         THE COURT:  Okay.  All right.  So it would be a

22   hardship for you to serve?

23         A JUROR:  Yes.  You wouldn't want me here.

24         THE COURT:  Ms. Day, anything further?

25         MS. DAY:  No questions.

Juror 16  - voir dire

1              MR. BOICE:  I don't either.

2              THE COURT:  Thank you very much.

3              A JUROR:  Okay.  Thank you.

4              (The juror left the jury room.)

5                        -  -  -

6              (The juror entered the jury room.)

7              THE COURT:  Hi.  How are you?  If you could have

8       a seat here.

9              A JUROR:  I'm good.

10             THE COURT:  And you should be Juror 16.

11             A JUROR:  I am.

12             THE COURT:  And you answered our one question

13      about having served as a juror before.

14             A JUROR:  I know, and I'm really ashamed,

15      because I really -- I have served as a juror before, but I

16      didn't know if it was civil or whatever it was.

17             THE COURT:  Okay.

18             A JUROR:  But I was a juror.

19             THE COURT:  How long ago?  I mean, do you

20      remember what Court it was or kind of the --

21             A JUROR:  Over there, the New Castle County

22      Court.

23             THE COURT:  Okay.

24             A JUROR:  I don't remember, because I've been

25      called about five or six times, but that was the only time I

Juror 16  -  voir dire

1   was ever chosen.  It was maybe seven years ago.

2                    THE COURT:  All right.

3                    A JUROR:  About that.

4                    THE COURT:  Do you remember if the jury actually

5   deliberated and reached a verdict?

6                    A JUROR:  Yes.  I acted as foreman.

7                    THE COURT:  Oh, okay.

8                    A JUROR:  I wasn't, but I did, because the

9   foreman wasn't acting, so I did.

10                    THE COURT:  Well, there you go.

11                    A JUROR:  Yes.

12                    THE COURT:  Do you remember whether the verdict

13   was for the --

14                    A JUROR:  Not guilty.  It was for the defense.

15                    THE COURT:  It was for the defense.

16                    A JUROR:  Mm-hmm.

17                    THE COURT:  And so probably a -- well --

18                    A JUROR:  Not guilty for the defense.

19                    THE COURT:  And do you remember any of the

20   details?

21                    A JUROR:  Yes.  It was a woman was pulling out

22   in a yield.  She stopped.  The guy behind her hit her.  She

23   was suing for medical.

24                    What we found out was that she had had another

25   one of those accidents before and another after, and the one

1    after sounded like it gave her more medical problems than

2    the one we had, so we said no.

3                    THE COURT:  All right.

4                    A JUROR:  All right.

5                    THE COURT:  Is there anything about your

6    experience in that trial that would make it difficult for

7    you to sit as an impartial juror in this case?

8                    A JUROR:  I don't think so.

9                    THE COURT:  Let me see if the lawyers have any

10   followup questions.

11                   A JUROR:  All right.  Here's another question

12   which I should have answered yes, but I didn't.

13                   THE COURT:  Well, tell us now.

14                   A JUROR:  I have a lesion in my cervical spine

15   and I had an MRI on Monday and my doctor is trying to get in

16   touch with me now to talk to me about it.  I've had -- we've

17   known about this since June.  It isn't growing, but the

18   whole idea of the MRI is to make sure it wasn't growing and

19   I don't know the results of this MRI.  That's my only

20   concern.  Chances are it's not, it's fine, but if it is, I'm

21   going into surgery.

22                   THE COURT:  Oh, okay.

23                   A JUROR:  ASAP.  But the chances are this is not

24   what's going to happen.  Okay?

25                   THE COURT:  Okay.

Juror 16 - voir dire

1           A JUROR:  All right.  But I thought I might

2    throw that little monkey wrench in there.

3           THE COURT:  I think that's a good idea.

4           Let me see if the lawyers have any followup

5    questions.  Ms. Day?

6           MS. DAY:  No, your Honor.

7           THE COURT:  Mr. Boice?

8           MR. BOICE:  Nor do I.

9           THE COURT:  Thank you very much.

10           A JUROR:  You're welcome.

11           (The juror left the jury room.)

12                      -  -  -

13           (The juror entered the jury room.)

14           THE COURT:  Hi, sir.  How are you?  If you could

15    have a seat in our hot seat here.

16           A JUROR:  Okay.  Good morning.

17           THE COURT:  You should be Juror 17.

18           A JUROR:  Correct.

19           THE COURT:  And you answered our question about

20    the subject areas.  Could you tell us what subject areas you

21    have experience in or knowledge of?

22           A JUROR:  Just that my wife works at Bayard as a

23    paralegal there and her group is into intellectual property.

24    I don't know if this case has -- if it has any bearing to

25    this case here.

Juror 17 - voir dire

1          THE COURT:  But she does work with the

2     litigation team over there?

3          A JUROR:  Yes.

4          THE COURT:  That does patent litigation?

5          A JUROR:  Yes.  And intellectual property,

6     things of that nature.

7          THE COURT:  I mean, are you -- does she tell you

8     about the cases?  Do you have any notion as to --

9          A JUROR:  I don't know anything about this case.

10    She just tells me, you know, like her duties that she does.

11    She does not tell me anything about any cases per se.

12         THE COURT:  All right.  Do you think her

13    experiences and her sharing her experiences with you would

14    affect your ability to sit as an impartial juror in this

15    case?

16         A JUROR:  I don't think so.

17         THE COURT:  Let me see if the lawyers have any

18    followup questions.

19         Ms. Day, anything?

20         MS. DAY:  No questions, your Honor.

21         THE COURT:  Mr. Boice?

22         MR. BOICE:  Sir, you really don't learn

23    anything about the types of cases she's working on or

24    subject matter?

25         A JUROR:  Well, she graduated from Wilmington

Juror 17 - voir dire

1    last year, legal studies, and she has been accepted at the

2    university of Baltimore Law School.

3                    MR. BOICE:  Okay.

4                    A JUROR:  So she's an aspiring lawyer.  So we do

5    law together.

6                    MR. BOICE:  Best of luck to you.

7                    A JUROR:  Thank you.

8                    THE COURT:  All right.  Thank you very much,

9    sir.

10                   MR. BOICE:  Thank you.

11                   A JUROR:  Thank you.

12                   (The juror left the jury room.)

13                              -  -  -

14                   (The juror entered the jury room.)

15                   THE COURT:  Hi, sir.  How are you?

16                   A JUROR:  Good.

17                   THE COURT:  If you could have a seat here.

18                   A JUROR:  Sure.

19                   THE COURT:  You should be Juror 19.

20                   A JUROR:  Yes.

21                   THE COURT:  And you answered our question about

22   the subject areas.  Could you let us know which subject

23   areas and what your experience is or that of a family

24   member?

25                   A JUROR:  Sure.  I guess it was the familiarity

Juror 19 - voir dire

1    with the computer software and computer hardware.  I'm a

2    strategy analyst for Bank of America, which requires us to

3    be pretty tech-savvy people.  We work a lot with our

4    technology groups any time we implement a new strategy or

5    process, so we're required to have general knowledge of

6    software and computer, you know, basics.  So that's pretty

7    much where that comes into play.

8             THE COURT:  All right.  So you understand

9    software and are expected to use it, but you don't

10   necessarily develop it?

11            A JUROR:  Yes.  I would not develop it.  I'm not

12   building the program, but I am basically understanding the

13   business needs going back to the line of business and then

14   just delivering that over to our technology group and

15   working with them so they understand basically what they're

16   building is exactly what we need.

17            THE COURT:  I see.  So you're part and parcel of

18   the development process, but just not on the --

19            A JUROR:  Right.  I'm not actually writing the

20   code.  I do a lot of -- I utilize programs like SQL and SAS

21   for data mining on a day-to-day basis.

22            THE COURT:  All right.  Do you believe that

23   the experience that you have every day on your job would

24   make it difficult for you to sit as an impartial juror in

25   this case?

Juror 19 - voir dire

1                  A JUROR:  I don't think so.

2                  THE COURT:  All right.  Let's see if the lawyers

3    have any followup.

4                  Ms. Day, anything?

5                  MS. DAY:  No followup questions, your Honor.

6                  THE COURT:  Mr. Boice?

7                  MR. BOICE:  About what size the group that you

8    work in?

9                  A JUROR:  For the development?

10                 MR. BOICE:  Yes.

11                 A JUROR:  Oh, that could be anywhere from five

12   people on up to maybe 75 to a hundred.  It just depends on

13   how big the project is.

14                 MR. BOICE:  I see.  It depends on the size of

15   the project just how big the group is working on it?

16                 A JUROR:  Yes.

17                 MR. BOICE:  Great.  Thanks.

18                 THE COURT:  Thank you very much.

19                 A JUROR:  Thank you.

20                 (The juror left the jury room.)

21                            -  -  -

22                 (The juror entered the jury room.)

23                 THE COURT:  Hi.  How are you?  If you could have

24   a seat here and you should be Juror 24.

25                 A JUROR:  Yes.

Juror 24 - voir dire

1          THE COURT:  And you answered one of our last

2     questions.

3          A JUROR:  Yes.  I got one reliable car for my

4     husband and I to share.  My kids are very active in

5     after-school programs and I live all the way in Greenwood.

6     So here to be getting out probably about 4:00 or

7     5:00 o'clock and trying to travel back there, my kids would

8     be without being picked up.  And I'm not sure about the

9     civil case either.

10         THE COURT:  Yes.

11         A JUROR:  The case with Dr. Bradley.  I was in

12    that, so I'm not sure if that would also...

13         THE COURT:  All right.  Any followup questions,

14    Ms. Day?

15         MS. DAY:  No, your Honor.

16         THE COURT:  Mr. Boice?

17         MR. BOICE:  I don't either.  Thank you very

18    much.

19         A JUROR:  Thank you.

20         (The juror left the jury room.)

21              -  -  -

22         (The juror entered the jury room.)

23         THE COURT:  Juror 26.

24         A JUROR:  Good morning.

25         THE COURT:  You did win.  You had more questions

Juror 26 - voir dire

1    than anyone else.

2              A JUROR:  I don't think there's a prize for

3    that, is there, your Honor?

4              THE COURT:  No.  So I suspect all of these are

5    interrelated.  Could you give us a short bio on what your

6    experience has been?

7              A JUROR:  I work for the DuPont Company.  I have

8    for quite a long time.  I'm responsible for mechanical

9    crafts and a lot of the research that's done, my group is

10   directly involved in putting together some of their

11   mechanical equipment and tweaking it, changing it.

12             We've worked on Kevlar, Tyvek.  We're currently

13   working on a project to make titanium dioxide from cheaper

14   ore.

15             I also receive e-mails, maybe several times a

16   week about retaining records for patent infringement cases

17   involving DuPont.  And I was on a patent infringement case

18   for Judge Sleet, oh, within the last five or six years.

19             THE COURT:  Serving as a juror?

20             A JUROR:  As a juror.

21             THE COURT:  Oh, okay.

22             A JUROR:  And it involved a couple of toy

23   manufacturers, patent infringement case on who had it first

24   and who was copying someone else's patent.

25             And as far as Motorola goes, I have Motorola

Juror 26 - voir dire

1    projects -- products all over my service center at the

2    experimental station.  We use their -- we've used their

3    phones for a number of years.  We don't use them anymore.

4    We went to a different system.  But I still have Motorola

5    fire radios, wireless communications, routers and things

6    like that.

7                THE COURT:  I think you've hit everything except

8    did the jury in Chief Judge Sleet's case deliberate and

9    reach a verdict?

10               A JUROR:  Yes, we did.

11               THE COURT:  Do you remember what it was?

12               A JUROR:  The verdict, we found for the

13   plaintiff and a hefty sum.

14               THE COURT:  All right.

15               A JUROR:  And also on the witness list,

16   there's a David Stewart on the witness list.  I don't

17   think it's my employee, David Stewart, but I need to

18   mention it anyway.

19               THE COURT:  All right.  Now, with all of this,

20   have you -- so you've been involved in the development of

21   the new product or process?

22               A JUROR:  Yes.

23               THE COURT:  But you have not taken -- you have

24   not been involved in the patenting of any of these things.

25   Right?

Juror 26 - voir dire

1              A JUROR:  No.  We develop it and once we

2     start -- then after we get our -- once they get their path

3     forward and get their product ready for patent, then that's

4     about where my involvement ends.

5              THE COURT:  All right.

6              A JUROR:  And I was also deposed once for a

7     civil trial.

8              THE COURT:  With all of this experience, do you

9     think you could sit as an impartial juror in this case?

10             A JUROR:  I could do like I do with everything

11    else.  I could do my best.

12             THE COURT:  Yes.  Do you think with your

13    familiarity with Motorola products, that that would present

14    a problem?

15             A JUROR:  I've used Motorola for a long time.  I

16    trust Motorola.  I don't even know why we got away from

17    Motorola because of a new phone system.  But would that

18    cloud my judgment?  I don't know.

19             THE COURT:  All right.  All right.  Let me see

20    if the lawyers have any followup questions for you.

21             A JUROR:  Okay.

22             THE COURT:  Ms. Day?

23             MS. DAY:  No questions, your Honor.

24             THE COURT:  And Mr. Boice?

25             MR. BOICE:  Just one.  I understand you get

Juror 26 - voir dire

1    document retention notices where you've got to keep your

2    documents in patent litigation?

3                   A JUROR:  Correct.

4                   MR. BOICE:  Do you have any other involvement in

5    the patent litigation?

6                   A JUROR:  Do I?  No, not unless my documents are

7    called in.

8                   MR. BOICE:  Okay.  So you may be asked questions

9    by someone at DuPont about those documents?

10                  A JUROR:  Correct.  But most of that -- those

11   document retentions, a lot of that is duplication, and by

12   the time they get down to me, they've already gone through

13   the people who shop at a different store than I do.

14                  MR. BOICE:  Okay.  Thank you very much.

15                  One more question:  Have you ever been named on

16   a patent application?

17                  A JUROR:  No.

18                  MR. BOICE:  All right.  Thank you very much.

19                  THE COURT:  Thank you very much, sir.

20                  A JUROR:  Thank you.

21                  THE COURT:  Appreciate it.

22                  (The juror left the jury room.)

23                            -  -  -

24                  (The juror entered the jury room.)

25                  THE COURT:  Hi, sir.  How are you?

Juror 27 - voir dire

1                A JUROR:  Fine.

2                THE COURT:  If you could have a seat here.

3                A JUROR:  Yes, your Honor.

4                THE COURT:  You are Juror 27.

5                A JUROR:  Yes.

6                THE COURT:  And you answered our last question

7     with some concerns about serving.

8                A JUROR:  Yes.  Your Honor, it's the length of

9     the trial, possibly eight days.  My mother has stage seven

10    Alzheimer's disease.  I help my sister with her.  We have to

11    do everything for her:  Bathe her, feed her and change

12    diapers, and my days to be there are Thursdays and Fridays

13    of each week.

14               THE COURT:  All right.  So it would be a

15    hardship for your family if you served?

16               A JUROR:  Yes.  For that length of time.

17               THE COURT:  Okay.  Any follow up, Ms. Day?

18               MS. DAY:  No, your Honor.

19               THE COURT:  Mr. Boice, anything?

20               MR. BOICE:  No.  Sorry for your condition.

21               A JUROR:  Thank you.

22               THE COURT:  Thank you very much.

23               A JUROR:  Thank you, your Honor.

24               (The juror left the jury room.)

25                         -  -  -

Juror 30 - voir dire

1                    (The juror entered the jury room.)

2                    THE COURT:  Hi.  How are you?  I'm going to let

3      you sit here at the head of the table.  You are Juror 30.

4                    A JUROR:  30.

5                    THE COURT:  And you answered a few of our

6      questions.

7                    A JUROR:  Yes.

8                    THE COURT:  I suspect they all have a common

9      thread, so perhaps you can tell us a little bit about your

10     background and what the common thread is.

11                   A JUROR:  My husband is an attorney.  He's a

12     member of the patent bar, although he does not do

13     litigation, and he has not done patents for a long, long

14     time, but he has written patents.  I have proofread them.

15     And I used to have a Motorola flip phone.

16                   THE COURT:  So how long has it been?  I mean,

17     how involved were you with -- I mean, did you read one

18     patent every ten years or were you --

19                   A JUROR:  Any one that he wrote, I read.

20                   THE COURT:  Okay.  And what period of time did

21     that occur during?

22                   A JUROR:  I'm not too positive about that, but

23     he has not written a patent for many years.

24                   THE COURT:  Okay.

25                   A JUROR:  He used to do a lot of trademarks as

Juror 30 - voir dire

1  well, but that's -- it was one particular client who kept

2  him busy.  He's not doing it any longer.

3              THE COURT:  All right.  And how long has it been

4  since you owned a Motorola product?

5              A JUROR:  Gosh, years.  I can't remember.  It

6  was the old flip phone.

7              THE COURT:  All right.  So in terms of your --

8  the subject areas and knowledge about patents and dealings

9  with patents, that all is helping your husband?

10             A JUROR:  I work as his paralegal.  I took the

11  paralegal course, but my background is in elementary

12  education.

13             THE COURT:  Okay.

14             A JUROR:  I'm not scientific at all.

15             THE COURT:  And how long has it been since you

16  were engaged actively in this?  Can you give us any idea?

17             A JUROR:  I would guess it has been ten years,

18  but I don't really know.

19             THE COURT:  All right.

20             A JUROR:  He does more collection works.

21             THE COURT:  Is there anything about your past

22  experience that would make it difficult for you to sit as an

23  impartial juror in this case?

24             A JUROR:  I don't think so.

25             THE COURT:  Ms. Day, do you have any followup

Juror 30 - voir dire

1    questions?

2                   MS. DAY:  No followup questions.  Thank you.

3                   THE COURT:  And Mr. Boice, anything?

4                   MR. BOICE:  Just one.  The paralegal work

5    that you do, is that in connection with litigation that

6    he's --

7                   A JUROR:  His litigation is civil.  He does not

8    do any patent litigation and he does real estate and

9    collection work.

10                  MR. BOICE:  Okay.

11                  A JUROR:  And I do mostly his real estate work,

12   but I do all of his proofreading.

13                  MR. BOICE:  Okay.  Thank you.

14                  THE COURT:  All right.  Thank you very much.

15                  (The juror left the jury room.)

16                              -  -  -

17                  (The juror entered the jury room.)

18                  THE COURT:  Hi.  How are you, ma'am?  At the

19   head of the table here.

20                  A JUROR:  Okay.

21                  THE COURT:  You are Juror 31?

22                  A JUROR:  Yes.

23                  THE COURT:  You answered one of our last

24   questions.

25                  A JUROR:  Yes, I did.  My husband has

Juror 31 - voir dire

1    Parkinson's and it would be really a challenge for me to be

2    gone several days at a time.  And he also has an appointment

3    for surgery next week, but primarily the Parkinson's is a

4    concern.

5                THE COURT:  All right.  Any followup, Ms. Day?

6                MS. DAY:  No, your Honor.

7                THE COURT:  Anything, Mr. Boice?

8                MR. BOICE:  No.  I don't have anything either.

9    Thank you very much.

10               A JUROR:  Okay.  Thank you.

11               (The juror left the jury room.)

12                              -  -  -

13               (The juror entered the jury room.)

14               THE COURT:  Hi.  How are you, sir?  If you could

15   have a seat.

16               A JUROR:  Thank you.  It looks like I'm picking

17   up the bill.

18               THE COURT:  You're Juror 36, and you answered

19   two of our questions.  One had to do with the subject areas

20   and the other was having worked for a company that had

21   patented products.

22               A JUROR:  I thought I answered three.

23               THE COURT:  Well, go ahead and tell us about

24   your background.

25               A JUROR:  I have a Bachelor's degree in

Juror 36 - voir dire

1    engineering, mechanical engineering.

2              THE COURT:  All right.  You worked for?

3              A JUROR:  I worked for General Electric and

4    DuPont, both of which heavily involved in patents.

5              THE COURT:  What other question did you think

6    you answered?

7              A JUROR:  Software.  I was a project manager for

8    DuPont at Singapore working on SAP software.

9              THE COURT:  Okay.  And how long ago was that

10   project?

11             A JUROR:  '91 through '93.

12             THE COURT:  Is there anything about your -- are

13   you still working for --

14             A JUROR:  No, I'm retired.

15             THE COURT:  Okay.  How long have you been

16   retired?

17             A JUROR:  Six years.

18             THE COURT:  Is there anything about your past

19   experience that would make it difficult for you to sit as an

20   impartial juror in this case?

21             A JUROR:  I don't think so.

22             THE COURT:  Let me see if the lawyers have any

23   followup.

24             Ms. Day, anything?

25             MS. DAY:  No questions, your Honor.

Juror 36 - voir dire

1                THE COURT:  Mr. Boice, anything?

2                MR. BOICE:  Just a couple questions.  The

3      software that you were working on, the development of SAP in

4      Singapore --

5                A JUROR:  It was implementation actually.

6                MR. BOICE:  Implementation?

7                A JUROR:  Rather than developing it.

8                MR. BOICE:  Perfect.  Do you have any patents?

9                A JUROR:  No.

10               MR. BOICE:  You're not listed on any patents?

11               A JUROR:  No, not that I'm aware of.

12               MR. BOICE:  Okay.  Thank you.

13               THE COURT:  All right.  Thank you, sir.

14               A JUROR:  Right.

15               THE COURT:  Got away without paying a cent.

16               A JUROR:  Okay.

17               (The juror left the jury room.)

18                     -  -  -

19               (The juror entered the jury room.)

20               THE COURT:  Hi.  How are you?

21               A JUROR:  Fine.  How are you.

22               THE COURT:  If you could have a seat here.  You

23      should be Juror 39.

24               A JUROR:  Yes.

25               THE COURT:  And you answered a question about

Juror 39 - voir dire

1    the subject areas.

2              A JUROR:  Yes.  My husband used to be an autoCAD

3    designer in the engineering.

4              THE COURT:  Used to be a?

5              A JUROR:  In the engineering department at

6    autoCAD.

7              THE COURT:  All right.

8              A JUROR:  And he was, you know -- he knew about

9    patents and licensing and we used to talk about it also.

10             THE COURT:  For whom was he employed?

11             A JUROR:  GSI.  He's deceased now.

12             THE COURT:  Oh, is he?

13             A JUROR:  Yes.

14             THE COURT:  How long ago was that?

15             A JUROR:  Seven years ago.

16             THE COURT:  So when he was employed, which has

17   been at least seven years ago, you might have had some

18   conversations with him about his work?

19             A JUROR:  With engineering and the patenting and

20   all of that with the engineering.

21             THE COURT:  All right.  Do you believe that

22   those conversations would make it difficult for you to sit

23   as an impartial juror in this case?

24             A JUROR:  I think so, because I would know

25   certain things about patenting and the engineering, what we

Juror 39 - voir dire

1      would talk about.

2                  THE COURT:  Can you give us -- well, maybe --

3                  A JUROR:  Well, maybe -- I don't think so,

4      because he would -- he would work for the engineering and

5      then he would work for a different engineering because they

6      got rid of him because he ended up with cancer.

7                  THE COURT:  All right.  But was he directly

8      involved in getting patents?  Does he have any patents in

9      his name or anything?

10                 A JUROR:  Not to my knowledge, no.  No.  But who

11     he worked for, you know, they had different patents that

12     they were trying to get, because he -- the engineering

13     department that he was working with, he was doing work for

14     Donald Trump and doing certain things in the hotel.

15                 THE COURT:  All right.  Let me see if the

16     lawyers have any followups.

17                 Ms. Day, anything?

18                 MS. DAY:  No questions, your Honor.

19                 MR. BOICE:  Just a little more, if you would,

20     please, on the engineering, the type of engineering that he

21     was doing, your husband.

22                 A JUROR:  He was an autoCAD designer.

23                 MR. BOICE:  Okay.

24                 A JUROR:  With the engineering department.

25                 MR. BOICE:  Okay.  And would he actually design

Juror 39 - voir dire

1    the autoCAD systems?

2                A JUROR:  Yes.  With the pipes and all of that,

3    yes.

4                MR. BOICE:  Okay.  Okay.

5                A JUROR:  Yes.

6                MR. BOICE:  Thank you very much.

7                A JUROR:  Mm-hmm.

8                THE COURT:  Thank you.

9                A JUROR:  Mm-hmm.

10               (The juror left the jury room.)

11                          -  -  -

12               (The juror entered the jury room.)

13               THE COURT:  Hi, sir.  If you could have a seat

14   here at the head of the table.

15               A JUROR:  Thank you.

16               THE COURT:  You should be Juror 42.

17               A JUROR:  Correct.

18               THE COURT:  And you answered two of our

19   questions.  One had to do with the list of subject areas and

20   the other one had to do with a company that had patented

21   products.  Could you fill us in on the subject areas and the

22   companies?

23               A JUROR:  I have an undergraduate degree in

24   mechanical engineering.

25               THE COURT:  And what company have you worked for

Juror 42 - voir dire

1     that had patented products or processes?

2                 A JUROR:  I currently work for the Boeing

3     Company.

4                 THE COURT:  All right.  And I take it -- have

5     you been involved in the patenting process or --

6                 A JUROR:  No.  I support manufacturing work.

7                 THE COURT:  All right.  Okay.  Is there anything

8     about your experience that would make it difficult to sit as

9     an impartial juror in this case?

10                A JUROR:  No.

11                THE COURT:  Let me see if the lawyers have any

12    followup questions.

13                Ms. Day, anything?

14                MS. DAY:  No questions, your Honor.

15                THE COURT:  Mr. Boice?

16                MR. BOICE:  Can you elaborate just a little bit

17    about what you do in supporting manufacturing work at

18    Boeing?

19                A JUROR:  Sure.  My specific title is a product

20    review engineer, so any time that there's any issues with

21    assembling the aircraft that does not conform to the

22    drawing, I have the authority to kind of make a drawing

23    change on the spot, then keep production going.

24                MR. BOICE:  Great.  Okay.  Thank you.

25                THE COURT:  Thank you very much.

1                    A JUROR:  Thank you.

2                    (The juror left the jury room.)

3                            -  -  -

4                    (The juror entered the jury room.)

5                    THE COURT:  Hi.  How are you?  If you could have

6     a seat here at the head of our table.

7                    A JUROR:  All right.

8                    THE COURT:  You should be Juror 43 and you

9     answered two of our questions.  One had to do with having

10    served as a juror before.  Can you tell us when and where?

11                   A JUROR:  That was probably three or four years

12    ago at the State Building, I guess.

13                   THE COURT:  All right.

14                   A JUROR:  Down the road a few blocks.

15                   THE COURT:  Right.  Right.  Do you recall what

16    kind of a trial it was?

17                   A JUROR:  It was a lawsuit.  It was a car

18    accident lawsuit.

19                   THE COURT:  And did the jury deliberate and

20    reached a verdict?

21                   A JUROR:  Yes.

22                   THE COURT:  Can you recall what that was?

23                   A JUROR:  It was for the plaintiff.

24                   THE COURT:  And is there anything about that

25    experience that would make it difficult for you to sit as a

Juror 43 - voir dire

1    juror in this case?

2              A JUROR:  No, not that experience.

3              THE COURT:  Is there another experience?

4              A JUROR:  My second, the second time I stood up

5    is my concern.

6              THE COURT:  Oh, okay.

7              A JUROR:  Yes, I'm sorry.

8              THE COURT:  All right.  So you worked for a

9    company that had patented products?

10             A JUROR:  Yes.

11             THE COURT:  Yes.

12             A JUROR:  So I work for DuPont presently,

13   30 years in the research and development area.  Very loyal

14   to the company and to the companies that we collaborate

15   with, so my concern is that I might show partiality to

16   Motorola.

17             THE COURT:  Because Motorola and DuPont have a

18   business relationship?

19             A JUROR:  Yes.

20             THE COURT:  All right.  Didn't know that.  All

21   right.

22             A JUROR:  Have.

23             THE COURT:  Have.

24             A JUROR:  Have, yes.  I have in the past dealt

25   with them over my 30 years, so, like I said, I'm loyal to

Juror 43 - voir dire

1    DuPont and the companies that we collaborate with.

2              THE COURT:  All right.  So how long ago has it

3    been since this collaboration?

4              A JUROR:  I'm not sure what year that was, but,

5    you know, just thinking back.

6              THE COURT:  All right.  So even though, to your

7    knowledge, the collaboration is over and done, you would

8    still feel as though you couldn't sit impartially in this

9    case?

10             A JUROR:  Yes.  That was back in the engineering

11   days and that has been 15, 20 years ago, when I'm familiar

12   with it.  I don't know what dealings they have presently

13   because now I'm in the chemicals end of it.  Not the

14   engineering.

15             THE COURT:  Okay.  But, nevertheless, you feel

16   as though you couldn't be impartial?

17             A JUROR:  I'm concerned.  I'm concerned.

18             THE COURT:  You're concerned?

19             A JUROR:  I'm concerned that I won't show

20   partiality.

21             THE COURT:  All right.  All right.  Ms. Day, any

22   questions?

23             MS. DAY:  No questions, your Honor.

24             THE COURT:  And Mr. Boice?

25             MR. BOICE:  I don't think I do either.  Thank

Juror 44 - voir dire

1    you.

2                    A JUROR:  Thank you.

3                    THE COURT:  All right.

4                    (The juror left the jury room.)

5                         -  -  -

6                    (The juror entered the jury room.)

7                    THE COURT:  Hi.  How are you?

8                    A JUROR:  Good.

9                    THE COURT:  Head of the table here.  You are

10   Juror 44.

11                   A JUROR:  Yes, I am.

12                   THE COURT:  And you answered a few questions

13   having to do with the subject areas and experience with

14   patents and working for a company with patents.

15                   A JUROR:  Yes.

16                   THE COURT:  Could you give us the background

17   here?

18                   A JUROR:  I work in the technology license.

19   It's called Intellectual Assets and Licensing Departments in

20   our company.  I'm an administrative assistant, but I get

21   involved in license agreements and patent research and

22   things like that, in addition to the typical, you know,

23   day-to-day travel arrangements and meetings, things like

24   that.

25                   THE COURT:  What company is this?

Juror 44 - voir dire

1              A JUROR:  DuPont.

2              THE COURT:  Oh, it's with DuPont?

3              A JUROR:  Yes.

4              THE COURT:  So can you give me a little bit more

5    idea of what you actually -- what your responsibilities

6    would be?

