1                          - VOLUME B -

2                 IN THE UNITED STATES DISTRICT COURT

3                 IN AND FOR THE DISTRICT OF DELAWARE

4                              - - -

5

   INTELLECTUAL VENTURES I LLC   :   CIVIL ACTION
6  and INTELLECTUAL VENTURES      :
   II LLC,                        :
7                                 :
                   Plaintiffs,    :
8                                 :
        vs.                       :
9                                 :
   MOTOROLA MOBILITY LLC,         :
10                                :
                   Defendant.     :   NO. 11-908-SLR-MPT

11

12                              - - -

13                         Wilmington, Delaware
                           Friday, January 24, 2014
14                         9:07 o'clock, a.m.

15
                                - - -
16

   BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J., and a jury
17
                                - - -
18

19  APPEARANCES:

20

               FARNAN LLP
21             BY:  BRIAN E. FARNAN, ESQ.

22
                        -and-
23

24
                                    Valerie J. Gunning
25                                  Official Court Reporter

```
 1    APPEARANCES (Continued):

 2
                 FEINBERG DAY ALBERTI & THOMPSON, LLP
 3               BY:  ELIZABETH DAY, ESQ.,
                      DAVID ALBERTI, ESQ.,
 4                    MARC BELLOLI, ESQ.,
                      YAKOV ZOLOTOREV, ESQ.,
 5                    NIKOLAS BOHL ESQ.
                      (Menlo Park, California)
 6

 7                    Counsel for Plaintiffs

 8

 9               MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                 BY:  JACK B. BLUMENFELD, ESQ. and
10                    STEPHEN J. KRAFTSCHIK, ESQ.

11
                          -and-
12

13               KILPATRICK TOWNSEND & STOCKTON, LLP
                 BY:  WILLIAM BOICE, ESQ. and
14                    CANDICE DECAIRE, ESQ.,
                      (Atlanta, Georgia)
15

16                        -and-

17
                 KILPATRICK TOWNSEND & STOCKTON, LLP
18               BY: STEVEN MOORE, ESQ.
                     (San Francisco, California)
19

20                        -and-

21
                 KILPATRICK TOWNSEND & STOCKTON, LLP
22               BY:  D. CLAY HOLLOWAY, ESQ.
                      (Atlanta, Georgia)
23

24                    Counsel for Defendant

25
                          -   -   -
```

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:07 a.m.)

 5

 6              THE COURT:  We are still missing one juror.  The

 7    question is how much longer we want to wait for that one

 8    juror.  I mean, we don't have a whole lot of flex time in

 9    our schedule at this point.  So I mean I would think by 9:15

10    if she's not here, we might consider going forward, or if

11    you just want to go forward now, it's up to you.  But I can

12    give you a few minutes to discuss it among yourselves.  I

13    will just step out in the hall and you let me know.  All

14    right?

15              We've tried to reach her on her cellphone and it

16    has just gone to voicemail, so we've done our best to reach

17    out to her and we have not communicated with her.  All

18    right.  So I will step out.  You let me know.

19              (Short recess taken.)

20                        -   -   -

21              (Proceedings resumed after the short recess.)

22              THE COURT:  All right.  We'll bring in our jury.

23              (The jury entered the courtroom and took their

24    seats in the box.)