7              A JUROR:  Basically, coordinate taking the

8    agreements, working with the lawyers and getting the

9    agreements put together and taking them through the process.

10   Making sure they get filed correctly in the legal

11   department.  And the patent research, I have to do, we put

12   some of our technologies that we have for licensing out on

13   the website that are available for licensing, and I manage

14   that process of putting the packages together and uploading

15   them to the website and keeping track of the inquiries and

16   things like that.

17             THE COURT:  Okay.

18             A JUROR:  And I manage our website that has the

19   marketing end of what we do on the corporate website.  So

20   it's a hodgepodge job, but it related to this, so I wanted

21   to make sure I brought it to your attention.

22             THE COURT:  Sure.  Sure.  So in terms of -- so

23   you probably have more information than most about what a

24   patent is and what purpose it serves.

25             A JUROR:  Yes, kind of.

Juror 44 - voir dire

1          THE COURT:  Do you believe that you could sit as

2    an impartial juror with the background that you have?

3          A JUROR:  Yes.  I did have a question, though.

4    One of the questions that you had asked initially, I just

5    wanted to clarify one of the companies.  I don't know

6    whether I can talk to you about it now?

7          THE COURT:  Sure.

8          A JUROR:  I didn't answer because it didn't seem

9    like it related to me.

10          THE COURT:  No.  You should bring it up now

11    rather than coming back later.

12          A JUROR:  Yes.  So one of the companies we did

13    have -- I mean, I didn't really have any connection with

14    them, but we have a confidentiality agreement with them that

15    I had kind of passed through the system, but, you know,

16    it -- I wasn't a stockholder.  The three questions that you

17    asked didn't seem to relate.

18          THE COURT:  Okay.  So it's one of the companies

19    on the list?

20          A JUROR:  Yes.

21          THE COURT:  So you've basically seen that there

22    is a confidentiality agreement?

23          A JUROR:  Yes.  I had a process.

24          THE COURT:  Okay.

25          A JUROR:  But it didn't seem to relate to any of

Juror 44 - voir dire

1   the questions that you asked about being a stockholder or

2   have any kind of personal -- within my job, we did run it.

3                  THE COURT:  All right.  Well, I mean --

4                  A JUROR:  It's one of those things.

5                  THE COURT:  Since it is a confidentiality

6   agreement, I don't want to divulge anything more, but do you

7   think that the fact that there is one would affect your

8   ability to sit as an impartial juror?

9                  A JUROR:  No.

10                  THE COURT:  All right.  Let me see if the

11   lawyers have any followup questions.

12                  A JUROR:  Thank you.

13                  THE COURT:  Ms. Day, anything?

14                  MS. DAY:  Just one question, your Honor.  In

15   your experience working for DuPont, is there any reason you

16   think you couldn't be fair to both of the parties in this

17   case?

18                  A JUROR:  No.  I don't see any reason.

19                  MS. DAY:  Thank you.

20                  A JUROR:  All right.

21                  THE COURT:  Mr. Boice?

22                  MR. BOICE:  Just one followup.  I may have

23   missed exactly what you said there.  What type of patent

24   research do you do?

25                  A JUROR:  Basically, we have -- Thompson, some

Juror 44 - voir dire

1    of the outside companies that have databases, I kind of go

2    and make sure that the patents that we have internally are

3    still -- we have an internal system, are still live patents,

4    because sometimes we put -- because we work for all the

5    departments in the company, so sometimes we'll put a

6    technology up on the website and I have to make sure that

7    all the patents are still granted.  They are not abandoned

8    or they are not expired or whatever.

9            So I do that research and then -- you know,

10   sometimes I will do a research on a software program that

11   kind of, like, sees what like patents are out there with us,

12   things like that.

13           MR. BOICE:  Okay.  Okay.  Thank you.

14           THE COURT:  All right.

15           A JUROR:  I'm not very good at explaining it.

16           THE COURT:  That's all right.

17           A JUROR:  I feel like I'm in a job interview.

18           MR. BOICE:  Sorry about that.

19           A JUROR:  That's okay.

20           THE COURT:  Thank you.

21           A JUROR:  Thank you.

22           (The juror left the jury room.)

23                         -  -  -

24           (The juror entered the jury room.)

25           THE COURT:  Hi, sir.  How are you?

Juror 45 - voir dire

1              A JUROR:  Good.  Yourself?

2              THE COURT:  If you could have a seat here at the

3     head of the table.

4              A JUROR:  All right.

5              THE COURT:  You should be Juror 45.

6              A JUROR:  Yes.

7              THE COURT:  And you answered our one question

8     about the subject areas.  Can you explain?

9              A JUROR:  I'm a boiler operator at Beebe

10    Hospital.  I work on the boilers, chillers, air switch gear.

11    We have Honeywell as our control is one and then Siemens.

12    And they have licenses for us to have programs on their

13    computers.

14             THE COURT:  All right.

15             A JUROR:  On our computers.  And that's what I

16    deal with, the controls, a lot of the heating and

17    air-conditioning and air.  I just know that with the

18    licenses that they have, that we have to acquire to utilize

19    their equipment.

20             THE COURT:  All right.

21             A JUROR:  For our programs.

22             THE COURT:  Is there anything about that

23    experience -- your work experience, your professional

24    experience, that would make it difficult for you to sit as

25    an impartial juror in this case?

Juror 45 - voir dire

1           A JUROR:  No, I don't think so.  I just know

2    that it's all about the dollar, you know what I mean?  I do

3    know that.

4           THE COURT:  Now, you work at Beebe down in

5    Lewes?

6           A JUROR:  Lewes.

7           THE COURT:  Will it --

8           A JUROR:  Mess me up here?

9           THE COURT:  Yes.

10          A JUROR:  Well, it hasn't been good for the last

11   couple weeks.  We've had some mishaps with natural gas and

12   things like that with the boilers, but I changed over to

13   number two fuel.  I don't think it should hurt.

14          My boss, I tried to get him to write a letter.

15   He was, no, you need to go.

16          THE COURT:  Okay.  So here you are.

17          A JUROR:  Yes.

18          THE COURT:  Let's see if the lawyers have any

19   followup questions for you.

20          A JUROR:  Okay.

21          THE COURT:  Hold on.

22          A JUROR:  All right.

23          THE COURT:  Ms. Day?

24          MS. DAY:  I don't have any questions.

25          MR. BOICE:  I don't either.  Thank you very

Juror 48 - voir dire

1    much.

2                    THE COURT:  We appreciate it.

3                    A JUROR:  All right.

4                    (The juror left the jury room.)

5                            -  -  -

6                    (The juror entered the jury room.)

7                    THE COURT:  Hi.  How are you, sir?  If you could

8    sit here at the head of the table.  You should be Juror 48.

9                    A JUROR:  Yes.

10                   THE COURT:  And you answered two of our

11   questions.  One had to do with knowledge of this case.

12                   A JUROR:  Mm-hmm.

13                   THE COURT:  Could you explain that?

14                   A JUROR:  When I was given the sheet with

15   companies, I was just curious and Googled it, obviously, and

16   so there are a lot of Google results coming up.  So I read.

17   I was there about half-an-hour and went through probably

18   three articles, I would say.

19                   THE COURT:  Well, that's a good way of getting

20   yourself out of the case.

21                   The second question that you answered was:  Had

22   you ever worked for a company that had patented products or

23   processes?

24                   A JUROR:  Yes.  So I worked for Canon Solutions

25   America.  It's a subsidiary company of Canon, Inc., so I

Juror 49 - voir dire

1    think they're a pretty large patent holder, what we're

2    told.

3                    THE COURT:  All right.  Well, now that you know

4    more about the case probably than we do, do you think it's

5    possible for you to sit as an impartial juror?

6                    A JUROR:  No.

7                    THE COURT:  All right.  All right.  Ms. Day,

8    anything?

9                    MS. DAY:  No questions, your Honor.

10                   THE COURT:  And Mr. Boice?

11                   MR. BOICE:  I don't either.  Thank you very

12   much.

13                   THE COURT:  Okay.  Thank you.

14                   A JUROR:  All right.

15                   (The juror left the jury room.)

16                                  -  -  -

17                   (The juror entered the jury room.)

18                   THE COURT:  Hi.  How are you, sir?  If you could

19   have a seat, you should be Juror 49.

20                   A JUROR:  Yes.

21                   THE COURT:  And although you answered a few of

22   our preliminary questions, you answered one of our last

23   questions about having some concerns.

24                   A JUROR:  Well, it was a time issue mainly.

25                   THE COURT:  All right.

Juror 49 - voir dire

1              A JUROR:  I live in Seaford.  I'm the chairman

2       of Nanticoke Health Services, which is Nanticoke Hospital.

3       Our board meeting was today.  We rescheduled it for next

4       Thursday and one order of business is to renew my CEO's

5       employment contract.  So I would hope to be there.

6              THE COURT:  All right.  So it's a professional

7       hardship if we would ask you to serve this length of time?

8              A JUROR:  Yes.

9              THE COURT:  All right.  All right.  Anything to

10      follow up on that, Ms. Day?

11             MS. DAY:  No, your Honor.

12             THE COURT:  And Mr. Boice?

13             MR. BOICE:  No.  I don't either.

14             THE COURT:  Thank you very much.

15             A JUROR:  All right.

16             (The juror left the jury room.)

17                         -  -  -

18             (The juror entered the jury room.)

19             THE COURT:  Hi, sir.  If you could have a seat

20      at the head of the table here.  You are Juror 53.  And you

21      answered a few of our questions, probably the most important

22      of which is you have some knowledge of this case?

23             A JUROR:  Yes.  I read an article on Fox

24      Business a couple days ago.  It was published on Tuesday

25      that discussed what was going on in the previous cases as

Juror 54 - voir dire

1    well.

2                 THE COURT:  Okay.  And do you believe that it

3    would be possible for you to sit as an impartial juror

4    having had that background information?

5                 A JUROR:  It's it kind of like was my opinion a

6    little bit about it.  It was pretty in depth about what the

7    interpretations of how liberal the patent cases are.  Just

8    kind of struck me a little.

9                 THE COURT:  Okay.  All right.  Anything to

10   follow up, Ms. Day?

11                MS. DAY:  No, your Honor.

12                THE COURT:  And Mr. Boice, anything?

13                MR. BOICE:  No.  Thank you.

14                THE COURT:  All right.  Thank you very much.

15                A JUROR:  Thanks.

16                (The juror left the jury room.)

17                         -  -  -

18                (The juror entered the jury room.)

19                THE COURT:  Hi.  How are you, sir?

20                A JUROR:  Hello.

21                THE COURT:  You are Juror 54.

22                A JUROR:  Correct.

23                THE COURT:  And you answered our one question,

24   which I have to find again.  It had to do with the companies

25   and whether you or a member of your family had any dealings

Juror 54 - voir dire

1    with or relied financially.

2              A JUROR:  I actually didn't realize I should

3    have answered like six times.  I used to run my own business

4    that was a cellular installation and repair company.

5    Motorola was our number one vendor.  I was a warranty repair

6    center, so we relied on them for our income to a large

7    degree.

8              I am currently carrying my first non-Motorola

9    cellphone, so that was one of the questions.

10             I work in technology and have for the last

11   20 years, so I'm very familiar with software, software

12   development, application development and hardware.

13             THE COURT:  All right.  Well, I guess how

14   long -- well, I guess the question is, with your

15   longstanding relationship with Motorola, is it possible for

16   you to be an impartial juror in this case?

17             A JUROR:  I don't know the particulars of the

18   case, but I would think probably not simply because the

19   reason I'm carrying my first non-Motorola phone is it seems

20   to me that since Google purchased their handset division,

21   the quality of the product and the support has gone south.

22             THE COURT:  You can take that home to your

23   client.

24             MR. BOICE:  Thank you very much.

25             THE COURT:  Okay.  All right.  Well, setting

Juror 54 - voir dire

1   aside -- well, let me see if the lawyers have any followup

2   questions for you.  I'm not sure how to follow on that.

3                MS. DAY:  No questions, your Honor.

4                THE COURT:  Mr. Boice?

5                MR. BOICE:  Message received.  Thank you.

6                THE COURT:  Anything, Mr. Boice?

7                MR. BOICE:  I do not.

8                THE COURT:  All right.  Thank you very much.

9                A JUROR:  Thank you.

10               (The juror left the jury room.)

11                         -  -  -

12               (The juror entered the jury room.)

13               A JUROR:  Hi.

14               THE COURT:  Hi.  How are you?  If you could have

15   a seat here at the head of the table.  Should be Juror 59.

16               A JUROR:  Yes.

17               THE COURT:  And you answered two of our

18   questions affirmatively having to do with working for a

19   company that had patented products and actually having

20   experience with patents.

21               A JUROR:  I'm not sure if I answered it

22   correctly.  I used to work 30 years ago for International

23   Computer Print, which was a patent company.  I typed and

24   proofread patents.

25               THE COURT:  Oh.

Juror 59 - voir dire

1              A JUROR:  So that's why I answered.  I wasn't

2    sure if I should answer it.

3              THE COURT:  All right.  So International

4    Computer?

5              A JUROR:  Print Corporation.  It's not around

6    anymore.

7              THE COURT:  I have not heard of it.

8              A JUROR:  It was in Wilmington and then it was

9    in Fort Washington.  It may be in Florida.  That was, like I

10   said, 30 years ago.

11             THE COURT:  You read patents?

12             A JUROR:  I typed, I typed and proofread the

13   patents.

14             THE COURT:  Okay.  All right.  So I mean, did

15   you walk away with any --

16             A JUROR:  Knowledge or any?  No.  These words

17   that were this long (indicating)?  No.  No.  Honestly, no.

18   I just wasn't sure how to answer that.

19             THE COURT:  Sure.  We appreciate talking to

20   you.

21             Is there anything about that past experience

22   that would make it difficult for you to sit as an impartial

23   juror in the case?

24             A JUROR:  No.

25             THE COURT:  Let me see if the lawyers have any

Juror 59 - voir dire

1   followup question.

2                Anything, Ms. Day?

3                MS. DAY:  No, your Honor.

4                THE COURT:  And Mr. Boice?

5                MR. BOICE:  I don't either.  Thank you very

6   much.

7                A JUROR:  Thank you.

8                (The juror left the jury room.)

9                THE COURT:  Now the question is whether everyone

10  else in the audience has decided they want to talk to us or

11  not.

12               DEPUTY CLERK:  We have four more, Judge.

13               THE COURT:  One more?

14               DEPUTY CLERK:  Four more.

15               THE COURT:  Four more?  Which ones?

16               A JUROR:  2, 10, 21, 43 just came up with

17  something else that she forgot to mention.

18               THE COURT:  2, 10?

19               DEPUTY CLERK:  21 and 43.

20               THE COURT:  I don't know that I want to talk to

21  43 again, but, okay.  We'll bring him in.

22               (The juror entered the jury room.)

23               THE COURT:  Hi.  How are you?

24               A JUROR:  Good morning.

25               THE COURT:  I will let you sit at the head of

Juror 2 - voir dire

1    the table here.  You are Juror No. 2?

2                    A JUROR:  I'm Juror No. 2.

3                    THE COURT:  Yes.  And you had a concern that you

4    wanted to share with us?

5                    A JUROR:  Yes.  The question that you asked,

6    have you ever been a plaintiff in a civil suit, I recall I

7    was.

8                    THE COURT:  Okay.

9                    A JUROR:  Twice.

10                   THE COURT:  All right.  Probably not in patent

11   litigation?

12                   A JUROR:  Not patent litigation, no.

13                   THE COURT:  All right.  And, generally, we ask

14   that question.  The followup would be:  Is there anything

15   about your experience in the courtroom, in the litigation,

16   that would make it difficult for you to sit as an impartial

17   juror here.

18                   A JUROR:  No.

19                   THE COURT:  All right.  Let's see if the lawyers

20   have any followup questions for you.

21                   MS. DAY:  No questions, your Honor.

22                   MR. BOICE:  I don't either.  Thank you.

23                   THE COURT:  All right.  Thank you very much.

24                   A JUROR:  Thank you.

25                   (The juror left the jury room.)

Juror 10 - voir dire

1                          -   -   -

2                    (The juror entered the jury room.)

3                    THE COURT:  Hi.  How are you?

4                    A JUROR:  Hello.

5                    THE COURT:  If you could have a seat.  I think

6     you are Juror 10.

7                    A JUROR:  Ten, yes.

8                    THE COURT:  And you had a concern you wanted to

9     bring to our attention.

10                    A JUROR:  After reviewing this handout, a closer

11    look, I saw a name on the witness list that may be a former

12    co-worker.

13                    THE COURT:  Okay.

14                    A JUROR:  Mr. Richard Harris.  Of course, Harris

15    is a common name.  It could be somebody else.  But at a

16    closer look, I recognize that name.

17                    And also, secondly, list of companies.

18    Motorola.  I have a stock portfolio with Merrill Lynch and

19    it's possible that there is some of that in my portfolio,

20    and in all honesty, I wanted to mention that now after I

21    digested this list.

22                    THE COURT:  All right.  Now, a co-worker.  Where

23    is it that you work?

24                    A JUROR:  The place is closed now.  We were

25    co-workers for about 30 years.

Juror 10 - voir dire

1              THE COURT:  Okay.  And what was the --

2              A JUROR:  N.C. Weil Products, formerly Forge

3    Steel & Wire, down on the edge of town here by the marine

4    terminal.

5              THE COURT:  And with respect to the stock

6    portfolio?

7              A JUROR:  I don't know if I have any of that

8    now.  I'm pretty sure we had some of that at some point in

9    time.  I may still have some.  I have mutual funds, a

10   cross-section of stuff with Merrill Lynch.  I may not have

11   it now, but it seems to me that there was some of that in

12   there.  It could still be in there.

13             THE COURT:  Is this a --

14             A JUROR:  They manage it for me.

15             THE COURT:  I was going to say it's not that you

16   buy and sell.  It's that Merrill Lynch buys and sells?

17             A JUROR:  Yes.  I'm aware of that because I get

18   monthly reports and we confer on the activity periodically

19   to change things.

20             THE COURT:  I suspect the Richard Harris isn't

21   the same Richard Harris.

22             With respect to your stock portfolio, we'll

23   assume that Motorola has been there at some point.

24             A JUROR:  I'm sure.

25             THE COURT:  Yes.

Juror 10 - voir dire

1           A JUROR:  In all honesty, rather than sit there

2     and have a surprise later on, I would rather bring it up

3     now.

4           THE COURT:  Okay.  The question really is

5     whether with this information, you could sit as an impartial

6     juror in this case or not.  I mean, without knowing if you

7     have a present stake at some point.

8           A JUROR:  I don't feel that it is that, but I

9     just want to mention in case there's something that comes up

10    and it does compromise me at some point in time.

11          THE COURT:  Okay.  All right.

12          A JUROR:  It's hard to say.  I don't do this

13    often, so I don't know what to expect.

14          THE COURT:  We don't make you do homework before

15    you come, for sure.

16          Any followup questions, Ms. Day?

17          MS. DAY:  No questions, your Honor.

18          THE COURT:  All right.  And, Mr. Boice,

19    anything?

20          MR. BOICE:  I think I understand the situation.

21    I don't have any questions either.

22          A JUROR:  Okay.

23          THE COURT:  Thank you very much.

24          A JUROR:  Thank you, your Honor.

25          (The juror left the jury room.)

Juror 21 - voir dire

1                        -  -  -

2                   (The juror entered the jury room.)

3                   THE COURT:  Hi.  How are you?  I think you are

4    Juror 21.

5                   A JUROR:  Yes.

6                   THE COURT:  And you have a concern that you want

7    to share with us.

8                   A JUROR:  I'm requesting for a trial at a later

9    date for two reasons.  The first one, I have two small

10   children that I have no arrangements made for over the next

11   eight days.

12                  And the second one, I work at Bank of America,

13   and we are scheduled for an all-day conference next

14   Wednesday where we have colleagues flying in from New York,

15   California and pretty much across the United States, and I

16   was required to attend and I already committed back in

17   November to attend the conference next Wednesday.  So I am

18   requesting to be moved to a later date.

19                  THE COURT:  All right.  So if you work outside

20   the home, your children have some kind of --

21                  A JUROR:  They do, yes, but I am the main -- I

22   pick them up and drop them off every day.  So I have them

23   before 9:00, after 3:00, and --

24                  THE COURT:  Okay.  All right.  Any followup, Ms.

25   Day?

1              MS. DAY:  No, your Honor.

2              THE COURT:  And, Mr. Boice, anything?

3              MR. BOICE:  Not from me either.

4              A JUROR:  Thank you.

5              THE COURT:  Thank you.

6              (The juror left the jury room.)

7                         -  -  -

8              (The juror entered the jury room.)

9              THE COURT:  Yes, ma'am?

10             A JUROR:  It's me again.  Just real quick.

11             THE COURT:  Juror 43 for purposes of the record.

12             A JUROR:  She jogged my memory.  I have a

13   doctor's appointment January 30th at 11:30.  It's an OB/GYN

14   appointment that takes two, sometimes three months to

15   reschedule.

16             THE COURT:  Okay.  Thank you very much.

17             A JUROR:  Thank you.

18             (The juror left the jury room.)

19             THE COURT:  Make sure no one else has come

20   forward.  Is that it?

21             DEPUTY CLERK:  Yes.

22             THE COURT:  All right.  Okay.  Well, let's go

23   through everyone.

24             Juror No. 2 had been mentioned prior.  Is there

25   still a request for cause or just...

1           MR. BLUMENFELD:  Can we talk for a second?

2           THE COURT:  Yes.

3           (Pause while counsel conferred.)

4           MR. BLUMENFELD:  Your Honor, we are going to

5    move for cause with respect to Juror No. 2.  She is at

6    Morris James, and from our research, they have some active

7    matters and some recently closed matters adverse to Google.

8    We're just concerned that somewhere along the way, she's

9    going to learn about that or figure it out.

10          THE COURT:  So I'm fairly confident her

11   practice, it's just that her firm --

12          MR. BLUMENFELD:  Correct.  It's not that she's

13   personally involved in those.  I don't think she has

14   anything to do with any patent work.

15          THE COURT:  Right.  So even though she's not

16   supposed to be talking about her experience, there's a fear

17   that someone might talk to her about their litigation?

18          MR. BLUMENFELD:  It's not so much that someone

19   is going to talk to her.  Somewhere along the way, she's

20   going to figure out that her firm has cases adverse to one

21   of the parties.

22          THE COURT:  Oh, okay.  All right.  All right.

23          Any response from the attorneys from IV?

24          MR. FARNAN:  Your Honor, she answered the

25   question whether she could be impartial.  She didn't say she

1   couldn't in response to the general questions by the Court,

2   especially the last two.  She didn't say anything here that

3   would say that she has a bias one way or the other.  I think

4   she's a lawyer.  She understands her duties, so I don't

5   think she would qualify for a for cause strike.

6                THE COURT:  All right.  Well, I have a very

7   interesting for cause standard, but I'm going to set her

8   aside for the moment.

9                All right.  I mean, the next person that I

10  would suggest for cause, I'm not necessarily going to talk

11  about anyone that I don't think there's any reason to, we

12  can come back to them, is Juror 5, who says he only gets

13  reimbursed one day and it would be a hardship for an

14  eight-day trial.

15               The next juror is Juror 8.  I don't have my

16  details.  I don't know how old he is, but between his

17  driving from Lewes and his wife not having a car and his

18  diabetes, it struck me that he wasn't necessarily -- it

19  could be that he should be excused for cause, so that was

20  someone that I was considering.

21               No. 10.  I don't know what you think about him

22  with having Motorola as part of his stock portfolio maybe.

23  Maybe --

24               MR. BOICE:  Your Honor, I might be able to

25  clarify.  Since Google bought Motorola Mobility, their stock

1    is not publicly traded.  At least since 2012, I think,

2    Motorola Mobility has not been a publicly traded stock.

3              MS. DAY:  I'm not sure he would draw that

4    distinction.

5              THE COURT:  Well, we can set him aside for a

6    minute.  I mean, a lot of these mutual funds, they don't

7    really, these folks don't really have any control over.  I'm

8    not confident it's a real issue.

9              Juror 11 with the medical procedure at the end

10   of the trial, I would excuse for cause.

11             Juror 16, I don't know whether -- I would hate

12   to get her on and then have her go off because of this

13   lesion on her spine.  It's amazing what you find out about

14   folks.  But she's someone I would consider excusing for

15   cause.

16             I guess 21, we usually excuse folks who have

17   small children and have to make those special

18   accommodations.

19             Was 191 -- I mean, I forget the numbers of the

20   folks that IV wanted to excuse, but I recall that 19 might

21   have been one of them.

22             MS. DAY:  19 was one.  And then I believe Juror

23   21 that we are speaking about right now, the woman with the

24   small children also works at Bank of America.

25             THE COURT:  Okay.  And what about Bank of

1    America?  What makes them --

2             MS. DAY:  Intellectual Ventures is currently in

3    litigation with Bank of America.

4             THE COURT:  Oh.  So it strikes me if we -- well,

5    it strikes me that that is kind of the same as Juror 2.  I

6    mean, we either keep them on or we strike them all, so let

7    me think about it.  But we've already taken care of 21.

8             Yes, sir?

9             MR. BOICE:  Just on Juror 19, if that person is

10   a lot lower down, they are not directly -- they wouldn't be

11   involved in any litigation.  You know, they do work in

12   software.  They're part of a big group on projects and not

13   really -- it does not seem to me that they would be affected

14   by litigation.

15            THE COURT:  Well, it's not affected.  It's

16   knowing about litigation.  I guess that's the question.  If

17   you're an attorney, you might know generally about

18   litigation and be affected by it, then I think any employee

19   might know about it.  So I will think about that whole

20   issue.

21            MR. BOICE:  Okay.

22            THE COURT:  But I tend to go one way or another

23   on these things.

24            Juror 24 sounded like she had real hardship.

25   She has one reliable car, children, Greenwood.

1              Juror 26, you know, a Motorola product guy.  It

2    struck me that he should be excused for cause.

3              Juror 27 with his mother and care I would strike

4    for cause.

5              31.  Husband with Parkinson's I would strike for

6    cause.

7              39 didn't want to serve.  I didn't even

8    understand her reasoning.  I mean, it's up to you.  I really

9    didn't understand her reasoning for thinking she had a

10   conflict.  I would not necessarily strike her for cause.  I

11   don't know how good a juror she's going to be, but it's up

12   to you all.

13             43, again, doesn't want to serve, and I think

14   especially now that we have a doctor's appointment, she

15   should be excused for cause.

16             48.  Now, we're going to have to do something

17   different.  He Googled the litigation while he was sitting

18   in the jury assembly room and so now knows all about it.  So

19   we're going to have to change the way we do things here for

20   these young people who are tech-savvy.  But I think we need

21   to excuse him for cause.

22             49.  He's the --

23             MS. DAY:  Chairman of the Board.

24             THE COURT:  Yes.  Nanticoke Medical.

25             53, kind of the same thing, although at least he

 1   didn't insult us by doing it in the jury assembly room.

 2              I'm wondering if we should identify the trials

 3   anymore because people can do all this research because he

 4   read the Fox News Report, Fox Business, so I think we need

 5   to excuse him for cause.

 6              54.  Oh, he's a Motorola guy.

 7              MS. DAY:  Yes.

 8              THE COURT:  A very outspoken Motorola guy.

 9              So, anyway, with the ones that I would

10   recommend -- well, it seems to me if we excuse Juror 2, then

11   we excuse Juror 19.  21 is already excused.  Who was the

12   other one?

13              MS. DAY:  48, I believe.

14              THE COURT:  48 we've excused.  He's the one who

15   Googled everything already.  So if we excuse 2, we're going

16   to excuse 19.

17              So these are the ones I have as possibilities.

18   If anyone wants to make a record or suggest others, they

19   can.

20              2, 5, 8, 11, 16, 19, 21, 24, 26, 27, 31, 39, 43,

21   48, 49, 53, 54.  How many is that?  17.

22              All right.  Any other suggestions?  Any

23   objections you want to state for the record?  Any issues?

24              MR. BOICE:  May I consult just for a second?

25              THE COURT:  Oh, sure.

 1              MR. BOICE:  Just to make sure I'm not missing

 2    something.

 3              MS. DAY:

 4              THE COURT:  Yes.

 5              (Pause while counsel conferred.)

 6              THE COURT:  Anyone have anything they need to

 7    put on the record?

 8              MR. BOICE:  Yes, your Honor.  On Juror No. 26,

 9    who is the DuPont employee of Motorola Products and he

10    worked with a long time ago and he said that he could be

11    objective and that would not affect him, I don't think that

12    he's an appropriate candidate for a cause strike.  So we

13    would object to that by giving his testimony and the amount

14    of time and --

15              THE COURT:  Well, even though he said I don't

16    know why we're not using Motorola anymore, I mean, it struck

17    me that he had a very positive feeling, strong feeling

18    towards Motorola, so I understand your objection.

19              MR. BOICE:  Okay.

20              THE COURT:  And it's made, but I'm going to

21    stick with that one.

22              MR. BOICE:  Okay.  We also -- I kind of renew my

23    objection, our objection to Juror No. 19.  He's the Bank of

24    America employee who has knowledge of software and software

25    development.  Part of a big group.  It does not seem

1    appropriate to strike him.

2              I understand your Honor to say that if 2 is

3    struck, then 19 would be.  We would prefer that neither one

4    be struck if that were the case.

5              THE COURT:  Well --

6              MR. BOICE:  For cause.

7              THE COURT:  I'm fine with that.

8              MR. BOICE:  Okay.

9              THE COURT:  All right.  So neither 2 nor 19 are

10   struck.

11             MR. BOICE:  Okay.

12             THE COURT:  All right.  Anything from

13   plaintiffs' counsel?  Ms. Day?

14             MS. DAY:  No, your Honor.

15             THE COURT:  All right.  We will reconvene.  It

16   has been a relatively long -- if you need to refresh

17   yourselves, my staff will let me know when you are ready to

18   go.

19             MR. BOICE:  Thank you, your Honor.

20             (Conference in chambers concluded.)

21                       -  -  -

22             (Proceedings resumed in the courtroom.)

23             THE COURT:  All right, folks.  Thank you for

24   your patience.  This is the last step in the jury selection

25   process.