25              THE COURT:  Everyone may be seated.  Thank you.
```

Barber - designations

1              And do we have a witness?

2              MR. BELLOLI:  We have a quick stipulation to

3    read for the jury, a factual stipulation, then we'll call

4    the next witness, which is appearing by video.

5              THE COURT:  Thank you.

6              MR. BELLOLI:  Intellectual Ventures and Motorola

7    hereby stipulate that Motorola has sold the following

8    products in the United States:

9              The Atrix 4G, the Atrix 2, the Atrix HD, the

10   Lapdock for Atrix 4G, Lapdock 100, Lapdock 500, Admiral,

11   Photon 4G, Photon Q 4G LTE, the XPRT, the Titanium, the

12   Electrified, the Electrified 2, the Electrified M, the

13   Defy XT, the Milestone X, the Triumph, the I867 and the

14   XT886.

15             As its next witness, Intellectual Ventures calls

16   James Barber by videotaped deposition.  He's an engineering

17   director for Motorola.  He had his deposition taken in

18   February of last year and he's going to testify about the

19   Motorola Lapdock product.

20             PLAINTIFFS' TESTIMONY, Continued.

21             (Videotaped deposition played as follows.)

22             "Question:  Can you please state your names for

23   the record.

24             "Answer:  My name is James Barber.

25             "Question:  How long have you been with

1   Motorola?

2           "Answer:  I've been with Motorola for 29 years.

3           "Question:  And what are your current

4   responsibilities at Motorola?

5           "Answer:  I am an engineering director and I

6   lead a team of engineers that work on product development.

7           "Question:  How many engineers do you lead?

8           "Answer:  Currently there are ten engineers that

9   are underneath me.

10          "Question:  Have you used a Lapdock?

11          "Answer:  I have used a Lapdock.

12          "Question:  And what was part of your work for

13  Motorola when you were using that Lapdock?

14          "Answer:  Yes, it was.

15          "Question:  Which model of Lapdock have you

16  used?

17          "Answer:  I've used the Lapdock 1, the original

18  Lapdock for Atrix 4G.  I've used a Lapdock 1.5, which was a

19  version developed for Droid Bionic, and then I used Lapdock

20  100 and 500.

21          "Question:  Are those all of the Lapdock models?

22          "Answer:  Those are all the Lapdock models that

23  we've developed and sold.

24          "Question:  Thank you.  Did you use those at

25  Motorola's facilities here in Illinois?

Barber - designations

1          "Answer:  Yes.

2          "Question:  Approximately how long have you been

3    using those, let's say from the first one until you stopped

4    using any of those Lapdocks?

5          "Answer:  I was the technical lead for Lapdock

6    for Atrix 4G.  So I used it from the very first prototypes

7    that we received up until I'd say several months after we

8    started shipping it.

9          "Question:  When did you first start developing

10   that first one and start using it?

11         "Answer:  I had discussions on the first Lapdock

12   in about February of 2010, but engineering work on it didn't

13   really start until about May of 2010.

14         "Question:  Generally, what would you describe

15   as the key selling points of the Lapdock product?

16         "Answer:  I think its key selling point is that

17   it provided a desktop browser experience using a handset and

18   a Lapdock peripheral.

19         "Question:  You said it was using -- using a

20   phone and a peripheral; is that correct?

21         "So does the phone attach to a Lapdock?

22         "Answer:  Yes.

23         "Question:  Okay.  And just in general for our

24   purposes, when I say Lapdock, I'll mean it to include all of

25   the Lapdock models that you mentioned that were produced.

1    If I refer to a specific model, then I'll be referring only

2    to that.

3              "Answer:  I understand.

4              "Question:  In your opinion, are both a phone

5    and a Lapdock portable?

6              "Answer:  Yes.

7              "Question:  Does the Lapdock work only with

8    Motorola phones or could you hook up another company's

9    phone?

10             "Answer:  It's intended only to be used with

11   Motorola phones.

12             "Question:  What's generally the purpose of a

13   Lapdock?

14             "Answer:  To provide a desktop web browsing

15   experience.

16             "Question:  What phones are compatible with the

17   Lapdock 100?

18             "Answer:  There's a series of phones that are

19   compatible.

20             "Question:  Okay.  If a U.S. consumer has a

21   problem with a Lapdock 100, can he send it in for service?

22             "Answer:  Yes.

23             "Question:  Where would it be serviced?

24             "Answer:  It would be serviced typically at the

25   distribution center in Texas.  They would do an initial

Barber - designations

1    triage on the Lapdock.

2              "Question:  Okay.  And before they send it back

3    to the consumer, they would test to see that that Lapdock is

4    properly functioning; is that correct?

5              "Answer:  Yes.

6              "Question:  And did you attach the Atrix 4G

7    phone to this Lapdock in the course of your work?

8              "Answer:  Yes.

9              "Question:  And where did you do that?

10             "Answer:  Typically, it was at work in

11   Libertyville, Illinois.

12             "Question:  And did you use the two products,

13   the phone and the Lapdock when they were attached together?

14             "Answer:  Yes.

15             "Mr. Mikhail:

16             "Question:  Earlier we talked about the

17   functionality of the Lapdock when the phone is not

18   attached.  You said that it limited functionality; is

19   that correct?

20             "Answer:  Yes.

21             "Question:  Could you describe what that limited

22   functionality is without the phone attached?

23             "Answer:  The Lapdock has a battery in it, and

24   you can check the state of charge of the battery.  So

25   there's a button on it that you press, and you'll get visual

1    feedback in terms of state of charge of the battery.

2               "Question:  Anything else it can do without the

3    phone attached?

4               "Answer:  No.  You can plug it in and charge the

5    battery in it.

6               "Question:  Is there a processor in the Lapdock

7    that runs an operating system?

8               "The Witness:  There are several processors in

9    the Lapdock.  You know, we have talked about the scaler

10   already.  That's one example of a processor.

11              "Mr. Mikhail:  I'm sorry.  You said the phone

12   was not attached.  If the phone is not attached, the Lapdock

13   is limited to charging or indicating what level of charge it

14   has; is that correct?

15              "Answer:  Yes, that's correct.

16              "Mr. Mikhail:

17              "Question:  If the lid -- if the lid on the

18   Lapdock is open and the phone is not connected, is there

19   anything displayed on the screen of the Lapdock?

20              "The Witness:  The screen would be dark.

21              "Question:  And without the handset, there is no

22   display on the screen of the Lapdock; is that correct?

23              "The Witness:  If the handset is not plugged

24   into the Lapdock, the screen will be dark on the laptop.

25              "By Mr. Mikhail:

Barber - designations

1                "Question:  So referring again to Lapdocks in

2        general, not any specific model, what's the advantage of

3        using a Lapdock which can only be used together with a

4        phone?  What's the advantage of using that as opposed to

5        just using the phone by itself?

6                "The Witness:  With the Lapdock you get a full

7        desktop browser experience.  You get a different experience

8        if you use the browser in the phone.

9                "By Mr. Mikhail:

10               "Question:  Presumably there's a better

11       experience?

12               "The Witness:  I think most people would

13       consider it a better experience.

14               "By Mr. Mikhail:

15               "Question:  And is that better experience --

16       does the -- does the larger screen contribute to that?

17               "Answer:  Yes.

18               "Question:  You had mentioned earlier Motorola

19       has some inventor of Lapdocks; is that correct?

20               "The Witness:  I don't know what the exact

21       status of inventory is at Motorola.

22               "By Mr. Mikhail:

23               "Question:  Okay.  But Motorola continues to

24       sell Lapdocks from inventory; is that correct?

25               "The Witness:  Motorola is continuing to sell

Barber - designations

 1   Lapdocks, yes.

 2              "By Mr. Mikhail:

 3              "Question:  Who are they selling Lapdocks to?

 4              "Answer:  They sell Lapdocks to our carrier

 5   customers.

 6              "Question:  Who would those carrier customers in

 7   the U.S. be?

 8              THE WITNESS:  Verizon, Sprint, AT&T, and I

 9   believe those are the care -- and I think that's it."

10              (End of videotaped deposition.)

11              MR. ALBERTI:  Your Honor, Intellectual Ventures

12   would now like to call Dr. Donald Alpert, expert witness, to

13   testify on behalf of issues surrounding the '462 patent.

14              THE COURT:  All right.  Thank you very much.

15              ... DONALD ALPERT, having been duly

16          sworn as a witness, was examined and testified as

17          follows...

18                      DIRECT EXAMINATION

19   BY MR. ALBERTI:

20   Q.   Good morning, Dr. Alpert.  Could you please state your

21   full name for the record.

22   A.   Yes.  It's Donald Alpert.  I go by Don.

23   Q.   Have you been hired as an expert in this case?

24   A.   Yes.  I've been retained by the plaintiff,

25   Intellectual Ventures.

Alpert - direct

1   Q.    And what work were you asked to do by Intellectual

2   Ventures?

3   A.    I was asked to study the '462 patent and to come to a

4   determination about whether the accused Motorola products

5   infringe that patent and also to determine whether the

6   patent is valid.

7   Q.    And did you prepare any demonstratives to aid in your

8   testimony today?

9   A.    Yes, I have.  There's a set of slides that I hope

10  we'll be able to use.

11  Q.    Did you also prepare some reports during your course

12  of work on this case?

13  A.    Yes.  There were at least two major reports that

14  were -- totaled about 250 pages summarizing my analysis.

15  Q.    And did you bring copies of those with you today?

16  A.    Yes.  I see there's a binder over here that has those

17  reports.

18  Q.    To the extent that you need to refer to that to

19  refresh your recollection for some specific issue today,

20  could you please let us know?

21          MR. HOLLOWAY:  Your Honor, I have an objection

22  to that.  If he's going to do that, I think he should

23  actually not be able to answer the question first, then go

24  through the refreshing recollection procedure.

25          THE COURT:  Yes.

Alpert - direct

1              MR. ALBERTI:  Sure.

2              THE WITNESS:  Yes, okay.  I think I understand

3    what the attorneys and the Judge has explained just there.

4    BY MR. ALBERTI:

5    Q.   And so can you take a look in your exhibit binder and

6    see if you will find a JTX-8.

7    A.   I was just going to ask a question:  Am I allowed to

8    use this?

9              THE COURT:  Yes.

10             THE WITNESS:  Okay.  Thanks.

11             Okay.  I see JTX-8 here.

12   BY MR. ALBERTI:

13   Q.   And what is JTX-8?

14   A.   JTX-8 is the '462 Kumar patent that I was just talking

15   about.

16   Q.   Let's talk a little bit about your background.  Could

17   you please just generally describe what your background is

18   in?

19   A.   Yes.  It's in electrical engineering, and I've been

20   fortunate to experience most of the so-called microprocessor

21   revolution.

22             I think we've heard yesterday about the first

23   microprocessor came out in 1971.  I actually had my first

24   experience in 1976.  That was a microprocessor that had

25   5,000 transistors in it, and the most recent microprocessor,

1    at least the one I kept track of, has about two-and-a-half

2    billion transistors, so during the course of my professional

3    experience, that's an increase of about half a million times

4    the number of transistors.

5            And so throughout that period I've had

6    experience in applying microprocessors, designing them,

7    analyzing them, studying them, and writing and teaching

8    about them.

9    Q.   Could you please walk us through some of your relevant

10   work experience.

11   A.   Yes.  Well, I think the, probably the most significant

12   accomplishment from my perspective is, I worked at Intel for

13   about 13 years, and over there I was the principal engineer

14   for the Pentium processor and it was not only a, you know, a

15   technical accomplishment of which I'm very proud, but it

16   also became a household name.

17           The Intel Inside and Pentium became well enough

18   known.  I know that people would ask my mother in her

19   retirement community once the publicity came about.

20   Q.   What is the Intel Pentium processor?

21   A.   The Pentium processor is a central processor.  It was

22   the most widely used, at least in the mid-nineties, for

23   personal computers, and I think even the patent itself makes

24   reference to the fact that it was commonly used in laptop

25   computers.

1              I also at Intel, I was just going to mention

2     another significant product that I worked on was known as

3     a chip set.  It's an 815 chip set.  It came out a little

4     bit later, but it was the most widely used chip set at the

5     time.  That means it handled the graphics memory and the

6     various I/O devices that would be in a desktop or laptop

7     computer.

8     Q.    Are you a named inventor on any patents?

9     A.    Yes.  Over 30 patents.

10    Q.    All right.  Could you please describe your educational

11    background.

12    A.    Yes.  I have undergraduate degree in electrical

13    engineering.  I graduated from MIT in 1973 and then later I

14    went to graduate school at Stanford University in

15    California, and I have a Master's degree from there and a

16    Ph.D. in 1984.

17    Q.    What do you currently do for a living?

18    A.    Currently, I'm an independent consultant.  I have my

19    own company, so I'm the only employee also.

20    Q.    Do you belong to any academic societies or groups?

21    A.    Yes.  For electrical engineers, the kind of main

22    organization is the Institute of Electrical and Electronic

23    Engineers, sometimes called IEEE.  And, in fact, I was a

24    member of the technical committee for microprocessors and

25    the past chair of that.  I am also a member of a little bit

Alpert - direct

1    more software-oriented group that's called the Association

2    For Computing Machinery, ACM.

3    Q.    Have you testified in trial in a District Court

4    proceeding before?

5    A.    Yes, I have.

6    Q.    How many times?

7    A.    Twice.

8              MR. ALBERTI:  Your Honor, IV tenders Dr.

9    Alpert as an expert in electrical engineering and

10   computer science, including processors and processor-based

11   devices.

12             THE COURT:  All right.  Any objection?

13             MR. HOLLOWAY:  No objection, your Honor.

14             THE COURT:  All right.  Thank you.

15   BY MR. ALBERTI:

16   Q.    What analysis did you do with respect to the '462

17   Kumar patent?

18   A.    Well, as I mentioned before, I analyzed the patent,

19   comparing it to Motorola's accused products, and I found

20   that, in fact, the accused Motorola devices do infringe the

21   '462 Kumar patent.  And I also considered whether the patent

22   was valid and looked at the number of prior art references

23   that Motorola's expert had provided and I concluded that the

24   patent is valid.

25   Q.    Are you being paid for your work on this case?

 1    A.     Yes.  I'm being paid at an hourly rate.  It's $500 an

 2    hour, what I've earned as a standard fee now.

 3    Q.     Is your compensation in any way tied to the substance

 4    of your testimony?

 5    A.     No.  I'm paid for the time, not for the outcome or

 6    results, and certainly not anything that would be related to

 7    the outcome of the trial here.

 8    Q.     Could you please go over the materials that you

 9    reviewed in reaching your opinions?

10    A.     Yes.  There's a summary over here.  I would say

11    hundreds, certainly hundreds of documents, thousands and

12    thousands of pages that were involved only talk about a

13    small subset here today, but there was, of course, the

14    Kumar '462 patent itself and something known as the file

15    history.  That's the record of the communication between the

16    applicant and the Patent Office while the patent is being

17    reviewed.  Deposition testimony of Motorola's engineers.

18    Specifically, Mr. Barber that we've just heard, and their

19    expert that I believe we'll hear from next week.

20              A lot of documents from Motorola.

21    Specifications, third-party documentation.  For example,

22    there's one of the processors that I will talk about that's

23    used in the handsets, nearly 6,000 pages just for the

24    specification of that one component.

25              There were hardware schematics.  That's the

Alpert - direct

1    representation of the board and the components and how

2    they're interconnected that would be in a phone, and as well

3    as the software, sometimes called source code, but basically

4    in kind of a human readable form of the software that runs

5    on the phones.

6                 And, finally, I actually, you know, tested on my

7    own and used and had the experience of working with all of

8    these accused products.

9    Q.    About how much time did you spend in your infringement

10   analysis?

11   A.    I spent about 300 hours, including writing the reports

12   and some of the other work.

13   Q.    Moving on now specifically to the '462 Kumar patent,

14   what generally is the technology described in that patent?

15   A.    Well, I think the title is a good summary.  It says

16   that it's a portable computing, communication and

17   entertainment device, and more specifically with a central

18   processor that's carried in a detachable handset.

19   Q.    Could you give us a real life example of such a

20   system?

21   A.    I'm just looking at several of the phones, of the

22   system.  Well, I think we'll talk about it more, but there's

23   the phone over here, Atrix 4G, that's identified as PTX-48.

24   And there's one of the Lapdock products.  And I think I will

25   point to this one, which is the Lapdock four Atrix 4G.  And

Alpert - direct

1   that one is identified as the Exhibit PTX-54.

2               MR. ALBERTI:  Your Honor, we would move to admit

3   PTX-48 and 54 into evidence.

4               MR. HOLLOWAY:  No objection, your Honor.

5               THE COURT:  Thank you.

6               (Plaintiffs' Trial Exhibit No. 48 and 54 were

7   admitted into evidence.)

8   BY MR. ALBERTI:

9   Q.    In general, what were some of the problems that the

10  Kumar patent was attempting to solve?

11  A.    Well, again, this is back in 1999, when the patent was

12  first applied for.  And one of the problems identified is

13  that typical kind of mobile, I was going to say office

14  worker.  It's actually, you know, salespeople.  It's people

15  walking around on a factory floor as well needed to have

16  multiple devices to perform all of the functions that were

17  going to be important to them.  It might be a smartphone

18  or even just a basic cellular phone, an organizer, and in

19  this case, it's also a laptop unit.

20              And besides just having to pay for and hold onto

21  multiple devices, associated with those devices there were

22  some additional problems.  There's a lot of accessories that

23  you need for charging, extra batteries, and as well there's

24  a challenge of -- it's described here technically as

25  synchronizing the data between, among the devices.

1          And what that really kind of means is that, for

2    example, if you had a, some type of an organizer, portable

3    digital assistant, and you had someone's phone number in

4    there, but that information wasn't on the phone, then you

5    were stuck with a problem.  You could read it off there and

6    type it in, but what you really wanted was to have that same

7    information available on all the devices or on a single

8    device.

9    Q.    What does the Kumar patent say about some of the

10   problems of early handheld devices?

11   A.    Well, again, this is speaking of the prior art, but I

12   think it would be also common today, which is to say that

13   these smaller devices that you can hold in your hand, they

14   have a relatively small screen that's used for both

15   displays.

16          In some of the prior art, you actually had

17   separate display and keyboard.  And so these are quite small

18   for doing certain type of activity that might be much more

19   comfortable on a desktop computer.

20          I think it gives an example here.  Yes, it

21   mentions web browsing, word processing.  If you need to

22   enter a lot of text or read a big document, then that's

23   quite awkward to do on any kind of device of this size.

24   Q.    And what did the Kumar patent say about the

25   limitations of the processing power of some of these early

Alpert - direct

1   devices?

2   A.    Well, the patent does indicate in the background that

3   some of these various handheld devices, they were limited in

4   function, very limited in the battery capacity, especially

5   because the battery is a substantial part of the size and

6   weight of these devices, and that therefore they were --

7   wound up being limited in the processing power that was

8   available.  Just enough to do whatever task the kind of

9   single function device was intended for.

10  Q.    And how did the Kumar patent attempt to overcome some

11  of these problems?

12  A.    Well, in the summary of the invention that's up here,

13  it does explain that an object of the invention was to

14  provide a single device that was for these various

15  functions, computing communication and entertainment.

16          I think if we look -- I'm just waiting for the

17  highlighting to come up.  And, in particular, that single

18  device does work much like a conventional computer, but in

19  this case there's a detachable handset which has the

20  central processor and all the communication capabilities as

21  well.

22  Q.    Now, before we go too far into the patent itself,

23  can you give us a little bit of background on computer

24  systems.

25  A.    Yes.  In fact, the field that I specialize in is

1    called computer architecture, and so it does kind of span

2    both the software and the hardware.  And in order to manage

3    the complexity of -- actually, older computer systems, it's

4    important to think about different levels of abstraction

5    regarding what the computer system is doing.

6              And I've shown over here this diagram.  There

7    are three levels.  The first two levels are different types

8    of software I will talk about in just a moment, and the

9    third level is the actual hardware components.

10             The level that's shown on top there is

11   application software.  That's generally why someone kind of

12   picks up one of these devices.  They'll want to select one

13   of the various applications that it can run, maybe to browse

14   the web, maybe to make a phone call.  I'm thinking just show

15   photos of your family, some of the applications that we all

16   commonly use.

17             The applications software, the next level is

18   actually the operating system software.  And that would be

19   the software that kind of switches between the applications

20   because you want to be able to do more than one thing even

21   if you just are changing from time to time to do more than

22   one thing, and it also is what controls the hardware of the

23   system.

24             And, finally, as I mentioned, what's shown as

25   the lowest level here is the actual physical hardware

Alpert - direct

1    components that are used to make the computer system.

2    Q.    What are some of the typical hardware components in a

3    computer system?

4    A.    Yes.  This is an example that represents, in fact,

5    what I've taught at kind of undergraduate electrical

6    engineering level, and usually we talk about the kind of

7    three main classes of devices, types of devices that are in

8    a computer system.

9             One is the central processor shown on the left

10   side there.  That device executes programs.  In particular,

11   it would execute the software that I talked about, both the

12   applications and the operating system.

13            And next in the middle is some memory and that

14   stores information.  It stores the programs that I talked

15   about.  That's where the processor executes the programs

16   from that memory.  And there's also all the data that the

17   processor manipulates.

18            And shown on the right side there, various other

19   devices in the system, sometimes called input/output

20   devices, or sometimes called peripheral devices, because

21   they're kind of at the outer edge of the system interacting

22   with either other systems or with humans.

23            And those input/output devices, examples, might

24   include for output, you might have a printer or a display

25   screen.  For input, you might have a keyboard or mouse, for

Alpert - direct

1   example, are commonly used devices.

2   Q.    What are some of the functions of the central

3   processor in a computer system?

4   A.    Well, as I mentioned, it would execute the operating

5   system and the applications.  It actually performs the

6   primary computational functions of the computer system.

7   Q.    And what's an example of a central processor?

8   A.    Well, one example would be the Pentium processor that

9   I worked on and is also referenced in the patent.

10  Q.    What are the differences between ordinary chips and

11  central processors?

12  A.    Well, all of the devices that I've shown here are

13  actually made from the same basic technology.  The past

14  30 years, it has been what's called a semiconductor

15  technology.  Kind of silicon is the fundamental material

16  there, and then additional materials are applied to make

17  semiconductor components.

18            And that same technology is used to make chips.

19  Some of the chips are processors.  Some would be memory.

20  And others would be for I/O devices, for example, at least

21  in a computer system.

22  Q.    Can a computer system have more than one processor?

23  A.    Yes.  There can be multiple processors.  There's one

24  central processor, and I think we'll see examples that there

25  would be potentially other specialized processors.  In

Alpert - direct

1    particular in the devices over there, are likely to include

2    a processor, such as a single processor that would be used

3    for communications peripherals.