1          Any of those jurors who have been excused for

2     cause, your numbers have been removed from our ring of

3     numbers and those who are still in the mix, your

4     representational numbers will be put in a wooden box, the

5     vast resources of the U.S. Government.

6          We will shake the box vigorously and then choose

7     randomly the numbers of the jurors who will be subject to

8     peremptory challenges.

9          So Ms. Scarpato, the stage is yours.

10          DEPUTY CLERK:  Juror No. 10, please come forward

11     and take the seat, first seat right over here.  You won't be

12     able to see it.  Thank you.

13          Juror No. 42, please come forward and take the

14     second seat.  You want to come behind counsel here and come

15     around this way.  Thank you.

16          Juror No. 32, please come forward and take the

17     third seat in the first row.

18          Juror No. 38, please come forward and take the

19     fourth seat in the first row.

20          Juror No. 25, please come forward and take the

21     fifth seat in the first row.

22          Juror No. 36, please come forward and take the

23     sixth seat in the first row.

24          Juror No. 37, please come forward and take the

25     next seat in the first row.

1                      Juror No. 13, please come forward and take the

2       eighth seat in the first row.

3                      Juror No. Two, please come forward and take the

4       first seat.  You'll want to come around this way.

5                      Juror No. 17, please come forward and take the

6       second seat in the second row.

7                      Juror No. 6, please come forward and take the

8       third seat in the second row.

9                      Juror No. 23, please come forward and take the

10      fourth seat in the second row.

11                     Juror No. 33, please come forward and take the

12      fifth seat in the second row.

13                     Juror No. 45, please come forward and take the

14      next seat in the second row.

15                     Juror No. 15, please come forward and take the

16      seventh seat in the second row.

17                     Juror No. 22, please come forward and take the

18      last seat in the second row.

19                     (Pause.)

20                     DEPUTY CLERK:  When I call your juror number,

21      you can go ahead and head back to your seat in the back of

22      the courtroom.

23                     Juror No. 10.  Juror No. 42.  Juror No. 25.

24      Juror No. 36.  Juror No. 17.  Juror No. 6.

25                     All right.  So if everyone could move down.  32

1    should sit there, then 38, then 37, and 13 can move down.

2    And then Juror No. 2, you can sit in the fifth seat in the

3    first row.  And then if everyone else could just shift down

4    and fill the first five seats.

5                Thank you.

6                THE COURT:  All right.  Any issues before we

7    excuse the rest of the jury panel?

8                MS. DAY:  No, your Honor.

9                THE COURT:  Mr. Boice, anything?

10               MR. BOICE:  No, your Honor.

11               THE COURT:  All right.  Members of the jury

12   panel, for those of you who were not selected today, we

13   appreciate again your efforts you made to fulfill your

14   public responsibility.  You are excused, though, and thank

15   you again.

16               And we should swear our jurors in.

17               (Jury sworn/affirmed.)

18               THE COURT:  And you may be seated.  Thank you.

19               I'm trying to figure out -- we generally -- do

20   we have our lunches ready yet?  No.  Oh, okay.  Well, I

21   think what we'll do is, we'll take a break.

22               We are expecting to have for you a lunch tray so

23   you don't have to go out, and it will take a few minutes for

24   my staff to introduce you to the jury room and how to get in

25   and out.  If you need to make calls to family members or

1    employers to let them know that you are going to spend a few

2    days with us, you can take that opportunity to do that.

3            So I suspect that that will take about an hour.

4    When we get back, we have an introductory video for you to

5    view about the patent system.  I have some preliminary

6    instructions and then we'll start the case.

7            So let's take a break until 12:30, to give you

8    an opportunity to refresh yourselves, make the phone calls

9    you need and get acquainted with your temporary home.  All

10   right.

11           (The jury was excused to the jury room for a

12   recess.)

13           THE COURT:  All right.  I had heard we were

14   expecting the lunch tray by 11:30, so I hope that's the

15   case.  You all may be seated.  I'm sorry.

16           We've got everything resolved I think through

17   opening.  I guess if there are issues with respect to our

18   first witness, we can handle that before we all take a break

19   as well.

20           MR. BELLOLI:  I think it's the second witness,

21   your Honor.

22           MR. BOICE:  That's correct.

23           THE COURT:  The second witness?

24           MR. MOORE:  That's correct.  Would you like me

25   to handle that now, your Honor?

1                    THE COURT:  It's up to you.

2                    MR. MOORE:  Yes.

3                    THE COURT:  I guess we can take some time to do

4     that.

5                    MR. MOORE:  Yes.  We would like to raise that.

6                    THE COURT:  All right.

7                    MR. BELLOLI:  So -- yes.  They should go ahead.

8                    THE COURT:  It's their objection.  They should

9     present it first.

10                   Mr. Moore?

11                   MR. MOORE:  Thank you, your Honor.  Steve Moore

12    for Motorola.

13                   The issue with is with respect to the

14    defendant's expert, Dr. Alpert, who will be their

15    infringement expert on the '462 patent.

16                   And the issue is that we learned last night for

17    the first time that apparently IV, while it would like Dr.

18    Alpert to opine during the infringement case on an issue of

19    copying or alleged copying of the invention.  Of course,

20    willfulness is not in the case and the only copying

21    identified in Dr. Alpert's, any of his report is in his

22    validity report, where he identified it as an alleged

23    indicia of secondary consideration of nonobviousness.

24                   We have two problems with the issue or with

25    trying to introduce that.  The first is that it's not in his

1    infringement report any discussion of copying, and I don't

2    think it's even relevant to the issue of infringement.

3            The second is that the evidence that apparently

4    they're going to have him talk about doesn't relate to the

5    legal standard for copying.

6            The Federal Circuit is very clear that to prove

7    copying, you must prove the replication of a specific

8    product and there's a number of ways you can do that, but

9    they all involve analysis of the patent owner's patented

10   product as opposed to the patent itself, because, of course,

11   if you do what the patent says, that's infringement.

12   Copying requires more.

13           Probably one of the leading cases is the Iron

14   Grip Barbell case, 392 F.3d, 1317 at, it looks like we're at

15   page 1325.

16           It says -- the Court says, rather, copying

17   requires the replication of a specific product, and then it

18   talks about how that may be done, but all the ways it talks

19   about are very clear that we're talking about a product and

20   not the patent.

21           What I think the only argument that, from what I

22   understand Intellectual Ventures will make is that this

23   copying is somehow relevant to inducement of infringement,

24   and they have pointed us to a decision of your Honor's

25   from 2004, in ArthroCare versus Smith & Nephew, 310 F.

1    Supp., 2d, 638, in which the Court permitted the patentee to

2    introduce evidence of copying as evidence of intent to

3    induce.  But there again, the evidence was the patentee, or,

4    I'm sorry, the accused infringer copied a specific patented

5    product.

6           Here, the only evidence that IV has pointed to

7    is that the inventor sent Motorola a flyer about his patent.

8    It didn't talk about any actual product he had, and that

9    Motorola also filed a patent case after this lawsuit was

10   filed on the accused product in which it cited the

11   patent-in-suit as a prior art reference.

12          That's their only evidence from which they are,

13   I think, going to try to argue copying.  In fact, the

14   patentee, the patent, the inventor, did not have a product.

15   He never made or sold one.  He had a prototype he made at

16   one point in time, but he never showed that to Motorola and

17   there won't be any testimony that anyone at Motorola ever

18   saw that prototype.

19          So we think that because it's not in the

20   expert's report, and also because it does not meet the legal

21   test for copying, that Dr. Alpert ought not to be able to

22   testify about that.

23          We also have -- and this is related.  We have

24   an evidentiary objection to the published patent

25   application that Dr. Alpert cites.  This is, again, a

1    Motorola-published patent application.  And I believe --

2    let's see if I have the exhibit number just for the record.

3    It's PTX-277.

4            The reason that we object is that IV is trying,

5    apparently, to have Dr. Alpert testify about this published

6    patent application as part of his infringement analysis.  In

7    other words, to argue that some of the claim elements are

8    satisfied because of some of the language in that patent

9    application.

10           The basis of the objection is one of foundation,

11   and it's that both in his report and in his deposition, Dr.

12   Alpert said that he didn't think the patent application

13   actually covered Motorola's accused product.  He said that

14   in his expert report and then at his deposition, he said

15   that, when I asked him a question, he said he disagreed that

16   the application itself is necessarily reflecting Motorola's

17   products, and so he couldn't answer about why that was the

18   case.

19           So we have a significant foundational issue

20   there, and that's related to this copying issue, which we

21   wanted to raise now because, of course, that can be quite an

22   inflammatory charge before the jury, and we just don't think

23   there's any evidence of it, nor is it in his report.

24           THE COURT:  All right.  Thank you.

25           MR. MOORE:  Thank you.

1              MR. BELLOLI:  Your Honor, there are three ways

2      in which this the patent application that Motorola filed is

3      relevant.

4              THE COURT:  So you're starting at the second

5      issue and moving backwards?

6              MR. BELLOLI:  They are all tied together.  If

7      this document comes in in the case, we think he should be

8      able to testify to it, testify about it.  So there are three

9      ways, one of which was taken up with your Honor.  It's in

10     the validity case.

11             They said -- they filed a Daubert motion on

12     copying, which was denied, and this was the basis, this on

13     application, PTX-287, I believe it is.  277.

14             But it's also relevant to infringement in two

15     ways.  One is, if a patent app describes a product -- and

16     this patent app is no normal patent app because it does not

17     have figures.  It actually has pictures of the accused

18     product in it, and describes the accused lapdock product in

19     multiple places.

20             Does the whole patent app describe the patent?

21     I mean, not every aspect, but there's tons of direct

22     descriptions of how that product, how it works in there, and

23     we have a case on that.  It's CSAV versus Peerless, 2007

24     Westlaw, 42156.  And that stands for the proposition, the

25     description of actual products in patent apps are relevant

1    to infringement.

2              So, one, it's relevant to secondary

3    considerations of copying, which your Honor ruled on.

4              Two, it's relevant to infringement, just as a

5    direct infringement general matter.

6              And, three, this is where we get to the copying

7    again, it's relevant to inducement.

8              And how is there copying here?  Well, what they

9    did was, they took the '462 patent and literally lifted

10   sections out of that and put it into Motorola's patent app.

11   The same typos even appear in Motorola's patent app that

12   appear in the '462 patent.

13             Mr. Moore's point was that it requires --

14   copying requires copying of a product.  I don't think the

15   case law is so limited.  What could be more probative of

16   copying than copying the actual document that is at issue,

17   which is the patent?

18             So our point is, when they were creating this

19   product, they knew about our patent, obviously, it's the

20   only thing they cited and copy the patent, because Mr.

21   Kumar had met with them back in 2004 and described the

22   invention.

23             And then they started taking parts of his patent

24   and putting it right into their patent application that

25   is, that reads right on the product.  And not only that,

1    Dr. Alpert, in both his infringement and validity report

2    goes through a five-page comparison of the -- four-page

3    comparison, I'm sorry, of the on, the Motorola application,

4    and the patent showing where the same language is used and

5    showing how Motorola is describing its own product, the

6    lapdock product and why those elements are there.

7              So I mean we think it's a clear a case of

8    copying as you can get outside of the smoking gun e-mail

9    that says we're going to copy this product or this patent,

10   because they literally start lifting language.

11             It's almost like a copyright deal, where you see

12   the source code and the same typos appear, the same language

13   appears that no one else would use.

14             So --

15             THE COURT:  Well, I just need to make sure I

16   understand.

17             Number one, Mr. Moore indicated that this wasn't

18   included in Dr. Alpert's infringement report.  You are

19   telling me it was.  I guess I need to see it to make sure it

20   was.

21             MR. BELLOLI:  Yes.  He is not going to sit on

22   the stand today and say copying.  He's just going to show

23   how the -- well, he'll state in the rebuttal report,

24   secondary consideration of nonobviousness.  But he's going

25   to show how that patent app and the product are the same and

1    show that it's infringement, and show, and then link the

2    patent app to the actual patent app issue to show how they

3    lifted the language.

4              THE COURT:  All right.  So you are telling me

5    that this is an efficient way to prove infringement, that

6    you just don't compare the product to your patent language,

7    but that the expert goes through a two step or three-step

8    process, where you have to compare Motorola's patent

9    application to its product.

10             And then I don't know whether Dr. Alpert is

11   comparing the language of your patent with the patent

12   language.  I frankly don't know.  I've never had this dealt

13   with in terms of infringement.  It does not strike me as

14   something that is efficient.  I'm not sure whether it's

15   appropriate.

16             So I guess if you have an expert report you want

17   to share with me?

18             MR. BELLOLI:  I do.

19             THE COURT:  I will take a look at it.

20             MR. BELLOLI:  I do.

21             THE COURT:  And understand it and try to get

22   back to you before this theoretically goes on.

23             I don't think it's an issue with validity.  I

24   think it's an issue of getting this in for infringement.

25   Right?

1            MR. BELLOLI:  Yes.  As I said, your Honor ruled

2    on the piece for validity later on.

3            THE COURT:  Exactly.  That's what I said.

4            MR. BELLOLI:  All right.  Would you like me to

5    hand this to, your Honor, or hand this to your deputy?  I

6    have the portion of the report that's germane.

7            THE COURT:  Well, I mean, I'm not -- have you

8    shown it to opposing counsel?

9            MR. BELLOLI:  Yes.  It is in the report that

10   they received back in May of 2013.

11           THE COURT:  All right.

12           MR. BELLOLI:  And it's the portion of the report

13   that I directed Mr. Moore to last night (handing documents

14   to Mr. Moore).

15           THE COURT:  And so is this -- this is

16   inducement?

17           MR. BELLOLI:  Three things.  Direct

18   infringement, so when you are describing your product,

19   you're explicitly describing your product in the patent

20   application, that's relevant information about the product

21   just as a technical specification or anything else would be,

22   because you're out there describing your product to the

23   public.

24           And the patent application, like I said, it

25   showed -- it's pictures of the product.  It's not pictures

1    of figures that were drawn, like you would see in a typical

2    patent application.  I mean, it's pictures.  This is the

3    accused product, right here, in their patent application.

4    They go on to say exactly what the individual parts of the

5    product are and how they work.

6            So it's just as probative as a technical

7    specification or anything else because it's them describing

8    their product in a government record.  So that's how you get

9    to the first issue of it's relevant to infringement.  Then

10   is it relevant to inducement, because they copied our patent

11   app or our patent and put the language in their patent

12   application on their product.

13           THE COURT:  So that's copying is --

14           MR. BELLOLI:  Inducement.  This is your Honor's

15   decision that Mr. Moore referred to.  It's the ArthroCare

16   case, 310 F Supp. 2d at 638, and that's March 10th, 2004.

17           And your Honor said, evidence of copying with

18   appropriate circumstantial evidence going to intent.  That

19   is, if Smith & Nephew used ArthroCare's patented products as

20   a template for its own, that would be circumstantial

21   evidence that Smith & Nephew knew or should have known that

22   its customers would directly infringe the patents-in-suit by

23   using the accused, or by using --

24           THE COURT:  Once again, your case is moot

25   because you have to make the connection between the

1       application and the product in the first instance.  Right?

2                   MR. BELLOLI:  Yes.  We do, by showing the

3       copying of the language, yes.

4                   THE COURT:  All right.  Let's hear from

5       Mr. Moore.

6                   MR. MOORE:  Yes, your Honor.  Two issues.  I

7       mean, it's not a plagiarism case.  You know, the law is

8       clear, it has to be the product, and even your Honor's

9       decision in ArthroCare makes it clear, you have to have

10      evidence of copying of a patented product.  There is no

11      evidence in this case.

12                  If the fact that some language was used from a

13      patent we cited in prior art in our own application doesn't

14      make it a copying case, so we think certainly, and Mr.

15      Belloli now says they won't talk about copying in their

16      infringement case, which is not what he told me last night.

17                  That was one of our concerns, they were going to

18      stand up and charge us with copying when they have not met

19      the legal standard.  We would respectfully submit they have

20      not met the legal standard with respect to secondary

21      considerations as well because the Iron Grip case and other

22      cases out of the Federal Circuit apply that same rule in the

23      context of secondary considerations.  In other words, they

24      have to have evidence of a product that they made that we

25      copied and that just does not exist.

1           With respect to the expert report, and I've got

2      his copy --

3           THE COURT:  And I thought I had already ruled on

4      that, so I'm not sure why we're talking about that, but it

5      strikes me there's a difference between an infringement case

6      and a secondary consideration of obviousness case.  But, in

7      any event, if you are asking me to reconsider, then you

8      should formally do so as opposed to flipping it in.

9           MR. MOORE:  We will do that.  We can do that,

10     your Honor.  But in fairness, while you did deny our Daubert

11     motion, I don't believe in your verbal ruling that you

12     addressed the copying issue per se.

13          We'd be happy to submit that more formally, if

14     that would be of assistance.

15          THE COURT:  Well, I mean, I don't need any more

16     papers, but if you're saying that there -- whether the case

17     law you've given me or whether there's other case law that

18     specifically addresses the point, not infringement,

19     secondary considerations of obviousness, that it has to be a

20     product as opposed to -- and the thing you have to

21     understand that I think I understand is that just because

22     you say X doesn't mean you're eliminating Y unless you

23     address Y.  And so you see what I mean?

24          The fact that cases have focused on product

25     doesn't necessarily mean that they have rejected something

1    else if it wasn't presented to them in the first place.

2                    MR. MOORE:  Right.

3                    THE COURT:  Without reading the case law, I need

4    to consider.  It's good you've given it to me so I have

5    something to do over my lunch break.

6                    MR. MOORE:  Your Honor, may I hand up a copy of

7    this Iron Grip case?

8                    THE COURT:  Sure.  That would be helpful.

9                    MR. MOORE:  Do you have this?

10                   MR. BELLOLI:  Yes.  Just the report as well, if

11   I could give to Mr. Moore to hand up to you.

12                   THE COURT:  All right.

13                   MR. MOORE:  May I approach?  Thank you (handing

14   documents to the Court).

15                   And just for the record, the page I would direct

16   your Honor to is, that primarily discusses this issue in

17   Iron Grip is 1325, headnote 13.  And there we are talking

18   about objective evidence of nonobviousness.

19                   And the Court says, our cases do establish that

20   copyright competitor may be a relevant consideration in the

21   secondary factor analysis.  But then it says, not every

22   competing product that arguably falls within the scope of

23   the product is evidence of copying.  Otherwise, every

24   infringement suit would automatically confirm the

25   nonobviousness of the patent.  Rather, copying requires the

1    replication of a specific product.

2              And then it goes on to talk about different

3    cases where copying has been found and finds that level of

4    evidence is not present there.  All of the examples it gives

5    involve cases where the patentee had a specific product and

6    that product was, in fact, copied by the infringer.

7              THE COURT:  Right.  But this is an important

8    issue because what you are basically telling me is that

9    anyone who doesn't have a product is precluded from ever

10   asserting these issues, whether it's infringement, which I

11   have some difficulty with, or secondary consideration.  So

12   it's an issue that I need to give some thought to.

13             MR. MOORE:  Understood.  But I think it's, for

14   the fact of copying, I think that is the right answer, that

15   you must have a product to be copied.  Otherwise, you just

16   have a claim for infringement, which is, of course, what IV

17   had.

18             On the expert report issue, our problem is, we

19   don't dispute that in some cases, if a technical expert were

20   to link up, you know, a patent application and say, well,

21   this has all the embodiments of the accused product in it,

22   then we don't have an issue with the case law that says that

23   you can show infringement if you establish that your patent

24   application, that is it's our patent application here,

25   actually covers the product.

1            The issue is that in Dr. Alpert's report at page

2    136, Paragraph 911.3, he says, the patent application may

3    not provide a fully accurate technical specification of the

4    accused lapdock product, but the publication does describe

5    many features of the lapdock.

6            And when I asked that about him at his

7    deposition, about what he was saying that the application

8    covered the lapdock or not, he said he couldn't say that it

9    did.  He disagreed with me, in fact.

10           My question to him was:  "Why would Motorola

11   want to get its own patent unless it believed that its

12   product, the lapdock, was different from the '462 patent?"

13           And he said:  "Well, let me address one part of

14   that first.  I think we've already talked about that

15   application and I said I thought that the application, the

16   application may not be disclosing an embodiment of the

17   product.  So I would disagree that the application itself is

18   necessarily reflecting Motorola's product."

19           So it's at page 287 of Dr. Alpert's deposition.

20           So IV cannot make the foundational link to show

21   that it has done the analysis you need to use a patent

22   application to prove infringement.  They've got tons of

23   technical documents.  We must have several dozen on the

24   exhibit list.  They're welcome to use all of our internal

25   documents, our deposition testimony.  They've got actual

1    products.  There's tons of stuff they can say about why the

2    product infringed.  We just don't have the foundation for

3    infringement much less copying on the expert report.

4              THE COURT:  All right.

5              MR. MOORE:  Thank you.

6              MR. BELLOLI:  Just two quick points, your Honor.

7    The first one is that Dr. Alpert does think that that patent

8    application describes a product, especially in the parts

9    where it is specifically linked to those.  They're not

10   figures, they're actually pictures of the product.

11             So while the whole application, while there may

12   be parts that describe future embodiments that aren't part

13   of the accused product, there are certainly places in there

14   that it describes the product very explicitly.

15             So --

16             THE COURT:  That's what I was looking for.  If

17   you can point it to me, I'm happy to say.  As I said, this

18   is an inefficient way to prove infringement at best and, of

19   course, I suspect the reason you want to do that is because

20   you bring kind of this copying in, which may or may not be

21   appropriate.

22             So you tell me where there's better language

23   than the language that was pointed out to me on page 136.

24             MR. BELLOLI:  136, it starts at the bottom, and

25   it's the next three pages, where he goes, this is a

1    side-by-side analysis.

2              THE COURT:  Well, I guess the problem is, I

3    mean, I don't know myself how many embodiments.  I mean --

4              MR. BELLOLI:  The other thing, your Honor,

5    inducement requires knowledge of the patent, and this

6    proves, this document also, this application also proves

7    knowledge of our patent exhibit, just the language from it

8    again, and because it's cited on the face of it.

9              THE COURT:  Well, I can see the side-by-side

10   link between the patent and the patent application.  I

11   guess where is the link between the application and the

12   product?

13             MR. BELLOLI:  Do you have the -- here's the

14   exhibit.  It's -- well, the link is all the figures he cited

15   to, which are the pictures of the product.  And then just

16   like a normal, any other patent application, when you

17   describe 206 or 214, when you have this picture of the

18   product, that passage is describing the product in that

19   regard.  That's how you link it up.

20             THE COURT:  All right.

21             MR. BELLOLI:  Yes.  This is the product.  It's

22   the same thing as in the patent application.

23             And on your Honor's point about the case law,

24   there is no case that says that literally the only way to

25   copy is to copy someone else's product.  I can't think of a

1   more probative case of copying than actually copying the

2   patent itself.  I think that's one step beyond in the, in

3   copying.

4            Thank you.

5            THE COURT:  Mr. Moore, you have the final word.

6            MR. MOORE:  I'm sorry.  I will be very brief.

7            On the knowledge point, the application was

8   filed after this lawsuit was filed, so obviously we knew

9   about the patent.  In fact, we don't dispute we knew about

10  the patent about a year before this lawsuit was filed, when

11  the inventor sent us this flyer that I mentioned.  So we

12  already knew about it before we filed the application.

13  There's no issue there.  We don't need the application for

14  that reason.

15           THE COURT:  All right.  All right.  I will --

16           MR. MOORE:  Thank you.

17           THE COURT:  I will consider it and we'll be back

18  at 12:30.

19           (Luncheon recess taken.)

20              -  -  -

21           Afternoon Session, 12:30 p.m.

22           THE COURT:  All right.  I'm not sure I'm

23  finished thinking about this, but let me give you my

24  thoughts so far.

25           Clearly, in the good old days, because copying

1    is an inflammatory suggestion, it has been limited to

2    proving willful infringement and obviousness, and I could be

3    the only judge, and perhaps incorrectly, to expand that to

4    inducing infringement.  And my reasoning was, if a defendant

5    uses a patented product as a template for its own product,

6    then that is circumstantial evidence of intent.

7              This is a step away.  This is using the patent

8    as a template for a patent application as a template for a

9    product.  And when I look at the expert report, it's a very

10   superficial comparison between the patent, the patent

11   application and the product.  The product picture just

12   identifies the outside parts of the device.  It does not go

13   at all into the circuits where the processer is or anything

14   else.

15             I'm truly not prepared, at least not at this

16   moment, to believe that taking this a step further out,

17   where, you know, no person has tread before based on this

18   analysis is appropriate.

19             I want to give it a few more minutes of thought,

20   but having looked at the case law and having thought about

21   my own experience, I'm not confident this passes muster for

22   an infringement analysis.  I certainly have not finished my

23   analysis as to whether it would ever be appropriate in an

24   obviousness analysis.

25             All right.  Are there any other issues we need

1    to address before?

2            So I will give you a final decision after

3    thinking about it a little bit longer before your second

4    witness.  We will probably take a break long before that

5    because I can't imagine you have short, concise openings.

6    Nobody does anymore, so we should have time to do that.

7            Are there any issues we need to address before

8    we have the preliminary instructions and openings?

9    Anything, Ms. Day?

10           MS. DAY:  No, your Honor.

11           THE COURT:  Anything, Mr. Boice?

12           MR. BOICE:  No, your Honor.

13           THE COURT:  Thank you.

14           So now we just have to wait for the jurors to

15   line up, which on the first day is always a painful

16   experience.  Give us a minute.

17           MR. BOICE:  Your Honor?

18           THE COURT:  Yes?

19           MR. BOICE:  I stood up here at the break and I

20   am wondering if we block the jurors' view here.  Will they

21   be seated far enough to the left that they'll be able to

22   see?

23           THE COURT:  You know, I used to complain about

24   my old courtroom, but this has some issues.

25           MR. BOICE:  This is my problem.

 1                    THE COURT:  I know.  I'm not sure.  Does that --

 2                    MR. BOICE:  I think it's me standing here that

 3     would block their view if they were sitting right there for

 4     this.

 5                    THE COURT:  Well, I mean, you can certainly move

 6     things around.  Move the screen.

 7                    MS. DAY:  As long as I can see the screen, you

 8     can move it this way.

 9                    MR. BOICE:  Do you think we should?

10                    THE COURT:  Just don't unplug anything, all

11     right, or I will be yelled at.

12                    MR. BOICE:  I think it's probably okay.  I think

13     they've got a line of sight there.

14                    MS. DAY:  Okay.

15                    MR. BOICE:  Thanks.

16                    THE COURT:  And hopefully they're an outspoken

17     group and they'll let us know if there's an issue.

18                    Just out of curiosity, especially in the

19     preliminary instructions, maybe not in the final

20     instructions, I might just refer to all of these products

21     rather than actually naming them all.  Is there an objection

22     to that since they're written down?

23                    MS. DAY:  No objection, your Honor.

24                    MR. BOICE:  Not here either, your Honor.

25                    THE COURT:  Thank you.

1                    (The jury entered the courtroom.)

2                    THE COURT:  And everyone may be seated.  And

3       it's good to bring coats in because at some point it will be

4       too hot, but you never know what the temperature is going to

5       be in here.

6                    Members of the Jury, I'm going to start with

7       some preliminary instructions, but before I do that, we are

8       going to show you a video that explains patents and the

9       patent system.

10                   Although the video talks about sample patents,

11      because you have the actual patent at issue in your

12      notebook, it would be helpful if you followed along to

13      explain the parts of the patent by looking at the actual

14      patent that we're going to be talking about for the rest of

15      our stay here.

16                   So before we go further, let's start the video.

17                   (Videotape played as follows.)

18                   MR. FOGEL:  Hello.  I'm Jeremy Fogel.  I've been

19      a United States District Judge since 1998 and I'm now the

20      Director of the Federal Judicial Center.

21                   As you probably know by now, this is a patent

22      case, so you may be wondering, how can I sit in judgment on

23      a case like this when I'm not entirely sure what a patent

24      is?  We hope to answer that concern with this brief video,

25      which will give you some of the background needed to do your

1    job.

2            This case will involve some special issues that

3    the judge and lawyers will explain to you, but all patent

4    cases involve some basics that you will learn about.

5            This video will discuss what patents are, why we

6    have them, how people get them, and why there are disputes

7    that require us to call in a jury like you.

8            We'll also show you what patents look like.

9            The United States Constitution gives Congress

10   the power to pass laws relating to patents.  Article 1,

11   Section 8, Clause 8 allows Congress to promote the progress

12   of science and useful arts, by securing for limited times to

13   authors and inventors the exclusive right to their

14   respective writings and discoveries.

15           A patent then is an official grant by the United

16   States Government that gives its owner certain rights to an

17   invention.  Those include the right to stop others from

18   making, using, selling, or offering for sale the invention

19   that is claimed in the patent.

20           A patent lasts for a specific period of time,

21   usually 20 years from the date that the application is filed

22   by the inventor, but because it takes an average of three

23   years for the Patent and Trademark Office to act on the

24   application, the effective life of the patent is closer to

25   17 years.

1            A patent represents a bargain made between the

2     government and the inventor.  In return for the right to

3     prevent others from using the invention, the inventor must

4     enhance the public knowledge of what we sometimes call the

5     state of the art by adding something new and useful to it.

6            A famous example is Thomas Edison's invention of

7     a light bulb.  Harnessing electrical power for illumination

8     transformed society and led to many important breakthroughs.

9     During the lifetime of the patent, its disclosure may

10    inspire new inventions and after it expires, the invention

11    is free for anyone to use.

12           It is this combination of something new and

13    valuable to the public that justifies granting time limited

14    patent protection to the inventor.  A patent is in many ways

15    like a deed to a piece of property.  It grants the owner the

16    right to keep people off the property or to charge them a

17    fee, like rent, for using it.  And just as a deed indicates

18    boundaries defining the landowner's property, a patent claim

19    defines the patent tees domain.  The patent system works

20    because the inventor is required to describe the invention

21    in clear and specific terms so that the public knows what

22    the boundaries of the invention are.

23           Once a patent is issued by the government, it

24    becomes available for public inspection.  In that way,

25    anyone who learns of the patent can read it and understand

1    exactly what the inventor invented and the limits of the

2    patent set forth in the claim.