4    Q.    Returning to the '462 Kumar patent, does the patent

5    provide an example of the system?

6    A.    Yes, the patent does.  There are a couple figures that

7    represent that.  Figure 1 and Figure 5 are shown up on the

8    slides over here.

9             Figure 1 shows what's highlighted in orange over

10    there, is a handset, a detachable handset.  And in green is

11    a portable docking display unit.

12             Figure 5 kind of shows a particular

13    organization.  I think the significance there is just to

14    show when the docking display unit can be opened up.

15    Q.    Does the handset, which is labeled 20, have

16    operation or utility separate from the docking

17    station?

18    A.    Yes.  The handset can be used separately.  The patent

19    explains in the summary of the invention that it's a

20    wireless phone unit, but it also has additional

21    functionality.  It can be used for playing music and for an

22    alarm clock as well as other examples that are provided in

23    the patent.

24    Q.    In the Kumar system, where is the central processor?

25    A.    The central processor is in that detachable handset.

 1    That's kind of what's represented here in the orange with

 2    the green representing the portable display unit.

 3    Q.    And when the handset is combined with the portable

 4    display unit, what provides the processing power?

 5    A.    When the two are combined, when the handset is

 6    attached to the docking display unit, it's, in fact, the

 7    handset that provides the processing and communication

 8    power.  More specifically, it's the CPU in the handset

 9    that provides the processing power for this combined

10    system.

11    Q.    Switching topics a little bit now, let's talk about

12    the actual claims of the patent.  And starting with claim 1,

13    can you quickly walk us through the main elements of

14    claim 1?

15    A.    Yes.  The very beginning identifies what is sometimes

16    called a preamble, where it says that the claim itself

17    covers a portable processing device, and then there are more

18    specific requirements.  There's kind of a lot of words

19    there, and we are going to go through I think pretty much

20    every word in a little while.  But there's an overall

21    structure as well.

22             The first major element, which is identified as

23    element 1a up there, is a detachable handset that has

24    certain characteristics.

25             The second major element, 1b, is a portable

Alpert - direct

1    docking display unit.

2              And, finally, there's an element, 1c, that

3    explains that the docking display unit itself is only fully

4    operable when the handset is attached.

5    Q.    Now, looking at Figure 1, can you point out where

6    these various elements are?

7    A.    Yes.  The portable processing device that was in the

8    preamble, that's represented in Figure 1 as an element with

9    a number 10, and that's showing both -- what you'll see is

10   the handset and the docking display unit.  The detachable

11   handset unit is indicated by a number 20 in that figure, and

12   the docking display unit is indicated by a number 30 in

13   Figure 1.

14   Q.    Now, what does the claim say about the central

15   processor for this system?

16   A.    The claim says that the detachable handset includes a

17   central processor, the kind of highlighted in red on the

18   third line there.  And it also says that the portable

19   docking display unit does not include a central processor.

20   Q.    What is Figure 3 that we see here?

21   A.    Figure 3 is a block diagram of the handset and of the

22   docking display unit.  It looks quite busy, but it does

23   have meaning to an engineer that's familiar with this

24   technology.

25              And we can see on the left side the detachable

1    handset unit has a central processor.  It's signified by a

2    number 11.  It also has a number of other components, some

3    of which will be relevant to the claims.

4              And on the right side, again, highlighted in

5    green is the portable docking display unit, and there's no

6    central processor in the portable docking display unit.

7    Q.    Does no central processor mean there are no other

8    chips or any other processors in the device?

9    A.    No.  There's most definitely chips, various types of

10   electronic components in there.  And as I mentioned, there

11   can also be other specialized types of processors, but just

12   not a central processor.

13   Q.    Going back to claim 1, there's some language here

14   describing interfaces.  Can you explain to the jury what

15   those are?

16   A.    Yes.  First of all, actually, it mentions that there

17   are a plurality of first circuits, so I just want to

18   explain, it's circuits.

19             When engineers talk about a circuit, they're

20   referring to a collection of electronic components.  And so

21   these particular electronic components, the interfaces, are

22   located between the central processor and the actual

23   devices, and they are used to control and to drive those

24   devices that they're attached to.  Video interface, for

25   example, would be connected to a display.

Alpert - direct

1   Q.    What does the patent say specifically about the

2   interfaces and where they are located on Figure 3?

3   A.    Well, on Figure 3 highlighted in yellow we have the

4   shown communication interface, a video interface.  That's

5   No. 15.  I'm just going from top to bottom, what's

6   highlighted there.  A pen interface and a keyboard

7   interface.  The patent tells us these interfaces are used to

8   support and drive the various peripheral devices, I/O

9   devices themselves.

10  Q.    What does the existence of a central processor and the

11  set of interfaces within that handset allow the handset to

12  do?

13  A.    Well, that provides the capability that the handset

14  can, the user can interact with the handset, and in

15  particular, it will -- it can be functional for the user.

16  Q.    Now let's talk a little bit about the accused

17  products.  At a high level, what accused products did you

18  analyze in this case?

19  A.    There were a number of smartphones from Motorola, also

20  known as a handset, and three models of what are identified

21  as the Lapdock product over there.

22  Q.    And can you state for the record what specific models

23  that you looked at?

24  A.    Yes.  There's the phone or handset that's known as an

25  Atrix 4G, and that particular phone works with a docking

Alpert - direct

1  display unit.  That's the Lapdock for Atrix 4G.

2           There were three more phones that I looked at:

3  The Photon 4, Electrify, and Atrix 2, and each of these

4  phones will work and operate with either a Lapdock 100 or a

5  Lapdock 500.

6  Q.   In front of you you'll see there's some devices along

7  with your notebook.  Can you see if you can identify each of

8  those products?

9  A.   Yes, I can.  In fact, they are labeled, but I can also

10  tell by the carrier on many of them who it was for.  I have

11  one that's PTX-64 that's an Electrify smartphone and that

12  was carried by U.S. Cellular.  It's a Motorola smartphone,

13  Motorola's name on the front.

14           I'm just picking them up in order.  So the Atrix

15  2 is the next one, a Motorola smartphone, and that's PTX-45.

16  That was carried by AT&T.

17           And the third one here in this pile is a

18  Motorola Photon 4G phone, PTX-42, and that one has Sprint's

19  name on the back.

20           For the Lapdocks, I have over here a Lapdock

21  100.  It's PTX-58.  And the larger one that I have here, the

22  largest one is a Lapdock 500, and that one has a label on

23  here, PTX-61.

24           MR. ALBERTI:  And, your Honor, Intellectual

25  Ventures moves to admit PTX-64, 45, 42, 58 and 61 into

Alpert - direct

1    evidence.

2                    THE COURT:  Any objection?

3                    MR. HOLLOWAY:  No objection, your Honor.

4                    THE COURT:  Thank you.

5                    (Plaintiffs' Trial Exhibit No. 64, 45, 42, 58

6    and 61 were admitted into evidence.)

7    BY MR. ALBERTI:

8    Q.    Now, what was your opinion regarding the accused

9    products and whether or not they infringed the claims of the

10   '462 Kumar patent?

11   A.    Well, there are certain claims that are asserted in

12   this case and it's my opinion and definite conclusion that

13   the accused products do infringe those claims.

14   Q.    Was there any disagreement between you and Motorola's

15   expert as to whether or not the products infringed claim 1?

16   A.    Yes.  For claim 1, I understand there's one point of

17   disagreement, which is whether the Lapdock includes a

18   central processor or not.

19   Q.    Do any of the Lapdocks include a central processor?

20   A.    No, definitely not.

21   Q.    Let's talk a little bit about the accused handsets.

22   You introduced them earlier.  What are some of the common

23   features of the accused handsets?

24   A.    Well, there's the photo up there.  Let me just see.

25   I've got the Atrix 4G here.

1            I think people can hopefully see or maybe later

2      when you get your hands on it that most of the smartphone

3      itself is a piece of glass.  It looks like it's just a solid

4      piece of glass, but there's actually different layers in

5      there.  And this serves as a, what's called a touch screen.

6      So it's used both to display information that the user can

7      see as well as when you press on it, the phone can sense

8      input from the user.

9            Additionally, there's a central processor in

10     each of these phones.  It's sometimes -- sometimes in the

11     documentation it's called an applications processor, an AP,

12     or sometimes AP-CPU.

13           For each of these phones, that application

14     processor runs an operating system.  It happens to be known

15     as an Android operating system.  That's provided by Google.

16     And it also runs some -- a number of applications, all the

17     applications that are available for the Android, but, in

18     particular, there's an application that was developed by

19     Motorola known as the WEBtop, which is what allows the phone

20     to work together with the Lapdock, to provide a bigger

21     display and keyboard input.

22     Q.   Now, relative to your infringement analysis, was there

23     any difference in the structure and operation of those

24     different phones?

25     A.   There were some small differences, but none was

Alpert - direct

1   significant for the infringement analysis.

2   Q.   Now let's talk about the docking display units.  What

3   were some of the common features of each of those display

4   units you introduced?

5   A.   Yes.  Each of them -- I'm just holding up the Atrix,

6   sorry, Lapdock for Atrix 4G over here.  These have large

7   display and keyboard, can be used like a laptop.  They have

8   a place where the phone can be docked into there.  And,

9   additionally, none of the Lapdocks has a central processor.

10  They all rely on the central processor that's in the

11  smartphone.

12  Q.   Now let's go back to that one issue you said you had

13  between you and Motorola's expert.  That was whether or not

14  the Lapdock included a central processor?

15  A.   Yes.  Just to be clear for the record, that's one

16  issue with respect to claim 1.

17  Q.   Okay.  And your opinion was?

18  A.   Okay.  I said it and I will say it again probably more

19  than one time up here, but the Lapdock does not have a

20  central processor.

21  Q.   Now, what were some of the things that you considered

22  in reaching this opinion?

23  A.   Well, you know, first of all, I could look at the

24  basic structures that are in there and how it operates.

25  And, you know, as I mentioned, I have over 30 years of

Alpert - direct

1   experience working with processors, microprocessors,

2   computer systems, and it was my clear conclusion that there

3   is no central processor in the Lapdock.  But, in addition,

4   there was, of course, from some of the information that

5   was provided in this case, there were some of Motorola's

6   own statements.  Actually, I found those publicly.  They

7   weren't provided to me in this case.  I found those on the

8   Internet.

9            Motorola's documents that were provided, many of

10  the internal confidential documents and as well the

11  so-called source code or the human readable software, at

12  least human if you're a -- if you're kind of computer savvy,

13  they're human readable.

14  Q.   If you can go into your binder, now let's start with

15  some of Motorola's own statements.  See if you can find

16  PTX-281.

17  A.   Yes, I see PTX-281.

18  Q.   Do you recognize that document?

19  A.   Yes.  This particular one is the printout that I've

20  created from Motorola's website indicating a press release

21  associated with the Atrix 4G and Lapdock for Atrix 4G

22  introduction.

23  Q.   And along with that press release, was there a video?

24  A.   Yes.  That particular web page had an embedded video,

25  was apparently a Motorola representative that was describing

Alpert - direct

1    some of the features and benefits of the Atrix 4G phone that

2    was just being introduced.  This is the Consumer Electronics

3    Show that we've heard about in 2011, in January of 2011.

4    Q.    Could we put PTX-634 up?

5              THE COURT:  And I take it there's no objection

6    to that?

7              MR. HOLLOWAY:  No objection.

8              THE COURT:  All right.  Thank you.

9              (Videotape played.)

10   BY MR. ALBERTI:

11   Q.    Do you recognize that video as the video that was

12   linked to Motorola's press release?

13   A.    Yes.  Yes, it is, and it's one I'd identified in

14   the -- in the report that I've prepared.

15             MR. ALBERTI:  Your Honor, we move to admit

16   PTX-281 and PTX-634.

17             MR. HOLLOWAY:  No objection.

18             THE COURT:  Thank you.

19             (Plaintiffs' Trial Exhibit No. 281 and 634 were

20   admitted into evidence.)

21   BY MR. ALBERTI:

22   Q.    Were there any other videos that you looked at that

23   were relevant to your analysis?

24   A.    You know, I think just before we move on, I hope

25   that was clear to everyone.  I've heard it enough times.  I

Alpert - direct

1    knew what it said.  But I have transcribed it and I want to

2    make sure that everyone recognizes that this is what

3    Motorola represented publicly when the products were

4    introduced.

5              It says, this entire experience is being powered

6    by the Motorola Atrix, that's referring to the 4G phone.  It

7    is a full computer in a smartphone.  So the 4G phone is a

8    computer on its own.

9              The laptop dock, which was how they described it

10   when it was very first initially introduced itself, is

11   nothing more than a battery.  We can't see the battery, but

12   there is a battery in here.  We heard Mr. Barber talking

13   about how the battery can be charged.  A screen that we see,

14   a keyboard, and it says a mouse pad.  This is sometimes

15   called a trackpad over here.

16             So this is what Motorola says is the Lapdock.

17   And, yes, there was some more information.  I don't know

18   which is the next exhibit.

19             MR. ALBERTI:  If we could play PTX-633 clip.

20             (Videotape played.)

21             "We knew this was a good solution for our

22   consumers, but we also sat down with some leading CEOs and

23   presented the solution.  They felt it was very useful for

24   them because now they don't have to manage and upgrade a

25   single device.  There's more.  That single device, because

Alpert - direct

1    this is -- you can see, this is a desktop, similar to a

2    desktop PC here, but if you wanted to go mobile, we also

3    created this laptop dock.  Laptop dock is thin.  Stereo

4    speakers.  There's where you would place your phone.  11.6

5    .6-inch.  Very large display.  Large touch pad, large

6    keyboard there.  And 36 (inaudible) battery for up to

7    18 hours of battery life because there is no storage,

8    there's no processing in here.  Everything an actually run

9    from the phone.

10               "As you can see, I'm going to go ahead.  So

11   remember what's shown on the screen now.  Take it off.

12   We're going to put it in here.  And there's not even a power

13   switch.  It comes on.  It shows the Motorola logo, launches

14   laptop and, bam, you're exactly where you were on your

15   desktop."

16               (End of videotape.)

17   BY MR. ALBERTI:

18   Q.    Do you recognize that video as the video you watched

19   about the presentation that Motorola gave?

20   A.    Yes.  This was the video again that I found on my own

21   on the website.  This was at the Consumer Electronics Show.

22   There was a presentation in a large hall.  It was kind of

23   hosted or led by Motorola's CEO at the time, Sanjay Jha

24   (phonetic), and he introduce this fellow, Seang Chau.  I've

25   seen him also in some other videos and other information

Alpert - direct

1   identified as the product manager for the Lapdock, and

2   specifically for the WEBtop software for the Lapdock.

3           And you can see this engineering manager is

4   telling us again about the Lapdock.  It's saying, there's no

5   fan, there's no storage, and there's no processing in here.

6   Everything is actually run from the phone.

7           MR. ALBERTI:  Your Honor, we move to admit

8   PTX-633.

9           MR. HOLLOWAY:  No objection.

10          THE COURT:  Thank you.

11          (Plaintiffs' Trial Exhibit No. 633 was admitted

12  into evidence.)

13  BY MR. ALBERTI:

14  Q.   Let's move on to some of the documents you considered.

15  If you can take a look in your binder and see if you can

16  find PTX-204.

17  A.   Yes, I see that one.  This is an internal, marked

18  confidential document from Motorola.  It's called a Motorola

19  Mobility Product Council Review for -- the topic is product

20  approval of the laptop, sorry, Lapdock 2 standard, which is

21  the code name for the Lapdock 100 product.

22          THE COURT:  I just want to make sure you're

23  not showing documents -- are you showing things before

24  they're admitted into evidence even though I assume there's

25  no disagreement?  All right.  But that's the way I do

Alpert - direct

1   things.

2              MR. ALBERTI:  Sure.  No problem.

3              THE WITNESS:  Do we need -- do we need to allow

4   that?  I think I jumped the gun there by talking.

5              THE COURT:  Who is working the button?  Whoever

6   is working the button, wait until it's moved into evidence.

7   All right?

8              MR. ALBERTI:  Your Honor, we'd move to admit

9   PTX-204.

10             THE COURT:  All right.  Any objection?

11             MR. HOLLOWAY:  No objection, your Honor.

12             THE COURT:  All right.  Thank you.

13             (Plaintiffs' Trial Exhibit No. 204 was admitted

14   into evidence.)

15             THE COURT:  That gives everybody a chance to get

16   some exercise.

17             MR. ALBERTI:  I was the guilty party.

18   BY MR. ALBERTI:

19   Q.   So we reproduced a highlighted version of PTX-204,

20   page 21.

21             Do you recognize that?

22   A.   Yes.  This particular page is showing, it's identified

23   as competitive benchmarking, and it's Motorola's own

24   internal planning document that's showing some of the

25   characteristics, the features of the Lapdock 1 and 2.  The

1   Lapdock 1 was the Lapdock for Atrix 4G and comparing those

2   two what would be some competitive products.

3              What I was just going to mention, what's

4   highlighted on that particular line, we'll look at it in

5   some more detail, is related to a particular feature of

6   what's the processor for those products.

7              And I think we have highlighted over here the

8   competitive products, various iPad 2 for Motorola -- I'm

9   sorry -- iPad 2 from Apple.  The Mac Air, which is a

10  very lightweight laptop notebook computer from Apple, and so

11  on.

12             And we can see that each of these identifies

13  a very specific processor that's with it.  The iPad 2 has

14  one that's developed internally by Apple.  The other three

15  are referring to Intel processors, various code names for

16  those.

17             And in contrast, for the Lapdock 2 standard,

18  that was the Lapdock 100 product, and the Lapdock 1, that's

19  the Lapdock for Atrix 4G product.  The particular internal

20  planning document indicates that for a processor for those

21  Lapdocks, it is, in fact, using the handset.

22  Q.    You also mentioned you relied on some deposition

23  testimony; is that correct?

24  A.    Yes.  Yes.  I believe by Mr. Barber.  And so what's

25  shown over here on page 75 is a statement.  It might be one

Alpert - direct

1    of the ones that we heard earlier.  But basically he's

2    saying, if the handset is not plugged into the Lapdock, the

3    screen will be dark.  The Lapdock can't be used for anything

4    without the phone other than -- he indicated it can be

5    charged, but it can't provide any useful function for the

6    user.

7    Q.    You also said you looked at some source code.  Could

8    you please summarize that?

9    A.    Yes.  Some of the source code I looked at was for the

10   kind of Android operating system, but there was also the

11   WEBtop software, and two particular versions that I looked

12   at most closely are identified here.  It says the particular

13   releases of that software were associated with Atrix G and

14   the Photon 4G phones.

15   Q.    Now let's move on to your infringement analysis.  And

16   specifically, what claims and what products did you find

17   were infringed?

18   A.    The claims at issue are claim 1, 8, 10, 11 and 13,

19   and I did consider all the products that we've talked about,

20   all the accused products.  And it's my conclusion that all

21   of the accused products do infringe all of the asserted

22   claims.

23   Q.    How did you interpret the claim language in your

24   analysis?

25   A.    Well, within the claims, particularly claim 1 that

Alpert - direct

1    we've seen, the Court provided an interpretation or it's

2    called a construction for two of the terms.  Shown over

3    here, central processor, the Court informed us is the part

4    of a computer system that performs the primary computational

5    functions.  For example, to control the operation of various

6    circuits.

7              And, secondly, detachable handset is a device

8    that can be attached to and detached from the portable

9    docking display unit and is small enough to be held in one

10   hand.

11   Q.   Now, for terms that the Court did not provide

12   construction, how did you view those terms?

13   A.   I interpreted those terms, that's kind of with their

14   plain meaning, and the plain meaning is as an engineer with

15   appropriate skill in the art.  I didn't see the video, but I

16   think they probably went, went through what that meant for

17   the patent.  And I identified that the ordinary level of

18   skill in the art would be an engineer with a Bachelor's

19   degree in electrical or computer engineering and one or more

20   years of actual work experience with the portable computing

21   or communication devices.  And, of course, there can be

22   equivalent experience.  It doesn't have to be, you know,

23   sitting down in a classroom to be able to know how these

24   things work.

25             And I would mention that this level of skill is

Alpert - direct

1   one that I'm quite familiar with, particularly at the time

2   of the patent.  Within the few years, probably about a

3   year-and-a-half before the patent, I was teaching people

4   with this level of skill at Stanford University.  I was

5   teaching an undergraduate class there.  And also in my work

6   at Intel, I was involved in recruiting new college graduates

7   with this skill level, and once they were on the job, of

8   supervising and training them.

9   Q.    Let's move on now to claim 1.  Starting with the

10  preamble, did you find that all of the accused devices

11  satisfied the preamble?

12  A.    Yes.  The preamble being a portable processing device

13  and comprising just means that it includes the other

14  elements.

15  Q.    Now, how did the accused products satisfy this part of

16  the claim?

17  A.    Well, again, just using the Atrix 4G phone and the

18  Lapdock for Atrix 4G, I think it's just apparent that

19  they're small enough and light enough to be carried about,

20  that they're portable.

21  Q.    Did you also rely on some testimony?

22  A.    Yes.  I think we heard this before also.  Mr. Barber

23  also stated clearly that both the phone and the Lapdock are

24  portable.

25  Q.    Do you have an understanding of Motorola's expert's

1   view on this?  Did he dispute you?

2   A.    No.  I believe there's no dispute on this point.

3   Q.    Now let's move on to the first claim limitation.  I

4   think we were calling that 1a, the detachable handset unit.

5   A.    Yes.  Claim element 1a, detachable handset unit.

6   Q.    Did you find any of the accused products satisfied

7   this limitation?

8   A.    Yes.  Each of the accused smartphones does satisfy the

9   limitation.

10  Q.    So taking this one piece at a time because there's a

11  lot of words there, let's just start with the phrase, a

12  detachable handset unit.

13        How did each of the phones satisfy that

14  limitation?

15  A.    Well, I think that that was one of the terms that the

16  Court had defined for us, and I think if I remember on the

17  next slide, might have that definition.  If I'm wrong, we

18  shouldn't go there.  No, okay.

19        So, yes, it does say up there, it's a device

20  that can be attached to and detached from the portable

21  docking display unit.  Okay.  Let me get the right one

22  here.

23        And so this phone we can see and we have seen

24  earlier, it can be attached to the docking display unit and

25  detached, and it's small enough to be held in one hand, I

Alpert - direct

1    think.  And we saw the representative from Motorola holding

2    it up on the -- the image that was on their website.

3    Q.    Okay.  Moving on to the next phrase, it says it's

4    sized for handheld grasping.  How do different handsets

5    satisfy that?

6    A.    Well, again, they're all sized not just that you

7    couldn't hold it in one hand, but you can really just get

8    your fingers around it and hold it securely so you can

9    operate it with your other hand while it's in the grasp of

10   your first hand.

11   Q.    Now, the next part of claim limitation 1a says that

12   the detachable handset unit includes a central processor.

13   Were you able to determine whether the accused handsets did

14   include a central processor?

15   A.    Yes.  Each of the accused handsets includes a central

16   processor.

17   Q.    Starting with the Atrix 4G as an example, what is a

18   central processor in the Atrix 4G?

19   A.    One of the components in the Atrix 4G is a chip.  It's

20   called a system on chip from a company called nVidia, and it

21   has the code name of an AP20.  And within that component

22   there is a central processor.

23   Q.    Can you please go to your binder and find PTX-426.

24   A.    Yes.  I have that, and this is -- it's kind of a