3              Now that we understand what a patent is, let's

4    take a closer look at term invention.  An invention is a new

5    way of solving a problem for a useful new machine,

6    manufacture or composition of matter.  The patent process

7    begins in the mind of the inventor, and in particular, when

8    the invention is formulated in the mind of the inventor.

9    Patent lawyers call this conception.

10             This is when the idea occurs to the inventor

11   clearly enough that he or she can write it down and explain

12   it to someone.  To qualify for a patent, the invention needs

13   to be new and useful.  Also, it must not be obvious to one

14   of ordinary skill in the field.

15             If the inventor believes these requirements are

16   met, he or she will prepare an application for filing with

17   the Patent and Trademark Office whose headquarters are in

18   Alexandria, Virginia, just outside of Washington, D.C.

19             The Patent and Trademark Office, often called

20   the PTO, is the agency of the federal government whose job

21   it is to examine patent applications to make sure they are

22   in proper form and comply with the requirements of the law.

23             The inventor can prepare an application for

24   filing with the PTO, but usually it is drafted by a patent

25   attorney or a patent agent who specializes in what is called

1    prosecuting patent applications.  That is, the process by

2    which they are evaluated.

3              The attorney or agent works with the inventor to

4    be sure the invention is described and claimed in a way that

5    complies with the law and the regulations of the PTO.

6    98 percent of patent applications are made on line using the

7    PTO's electronic filing system, although a few paper

8    applications are still made.

9              When the PTO receives the inventor's

10   application, it is first checked to see if it is complete

11   and complies with all the PTO's application requirements.

12   It then assigns the submission to a Patent Examiner, a staff

13   person with a background in the field or art the invention

14   falls within to evaluate the application and decide whether

15   a patent can be granted.

16             You've been given a sample patent to refer to as

17   you watch this video, so you already have a sense of what a

18   patent looks like, but now let's take a closer look at the

19   three main parts of a patent.

20             To begin with, there are some basic identifying

21   information on the first page.  This material is highlighted

22   in your hand out.  On the upper right side of the page is

23   the number assigned to the patent by the PTO and on the left

24   side is a title that describes the invention and the names

25   of the inventors and sometimes the company to whom they've

1    assigned the patent.

2           Also on the left is the date when the patent

3    application was filed and back on the right, the date when

4    the patent was issued.  There also is more detailed

5    information on the first page, including a list of numbers

6    following the caption, field of search.  These numbers

7    identify previously issued patents the examiner looked

8    at or searched to make sure the applicant's claimed

9    invention really is something new, not obvious, and thus

10   patentable.

11          Also listed on the first page is what we call

12   references.  That is previous patents or articles that

13   describe the technology or prior art known at the time the

14   application was filed.  It may seem strange to you that we

15   call this pre-existing technology prior art even though it

16   has nothing to do with artists.

17          We use the word "art" in its historical sense,

18   to include inventions and other subject matter reasonably

19   related to the claimed invention.  We also refer to a latest

20   technology as state of the art and we say of someone who can

21   understand and apply the technology that he or she is

22   skilled in the art.

23          The second major part of the patent is what we

24   call the specification or written description.  As is the

25   case in your sample, it is usually the longest part of the

1    patent.  It includes an abstract, which is a brief summary

2    of the invention.  A background section describes the nature

3    of the problem the invention is supposed to solve.

4             One or more drawings, called figures, that

5    illustrate various aspects of the application, and a

6    detailed description of one or more embodiments of the

7    invention.  An embodiment is a specific device or method

8    that uses the invention, such as a particular form of light

9    bulb.

10             The third and most important part of the patent

11   is the claims.  These are the numbered paragraphs that

12   appear at the end.  The claims are what give the public

13   notice of the boundaries of the invention.  They are similar

14   to the description of property you may have seen in a deed,

15   referring to precise measurements taken on the ground.

16             The Judge will instruct you further on how any

17   technical or ambiguous terms in the patent claims should be

18   understood.

19             Now that we've discussed the main parts of a

20   patent, let's look at how the PTO processes patents

21   applications, what we referred to earlier as prosecution of

22   the patent application.

23             This process begins when the inventor's

24   application arrives at the PTO.  There, it receives a filing

25   date.  Under the American Invents Act of 2011, filing dates

1    will determine who was awarded the patent if there are

2    competing valid applications.  In 2012, the PTO received

3    nearly 600,000 patent applications and issued more than

4    270,000 patents.

5              After determining that the application is

6    complete, the receiving branch also decides what field of

7    technology an application relates to and assigns it to the

8    appropriate examining group.  In order to make that

9    decision, the Patent Examiner usually looks at patents that

10   have been issued previously in the same or closely related

11   fields of art.  The examiner has computer databases that

12   contain information used to accomplish this task.

13             Another part of the job is to decide if the

14   inventor's description of the invention is complete and

15   clear enough to meet the requirements for a patent,

16   including the requirement that the description enables

17   someone of ordinary skill in the field to actually make and

18   use it.

19             However, because the job of examining so many

20   applications is challenging, the law requires the applicant

21   to tell the examiner whatever he or she knows about the

22   prior art that might be important to the examiner's decision

23   on whether to allow the patent.  We call this the

24   applicant's duty of candor.  One way the applicant can

25   satisfy this duty is by bringing pertinent prior art to the

1   attention of the examiner, either in the original

2   application or in other submissions called information

3   disclosure statements.  In this way, the decisions of the

4   examiner are based on both the information provided by the

5   applicant and on the information the examiner finds during

6   his or her prior art search.

7           Sometimes the examiner concludes that the

8   application meets all the requirements we've discussed and

9   allows the patent to issue at this first stage, but more

10  frequently the examiner will reject the application as

11  deficient in some respect.  This decision will be

12  communicated by the examiner in what is called an office

13  action, which is a preliminary notice to the applicant of

14  what the examiner finds insufficient or unpatentable.

15          For example, the examiner may reject certain

16  claims as being unpatentable because a journal article

17  written and published by another person prior to the

18  effective filing date of the patent application disclosed

19  what the applicant was currently claiming.  At that point,

20  the applicant prepares a written response either agreeing or

21  disagreeing with the examiner.

22          An applicant who agrees with the examiner can

23  suggest amendments to the application, designed to overcome

24  the Examiner's rejection.  Alternatively, an applicant who

25  disagrees with the Examiner's office action can explain the

1    reasons for the disagreement.

2            This exchange of office actions and responses

3    goes on until the examiner issues a final office action,

4    which may reject or allow some or all of the applicant's

5    claims.  The overall process is referred to as the

6    prosecution history of the application.

7            The written incoming and outgoing correspondence

8    between the PTO examiner and the applicant is also called

9    the file wrapper.  In the past, these file wrappers were all

10   in paper form, as were the submitted applications.  Now they

11   are most often electronic and may occasionally be paper as

12   well.

13           Most patent applications filed on or after

14   November 29th, 2000 are published by the PTO 18 months after

15   the inventors has filed his application so that the public

16   may inspect it.

17           Once a final PTO office action has occurred and

18   one or more claims have been allowed, the applicant is

19   required to pay an issuance fee and the patent is printed.

20   Then, on the date shown on the upper right-hand corner, the

21   first page of the patent, it is issued by the PTO and the

22   inventor receives all the rights of a patent.  That date is

23   highlighted on your sample.

24           Once a patent has issued, the inventor or the

25   person or company the inventor has assigned a patent to can

1    enforce the patent against anyone who uses the invention

2    without permission.  We call such unlawful use infringement,

3    but the PTO and its examiners have no jurisdiction over

4    questions related to infringement of patents.  If there is a

5    dispute about infringement, it is brought to the Court to

6    decide.

7              Sometimes in a court case you are also asked to

8    decide about validity.  That is whether the patent should

9    have been allowed at all by the PTO.  A party accused of

10   infringement is entitled to challenge whether the asserted

11   patent claims are sufficiently new or nonobvious in light of

12   the prior art or whether other requirements of patentability

13   have been met.  In other words, a defense to an infringement

14   lawsuit is that the patent in question is invalid.

15             You may wonder why it is that you would be asked

16   to consider such things when the patent has already been

17   reviewed by the government examiner.  There are several

18   reasons for this.

19             First, there may be facts or arguments that the

20   examiner did not consider, such as prior art that was not

21   located by the PTO or provided by the applicant.  In

22   addition, there is of course the possibility that mistakes

23   were made or important information overlooked.  Examiners

24   have a lot of work to do and no process is perfect.

25             Also, unlike a court proceeding, prosecution of

1    a patent application takes place without input from people

2    who might later be accused of infringement, so it is

3    important that we provide a chance for someone who is

4    accused of infringement to challenge the patent in

5    court.

6              In deciding issues of infringement and validity,

7    it is your job to decide the facts of the case.  The judge

8    will instruct you about the law, which may include the

9    meaning of certain words or phrases contained in the

10   patent.

11             So it is your primary duty as jurors to resolve

12   any factual disputes and in some cases, such as infringement

13   and validity, to apply the law to those facts.  To prove

14   infringement, the patent holder must persuade you by what is

15   called a preponderance of the evidence relating to the facts

16   of the case that the patent has been infringed.  To prove

17   invalidity, the alleged infringer must persuade you by what

18   is called clear and convincing evidence that the patent is

19   invalid.  The judge in your case will explain these and

20   other terms and provide additional specific instructions at

21   the appropriate time.

22             Good luck with your task and thank you for your

23   service.

24             (End of videotape.)

25             THE COURT:  I don't think we need the credits.

1    It's the first time I've seen this new one.  I like the

2    music in the old one better, but there you go.

3              All right.  Members of the Jury, now that you've

4    had that introduction, I have the following preliminary

5    instructions for guidance on your role as jurors in this

6    case.  These instructions are included in your notebook if

7    you want to follow along.

8              This is an action for patent infringement

9    arising under the patent laws of the United States.  The

10   plaintiffs are Intellectual Ventures I LLC and Intellectual

11   Ventures II LLC, which I will refer to as Intellectual

12   Ventures.  The defendant is Motorola Mobility LLC, which I

13   will refer to as Motorola Mobility.

14             Intellectual Ventures is a company engaged in

15   developing, acquiring, licensing and enforcing patents.

16   Motorola Mobility is a company engaged in the design,

17   development, marketing, and sale of mobile phones and other

18   products.

19             Motorola Mobility markets certain mobile phones

20   and other products including, and there's a whole list of

21   those and I'm not going to read them aloud.  I'm saving my

22   energy here.  I will refer to these products collectively as

23   the Motorola Mobility products.

24             Intellectual Ventures is the owner of the United

25   States patents at issue in this case.  There are three

1    patents:  U.S. Patent Nos. 7,120,462, 6,557,054, and

2    6,658,464.  I will refer to each of these patents by their

3    last three numbers:  The '462 patent, the '054 patent, and

4    the '464 patent.

5              Copies of these patents have been given to you

6    in the binders you've been given, along with these

7    preliminary instructions and paper for taking notes.

8              A patent case generally involves at least two

9    steps.  The first step is determining whether the accused

10   product, method or system falls within the scope of the

11   patent claims, that is, does the accused product, method or

12   system infringe the patent claims.

13             The second step is determine whether the patent

14   is invalid because it is not novel and/or is obvious or

15   because it does not comply with other legal requirements.

16             In this patent case, you must determine whether

17   Intellectual Ventures has proven that the Motorola Mobility

18   products infringe claims 1, 8, 10, 11, and 13 of the '462

19   patent, claims 151, 159, 162, 181, 189, 192, 256, 264 and

20   267 of the '054 patent, and claims 1, 8, 16 and 17 of the

21   '464 patent.  These claims may be referred to as the

22   asserted claims.

23             Intellectual Ventures also contends Motorola

24   Mobility has contributed to infringement by third parties by

25   supplying the Motorola Mobility products to customers.

1    Intellectual Ventures contends as well that Motorola

2    Mobility has induced third parties to infringe certain of

3    the asserted claims.

4              Motorola Mobility denies all of Intellectual

5    Ventures' allegations of infringement.  Motorola Mobility

6    affirmatively asserts that the '462 patent, the '054

7    patent and the '464 patent are invalid because they are

8    not new inventions, because they are obvious, and because

9    they do not comply with other legal requirements for a valid

10   patent.

11             You must decide these issues according to the

12   instructions that I shall give you at the end of the trial.

13   Those instructions will repeat the summary and will provide

14   more detail.

15             In terms of burdens of proof, this is a civil

16   case.  Intellectual Ventures has the burden of proving of

17   proving patent infringement by what is called a

18   preponderance of the evidence.  That means that Intellectual

19   Ventures has to produce evidence which, when considered in

20   the light of all the facts, leads you to believe that what

21   Intellectual Ventures claims is more likely true than not.

22   To put it differently, if you were to put the evidence of

23   Intellectual Ventures and Motorola Mobility concerning

24   infringement on opposite sides of a scale, the evidence

25   supporting Intellectual Ventures' claims would have to make

1    the scales tip somewhat on its side in each instance.

2              Motorola Mobility has the burden of proving that

3    the '462 patent, the '054 patent, and the '464 patent are

4    invalid.  A patent must be proved invalid by clear and

5    convincing evidence.  Clear and convincing evidence is

6    evidence that produces an abiding conviction that the truth

7    of a factual contention is highly probable.

8              Those of you who are familiar with criminal

9    cases will have heard the term proof beyond a reasonable

10   doubt.  That burden does not apply in a civil case and you

11   should, therefore, put it out of your mind in considering

12   whether the parties have met their burdens of proof in this

13   case.

14             It will be your duty to find what the facts are

15   from the evidence as presented at trial.  You, and you

16   alone, are the judges of the facts.  You will have to apply

17   those facts to the law as I will instruct you at the close

18   of evidence.  You must follow that law whether you agree

19   with it or not.

20             You are the judges of the facts.  I will decide

21   which rules of law apply to this case.  Nothing I say or do

22   during the course of the trial is intended to indicate what

23   your verdict should be.

24             The evidence from which you will find the facts

25   will consist of the testimony of witnesses, and documents

1    and other things admitted into evidence.  In addition, the

2    evidence may include certain facts as agreed to buy the

3    parties or as I instruct you.

4              Certain things are not evidence.

5              The statements, arguments and questions by

6    lawyers are not evidence.

7              Objections to questions are not evidence.

8    Lawyers have an obligation to their in clients to make an

9    objection when they believe testimony or exhibits being

10   offered into evidence are not admissible under the Rules of

11   Evidence.

12             You should not be influenced by a lawyer's

13   objection or by my ruling on the objection.  If I sustain or

14   uphold the objection, and find the matter is not admissible,

15   you should ignore the question or other item of evidence.

16             If I overrule an objection and allow the matter

17   in evidence, you should consider the testimony or other item

18   of evidence as you would any evidence.

19             If I instruct you during the trial that some

20   item of evidence is admitted for a limited purpose, you must

21   follow that instruction and consider the evidence for that

22   purpose only.  I will instruct you further during the trial

23   if this happens.

24             Anything you see or hear outside the courtroom

25   is not evidence and must be disregarded.  You are to decide

1    this case solely on the evidence presented here in the

2    courtroom.

3              In judging these facts, it will be up to you to

4    decide which witnesses to believe, which witnesses not to

5    believe, and how much of any witness' testimony to accept or

6    reject.

7              Now, a few words about your conduct as jurors.

8              Although you are not to talk about the case with

9    anyone else, you are permitted to talk to each other, when

10   everyone is in the jury room, about the technology at issue

11   in this case.

12             If you have questions in this regard, you may

13   write the questions down and give them to Francesca, my

14   courtroom deputy.  She will give the questions to me and I

15   will pass them along to the attorneys, who may or may not

16   try to incorporate your questions into their examinations.

17             Even though you may talk to each other about the

18   technology, you should not reach any conclusions as to the

19   issues presented until all the evidence is in and you have

20   been given your final instructions.

21             Finally, you must only consider the evidence

22   presented in the courtroom.  Do not read or listen to

23   anything touching on this case that is not admitted into

24   evidence.  By that I mean, if there may be a newspaper

25   article or radio or television report relating to this case,

1    do not read the article or watch or listen to the report.

2    In addition, do not try to do any independent research or

3    investigation on your own on matters relating to this case.

4          The proceedings during trial will be transcribed

5    by court reporters; however, it is not the practice of this

6    Court to make the trial transcripts available to jurors.

7    You must rely on your own recollection of what testimony was

8    presented and how credible that testimony was.

9          If you wish, you may take notes in the binders

10   we have provided to help you remember what witnesses said.

11   My courtroom deputy will arrange for pens, pencils, and

12   paper.  If you do take notes, please keep them to yourself

13   until the end of trial when you and your fellow jurors go to

14   the jury room to decide the case.  Here are some other

15   specific points to keep in mind about note-taking:

16         One, note-taking is permitted, but it is not

17   required.  You are not required to take notes.  How many

18   notes you want to take, if any, is entirely up to you.

19         Two, please take sure that note-taking does not

20   distract you from your tasks as jurors.  You must listen to

21   all the testimony of each witness.  You also need to decide

22   whether and how much to believe each witness.  That will

23   require you to watch the appearance, behavior, and manner of

24   each witness while he or she is testifying.  You cannot

25   write down everything that is said and there is a fear that

1    a juror will focus so much on note-taking that he or she

2    will miss the opportunity to make important observations.

3              Three, your notes are memory aids; they are not

4    evidence.  Notes are not a record or written transcript of

5    the trial.  Whether or not you take notes, you will need to

6    rely on your own memory of what was said.  Notes are only to

7    assist your memory; you should not be overly influenced by

8    notes.

9              We also ask you to wear your juror

10   identification tags where people can see them, so persons

11   involved in the case don't accidentally engage you in

12   conversation.  Even if it is innocent conversation, it might

13   draw into question your impartiality.  So please make sure

14   that people can identify you as jurors in the case.

15             As soon as I'm done reading these, the trial

16   will begin.  The attorneys will have three opportunities to

17   talk to you during the trial.  The first opportunity is the

18   opening statement.

19             During the opening statements, the attorneys

20   will introduce their respective stories to you.  As I've

21   already instructed, however, what the lawyers say is not

22   evidence.  It will be up to you to determine whether the

23   evidence -- the testimony of the witnesses and the admitted

24   documents -- supports what the lawyers say in their opening

25   statements.

1          The second opportunity that the lawyers have to

2    talk to you is during transition statements.  Lawyers are

3    permitted to make transition statements whenever they call a

4    witness to the stand, to introduce the witness and to

5    briefly explain the relevance of the witness' anticipated

6    testimony.

7          Finally, after all the evidence is in, the

8    lawyers will offer closing arguments to summarize and

9    interpret the evidence for you, and to tie the evidence to

10   their story.  I will then give you instructions on the

11   law and describe for you the matters you must resolve.

12   You will then retire to the jury room to deliberate on your

13   verdict.

14          You should generally expect that we will start

15   the trial each morning at 9:00 a.m. and finish at 4:30 p.m.,

16   with two 15-minute breaks, morning and afternoon, and a

17   break for lunch.

18          As I said earlier, I time my civil trials,

19   meaning each party is given a certain number of hours in

20   which to present its evidence.  This assures that trials

21   will be completed on a predictable basis.  This system can

22   only work, however, if you, as jurors, report to the

23   courtroom on a punctual basis as well.

24          All right.  Ms. Day, are you prepared to proceed

25   with your opening?

1              MS. DAY:  I am, your Honor.  Thank you.

2              May it please the Court, counsel, ladies and

3    gentlemen of the jury, my name is Elizabeth Day and it is my

4    privilege to be here representing the plaintiff,

5    Intellectual Ventures.

6              Allow me to introduce you to Melissa Finnochio.

7    She's Vice President and Chief Counsel of Intellectual

8    Ventures.  And our team, David Alberti, Marc Belloli, and

9    behind them, Clayton Thompson.

10             Now, before I introduce you to Intellectual

11   Ventures, let me tell you what this case is about.  This

12   case is about smartphones.  For some of you who may own a

13   smartphone, I think you'd agree with me that these phones

14   can do amazing things, and during the course of this trial,

15   you will learn about all of the technology in these

16   smartphones that makes these handheld devices computers.

17             This is a case about infringement of three

18   patents, and you'll hear about the technology that was

19   invented by the two inventors, Mr. Raj Kumar, and

20   Mr. Richard Reisman.  The evidence will show that Motorola

21   Mobility is using the inventions of Mr. Kumar and

22   Mr. Reisman in their smartphone technology today.

23

24             Here's an overview of what I plan to discuss

25   with you.  I'm going to briefly discuss what a the patent

1    is, although you had a nice explanation in the video that

2    you just saw.  I'm going to go into a little more detail

3    about what a smartphone is.  And then I'm going to talk

4    about Mr. Raj Kumar and the '462 Kumar patent.

5              As you'll see and as the video explains, we'll

6    be referring to the patents-in-suit by their last three

7    numbers, so Mr. Kumar's patent is the '462 Kumar patent.

8              Then I will introduce you to Mr. Richard Reisman

9    and his two patents, the '464 Reisman patent and the '054

10   Reisman patent.  I will then give you some background on the

11   parties, the plaintiff, Intellectual Ventures, and then

12   defendant, Motorola Mobility.

13             I'm then going to walk you through the evidence

14   of infringement and I will conclude my presentation with a

15   discussion of why these three patents are valid.

16             As the video mentioned, a patent is a property

17   right granted by the United States government to an

18   inventor.  A patent allows an inventor to exclude others

19   from making, using, selling, or offering for sale an

20   invention in the United States for a period of time, usually

21   20 years.

22             The video also explained that the Patent Office

23   employs people called examiners.  Examiners are experts that

24   work with the inventor to discuss what the invention is, to

25   make changes to the invention, but once the inventor and the

1    examiner agree on what the inventor has invented, a patent

2    issues.  As we see on this slide, a patent is like a deed to

3    real property.  It tells the world what you own.

4             And like a deed to real property, a patent shows

5    the boundary of the property.  It is the claims of the

6    patent that mark the property line.  You'll be hearing about

7    the asserted claims that the judge just read to you

8    throughout this case.  And just like it is trespassing to

9    cross real property lines, to use a patent without

10   permission is infringement.  Permission is only granted with

11   a license.

12            The evidence will show that Motorola Mobility is

13   trespassing on the '462 Kumar patent and the '464 and '054

14   Reisman patents because it is using that technology in its

15   smartphones without the permission of the inventors and

16   without the permission of Intellectual Ventures.

17            Now, before I introduce you to the two

18   remarkable men behind the inventions at issue in this case,

19   let me touch briefly on what a smartphone is.  A smartphone

20   is a computer that will let you do amazing things.  Each of

21   these computers that you see here have an operating system.

22   If you happen to own an Apple smartphone, the operating

23   system is called iOS.  If you own an HTC, a Samsung or

24   perhaps a Motorola phone, the operating system is called

25   Android.  And these computers let you do amazing things.  Of

1    course, they allow you to make and receive phone calls, but

2    they also let you send text messages, search the Internet,

3    play games, and download and update apps.

4         Now, what's an app?  An app is software and as

5    you see on the screen here, those square icons, those

6    represent apps.  If any of you own a smartphone, you may

7    have used apps to check the weather, to send a text message

8    or to play a game, like Angry Birds.

9         And, again, here we have examples of three

10   smartphones, one from Apple, one from HTC, and one from

11   Samsung.  And the patents you're going to hear about in this

12   case don't relate to technology in cellphones.  They relate

13   to the computer technology in today's smartphone.  I will

14   explain the difference between a cellphone and a smartphone

15   in just a moment.

16        Now, before I introduce you to Mr. Raj Kumar, I

17   want to take you back in time.  I want to take you back to

18   1999.  This was the year in which Mr. Raj Kumar was working

19   on his invention 15 years ago.  Mr. Kumar is going to

20   testify before you later today, and when you hear him

21   testify, try to take yourselves back to 1999.

22        You may recall that back in 1999, people had to

23   carry a lot of devices.  We had a laptop computer.  We had a

24   cellphone.  If we wanted to be organized, perhaps we

25   carried a PDA or a personal digital assistant.  And if we

1   wanted to listen to music, we'd have a walk man or an MP3

2   player.

3          Now, owning all of these devices was not only

4   expensive, but you needed to have a lot of batteries to keep

5   them going.  In addition, there was no way to guarantee that

6   all of the data on all of those four devices would be

7   available, meaning that it would be on each and every

8   device.  Generally speaking, your cellphone couldn't hold

9   your music.  You needed your MP3 player for that.

10          And if you were content to just carry a

11   cellphone back in 1999, you may remember that the screen and

12   the keyboard were very small on cellphones back then and it

13   was difficult to do anything really.  And today we take for

14   granted larger screens and larger keyboards to allow us to

15   do things, like search the Internet or edit a document.

16   Obviously, you couldn't do that back on your cellphone in

17   1999.

18          But Mr. Kumar came up with a solution to having

19   to carry multiple devices and to make sure that your data

20   was available to you at all times.

21          Let me introduce you to Mr. Raj Kumar, who is

22   the inventor on the '462 patent.  Mr. Kumar was educated in

23   India, but he came to the United States for the opportunity

24   to invent things.  Mr. Kumar loves to invent things.  He has

25   over 50 patents and many applications still pending before

1    the Patent Office.

2              The invention of the '462 Kumar patent has two

3    components.  The first component is a handset or a phone

4    that contains a central processor.  You can think of a

5    central processor as the brains or the engine, because what

6    a central processor does is it handles the heavy computing

7    tasks and it controls the operation of other components in

8    the computer.

9              The other component or part of Mr. Kumar's

10   invention is a docking station.  Now, the docking station

11   doesn't have a central processor, but it has a larger screen

12   and a larger keyboard.  And when you combine the handset

13   with the docking station, you have a really neat invention.

14   Let me show you.

15             So here is a prototype.  This is plaintiffs'

16   trial Exhibit 315, that Mr. Kumar developed.  And what is a

17   prototype?  It's a product that's used to test a concept, to

18   see if an idea will really work.

19             Mr. Kumar will tell, be telling you more about

20   his invention when he takes the stand later today, but the

21   one thing to remember is that the phone, the handset, this

22   is what it looked like back in 1999, contains the central

23   processor.  The brains are in the handset.

24             And this is Mr. Kumar's docking station from his

25   prototype and as you'll see, it has a larger screen than the

1    handset and a larger keyboard than the handset.  And when I

2    take the two and put them together, I'm able to use the

3    brains from the handset with the larger screen and keyboard

4    of the docking station to take advantage of the larger

5    screen and keyboard in order to do things, like search the

6    Internet and edit documents.  Obviously, you couldn't do

7    that back in 1999, but today those are things that users

8    really want to be able to do.

9         Now, you don't have to take my word for how

10   innovative Mr. Raj Kumar's invention is.  Here is

11   Plaintiffs' Trial Exhibit 314, and this is an award that

12   Mr. Kumar received from the Consumer Electronic Show in

13   2001.  The Consumer Electronic Show is one of the world's

14   largest electronic shows and it's held every year in Las

15   Vegas.

16        Back in 2001, Mr. Kumar received the design and

17   engineering showcase award for his product and I neglected

18   to mention his prototype is called the Pocket Partner.

19        So back in 2001, Mr. Kumar received this award

20   for his Pocket Partner and this is evidence of industry

21   praise for Mr. Kumar's hard work and innovation.

22        In addition to receiving the award from the

23   Consumer Electronics Show, Mr. Kumar also received his

24   patent.  Here is the '462 Kumar patent and the title is,

25   portable computing, communication and entertainment device

1    with central processor carried in a detachable handset.  The

2    title of this patent describes Mr. Kumar's invention

3    perfectly.

4              And as I mentioned, Mr. Kumar will be here to

5    testify later today, to tell you more about his invention

6    story and why he chose to partner with Intellectual

7    Ventures.

8              So now I'm going to take you even further back

9    in time, to 1993, and talk to you about the problems that

10   our next inventor, Mr. Richard Reisman, was facing.

11             So here we are in the early 1990s, and some of

12   you may remember that there were two worlds of computing

13   back then:  The world of the personal computer and the world

14   of the online network.  Users of personal computers, in

15   order to get software onto their computers, would either

16   have to go to the store or wait for the mail in order to

17   receive a floppy disk or a CD-ROM.  We see all of the floppy

18   disks stacked here.  Each disk is a different software

19   application.  And then if the user wanted to update that

20   software, he or she would either have to go back to the

21   store or wait for the software to arrive in the mail, a very

22   burdensome and time-consuming process.

23             Now, the other world of computing back in the

24   early 1990s was the world of the on line network.  It's hard

25   to believe, but back in the early nineties, the Internet was

1    just getting started.  Very few people used it and it was

2    very complex.  In fact, only those in research and academia

3    were the ones using the Internet.

4              And think about that.  In order to get software

5    off of the Internet, a user would first have to figure out,

6    how do I get onto the Internet?  Once I'm on the Internet,

7    how do I navigate my way through the Internet?  Once I find

8    a software application that I want to download, how do I

9    make that happen?  And if I'm lucky enough to make sure that

10   the software actually down loads from the Internet, where do

11   I store it in my computer so I can find it again for later

12   use?

13             And then, if the software gets updated, I've got

14   to repeat all of those steps again.

15             The burden was all on the user.  But

16   Mr. Reisman's invention solved all of these problems.  Let

17   me show you.

18             This is Mr. Richard Reisman.  He has over

19   50 years of experience working with computers and

20   programming software applications.  He believes that

21   computers should give people more freedom, more power, and

22   more fun.  Mr. Reisman also has a lot of patents.  He has

23   over 30 patents and many applications still pending before

24   the United States Patent Office.

25             Now, there are three words you should remember

1    when thinking about Mr. Reisman's inventions:  Simple,

2    economical and prompt.  What do I mean by simple?  Simplify

3    user tasks.  Have the computer do all the work.

4              Economical?  That means making it easier in

5    terms of time and money, not only for those who develop the

6    software application, the people who write the software that

7    we like to use, but save time and money for the user by

8    using a more powerful communications network.

9              And prompt?  That relates to the communications

10   network as well.  Using the Internet to make sure that the

11   user has the most up to date software in real time.

12             When Mr. Reisman testifies later this week,

13   he'll explain his inventions to you in more detail and he'll

14   walk you through his inventor notebook.

15             Here are the two Reisman patents we're going to

16   be discussing during this trial.  The first Reisman patent,

17   the '464, is titled, user station software that controls

18   transport, storage, and presentation of content from a

19   remote source.