25   project product summary that was a document internal for

Alpert - direct

1    Motorola's planning purposes.  It's sometimes referred to as

2    a dashboard.  This was for the Atrix 4G.  It has the code

3    name during the development of Olympus.

4                MR. ALBERTI:  Your Honor, we move to admit

5    PTX-426.

6                MR. HOLLOWAY:  No objection, your Honor.

7                THE COURT:  Thank you.

8                (Plaintiffs' Trial Exhibit No. 426 was admitted

9    into evidence.)

10   BY MR. ALBERTI:

11   Q.    How does the, you called it the Tegra 2 processor, how

12   does it satisfy that central processor limitation?

13   A.    Well, we can -- I just want to identify a little bit

14   more about that processor first.  It's one of the key

15   selling points that's identified for this is the fact that

16   there's called a dual core processor.  The AP20 has that

17   characteristic.

18                And the next kind of entry that came out of this

19   document shows that it is, in fact, the nVidia AP20

20   processor that's in there.  It also identifies a baseband

21   processor, MDM6200.  That's from a company known as

22   Qualcomm.  Basically, if you have a smartphone, it's the

23   AP20 that makes it smart.  That's what makes a smartphone

24   smart.  It's kind of the brains of the whole thing.

25                And the baseband processor and associated

1  circuitry is what makes it a phone, allows you to make phone

2  calls and to receive and transmit data over the cellular

3  connection.

4  Q.    Now going to page 2 of that same document, what does

5  the central processor do in the handset?

6  A.    Well, a couple of things that are identified here in

7  that document are the software that's provided with the

8  smartphone computer system, and it does indicate that the

9  smartphone has the Android operating system.  And among the

10  applications available on there is the WEBtop application

11  that allows the phone to control the Lapdock.

12  Q.    Can you please turn now to PTX-435 in your binder and

13  let me know if you recognize that.

14  A.    Yes.  This is a hardware schematic diagram for the

15  main board in the Atrix 4G phone.

16          MR. ALBERTI:  Your Honor, we move to admit

17  PTX-435.

18          MR. HOLLOWAY:  No objection, your Honor.

19          THE COURT:  Thank you.

20          (Plaintiffs' Trial Exhibit No. 435 was admitted

21  into evidence.)

22  BY MR. ALBERTI:

23  Q.    Now, can you please explain to the jury what this

24  rather complicated looking diagram is?

25  A.    Well, I will explain just generally that the

Alpert - direct

1    schematics, that's a way that the kind of graphically and

2    kind of formally the components and the interconnection that

3    are on the board.  It's actually built, derived from the

4    same format as this graphical representation, and it does

5    show us there the apps processor, A-p-p-s processor.  And

6    the top right, it indicates, in fact, that it is the AP20

7    that's in there.

8              And there's the processor then that runs the

9    applications.  It's performing the primary computational

10   functions by running the various applications.  And as we'll

11   see, it is also controlling the devices when the operating

12   system executes.

13   Q.   Moving on to the rest of the claim, it also recites a

14   plurality of first circuits.

15             First of all, what does that mean?

16   A.   Well, first of all, as I mentioned, the circuit,

17   generally, an engineer with skill would just indicate that

18   there's some arrangement of electronic components.  It's

19   calling it first circuits here just to distinguish it from a

20   second set of circuits that would be located in the portable

21   docking display unit.  And the circuits that the claim

22   element 1a indicates need to be, that are required of the

23   detachable handset are a video interface, communication

24   interface, and a data input interface.

25   Q.   And that word "plurality," what does that mean?

1    A.    Plurality just means, I think it means more than

2    one.

3    Q.    All right.

4    A.    I guess like plural.  Yes.

5    Q.    Did each of the Motorola handsets meet the first

6    circuit limitation?

7    A.    Yes.  Yes.  They have -- each of the handsets has all

8    of those interface circuits.

9    Q.    If we could go back to PTX-435, where were the video

10   interface circuits?

11   A.    The video interface circuit, it's shown over there.

12   This box was even labeled in the schematic as a display

13   interface, kind of display and video are used

14   interchangeably.  So that would be the video interface.

15            This is also part of the AP20 component.  As I

16   mentioned, technology has improved so much that you can

17   include not only the processor, but even portions of the

18   memory, and some of the device controllers on a single

19   chip.  So this is the video interface.

20   Q.    Continuing on with PTX-435, did you identify

21   communications interface?

22   A.    Yes.  Just for the record, this is a different page.

23   This is on page 1.  What's highlighted is interface for the

24   cellular communication that's going over to the baseband

25   processor.  Just below that is a Bluetooth interface.

Alpert - direct

1    Bluetooth is a wireless communication.  If you use it with

2    a phone, it's common to have a Bluetooth headset.  And a

3    Wi-Fi interface, which is the wireless local networking

4    standard.

5    Q.    And, finally, did you identify a data input interface?

6    A.    Yes.  There were actually several, but one that is

7    shown over here, it looks like that's also on page 1, is

8    interface to the touch screen.  And we can see, it's kind of

9    touch/prox it says, on the left side.  Prox would be for

10   proximity.

11   Q.    If you could go your binder now, see if you can

12   find PTX-167 and let me know if you recognize that

13   document.

14   A.    Yes.  Let's see.  167, yes.  It's identified as some

15   training slide internal Motorola document for an MB860,

16   which was the, also not the code name, whatever the product

17   number for the Atrix 4G phone.

18              MR. ALBERTI:  Your Honor, we move to admit

19   PTX-167.

20              MR. HOLLOWAY:  No objection, your Honor.

21              THE COURT:  Thank you.

22              (Plaintiffs' Trial Exhibit No. 167 was admitted

23   into evidence.)

24   BY MR. ALBERTI:

25   Q.    Now, looking at this document, can you identify what

Alpert - direct

1   the data input interface drives in the system?

2   A.    Okay.  In this -- the diagram over here, what's kind

3   of highlighted on the slide, it looks like it's page 8, is

4   that there's a four-inch, would be four-inch diagonal

5   touchscreen display.  And as I mentioned, that's used both

6   as a display and an input device and the touch portion of it

7   would be used as the, the way that the user can input

8   information.

9           If there's a phone application, you can touch

10  the screen and select the numbers.  If it were a web

11  browser, you could press on the screen and the link would be

12  selected.

13  Q.    The final limitation here that we have in 1a says that

14  the central -- said processor controlling the operation of

15  said first circuits.

16          What does that mean?

17  A.    Well, this is said processor is referring to the

18  central processor, so it's saying that the central processor

19  controls the operation of those interfaces, and so

20  specifically, that's accomplished.  The AP20 as part of the

21  operating system, there are certain portions of the

22  operating system that are known as drivers or device drivers

23  and those specifically control the circuits.  One of the

24  ways they do that is that each of those interface circuits

25  has some control registers, kind of a place that the

1    operating system writes a command to the device in order to

2    control it, sorry, to the interface itself in order to

3    control it.

4    Q.    Do you have an understanding of whether Motorola's

5    expert disputed that the various handsets satisfy claim

6    limitation 1a?

7    A.    It is my understanding there's no dispute on that

8    point.

9    Q.    And did your analysis apply to all the handsets you

10   examined?

11   A.    Yes.  It applies to all of them.

12          This next slide is just a summary showing that

13   the, for three of the handsets, Atrix 4G, Photon 4G and

14   Electrify, all use that AP20 processor from nVidia and that

15   applications processor has within it, has a central

16   processor.

17          The Atrix 2 uses a different applications

18   processor.  It's one from Texas Instruments.  Got a product

19   name of an OMAP4430.  That also has a central processor

20   within it.

21   Q.    Moving on now to the second limitation, that is the

22   portable docking display unit, are you able to determine

23   whether any of the of the accused products satisfy the claim

24   limitation 1b?

25   A.    Yes.  The accused products do satisfy limitation 1b.

Alpert - direct

1   Q.    And how do the accused products satisfy the

2   portability piece of that?

3   A.    Well, they can be carried about.  I think this form

4   factor is sometimes called a notebook computer because it's

5   common to carry it on your side the way you might carry a

6   notebook.

7   Q.    Can you go into your binder and see if you can find

8   PTX-136.

9   A.    Yes.  I see that document.  It's also this, what

10  Motorola was calling a dashboard that's kind of internal

11  planning and product summary judgment.  In this case, it's

12  for the Lapdock for Atrix 4G.  It had a project name of

13  Attach.

14              MR. ALBERTI:  We move to admit PTX-136.

15              MR. HOLLOWAY:  No objection, your Honor.

16              THE COURT:  Thank you.

17              (Plaintiffs' Trial Exhibit No. 136 was admitted

18  into evidence.

19  BY MR. ALBERTI:

20  Q.    Taking a look at the first phrase of limitation 1b, it

21  says, a portable docking display unit dimensioned

22  substantially larger than said handset unit.

23              Looking at PTX-426, which we already addressed

24  and 136, how did you determine that this limitation was

25  satisfied?

Alpert - direct

1   A.   Well, I think, first of all, you know, it doesn't take

2   an engineering degree to look and to understand that the

3   Lapdock is substantially larger than the phone.  Just

4   looking at the dimensions, it's about eight times larger

5   when it's closed, and, of course, it's used when it's open,

6   so the display and the keyboard are accessible, and it's

7   even -- it's even larger than that.  So I think that was

8   clear.

9   Q.   And can you please take a look in your binder at

10  PTX-281.

11  A.   Yes, I see that.  I believe we might have referred to

12  this before.  It's the press release that I've talked about

13  when the product was first introduced.  And, again, this is

14  actually the wording from the press release, not

15  specifically from the video.  And it is Motorola's

16  explaining to the world that specifically the Lapdock

17  provides users with a larger screen keyboard and trackpad,

18  enabling them to have an enhanced, a more interactive

19  computer-like experience with their devices.

20           So just like the patent in fact taught the

21  screen is kind of too small for displaying, say -- of

22  displaying and entering information for web browsing or

23  large document processing, again, it's serving the same

24  purpose here of providing more of a computer-like

25  experience.

Alpert - direct

1    Q.    Now let's move on to the next part of 1b.  It says the

2    portable docking display unit, including a first display.

3    Did you find that the various Lapdocks you analyzed

4    satisfied this limitation?

5    A.    Yes.  There's a first display, a display of each of

6    them.  This is what's known as a display.  It's more

7    specifically, it's a liquid crystal display or LCD.

8    Q.    Can you now turn to your binder for PTX-217.

9    A.    Yes.  I see that document.  It's a specification,

10   internal confidential engineering document for the Lapdock.

11   That would be Lapdock for Atrix 4G.

12             MR. ALBERTI:  Your Honor, we move to admit

13   PTX-217.

14             MR. HOLLOWAY:  No objection, your Honor.

15             THE COURT:  Thank you.

16             (Plaintiffs' Trial Exhibit No. 217 was admitted

17   into evidence.)

18   BY MR. ALBERTI:

19   Q.    Do you recognize the diagram shown on the screen?

20   A.    Yes.  This is the diagram from page 9 of that document

21   that's known as a, just a block diagram.  It shows the kind

22   of major components and how they're interconnected.  And

23   I've just had the LCD panel, the liquid crystal display

24   circled on there, to show the first display.

25   Q.    Moving on to the next part of limitation 1b, it says a

Alpert - direct

1    plurality of second circuits.

2              What is that?

3    A.   We saw before there was first circuit, so these are

4    second.  There are also some circuits that it's going to

5    identify and they're distinct and additional to the first

6    circuits that were in element 1a.

7    Q.   The claim goes on to say that the second circuits do

8    not include a central processor.

9              Were you able to determine whether the Lapdock

10   products did not include a central processor?

11   A.   Yes, I determined they do not include a central

12   processor, as the claim requires.

13   Q.   Now, turning back to that engineering diagram we

14   looked at on PTX-217, can you explain to the jury how you

15   concluded there's no central processor through the

16   documentation?

17   A.   Well, even before we get into the, to the detail of

18   this one, you know, I think that we've heard and seen that

19   when the phone is not attached, that you can't use the

20   Lapdock, that it does not have anything on display.  You

21   can't input any information.  And furthermore, if we do look

22   at this diagram, we can see -- I wish I had a pointer, but I

23   will try to describe it.

24             The two main sections I wanted to point out.

25   There's a subsection at the top where there's something

 1    that's labeled as an HDMI connector in HDMI.  I don't

 2    remember what it stands for, but it's widely used video

 3    consumer electronics interconnection.  If you have a flat

 4    panel TV or you've seen one in recent years, it would most

 5    likely have that type of connection in.

 6           The audio and video information and control

 7    information comes from the smartphone into there through a

 8    device that's in green identified as a scaler.  And from

 9    there it's presented on the screen, the LCD panel, and

10    provided to the amplifier for the speakers.

11           Most of the rest of this up here is a separate

12    subsystem that's used primarily for the data input, and

13    that's a connector, kind of in orange, about the middle of

14    the screen there.  It says a micro USB connector.  USB

15    stands for universal serial bus widely used in computers.

16    The micro, if you've got pretty much any portable device, it

17    uses that connection at least for charging.  And that is

18    related to a hub over there as well as the keyboard shown on

19    the right in blue.  And just next to the keyboard is a touch

20    pad.

21           So there are two subsystems of the computer

22    system that are in here.  The first one is for audio and

23    video.  The lower one is for the input devices.  And these

24    are completely separate in here.  In fact, all of the,

25    the central control that covers these devices is located

1   back in the handset and it does come from the central

2   processor.

3                And, in fact, I was noticing just --

4   Mr. Barber's testimony that, of course, I've read before,

5   but I was hearing again fresh today.  He, in fact, indicated

6   that the Lapdock is a peripheral of the handset, meaning

7   that, in fact, it's just a device that's under control of

8   the handset.

9   Q.    So when a handset is connected to this peripheral

10  Lapdock, what's performing the primary computational

11  functions of that system?

12  A.    Well, that would be, of course, the central processor,

13  and that's within the AP20 that I indicated, within the

14  applications processor.  It's running the applications.  If

15  you have a browser, it's determining how the screen, the

16  page would be presented.  Kind of interprets something

17  called an HTML that describes the contents of the page.

18               If you have a -- you're showing photos, that it

19  will call up the photo, allow you to resize them.  You could

20  play music.  So it is that central processor that's running

21  the applications and it's controlling the devices of the

22  computer system, including the devices that are in the

23  Lapdock.

24  Q.    Now referring back to PTX-204, what did Motorola say

25  about the central processor with respect to the Lapdock

Alpert - direct

1   product?

2   A.    Yes.  We have seen this before.  Just to repeat, but

3   quickly, it does say that the Lapdock, in fact, uses the

4   handset for the processor, and that is distinguished from

5   the competitive products, where each of those has its own

6   central processor, either the one Apple developed or the one

7   provided by Intel.

8   Q.    And, again, were you informed by Intel's spokespeople

9   with respect to this issue?

10  A.    Yes.  This was, again, from that video.  And, again,

11  it quite clearly states that the experience is being powered

12  by the phone and that Lapdock itself has merely a battery

13  screen, that we've seen the display, keyboard and mouse,

14  mouse or trackpad.

15  Q.    Claim limitation 1b goes on to say that the docking

16  display unit includes a video interface and a data input

17  interface.

18          Were you able to determine whether the various

19  Lapdock products satisfied this part of the claim?

20  A.    Yes.  They each have their own interface circuits.

21  That's, of course, additional to the video interface and

22  data input interface circuits that are within the

23  smartphone.

24  Q.    Again, going back to PTX-217, what is the video

25  interface?

1    A.    The video interface is the component.  This particular

2    diagram, it's in green.  It's identified as a scaler.  It's

3    a description of the component.  And I should say it's, you

4    know, as we pointed out for interface, it's located between

5    the central processor and the actual device that it's

6    controlling, that's being controlled, which would be the LCD

7    panel.

8    Q.    Referring again to the same diagram, where is the data

9    input interface?

10   A.    Data input interface I've identified as being the

11   USB hub, kind of a red block that's circled about the

12   middle of the diagram.  And, again, that's located between

13   the central processor of the handset and the device that's

14   being controlled, which would be the keyboard and the

15   touch pad.

16   Q.    Now let's move on to this last chunk of limitation

17   1b.  This says, wherein said central processor controls the

18   operation of at least one of said circuits and said first

19   display when said detachable handset unit is docked with

20   said docking display unit.

21        Did you find that the various accused products

22   satisfied this part of limitation 1b?

23   A.    Yes, I did.

24   Q.    And how did that happen?

25   A.    Well, the -- in fact, in looking at the diagram again,

Alpert - direct

1   the central processor that's within the handset does -- as

2   I've described, does control both of the video interface and

3   the data input interface, and it does that through the

4   connector, HDMI connector for the video interface and the

5   mini USB connector for the data input interface.  And that

6   element or that limitation was part of element 1b, also does

7   require that the central processor control the display.  And

8   the central processor of the smartphone does control the

9   display.  It controls what information is presented on the

10  display.  And it controls other characteristics of the

11  display, such as the brightness of the display.

12  Q.    Did Mr. Barber's testimony inform your opinion?

13  A.    Yes.  One of the things he said, what's up here is

14  page 75 from his testimony.  And, again, I don't know if

15  this is the exact quote that he said before because he did

16  say it multiple times in the deposition.  But if the handset

17  is not plugged into the Lapdock, the screen will be dark.

18  So we need to have the handset attached that allows the

19  central processor through those connectors, the central

20  processor and the smartphone through those various

21  connectors to control the interface circuits and the Lapdock

22  as well as the display on the Lapdock.

23  Q.    Now, how does the central processor in the handset,

24  what are the different ways it can control the display?

25  A.    Well, there is the HDMI connector.  It does present

1   over that the information that's put on the display, but

2   there's also a, something -- a portion of that interface in

3   that connector that's known as a data display channel.  It's

4   DDC.  I don't remember if it's data display channel or

5   display data channel, which is specifically -- it has been a

6   standard around for a long time, even going back to analog

7   monitors, that allows various characteristics of the monitor

8   to be controlled by host computer.  And so, for example, the

9   brightness.

10          And one of the things that -- I think if the

11  next one is admissible, or is it a user guide?  I might want

12  to come back to this also.  Okay.

13  Q.   Let's go into your binder and see if you can find

14  PTX-278.

15  A.   Okay.  PTX-278 is a Motorola Lapdock user's guide,

16  something that was made available with the Lapdock at least

17  through AT&T.

18          MR. ALBERTI:  Your Honor, we move to admit

19  PTX-278.

20          MR. HOLLOWAY:  No objection, your Honor.

21          THE COURT:  Thank you.

22          (Plaintiffs' Trial Exhibit No. 278 was admitted

23  into evidence.)

24          THE WITNESS:  And I just want to point to the

25  description of this operation from that document one thing

1    that we can see and we've seen in court and we've seen from

2    some of the videos is the fact that the phone is actually

3    presenting the display on the Lapdock, and then, in addition

4    to the right side over there, it's indicating that if the

5    user wants to, for example, make the screen brighter, then

6    there's a couple of keys on here that need to be pressed.

7    There's a function key.  Okay.  And I think there's, like,

8    these little kind of stars that would indicate the

9    brightness.  That's explained on the right side over there.

10              So if the user wants to make the screen

11   brighter, they'll enter that information on the keyboard,

12   and then it would go back to the previous diagram just

13   briefly.

14              That information from the keyboard goes through

15   the USB hub and the USB connector goes back to the central

16   processor within the handset, within the smartphone.  And

17   the driver from the operating system will send back the

18   control information through the HDMI interface to make the

19   screen either brighter or darker, whatever the user

20   instructed.

21   Q.   Now, before we move on to the next claim limitation,

22   why did Motorola's expert dispute your analysis of

23   limitation 1b?

24   A.   Well, he'll have --

25              MR. HOLLOWAY:  Your Honor, I'm going to object

Alpert - direct

1    to that.  It assumes facts not in evidence.

2              THE COURT:  Do you want to restate the question?

3              MR. ALBERTI:  Okay.

4    BY MR. ALBERTI:

5    Q.    Did Motorola's expert dispute your analysis of

6    limitation 1b?

7    A.    Yes, he did.

8    Q.    On what grounds?

9              MR. HOLLOWAY:  Same objection, your Honor.

10             THE COURT:  Well, the objection is overruled.

11             THE WITNESS:  Oh, I'm sorry.  I didn't hear.

12             THE COURT:  You may answer the question.

13             THE WITNESS:  Okay.  Yes.  In his report in the

14   deposition, he indicated that the scaler or possibly a

15   portion of the scaler was central processing unit.

16   BY MR. ALBERTI:

17   Q.    Is a scaler a central processing unit?

18   A.    No, it's not a central processing unit.

19   Q.    Why not?

20   A.    It's, it's a peripheral controller.  It's not

21   performing the primary computational functions.  Those are

22   back in the central processor of the AP20, in the handset

23   that's running the applications.  It's, in fact, running a

24   lot of graphical calculations back there before the

25   information even comes over HDMI to the scaler.

Alpert - direct

1          In addition, as we've seen, the scaler itself,

2     the Lapdock, including the scaler, won't present any

3     information on the display to the user unless the handset is

4     attached.  So it's really the handset and the central

5     processor, and the handset that has the control for the

6     circuits and for the display.

7     Q.    What can a scaler do without the handset attached to

8     the Lapdock?

9     A.    In the Lapdock, it can't do anything.

10    Q.    And which of the Lapdock products did your analysis

11    apply to?

12    A.    All of the accused Lapdock products.

13    Q.    Now let's move on to the last limitation.  That would

14    be limitation 1c.  The docking display unit is fully

15    operable only when the detachable handset is docked thereto.

16          Did you find that the accused products satisfied

17    limitation 1c?

18    A.    Yes, I did.

19    Q.    And how is that?

20    A.    Well, as we've kind of heard and seen, when the

21    docking, sorry.  When the handset is not attached, then the

22    docking display unit or the Lapdock can't be used to display

23    anything on the screen, can't be used for input.  But then

24    when the handset or the smartphone is attached, then the

25    docking display unit becomes operable.

Alpert - direct

1              You can see information displayed on the screen.

2    You can enter information from the keyboard.  You can move

3    around, kind of a mouselike control for the trackpad.

4    Q.    Did Mr. Barber's testimony inform your analysis?

5    A.    Yes.  I think he also clearly stated -- this is on

6    page 69 of his deposition.  He was asked about limited

7    functionality when the phone is not connected, and he

8    described I think quite accurately, you can plug it in and

9    charge the battery.  That's all you can do.  He didn't say

10   it.  I'm saying it.  That's all he can do.

11   Q.    Did you do any testing to confirm this?

12   A.    Yes.  I used all the Lapdock products in combination

13   with the compatible phones and they all exhibit this

14   behavior.

15   Q.    Did Motorola's expert, Dr. Drabik, dispute limitation

16   1c is satisfied?

17   A.    No, he did not dispute.

18   Q.    Now, to summarize, did each of the different sets of

19   sets of accused products he tested satisfy all the

20   limitations of claim 1?

21   A.    Yes.  For claim 1, all the combinations of the accused

22   products did.

23              THE COURT:  Is this a good time to take our

24   morning break?

25              MR. ALBERTI:  Absolutely.

Alpert - direct