20             We're going to be referring to this patent as

21   the content delivery patent.  And what the content delivery

22   patent allows is the selecting, downloading, storing and

23   presenting of software application.  It makes these tasks

24   do-able for the average user, not just a computer guru.

25             The second patent, the '054 Reisman patent, is

1    titled method and system for distributing updates by

2    presenting directory of software available for user

3    installation that is not already installed on a user

4    station.  That's a very long title, so we're going to be

5    referring to this patent as the directory patent.

6              And what the '054 Reisman patent does is it

7    allows a user to keep track of all of the software that he

8    or she has downloaded, and when that software needs

9    updating, the user is presented with a directory, a listing

10   of the software that needs to be updated and that is

11   available for updating.  The user can then choose which

12   software he or she wants to update, and the updates are done

13   in real time.

14             Taking his two inventions together, there is no

15   more going to the store or waiting for the mail in order to

16   get software onto your computer.  With Mr. Reisman's

17   inventions, it all happens at a click of a button.  A user

18   is able to go to one location, consider it one stop

19   shopping, select and download and update software

20   applications.

21             Realtime is far better than disks.

22             So now that you've met the two inventors, let me

23   introduce you to Intellectual Ventures.  Intellectual

24   Ventures is a company that was founded in 2000, and one of

25   its founders, Mr. Peter Detkin, will be here to testify

1    later in this trial.  Intellectual Ventures employs over 800

2    people in 13 countries in nine offices around the world.  In

3    addition, Intellectual Ventures has its own research

4    laboratory in Bellevue, Washington, which is where

5    Intellectual Ventures is headquartered.

6              Now, there are three words you should think

7    about when you are listening to the evidence about

8    Intellectual Ventures:  Buy, build, partner.

9              What do I mean by buy?  Intellectual Ventures

10   buys patents from companies and individual inventors like

11   Mr. Kumar and Mr. Reisman.  Buying patents is nothing new

12   and, in fact, companies buy and sell patents all the time.

13   It's standard business practice.

14             What do I mean by build?  As I mentioned a

15   moment ago, Intellectual Ventures has its own laboratory in

16   which about 120 inventors, scientists, engineers are working

17   to invent new things.  And when those individuals invent new

18   things, Intellectual Ventures either gets a patent on those

19   inventions or it spins off new companies in order to bring

20   those inventions to market.

21             And partner.  Intellectual Ventures has

22   partnered with, for example, the two inventors in this case

23   to license their patents.

24             Now, you will hear during this trial that

25   sometimes people are good at inventing things, but they are

1    not so good at marketing or licensing, for example.

2    Mr. Kumar and Mr. Reisman will testify about the challenges

3    they faced and this is where Intellectual Ventures comes in.

4    When inventors are facing challenges, Intellectual Ventures

5    comes in to provide resources and expertise to make

6    inventors' dreams a reality.

7             Now, despite all the invent touring and

8    partnering that Intellectual Ventures does, it does not make

9    any products.  I think Motorola is going to try to convince

10   you that somehow that matters.  It doesn't.  Anyone who owns

11   a patent may come to court and enforce that patent against

12   those they believe are infringing.  That is why we are here

13   today.

14            I will just spend a few moments introducing you

15   to the defendant, Motorola Mobility, or Motorola for short.

16   We are here today because Intellectual Ventures believes the

17   evidence will show that Motorola is using the '462 Kumar

18   patent and the '464 and '054 Reisman patents without the

19   permission of the inventors and without the permission of

20   Intellectual Ventures.

21            As I explained at the beginning, when someone

22   uses a patent without the owner's permission, that is

23   infringement, and as the judge explained, that is one of the

24   issues you will be deciding in this case.

25            Intellectual Ventures believes in invention and

1    it applauds those companies who continue to develop

2    technology.  Take Motorola, for example.  Almost 30 years

3    ago, Motorola developed the first portable cellphone and we

4    see a picture here.  This is the Motorola Star TAC.  Some of

5    you may have even owned a Star TAC at one point in time.

6    This was the first clamshell cellphone that Motorola

7    released back in 1996.

8              Now, a cellphone was very innovative at the time

9    because it allowed people to be mobile, to make and receive

10   calls on the go, but that's all a cellphone would let you

11   do.  Let's fast forward to the early to mid, to late 2000s

12   and the introduction of the smartphone.

13             In 2007, Apple released the iPhone and that was

14   a game changer.  As I mentioned, now a user is able to not

15   only make and receive calls, but you have a handheld

16   computer that let's you search the Internet, send text

17   messages, check your e-mail, play games and download and

18   update apps.

19             In 2008, HTC released the Dream product.  That

20   was the first Android-based smartphone.  And in 2009,

21   Motorola released its first Android-based smartphone.

22             As you listen to the evidence, remember that

23   this is a case about smartphones, not cellphones.

24   Intellectual Ventures agrees that Motorola invents and that

25   it has had a long history of innovation, but this is a case

1    about what Mr. Kumar and Mr. Reisman have done.  The

2    evidence will show that Motorola is using these inventions

3    today in its smartphones.

4              So now that you know who the parties are and who

5    the inventors are, let me take you through some of the

6    evidence regarding infringement.

7              Turning back to the '462 Kumar patent, this is

8    the product that Intellectual Ventures believes the evidence

9    will show infringes the '462 Kumar patent.  Now, there are

10   different models of this product that you'll be hearing

11   about during the trial, but the evidence will show that each

12   and every model infringes.

13             This is a picture of the original lapdock and

14   the phone that's docked to the dock is known as the Atrix

15   4G.  And remember the prototype.  Here is the handset

16   (indicating).  We see in the picture the smartphone, the

17   Atrix 4G.  That's the handset.

18             And, again, Mr. Kumar's invention, his docking

19   station.  We see in the picture a docking station as well.

20   And just like I can attach the phone to the docking station

21   in Mr. Kumar's invention, you see the Atrix 4G attach to the

22   lapdock.

23             And as you can see from this picture, by using

24   the brains or the engine of the central processor that is in

25   the Atrix 4G phone, the docking station works.  The screen

1   is on.

2              The evidence will show, however, that when you

3   remove the phone from the lapdock, the lapdock will not

4   work.  The screen will be dark.

5              Let me show you what Motorola's own documents

6   and the testimony you are going to hear later in this case

7   confirm about infringement.  Here we have Plaintiffs' Trial

8   Exhibit 204, and this is an internal Motorola document from

9   the Motorola Mobility Product Council Review.  The Product

10  Council Review is a big deal at Motorola because it's that

11  group of people that decides which products go to market.

12             Here we see this relates to the Lapdock 2, and

13  that's Motorola's internal name for the Lapdock 100 product

14  that you will be hearing about during this trial.

15             And if you were to turn to page 21 of

16  Plaintiffs' Exhibit 204, which is shown right here, we see

17  that this is a competitive benchmarking document where

18  Motorola is comparing the features of its lapdock product to

19  other products on the market.

20             Now, I know this is a little hard to read, so

21  let me make it larger.  And we see hear the Lapdock 2,

22  that's a Motorola product, the Chrome Net Book, the iPad 2,

23  the MAC Air 11, the HP Mini 311 and the Lapdock 1, which is

24  again another Motorola product.

25             On the row that says "processor," we see for

1    each of the lapdock products, it says, "uses handset."  What

2    does that mean?  That means that in order for the lapdock to

3    work, it must use the central processor that's in the

4    handset.  For the other products that are listed there, you

5    see a reference to Intel or a Dual Core A5.  Those are the

6    central processors that are used in those laptop computers

7    or those tablets.  But, again, the lapdock does not have a

8    central processor.  It must use the central processor from

9    the phone when the phone is docked in order to work.

10           This is Mr. James Barber.  He is an engineering

11   director at Motorola, responsible for leading a team of

12   engineers in product development.  You will hear from

13   Mr. Barber during this trial.  But let me preview what some

14   of his testimony will be.  His deposition was taken in this

15   case and he was asked the following question:

16           "Without the handset, there is no display on the

17   screen of the lapdock.  Correct?"

18           And in response he said:  "If the handset is not

19   plugged into the lapdock, the screen will be dark on the

20   lapdock.

21           "What does it mean that the screen will be dark

22   when the handset or phone is not connected?

23           "It means that the lapdock does not contain a

24   central processor.  The lapdock only works when the phone is

25   attached."

 1              And as you sit here and listen to the evidence,

 2    ask yourself if the phone is not attached to the lapdock,

 3    will the lapdock work?  The answer is no.  And let me show

 4    you.

 5              So here we have the original lapdock and the

 6    Atrix 4G.  This is the same model that we saw in the picture

 7    a few moments ago.  And you see that the Atrix 4G is

 8    connected to the lapdock.  And by virtue of it being

 9    connected, the screen is on.  You can interact with the

10    lapdock, take advantage of the larger screen to do things

11    like search the Internet or take advantage of the larger

12    keyboard to edit documents.  But when I remove the phone,

13    when I take away the brain, what happened?  The screen goes

14    dark.  I type.  Nothing happens.

15              The evidence will show that without the central

16    processor, without the brains in the phone, the lapdock will

17    not work.  Phone in, lapdock works.  Phone out, lapdock

18    won't work.  The central processor is in the phone, not in

19    the lapdock.

20              So less shift gears and talk about the evidence

21    with respect to the two Reisman patents.  Now, as I

22    mentioned, these patents cover the downloading and updating

23    of software applications.  If you own a Samsung, HTC or

24    Motorola phone with the Android operating system, you would

25    go to a place called Google Play in order to download your

1    applications.  If you're not familiar with Google Play,

2    here's a screen shot of the home page.

3             And you see that if you wanted to download apps,

4    music, magazines, books, movies or TV, you would go to

5    Google Play in order to do so.  The evidence will show that

6    it is Google Play running on the Motorola Android phones

7    that infringe the '464 Reisman and the '054 Reisman patents,

8    because Google Play allows users to download and update

9    applications.

10            Now, here's Figure 1 from the '464 and '054

11   Reisman patents, and Mr. Reisman will be here later in the

12   trial to explain this to you in much more detail, but the

13   gist of Figure 1 is that it shows the system and software

14   behind a user's ability to find an application, to click on

15   it, and to have it end up on the smartphone.

16            And when the application on the phone is out of

17   date, the user is notified.  The user gets a list saying,

18   hey, your applications are out of date and the user can

19   then, with a single click, click update and have the most

20   current version of the software downloaded in real time onto

21   the phone.

22            By using the technology in the Reisman patents,

23   the evidence will show that Motorola infringes.  And you're

24   not going to hear any disagreement from Motorola that the

25   whole purpose of today's smartphone is the delivery of

1   application.

2               Here is Mr. Alvin Von Ruff, and he's Senior

3   Director of Platform Engineering at Motorola Mobility.  He

4   has been with Motorola for 23 years, and he was also deposed

5   in this case.

6               And during his deposition, he was asked:

7               "What is the benefit of using an application for

8   a user?"

9               Under oath, what did he say?

10              He said:  "The whole point of the smartphone is

11  to basically deliver applications to the user, and that each

12  application is going to give the user some experience or

13  access to some resource that's only available through that

14  application."

15              You will also hear additional testimony from

16  Mr. Von Ruff during this trial that Intellectual Ventures

17  believes will confirm that Motorola infringes the '464 and

18  '054 Reisman patents.

19              Remember, the delivery of apps is the whole

20  point of the smartphone.

21              Let me discuss validity for a moment and then I

22  will wrap up.

23              Intellectual Ventures believes the evidence will

24  show that Motorola infringes the '462 Kumar patent and the

25  '464 and '054 Reisman patent.  Motorola is going to tell you

1    they don't infringe, but if you, the jury, think they

2    infringe, Motorola has got another argument for you.

3              Mr. Kumar and Mr. Reisman didn't invent

4    anything.  Their patents are invalid.  And what they are

5    going to do is they are going to stand before you today in

6    the year 2014 and tell you what somebody believed 20 years

7    ago, when Mr. Kumar and Mr. Reisman were working on their

8    inventions.  They are going to argue that the inventions I

9    have been discussing with you this afternoon aren't

10   inventions at all.

11             But what you cannot do is use what you know

12   about technology today and apply it to what was going on

13   back in the early nineties, 1993 with Mr. Reisman and 1999

14   with Mr. Kumar.  You will be instructed by the Court at the

15   end of this trial that you are not to apply hindsight in

16   determining validity.  With hindsight, everything seems

17   simple.

18             If you do what I ask you to do, which is put

19   yourself back in the time of 1999 or 1993, I think you will

20   agree that Mr. Kumar and Mr. Reisman were the first to come

21   up with the ideas they patented.

22             Now, I'm not going to talk about all of the

23   prior art that Motorola is going to show you during this

24   trial.  I'm just going to talk about a few references

25   quickly.

1         Now, as I mentioned, Motorola is going to stand

2    before you and say that Mr. Raj Kumar didn't invent

3    anything.  The man who loves to invent didn't invent

4    anything.  But let's think about that for a moment.

5         As you recall, Mr. Kumar's invention has two

6    pieces and this is the handset part of Mr. Kumar's invention

7    (indicating).  Mr. Kumar, when he testifies, will tell you

8    that the handset part of his invention contains a ton of

9    functionality.  You could make and receive calls.  You

10   could input data.  You could do all sorts of things.  And

11   why is that?  Because the central processor is in the

12   handset.

13        The handset is a very functional device in and

14   of itself.  It doesn't need the docking station in order to

15   work.  It works all on its own because it has a central

16   processor.

17        Now, here's one of the references that I think

18   Motorola is going to show you.  It's a U.S. patent granted

19   to an inventor by the name of Kobayashi.  And Motorola is

20   going to point you to those personal processor modules that

21   you see there.  And Motorola is going to say, those are the

22   handsets in Mr. Kumar's invention.  But the evidence will

23   show that unless you take that personal processor module and

24   combine it with the notebook, for example, the module will

25   not work on its own.

1          So as I explained a moment ago, Mr. Kumar's

2   invention, his handset, does a whole bunch of things all on

3   its own.  It does not need another component or device to

4   work.  The personal processor and module in Kobayashi, on

5   the other hand, must be connected with something else in

6   order to work.  If you don't connect it to anything, that

7   personal processor module is nothing more than a

8   paperweight.

9          And moving on to the Reisman patent, again,

10  Motorola is going to tell you that Mr. Reisman didn't invent

11  anything, that this gentleman with 50 years of experience

12  programming computers and developing software applications

13  didn't invent anything.

14         Let's take a look at what Motorola may show you.

15  So here's CompuServe.  Now, Motorola won't be showing you

16  any actual system or any actual prototype.  They are going

17  to show you I think some articles, some press releases,

18  maybe a book or two.

19         When you hear Motorola talk about CompuServe, I

20  want you to understand that the Patent Office knew about

21  CompuServe when it was examining Mr. Reisman's patent.  The

22  Patent Office knew about CompuServe because Mr. Reisman told

23  the Patent Office about CompuServe.

24         In the video you saw how a patent is granted and

25  the video mentioned references.  And references are patents

1    or publications, articles, known at the time that the

2    invention was filed.

3              The video calls this prior art.  You're going to

4    be hearing a lot about prior art over the next eight days.

5    The prior art that the patent knows about is listed on the

6    face of the patent under references cited.  And to show you

7    that Mr. Reisman told the Patent Office about CompuServe,

8    let me show you one of his patents.

9              So here's Joint Trial Exhibit 7, and this is a

10   copy of the '464 Reisman patent.  And you will see on the

11   front of the patent, there's a highlighted portion called

12   references cited.

13             If you turn in the '464 patent, or you can look

14   at the '054 patent, the specifications of the two are the

15   same.  And if you turn to page 4 you'll see toward the

16   bottom of the first column, we have an article written by M.

17   Banks titled "Welcome to CompuServe for Windows."  And then

18   at the top of the next column, we see another article

19   written by S. Davis:  "CompuServe Information Manager For

20   Windows.  Complete Handbook and Membership Kit."

21             Mr. Reisman told the Patent Office about

22   CompuServe not once, but twice.  And what did the Patent

23   Office do?  The Patent Office determined that Mr. Reisman's

24   inventions are different than CompuServe and they awarded

25   him a patent.

```
 1              And here's another prior art reference that

 2    Motorola may show you.  This is, again, a U.S. patent given

 3    to an inventor with the last name of Ogaki.  This is a

 4    vending machine patent from Japan.  That's all I'm going to

 5    say about that.

 6              On behalf of Mr. Kumar, Mr. Reisman and

 7    Intellectual Ventures, I really want to thank you for

 8    your time and attention during my presentation.  Thank

 9    you.

10              THE COURT:  All right.  I'm thinking that we

11    should take a break before you start.  Let's take

12    15 minutes, ladies and gentlemen.

13              (The jury was excused for a short recess.)

14              THE COURT:  All right.  Fifteen minutes.

15              (Short recess taken.)

16                   -  -  -

17              (Proceedings resumed after the short recess.)

18              THE COURT:  All right.  Is the jury ready to

19    come in?  All right.  Good.

20              (The jury entered the courtroom.)

21              THE COURT:  They're waiting for you, so you all

22    can be seated.

23              All right.  Everyone may be seated.  And, Mr.

24    Boice, you may proceed.

25              MR. BOICE:  Thank you, your Honor.
```

1          May it please the Court, counsel.  Ladies and

2    gentlemen, my name is Bill Boice and I represent Motorola

3    Mobility.  Before I introduce the rest of my team, I want

4    to, on behalf of the team, thank you for your service here

5    today.  We understand it's difficult, it's not even easy to

6    get here these days, but to serve on this is a very

7    important function and we greatly appreciate your time and

8    effort and energy in that.

9          Now, let me introduce the rest of the team for

10   Motorola and let me start with the counsel.  My partners,

11   Steve Moore, Candice Decaire, Clay Holloway.  My co-counsel,

12   Jack Blumenfeld, from the Morris Nichols firm.  The client

13   representative, Molly Peck, who was a longtime employee of

14   Motorola.  When Google acquired Motorola, she became a

15   Google employee, but she continues to represent Motorola and

16   so she is here in that role with us today.

17         And another representative of the client is

18   Rennie White, who is also with Motorola in the legal

19   department there.

20         There are others I will introduce as we go

21   along, but let me go ahead and get started.

22         Valid patents are very important to our

23   progress.  Valid patents protect new inventions.  Valid

24   patents disclose technology that helps others advance that

25   technology.  The patents that are involved in this case are

1    not valid patents.  They don't do either of those things.

2    The patents that are involved in this case claim things that

3    were not new, claim things that were obvious, and do nothing

4    to advance the technology, and that's why we're here.

5            We represent Motorola Mobility, as I said,

6    and we want to make a couple of things clear right off the

7    bat.  Motorola has taken nothing from Intellectual Ventures.

8    We build our products independently.  There's nothing

9    that we learn from their technology that goes into those.

10   We built the products without knowing anything about their

11   patents.

12           Intellectual Ventures, on the other hand, bought

13   the patents that it is suing on in this case.  And it buys

14   those patents to a certain against existing products,

15   products that people have already made, and that's where we

16   are today.  Motorola Mobility actually made the products

17   they are being sued on today.

18           So why are we here?  Well, the simple answer, of

19   course, is we're here because we got sued and we're here to

20   defend that lawsuit.  We're here to defend a lawsuit,

21   though, because the evidence will show that Motorola took

22   nothing from Intellectual Ventures.  The patents are not

23   valid.  They are not new concepts.  And there are really two

24   things that you are going to be asked to decide in this

25   case.  One is whether these patents are valid or not.  And

1    the second is whether we infringe those patents if they are

2    valid in this case.  And the evidence will show at the end

3    of that, that we don't infringe these patents.  We've taken

4    nothing.  We don't use or need anything from Intellectual

5    Ventures that they are asserting in this case and we don't

6    use it.

7              So let me tell you a little bit more about

8    Motorola Mobility.  This is a picture of Motorola's

9    headquarters outside of Chicago.  Motorola is a very old

10   company.  It has been around since the 1920s, founded in

11   '28.  One of the first products at Motorola was the car

12   radio and you see pictures here of that product.

13             But Motorola has had a long history of

14   innovation and making products that have been at the

15   forefront of our society throughout its history.  For

16   example, in World War II, Motorola was very involved in

17   providing walkie-talkies.  As they called it then, the

18   Handie-Talkie radio, two-way radio to our troops overseas

19   and other products, other things like that in the mobile

20   communications area.

21             It has also had a long history in television.

22   Of course, portable television, and in -- and a long history

23   with NASA.  Beginning in the 1950s, Motorola was heavily

24   involved in the Space Program, including this memorable

25   sequence.

```
 1                    (Videotape played.)

 2                    "That's one small step for man, one giant leap

 3       for mankind."

 4                    the quality of Motorola's phones have improved

 5       since 1969, but then most of our calls don't have to go

 6       176,000 miles either.  But coming before it in time, you see

 7       some other iconic products of Motorola for which the company

 8       is obviously very proud.

 9                    For example, the first cellphone, the first

10       commercial cellphone in 1983.  It's that product there that

11       looks like a brick being held by Michael Douglas.  And then

12       other phones, I think we've heard some about already, the

13       Star TAC and other products such as that and continuing on

14       into the future.

15                    As I mentioned a minute ago, Motorola is now a

16       Google company.  That is, it is owned by Google, but -- and

17       we're proud of that.

18                    Google is a company that is responsible for the

19       Android operating system, if you've heard of that.  It's an

20       operating system for cellphones that is now, it's open

21       source, which means it's developed by people in an open

22       source community.  Everyone can see the source code.  Anyone

23       can use this code for any product.  And companies do.

24                    It has become the most used software operating

25       system in the world and replaced Apple and others there.
```

1    And Motorola, of course, continues to have new products that

2    are also leading edge products.

3             Let me tell you a little bit more about

4    Motorola's history of innovation.  This is a picture of a

5    wall at -- can you see okay past me?  I don't want to block

6    your view.  This is a picture of a wall at Motorola's

7    headquarters in Libertyville, and this is a wall, these are

8    all patents.  They're some of the more significant patents

9    that Motorola has.  And Motorola has 17,000 patents or at

10   least did a couple of years ago even in the wireless

11   communications industry on these smartphones and cellphones

12   and the things that we've been talking about and thousands

13   of applications as well.

14            The significant thing about Motorola's patents

15   is Motorola invented those patents.  These patents are based

16   on its products, its own research and development, and

17   that's a very proud history of the company, and significant

18   I think for what's involved in this case.

19            Let me tell you just a little bit more about

20   Intellectual Ventures, which is kind of a light touch on the

21   plaintiffs' side on that.

22            Intellectual Ventures is a relatively new

23   company, started 13 years ago.  They were correct, we don't

24   compete with Intellectual Ventures in products because they

25   don't have any products.  They don't make products at all.

1    What Intellectual Ventures does is it buys patents without

2    any intention to make products on them.  It buys patents to

3    license or to sue if you don't take a license.

4              Now, you heard plaintiffs' counsel say, Ms. Day,

5    say, well, there are three things to remember about

6    Intellectual Ventures:  Buy, build and partner.  This case

7    involves the buy part and a little bit of the partner part

8    that I will tell you about, but there's no build here.

9    There's no building at Intellectual Ventures.  There are no

10   products that come out of there.

11             The companies that are bringing this lawsuit

12   are in the business of bringing lawsuits.  The partner

13   part of this is partnering with inventors, like Mr. Kumar

14   and Mr. Reisman, to also assert those patents against

15   companies.  They didn't partner with Mr. Kumar and

16   Mr. Reisman to help them build products to compete in the

17   marketplace.  They partnered with Mr. Kumar and Mr. Reisman

18   to assert their patents against other companies.  And that

19   is, in fact, the business model.  They buy patents to either

20   license or sue companies on existing products, not products

21   they teach anyone how to make or that they helped anyone

22   make, but to sue other companies, including Motorola's

23   existing products.  And that's why we're here, is to defend

24   this lawsuit.

25             I want to talk a little bit more about patents

1    and the patent law.  You just got through an hour or so ago

2    of watching that patent video and I want to talk a little

3    bit about some of the important concepts in that video that

4    you're going to have to decide here and highlight a couple

5    of those things.

6              When I talk about the law, I want to be very

7    clear, I'm not the one -- it's not my role to instruct you

8    on the law.  The Court will do that.  That's the Court's

9    role.  And I am only telling you what I think the Court will

10   ultimately tell you here, but the Court is the one who is

11   the expert on the law, not me as the attorney, and I don't

12   purport to be on that.

13             Some basics.  We agree a patent is like a deed.

14   It describes the boundaries of the invention.  There's one

15   thing to emphasize here we don't want to skip over too

16   lightly, and that is like a deed, a patent has to be very

17   specific about what it covers.

18             For example, this piece of property that's

19   outlined in this block here between Second and Main Street,

20   that piece of property has got to be described in a very

21   specific description, number of feet this direction, number

22   of feet west, number of feet south, back east, then north,

23   so that you know exactly what's covered by it.  But that

24   deed does not cover anything else on that block, just that

25   piece of property.  The patent is the same way.  It's very

1    specific about what it covers.  It does not cover anything

2    other than what is exactly described in the claims of the

3    patent.

4              So for a patent to be valid, you saw this just

5    in the video.  To have a valid patent, to have a valid deed

6    to your piece of property, to use to protect that or to

7    exclude others, there are three things that the patent has

8    got to have.  It has got to be, the invention has got to be

9    new.  That is, the inventor has got to be the first one who

10   came up with this idea.  Someone else can't have come up

11   with this idea.  I will talk about that more in a minute.

12             It has to be new.  It has to be a useful

13   product.  It can't be trivial.  It can't be some minor

14   thing.  And it cannot be obvious to one of skill in the art.

15   So it has to be new, useful and nonobvious to one of skill

16   in the art.  I will talk all about these things more.

17             You know, you were shown this, you were asked in

18   the video, well, why should you be involved in the process?

19   And I'd like to talk about that just a little bit more.

20             This is a very important concept and that's why

21   I thanked you at the very first of my presentation here.

22   You are very important, a very important part of the patent

23   process.  The patent process begins in the Patent Office.

24   It does not end there.  It begins in the Patent Office with

25   the examiner and the applicant.  And there are a couple

1       things that are very important for you to keep in mind.

2               That is a secret process.  When these patents

3       were prosecuted, the people present were Mr. Kumar or his

4       lawyers and the Patent Examiner or Mr. Reisman and his

5       lawyers and the Patent Examiner.  You didn't have other

6       people from the public.  Motorola wasn't there.  Other

7       people of skill in the art weren't there.  It's a secret

8       process.  So there was no opportunity for anyone else to

9       say, wait a minute.  That's not a valid patent.  You can't

10      patent that.  That's not new.  And here's some art that

11      would show that.

12              The second thing about this slide that's

13      significant is the legal system is a part of the patent

14      process.  It's part of our checks and balances of our system

15      of government, so that we have a check on the executive part

16      of the government where we have a legal system that we're

17      entitled to come to to make sure that everything was done

18      right and did we get it right and that's why we're here

19      today.

20              And you're now, you've been sworn in, you're

21      part of that process.  The judge, of course, is the one who

22      will decide the law, as I mentioned before, and the judge

23      will do things like interpret the claims as to what they

24      mean.  But you have the role of determining whether, in

25      fact, this is a valid patent or not, or whether there's

1    prior art, and I will talk a little bit more about that in a

2    minute that makes it invalid, and you are the ones who will

3    decide if it is valid, whether it has been infringed.

4              More specifically talking about the patent

5    video, the concept here that I want to highlight, and that

6    is that there's a bargain here that's made in the Patent

7    Office or in the patent system.  You only get a patent if

8    you have come up with something new that you've advanced the

9    public knowledge, that you've added to our state of

10   knowledge.  You don't get a patent just because -- unless

11   you have done that.

12             And there's a bargain here because if you get a

13   patent, that means you get the sole right to use that

14   invention.  Others can't use it.  You can keep them from

15   using it.  You can charge them for using it.  And so it's

16   very important that the patent bargain be adhered to and we

17   only give, we only allow valid inventions to keep their

18   patent status.

19             Now, how do we do that?  There's some talk about

20   prior art.  Prior art is, as he said in the video, it's not

21   art, it's not artwork.  It's things that existed before.

22   Why are we looking at prior art?  We're looking to see

23   whether this invention was new or there was some example of

24   it someplace else that already existed.  And these are

25   examples of where it could exist.

1          Some people have the notion that prior art must

2     always be another patent.  That's not accurate.  Prior art

3     could be any number of things.  For example, it can be a

4     publication that would show the same invention.  Someone

5     else has the same idea.  It's in a book.  It's in a

6     magazine.  And you'll see some of that in this case, or it

7     could be an earlier product or the one down here on the

8     bottom left, it could be a public disclosure.

9          And you're going to see a lot here or you're

10    going to hear a lot about some things that were done by

11    large numbers of people that practiced the same thing, did

12    the same thing that was claimed to be invented in these

13    patents.  All of that, any one of those things, they're all

14    prior art.  They're all things that were known that would

15    destroy the bargain of having something new to get this

16    exclusive right going forward.

17          So the question you're going to be asked to

18    decide later on is:  Is this patent, are these patents,

19    these three patents valid or not?  And there are two ways,

20    two things you're going to need to decide.  You are going to

21    need to determine.

22          One is whether it's a new idea that's included

23    in this patent, or the second thing is, if it's not a new

24    idea, is it an obvious one?  If it's a new idea or if it's

25    an obvious one, then it's not a valid patent.

1           A couple things that I want to explain a little

2    bit more on the new idea.  If it's not a new idea, the

3    patent law calls that, it's anticipated by prior art, and

4    that's an awkward word, quite frankly.  It means that

5    something in the prior art, a single reference in the prior

6    art, a single piece of art, a single patent or a single

7    publication describes everything in the patent.

8           So anticipation only means one thing describes

9    the invention.  So I have this invention that I've come to

10   the Patent Office with.  I've got a book that describes the

11   same thing.  You can't get a patent.  Just one thing and it

12   could be a book, it could be a patent, it could be prior

13   use, any of that could do it.

14          And you could have several things that, in fact,

15   describe it, but any one of them would invalidate the

16   patent.  It's said to be anticipated.  It's not a valid

17   patent.