```
 1                  THE COURT:  All right.  Fifteen minutes, ladies

 2   and gentlemen.

 3                  (The jury was excused for a short recess.)

 4                  THE COURT:  All right.  Fifteen minutes.

 5                  (Short recess taken.)

 6                        -  -  -

 7                  (Proceedings resumed after the short recess.)

 8                  THE COURT:  Let's bring the jury in.

 9                  (The jury entered the courtroom and took their

10   seats in the box.)

11                  THE COURT:  You all may be seated and you may

12   proceed.

13                  MR. ALBERTI:  Thank you, your Honor.

14   BY MR. ALBERTI:

15   Q.    So when we left off, we were talking about the

16   dependent claims of the Kumar patent.  And let's take these

17   one at a time, starting with claim 8.

18                  Did you find that the accused products satisfied

19   the limitations of claim 8 as well?

20   A.    Yes.  Claim 8 requires that the detachable handset

21   unit includes a connection for an external headphone, and

22   each of them has at the top of the phone, there's a place

23   where the headphone can connect in.

24   Q.    Returning to the diagram we saw before in PTX-167,

25   page 8, can you identify where that is shown?
```

Alpert - direct

1   A.    Yes.  That's at the, kind of circled in red there.  It

2   says a 3.5 millimeter.  That's just the dimensions for the

3   particular headset connector.  That's the headphone

4   connection.

5   Q.    Which Motorola handsets did your analysis apply to?

6   A.    It applies to all of them.  I mean, it's clear when

7   you look at the top that there's the connector for the

8   headphone.

9   Q.    Did Motorola's expert dispute the various handsets

10  included this headphone connector required by claim 8?

11  A.    No, no dispute on that point.

12  Q.    Let's turn now to claim 10.  Claim 10 says, a device,

13  as set forth in claim 1, wherein said detachable handset

14  unit includes a Global Positioning System receiver.

15        First off, what is a Global Positioning System

16  receiver?

17  A.    Sometimes known by just the first letters, GPS,

18  there's a collection of satellites that the government

19  operates that provide information that can be used.  When

20  you have a receiver for the signals from those satellites,

21  that information can be used to determine the location on

22  the surface of the earth.

23  Q.    Were you able to determine whether the Motorola

24  handsets you analyzed included GPS receiver?

25  A.    Yes.  Each of them includes a GPS receiver.

Alpert - direct

1   Q.    How did you know that?

2   A.    Well, there were a number of ways, including the

3   schematics, but I think over here -- I don't know.  Is this

4   a new document or we've seen this one?

5   Q.    We've seen this one before.

6   A.    Okay.  We've seen this one before.  This is

7   explaining, what's kind of highlighted there is to say that

8   the capabilities of the Atrix 4G phone include aGPS,

9   assisted GPS, which does tell us that there's, in fact, GPS

10  capability in the GPS receiver in the phone.

11  Q.    And you're referring to PTX-426?

12  A.    Yes, PTX-426.

13  Q.    If you take a look in your binder now, see if you can

14  find PTX-398 and PTX-143 and let me know if you recognize

15  those documents.

16  A.    Okay.  I've seen PTX-143.  It looks like though it's a

17  training slide for, I believe it's the Atrix 2 NB865.

18  Q.    And I'm sorry.  What was the other number?

19  A.    PTX-398.  Yes.  PTX-398 is the, kind of internal

20  planning document that is known as the dashboard from

21  Motorola, and that one lists, that is for the Electrified

22  phone.

23        MR. ALBERTI:  Your Honor, we'd move to admit

24  PTX-398 and 143.

25        MR. HOLLOWAY:  No objection, your Honor.

1            THE COURT:  Thank you.

2            (Plaintiffs' Trial Exhibit No. 398 and 143 were

3    admitted into evidence.)

4            THE WITNESS:  It's the excerpt from the document

5    PTX-398 that refers to Electrified also refers to Photon 4G.

6    It shows again there's this standalone GPS or assisted GPS,

7    so it means that there's a GPS receiver in there.

8    Similarly, there's a highlighted excerpt below from PTX-143

9    concerning the Atrix 2 phone that shows that it has GPS

10   capability, meaning there's a GPS receiver in there.

11   Q.    Which of the Motorola phones did you determine

12   satisfies the additional GPS limitation of claim 10?

13   A.    All of them do.

14   Q.    Did Motorola's expert dispute this fact?

15   A.    No, no dispute on claim 10.

16   Q.    Moving on to claim 11, the device of claim 1, wherein

17   the docking display is configured as a clamshell unit with

18   first and second portions, having the said auxiliary display

19   in the first portion and auxiliary keyboard in the second

20   portion.

21           Were you able to determine whether the accused

22   Lapdock products satisfied this additional limitation of

23   claim 11?

24   A.    Yes.  They all do.

25   Q.    And can you demonstrate probably the best way to show

Alpert - direct

1   how that is?

2   A.    This is the Atrix 4G Lapdock and there's a hinge

3   towards the rear that allows this portion that has the

4   display to open up.  The hinge that allows it to rotate like

5   that makes this what's called a clamshell.  It's kind of

6   like in nature the way a clam might open and close.

7            And it says that there's first and second

8   portions.  The display is in the first portion and the

9   keyboard is in the second portion.

10  Q.    And did you find that to be the case for all of the

11  various Lapdocks you analyzed?

12  A.    Yes.

13  Q.    Did Motorola's expert dispute this fact?

14  A.    No, no dispute on claim 11.

15  Q.    Let's move on now to claim 13, which recites the

16  device of claim 11, wherein the docking display includes a

17  recessed portion in which the handset is docked, wherein the

18  handset when docked, is positioned on the back of one of the

19  portions of the clamshell unit.

20           Were you able to determine whether the Motorola

21  Lapdock product satisfied this additional limitation in

22  claim 13?

23  A.    Yes, they do.

24  Q.    And what did you rely on?

25  A.    Well, one is just examination.  Again, on the back of

1    one portion is -- I think the jury may have access to these

2    at some point, but there's this so-called recessed portion,

3    and this is where the Atrix 4G phone will dock.  It's

4    sometimes a tight connection over there.  And so just by

5    examination was one way to determine this.

6    Q.    If we could refer back to PTX-281, which we've seen

7    before, how did that inform your opinion?

8    A.    Yes.  PTX-281, that was the, that was from the press

9    release, and it's explaining the users simply dock their

10   Motorola Atrix 4G into the back of the laptop dock.  So this

11   is the description that Motorola presented.

12   Q.    And which of the Lapdock products did your analysis of

13   claim 13 apply?

14   A.    It applies to all of the Lapdock products.

15   Q.    Now I want to switch topics again and talk about

16   whether Motorola by its own actions infringes the '462

17   patents, is sometimes called direct infringement.  I think

18   we saw that in the video.

19              Did you form opinions as to direct infringement?

20   A.    Yes.  My opinion, Motorola directly infringes the

21   asserted claims of the '462 patent.

22   Q.    In what ways does Motorola directly infringe?

23   A.    Well, Motorola sold the accused products in the United

24   States.  I believe that was covered by what we heard earlier

25   from Mr. Barber, and also the Motorola employees had used

Alpert - direct

1   and tested the accused Lapdocks and handsets in the United

2   States.  And, again, I believe that was at least covered by

3   one of the, one or more of the excerpts from Mr. Barber's

4   testimony.

5   Q.    All right.  Who does Motorola sell these handsets and

6   Lapdocks to?

7   A.    They sell them to what are sometimes called carrier

8   customers, and, again, Mr. Barber identified, I believe,

9   AT&T and Sprint as being two of the carrier customers, and

10  also to the end users.  There's an online store through

11  which Motorola has sold these products.

12  Q.    How did Mr. Barber's testimony inform your analysis?

13  A.    Well, this particular portion from page 107, he was

14  referring to the fact that at the time of his deposition,

15  that Motorola still had Lapdock products in its inventory

16  and was continuing to sell those, indicating, for example,

17  that Verizon and AT&T.

18  Q.    Are there any other carriers that Motorola sells

19  to?

20  A.    Yes, there are.  He indicates Verizon here, but, in

21  addition, there's U.S. Cellular that was the carrier for the

22  Electrify phone.

23  Q.    Could you please go into your binder now and find

24  PTX-632.

25  A.    Yes.  I see that.  That is a printout from the

Alpert - direct

 1    Motorola store web page that I created from when I was

 2    looking online.

 3                  MR. ALBERTI:  Your Honor, we move to admit

 4    PTX-632.

 5                  MR. HOLLOWAY:  No objection, your Honor.

 6                  THE COURT:  Thank you.

 7                  (Plaintiffs' Trial Exhibit No. 632 was admitted

 8    into evidence.)

 9    BY MR. ALBERTI:

10    Q.   Can you explain how this printout from the Motorola

11    website supports your opinion?

12    A.   Well, it's -- at the top, hopefully people can read,

13    it says Motorola Atrix 4G.  It's for AT&T.  That was the

14    carrier that used this phone.  This price over there that is

15    offered for sale, and some of the highlights are that it has

16    the dual core technology that's referring to the central

17    processor within the AT20 and also that it has the WEBtop

18    application.

19                  In addition, on the bottom left is shown the

20    Lapdock for Motorola Atrix 4G, also available for sale.

21    Q.   What did you base your opinion on that Motorola's

22    employees actually used these products in the United

23    States?

24    A.   Well, it's highlighted here from page 12 of

25    Mr. Barber's testimony.  It's statements that he made.  I

Alpert - direct

1   believe that we heard them earlier.

2   Q.    And as far as testing, do you rely on any of

3   Mr. Barber's testimony with respect to that issue?

4   A.    Yes.  He was asked about whether it's common business

5   practice for Motorola to test its products before it shipped

6   them and he said absolutely.  Completely standard in the

7   industry.

8   Q.    Now I want to move on to a separate topic.  This

9   relates to whether Motorola knowingly caused others to

10  infringe.  This is sometimes referred to as an indirect

11  infringement.

12        Were you able to form any opinions with respect

13  to indirect infringement?

14  A.    Yes.  My opinion is that Motorola does indirectly

15  infringe the asserted claims of the '462 Kumar patent.

16  Q.    And what forms of indirect infringement did you find?

17  A.    There are two forms that I considered.  One is known

18  as contributory infringement and the other is known as

19  inducing infringement.

20  Q.    Now, with respect to contributory infringement, can

21  you summarize your opinions?

22  A.    Yes.  First of all, Motorola knew of the patent and

23  knew that its products would be used in an infringing way.

24  Well, let me go to the last one because I think my mind,

25  it's easier to start with that.

Alpert - direct

 1              First of all, you have to show that it was

 2    actually infringed, that someone, even if it wasn't Motorola

 3    in the United States, used or sold or was otherwise

 4    infringing, even if that person or so on was doing it

 5    unintentionally.

 6              And then if we go back to the middle one, it

 7    talks about the Lapdocks are especially made or adapted for

 8    use in a product that has, and it also has no substantial

 9    noninfringing use.

10    Q.    What does that mean to you, no substantial

11    noninfringing use?

12    A.    It means that the product really has no value to a

13    user unless, except when it's used in a manner that

14    infringes the claim.

15    Q.    Now, taking these one piece at a time, what did you

16    rely on to say that Motorola knew of the '462 patented

17    technology?

18    A.    Well, I did rely on the number of pieces of evidence

19    that were, you know, made available.  I believe we heard

20    Mr. Kumar testify and he had been deposed earlier that he

21    had made Motorola, or the a least representatives of

22    Motorola aware of the technology, I believe it was about

23    2004, and as well that he had provided a flyer, some

24    additional information after the patent was issued, and

25    specifically pointing to the fact that some of the

Alpert - direct

 1    information he was presenting related to the '462 patent in

 2    his name.

 3    Q.    Now, taking that one piece at a time, who at Motorola

 4    did Mr. Kumar talk to about his invention in 2004?

 5    A.    Well, as we heard the testimony here earlier, he said

 6    he spoke to, I believe it was some of the senior executives,

 7    at least one senior executive, as well as a number of people

 8    from the engineering teams that came in to hear his

 9    presentation and were taking notes about that.

10    Q.    All right.  You can take a look in your binder at

11    PTX-326 and PTX-318 and let me know if you recognize those

12    documents.

13    A.    Yes.  PTX-326 is a, kind of lawyer talk, is a response

14    to a set of interrogatories.  That just means lawyers ask

15    each other questions and give answers in sometimes a

16    long-winded way.

17              And the other one is -- what was the second

18    one?

19    Q.    PTX-318.

20    A.    Yes.  And 318 I believe was an exhibit to that or

21    otherwise associated and it's the flyer.  I believe it's the

22    flyer that Mr. Kumar described.

23    Q.    How did those inform your opinion?

24    A.    Well, from that information, I understand that

25    Motorola acknowledges that they were made aware of the

Alpert - direct

1    patent, I believe it was about October 2010, if my

2    recollection is correct.  And also this particular flyer, I

3    don't know if we can -- oh, I don't know if it's admitted,

4    actually, before I talk about it.

5    Q.    It has been admitted through Mr. Kumar.

6    A.    It was admitted.  Sorry.

7                Yes.  This one is, I think it talks up at the

8    top, I will get to that in a moment.  It talks about, you

9    know, connecting a smartphone to various devices.  There's

10   actually, if you look at the -- I was going to jump actually

11   to figure, the second figure in there, I think, kind of

12   captures it.

13               It's showing there's a phone that's docked.  In

14   this case, it's not docked at the back of the laptop like

15   interface, but this is showing the, you know, what we've

16   seen is that detachable handset and a portable display unit.

17   And then the portion highlighted at the bottom does indicate

18   that this was the, the information that he's disclosing is

19   related to the '462 patent, which had been issued in his

20   name by that time.

21   Q.    Did you rely on any testimony from Motorola legal

22   department people?

23   A.    Yes.  I had read a deposition, I believe it was

24   Mr. Kowalski, someone from Motorola's legal department, that

25   did acknowledge that they had received information and

Alpert - direct

1    became aware of the patent, at least as of October 2010.

2    Q.    Now let's talk about Motorola knowing that its

3    products would be used in an infringing way.  Starting with

4    PTX-635 in your binder, if you can find that and let me know

5    if you recognize it.

6    A.    Yes.  This particular document also I located on

7    Motorola's website and it provides instructions.  Customer

8    Help Website provides instructions.  The title says, How do

9    I use the Lapdock?

10              MR. ALBERTI:  Your Honor, we move to admit

11   PTX-635.

12              MR. HOLLOWAY:  No objection, your Honor.

13              THE COURT:  All right.

14              (Plaintiffs' Trial Exhibit No. 635 was admitted

15   into evidence

16              THE WITNESS:  And the information on that web

17   page, you know, showed very specific directions to attach

18   the smartphone, one of the accused handsets to the

19   particular cable for this Lapdock and then to place the,

20   sorry, place the handset shown on the bottom into a cradle

21   that's in the back of the Lapdock.

22              So this is showing people how to use those

23   products in a way that infringes the patent.

24   BY MR. ALBERTI:

25   Q.    What other types of documents did you rely on to show

Alpert - direct

1    that Motorola knows its products would be used in an

2    infringing way?

3    A.    Okay.  Yes.  Sorry.  There's -- this is PTX-281, which

4    was already introduced.  Okay.  The press release is again

5    informing people, simply dock the Motorola Atrix 4G in the

6    back of the laptop dock to turn it into an active connective

7    machine and so on.

8              So telling people how to use it, telling them

9    what would be the advantages of using the handset with the

10   Lapdock.

11   Q.    Now let's move on to the second part of your

12   analysis.

13             You mentioned that the Lapdocks were especially

14   made for use in a product that infringes the patent.  On

15   what do you base that?

16   A.    Well, I think there are two pieces.  One, we heard

17   from Mr. Barber that if you take the Lapdock on its own, you

18   can't do anything with it but charge.  So it does need to

19   be, to be useful to have a handset attached, and there was

20   some information, I want to talk about authentication.  I

21   don't know if that document was admitted already.

22   Q.    PTX-217 has been admitted and a relevant portion is

23   shown on the slide.

24   A.    Okay.  PTX-217.  This described over here something

25   that was called authentication.  It's some communication

Alpert - direct

1    that happens between the phone and the Lapdock when it's

2    first attached that actually makes sure that the Lapdock

3    will only work with one of the compatible Motorola phones.

4              So in this way, you know, I don't see there's

5    any useful application for the Lapdock other than by

6    connecting it with a phone in an infringing manner.

7    Q.   Moving on to Mr. Barber's testimony, can you explain

8    how that supported your opinion?

9    A.   Yes.  I mentioned I think just now, if the phone is

10   not attached, then the Lapdock is limited to charging.

11   Q.   Now, who did you determine actually used the products

12   in an infringing way?

13   A.   There was both the carrier customers identified, such

14   as AT&T as well as end users.

15   Q.   Now let's move on to that second part of indirect

16   infringement, inducement.

17             Can you summarize your opinions with respect to

18   inducement?

19   A.   Yes.  In my opinion, Motorola does induce infringement

20   of the '462 Kumar patent.

21   Q.   And why is that?

22   A.   Well, a number of points listed here.  Some of them

23   overlap with the last issue.  We see that Motorola did know

24   of the '462 patent and had intended that it be used in a way

25   that infringes, and, in fact, that the products were sold or

Alpert - direct

1     used by Motorola's carrier customers and end users in the

2     U.S.  Some advertising, at least that demonstrates to the

3     carrier customers.

4              And in terms of the users, actually located

5     plenty of videos online as well as a user's forum that

6     Motorola had sponsored online.  And information on there

7     indicated that from the users that I looked to see where

8     they were located, they were all located in the U.S.

9              And, finally, there was very specific

10    instructions and encouragement for the users to attach the

11    smartphone to the Lapdock in such a way that it would

12    infringe.  Some of the benefits on that as well as the

13    instructions on how to do that were provided by Motorola.

14    Q.    If we go back to PTX-632, how did that support your

15    opinion on inducement?

16    A.    This was the web page from the Motorola Store that I

17    talked about before and it is indicating in the same place

18    purchasing Motorola, Motorola Atrix 4G phone and the

19    Motorola for Atrix 4G laptop along with some bullet points

20    on what are the advantages.

21    Q.    Can you take a look in your binder at PTX-556?

22    A.    Yes.  I see that.  This is a, I believe it's a user's

23    manual for the Motorola Electrify phone.

24              MR. ALBERTI:  Your Honor, we move to admit

25    PTX-556.

1          MR. HOLLOWAY:  No objection, your Honor.

2          THE COURT:  Thank you.

3          (Plaintiffs' Trial Exhibit No. 556 was admitted

4     into evidence.)

5          THE WITNESS:  And I believe over there we can

6     see the very first page of that user guide, talking to the

7     users, congratulating them.  And highlighted at the bottom

8     is a particular point that is encouraging the users to

9     connect their phone to a Lapdock, and, in particular, what

10    would be some of the advantages for accessing files, photos,

11    e-mails and so on.

12    BY MR. ALBERTI:

13    Q.    And did you find similar instructions with respect to

14    other phones sold by Motorola?  Specifically, the accused

15    handsets?

16    A.    Yes.  Similar instructions for each of the accused

17    handsets.