18          The other concept that's important is

19   obviousness.  And I want to talk a little bit about that

20   here, too.  And obviousness means you can take more than one

21   reference, you can take something from the patent, a patent,

22   something from a publication, maybe something from prior

23   use.  They are all in the same field.  They are all

24   something a person of skill in the art would say, those are

25   things that ought to be combined or could be combined and

1    say, look at those and say, well, this new invention is

2    really obvious when you see the other inventions that have

3    already been done in this same area.  And a person of skill

4    in the art would say, that's something I could apply.

5            That's a tougher concept, so let me show you a

6    little bit of an example of that.  A simple example.

7    Someone who is in the business of building furniture knows

8    about a three-legged stool, knows about a chair, got four

9    legs, of course, and here's the design of it.  He's sitting

10   there and saying, you know, that three-legged stool is a

11   little bit unstable so I'd like something, you know, a

12   little bit more stable.

13           Well, he knows about the chair.  What does he

14   do?  He puts another leg on it.  It looks like the bottom

15   half of the chair.  That's an obvious invention.  You can't

16   get a patent on something that is obvious.  So is it for us

17   to decide whether it's obvious or not?  It's for you to

18   decide, but you've got to look at this from the position of

19   someone who is skilled in the art at the time.

20           So like in the stool example, it would be

21   someone who is knowledgeable or skilled in building

22   furniture.  In these areas, there will be people who are

23   skilled or knowledgeable about software, about design

24   products and those types of things.

25           And then that person of skill in the art, you

1    can look at this art that is out there, and to make a

2    decision whether something is obvious, he is presumed to

3    know, this person, this hypothetical person, this person of

4    skill in the art that you are supposed to -- who is deciding

5    whether something is obvious, he's presumed to know all of

6    the art that is out there that's related to that subject

7    matter.  So he knows about all the patents.  He knows the

8    publications, what's being used.

9              The reason you presume that or you can use any

10   of that is because you don't want people getting patents

11   just because one particular person of skill in the art

12   didn't know about something, because, you know, that's how

13   bad patents get issued.

14             So you presume that.  And then he uses his

15   knowledge of techniques in the industry, you know, what has

16   been done in the marketplace, and he uses, as we will ask

17   you to use, common sense in putting those things together.

18   And if he looks at those things and says, okay.  This

19   reference here or this book here and this patent here

20   describe things that are very similar.  You put them

21   together.  It's an obvious combination, then it's an invalid

22   patent.

23             Now let's turn to the patents-in-suit and talk

24   about those in a little bit more detail.  And as you recall,

25   the three patents.  There's the two on the right-hand side

1    of the screen are related.  Those are Mr. Reisman's patents.

2    His company is actually called Teleshuttle.  We sometimes

3    call them the Teleshuttle patents.  It does not matter.

4    Those are related patents from Mr. Reisman.  The one on

5    the left-hand side is the docking station patent of

6    Mr. Kumar.

7            These two -- and they're different patents, very

8    different.  And I will tell you just a few things about them

9    and go into those in just a little bit more detail here.

10           Let's talk first about this, the docking, the

11   portable computing device patent.  This is the one, we often

12   will refer to these as the patent by the last three digits

13   of the number there.  So you may hear it referred to as the

14   '462.  I apologize for that.  That's just the way people,

15   it's a convention that people talking about patents talk

16   about them sometimes.  We'll try to talk about it as

17   Mr. Kumar's patent, make it easier to, you know, keep that

18   straight.

19           This is a picture of the basic invention.  You

20   saw Ms. Day showed you the prototype of this invention.  And

21   the device in yellow is the portable processor and the

22   device in green is the docking station.

23           And there are two things about those that are

24   important to this invention.  The portable device is the

25   portable processor.  It has the intelligence or has the

1    things that run the device, has the computing power, if you

2    will, and the docking station, the thing in green, is a dumb

3    docking station that doesn't have any processor.  It does

4    not have any ability to do anything on its own.

5            So this device is basically a docking station,

6    portable processor, combined to take advantage of the two.

7    That's what the invention claims cover.

8            The highlight of the invention is it wasn't new.

9    You saw the prototype of the docking station and you saw the

10   handset that went along with it, which is a portable

11   processor.  That handset in the prototype was not a phone.

12   That prototype, that handset was actually a barcode reader.

13   It's just any portable processor.  So keep that in mind.

14   We're not looking for a phone, we're looking for a portable

15   power source, portable processor to be combined with a dumb

16   docking station.

17           And let's look at the prior art.  First, the

18   patent was filed in 1999, and so that's the date.  If

19   anything before that is prior art, anything before that

20   would show there was a prior invention, the patent wouldn't

21   be invalid.

22           So what is the evidence going to show in this

23   case?  Well, these types of devices have been around for a

24   long time.  Here's the first example in 1992, seven years

25   before this claimed invention, there was a docking station

1    for laptops.  We still use those today.  Laptop -- you know,

2    power all comes from the laptop.  Docking station is

3    basically a basic device.

4          But then, more particular, and Ms. Day talked a

5    little bit about this, the Kobayashi invention.  This had

6    exactly the same thing that is claimed in the patent.  The

7    yellow device is the portable processor.  It can be carried

8    around.  The green device is a dumb docking station that

9    makes the portable device a -- when you put the two

10   together, a fully functioning computer.

11         Well, how was this invented?  It was invented so

12   that you could have one processor that you could carry

13   around and use it in various different computers, different

14   docking stations.  So you would have one at work, one home,

15   one someplace else or someone else's docking station.  Plug

16   it in and your lap to be would be there.  That was the basis

17   of the invention.

18         There is no requirement in the patent that this,

19   that the patent -- there's no requirement that -- the patent

20   does not require that the processor be a fully functioning

21   device on its own.  It has got to be a processor that has

22   the power and can run the docking station and together they

23   do something, but it does not need to be a functional phone,

24   and you will see that when you hear the Court's instruction

25   about what is required in this patent.  Kobayashi does the

1    same thing, and Mr. Kumar claimed to have invented seven

2    years later because Kobayashi was, or six years later.

3    Kobayashi was a 1993 patent.

4            That's another example, also in 1993, same thing

5    of the portable processor, docking station, and this also

6    was in 1993, a little bit later in the year, also prior art.

7    One piece of prior art anticipates, because it does the same

8    thing as Mr. Kumar's claimed invention in 1999.

9            Just so, if you feel like you really want to see

10   a phone, there's a device that has a phone as well.  This

11   one in 1995, four years before the, or three-and-a-half

12   years before the claimed invention.  The phone in this

13   device was actually matched up with a docking station.

14           Now, this docking station was actually a laptop

15   and it would not meet all the claim elements of the patent

16   because it has got functionality.  It not a dumb device.

17           But the combined phone and lapdock did more

18   together than either device did separately.  The phone was

19   used essentially as a modem.  Used the wireless capacity of

20   the phone to get on the Internet, online, get on the

21   Internet to communicate.

22           This invention combined with the others, which a

23   person of skill in the art could do, makes this invention

24   obvious to one skilled in the art and also then anticipates.

25           You will hear from several people, three people

1    in particular on this patent.  Mr. Barber, you heard a

2    little bit about before.  He's a long time Motorola

3    engineer.  He led the lapdock development team, the product

4    that is accused, and you will hear him talk about that whole

5    development process, how it came about, how they put it

6    altogether.  And he will be here testifying probably now

7    since it's late in the week, by early next week.

8              Also on this, Tim Kowalski, who is an IP counsel

9    at Motorola, will talk about efforts at Motorola to not use

10   other people's inventions, to be careful about that.

11             And let me say something about that I should

12   have mentioned earlier.  Motorola, as I mentioned, has lots

13   of patents itself, and patents are very important to

14   Motorola.  We respect, you know -- we expect people to

15   respect our IP, our patents, and we respect other people's

16   intellectual property, their patents.  And we work hard not

17   to infringe any valid patents.  And we have processors that

18   are designed to do that.  So Mr. Kowalski will talk some

19   about that.

20             Then we have Dr. Timothy Drabik, who is actually

21   here.  Dr. Drabik, would you stand up for a second?  Thank

22   you.

23             He is a professor from, at both Georgia tech and

24   then more recently, Stanford, an expert in the area, and he

25   will go through those prior art devices, explain the working

1    of all of those devices, and how they show that, what

2    Mr. Kumar claims to have invented was not a valid invention.

3    And he also will go through then an analysis of the lapdock

4    product that is accused of infringing and show how it, in

5    fact, does not infringe the narrow aspects of this patent.

6    He'll talk about that a little bit more.

7              All right.  Then the next two patents are the

8    two Reisman patents that we mentioned before.  And these are

9    the patents that, the patent application was filed in 1994,

10   and Ms. Day talked about how that was a long time ago, and

11   that Mr. Reisman was dealing with problems in 1993, so you

12   had to put yourself back in 1993 to understand the problems

13   that he was trying to solve back then.  Okay?

14             Well, that's partly right.  He was looking at

15   problems in 1993, but those problems had actually been

16   solved ten years earlier in the 1980s.  And that's why these

17   patents are not valid.  And let's go through a little bit of

18   that.

19             So, first of all, let's put ourselves back in

20   time.  Early 1980s, early 1990s.  The early eighties, of

21   course, that was Reagan's time.  Bush, Sr. came in in the

22   late eighties, early nineties.  Olivia Newton-John, Michael

23   Jackson music in the eighties.

24             The movies back then, Back to the Future, Ghost

25   Busters.  Games:  Rubik's Cube, of course, Pac Man, the

1    Nintendo.  They were around my house, still is.  My son is

2    too old to be doing that.

3            Early 1980s, computers looked like this, big,

4    chunky.  Those things in front of it were floppy disks

5    because they didn't have much memory.  You always ran out of

6    memory.  You had to go buy more memory for them.

7            Cellphones looked big and chunky.  You see the

8    brick there and then others that are just cellphones because

9    there weren't any smartphones back then.  There really

10   wasn't much WiFi.  But what we had was dial-up and it was

11   slow and we'll talk a little bit more about that.

12           But that's a real significant part of this.  And

13   Ms. Day said, well, you know, the Internet was just getting

14   started back then.  That's true, but there were things that

15   were going on well before that.  And what was going on

16   before the Internet was dial-up, dial-up networks like AOL.

17   You probably remember this.  It was never that quick for me.

18   In any event, they made a movie that had all of that in it.

19           America Online was one of those dial-up

20   networks.  There's another one that we're going to be

21   talking a lot about and that's CompuServe, and it's, in

22   fact, the granddaddy of these networks.  Prodigy is another

23   and we'll also be talking about them.

24           So let's talk now a little bit more about this,

25   this patent that -- one of Mr. Reisman's patents.  This is

1    the one that I think plaintiffs' counsel referred to as the

2    directory patent.  It's essentially -- it's a pretty simple

3    concept and I think that's important to keep in mind.  We'll

4    talk later about exactly what was going on when this was

5    invented.  But the concepts here are really simple.

6              You know, the user of the computer selects

7    available updates to software and the computer then delivers

8    that to the user.  Basic type stuff that is going on.

9              This basic invention is being asserted against,

10   and the next one, too, we talked about that, the '464.  This

11   is the one I think they call the -- I don't know whether

12   they call it.  It's essentially the simple steps, they

13   called it the steps select, download, store and present.  In

14   other words, select content.  The user selects content from

15   different publishers.  The computer transports, down loads

16   it and stores it on your computer.  And then it presents it

17   to the user to actually use.

18             These are software patents where basically you

19   are downloading software off of the network.  These are

20   patents they now say cover app stores that were not

21   developed until 2007, with Apple, as they told you that.

22   This is 1993.  They say these knowledge of software ideas.

23   So a number of years later.

24             The reason I say that is because they're very

25   basic, simple concepts that they are saying do the same

1     thing.  The problem with basic, simple concepts is, it's

2     hard to find one that's new, and there's not one that's

3     new here in either of these patents, and let's show you

4     why.

5             Beginning with CompuServe, let me talk just a

6     little bit more about CompuServe.  This is 1980 that

7     CompuServe was actually born.  The company, the predecessor

8     company, began in the 1960s, '69, in Columbus, Ohio, '71.  I

9     will tell you about someone who is going to testify here

10    joined it.  But this was a dial-up network where you would

11    dial up.  It was very popular in the early eighties.  It was

12    popular into the nineties.  '96, I think, or longer than

13    that.

14            But on this network, you could dial up and you

15    could, you know, download software.  You could -- you had

16    e-mail.  You had instant messaging.  You had chat.  You had

17    downloading of software, downloading of games, all of this

18    over a computer network, you know, the early days of PCs.

19    Okay?

20            So you didn't -- I mean, this began when you

21    didn't even have a mouse.  I mean, you had to type in the

22    codes to go to the source, but then you were able to

23    download this content.

24            That's where all of these simple concepts that

25    are now claimed in these two patents of Mr. Reisman were

1    fully done and utilized and that's why they invalidate it.

2           So you have CompuServe began in 1980.  In 1984,

3    there was a book written about it of all the things that it

4    could do, about how you could, the various things that you

5    could, the software you could download, the updates you

6    could get, all the things that are claimed to have been

7    invented almost -- well, ten years later, the application

8    was filed were all being done and are shown in this book in

9    1984.

10          The Ogaki patent.  This is directly relevant to

11   the patent that has to do with presenting content from

12   different publishers.  This was an online, a video machine

13   that had, was connected to a network, so that if you wanted

14   to get different games, for example, from different

15   publishers or different software from different publishers,

16   you could get, you could download those right there and they

17   would be transported over a network to this device, and you

18   would take and put it on, it wasn't even a disk.  It was a

19   cassette that you had been putting on your computer and do

20   the same thing, download there, but the same functionality

21   was done.

22          You had other online networks.  Prodigy.  You

23   share files, download files, download things.  This is all

24   about before Mr. Reisman claims to have invented these

25   patents.

1              So is this, ProComm, another one where you share

2     files, browse.  Let me say something about -- I will come

3     back to this.  Let me finish it out before I get too

4     interrupted here.

5              Another book about CompuServe, all the things

6     they were doing.  This one was in 1991.  Again, prior art

7     before Mr. Reisman claims to have invented it.  Let me say

8     this here.  CompuServe had thousands or actually hundreds of

9     thousands of people using it in this time frame.  Got to

10    like 2 million people using the CompuServe network and they

11    would have people sharing information.  They would have

12    cites you could go to where you could download software,

13    people writing software, posting it to that, listing it out.

14    You could get updates for your software.

15             There's a very collaborative system.  They had

16    games that you could download.  There are all kinds of

17    things that various people who were on this network were

18    doing.  The reason I mention that right here is because

19    that's what's known in the eighties, in the early nineties,

20    before this claimed invention.  People were doing that.

21    Hundreds of thousands of people were doing that.  You can't

22    come and claim these very basic processes are new.

23             Again, finishing that out, other, America

24    Online.  We saw that again.  Same type of network.  Also

25    prior art.  The remote wear, a system that surveyed what was

1    on your computer, tell you what updates you needed.  You

2    could download those.

3            Daily Federal Register, same type of thing.  And

4    that's in 193.

5            And then finally, in '94, Mr. Reisman claims to

6    invent things that have been done in all of these three

7    pieces of prior art in the prior years.

8            That's why these patents are invalid and that's

9    what the evidence is going to show in this case.  CompuServe

10   is the prior one that we're going to be talking about for

11   this patent, the patent that you would select, download,

12   store and present as Intellectual Ventures says.  And then

13   the two references we talked most about are CompuServe again

14   and the software vending machine in the Ogaki patent, which

15   are the, the compilation of those makes everything in the

16   '464 obvious as well.

17           And you will hear from a couple people.  You'll

18   hear from Sandy Trevor, who is, will be here to testify.

19   He's the person I talked to you about who started working

20   with CompuServe in 1971, became the Executive Vice President

21   and Chief Technology Officer, was with them until 1996.

22   Knows everything.  Knows a lot about all that's going on.

23   He can't know everything that's going on in CompuServe

24   because it's a huge network of people doing things, but he

25   can tell you the things that were being done and all the

1    things that he knows that were being done that invalidate

2    this patent.

3              And then we have an expert, Dr. Brian von

4    Herzen.  He is here.  Brian, stand up.

5              Brian is at Cal Tech, very knowledgeable,

6    interesting guy involved in a lot of different things.  He

7    will go through the prior art, explain the technology, what

8    was being done in the area and why this invention is not

9    new.

10             There were a couple other people then.  Since

11   the play store, the Google Play store is being accused of

12   infringing, and that's a service that we get, that Motorola

13   gets from Google.  The Play Store is a free service of

14   Google.  I mean, they have a lot of apps that are free.

15   Google has a lot of free stuff, maps and navigation and a

16   lot of things that are very helpful.

17             And Motorola is not special.  We're not treated

18   special about this because we're -- Motorola, because we're

19   owned by Google.  All users of Android operating systems

20   also get the operating system from Google, you know, foe

21   free and they get these basic packages of free apps that

22   come with them.

23             So since they're accusing Google's action, we're

24   bringing someone from Google to testify about them.  That's

25   Ficus Kirkpatrick.

1          And then from the Motorola side, we're bringing

2     the person at Motorola, who is a software engineer, is

3     responsible for that, and that's Rajesh Rudrardyha, and he

4     will be testifying as well.  I'm glad he's not here.  I

5     butchered his name because I really have a hard time with

6     it.

7          In any event, let's talk about why you should

8     consider or why you should be, as a jury, involved in

9     invalidity, in deciding whether these patents are valid.

10    And the three reasons that you should, and I'm going to talk

11    about each of those.  They were covered a bit in the patent

12    video that you looked at, so let me move through that and

13    talk about them rather than let you spend too much time on

14    it.

15         The first one is this, the Patent Examiner

16    didn't know everything and the reason for that is, is that

17    there's a lot of prior art out there that the Patent Office

18    would never know about when they are trying to evaluate a

19    patent.  They are not going to know about things that are

20    happening on CompuServe, the network, what people were

21    doing, unless someone who is involved in that talks to them,

22    and they are not set up to do that.

23         So there are a lot of things that they don't

24    know that you are going to learn about that they didn't know

25    about, and you are going to see a lot more than the Patent

1    Office ever could see, because they're just not set up to

2    see all of that.  So there's art they didn't consider and

3    there's very important art and testimony you're going to

4    hear that they didn't know about.

5             The second reason is this possibility of

6    mistakes.  Everybody makes mistakes.  That's not really the

7    point we're trying to make here.  We're really focused on

8    the things that the Patent Office didn't know, didn't see

9    that you are going to see.

10            The third reason is what I talked about before.

11   That is that the examination takes place in private.  The

12   original examination of these patents took place in private.

13   Motorola wasn't involved in that.  So we didn't have a

14   chance to present all of the art that we've looked for and

15   we found and invalidates these patents.

16            So the bottom line on this, let me summarize.

17   I'm about done here.  The Intellectual Ventures, the patents

18   that are asserted against us are invalid.  The Kumar patent,

19   the one that's on the docking station, it is anticipated.

20   There are two references to Kobayashi and Nelson.  Either

21   one of those invalidated.  It's also obvious and invalid

22   when you combine that Smith patent with the phone and

23   Nelson, another reference, and we'll go through that in more

24   detail.

25            The '054 patent, totally anticipated by things

1    that were being done, anticipated and both -- anticipated

2    and rendered obvious by things that were being done at

3    CompuServe.

4              And the '464, anticipated and made obvious by

5    things being done at CompuServe and by the Ogaki reference.

6              Briefly on noninfringement, I'm not going to go

7    through noninfringement because you are getting tired and

8    it's technical and detailed, and it will take a lot more

9    explanation and you are not going to remember it right now.

10   But we're going to have experts explain why the various

11   claims of these various patents we don't infringe.

12             A couple things I want to tell you though about

13   noninfringement that are important to keep in mind as you're

14   going through this.  To show that a patent is infringed, the

15   patent owner has to show that the accused product does

16   everything in a claim of the patent.  Every element in that

17   claim has to be infringed, has to be met for the patent, for

18   that claim to be infringed.

19             So to prove infringement, you've got to show

20   everything the patent claims is new is in the accused

21   product.

22             Second, the second part of this, the bottom, if

23   not everything is present, the patent is not infringed.

24   We'll give you a little example of that.

25             Two patents here, one on a soccer ball, one on a

1    football, both made of leather.  Okay.  That's met.  You

2    have the patent, the accused products.  Both are stitched

3    together, so that element is met.  Both filled with air,

4    that's met.  Both can be kicked, that's met.  The soccer

5    ball is round.  The football is oblong.  Not met, not

6    infringed.  The football wouldn't infringe that because not

7    every element is met.

8            The significant thing I'd like you to take away

9    from this is, close is not good enough in infringement.  It

10   has got to be a hundred percent.  So even if 95 percent of

11   the things are done in the accused product, if there's five

12   percent that is missing, you are not infringed.  It's a

13   total deal here that you have to meet every element of the

14   claim.

15           All right.  Bottom line.  At the end of all of

16   this, you're going to be asked to decide whether these

17   patents are valid and whether they are infringed.  I would

18   ask as you listen to the evidence that you ask yourself when

19   you see what they're accusing, you know, what's the process

20   that they're accusing here?  Was that really new?  Did they

21   really invent it or was there something before?  And keep an

22   open mind about that.  So as you go through, ask yourself

23   that as you go along.

24           I would like to also remind you that they go

25   first.  The plaintiff goes first in this case, so they have

1    an opportunity to tell their story before we get to tell

2    ours.  And they are basically going to be talking about

3    whether these products infringe.  When they get through

4    doing that, we're going to talk about how we don't infringe

5    and why these patents are invalid.

6              So you are not going to hear about all of the

7    invalidity evidence until we start our case, and all I can

8    ask you is, if you will keep an open mind and not jump to

9    any conclusions until you hear the rest of the story, and

10   the rest of the story is why these patents are invalid.

11             And at the end of that, we expect you to, I

12   would hope that you will find, you will agree with us that

13   we don't infringe these patents, and these patents are not

14   valid patents.  They don't own this space and we're not

15   liable to them.

16             Thank you very much again for your attention.  I

17   greatly appreciate it.

18             THE COURT:  All right.  Thank you.  Are we ready

19   to proceed with our first witness?

20             MS. DAY:  We are, your Honor.

21             THE COURT:  All right.

22             MR. ALBERTI:  Your Honor, Intellectual Ventures

23   calls its first witness, Raj Kumar.

24             Raj Kumar is the founder of Khyber Technologies

25   and is the inventor of U.S. Patent No. 7,120,462.

 1             THE COURT:  All right.  Thank you.

 2                 PLAINTIFFS' TESTIMONY

 3                 ... RAJDENDRA KUMAR, having been duly

 4             sworn as a witness, was examined and testified

 5             as follows ...

 6             THE COURT:  You may proceed.

 7                 DIRECT EXAMINATION

 8    BY MR. ALBERTI:

 9    Q.    Good afternoon, Mr. Kumar.  Could you please state

10    your full name for the record.

11    A.    Rajdendra Kumar, but I go by Raj Kumar, the first two

12    letters.

13    Q.    Are you the inventor of any patents?

14    A.    Yes.  The Kumar patent, the '462.

15    Q.    And did you prepare any demonstratives to aid in your

16    testimony today?

17    A.    Yes.  I have some slides.

18    Q.    Let's start discussing your background.  Could you

19    tell us a little bit about your education.

20    A.    So I have a Bachelor's degree in electrical

21    engineering from Indian Institute of Technology in India.  I

22    can say proudly it has been termed as the MIT of India.  And

23    I did that in 1969.  And then moved here to U.S., in Texas,

24    to do some graduate studies, and did that for about a

25    year-and-a-half.  And then moved to Houston, Texas, and

Kumar - direct

1    started working.

2    Q.    What was your first job when you went on to Houston?

3    A.    That was Electronic Labs, a small company.  They were

4    doing some different projects.  But that was in 1971.  Good

5    timing because Intel just came out with the first chip, the

6    first microprocessor, and Electronic Labs, they started a

7    project which was one of the first four projects in the

8    world using microprocessor.  And they picked me to work on

9    that project along with about three more people.

10   Q.    Where did you go after Electronic Labs?

11   A.    Electronic Labs, after that, I wanted to try out a

12   bigger company.  Electronic Labs was small, so I went to

13   TRW Systems.  They were across from Johnson Space Center

14   outside Houston.  And basically they developing -- I

15   oversaw development of traffic controllers using

16   microprocessors, so they hired me as a microprocessor

17   specialist at that time.

18   Q.    Were you involved in any startups?

19   A.    Yes.  So TRW Systems was a wonderful company to work

20   for, but I kind of realized after working there and

21   comparing it with Electronic Labs that I liked small

22   companies.

23         So I joined a couple of my colleagues from

24   Electronic Labs, worked for them for about two-and-a-half

25   years, and then went on my own.  I did that for a

Kumar - direct

1    year-and-a-half.

2                    And then I went back to work for Electronic Labs

3    basically, but their name had changed to Telxon now, and

4    they moved their headquarters to Ohio from Houston, Texas.

5    So I worked for Telxon.

6    Q.    What did you do at Telxon?

7    A.    Telxon was a wonderful experience.  Eleven years at

8    Telxon, and they made these handheld computers you might

9    have seen used in the field for scanning barcode and data

10   entry.

11                   So in retail stores, they use it for inventory.

12   Rental car agencies use it.  If you saw Avis, my kids got

13   tired of me by every time I see Avis guy, say, how do you

14   like the computer, because I designed it.  Also the route

15   delivery people, Pepsi, Coca-Cola, they use that.

16                  So that's basically what I did there and our products

17   were just great.  At that time we -- and they were

18   trendsetters, and they did well.

19   Q.    Why did you leave Telxon?

20   A.    The Telxon experience was great, but the company grew.

21   They did well.  They went public and then, you know, stock

22   was going higher and higher, which was good, but it became

23   too bureaucratic and kind of political for what I like to

24   work in.  So I just took some of the money I had made

25   through stock options and all and said I will go realize the

Kumar - direct

 1    American dream and have my own company, create some new and

 2    unique products.  So I founded Khyber Technologies.

 3    Q.    What did Khyber Technologies do?

 4    A.    So Khyber, we did custom products for our clients.  In

 5    many cases, we just made prototypes.  In some cases we made

 6    about 2,000 units, and we would subcontract the work to

 7    manufacturers.

 8              IBM, for example, we made portable point of sale

 9    that you could put it on your shoulder and you had barcode

10    scanner, a printer, a magnetic stripe reader.  So the idea

11    was you just walk up to the customer, check them out at

12    different places.

13              We did that for them.  We did a little work for

14    UPS.  Then we did some work for Telxon, my old employer, and

15    some other smaller companies we did work.

16    Q.    Are you the named inventor on any U.S. patents?

17    A.    Yes.  Actually, a total of over 50 U.S. and global

18    patents and Chinese and Canadian and over ten of them are

19    still pending.

20    Q.    So let's move on to the subject of this case.  If you

21    look in front of you, you will see there is a binder.  And

22    if you would please turn to JTX-8 and let me know if you

23    recognize that.

24    A.    Oh, yes, I do.

25    Q.    Okay.

1    A.    This is my patent, the '462 Google Kumar patent.

2              MR. ALBERTI:  Your Honor, we'd move to admit the

3    '462 Kumar patent, JTX-8, into evidence.

4              THE COURT:  Any objection?

5              MR. BOICE:  No objection, your Honor.

6              THE COURT:  All right.  Thank you.

7              (Joint Exhibit No. 8 was received into

8    evidence.)

9    BY MR. ALBERTI:

10   Q.    What is the title of your patent?

11   A.    The title is "Portable Computing, Communication and

12   Entertainment Device With Central Processor Carried in a

13   Detachable Handset."

14   Q.    Are there any other inventors?

15   A.    No.  I'm the only one.

16   Q.    When did you file for a patent on your invention?

17   A.    It was April 7, 1999.

18   Q.    Now, what were the problems you were trying to solve

19   with your invention?

20   A.    So at that time, there were two problems, main

21   problems.  One was, as you see there, multiple devices.  So

22   this is going back to 1999, mobile phones or cellphones were

23   there, of course.  Then Palm Pilot, the stylus used, that

24   had been out for about five years at that time.

25              And then there were MP3 players for listening to

Kumar - direct

1    songs, which later on Ipod, that kind of thing.  And then,

2    of course, you had laptop computers and work computer,

3    computer at home.

4              So there were so many computers in one's life.

5    Not all of them in everybody's life, but generally mobile

6    workers are facing that problem, that there were multiple

7    computers.  And one kind of data here, one kind of data

8    here.  You had to sometimes synchronize it.  So that was one

9    problem.  And with portable, you had to carry the charger

10   with you.

11             Smartphones came out and they were just starting

12   to come out, and they combined some of these things.  So

13   like MP3 player and maybe the Pocket, I mean, excuse me, the

14   Palm Pilot.  They would combine that.  But still, the one

15   problem remained, all of these devices were handset.

16             So as long as it's handset, the display is

17   limited because, you know, it had the power to do word

18   processing, spread sheet, but because it had to be handset,

19   the display size has to be small and the keyboard had to be

20   small.  So that was the second problem that I was trying to

21   solve.

22   Q.   Now, can you explain in your own words what you

23   invented to solve these problems?

24   A.   So what I invented was basically a two-piece device.

25   One was the handset part.  So that's the handheld.  You put

Kumar - direct

1    all the processing of the combined unit in that so that you

2    carry with you the processor and communication circuits and

3    also the data.

4              So as you go from work to home or different

5    places, you are carrying with you the processing power and

6    the communication and the data with you.  And then the other

7    piece was kind of like a dumb laptop, if you would.  Imagine

8    taking a laptop and just taking out the processing

9    communication and everything and all that's left is display

10   and keyboard.  So that was the other piece.

11             And it had a little docking port.  So you put

12   the handset when you want the big display, when you want

13   laptop functionality, you dock it in there and now you've

14   got yourself a laptop.  A little bit lower performing laptop

15   than what you would otherwise, but, you know, that was

16   depending on the times.

17             So that was, that's how I solved the problem.

18   Q.    Were you the first person to come up with this idea?

19   A.    Yes.  I think so.

20   Q.    Now, could you please go back into your binder and

21   look for Exhibit PTX-313?

22   A.    Okay.

23   Q.    Do you recognize that document?

24   A.    Yes.

25   Q.    What is it?

Kumar - direct

1    A.    PTX-315?

2    Q.    313.

3    A.    It's a picture of the prototype.

4    Q.    313.

5    A.    Oh, okay.  Oh, okay.  Yes.  It's my PowerPoint

6    presentation that I had made to describe the patent and my

7    idea of a product that uses the patent.