18    Q.    Now I want to talk about the timing of this.  With

19    respect to Motorola's knowledge of the patent, when did all

20    of these statements and encouragements and advertisements

21    occur?

22    A.    All of those statements I was referring to occurred

23    after the product was introduced in January of 2011.

24    Q.    And when would that be relative to Motorola knowing

25    about Mr. Kumar's technology?

Alpert - direct

1    A.    Well, that would be after the various evidence we've

2    talked about that indicated when they had learned, at least

3    from Mr. Kumar, about the technology and later the '462

4    Kumar patent.

5    Q.    And, finally, to conclude, what can somebody do with

6    one of these Lapdocks unless they have an accused handset

7    with a central processor?

8    A.    Well, I think Mr. Barber said it succinctly and

9    completely accurately.  He said that the Lapdock is a

10   peripheral device for the phone, and the only thing you can

11   do without the phone attached is to plug it in and charge

12   the battery.

13              MR. ALBERTI:  Your Honor, I pass the witness.

14              THE COURT:  All right.  Cross-examination.

15              MR. HOLLOWAY:  Your Honor, I have a notebook

16   that I would like to use.  May I pass it to the witness?

17              THE COURT:  Yes, you may.

18              (Mr. Holloway handed a notebook to the witness.)

19              THE WITNESS:  Thank you.

20                        CROSS-EXAMINATION

21   BY MR. HOLLOWAY:

22   Q.    Good morning, Dr. Alpert.  My name is Clay Holloway

23   and I represent Motorola Mobility.  I don't think we've ever

24   met before, so it's nice to meet you.

25   A.    Okay.  Thank you, counselor.  Good morning to you,

Alpert - cross

1     too.

2     Q.    Good morning.  I hate to be the last guy before lunch,

3     so I'm going to try to move quickly through my questions.

4     Okay?

5     A.    Okay.

6     Q.    You have worked in the past for IV evaluating patents;

7     is that correct?

8     A.    Yes, I did some work for IV.

9     Q.    And so working on the '462 patent, this is not your

10    first time working with Intellectual Ventures?

11    A.    That's correct.

12    Q.    In fact, you were involved in a pre-litigation

13    analysis that involved potentially asserting patents against

14    IBM?

15    A.    I was involved in pre-litigation analysis.  I think it

16    was potentially against IBM.  I don't remember for sure at

17    the moment.

18    Q.    And I'm correct, am I not, that before you started

19    working on this case, you don't believe you had ever seen

20    the '462 patent before?

21    A.    That's correct.

22    Q.    And you had never heard of Mr. Kumar before?

23    A.    That's correct.  I had not heard of him.

24    Q.    Or Mr. Kumar's company, Khyber Technologies?

25    A.    No, I hadn't heard of them.

Alpert - cross

1    Q.    You had never heard of the barcode reader called a

2    Pocket Partner before?

3    A.    No, I hadn't heard of that.

4    Q.    And you never heard of the attachment you could put on

5    the Pocket Partner called a Pocket Dock before?

6    A.    No, I hadn't heard of those.

7    Q.    And currently, a hundred percent of the money that you

8    get from your consulting company comes from being expert

9    witnesses in cases like this; is that correct?

10   A.    I work primarily as an expert witness.  Some of them

11   are patent litigations, some other types of cases.

12   Occasionally, I'm able to obtain some other types of work,

13   such as due diligence with venture capital.

14   Q.    But currently a hundred percent of the money that you

15   get from your consulting company currently comes from

16   working in litigation cases?

17   A.    Last year, that's correct, yes.

18   Q.    Now I want to talk about some of your opinions

19   regarding infringement.  Okay?

20   A.    Sure.

21   Q.    A cellphone by itself doesn't infringe claim 1 of the

22   '462 patent; correct?

23   A.    Correct, it does not infringe claim 1 by itself.

24   Q.    And I could use a cellphone, one of the ones that you

25   have up there on the witness stand with you, I could use

 1   one of those phones and never, ever dock it to a Lapdock;

 2   right?

 3   A.    Yes.

 4   Q.    And a docking station by itself, like the Lapdock,

 5   doesn't infringe claim 1 by itself either, does it?

 6   A.    Correct.  By itself, it does not infringe.

 7   Q.    So taking the Atrix 4G, for example, for the Atrix 4G

 8   and the Lapdock to infringe, I have to put them together; is

 9   that right?

10   A.    You have to have both of them or, as I understand,

11   just offering for sale the two of them would potentially be

12   infringing.

13   Q.    But the claim is to a portable processing device that

14   has two components:  A handset and a docking display unit,

15   and you put them together and that's how you get the

16   portable processing device; is that correct?

17   A.    The portable processing device requires the handset

18   and the portable docking display unit, but, no, it does

19   not require that they be attached to meet the claim

20   limitation.

21   Q.    How would it be fully operable if I don't ever attach

22   it?

23   A.    Do we have the claim --

24   Q.    I will get it for you.

25   A.    -- available?

1              MR. HOLLOWAY:  Your Honor, I've got a board with

2    the claim on it.  May I put it between that witness and the

3    monitor that's over there on that stand?

4              THE COURT:  Yes.

5              (Mr. Holloway placed a board on the easel.)

6              MR. HOLLOWAY:  So everybody can see it.

7    BY MR. HOLLOWAY:

8    Q.    Are you able to see that?

9    A.    No, I'm not.

10   Q.    That's what I'm asking.

11   A.    Okay.

12   Q.    Can you see it now?

13   A.    Yes.

14             MR. HOLLOWAY:  Can you guys see it pretty good?

15   BY MR. HOLLOWAY:

16   Q.    So back to my question.  To infringe all three parts

17   that we walked through before, I have to connect them.

18   Otherwise, it's not fully operable until they're connected;

19   is that right?

20   A.    No, it's not correct that it would have to be

21   connected to infringe.  In particular, the last element is

22   saying that it's fully operable only when the detachable

23   handset is docked therein, and I believe that the correct

24   interpretation for that is it has the capability to be

25   attached and to be fully operable, but it's not a method

Alpert - cross

1    claim.  It doesn't require specifically that the user attach

2    them.

3    Q.    So with the Lapdock specifically, that's what your

4    opinions are about is the Lapdock, let's take that, for

5    example.

6            When Mr. Alberti led you through your testimony

7    today, you spent a lot of time talking about how the Lapdock

8    doesn't do anything; right?

9    A.    Well, a lot of points you made there.  I would

10   disagree that Mr. Alberti led me through testimony.  I mean,

11   he asked questions.  I prepared some material.  I will

12   stand by that with or without anything that Mr. Alberti

13   might say.

14   Q.    The more important part of my question was, you talked

15   about how the Lapdock didn't do anything; right?

16   A.    The Lapdock, without having the smartphone attached,

17   can only be charged.

18   Q.    So it's your opinion that the Lapdock by itself is not

19   operable at all; right?

20   A.    That the Lapdock -- it has no use for the user.  You

21   can only charge it.

22   Q.    So when the claim is talking about fully operable and

23   we're talking about a Lapdock for Atrix 4G and the Atrix 4G

24   phone, it's only the portable processing device that's fully

25   operable when connected when they're actually connected; is

Alpert - cross

1    that right?

2    A.    I'm not sure I understand the question.  When

3    they're --

4    Q.    So --

5    A.    When they're connected, the Lapdock will display

6    information on the screen and the keyboard can be used.  I

7    don't know if that answered your question.  I'm trying to.

8    Q.    The claim is a portable processing device.

9              THE COURT:  And I take it this isn't a matter of

10   claim construction that you are asking?

11             MR. HOLLOWAY:  No, your Honor.  It's an

12   infringement point.

13             THE COURT:  I'm not so sure, but we'll talk

14   about it later.

15             MR. HOLLOWAY:  Okay.

16   BY MR. HOLLOWAY:

17   Q.    I will move on from that.

18             And you had a slide, did you not, during your

19   testimony that said the only issue is, does the Lapdock have

20   a central processor.

21             Do you recall that?

22   A.    For claim 1, that's the only issue I'm aware of in

23   dispute.

24   Q.    Okay.  Before I move to that, let me ask you one other

25   question.  You talked about the meetings that, the alleged

1    meetings that Mr. Kumar had with Motorola in 2004.

2              Do you recall that testimony?

3    A.    Yes.

4    Q.    All right.  You have no personal knowledge of that

5    meeting?

6    A.    No.  Just what I've heard from Mr. Kumar.

7    Q.    And you have no personal knowledge about the flyer and

8    how the flyer got to Motorola, do you?

9    A.    No.  Just what I heard from Mr. Kumar.

10   Q.    So back to the question of the only issue is, does the

11   Lapdock have a central processor, there are other

12   limitations in the claim besides just the central processor;

13   is that correct?

14   A.    Yes, there are.

15   Q.    All right.  And one of them is that the -- that the

16   central processor on the phone controls the operation of the

17   first circuits and the display on the Lapdock; is that

18   correct?

19   A.    Let's see what it says.  So it does say -- yes.  It

20   says, the central processor controls operation of at least

21   one of the second circuits and the first display, yes.

22   Q.    And, in fact, that was a point that Mr. Kumar

23   emphasized when he was applying for the patent that led to

24   the '462; correct?

25   A.    You know, there were statements that were made that

Alpert - cross

 1   related to, that were reported in the file history.  This

 2   is, as I recall, this was what the examiner came up with,

 3   the final wording for this claim.

 4   Q.    Let's talk about that a little bit.  You mentioned the

 5   file history.

 6           Were you here when the video was played to the

 7   jury about the going through prosecution with the Patent

 8   Office?

 9   A.    No, I wasn't present in the courtroom for that.

10   Q.    Okay.  So what's your understanding of what the file

11   history is?

12   A.    The file history would be a record of the

13   correspondence between the applicant and the Patent Office

14   while the patent is being evaluated.

15   Q.    Okay.  Let's turn in your notebook to --

16   A.    Is this the notebook that you provided?

17   Q.    I'm sorry.  The notebook that I gave you.

18   A.    Okay.

19   Q.    If you could turn in your notebook to JTX-5.

20   A.    Yes, I'm there.

21   Q.    Have you seen this before?

22   A.    It -- I have.  It looks like it's from the file

23   history.

24           MR. HOLLOWAY:  Your Honor, Motorola moves to

25   admit JTX-5, which is the file history for the '462 patent.

Alpert - cross

1           MR. ALBERTI:  No objection.

2           THE COURT:  All right.  Thank you.

3           (Joint Trial Exhibit No. 5 was admitted into

4    evidence.)

5           MR. HOLLOWAY:  If I could pull up page --

6    BY MR. HOLLOWAY:

7    Q.    I'm going to direct your attention, Dr. Alpert, to

8    page 56 of this.  And when I say page 56, I'm talking

9    about the bottom right-hand corner, where it says

10   JTX-005.0056.

11          MR. HOLLOWAY:  If we could have that on the

12   screen, please.

13   BY MR. HOLLOWAY:

14   Q.    And I believe you testified a second ago that you

15   believed that the language that we just walked through about

16   the controlling the operation, that was something that the

17   examiner added to the claim; is that correct?

18   A.    I would say to the best of my recollection, it was the

19   examiner that did come up with the final language that was

20   added.  I don't remember all the history by heart.

21   Q.    All right.  And that language that was added, the

22   examiner said that that language was what he didn't find in

23   the prior art; is that correct?

24   A.    Well, I'm just looking at the page you pointed me to

25   and there's a paragraph that says what the examiner didn't

Alpert - cross

1    find, and there are several items he lists here.  One of

2    them is that particular phrase you pointed to.

3                 MR. HOLLOWAY:  If we could pull up under the

4    second paragraph, make that a little bigger, regarding

5    claim 1 paragraph.

6    BY MR. HOLLOWAY:

7    Q.    Is this what you were pointing to, Dr. Alpert?

8    A.    Yes.

9    Q.    And it says that claim 1, regarding claim 1, the cited

10   prior art, either alone or in combination, fail to teach,

11   and then it lists some things; is that correct?

12   A.    Yes.

13   Q.    And one of them is, wherein said central processor

14   controls the operation of at least one of said circuits and

15   said first display.

16                 Did I read that correctly?

17   A.    Yes.

18   Q.    Okay.  Now, you and Mr. Alberti spent some time

19   talking about the detachable handset this morning.

20                 Do you recall that?

21   A.    Yes.

22   Q.    Okay.  And if you look at the term detachable handset

23   I have highlighted up there, that's talking about the first

24   element of the claim, what you were calling element 1a; is

25   that correct?

Alpert - cross

1    A.    Yes, that's part of element 1a.

2    Q.    And it has some requirements, one of them being that

3    it include a central processor?

4    A.    That's correct, yes.

5    Q.    And then the first circuits; is that correct?

6    A.    Yes.  Those are requirements of element 1a.

7    Q.    And then those circuits have three interfaces, a video

8    interface, a communication interface and a data input

9    interface?

10   A.    Yes.  That's a requirement of element 1a.

11   Q.    Okay.  Does anything in element 1a of claim 1 require

12   that the detachable handset be operable?

13   A.    I believe that a person of skill in the art that would

14   be reading this claim in the context of the patent would

15   understand that, in fact, a handset is operable.  It's

16   functional for a user.

17   Q.    Do you see the word "operable" in claim 1?

18   A.    Well, again, the claim would be interpreted --

19   Q.    Dr. Alpert, do you see the word "operable" in element

20   1a of claim 1?

21   A.    No, I don't see that it's in the claim language

22   itself.

23   Q.    And --

24                THE COURT:  And, again, I'm confused about where

25   this is going, so if we're going down this path, I might

 1    need to understand it better.  We might need to take a short

 2    break.

 3                    All right.  Ladies and gentlemen, we're going to

 4    just take a short break.

 5                    (The jury was excused for a short recess.)

 6                    THE COURT:  And I will have our witness step

 7    outside the courtroom.  And everyone else can be seated.

 8                    (The witness was excused from the courtroom.)

 9                    THE COURT:  So this sounds like a claim

10    construction issue.  Now, it could be that it's not, but it

11    sounds like it's something that is a claim construction

12    issue, and before we go down this path, I need to understand

13    where you're going to make sure you are not overstepping the

14    boundaries.

15                    MR. HOLLOWAY:  Absolutely, and I've tried to

16    keep my questions to avoid to make it seem like we're

17    arguing claim construction, because from Motorola's

18    perspective, we're not.

19                    The question is whether the term "operable"

20    appears in element 1a of the claim.  IV proposed a

21    construction of detachable handset unit that required it to

22    be operable and to be a phone and your Honor rejected both

23    parts of that.

24                    We heard in opening and in Mr. Alberti's direct

25    that the handset unit has to do something.  They even tried

Alpert - cross

 1    to distinguish it over the prior art at the very beginning

 2    by saying it just sits on the table as a doorstop.

 3                  So we're in a position where the jury has now

 4    heard that detachable handset unit has to be operable and

 5    this is the first time I get to address that.  And the next

 6    time I would get to be able to address it is when I put my

 7    invalidity expert on the stand and say, does a detachable

 8    handset have to be operable?

 9                  And I'm going to put the language detachable

10    handset unit that your Honor gave us in front of the witness

11    and ask the same question:  Does it say it has to be

12    operable?  That's my only point I'm trying to make and I

13    will move on from there.

14                  THE COURT:  All right.  Anything from --

15                  MR. ALBERTI:  Your Honor, I'm not sure what this

16    has to do with infringement.  Is Motorola going to argue

17    that its handsets are not operable, point one?

18                  Point two, while your Honor did construe

19    detachable handset, there are a whole lot of other words in

20    that claim that Dr. Alpert spoke about and how one of

21    ordinary skill in the art would understand, when you have

22    something like this with a central processor controlling

23    multiple interfaces to do multiple things, it is a usable

24    device.  It's not a paperweight.

25                  And if he wants to ask Dr. Alpert about opinions

Alpert - cross

 1   with respect to those other terms and why it's operable, I

 2   guess I don't have a problem, but this is validity.  I don't

 3   think this has anything to do with infringement because

 4   nobody is disputing that Motorola's handsets are operable.

 5   They do things.

 6              MR. HOLLOWAY:  May I address that, your Honor?

 7              THE COURT:  Yes.

 8              MR. HOLLOWAY:  Mr. Alberti is essentially asking

 9   me to open the door under your Honor's claim construction.

10   I'm not the one that did that.  Ms. Day and Mr. Alberti had

11   the witness testify that the handset unit is operable and

12   your Honor rejected that construction.  This is the

13   back-door claim construction.

14              THE COURT:  Well, so you're telling me that

15   your noninfringement argument is that you have operable

16   phones?

17              MR. HOLLOWAY:  No, your Honor, but the next time

18   I get to address this is in three or four days, after the

19   jury has heard that it's operable for --

20              THE COURT:  Well, no.  You're missing my point.

21   I mean, I should have my claim construction here.  I don't.

22   And trust me, I've done about 12 other since then.  But if

23   your infringement argument does not depend on this point and

24   this is an infringement expert, then this is an

25   inappropriate time for you to address it.  This is just the

Alpert - cross

1    way it goes.

2                   If this is a validity argument, you save it for

3    validity.  You don't insert it into an infringement

4    argument.

5                   MR. HOLLOWAY:  That's fine, your Honor.

6                   THE COURT:  All right.  And by the time I see

7    you on Monday, I will make sure I have my claim construction

8    here so I can refresh my recollection what I've done in this

9    case.

10                  All right.  Let's bring our jurors in.

11                  (The jury entered the courtroom and took their

12   seats in the box.)

13                  THE COURT:  All right.  Everyone may be seated.

14   You may continue.

15                  MR. HOLLOWAY:  Thank you, your Honor.

16   BY MR. HOLLOWAY:

17   Q.   Dr. Alpert, we were talking about the detachable

18   handset unit.  I want to switch more to the portable docking

19   unit.  Okay?

20   A.   Sure.

21   Q.   And I want to put up on the board PTX-217, which is a

22   document that you spent some time talking about, so if we

23   could have that up.  And if we could call out the top box of

24   the whole thing.  Yes.

25                  And I believe you showed the jury a block

1    diagram that came out of PTX-217; is that correct?

2    A.    Yes.  I believe that was from this document.

3    Q.    Okay.  If we look at the revision date, that's

4    May 10th, 2010; is that correct?

5    A.    Yes.

6    Q.    And this is the method spec for the Lapdock for Atrix

7    4G; is that correct?

8    A.    Yes.

9    Q.    Okay.  And if we look beneath that, we'll see revision

10   number T1 and T2.

11            Do you see that?

12   A.    Yes.

13   Q.    And that's kind of the notation for which revision

14   this is?

15   A.    I would expect so.  Similar documents I've seen.

16   Q.    Okay.  And if we look across from T2, that's the one

17   that this is.  This T2; is that correct?  PTX-217?

18   A.    Yes.  It says issue T2 on there.  I assume that

19   indicates that it's -- what would be the last version that's

20   identified.

21   Q.    Okay.  If we go to the revision T2 line and go all the

22   way to the changes, it says, updated prior to design

23   meeting, doesn't it?

24   A.    Yes, it says that.

25   Q.    All right.  Do you know if this was the last revision

Alpert - cross

1    for the Lapdock for Atrix 4G?

2    A.    This was the last one that was made available for this

3    litigation.  I don't know if there were later ones.

4    Q.    This is the last one that you were given?

5    A.    This is the last one that I've seen, yes.