8              MR. ALBERTI:  Your Honor, Intellectual Ventures

9    moves to admit PTX-313.

10             THE COURT:  Any objection?

11             MR. BOICE:  No objection, your Honor.

12             THE COURT:  All right.

13             (Plaintiffs' Exhibit No. 313 was admitted into

14   evidence

15             MR. ALBERTI:  Could we go to page 4 of 313?

16   BY MR. ALBERTI:

17   Q.    Okay.  Taking a look at page 4 of Plaintiffs'

18   Exhibit 313, could you explain to the jury what's being

19   depicted here?

20   A.    Okay.  So this is what I was talking about earlier.  I

21   will start from the left and go to the right.

22             What's shown on the left is the back side of

23   docking display in the form factor of, like a tablet.  And

24   you see there is the recessed area there.  That is the

25   docking port for the handset.

Kumar - direct

1              So the lower unit has no processor, central

2     processor.  The central processor is in the smaller unit.

3     And then the one in the middle, it shows a laptop form

4     factor device where it is showing that the handset has

5     docked in now.

6              And the one on the right side is basically with

7     the docked in the back, it's hard to see, but that is like a

8     laptop that's ready to be used.

9     Q.    When you refer to an engine here, what do you mean?

10    A.    Engine is -- so for the combined unit, that is the

11    central processor and communication.  That is the one that

12    drives everything.  Without it, it's like taking the engine

13    out of the car.  It's not really operating.

14             So that is what I mean by engine.

15    Q.    Did you ever make a prototype of your invention?

16    A.    Yes, we did.

17    Q.    If you look around you, you should see a device

18    labeled PTX-315.  Do you see that?

19    A.    Yes.  It has been staring at me.

20    Q.    And what is PTX-315?

21    A.    So this is the prototype we had made.  This is the

22    handset.  So this would be the real processor for the

23    combined unit, central processor and communications, and

24    data would be in here.  There would be storage in this.  And

25    this here is what I call a dumb, not a laptop, but this

Kumar - direct

1    would be more like a dumb notebook.

2              So this is just a display keyboard.  There will

3    be support circuitry for the display, but that circuitry

4    doesn't decide what goes on display.  It just gets it from,

5    once you dock it, then this is the one that is driving

6    everything.

7              So this is the notebook.  You can see in here

8    that this is ready to be used.  It's like a laptop except

9    it's smaller, so this is what we did as a prototype.

10   Q.    In general, what is a prototype?

11   A.    Prototype is, before you get into full production for

12   a product, where you can make thousands, tens of thousands,

13   or like in the case of iPhone, millions.  You just want to

14   make a few to demonstrate the concept, and basically that's

15   the prototype.  It's an example of the product, how it's

16   going to be somewhat.

17   Q.    In your own words, what are some of the advantages of

18   your invention?

19   A.    So the advantage is that you are carrying -- the

20   display went out.  You're carrying the processing power and

21   the data and the communication with you in that handset, and

22   where you go, maybe you have a -- the dumb docking display

23   unit at home or -- so that's the advantage, that you are not

24   having to synchronize.  It's more convenient.  You are

25   having to learn only one unit, which is this (indicating).

1     The rest is just display.  Size changes, keyboard changes.

2                So that's the advantage, the convenience, that

3     you have to learn only one unit because the central

4     processor is only in one unit, and the other advantage is

5     that cost would be lower for the combined unit.

6                MR. ALBERTI:  Your Honor, plaintiff moves to

7     admit PTX-315 into evidence.

8                THE COURT:  Any objection?

9                MR. BOICE:  No objection, your Honor.

10               THE COURT:  Thank you.

11               (Plaintiffs' Exhibit No. 315 was admitted into

12    evidence.)

13    BY MR. ALBERTI:

14    Q.    Did you ever win any awards for your invention?

15    A.    Yes, we did.

16    Q.    What award did you win?

17    A.    Well, at the Consumer Electronics Show, which is, from

18    what I understand, the world's largest electronics show, it

19    happens in Las Vegas the first week of January every year,

20    we had a booth there, a Khyber Technologies booth, and we

21    entered with just what you just saw here, with this

22    prototype, and we won this award, which is design

23    engineering showcase award (indicating).

24               So they give this award for really innovative,

25    unique kind of products.  And so we were very proud of this.

Kumar - direct

1    Q.    Are you referring to PTX-314?

2    A.    It's here.  Yes.  Yes.

3              MR. ALBERTI:  Your Honor, plaintiff moves to

4    admission PTX-314 into evidence.

5              MR. BOICE:  No objection, your Honor.

6              THE COURT:  Thank you.

7              (Plaintiffs' Exhibit No. 314 was admitted into

8    evidence.)

9    BY MR. ALBERTI:

10   Q.    Now, what is the Consumer Electronics Show?

11   A.    Consumer Electronics Show.  Like I described, it's the

12   largest show in the world.  About 150,000 people come to

13   that show in Las Vegas.  It happens every year.  And you'll

14   find everybody there.  Microsoft, Apple, everybody is there,

15   Samsung, from all over the world.  Toshiba, Japan,

16   everywhere.  It's the largest electronics show in the world.

17   Q.    What year did you win this award?

18   A.    2001.

19   Q.    Are you familiar with Intellectual Ventures?

20   A.    Oh, yes.

21   Q.    How did you become familiar with Intellectual

22   Ventures?

23   A.    They called me actually regarding one of my previous

24   patents.

25   Q.    What came of that conversation?

Kumar - direct

1    A.    At that conversation, we were not -- it went on for a

2    while because we were not ready when they first called us,

3    but, you know, it seemed to click.  I like what I heard.

4              So we were in the middle of a project when they

5    approached us, but we waited until that project was over and

6    then I called them back and then we talked back and forth,

7    and I ended up selling them that patent.

8    Q.    When you say you sold them the patent, what do you

9    mean by that?

10   A.    Well, you know, patent is like a -- from what I

11   understand, it's a property ownership document that the

12   United States Government gives to you for intellectual

13   property, such as inventions.

14             So we sold it, meaning they became the new

15   owner.  In return, I get cash, and they go and license it

16   and in many cases, I get the profit sharing.  They do that

17   with inventors.

18   Q.    Did you sell the patent that we've been talking about

19   today, the '462 patent, to Intellectual Ventures?

20   A.    Yes.  Yes, we did.

21   Q.    When was that?

22   A.    That was 2011, September 2011.

23   Q.    Other than cash and some profit sharing, was there

24   anything else that you received?

25   A.    Yes.  And this -- this meant a lot to me.  They let me

Kumar - direct

1    retain the right to use this patent in my designs.  So when

2    I designed the product, I can use this patent, combined it

3    with other things, and then take it to companies and try to

4    get some kind of sponsorship to take it to the market.

5    Q.    Why did you decide to sell your patent to Intellectual

6    Ventures?

7    A.    Well, this was in 2011 that I sold it to them and I

8    started Khyber Technologies in 1991.  I found out that it's

9    not easy.  Nobody, you know, the big companies, we have the

10   product design.  Big companies had the resources to

11   manufacture it, engineer it, take it to the market.  But

12   they don't want to listen to me.  They don't want to listen

13   to the little guy.  Maybe I would behave the same way if I

14   worked for them.

15        But they don't want to listen to me.

16   Intellectual Ventures, they are a pretty established IP

17   company, so they have the resources and wherewithal and

18   connections to take it to those big guys.

19        So this was, it's a win-win situation.  I can go

20   on and keep inventing more, and they can go and license it

21   to bigger companies and I may have the joy of seeing my

22   products, which I've had, in the market.

23   Q.    Now, you said it was hard as a small company and an

24   individual inventor to license your technology.  Can you

25   give me an example of that?

Kumar - direct

1    A.    Well, you know, one example is, we had approached

2    Motorola back in 2004, and my, one of my partners, Paul

3    Carlton, he knew Mr. Reza Kola.  He was on the board of

4    Motorola.  So we got invited to go to Schaumburg.  In 2004,

5    we were in Ohio.  So we got invited.  Both of us went there,

6    gave a presentation in a meeting.  Like six or seven people

7    came in.  They took notes, asked questions.  But it just

8    didn't go anywhere.

9    Q.    What types of people were at the meeting?

10   A.    Oh, there were marketing type people, strategy people,

11   engineering people.  A good collection.

12   Q.    Did you talk about the technology and your '462 patent

13   at that meeting?

14   A.    Oh, yes.  I talked about all the patents we had, all

15   pending also, yes.

16   Q.    And you mentioned a moment ago people were taking

17   notes.  Why was that significant to you?

18   A.    Well, you know, you don't want people -- that meant

19   that they were paying attention.  They were interested.

20   And, you know, we're little guys going to the big guy and

21   they're there taking notes.  That's -- that's very good.

22   It's consoling.  But that means they are interested.

23   Q.    What came out of that meeting?

24   A.    Nothing.  I went back and I followed up and they were

25   courteous on the phone, but just nothing happened.  They --

Kumar - direct

1    Motorola took notes about my invention and left.

2    Q.    Now, did you have an opportunity to communicate more

3    with Motorola after that?

4    A.    Yes.  So in 2008, my wife and I, we moved from Ohio to

5    Silicon Valley, the San Francisco Bay area, and so one of --

6    a bank, a banker who was looking at my investments, they

7    introduced me.  I asked them that I'm new in this area, so I

8    was trying to connect to high-tech people there in the San

9    Francisco Bay area.

10             So the gentleman introduced me to Mr. Herschel

11   Sanghi, Vice President of Motorola Ventures.  I was thrilled

12   by that because it seemed like it was the right kind of

13   connection.  So I sent him an e-mail, and a flyer about the

14   patent.  But there again, nothing, nothing happened.

15   Q.    Can you please go into your binder and see if you can

16   find PTX-318.

17   A.    Yes, I see it.

18   Q.    Do you recognize that document?

19   A.    Yes.  I did send this to Mr. Sanghi.

20   Q.    And what is it?

21   A.    Oh, it's a -- again, it is a flyer, it's a flyer of

22   the invention and now another product, another form factor

23   in my mind that I thought would be the right way to

24   commercialize my patent.

25             MR. ALBERTI:  Your Honor, plaintiff moves to

Kumar - direct

1    admit PTX-318.

2                    MR. BOICE:  No objection, your Honor.

3                    THE COURT:  Thank you.

4                    (Plaintiffs' Exhibit No. 318 was admitted into

5    evidence

6                    MR. ALBERTI:  Can we get that on the screen,

7    please.

8    BY MR. ALBERTI:

9    Q.    First off, Mr. Kumar, is your invention discussed in

10   this flyer?

11   A.    Yes.  Right here, down at the bottom (indicating).  It

12   says, "The docking display concept relates to U.S. patent

13   7,120,462 and Chinese patents."

14   Q.    And that's the same '462 patent that we've been

15   talking about today?

16   A.    Yes.

17   Q.    When did you send this flyer to Motorola?

18   A.    Well, it was around -- the date on this is October,

19   and that was around that time that I sent it.

20   Q.    What year was that?

21   A.    Oh, 2010.

22   Q.    All right.  Now, after you sent this flyer to Motorola

23   discussing your invention and identifying the actual patent

24   number, did Motorola get back to you?

25   A.    Well, it followed up and talked to Mr. Sanghi for

Kumar - direct

1    about ten minutes.  And he said he'll send it to the right

2    party.

3    Q.    So did you hear from the right party?

4    A.    No, no party.

5    Q.    So what happened after that?

6    A.    Well, you know, this -- I basically then started to

7    think of what to do, and next move, but then -- the worst

8    wasn't over.  I saw a product, Motorola came out, they

9    announced at the Consumer Electronics Show.  And that was

10   Atrix and it had a lapdock and I could not believe my eyes,

11   but that was -- that's what happened.  That was the next

12   thing.

13   Q.    And when was it that you saw Motorola come out with a

14   product at CES?

15   A.    It was in January.  I didn't go there, but I read all

16   about it and it's a very well-covered show, consumer

17   electronics.

18   Q.    What year was that?

19   A.    That was -- oh, that was 2011.

20   Q.    Did anyone at Motorola contact you after they

21   announced their product about licensing your patent?

22   A.    No.

23          MR. ALBERTI:  I have no further questions.  I

24   pass the witness.

25          THE COURT:  All right.  Technically, the jury

1    has been sitting for almost an hour-and-a-half and we're not

2    going to make it to the next hour, so I think we'll take

3    15 minutes.

4              (The jury was excused for a short recess.)

5              THE WITNESS:  I can get up?

6              THE COURT:  You can.  Let the jury get out

7    before you try to get out.

8              THE WITNESS:  Thank you.

9              THE COURT:  All right.  15 minutes.

10             (Short recess taken.)

11                        -  -  -

12             (Proceedings resumed after the short recess.)

13             THE COURT:  Are we going to get to our second

14   witness?  Do I need to have a short discussion with you?

15             MR. ALBERTI:  Your Honor, we would propose,

16   because there's still an unresolved evidentiary issue, and

17   in particular I think there are some issues raised in

18   opening that pertain to that issue, that after this witness,

19   we'll play some -- we have some videotaped testimony we

20   will play, and then maybe we could either resolve that

21   evidentiary -- let the jury go home, resolve the evidentiary

22   issue, and if there's any extra time, we would just eat

23   it.

24             THE COURT:  All right.  Good enough.  Let's

25   bring the jury in.

Kumar - cross

```
 1              (The jury entered the courtroom and took their
 2    seats in the box.)
 3              THE COURT:  All right.  Everyone may be seated.
 4    And Mr. Boice, you may proceed with cross-examination.
 5              MR. BOICE:  Yes.  Thank you, your Honor.
 6                     CROSS-EXAMINATION
 7    BY MR. BOICE:
 8    Q.    Mr. Kumar, my name is Bill Boice.  I don't think we've
 9    met, but I represent Motorola in this case.  How are you
10    this afternoon?
11    A.    I'm good.  Thank you.
12    Q.    Okay.  Good.
13              Let me ask you just a couple, a few more
14    questions about your background to make sure we got all of
15    that straight here as we go along.
16              You started at a company called Electronic Labs.
17    That's the same company that later became Telxon that you
18    also worked for; correct?
19    A.    Right.
20    Q.    And in between that you worked for a company, a
21    startup of your own in like the mid-seventies?  Like '75?
22    A.    It was not a start-up.  My own.
23    Q.    Okay.
24    A.    It was -- one company was Texas Micro Systems and they
25    came from Electronic Labs.  So I worked for them for about
```

Kumar - cross

1    two years.  Then I quit and then I started a company, a

2    one-man company, basically designing microprocessor based

3    products.  That was on my own.  It was called Micro Pace.

4    Q.    Okay.  So that was a one-man company.  That is with a

5    just you?

6    A.    Yes, sir.

7    Q.    Okay.  And what you were doing was you were selling

8    basically design services to companies?

9    A.    No.  Actually, I was designing prototypes.

10   Q.    Okay.

11   A.    Would design the prototype.  I knew circuit design,

12   software, so I would deliver a turnkey prototype, basically.

13   Q.    Okay.  So you would deliver prototypes and if a

14   company decided to go forward with it, you would contract

15   out the manufacturing or they would do that?

16   A.    They would do that.

17   Q.    Okay.  So you're just coming up with ideas and giving

18   them prototypes and that was what you were doing?

19   A.    Right.  At that time, since the microprocessors had

20   just begun, there's this whole world filled with different

21   kind of electronics and so people wanted to convert to

22   microprocessors.

23   Q.    Okay.  And then you went back to -- well, back to

24   Electronic Labs, which is now Telxon.  And there, you were

25   working on handheld computers that read bar codes?

Kumar - cross

1    A.    Yes, sir.

2    Q.    Okay.  And that was a big product of Telxon?

3    A.    It was, yes.

4    Q.    All right.  And then what you were doing is you were

5    developing these handheld computer products.  And what I

6    think you described before is you used common sense to apply

7    what was being done in the calculator industry to the

8    handheld products at Telxon?

9    A.    The --

10   Q.    Is that right?

11   A.    It's not common sense.  I wouldn't put it as that.

12   It's not common sense.

13   Q.    You say it wouldn't be?  You saw what was going on --

14   let's back that up, then.  Let's unpack it a little bit.

15         What was going on in the calculator industry

16   that you noticed at the time you were doing this consulting,

17   while you were working at Telxon, was calculators were

18   getting smaller and smaller; is that correct?

19   A.    Right.

20   Q.    All right.  And devices were shrinking down in size;

21   correct?

22   A.    Right.

23   Q.    And so basically what you were doing, you were taking

24   that knowledge of what's going on in the calculator

25   industry, applying it to what you were doing at Telxon, and

1    modifying those devices; is that correct?

2    A.    Instead of just -- because you are putting things out

3    of context, if I may say so, because I like to describe what

4    I did for Telxon.

5              Telxon was in an industry where they were

6    using -- it used to be the handheld computers used to be the

7    size of bricks.  Why?  Because they were using these

8    old-fashioned mechanical keys, and they were using LED

9    displays and they were using old kind of electronics.

10             And that's what they were doing.  That's what

11   the number one company in the industry was doing, MSI.  When

12   I joined Telxon, then I looked at actually Hewlett-Packard

13   calculator, and they had, they were using LCD display,

14   things which are common today, but not then.  This was 1980,

15   '83.

16             And then they were -- there were surface mount

17   electronic devices.  So I took the most state of the art

18   which was out there and brought it to Telxon's industry, and

19   we came up with a product that I came up with.  It was

20   one-third the size of the product that was there before.

21             And within a few years, Telxon became number

22   one.  MSI was bought out by somebody.  We became number one.

23   And we became very strong.  The company went public.  So I

24   think that's -- that's the description of what I did for

25   Telxon Corporation.

1    Q.    Yes.

2    A.    And the industry knows that you can talk to the old

3    time errs, very well-known in that industry.

4    Q.    Yes.  My question had to do with how you made that

5    combination, and what you did was, you used just common

6    sense that you applied to see what was being done in the

7    calculator industry and applying it to this industry,

8    because hand-helds used to be so big?

9    A.    It's not common sense.

10   Q.    Okay.

11   A.    If it was common sense, they would have done it

12   before.

13   Q.    Okay.  Let's see.

14         MR. BOICE:  May I hand up a copy of his

15   deposition?

16         THE COURT:  Yes, you may.

17         (Mr. Boice handed a deposition transcript to the

18   witness.)

19   BY MR. BOICE:

20   Q.    Mr. Kumar, let me ask you to look at page 18 of your

21   deposition.  First of all, you recall your deposition being

22   taken in this case?

23   A.    Yes.

24   Q.    That was taken on February 12th of 2013; is that

25   correct?

Kumar - cross

1   A.     That sounds about right.  Yes.

2   Q.     Okay.  And you were under oath in that deposition?

3   A.     Yes.

4   Q.     Okay.  And let me then direct your attention to page

5   18.

6             THE COURT:  I don't generally allow this.

7             MR. BOICE:  You don't -- no video.  I was just

8   going to read it, your Honor, if that's all right.

9             THE COURT:  That's fine.

10            MR. BOICE:  All right.

11  BY MR. BOICE:

12  Q.     And let me direct your attention to page 18, line 7

13  through 11, and let me read that to you.  Just talking about

14  your work at Telxon:

15            "I came out with products, handheld computing

16  products.  Just common sense I applied seeing what was being

17  done in the calculator industry and applying it to this

18  industry, because their hand-helds used to be big."

19            Was that your testimony?

20  A.     Yes, it is, but, again, you are taking it out of -- it

21  was my common sense.

22  Q.     Yes, sir.  That's what I'm saying.

23  A.     Yes.

24  Q.     You used your common sense as a person of --

25  A.     Yeah.  When you asked me the question, you didn't say

Kumar - cross

1    my common sense.  I'm -- you know, I consider myself an

2    innovator.

3    Q.    Okay.

4    A.    I have a track record.  So what is my common sense --

5    Q.    So --

6    A.    -- may not be a common sense in general.

7    Q.    Okay.  So your common sense is better than everybody

8    else's common sense is what you are saying?

9    A.    I'm an expert in my field, so what might be of common

10   sense to me is not necessarily -- that's how I invented.

11   Q.    All right.

12   A.    For me, it's easy.

13   Q.    So --

14   A.    In my field.  Otherwise, I'm not that good.

15   Q.    All right.  To you, it was easy -- all right.  Never

16   mind.  I understand what you are saying there.

17            Now, in 19 -- let's see.  You were at Telxon for

18   several years; is that correct?

19   A.    Yes, I was.

20   Q.    And in 1991, was it, that you left to form Khyber

21   Technologies, your company?

22   A.    Yes, sir.  January 1, 1991.

23   Q.    All right.  And Khyber was in the business of

24   designing products for other people, too; is that correct?

25   A.    Yes, sir.

Kumar - cross

1    Q.    All right.  Like you had been doing at Microface

2    before; correct?

3    A.    Yes.

4    Q.    Okay.  And that's how you made your money at Khyber;

5    is that correct?

6    A.    Yes.  Actually, during ten years, I ended up putting

7    everything I had from before, the savings, into that.

8    Q.    All right.  And one of the first products that you

9    came up with, you took the handheld computer Telxon was

10   making and you added a smart card reader to it?

11   A.    Yes, sir.

12   Q.    Okay.  And what you would do -- this was at Khyber,

13   your company?

14   A.    Yes, sir.

15   Q.    All right.  And what you would do is you would

16   basically take that, that handheld computer, which is a

17   barcode reader?

18   A.    No.  It was a smart card reader.

19   Q.    Smart card reader, okay.  And you would, you would

20   add -- actually, you added a smart card reader to the

21   handheld computer from Telxon; is that correct?

22   A.    Yes, sir.

23   Q.    Okay.  So you made a smart card reader, so you added

24   that feature to the handheld and you sold it for a lot more

25   money?

Kumar - cross

1    A.    Yes, sir.

2    Q.    Okay.  Like, you know, you buy the handheld computer

3    for a couple hundred dollars and you sold the smart card

4    reader on it, sell it for like a thousand dollars?

5    A.    Yes.  And, you know, again, the true picture of that

6    is, this company went to Telxon, and they wanted that done,

7    but Telxon engineer, same engineer that used to work for me.

8    Somehow Telxon turned down the offer.  They said it will

9    not fit.  The smart card will not fit, they said, in this

10   unit.

11            So that customer was going to go away, but the

12   salespeople used to like me because I used to listen to them

13   and ask them, what is it that customers want?  And then I

14   would create the solution for them.

15            Again, this was common sense to me, but it's

16   just --

17   Q.    We understand that.

18   A.    Okay.

19   Q.    Let me ask you some more questions.

20   A.    Please, if you --

21   Q.    I don't think there's a question that you are

22   answering now.

23   A.    Well, I am answering.  You asked about that product.

24            So that salesman contacted me.  He says, Raj,

25   what do I do?  This customer is going to go away.  I said,

Kumar - cross

1    well, send them our way.

2              They wanted to pay $2,000 for a handheld

3    computer from Telxon that read smart cards.  Well, I took

4    out some parts that that customer didn't care for.  That's

5    how I created the space.  Common sense for me.  But it

6    didn't occur to them.

7    Q.    Okay.

8    A.    So I asked the customer.  So that's how we did it.

9    Q.    I understand and I appreciate your perspective on

10   that.

11             After starting Khyber, you actually filed a

12   patent, or you filed for a patent on a portable computer

13   that worked like a personal digital assistant; is that

14   correct?

15   A.    Personal what?

16   Q.    A digital assistant?  PDA?

17   A.    Yes.  Yes, I did, yes.

18   Q.    What would you call a PDA other than personal digital

19   assistant?

20   A.    No.  You are right.  Yes.

21   Q.    Okay.  And you actually got a patent on a PDA?

22   A.    Yes, I did.

23   Q.    Okay.  And that was a personal digital assistant that

24   you could write notes on?

25   A.    Yes.

Kumar - cross

1    Q.    Okay.  And it would keep those notes for you?

2    A.    Yes.

3    Q.    Okay.  And you did that with a stylus or a pen of some

4    sort?

5    A.    Yes.

6    Q.    All right.  And then you actually, you got that

7    patent, but you're still doing design work at Khyber during

8    that time period; is that correct?

9    A.    Yes.  Actually, that's what I did at Khyber.

10   Q.    Okay.

11   A.    And --

12   Q.    And then in 2000 -- this was after the tech bubble

13   burst in 2000.

14   A.    Correct.

15   Q.    Your potential investors wanted you, or your investors

16   or potential investors wanted you to get back into the

17   barcode field, but you didn't want to do that; is that

18   correct?

19   A.    Potential investors?  There was a venture capital

20   company.

21   Q.    Is that yes?

22   A.    Yes.  It is yes, yes.

23   Q.    It's a yes?  All right.

24   A.    It's just not a complete story, but, yes, I did, yes.

25   Q.    Okay.  And because you didn't want to get in the

Kumar - cross

1    barcode field, you didn't get that investor money?

2    A.    That's right.

3    Q.    Okay.

4    A.    Yes.

5    Q.    And at that time you had around 50 employees at

6    Khyber?

7    A.    Yes.

8    Q.    Okay.  And this is in the 99/2000, and your average

9    revenues were about $500,000 a year, average?

10   A.    We never had steady revenue.  You know, that was --

11   Q.    I understand that.

12   A.    Yes.

13   Q.    Your average was around $500,000 a year?

14   A.    Maybe.  I don't know.  I never calculated it.

15   Q.    Okay.

16   A.    We used to have no dollars for a few years and then

17   all of a sudden, we get $2 million revenue.

18   Q.    Okay.  Rather than have you -- have my read you the

19   deposition, about 500,000 -- does about 500,000 sound about

20   right to you?

21   A.    Yes.

22   Q.    Okay.

23   A.    That's fine.

24   Q.    All right.  And then at that time, you had about 50

25   employees, but you essentially, you laid off those

Kumar - cross

1    employees?

2    A.    Yes.  After the technology bubble burst, yes.

3    Q.    Okay.  And your business model shifted after that time

4    and you began asserting your patent, and particularly your

5    PDA patent, against big companies?

6    A.    Yes.

7    Q.    Is that correct?

8    A.    Yes.

9    Q.    So you shifted your business model from this design

10   service to focusing on basically suing people on your

11   patent?

12   A.    Well --

13   Q.    Is that right?

14   A.    That is right, but I have to tell you the whole story.

15   That I was --

16   Q.    Let's --

17   A.    I was broke.  I was broke.  I had lost everything I

18   had and I was broke.  So that was the only way, because --

19   Q.    Okay.

20   A.    -- I had to put kids through college.  So, yes.

21   Q.    I'm not trying to judge you or anything.

22   A.    No.  You are telling half the story and, you know,

23   it's important for me.

24   Q.    Okay.

25   A.    Unless I'm breaking rules of court or something, you

Kumar - cross

1   know.

2   Q.   Well, it would be helpful to answer the question, but

3   if there's more --

4   A.   Okay.  I appreciate that.

5   Q.   -- if there's more answer to be fair, I'm not trying

6   to hide anything.

7   A.   I appreciate that.

8   Q.   I'm trying to be fair as well.

9   A.   I understand.

10  Q.   I'm just trying to figure out what you did from the

11  business side and I have no reason to suspect your

12  motivation whatsoever.

13  A.   Okay.

14  Q.   Okay?  I'm just trying to get that out.

15       In any event, your new business model of suing

16  companies turned out fairly well?

17  A.   You know, that -- this is why I -- it was never my

18  business model to sue companies.

19  Q.   Okay.  Well, then, let me just say this.

20  A.   Yes?

21  Q.   The lawsuit that you filed, you filed a lawsuit

22  against Hewlett-Packard?

23  A.   Right.

24  Q.   Big company?

25  A.   Right.

Kumar - cross

1   Q.    You filed a lawsuit against Casio?

2   A.    Right.

3   Q.    Okay.  You filed the lawsuit against Hewlett-Packard

4   in 2003; is that correct?

5   A.    Mm-hmm.

6   Q.    You settled that in 2005?

7   A.    No, no.  It was all in 1999.

8   Q.    '99.  You settled it in 2005?

9   A.    Yes.

10  Q.    Okay.  And you settled that for, as you said, north of

11  $10 million?

12  A.    Okay.  Yes.

13  Q.    Correct?

14  A.    That's right.  Yes.

15  Q.    And then your lawsuit against Casio, you settled that

16  for more than a million dollars?

17  A.    Right.

18  Q.    Okay.  Now, the lawsuit that you were suing on was on

19  a PDA, wasn't it?  It's not the patent involved in this

20  case?

21  A.    No, not at all.

22  Q.    Okay.  It's just a separate patent?

23  A.    This patent wasn't even out then.

24  Q.    Okay.  And it was -- you said that IV, Intellectual

25  Ventures, contacted you at one point in time and you didn't

Kumar - cross

1    want to do anything with it right away because you were

2    involved in a project; is that correct?

3    A.    Yeah, yeah.  Right.

4    Q.    Right.  The project you were involved in was you were

5    waiting for the lawsuit that you had against Hewlett-Packard

6    and Casio to settle, so you would get that money; is that

7    correct?

8    A.    Yes.  They may have taken care of that, but I was in

9    partnership with a company in Cleveland and that was a good

10   partnership, so I stayed with them.

11   Q.    All right.  It was then after you got the money from

12   Hewlett-Packard and Casio that you then sold that PDA patent

13   to Intellectual Ventures?

14   A.    Not right after that, but it turns out I received a

15   continuation of that patent.

16   Q.    Okay.  But -- and that's what you sold to Intellectual

17   Ventures?

18   A.    Yes.  And, by the way, I'm so proud of the work I do,

19   I have to add this, that the people that I sued,

20   Hewlett-Packard and Casio, I spent about two to three years,

21   I kept writing to them and they wouldn't do anything.

22   Q.    Okay.

23   A.    I kept writing to them.  I would give proposed design

24   things and just to, you know, designing.

25   Q.    Mr. Kumar, this will go on really longer than we have

Kumar - cross

1  and this is -- we have a limited amount of time for the

2  lawsuit?

3  A.    Well, sorry.  I just have my pride.  When you ask half

4  the question, question that shows half the story --

5  Q.    No, sir.  I'm just trying to get some facts out?

6  A.    Okay.

7  Q.    I'm not trying to draw any conclusions or cast any

8  aspersions.  I'm just trying to get some facts out.