6    Q.    Let's go to page .008 of this.  Sorry.  Yes.

7              MR. HOLLOWAY:  And if you could call out the one

8    that says, the paragraph above 7.8 that starts with the

9    Lapdock must, could you call that out, please?

10             THE WITNESS:  Yes.  It says, the Lapdock must

11   include a brightness control device.

12   BY MR. HOLLOWAY:

13   Q.    So the Lapdock must include a brightness control

14   device.  That's what it says?

15   A.    Yes.

16   Q.    All right.  If we could go in this document to page --

17   sorry.  If we could go in this document to page 9 and blow

18   up the block diagram.

19             This was the block diagram you walked the jury

20   through; is that correct?

21   A.    Yes, it is.

22   Q.    This was the only block diagram from the Lapdock you

23   walked the jury through; correct?

24   A.    That's the only one that was presented in evidence,

25   yes.  There were other block diagrams I referred to for the

Alpert - cross

1   other Lapdock products.

2   Q.    Okay.  If I could have you turn in your binder to

3   DTX-113.

4   A.    Oh, wait.  That's the binder you provided me?

5   Q.    Yes.  The white binder that I gave you.

6   A.    I'm sorry.  I normally have this on the computer and I

7   try not to deal with so many pieces of paper, but you had

8   asked me --

9   Q.    DTX-118.

10  A.    You said 118 or 113?

11  Q.    118.  I'm sorry.  113.  You're right.

12  A.    Okay.  I don't see a 118 in here.

13  Q.    Yes.  I need my glasses today.

14  A.    Okay.

15  Q.    Okay.  Now, if we look at the first page of this, this

16  is entitled "Attached."

17              Do you see that?

18  A.    Yes.

19  Q.    Okay.  And I believe you testified earlier that you

20  understood Attached to be the internal Motorola name for the

21  Lapdock for Atrix 4G?

22  A.    Yes.

23  Q.    And if you look at the second line under revision T2

24  and go across, it says, updated prior to design meeting;

25  correct?

Alpert - cross

1    A.    Yes.

2    Q.    And that would be the revision that you were talking

3    about that I just had on the screen; is that correct?

4    A.    Yes.

5    Q.    And I believe you testified that you would understand

6    that these revision numbers in the left-hand column, based

7    on your experience, indicate that there are subsequent

8    revisions to a specification; correct?

9    A.    Yes, that's my understanding.

10   Q.    Okay.

11              MR. HOLLOWAY:  Your Honor, at this time Motorola

12   moves DTX-113 into evidence.

13              MR. ALBERTI:  No objection.

14              THE COURT:  Thank you.

15              (Defendant's Trial Exhibit No. 113 was admitted

16   into evidence

17              MR. HOLLOWAY:  If we could put the cover up,

18   please, page 1, and blow up that box that says T1 through

19   T4.

20   BY MR. HOLLOWAY:

21   Q.    I wanted to talk through that foundation, but let's

22   explain to the jury what we just talked about.

23              In that left-hand column you see revision T2 and

24   if you go across, it says, updated prior to design meeting;

25   is that correct?

1    A.    Yes.

2    Q.    Okay.  And that's the document that you walked the

3    jury through with that block diagram; correct?

4    A.    Yes.  The block diagram came from that version.

5    Q.    Okay.  And we see, on this one we see, don't we, that

6    there's a T3 and a T4 revision; is that correct?

7    A.    That's what it's showing, yes.

8    Q.    Okay.  And if we look at the T4 revision and we go to

9    the third column, we see that's September 11, 2010; is that

10   correct?

11   A.    Yes.

12   Q.    And if we go back to that middle line, you see issue

13   T4 and that indicates this document is discussing the T4

14   revision, which was September 11, 2010; is that correct?

15   A.    That would be my understanding of the document.

16   Q.    Okay.  I'd like you to turn in this one to page 10.

17             MR. HOLLOWAY:  And if we can put that block

18   diagram up on the screen.  If we could blow that up, please.

19   Thank you.

20   BY MR. HOLLOWAY:

21   Q.    And I believe in the diagram that you were showing the

22   jury from T2, you talked about how there were, there were

23   the -- a separate system that involved a USB hub and a

24   different part of the separate system that was the scaler;

25   is that correct?

1    A.    Yes.

2    Q.    And I believe your testimony with Mr. Alberti is that

3    they are not connected.  Did I understand that correctly?

4    A.    That they're independent subsystems, yes.

5    Q.    Okay.  So if we go in this document, and let me ask

6    you another question.  Do you understand the version I just

7    showed you is T4 to be in the material and method spec for

8    the final Atrix 4G laptop Lapdock?

9    A.    I don't know if that's correct or not.

10   Q.    You don't know?

11   A.    No, I don't know if it's the final one.

12   Q.    Who would know, who would know in that case?

13   A.    I don't know.  I wouldn't know.

14   Q.    Did we see who the author was on the front of this?

15   Let's go back to page 1.

16         Do you understand that under the name column,

17   that's the author of this document?

18   A.    It is the person responsible for it.  I don't know if

19   it meant it was the author.

20   Q.    And Jim Barber is the person responsible for this

21   document for the T4 revision?

22   A.    Yes, that's what it says here.

23   Q.    He's also the person responsible for the T2 revision?

24   A.    Yes.

25   Q.    Let's go back to page 10, block diagram, please.

Alpert - cross

1              And I want to point to something with my laser

2    pointer here, down here at the bottom that says scaler

3    Realtek.  Do you understand that to be the scaler that would

4    be the scaler for the video scaler?

5    A.    Yes.

6    Q.    And if we look up here, I'm going to highlight

7    something else on the far right.  It says keyboard.

8              Do you see that?

9    A.    Yes.

10   Q.    Okay.  And the keyboard is connected to something

11   called Holtek.

12             Do you see that?

13   A.    Yes.

14   Q.    Okay.  And the Holtek device, you understand that to

15   be the keyboard controller?

16   A.    I don't recall what that device was.

17   Q.    Okay.  Let's go to page six of this document, please.

18   Page six, please.  If we can bring up that chart.

19             Do you understand what this table is in document

20   PTX-113?

21   A.    Yes, I believe so.

22   Q.    What is this table?

23   A.    Well, it's summarizing what would be certain of the

24   components that were used in a Lapdock.

25   Q.    Not certain components.  The critical components; is

1    that correct?

2    A.    It does say critical components list, yes.

3    Q.    And if we look at the top entry, it says USB KB

4    controller, vendor Holtek and then gives a part number.

5              Did I read that correctly?

6    A.    Yes.

7    Q.    Does KB stand for keyboard controller?

8    A.    Yes, I believe in this context, it would.

9    Q.    Let's go back to page 10, our block diagram, please.

10             So the keyboard over here on the right

11   (indicating) is connected to this Holtek keyboard

12   controller; is that correct?

13   A.    Yes.

14   Q.    And the keyboard controller is connected to the scaler

15   via this GPIO controller; is that correct?

16   A.    Yes, that's what the block diagram shows.

17   Q.    Okay.  So in this version, this later version of the

18   material and method spec, the keyboard and the scaler are

19   connected via the Holtek keyboard controller; is that

20   correct?

21   A.    It does indicate that there's certain signals that

22   connect them, yes.

23   Q.    I'd like to go back to the chart on page 6, please.

24   And you spent some time with Mr. Alberti talking about the

25   video scaler and I already asked you if it was the, if

1   the vendor was Realtek.  Did I read that correctly on the

2   table?

3   A.    Yes.

4   Q.    Okay.  And the scaler in the Lapdock sits between the

5   HDMI connector and the display; is that correct?

6   A.    Yes, that's where it's positions.

7   Q.    All right.  And the HDMI connector is where the HDMI

8   signal comes out of the phone and goes into the Lapdock;

9   correct?

10  A.    Well, there's a number of signals there.  It's a

11  collection of signals, HDMI.

12  Q.    So let me ask my question again.  So the HDMI

13  connector is where the HDMI signal comes out of the phone

14  and goes into the Lapdock; is that correct?

15  A.    Yes.  And multiple signals are part of that.

16  Q.    All right.  What you mean by that is the HDMI signal

17  composes multiple parts, is made up of multiple different

18  signals?

19  A.    Yes.

20  Q.    All right.  If we can go to page 8 of this document

21  again.  And I want to blow up Section 7.6.

22            And you read -- I will just read it.  I'm sorry.

23  The second sentence says, the video portion of the HDMI

24  signal will be converted to LVDS for the Lapdock's display.

25            Did I read that correctly?

Alpert - cross

1    A.    Yes, that's correct.  That's the function it performs.

2    Q.    And the LVDS signal is different from the video part

3    of the HDMI signal; is that correct?

4    A.    It's a different signal.  Yes.

5    Q.    It's a different signal.  Thank you.

6              If we can bring up Section 7.7, please.  And

7    Section 7.7 talks about some of the required characteristics

8    about the LCD display; is that correct?

9    A.    Yes.  That's what this section of the specification

10   covers, yes.

11   Q.    All right.  And when it says LCD display, that's not

12   the part on the phone.  That's the part on the Lapdock; is

13   that correct?

14   A.    Yes.  This is referring to the Lapdock.

15   Q.    So will it offend you if I call it the Lapdock display

16   instead of LCD display?

17   A.    I think I can deal with that.

18   Q.    So it lists various characteristics, one of which is

19   resolution.

20             Do you see that?

21   A.    Yes.

22   Q.    All right.  Another one is brightness.

23             Do you see that?

24   A.    Yes.

25   Q.    Okay.  Another one is display colors.

1            Do you see that?

2    A.    Yes.

3    Q.    Okay.  All of those are requirements of the Lapdock

4    display; is that correct?

5    A.    That's my understanding of the, what's written here,

6    yes.

7    Q.    All right.  Also a requirement of the Lapdock display

8    is that it include a brightness control device so the user

9    can adjust the brightness level of the display.

10            Did I read that correctly?

11   A.    Yes.

12   Q.    I think you demonstrated that with the Atrix 4G.  You

13   plugged it in and you showed the jury how you can make it

14   brighter and dimmer; right?

15   A.    Yes.  It wasn't actually operating, but I went through

16   the motions.

17   Q.    Oh.  Well, let's do that.  So I'm going to hand you

18   what is marked as DTX-243 and DTX-239, and this is a Lapdock

19   100 and a Photon 4G and move these into evidence.

20            MR. ALBERTI:  No objection, your Honor.

21            THE COURT:  All right.

22            (Defendant's Trial Exhibit No. 243 and 239 were

23   admitted into evidence.)

24            (Mr. Holloway handed exhibits to the witness.)

25   BY MR. HOLLOWAY:

Alpert - cross

1   Q.    So, Dr. Alpert, I am going to ask you to turn those

2   on, if you could.

3   A.    Okay.  I've got the phone on, and if I open the

4   Lapdock, it's supposed to turn on, which it appears to have.

5   It's showing the kind of Motorola batwing logo.

6   Q.    All right.  Now, I believe there's a series of

7   keystrokes that you can hit to make the screen get brighter

8   and dimmer.

9             Do you see those?

10  A.    On this particular one, I see some, it looks like

11  different sized asterisks or kind of snowflakes.  I don't

12  remember if the that was the one.  We have the user guide.

13  I can check.

14  Q.    So in all your work at Intel, did you work with

15  computers actually working them or did you just design

16  chips?

17  A.    I worked extensively with computers every day.

18  Q.    Okay.  Have you ever adjusted the brightness on your

19  screen?

20  A.    Yes, occasionally.

21  Q.    Okay.  And the symbol for that is usually a smaller

22  sun next to a bigger sun sometimes?

23  A.    Lots of different symbols.  Lots of different ways of

24  activating them.

25  Q.    Okay.

Alpert - cross

1   A.    You know, if you have a specific question about this,

2   I will be happy to answer.

3   Q.    I was hoping if you wouldn't mind for me demonstrating

4   for the jury how you make the screen brighter and dimmer.

5   A.    Well, I don't have the user guide, but possibly

6   without the function key in this one -- I don't know if it

7   needs the function key -- it's possible to press one of the

8   keys and make the screen brighter and dimmer.

9   Q.    Could you do me a favor and make it as dim as it goes?

10  Could you show that to the jury, please?

11  A.    Sure.

12  Q.    Thank you.

13        Now could you do me a favor and make it as

14  bright as it goes?  Thank you very much.  You did that with

15  the keyboard on the Lapdock; correct?

16  A.    Yes.

17  Q.    You can put that down.

18        MR. HOLLOWAY:  You can take those down, too,

19  please.

20  BY MR. HOLLOWAY:

21  Q.    During your direct examination, you played a video

22  clip from CES January 2011.

23        Do you recall that?

24  A.    There might have been two.  I don't know if -- which

25  one you are referring to.

Alpert - cross

1    Q.    Fair enough.  Good point.  I'm talking about the one

2    with Seang Chau.

3              Do you recall that one?

4    A.    Yes.

5    Q.    And that was the one where he was standing at the

6    podium and he got all excited at the Lapdock and almost

7    forgot his words and then walked out from behind the podium.

8              Do you recall that?

9    A.    He gave some words.  I will let you characterize what,

10   you know, the other aspects of his presentation.

11   Q.    So you just focused on the words?  In his speech, you

12   were just focused on the words?

13   A.    That was the most informative parted.

14   Q.    The most informative part were the words where he

15   said, there's no processing in the Lapdock; is that correct?

16   A.    Can we -- can we see the -- the quotation again?

17   Q.    Well, let me ask you this way:  Do you recall focusing

18   him saying that there's no processing in the Lapdock?

19   A.    Something of that sort.  I don't remember the exact

20   words.

21   Q.    But you know that's not true, that the Lapdock doesn't

22   do any processing; right?

23   A.    I believe he's telling us that the processing that

24   he's concerned with is done in the handset.

25   Q.    The processing he's concerned with.  Did I hear your

Alpert - cross

1    testimony just then correctly?

2    A.   Yes.

3    Q.   Okay.  That's different than saying there's no

4    processing in the Lapdock; right?

5    A.   Literally, yes, that's true.

6    Q.   Okay.  And you don't dispute that the scalers in the

7    Lapdock have a processor, do you?

8    A.   I've seen one data sheet that Dr. Drabik provided.  I

9    don't know if that -- it wasn't for the Realtek.  I don't

10   know what's in the Realtek scaler.

11   Q.   I'm going to ask you again:  You do not dispute that

12   the scalers in the Lapdock have a processor, do you?

13   A.   I would dispute that, yes.

14   Q.   Okay.

15   A.   Dispute it, not that I have knowledge otherwise, but I

16   have not seen information about the Realtek scaler.

17   Q.   Do you recall giving your deposition in this case?

18   A.   Yes.

19   Q.   Okay.  And it wasn't me that took your deposition, it

20   was my partner, Mr. Moore; is that correct?

21   A.   Yes.

22   Q.   Okay.  I'd like you to turn in your binder to your

23   deposition.  It should be the first thing.  I will let you

24   tell me when you are there.

25   A.   Okay.

Alpert - cross

1   Q.    Okay.  And the cover of your deposition says that it

2   was taken on Wednesday, June 26th, 2013.

3              Do you see that?

4   A.    Yes.

5   Q.    And do you recall there was a court reporter at your

6   deposition?

7   A.    Yes.  Generally.

8   Q.    And you took an oath just like you took today?

9   A.    Yes.

10  Q.    All right.  I'd like you to turn in your deposition to

11  page 90.  And looking at line 23:

12             "Would you expect that the integrated circuit

13  packet would also have a processor on it?

14             "Answer:  I don't know if this one has a

15  processor.

16             "You don't know one way or the other?

17             "Answer:  I don't know."

18             Did I read that correctly?

19  A.    Yes.

20  Q.    And you would agree that when the scaler receives an

21  HDMI signal and turns it into LVDS format, processing is

22  what makes that happen through an image processing

23  operation; is that correct?

24  A.    I believe that's what I said over here and that's

25  correct, there's image processing that does occur in the

 1    Lapdock as well as a substantially larger amount that

 2    happens within the phone.

 3    Q.    And you don't know whether the HDMI video would

 4    display on the LCD if there was no scaler, do you?

 5    A.    I'm not aware of any way that it could, but I'm not

 6    certain whether, one way or another whether it would be able

 7    to.

 8    Q.    And were you here for the opening statements in this

 9    case that Ms. Day presented?

10    A.    Yes.

11    Q.    All right.  And you watched her take the lap -- the

12    Atrix 4G out of the Lapdock and the screen went dark?  You

13    saw that?

14    A.    I don't remember for sure what she showed.

15    Q.    Okay.

16    A.    I've done that myself, though.

17    Q.    If I had an Atrix 4G in my Lapdock and it was turned

18    on and then I removed the video scaler, the same thing would

19    happen, wouldn't it?

20    A.    I don't know.

21    Q.    Okay.  Let's go to -- I will ask you to turn in your

22    notebook to DTX-8, please.

23    A.    Okay.  I can see if I have the correct document.  It's

24    the Lapdock 2 standard specification?

25    Q.    That's correct.  And the revision date is

Alpert - cross

1    November 22nd, 2011; is that correct?

2    A.    That's what I see here, yes.

3    Q.    And you see revisions A through E listed on the left

4    side?

5    A.    Yes.

6    Q.    Again, this is the same kind of technical document

7    that we talked about earlier, where you would expect the

8    revisions to be called out in that left-hand column?

9    A.    Yes.  That's what I would expect --

10   Q.    Okay.

11   A.    -- from my experience.

12   Q.    And have you looked at this specific document before?

13   A.    You know, I've looked at lots of documents.  I could

14   check in my report.  I believe there's an appendix that

15   listed all the documents that I considered.  In fact, I

16   think it's quite possible that the later Lapdock, Lapdock

17   spec that didn't have the colorful figure, I may have

18   referred to as well.

19   Q.    Okay.

20   A.    Is that something you want me to do?

21   Q.    No, no.  I'm just trying to make sure we all know what

22   the document is so I can do the following.

23            MR. HOLLOWAY:  We'd like to move DTX-008 into

24   evidence, please.

25            THE COURT:  Any objection?

Alpert - cross

1          MR. ALBERTI:  No objection, your Honor.

2          THE COURT:  Thank you.

3          (Defendant's Trial Exhibit No. 008 was admitted

4     into evidence.)

5          MR. HOLLOWAY:  If we could put the cover page up

6     for this.  Again, call out that top block so we can walk the

7     jury through what we just talked about.

8     BY MR. HOLLOWAY:

9     Q.    This is the Lapdock 2.0 material standard and method

10    spec; is that correct?

11    A.    Yes.

12    Q.    And this is the Lapdock 100, as it's called in the

13    market?

14    A.    Yes.

15    Q.    And if you look at this, you'll see that there are

16    five revisions that go up to November 22nd, 2011?

17               Do you see that?

18    A.    Yes.  I think that's clear from the document.

19    Q.    Okay.  And this is the material and method spec for

20    the Lapdock 100 that you just showed to the jury when we

21    adjusted the brightness; is that correct?

22    A.    Yes, that's the Lapdock 100.

23    Q.    Okay.  And I want to turn to page 15 of this document,

24    if we can blow that up.  Thank you.

25               And this is the block diagram for the Lapdock

1   100; is that correct?

2   A.   Yes, it is.

3   Q.   Now I want to walk through a couple of things here.

4   On this bottom left-hand corner, I've got the HDMI input; is

5   that correct?

6   A.   Yes.  We can see there, there are multiple signals

7   over there, including the bottom one, which is the data

8   display channel that I mentioned.  Sorry.  Display data

9   channel that I mentioned.

10  Q.   All right.  And this is where the HDMI signal comes

11  into the Lapdock; is that correct?

12  A.   Yes, that's correct, through that connector.

13  Q.   Okay.  It then goes to a box that has been handwritten

14  and labeled scaler.

15          Do you see that?

16  A.   Yes.

17  Q.   Do you understand that that is the display scaler or

18  the video scaler we talked about?

19  A.   That's what I'd expect it to be, and as I recall,

20  Mr. Barber represented.

21  Q.   Okay.  And then it goes on.  You see these various

22  signals that go out to the LCD panel and that's the Lapdock

23  display; is that correct?

24  A.   That is the Lapdock display.  It's going out there,

25  yes.

Alpert - cross