9  A.    I understand.

10  Q.    It's after you settled with Hewlett pack company the

11  Casio lawsuit and you got like $11 million for that, that

12  then after that you sold that same patent to Intellectual

13  Ventures; is that correct?

14  A.    Yes.

15  Q.    And you sold it to them for what?  Another $3 million?

16  Something like that?

17  A.    Yes.  It was 10 million, actually.

18  Q.    $10 million to Intellectual Ventures.  All right.  So

19  now you've got $21 million that you've recovered on that PDA

20  patent; is that correct?

21  A.    Yeah.  It's confidential.  It's okay?

22  Q.    Okay.  And then you had another lawsuit on another

23  patent.  You sued socket communications on PC cards with a

24  scanner; is that correct?

25  A.    Mm-hmm.  Yes.

Kumar - cross

1   Q.    And you settled that for another 600,000; is that

2   correct?

3   A.    Yes.

4   Q.    Is that right?

5   A.    Yes.

6   Q.    Okay.  All right.  And then, now, on that PDA patent

7   that you sold to Intellectual Ventures, you ultimately

8   bought that back from Intellectual Ventures; is that

9   correct?

10  A.    Yes.  I have not done anything with it.

11  Q.    Okay.  You bought it back for -- you sold it to

12  Intellectual Ventures for $10 million and you bought it back

13  for like $25,000?

14  A.    Yes.  More for pride than anything.  We haven't done

15  anything.

16  Q.    You just happen to have it now?

17  A.    Yes.

18  Q.    All right.  But then you had a patent on a keyboard

19  that you sold to Intellectual Ventures in 2009; is that

20  correct?

21  A.    Right.

22  Q.    How much did they pay you for that one?

23  A.    You know, we signed confidentiality.  Is it okay?

24  Q.    Yes, it is.

25  A.    They paid $1.2 million.

Kumar - cross

1    Q.    1.2.  And they is Intellectual Ventures paid you; is

2    that correct?

3    A.    Right.

4    Q.    Okay.  And then you ultimately sold the patent that's

5    involved in this case to Intellectual Ventures, and you sold

6    it to Intellectual Ventures for how much?  Is that $2

7    million?

8    A.    $2 million plus profit sharing.

9    Q.    Okay.  All right.  All right.  And -- plus profit

10   sharing.  Now, the profit sharing is if Intellectual

11   Ventures gets any money on the '462 patent through licensing

12   or through lawsuits, you get a share of it?

13   A.    Yes.  Yes, sir.

14   Q.    And you get ten percent of it?

15   A.    Yes, ten percent.

16   Q.    So Intellectual Ventures gets 90 percent and you get

17   ten percent of any recovery in this lawsuit or any other

18   lawsuit or licensing?

19   A.    I think the profit.

20   Q.    Profit?

21   A.    Yes.

22   Q.    Profit.  After they pay their expenses?

23   A.    Yes.

24   Q.    And whatnot.  Okay.

25              All right.  Let me ask you about this meeting

1    you had at Motorola in 2000.  You said it was 2004?

2    A.    Oh, yes, yes.

3    Q.    Was it 2004 or 2003?

4    A.    I think it was 2004.

5    Q.    Okay.  And that's where you, you met with a number of

6    people there that came in to talk to you.

7              You were talking to them about your PDA patent

8    as well, your PDA at that time, or not?

9    A.    We talked to them about everything.

10   Q.    Okay.

11   A.    All of my patents.

12   Q.    All right.  Your PDA included?

13   A.    Mm-hmm.

14   Q.    Correct?

15   A.    Yes.

16   Q.    Okay.  And in that meeting -- well, that was in 2004.

17   Your patent didn't issue until 2006, so on the '462, the

18   patent in this case?

19   A.    Right.

20   Q.    So you didn't have a patent on the dock station that

21   you had; is that correct?

22   A.    Yes, but I used to talk about pending as well as the

23   patents, everything.

24   Q.    Okay.

25   A.    The entire portfolio.

Kumar - cross

1   Q.    And this was -- let's see.  You still were operating

2   as Khyber at that time?

3   A.    Yes, I was.  Yes.

4   Q.    And what you were basically doing is, you were -- the

5   same thing you've been doing all along:  Going to companies

6   with designs, offering to give them prototypes, help them

7   design the product; is that correct?

8   A.    Yes, sir.  Yes, sir.

9   Q.    And the patent was kind of -- kind of thrown in.  It

10  was not really what you were selling.  It was all part of a

11  package, if you will?

12  A.    Exactly.

13  Q.    Okay.  All right.  And so you're going to companies

14  that have big design departments saying, here, I've got an

15  idea.  Maybe a prototype, maybe not, or an idea for a

16  prototype and trying to get them to hire you to do the

17  design work that their own people would do?

18  A.    Yes, sir.

19  Q.    Okay.  And their own people, of course, have their own

20  ideas about how to combine products and that was a tough

21  sell, quite frankly?

22  A.    Yes.  Yes.  I found that out.

23  Q.    You found that out every place you went, any big

24  company that had their design people, they are not

25  interested in hiring you to come in and tell them how to

Kumar - cross

1    design products?

2    A.    Not every company.  IBM and Telxon, of course.

3    Q.    Telxon?  All right.  All right.

4    A.    IBM and Telxon.

5    Q.    All right.  For any particular product.  But you had a

6    lot of companies that you went to trying to sell your design

7    services and that was not very successful?

8    A.    The only problem is I'm not a salesman and I never

9    could -- never had the resources to hire a salesman.  You're

10   right.  I did not do that well as a salesman.

11   Q.    You had me fooled about not being a salesman.

12   A.    Thank you.

13   Q.    Then let's talk about your, let's see, I think it's --

14   you also then talked to -- you said you had another meeting

15   with Motorola in 2010; is that correct?

16   A.    Yes.

17   Q.    And that was actually, that was someone with Motorola

18   Ventures?

19   A.    Yes, sir.  Mr. Herschel Sanghi.

20   Q.    Mr. Herschel Sanghi?

21   A.    Yes.

22   Q.    And Motorola Ventures, it's an investment arm of

23   Motorola companies.  Did you understand that?

24   A.    Yes, I understood that.

25   Q.    Okay.  It's not the people doing the manufacturing?

Kumar - cross

1    A.    Oh, yeah, I understood that very well.

2    Q.    They're just investing in different things; is that

3    correct?

4    A.    Yes.  Yes, I understood that.

5    Q.    So when you talked to Mr. Sanghi, you were talking to

6    him about a potential investment in your company?

7    A.    No, not at all.  I was asking him if -- if he would

8    extend this to the right party.

9    Q.    Okay.  I got you.  All right.

10          And that was Exhibit PTX-318.  You have that up

11   there; right?

12   A.    PTX-318?  Yes, it is.

13   Q.    Okay.  And that's the flyer that you gave this to

14   Mr. Sanghi?

15   A.    I e-mailed that to him, yes.

16   Q.    You e-mailed that to him.  And that was in October of

17   2010?

18   A.    Yes.

19   Q.    Okay.

20   A.    Yes.

21   Q.    And you don't know whether Motorola had designed their

22   lapdock that has been accused in this case by that time, do

23   you?

24   A.    No, not at all.

25   Q.    Okay.  You do know that they, that Motorola just three

Kumar - cross

1   months later launched that product at the CES show in Las

2   Vegas, in January?

3   A.    Yes.

4   Q.    Of 2011?

5   A.    I do know that.

6   Q.    Okay.  And then the product that you showed there on

7   this PTX-318 --

8              MR. BOICE:  Can you put that up?

9   BY MR. BOICE:

10  Q.    That product is not -- that's not the same product

11  that you -- that we saw a prototype that you have?  That

12  doesn't look like the prototype that you had; is that

13  correct?

14  A.    It's -- no, because it uses another new invention,

15  this one.

16  Q.    All right.

17  A.    It uses '462 plus another new one.

18  Q.    Okay.  So this is a different invention than just the

19  '462?

20  A.    It's not different.  It's another embodiment.

21  Q.    Okay.

22  A.    You know, for one patent, you can come up with

23  hundreds of ways of doing a patent.

24  Q.    All right.  And, in any event, you didn't hear

25  anything further back on that; is that correct?

Kumar - cross

1    A.    Right.

2    Q.    Okay.  And then let's see.  After that, you had some

3    conversations about -- you said you saw the lapdock product

4    at the CES show?

5    A.    I read about it.

6    Q.    You read about it.  You weren't actually there?

7    A.    I was not there.

8    Q.    Okay.  And it was after that that you sold the --

9    well, excuse me.  No.

10         When did you actually -- yeah.  Did you talk to

11   Intellectual Ventures about the -- about seeing the lapdock

12   or seeing that Motorola had a lapdock product?

13   A.    Yes, I did.

14   Q.    And did you do that when you were trying to sell the

15   '462 patent, the patent in this case, to them?

16   A.    Yes.

17   Q.    Okay.  So you went to -- you went to Intellectual

18   Ventures, who had bought your PDA patent and your keyboard

19   patent and you say, I've got another patent and Motorola has

20   got a product of the it looks like we could assert it

21   against?

22   A.    I had been talking to IV about it even before.

23   Q.    But that's what you said, basically.  It look like

24   Motorola has a product.  Here, check this out.  Looks like

25   you can assert it here?

Kumar - cross

1    A.    Yes.  It was part of the interactive, you know,

2    calling again and again and, yeah, at some point, yeah.

3    Q.    Well, that's kind of the partnership that you had with

4    Intellectual Ventures.  They had bought some other patents

5    from you.  Now you are trying to sell them another patent

6    and you're identifying people they could assert the patent

7    against as part of your partnership?

8    A.    Yes.  If it wasn't for Intellectual Ventures, small

9    inventors like me would be out of business.

10   Q.    Right.  I understand.

11   A.    Not everybody, but many of them.

12   Q.    All right.  Well, did Intellectual Ventures ever

13   provide any money to you to actually develop a product?

14   A.    No, but the money that they -- that I do receive from

15   the patent, I'm actually investing it in coming out with a

16   product.  So it's not direct, but that's -- that's what

17   basically ends up happening, that I make money, and then

18   instead of going out of business or not inventing, then I go

19   and keep inventing.

20   Q.    All right.  Well, you actually -- the product, we've

21   seen a prototype.  You have a prototype up there?

22   A.    Yes.  This one here?

23   Q.    Yes.

24   A.    Yes.

25   Q.    And that handheld unit, that's a -- is that a barcode

Kumar - cross

1    reader?

2    A.    This particular one?  Yes, it has a bar keyed reader

3    in it.

4    Q.    Okay.  Well, and you never built a prototype with a

5    phone in it, did you?

6    A.    You could use it as a phone by using WiFi.

7    Q.    And my question is, did you ever have a prototype with

8    a phone in it?

9    A.    Well, it depends on what you call phone, sir.  Yes.

10   Q.    All right.

11   A.    In a store, you would have voice over IP, you know,

12   I'm a techie, I'm a nerd.  So, yes.  A phone was there, but

13   if you say that cellular telephone using AT&T and -- that

14   answer is no.

15   Q.    You are absolutely right.  I was being vague about

16   that, talking about telephones.

17   A.    That's okay.

18   Q.    And cellphones.  And you never had a cellphone as part

19   of your docking station?

20   A.    That's right.

21   Q.    No cellphone, no smartphone.  You have nothing like

22   that?  You had -- your prototypes are just these barcode

23   readers?

24   A.    That's right, because this was --

25   Q.    All right.

Kumar - cross

1    A.    -- funded by Telxon and that's what they wanted.

2    Q.    I understand.  I understand.  But haven't you been

3    trying to develop a prototype to actually go sell the

4    product?

5    A.    No.  After that, I --

6    Q.    You did not try that again?

7    A.    Yes, because, you know, I could not raise money

8    because venture capitalists said how will you compete with

9    these giants, so that's why I could not raise any money, and

10   that's when venture capitalists wanted me to go back to

11   barcode business.  I said, why would I go back to that?

12   That business is not going anywhere.

13   Q.    Yes.

14   A.    And so that's what you had mentioned before.

15   Q.    Right.  I understand.

16         Let me ask you a little bit more about some

17   specifics of your -- of your patent.

18         MR. BOICE:  Do you have the board?  Put the

19   claim up.

20         (Pause.)

21   BY MR. BOICE:

22   Q.    I'm sure you are very familiar with your patent any

23   way.  I don't need anything up there right now.  Okay.

24   There's the claims of it.

25         Go ahead and put that up there, please.  All

Kumar - cross

1  right.  This is your -- this is Claim 1 of your patent?  You

2  are familiar with this; correct?

3  A.    Yes.

4  Q.    Pretty much so.

5        The handheld unit here, you claim it has three

6  main parts.  You've got a detachable handset unit, a docking

7  station that does not have a central processor, and you put

8  the two together and you have a fully functional display

9  unit; is that correct?

10  A.    Yes, sir.

11  Q.    All right.  And the handheld unit had a central

12  processor?

13  A.    Yes, it does.

14  Q.    Okay.  And when you filed for your patent, there were

15  already commercially available processors that could act as

16  a central processor and control the display, the portable

17  display unit?

18  A.    Sure, yes.

19  Q.    And specifically in your patent, you talked about the

20  Intel Strong ARM processor?

21  A.    Yes.

22  Q.    And other processors from Hitachi and NEC?

23  A.    Yes.

24  Q.    Okay.  And you didn't invent any of those processors?

25  A.    No, not at all.

Kumar - cross

1   Q.    All right.  And you also would agree that software

2   existed off the shelf that could run the handheld unit and

3   the docking station, docking display described in your

4   patent?

5   A.    Sure.

6   Q.    Okay.

7   A.    Yes.

8   Q.    And Claim 1 says that the handheld unit has to have

9   interfaces?

10  A.    Yes.

11  Q.    To the docking station?  Okay.  And you'll agree that

12  wires used for collection of signals being communicated are

13  interfaces?

14  A.    Yes.

15  Q.    All right.  And your patent also talks about or

16  contemplates multiplexed interface between the handset and

17  the display unit?

18  A.    Yes, it could.

19  Q.    All right.  And multiplexing is simply where one

20  interface carries multiple signal types?

21  A.    Yes.

22  Q.    Okay.  And multiplexing was known before 1999?

23  A.    Oh, sure.

24  Q.    All right.

25  A.    I didn't invent multiplexing.

Kumar - cross

1   Q.    All right.  You answered my next question.  And then

2   claim 8 of this patent -- put that up there, if you will.

3          Claim 8 combines the device that's in claim 1

4   with a, with an external headphone?

5   A.    Yes.

6   Q.    Okay.  And so you have a headphone jack on the phone?

7   A.    Yes.

8   Q.    And you didn't invent headphones or headphone jacks

9   either, did you?

10  A.    No, because claim 8 is a dependent claim.  You cannot

11  read it by itself.

12  Q.    No, I understand.

13  A.    You have to combine everything that claim 1 has and

14  this.

15  Q.    I understand.

16  A.    That's why I invented.

17  Q.    I'm just trying to get some facts out.

18  A.    I'm just making sure that my patent is understood.

19  Q.    Let me get it on the record.  Okay?

20  A.    Yes.

21  Q.    All right.  Claim 10 deals with a GPS receiver; is

22  that correct?

23  A.    Claim 10.  Can you blow that up for me, please?

24  Q.    Yes.

25  A.    Yes, you're right.

1    Q.    So the handset now has got a GPS receiver.  Again, you

2    didn't invent GPS receivers?

3    A.    No, not at all.

4    Q.    In fact, there were off the shelf GPS receivers

5    available when you wrote your patent?

6    A.    Sure.

7    Q.    All right.  Claim 11.  Claim 11 deals with a clamshell

8    unit, or it says the docking display needs to be a clamshell

9    unit.  Now, that means that the two pieces of the docking

10   unit close together; is that correct?

11   A.    Yes.

12   Q.    So it's like a laptop.  The keyboard closes together

13   and opens up, so you've got a keyboard here, you've got a

14   display here?

15   A.    Sure.

16   Q.    That's a clamshell?

17   A.    Yes.

18   Q.    And clamshell designs for portable devices were known

19   before 1999?

20   A.    Oh, yeah.

21   Q.    Back to the 1980s, really.

22   A.    84.  Hewlett-Packard came out.

23   Q.    Hewlett-Packard in '84.  You didn't invent the

24   clamshell?

25   A.    Not at all.

Kumar - cross

1    Q.    All right.

2    A.    I wish I did.

3    Q.    Now, you said, I think you were asked a question in

4    your direct about whether you were aware of any other

5    devices like this.

6                Were you aware of at the time that you wrote

7    your patent of the Kobayashi patent?

8    A.    Well, the name doesn't ring any bell.

9    Q.    Okay.

10   A.    But --

11   Q.    Did you look for any patents at the time that you

12   filed your patent for the '462 patent?

13   A.    Just in general, I used to look at what prior art was

14   there and lawyers used to do some of that, but I don't

15   recall exactly what I found.

16   Q.    You don't recall doing that for this patent, though?

17   A.    I mean, I may have, and I would have turned that in.

18   Q.    Okay.  And do you recall being -- well, let's see

19   this.

20                In your -- I'd rather read it to you again.  Let

21   me ask you to look at your deposition on Kobayashi and on

22   page 165.

23   A.    And where do I find it?

24   Q.    Your deposition.  Page 165.  Your deposition is up

25   there in your notebook.

Kumar - cross

1  A.    Oh, okay.  Okay.

2  Q.    And look at page 165 at lines 9 through 18.  You were

3  shown a copy of the patent.  I won't read the whole number.

4  5,463,742, the Kobayashi.

5          And you were asked whether you had seen that

6  before.  And your answer was, no, you had not.  No, I have

7  not.

8  A.    Okay.

9  Q.    Does that refresh your recollection, you hadn't seen

10  that patent before?

11  A.    I guess so if it's here.

12  Q.    Okay.

13  A.    It must be right.

14  Q.    All right.  And then also you were not aware of a

15  patent to Nelson before you filed your patent application;

16  is that correct?

17  A.    Yes.  Like I said, must be if it's, if it's right --

18  Q.    Okay.

19  A.    -- right here.

20  Q.    You don't remember looking for and finding a patent of

21  Nelson?

22  A.    No.

23  Q.    All right.  Okay.  Mr. Kumar, you've continued to try

24  to market your Pocket Dock and Pocket Partner since 2002?

25  A.    I'm not marketing it right now because I'm getting a

Kumar - cross

1    prototype made.  Not exactly that, but I'm combining more

2    newer features and I plan to market it.

3    Q.    I think you, in your deposition in February of 2013,

4    you talked about you were getting a prototype made.

5    A.    Yes.

6    Q.    But you have not done that yet?

7    A.    No.  For the first time I went to India.  In 40 years

8    for the first time I went to India.  I'm never going there

9    again.  It's delayed by a year.

10   Q.    So it slowed everything down, your life for a year, by

11   going to India?

12   A.    I'm glad I left in 1969.

13   Q.    Okay.  Who is making that prototype for you or is

14   anyone doing it?

15   A.    They are.  It's in bank lore, that's where everybody

16   goes.  They are making it, but the company that was doing

17   it, they got bought out by Harmon Kardon.

18   Q.    Okay.

19   A.    And that was unfortunate, but I learned my lesson.

20   Q.    Okay.  Let me ask you about your product.  You

21   actually have in your -- in this lapdock, this docking

22   station patent, you have two parts, the handheld unit and

23   the docking station; is that correct?

24   A.    Yes, sir.

25   Q.    And you were in your marketing of that product, you

Kumar - cross

1    called the handheld unit a -- what did you call that?  A

2    Pocket Partner?

3    A.     Pocket Partner, yes.

4    Q.     And what was the Pocket Partner part of that?  Was

5    that the -- was that the barcode reader?

6    A.     It's not barcode reader, no.  Pocket Partner --

7    Q.     The PDA?

8    A.     Is a PDA part, yes, or a smartphone.

9    Q.     A smartphone?

10   A.     You know, as time goes by, definition will change.

11   But Pocket Partner was like a computer kind of thing that

12   fits in your pocket, so it's always with you.

13   Q.     But it's like a PDA in 2001, when you went to the CES

14   show?

15   A.     At that time, I think smartphones were coming out, so,

16   yes.  Unless you come out with a real product that somebody

17   can buy.  You know, it's concept that I was selling.  So

18   it -- it's -- the Pocket Partner would mean different things

19   at different time.

20   Q.     All right.  But in 2001, I'm trying to get back to the

21   CES show, the Computer Electronics Show in Las Vegas in

22   2001.  What were you showing there?  Pocket Partner and a

23   Pocket Dock?

24   A.     They -- it was not a cellphone and they actually

25   operate the thing, only then they give you the work.  So

Kumar - cross

1    that unit did not have a cellphone in it.

2    Q.    Okay.  What was that unit, the Pocket Partner?

3    A.    This unit has a central processor to drive both of

4    these things.

5    Q.    Okay.

6    A.    So basically this unit was using my patent, the '462.

7    Q.    Okay.  And that's what you showed at the CES show in

8    2001?

9    A.    Yes, sir.

10   Q.    That product?

11   A.    Yes, sir.

12   Q.    Okay.

13   A.    Yes.

14   Q.    All right.  And you got an award at that show; is that

15   correct?

16   A.    Yes, sir.

17   Q.    And to get an award at that show, you have to have a

18   booth at the show; is that correct?  You have to be --

19   A.    I'm not sure, but most likely, yeah.

20   Q.    And then you had to pay some money to enter into the

21   show; is that correct?

22   A.    No.

23   Q.    For the award?

24   A.    No.  You just have to have a booth and -- there are

25   thousands of booths and big companies are there, so...

Kumar - cross

1    Q.    All right.  And then you actually, you got the award

2    there and that's PTX-314?  Would you look at that?

3    A.    Yes, it is.

4    Q.    And this is really bad when I've got to change glasses

5    to read something, but this says that this award is on

6    the -- it's a design and engineering showcase award; is that

7    correct?

8    A.    Yes.  That's what it says, yes.

9    Q.    And how many awards were given out at the show?

10   A.    At the show, there -- I'm guessing maybe about a

11   dozen.

12   Q.    A dozen?  Okay.  And do you know how many entrants

13   there were for products to get an award?

14   A.    Yes.  We received -- how many interest?

15   Q.    Entrants.

16   A.    Oh, entries.  Well, there was, like, hundreds of

17   entries.  I mean, everybody wants to get the award because

18   --

19   Q.    Do you know --

20   A.    -- then they get displayed.  I don't know.

21   Q.    Okay.

22   A.    But it was known to be a big honor.  Samsung and HP,

23   Sony.

24   Q.    Okay.

25   A.    Microsoft.  These companies have received these

1   awards.

2   Q.    Yes.  Well, let me ask you, this award was given to

3   Chiro Technologies Corporation?

4   A.    Yes, sir.

5   Q.    And it's on the Pocket Partner 200.  That's actually

6   handheld unit, not the dock?

7   A.    Well, again, the Pocket Partner 100 was this device we

8   made at Telxon Corporation.  150 of these, actually.  So I

9   used a different model number.  So to me, the Pocket Partner

10  200 was the combined unit.  This is Pocket Partner 200.

11  Q.    But you've had two separate devices.  You had the

12  Pocket Partner and the Pocket Dock?

13  A.    There's no model number for this.  This is Pocket

14  Partner 200.  That's how Consumer Electronics Show people

15  understood that as.

16  Q.    When you deposition was taken, I think you just said

17  that was a mistake when they gave out the award; is that

18  correct?

19  A.    At the time, yes.  I was just reading the deposition.

20  At the time I thought it was, but it wasn't, actually.

21  Q.    So how did you find out it wasn't a mistake?

22  A.    When I was reading the deposition, then I remembered

23  that.

24  Q.    Okay.  All right.

25              THE COURT:  It is 4:30.  Unless you have one

1    question?

2              MR. BOICE:  I think I am just about done, your

3    Honor.  I'm sorry.  I didn't realize it was that late.  Let

4    me check one second, if I might?

5              THE COURT:  All right.

6              (Pause while counsel conferred.)

7              MR. BOICE:  We're done, your Honor.

8              THE COURT:  All right.  We're going to recess

9    for the evening.  Ladies and gentlemen, I will remind you

10   that during the evening recess, you are not to discuss the

11   case among yourselves or with anyone else.  You are not to

12   read anything listening or touching on the case and you are

13   not to perform an independent investigation relating to the

14   case.

15             Have a safe trip home, a pleasant evening.

16   We'll see you tomorrow morning at 9:00.  Thank you very

17   much.

18             (The jury was excused for the evening recess.)

19             THE COURT:  And the witness may certainly step

20   down, and you are excused for the evening.

21             THE WITNESS:  Thank you.

22             THE COURT:  And everyone else may be seated.

23             Yes?

24             MR. ALBERTI:  I just want to state for the

25   record, we don't have redirect, so I think he's released for

1    good.

2                    THE COURT:  Okay.  All right.  You are released

3    for good.

4                    (Witness excused.)

5                    THE COURT:  And everyone may be seated.  I do

6    have a couple of proceedings yet this afternoon, but if

7    there are issues that are best addressed now rather than

8    tomorrow morning, I'm happy to take maybe not more than

9    15 minutes.

10                   With respect to the copying issue, again, it

11   strikes me that copying is difficult to prove.  In my years

12   on the bench, it has been very rare that copying has been

13   allowed because a proffer hasn't been successful.

14                   In this case, when we're talking about

15   infringement, not necessarily obviousness, I'm still

16   contemplating that, but when we're talking about this next

17   witness and using the allegation that Motorola's patent

18   application has copied the '462 patent language, I think

19   it's simply too far removed.

20                   I do not see in this analysis the nexus between

21   the '462 patent claim language, Motorola's patent

22   application language and the product.  There just isn't that

23   very specific analysis and therefore I will not allow it for

24   infringement.  I am still contemplating whether it is

25   appropriate for secondary considerations of nonobviousness.

1              And I don't know whether the -- I don't know

2     whether the analysis for the invalidity or for the validity

3     portion of whoever's expert report is any more detailed, but

4     I do think if we're using this, there has to be a specific

5     nexus between these three things.

6              So if it's not any different, then my analysis

7     won't be any different for the invalidity.

8              MR. ALBERTI:  Your Honor, could I address the

9     nexus issue?

10             THE COURT:  Well, if you want to stand up, you

11    may.  Just very briefly address it.

12             MR. ALBERTI:  So the nexus here is, first of

13    all, the first named inventor listed on that patent

14    application is one of the designers of these lapdock

15    products.  And I heard counsel throughout their opening say

16    repeatedly, we build our products independently, without any

17    knowledge of the patent.  Okay?

18             This evidence goes to directly contradict these

19    statements by Motorola.  Its designers knew of the Kumar

20    patent because the Kumar patent was the only patent that

21    they cited in an application that the designer signed off

22    on.

23             THE COURT:  Well, I understand that you believe

24    there has been bad conduct.  The question is whether it's

25    relevant to any issue in this case.  Without a nexus between

1    the patent language, patent language and the product

2    specifically in an expert report or something like it, it's

3    not appropriate.  Now, whether it's relevant to anything

4    else, I don't know, but I don't think it's appropriate to an

5    infringement analysis.  If you are talking about something

6    else --

7                MR. ALBERTI:  Yes.  And it was cited in two

8    places in Dr. Alpert's infringement report.

9                First of all, there was the infringement

10   analysis.  Secondly, I think more importantly, it was cited

11   as evidence of knowledge of acts of -- for inducement, you

12   need knowledge that what you are doing, okay, is trespassing

13   on another's patent rights.

14               So they need to know of the patent itself to

15   prove inducement.  That's at least one core part of it.  You

16   have to have knowledge of the patent.

17               THE COURT:  I understand that.  So you are

18   telling me, though, that for purposes of damages later, your

19   date for when they had knowledge of the patent is somehow --

20   I mean, I thought that that was proven by something else.  I

21   mean, I don't know why this comparison between the two is an

22   appropriate way to prove knowledge when apparently you have

23   lots of other information about it.

24               MR. ALBERTI:  Well, we don't necessarily need

25   the comparison, but we definitely would like to reference

1    the fact that evidence that they knew of the patent, they

2    cited it in an IDS as the only relevant piece of prior art

3    to their patent which establishes that they had knowledge of

4    the patent for purposes of indirect infringement, without

5    necessarily the side-by-side comparison.  It is still

6    relevant to their state of mind, to their knowledge of the

7    Kumar patent.

8            THE COURT:  Well, I'm not sure there's any

9    objection or there could be objections necessarily to the

10   lifting of the '462 in the IDS of one of their patents.  I

11   don't know.

12           Is there an objection to that?

13           MR. MOORE:  No, your Honor.  In fact, that would

14   have been done in 2012 or later and we also agreed we

15   received notice in 2010 for this lawsuit.  It's not really

16   relevant.  The third time we learned about it, when we were

17   sued, too.

18           THE COURT:  Well, in any event, we're talking

19   about -- I don't think that is inflammatory, overly

20   prejudicial, and it sounds like it is a fact.  It was cited

21   as a -- it was cited.  So that's not what we are talking

22   about.  We're talking about the issue of copying and I've

23   made my decision, I believe.

24           MR. ALBERTI:  With respect to infringement?  We

25   can revisit this for --

 1                    THE COURT:  I am still -- although I have to

 2      say, without that specific nexus between the language of the

 3      patent, the language of the patent and the product, if it's

 4      not any better than this, then I think even if I were to

 5      believe that evidence of this kind of copying as opposed to

 6      limited to a product might be appropriate, we still need

 7      that nexus.  And unless you demonstrate that there is that

 8      nexus, I would -- my conclusion would be the same.  So I

 9      would need to look at that.  All right?

10                    MR. ALBERTI:  Okay.

11                    THE COURT:  All right.  Is there anything else

12      that we should address briefly before I have to go onto the

13      rest of my day?

14                    MR. MOORE:  Nothing from Motorola.  Thank you,

15      your Honor.

16                    THE COURT:  All right.  All right.  I do have

17      something -- I think I have something at 8:30, but if you

18      all have issues for the witnesses tomorrow, please let my

19      staff know and I will try to get here before 9:00.

20                    All right.  Thank you very much, everyone.  Oh,

21      I have to close out my computer, so go home.

22                    (Court recessed at 4:40 p.m.)

23                                    -  -  -

24

25