```
 1   Q.    Okay.  And if we go up to the top left-hand part of it

 2   and second block down, you'll see a keyboard.

 3              Do you see that?

 4   A.    Can you point to which one?

 5   Q.    Yes.

 6   A.    Keyboard is on the left side.  Yes.

 7   Q.    Sorry if I said right.

 8   A.    I don't remember what you said.  I expected it on the

 9   right.

10   Q.    And then in between the keyboard and the scaler is

11   this big block with this really long name that starts with

12   MSP.

13              Do you see that?

14   A.    Yes.

15   Q.    Do you know what the MSP is?

16   A.    That is a component from Texas Instruments.

17   Q.    Okay.  And did you look somewhere in this document to

18   decide what that was?

19   A.    Yes.  I want to make sure that I was recalling

20   correctly, and I guess it's on, I don't know.  DTX -- the

21   last digits are 8, even though the -- the page number on the

22   document itself is 32.

23   Q.    All right.  Let's look at what I think you are looking

24   at and make sure.

25              MR. HOLLOWAY:  If we could have page 8 and call
```

Alpert - cross

1    up the Table 4.  Thank you.

2    BY MR. HOLLOWAY:

3    Q.    And you were looking at that.  If you go down the

4    third line and go under "vendor partner," you'll see MSP?

5             Do you see that?

6    A.    Yes.

7    Q.    If you go over one, you see the vendor was TI, and you

8    said that was Texas Instruments?

9    A.    Yes, that would be Texas Instruments.

10   Q.    What's that function called?

11   A.    It's called a microprocessor.

12   Q.    Okay.  So let's go back to block diagram on page 15.

13   So, again, we see a keyboard in the Lapdock 1 husband.  We

14   see a keyboard connected to a microprocessor connected to

15   the scaler; is that correct?

16   A.    Can you -- can you just walk me through one step at a

17   time?

18   Q.    A keyboard connected to a microprocessor; is that

19   correct?

20   A.    Correct.

21   Q.    Microprocessor connected to a scaler; is that correct?

22   A.    There is a -- yes, there is a connection shown there.

23   Q.    And you demonstrated for the jury how you can use the

24   keyboard to adjust the brightness on the Lapdock 100;

25   correct?

1   A.    Yes.  And that's done through the WEBtop software on

2   the phone.

3   Q.    It's done through the WEBtop software on the phone?

4   A.    Yes.

5   Q.    Where is that shown on this diagram?

6   A.    It's not shown there.  There's other requirements

7   documents that explain that clearly.

8   Q.    And you talked about those requirements documents on

9   direct?

10  A.    No.  There's a limited amount of time to talk about

11  different documents.  If you want, I can talk about it now.

12  Q.    Do you know if Motorola is even making the Lapdock

13  anymore?

14  A.    No, I don't know.

15  Q.    And I just want to go over one thing.  You said you

16  looked at thousands and thousands of pages of technical

17  documents about the Lapdock; is that correct?

18  A.    I said I considered them, yes.

19  Q.    Okay.  And you displayed one figure of block diagrams

20  when you walked through; correct?

21  A.    I recall the one colorful figure.  I don't know if

22  there were any others.

23  Q.    Do you recall showing any others from the technical

24  specification documents about the Lapdock itself?

25  A.    No.  I don't recall using other figures.

1              MR. HOLLOWAY:  Pass the witness.

2              THE COURT:  All right.  Redirect.

3                        REDIRECT EXAMINATION

4    BY MR. ALBERTI:

5    Q.    Can we go to DTX-113?  DTX.

6              Do you remember this document Mr. Holloway was

7    walking you through?

8    A.    I kind of backed off when you said you were leading

9    me, so I'm not going to attribute his leading me.  But I do

10   remember discussing it.

11   Q.    And this is a specification for one of the Lapdock

12   products; true?

13   A.    Yes.  It says it's for Attach, so that would be the

14   first Lapdock for Atrix 4G.

15             MR. ALBERTI:  And if we could go to DTX-113,

16   page 8.  Blow up 7.7, please.

17   BY MR. ALBERTI:

18   Q.    Can you read the last sentence here in 7.7, the

19   section Mr. Holloway was asking you about?

20   A.    Yes.  It says, the screen saver mode for the display

21   will be controlled by the handset.

22   Q.    How does that inform your opinion with respect to what

23   actually controls the display on these devices?

24   A.    Well, I think it -- this statement is at least one

25   example of how it's the central processor in the handset

Alpert - redirect

1    that controls the peripheral devices of the Lapdock.

2                 MR. ALBERTI:  I have no further questions.

3                 THE COURT:  All right.  You may step down, sir.

4    Thank you very much.

5                 (Witness excused.)

6                 MS. DAY:  Your Honor, we're prepared to call our

7    next witness, although my understanding is we're ending

8    today at 12:30, so with the Court's permission, perhaps we

9    end a few minutes early today.

10                THE COURT:  Only if you want to eat the ten

11   minutes.  It's up to you.

12                (Pause while counsel conferred.)

13                MS. DAY:  Your Honor, we'll eat the time.

14                THE COURT:  All right.  Ladies and gentlemen,

15   you get an early out today.  I will just remind you that

16   during the weekend recess, you are not to discuss the case

17   among yourselves or with anyone else.  Don't read or listen

18   to anything touching on the case.  Don't perform any

19   independent investigation.

20                Have a safe trip home, a pleasant weekend.

21   We'll see you Monday at 9:00.  Thank you very much.

22                (The jury was excused.)

23                THE COURT:  You all may be seated.  I do have

24   afternoon proceedings, so you'll have to clear the tables.

25   We're working on jury instructions.  We'll get them to you

Alpert - redirect

1    no later than Thursday.  I am hoping we'll have a charge

2    conference at 8:00 o'clock on Friday morning, next Friday,

3    obviously.  That's the only -- those are the only things I

4    can think of at the moment.

5              Is there anything that we can helpfully discuss

6    yet this afternoon?  Anything from IV?

7              MS. DAY:  No, your Honor.

8              THE COURT:  Anything from Motorola, Mr. Boice?

9              MR. BOICE:  No, your Honor.

10             THE COURT:  All right.  Have a good weekend.

11             (Counsel respond, "Thank you, your Honor.")

12             (Court recessed at 12:22 p.m.)

13                         -  -  -

14

15

16

17

18

19

20

21

22

23

24

25