1                          - VOLUME C -

2                IN THE UNITED STATES DISTRICT COURT

3                IN AND FOR THE DISTRICT OF DELAWARE

4                              - - -

5

    INTELLECTUAL VENTURES I LLC   :   CIVIL ACTION
6   and INTELLECTUAL VENTURES     :
    II LLC,                       :
7                                 :
                    Plaintiffs,   :
8                                 :
        vs.                       :
9                                 :
    MOTOROLA MOBILITY LLC,        :
10                                :
                    Defendant.    :   NO. 11-908-SLR-MPT

11

12                           - - -

13                         Wilmington, Delaware
                           Monday, January 27, 2014
14                         9:37 o'clock, a.m.

15
                             - - -
16
    BEFORE:  HONORABLE SUE L. ROBINSON, U.S.D.C.J., and a jury
17
                             - - -
18

19  APPEARANCES:

20
            FARNAN LLP
21          BY:  BRIAN E. FARNAN, ESQ.

22
                    -and-
23

24
                           Valerie J. Gunning
25                         Official Court Reporter

1    APPEARANCES (Continued):

2

             FEINBERG DAY ALBERTI & THOMPSON, LLP
3            BY:   ELIZABETH DAY, ESQ.,
                   DAVID ALBERTI, ESQ.,
4                  MARC BELLOLI, ESQ.,
                   YAKOV ZOLOTOREV, ESQ.,
5                  NIKOLAS BOHL ESQ.
                   (Menlo Park, California)
6

7                  Counsel for Plaintiffs

8

9            MORRIS, NICHOLS, ARSHT & TUNNELL LLP
             BY:   JACK B. BLUMENFELD, ESQ. and
10                 STEPHEN J. KRAFTSCHIK, ESQ.

11
                        -and-
12

13           KILPATRICK TOWNSEND & STOCKTON, LLP
             BY:   WILLIAM BOICE, ESQ. and
14                 CANDICE DECAIRE, ESQ.,
                   (Atlanta, Georgia)
15

16                      -and-

17
             KILPATRICK TOWNSEND & STOCKTON, LLP
18           BY: STEVEN MOORE, ESQ.
                   (San Francisco, California)
19

20                      -and-

21
             KILPATRICK TOWNSEND & STOCKTON, LLP
22           BY:   D. CLAY HOLLOWAY, ESQ.
                   (Atlanta, Georgia)
23

24                  Counsel for Defendant

25
                        -   -   -

```
 1                    P R O C E E D I N G S

 2

 3              (Proceedings commenced in the courtroom,

 4    beginning at 9:37 a.m.)

 5

 6              THE COURT:  I understand there's an issue before

 7    we bring the jury in?

 8              MR. HOLLOWAY:  Yes, your Honor.  We'd like to

 9    renew our objection to Mr. Stewart's testimony as hearsay

10    and object to the exhibits that he would enter.  Plaintiffs'

11    Exhibit 116 and 117.  We'd rather do that now before he

12    takes the stand on direct.

13              We have one other point on that.  To the extent

14    that he or Intellectual Ventures tries to argue that the,

15    based on the wording of the question, that's evidence of

16    actual infringement, we would suggest a limiting instruction

17    be given to the jury, and I have one proposed, if you would

18    like to hear that now, or just wait and see if that happens.

19              THE COURT:  Well, why don't you give me your

20    proposed limiting instruction.  I take it you have not

21    shared it with --

22              MR. HOLLOWAY:  Not yet.

23              THE COURT:  Given the format, I figured you

24    hadn't.

25              MR. HOLLOWAY:  I typed it on this post it note.
```

1    It says, you may consider the survey evidence as evidence of

2    use of Google Play, but you should not consider it as

3    evidence that, you should not consider it as evidence that

4    use satisfies any particular limitation of the claims of the

5    '054 or '464 patent.

6              THE COURT:  All right.  Well, maybe write it up

7    on something larger so that if, in fact, we reach that

8    point, I have some language here.

9              MR. HOLLOWAY:  Will do.

10             THE COURT:  And as far as your objections, I

11   know you made them for purposes of the record, and they are

12   denied.

13             All right.  Are we all set to bring the jury in?

14             MS. DAY:  We are, your Honor.

15             THE COURT:  All right.  Thank you.

16             (The jury entered the courtroom and took their

17   seats in the box.)

18             THE COURT:  Good morning, ladies and gentlemen.

19   Welcome back.  You all may be seated.

20             And let's proceed with our next witness.

21             MS. DAY:  Thank you your Honor.  Good morning.

22   Some might even say happy Monday.

23             Last week you heard from Mr. Kumar and Dr.

24   Albert.  Those were our witnesses for the '462 Kumar

25   patent.  Now we're going to be moving into the Reisman and

1   Google Play side of the case, and I want to provide a brief

2   overview of the testimony and evidence you're going to hear

3   today.

4          Intellectual Ventures' first witness today is

5   Dr. David Stewart.  He is a survey expert and he conducted a

6   survey on whether people in the United States used Google

7   Play to download and update applications using a Motorola

8   smartphone, so you'll hear from him first this morning.

9          He'll be followed by Peter Detkin, who is one of

10  the founders of Intellectual Ventures.  Then we are going to

11  play some video testimony for you have Motorola employees

12  and engineers and a Google engineer explaining to you the

13  functionality of Google Play.

14         That testimony will be followed by Mr. Richard

15  Reisman.  He's the inventor on the '464 and '054 Reisman

16  patents.

17         And then we'll conclude our case-in-chief with

18  testimony from Dr. Jason Nieh.  He's our expert on

19  infringement of the '464 and '054 Reisman patents.

20         So with that overview and without further ado,

21  Intellectual Ventures calls Dr. David Stewart to the stand.

22                PLAINTIFFS TESTIMONY, Continued.

23                ... DAVID WAYNE STEWART, having been

24                duly sworn as a witness, was examined and

25                testified as follows ...

Stewart - direct

1                        DIRECT EXAMINATION

2    BY MS. DAY:

3    Q.    Good morning, Dr. Stewart.

4    A.    Good morning.

5    Q.    Would you please state your name for the record again.

6    A.    My name is David Wayne Stewart.

7    Q.    And have you been hired as an expert in this case?

8    A.    I have been.

9    Q.    And by whom?

10   A.    I was hired by Feinberg & Day on behalf of

11   Intellectual Ventures.

12   Q.    And what did Intellectual Ventures ask you to do in

13   connection with this case?

14   A.    I was asked to design a consumer survey, the purpose

15   of which was to determine whether one or more consumers in

16   the United States used various features of Motorola mobile

17   telephones.  More specifically, whether they used features

18   of, associated with one of 26 different models of Motorola

19   phones.

20   Q.    And did you conduct such a survey?

21   A.    I did.

22   Q.    Now, before we talk about the survey that you

23   conducted, could you please tell the jury a little bit about

24   your background.

25              MS. DAY:  And if I could have slide 2.

1            THE WITNESS:  Well, I'm currently the

2   President's Chair in Marketing and Law in the Department of

3   Marketing and Business Law at Loyola Marymount University.

4   I have been on the faculties in Business at Vanderbilt

5   University, the University of Southern California, and at

6   the University of California Riverside.  Also earlier in my

7   career I was a research manager with a large advertising

8   agency in Chicago.

9            I hold degrees in psychology, a Bachelor's

10  degree from Northeast Louisiana University and a Master and

11  Ph.D. in psychology from Baylor University.

12           I have been involved in marketing and marketing

13  research for almost 40 years.  I teach marketing at the

14  university level.  I teach undergraduates.  I teach MBA

15  students, doctoral students and practicing managers.  I

16  teach advertising, product management, and marketing

17  strategy and marketing research.  There's a part of

18  marketing research, we cover survey research.

19           I have also been involved in surveys as a part

20  of my academic work, my research.  I've written ten books

21  and over 200 publications, and many of those have actually

22  involved survey research, such things as investigating how

23  people go about gathering information when they buy cars or

24  what sources of information do they use in selecting a

25  physician.

Stewart - direct

1          I also consult regularly with organizations and

2     much of that consulting involves survey research.  Some of

3     the organizations I've worked with include Coca-Cola,

4     Hewlett-Packard, Xerox, among others.  And I've worked with

5     government organizations, and in that capacity have also

6     been involved in survey research.

7          So I've done survey research for the Federal

8     Trade Commission.  I've also worked with the United States

9     Census Bureau in design of specific surveys as well as the

10    economic censuses that they conduct.

11         Over the course of my career I've probably

12    conducted more than a thousand surveys.  I have reviewed

13    many more than that.  I've served as editor of three

14    journals in my field, including the Journal of Marketing,

15    which is generally regarded as the leading journal in the

16    field.

17    Q.    Have you testified as a survey expert before in court?

18    A.    I have, on several occasions testified as a survey

19    expert in court, yes.

20    Q.    And have you testified on behalf of both plaintiffs

21    and defendants?

22    A.    I have, yes.

23         MS. DAY:  Your Honor, Intellectual Ventures

24    tenders Dr. Stewart as an expert in developing and

25    conducting consumer surveys.

Stewart - direct

1        MR. HOLLOWAY:  No objection, your Honor.

2        THE COURT:  Thank you.

3   BY MS. DAY:

4   Q.    All right.  Let's turn to the survey you conducted.

5   And can you tell the jury again what it was you surveyed?

6   A.    Well, the purpose of the survey was actually rather

7   direct and rather simple, and that was to determine whether

8   or not one or more users of one of 26 models of Motorola

9   phones had been used in a particular way, whether or not a

10  particular consumer had used a particular feature.  It was

11  really a kind of set of yes/no questions.  Did you do it or

12  did you not do it or did you not remember?

13  Q.    And how did you know what to survey for purposes of

14  this case?

15  A.    Well, as with any survey, I have to begin by having an

16  understanding of what the issues are that the survey will

17  inform.  I can't make up a survey out of whole cloth if it's

18  going to be useful.  So I have to have information from

19  attorneys in this case about what are the models of Motorola

20  telephones that are relevant, and they gave me a list of 26,

21  and what are the features of those phones that are really at

22  issue here so I can ask about those features.

23  Q.    And after you learned what Intellectual Ventures

24  wanted surveyed, what did you do next?

25  A.    Well, the next thing I did was to actually design the

Stewart - direct

1    survey.  I first identified an organization to actually

2    collect the data.  We call that a field service.  They are

3    individuals who will take the questionnaire that I design

4    and in this case actually program it into a computer because

5    we collected the data over the Internet.

6           You want to do that because good survey practice

7    suggests that you use something called a double blind

8    procedure.  You don't want the respondents to know who the

9    responsible or purpose of the research is, and you don't

10   want the people collecting the data to know who the sponsor

11   or what the purpose of the research is.  So we used field

12   services for that purpose.

13          So I identified a field service, California

14   Field Research, to work with me.  I also had to find a list

15   of relevant consumers.  Who would we go and ask about

16   telephones?

17          And increasingly today we use Internet panels.

18   These are panels of consumers who have been pre-recruited to

19   participate in survey research.  We've been using consumer

20   panels for a hundred years.  For many years, it was mail,

21   but now we've moved to the Internet.

22          Probably the best known of the consumer panels,

23   at least in the popular press, is the Nielsen Ratings Panel,

24   but there are many of them.  And identify a panel company

25   that I've worked with in the past called Research Now, which

Stewart - direct

1    has a very large panel that they maintain, they develop in a

2    way that is broadly representative of consumers not only in

3    the U.S., but even worldwide.

4              So I identified the partners, if you will, that

5    would work with me in conducting the research, the field

6    service and the list provider, and then I developed a

7    questionnaire.  Essentially, the questionnaire asks

8    respondents, do you use one of these 26 phones?  And if they

9    didn't use any of them, they would thanked and that was the

10   end.  They didn't answer any more questions.  And then I had

11   a series of questions that asked, have you done the

12   following with your particular model of phone?  And people

13   would answer generally yes or no.

14             Once I had the questions in place, California

15   Survey Research programmed it.  They obtained the list of

16   consumers from California Survey, from Research Now.  It was

17   a list chosen randomly from their panel.  E-mail invitations

18   went out and individuals could then come and determine

19   whether they were qualified to complete the questionnaire,

20   because they owned the relevant model phone, and would

21   ultimately complete the questionnaire.

22   Q.   Dr. Stewart, how many people were surveyed or how many

23   people took the survey?

24   A.   Ultimately, there were 1,007 individuals who completed

25   the survey.

Stewart - direct

1    Q.    And where were these people who were taking the survey

2    located?

3    A.    They were all located in the United States, but they

4    were scattered throughout the United States.

5    Q.    And how do you know that the people that took the

6    survey were located in the United States?

7    A.    Well, the panel company, Research Now, does a great

8    deal of work in the construction of their panel to assure

9    that they have information about where people are located.

10   That's a part of their construction.  It's part of the value

11   they add in constructing and maintaining panels.

12              And they do a variety of things.  They conduct

13   people on a regular basis, to understand what their address

14   is.  They can use IP addresses on the computer to determine

15   where their computer is located.  So there are a variety of

16   ways to double-check whether the individuals are in the

17   United States or not.

18   Q.    And at a high level, what were your conclusions based

19   on the survey results?

20   A.    Well, at a very high level we found that there was

21   one, in fact, more than one individual in the survey who had

22   used each of the features that are at issue here on each of

23   the phones that are at issue here.

24   Q.    All right.  Let's take a look at the questions and

25   your survey results.  If you could please turn to the binder

Stewart - direct

1    in front of you to PTX-116.

2              And do you recognize this document?

3    A.    I do.

4    Q.    And what is it?

5    A.    This is a set of screen shots of the questionnaire.

6    It's essentially the questionnaire as would have been seen

7    by a respondent, taking the questionnaire, looking at the

8    computer screen.  And so for each screen they saw, there's a

9    page that is essentially the screen shot of the screen that

10   they saw.

11             MS. DAY:  Your Honor, Intellectual Ventures

12   moves PTX-116 into evidence.

13             MR. HOLLOWAY:  Subject to our renewal this

14   morning, no objection.

15             THE COURT:  Thank you.

16             (Plaintiffs' Trial Exhibit No. 116 was received

17   into evidence.)

18             MS. DAY:  If I could have PTX-116 on the screen,

19   please.

20   BY MS. DAY:

21   Q.    So, Dr. Stewart, on the first page of PTX-116, this is

22   the first screen shot someone taking the survey would have

23   seen?

24   A.    That's correct.

25   Q.    And if I could direct your attention to the second

Stewart - direct

1    page, please, of PTX-116, if we could blow that up.

2              And, Dr. Stewart, what is shown on the second

3    page of this survey?

4    A.   The second page of the survey is actually the first

5    question that respondents were asked.  And it's simply a

6    list of Motorola telephones, models of Motorola telephones.

7    And individuals were asked:  Have you used any of the

8    following Motorola phones?  And then people could put a

9    checkbox by one or more if they had actually used them.

10   Q.   And I believe you testified if a survey participant

11   clicked none of the above, they were thanked for their time

12   and the survey would end; is that right?

13   A.   That's correct.  They would not have been qualified to

14   participate further.

15   Q.   All right.  Let's look at the first question in the

16   survey.  If I could direct your attention to page 13 of

17   PTX-116.

18             What was the first question that was asked

19   during the survey?

20   A.   Well, the first question was:  Have you selected and

21   downloaded applications using Google Play or Android Market

22   application on the Atrix 2?

23             And people could answer yes or no or indicate

24   that they don't know or don't remember.

25   Q.   Can you explain to the jury what it means the

Stewart - direct

1    Play/Android market in this first question?

2    A.    Well, Google Play is the, is the current application.

3    Android Market was a predecessor.  It was the way one could

4    do downloads and updates prior to the introduction of Google

5    Play.  So we wanted to capture both the, the prior product

6    as well as the current product.

7    Q.    And I see that this question asks about the Atrix 2.

8    Why is that?

9    A.    Well, this is simply intended to be representative of

10   the questions that we ask.  Respondents would only have seen

11   this question with Atrix 2 in it if they, in fact, had

12   indicated that they used an Atrix 2 phone.  If it had been

13   an Admiral, for example, it would have said Admiral.  So the

14   question would be modified somewhat to put it in the context

15   of the phone that the particular consumer said that they had

16   used.

17   Q.    Did at least one person answer yes to this question

18   number one for each phone model that was the subject of the

19   survey?

20   A.    Yes, they did.

21   Q.    And if we could turn to the next question.  What was

22   the second question in the survey?

23   A.    When you use the Google Play/Android Market

24   application, do you connect using:  And then there are

25   several choices:  A cellular network, WiFi, both cellular

Stewart - direct

1    and WiFi and then, again, people could say they don't know

2    or can't remember.

3    Q.    Did at least one person answer yes to this question

4    for each phone model that was the subject of the survey?

5    A.    Yes.  There was at least one person who answered yes

6    to each of the options.  Cellular phone, cellular network,

7    WiFi or both cellular and WiFi.

8    Q.    What was the next question that was asked during the

9    survey?

10   A.    Have you run any applications you downloaded through

11   Google Play/Android Market application on Atrix 2, or

12   whatever other phone might be relevant.  And people had the

13   option of answering question, no, or don't know.

14   Q.    And did at least one person answer yes to this

15   question for each phone model that was the subject of the

16   survey?

17   A.    Yes, they did.

18   Q.    All right.  If we could turn to the next page, please,

19   and blow up the question.

20         What was the next question asked in the survey?

21   A.    While using the Atrix 2, or whatever model would have

22   been relevant to the respondent, have you ever been

23   presented with a directly of available application updates

24   while using the Google Play/Android Market application?

25         It says see an example below and there's a

Stewart - direct

1    picture below that respondents saw.

2                   MS. DAY:  And if we could blow up the picture,

3    please.

4    BY MS. DAY:

5    Q.    This is the picture that the respondents would have

6    seen if they were taking the survey?

7    A.    That is correct.

8    Q.    And why did you provide a picture in connection with

9    this question?

10   A.    To make the, the question clearer.  We are asking

11   people about have you ever been presented with something, so

12   we wanted to give them an example of what they might have

13   been presented with, and a picture is a good way to do that.

14   Q.    Now, if the question were asked about a different

15   phone, for example, the Admiral, would the picture that's

16   shown here change in the survey?

17   A.    Well, the picture of what's on the screen would not

18   have changed.  The surround area might have changed

19   moderately given the model of the phone, but, again, the

20   picture on the phone screen would be the same.

21   Q.    Did the a least one person answer yes to this question

22   for each phone model that was the subject of the survey?

23   A.    Yes, they did.

24   Q.    If we could please turn to the next page.  What was

25   the next question asked in the survey?

Stewart - direct

1    A.    Have you ever used the Atrix 2, or, again, whatever

2    phone may have been relevant to download an update to an

3    application from the directory of available updates using

4    the Google Play/Android Market application?  People could

5    answer yes, no, or don't know.

6    Q.    Did at least one person answer yes to this question

7    for each model phone that was the subject of the survey?

8    A.    Yes, they did.

9    Q.    And moving onto the final question, what was the last

10   question in this portion of the survey?

11   A.    Have you ever run an application after downloading

12   an update to the application through Google Play/Android

13   Market using the Atrix 2, or whatever phone would have

14   otherwise been relevant?  People could answer yes, no, or

15   don't know.

16   Q.    Did at least one person answer yes to this question

17   for each phone model that was the subject of the survey?

18   A.    Yes, they did.

19   Q.    Dr. Stewart, are you confident in the accuracy of the

20   survey?

21   A.    Yes.  I'm quite confident in the accuracy of the

22   survey.  It's a very simple survey in which we are simply

23   looking for one or more people who say they have used a

24   particular feature of a phone.  And we found not one, but

25   many who indicated that they had used it, so I'm quite

Stewart - direct

1  confident that there's at least one person and often more

2  who, in fact, did use each of the features for each of the

3  models of the phone.

4  Q.    If you could please turn in your binder to PTX-117.

5  And do you recognize this document?

6  A.    I do.

7  Q.    And what is it?

8  A.    This is a document that provides a very detailed

9  tabulation of questions in the survey and breaks out the

10 responses by, literally by model.  So you can look model by

11 model, question by question at how many people said yes or

12 no or don't know.  So it's a very detailed analysis of the

13 data.

14          MS. DAY:  Your Honor, Intellectual Ventures

15 moves PTX-117 into evidence.

16          MR. HOLLOWAY:  Again, subject to our renewal, no

17 objection.

18          THE COURT:  Thank you.

19          (Plaintiffs' Trial Exhibit No. 117 was admitted

20 into evidence.)

21 BY MS. DAY:

22 Q.    Dr. Stewart, if I could direct your attention to page

23 56.

24          MS. DAY:  If we could bring that up on the

25 screen, please.

Stewart - direct

1   BY MS. DAY:

2   Q.    And here we have table 25-1, which is -- which was

3   question 16, which is one of the questions we reviewed with

4   the jury.

5           Can you walk the jury through what this page

6   shows?

7   A.    Certainly.  Well, this is a table that summarizes the

8   results of responses to the question, have you selected and

9   downloaded applications using Google Play/Android Market

10  application on whatever the model may be.

11          And what you will see across the top are the

12  lists of the individual models, beginning with Admiral, then

13  there's Atrix 2, there's Atrix 4G, Atrix HD and so forth.

14          Below each of those models is a column of

15  numbers that indicate, first of all, how many people

16  reported that they had ever used that phone?  So, for

17  example, for the Admiral, 69 people in the sample of 1,007

18  said that they had used, the Admiral model phone.

19          Of those 69, 31 or 45 percent said, yes, they

20  had, in fact, selected and downloaded applications using

21  Google Play or Android Market application on that model.

22          And then below that, the number of people who

23  said no and the number of people who said don't know.

24          So here we see 35 said -- 35 said no and three

25  people said they couldn't remember.

Stewart - direct

1   Q.    If we could return to the PowerPoint slides for a

2   moment and bring up slide probably 2, 3.  Page 3, the final

3   page.  Thank you.

4             Dr. Stewart, can you explain what is shown on

5   this slide of the Google Play Usage slide?

6   A.    Well, this is a slide from the written report that I

7   provided in this matter.  That report was a description of

8   the survey.  And what I attempted to do with a table within

9   the report was to summarize and simplify the very complex

10  tabulation that we just talked about.  Certainly, you could

11  look model by model and that tabulation provides it.

12            What I did in this particular table was to take

13  each of the questions and look across all models and

14  identify what percentage of individuals said yes for at

15  least one model.

16  Q.    And if you could please walk the jury through your

17  results.

18  A.    Sure.  So for No. 16 here, that was the question

19  number:  Have you selected and unloaded applications using

20  Google Play/Android Market application on whatever the phone

21  may be?  73 percent of the individuals answered on average,

22  answered yes in response to that question.

23            For 17, when you use Google Play/Android Market

24  application, do you connect using:  And then on average,

25  across the models, 24 percent said WiFi, 12 percent said

Stewart - direct

1    cellular network, and 49 percent said both cellular and

2    WiFi.

3              For question 18:  Have you ever any applications

4    you downloaded through Google Play/Android Market

5    application on your phone?  Again, on average across the 26

6    models, 71 percent said yes.

7              For 19, when using the whatever model they used,

8    have you ever been presented with a directory of available

9    application updates using the Google Play/Android Market

10   application?  Again, on average, across the 26 models, 86

11   percent said yes.

12             Have you ever used your phone to download and

13   update to an application from the directory of available

14   updates using the Play/Android market application?

15             Again, on average, across models, 72 percent

16   said yes.

17             And, finally, have you ever run an application

18   after downloading an update to the application through

19   Google Play/Android Market using your phone?  Across the 26

20   models, on average, 71 percent said yes.

21   Q.   Dr. Stewart, I just want to direct your attention back

22   to question 19.  What was the result of the survey?

23   A.   Oh, I'm sorry.  80 percent said that -- said yes in

24   response to this on average across the 26 models.

25             MS. DAY:  All right.  Thank you.  I have no

Stewart - cross

1     further questions.

2                    THE COURT:  All right.  Cross-examination.

3                         CROSS-EXAMINATION

4     BY MR. HOLLOWAY:

5     Q.    Good morning, Dr. Stewart.  My name is Clay Holloway.

6     I'm on behalf of Motorola Mobility and I'm going to ask you

7     a couple questions.  Okay?

8                    Dr. Stewart, you don't have an electrical

9     engineering degree, do you?

10    A.    No, I do not.

11    Q.    And other than having used a cellphone in the past,

12    you don't have any experience with the technical workings of

13    a cellphone?

14    A.    I would not consider myself a technical expert with

15    respect to cellphones.

16    Q.    And you don't hold yourself out today as an expert how

17    cellphones work; correct?

18    A.    No.

19    Q.    You're not an expert in how to read patent claims?

20    A.    I am not.

21    Q.    In fact, I believe you testified in the past that you

22    hadn't seen the patents at issue in this case, have you?

23    A.    No, I have not.

24    Q.    And you don't believe you've ever used the phones at

25    issue in this case before, have you?

Stewart - cross

1    A.    I do not believe so.

2    Q.    Before this case, had you ever performed a survey

3    examining the usage of features on a cellphone?

4    A.    I don't believe I have.

5    Q.    And in this survey, you don't yourself actually talk

6    to the respondents, do you?

7    A.    No, I do not.

8    Q.    You contract with someone else who asks those

9    questions and then you just review the results?

10   A.    That's consistent with the double blind procedure I

11   talked about earlier, yes.

12   Q.    And as part of this survey, you never asked the

13   respondents when the features, as you put it, were used, did

14   you?

15   A.    No.  The questions were simple, yes, no, have you used

16   it.

17   Q.    And one of the things I believe you testified to, and

18   I tried to write it down was, you worked with Feinberg Day

19   to learn what they wanted surveyed.

20         Did I get that right?

21   A.    That's correct.

22   Q.    Okay.  And then several times you said that you

23   designed the survey or designed the questions.

24         Did I get that right as well?

25   A.    That is correct.

Stewart - cross

1   Q.    All right.  And one of the questions that was asked

2   was, while using the Atrix 2, or whatever phone it might be,

3   have you ever been presented with a directory of available

4   application updates while using the Google Play/Android

5   Market application.

6            Did I get that right?

7   A.    You did.

8   Q.    All right.  And your only understanding of what a

9   directory means in the context of the Google Play or Android

10  Market comes from the picture that IV's lawyer, Mr. Belloli,

11  gave you; isn't that correct?

12  A.    Well, my understanding is also based on my general

13  understanding of what a directory is.  But in the context of

14  this particular survey, you're correct.

15  Q.    Okay.  And, in fact, Mr. Belloli gave you the

16  questions to use in the survey; is that correct?

17  A.    He gave me the set of features and set of models, yes.

18  Q.    So he gave you the questions?

19  A.    Well, no.  I created the questions.  They weren't

20  difficult to create once one has the models and the, and the

21  features.

22  Q.    And you chose the words directory of applications

23  yourself with no input from Mr. Belloli?

24  A.    No.  I -- I don't recall where the term directory came

25  from.  It may have come from him.  It may have been

Stewart - cross

```
 1   something I suggested.  I really don't -- don't recall.  It
 2   didn't seem like a particularly critical issue at the time.
 3   Q.    Did he give you the pictures to use in the survey?
 4   A.    Yes, he did give me the pictures.
 5   Q.    So I want to make sure I'm real specific on what
 6   you're here to testify about.
 7              Your testimony to the jury is to let them know
 8   that 80 percent of the people taking the survey answered the
 9   question we just talked about by clicking the word yes; is
10   that right?
11   A.    No, that's not actually what the purpose of the survey
12   was.  That is one result.  The purpose of the survey was
13   simply to identify whether there was one or more individuals
14   who indicated that they had clicked yes in response to that
15   question or some of the other questions.
16   Q.    And you have no idea of all of the users of various
17   Motorola phones, you have no idea how many people have
18   actually ever done that in the real world, do you?
19   A.    I do not.  That was not the purpose of the survey.
20   Q.    And the -- I think you mentioned the company who did
21   the survey was California Survey Research; is that correct?
22   A.    They were the field service that actually collected
23   the data.
24   Q.    All right.  And if I'm not mistaken, that cost $27,000
25   to have them ask those questions?
```

Stewart - cross

1   A.    That's correct.

2   Q.    Okay.  And that does not include your time, does it?

3   A.    That's correct.

4   Q.    All right.  And before getting ready for today, you

5   billed IV $19,000 for your work on this?

6   A.    That's about right, I think.

7   Q.    And that's at a rate of $750 an hour?

8   A.    That's correct.

9   Q.    All right.  So IV has paid $27,000 in surveys, $19,000

10  in your time plus today, flown you out here for you to tell

11  us that you asked somebody else to ask somebody else a

12  question and what they told them; right?

13  A.    Well, no.  You are misrepresenting what had

14  transpired.  I'm here to present survey results done in the

15  way in which surveys are typically done, and that is to

16  employ a field service so that you can have a double blind

17  design and therefore have an objective, a more objective

18  survey.

19  Q.    But just to be clear, you didn't ask the people that

20  used the phones whether they had actually done that

21  yourself, did you?

22  A.    They were asked via the Internet.  I did not -- I

23  drafted the questions, but, no, I did not ask the questions.

24           MR. HOLLOWAY:  Pass the witness.

25           THE COURT:  Any redirect?

Detkin - direct

 1            MS. DAY:  We don't have any further questions

 2    for Dr. Stewart.

 3            THE COURT:  All right.  You may step down, sir.

 4            THE WITNESS:  Thank you.

 5            (Witness excused.)

 6            MS. DAY:  Your Honor, Intellectual Ventures

 7    calls Peter Detkin to the stand.  As I mentioned, Mr. Detkin

 8    is one of the founders of Intellectual Ventures.

 9                 ... PETER DETKIN, having been duly sworn

10                 as a witness, was examined and testified as

11                 follows ...

12                      DIRECT EXAMINATION

13    BY MS. DAY:

14    Q.    Good morning, Mr. Detkin.

15    A.    Good morning.

16    Q.    You would please state your name for the record again.

17    A.    Peter Detkin.

18    Q.    And for whom did you work?

19    A.    Intellectual Ventures.

20    Q.    What do you do for Intellectual Ventures?

21    A.    I'm one of the founders of the company and I currently

22    serve as Vice Chairman.

23    Q.    Before founding Intellectual Ventures, what did you

24    do?

25    A.    Before Intellectual Ventures, I was a Vice President

Detkin - direct

1    at Intel Corporation in Silicon Valley, where I was

2    responsible for Intel patents, litigation licensing,

3    licensing and worldwide litigation.

4    Q.    And in what year did you join Intel?

5    A.    1994.

6    Q.    What did you do before you joined Intel?

7    A.    I was a lawyer, Silicon Valley.

8    Q.    Please tell the jury about your education.

9    A.    I was originally -- got a degree in electrical

10   engineering from the University of Pennsylvania, right up

11   the road here, and liked Philadelphia, so I stayed there for

12   law school.  I went to Penn Law School as well.

13   Q.    Are you still a lawyer today?

14   A.    I'm not.  I'm inactive.

15   Q.    Would you please tell the jury about Intellectual

16   Ventures.

17   A.    Sure.  We're a company largely headquartered in

18   Seattle, but with offices around the world, including

19   Silicon Valley, where I am.  Have about 800 employees, and

20   we invest in inventions.  That's our, that's our main goal,

21   is to invest in invention.

22   Q.    Does Intellectual Ventures have a research laboratory

23   at its headquarters?

24   A.    Yes.  It's not actually at the headquarters.  It's

25   also in the Seattle area.  We have about, I think it's about

Detkin - direct

1    a hundred inventors working in a lab in Bellevue,

2    Washington.

3    Q.    Allow me to show you the next slide.  Can you please

4    explain to the jury what means to buy, build and partner?

5    A.    Sure.  As I mentioned, what we do is we invest in

6    invention and we do it three ways.  We buy, build and

7    partner.

8             The labs, you mentioned the labs.  We'll start

9    with that.  That's our invention science fund.  That's our

10   build, the one in the middle.  That's where we identify

11   interesting problems that we think need to be solved.

12            And we work with a network of inventors to help,

13   to identify solutions to those problems, secure the rights

14   to those solutions, and then go out and either license those

15   rights out, license those inventions out or, in some cases,

16   we build companies around those inventions and try to spin

17   them out.

18            The partner is to take that same concept and

19   extend it one step further, where we work with research

20   institutions around the world to again identify interesting

21   problems.

22            We find that, you know, we have smart people,

23   but there are smart people everywhere and some areas there

24   are research institutions that have some areas of expertise,

25   so we'll work with them.  And, again, we'll identify

Detkin - direct

1    problems and help identify solutions, secure the rights, and

2    then go ahead and license them out or find some other way to

3    make money off of those inventions.

4            And, finally, again, because there are smart

5    people everywhere who have invented other things, we buy

6    inventions.  We will go out and identify interesting things

7    that others have invented and we will buy them and then go

8    ahead and license them out.

9    Q.   And in addition to the partnering you just testified

10   about, does Intellectual Ventures partner with inventors in

11   other ways?

12   A.   Yes.  Well, again, on the buy side, what we'll do is,

13   we will work with them in many different ways to try to find

14   the best way to get the inventions out in the marketplace.

15   Q.   Can you give the jury some examples of the resources

16   or expertise that Intellectual Ventures provides to

17   inventors.

18   A.   Sure.  Well, what we find is that inventors are very

19   good at inventing, but they are not always very good at

20   getting those inventions out into the marketplace.  And what

21   we are good at is, we have contacts, we have expertise, we

22   have licensing expertise, we have negotiation and deal

23   making expertise, so we find that that is the value that we

24   bring.  We add to the equation.  The inventors do what they

25   do best and we get to do what we do best.

Detkin - direct

1    Q.    And under the "Buy" heading, I believe you mentioned

2    that Intellectual Ventures buys patents from inventors?

3    A.    Yes.

4    Q.    And are there other sources from whom or which

5    Intellectual Ventures buys patents?

6    A.    Well, we buy it from all different kinds of sources.

7    There's the traditional small inventor that you've, the

8    individual inventor that you've either met or are about to

9    meet.  I'm not sure where we are in the process, all the way

10   up to through companies, both small and medium and large

11   companies, up to some of the largest companies.

12              These are companies, of course, that do have

13   their own skills at bringing products to the marketplace,

14   but they may not have focused on these particular

15   inventions, but they look to us to license out those

16   inventions while they focus on other things.

17              MS. DAY:  Your Honor, I just realized,

18   Mr. Detkin doesn't have a witness binder, so may I approach?

19              THE WITNESS:  I have this right here.

20              MS. DAY:  I don't think it's the same one.

21              THE WITNESS:  This is somebody else, I just

22   noticed.

23              MS. DAY:  Yes.  We'll switch.

24              THE WITNESS:  I'm not David Stewart.

25              (Ms. Day handed a witness binder to the

Detkin - direct

1   witness).

2   BY MS. DAY:

3   Q.    There you go.

4   A.    Okay.

5   Q.    Now that you have your binder --

6   A.    Yes.

7   Q.    -- may I direct your attention to DX-73?

8   A.    Okay.

9   Q.    And have you seen this document before?

10  A.    I have.

11  Q.    And what is it?

12  A.    It's a series of e-mails describing some meetings

13  between Intellectual Ventures employees and Motorola

14  employees.

15  Q.    And were you a recipient of this e-mail?

16  A.    Again, it's a series of e-mails and I was a recipient

17  of most of them.

18         MS. DAY:  Your Honor, Intellectual Ventures

19  moves DTX-73 into evidence.

20         MR. BOICE:  No objection, your Honor.

21         THE COURT:  Thank you.

22         (Defendant's Trial Exhibit No. 73 was admitted

23  into evidence.)

24         MS. DAY:  If I could have DTX-73 on the screen,

25  please, and blow up the -- yes, perfect.

1    BY MS. DAY:

2    Q.    So, Mr. Detkin, I understand you testified this was a

3    series of e-mails, one of which was sent June 25th, 2007; is

4    that right?

5    A.    Yes.

6    Q.    And we see your name, Peter Detkin, on the cc line?

7    A.    Yes.

8    Q.    And what is the subject of this e-mail?

9    A.    Motorola.

10   Q.    If we could turn to the third page, I believe.  Yes.

11            MS. DAY:  If you could blow up that paragraph,

12   background.  Perfect.

13   BY MS. DAY:

14   Q.    Mr. Detkin, can you explain to the jury what this

15   series of e-mails was about?

16   A.    In general, it's regarding, as I mentioned, some

17   visits between an employee of Intellectual Ventures and

18   Motorola, in which we met with Motorola to describe our

19   patent purchasing program.

20            And Motorola responded by saying, that's

21   interesting, and as described, the part you have highlighted

22   here, they sent us a list of over a thousand patents saying,

23   here's some that you might want to consider buying from us.

24   Q.    Let's take a step back for a moment.  And can you

25   explain to the jury the steps that IV takes when it's

Detkin - direct

1   considering buying patents from inventors or from companies?

2   A.    Sure.  We receive a lot of patents that come in

3   through various sources and we filter them down first by

4   technology area to see if it's an area that, broadly

5   speaking, we'd be interested in purchasing, and then we

6   analyze further to see if it's a technology that we think

7   fits our investment roadmap.

8         There are technologies that are worth investing

9   in, technology we don't want to invest in.  And once we find

10  patents within the offering that we think have potential to

11  be valuable, we'll then do our analysis.  We'll say, are

12  these patents well written?  Do they cover an interesting

13  technology?  Do we think that they'll stand up to scrutiny?

14        Typically, we are offered patents in a

15  portfolio.  That is more than one or two, so we don't look

16  at all the patents that we are offered, but we pick the ones

17  that we think are of the most interest.  And we zero in on

18  those and we -- we analyze those to see how strong we think

19  they are.

20  Q.    And if Intellectual Ventures finds value in those

21  patents, it usually acquires them?

22  A.    Well, at that point we negotiate with the folks

23  offering it to see if we could find a deal.

24  Q.    Going back to Motorola, has Intellectual Ventures ever

25  bought any patents from Motorola?

Detkin - direct

1    A.    Yes, we have.  We've done two separate deals with

2    Motorola.  In total, we've bought over a hundred patents.

3    Q.    If we could turn back to the PowerPoint slides,

4    please, and the buy/build/partner slide.

5                Mr. Detkin, can you explain to the jury who are

6    Intellectual Ventures investors?

7    A.    Yes.  We broadly break our inventors down into two

8    classes.  We call them financial and strategic.  Financial

9    investors are typically either institutions or schools,

10   endowments and strategics are companies.

11               Can I give some examples of each?

12   Q.    That would be helpful.

13   A.    So financial investors, we have schools such as my

14   alma mater.  Penn is an investor.  Stanford, Cornell, Johns

15   Hopkins, University of Texas.  Those come to mind off the

16   top of my head.  Institutions such as the Hewlett

17   Foundation.  The GM Pension Fund is an inventors of ours.

18               And, finally, the strategic companies who have

19   invested in us are companies that I'm sure you've all heard

20   of:  Apple, Microsoft, Nokia, Cisco, Verizon, Intel.  Those

21   are the ones that just come to mind.

22   Q.    Why do companies invest in Intellectual Ventures?

23   A.    Well, for reasons most people invest is for a

24   financial return.  Both the strategics and the financial

25   investors are looking for us to return to them more than

Detkin - direct

1    they give to us, and they hope for a lot more than they give

2    to us.

3              In addition, the strategic investors, those

4    companies I mentioned, will receive a license to some or all

5    of the assets that we buy, some or all of the patents that

6    we buy.  What rights they receive is different for each

7    company, but in general they receive a license to some of

8    the those assets.

9    Q.    Does Intellectual Ventures make any products?

10   A.    I don't, we don't.

11   Q.    Then how does Intellectual Ventures make money?

12   A.    Again, as I mentioned, we bring a certain amount of

13   skills, different level of skills to the, to the equation

14   that inventors typically don't have or, in the case of

15   companies, we have resources that they don't have or that

16   they don't want to put into the discussions.

17             So we have contacts and licensing expertise that

18   we are able to provide that the inventors don't have.

19   Q.    Let's shift gears now and talk about Motorola for a

20   moment.

21   A.    Okay.

22   Q.    We're obviously here in court.  Prior to Intellectual

23   Ventures filing this lawsuit, did Intellectual Ventures ever

24   try to license Motorola?

25   A.    Yes, we did.

Detkin - direct

1    Q.    If you could please turn to --

2                MR. BOICE:  Objection, your Honor.  These are

3    pre-suit negotiations covered by NDAs.

4                MS. DAY:  The question was:  Did they ever try

5    to license?

6                THE COURT:  That's going to be -- isn't that --

7    is that something we need to talk about at sidebar.

8                MR. BOICE:  We do, your Honor.

9                THE COURT:  All right.

10               (Sidebar conference held out of the hearing of

11   the jury as follows.)

12               MR. BOICE:  These are pre-suit, pre-suit

13   negotiations with Intellectual Ventures and Motorola are

14   covered by nondisclosure agreements and actually an

15   agreement in this case that they will not be discussed

16   between counsel here.

17               Steve, you may want to elaborate on this.

18               MR. MOORE:  We have a provision in our pretrial

19   order in which IV agreed that they would not get into

20   discussions covered by nondisclosure agreements, which

21   include the discussions about these IV patents pre-suit, and

22   apparently Ms. Day is intending to tread that ground even

23   they agreed not to do it in the pretrial order.

24               MS. DAY:  Your Honor, the question that I just

25   asked is:  Did Intellectual Ventures ever try to license

Detkin - direct

1    Motorola.  The witness said yes.  That's as far as I'm

2    going.  I'm moving on to the notice letter.  I am just

3    trying to lay a foundation for why Intellectual Ventures

4    signed the letter to Motorola.  I am not asking any further

5    questions about prior discussions, NDA, anything.

6              MR. BOICE:  Your Honor, I move to strike that

7    question with the instruction to please disregard it because

8    they're opening the door and leaving us hanging there

9    without having said anything in response.

10             THE COURT:  What was the background supposedly

11   for?

12             MS. DAY:  I'm about to have Mr. Detkin turn to

13   PTX-118, which is the notice letter that was sent to

14   Motorola.

15             THE COURT:  I take it there's no objection to

16   that?

17             MR. BOICE:  We don't have a problem with that.

18             THE COURT:  All right.

19             MR. BOICE:  It's the pre-suit negotiations.

20             MS. DAY:  I'm not asking any questions about

21   pre-suit negotiations.  The jury will not hear another word.

22             THE COURT:  Well, except that you have left a

23   question in their mind.  I'm going to instruct them to

24   disregard that last question and answer.

25                  (End of sidebar conference.)

Detkin - direct

1    BY MS. DAY:

2    Q.    Mr. Detkin --

3              THE COURT:  Just a moment.

4              I was going to instruct you, ladies and

5    gentlemen of the jury, to disregard that last question and

6    answer.

7              You may continue, Ms. Day.

8    BY MS. DAY:

9    Q.    And I believe I was directing your attention to

10   PTX-118 in your binder.

11   A.    Okay.

12   Q.    And do you recognize is that document?

13   A.    Yes.

14   Q.    And what is it?

15   A.    This is a letter that was sent from Intellectual

16   Ventures to Motorola.

17             MS. DAY:  Your Honor, Intellectual Ventures

18   moves PTX-118 into evidence.

19             MR. BOICE:  No objection, your Honor.

20             THE COURT:  Thank you.

21             MS. DAY:  And if we could have PTX-118 on the

22   screen, please.

23   BY MS. DAY:

24   Q.    So, Mr. Detkin, this was the letter that Intellectual

25   Ventures sent Motorola Mobility on October 6, 2011; is that

Detkin - direct

1    right?

2    A.   Yes, that's correct.

3              MS. DAY:  I have no further questions.  Thank

4    you.

5              THE COURT:  Cross-examination.

6              MS. DAY:  Your Honor, if I may have one minute

7    to look at the cross exhibits prior to Mr. Boice commencing

8    the line, some of the discussions we had at the pretrial

9    conference about the scope of the examination of Mr. Detkin?

10             MR. BOICE:  Your Honor, may I approach the

11   witness to hand him across examination binder?

12             THE COURT:  Yes.

13             (Mr. Boice handed a binder to the witness.)

14             MS. DAY:  Your Honor, I believe we're going to

15   have to take up a few issues outside the presence of the

16   jury.

17             THE COURT:  All right.  We'll take an early

18   morning break, members of the jury.  15 minutes.

19             (The jury was excused for a short recess.)

20             THE COURT:  And I will ask the witness to step

21   down and leave the courtroom while we have the discussion.

22             (The witness was excused from the courtroom.)

23             MS. DAY:  So as your Honor may recall, during

24   the pretrial conference we had a discussion about how much

25   Motorola would be permitted to say regarding Intellectual

1    Ventures and its business practice.  You've now heard from

2    Mr. Detkin on direct what we explained, and in the

3    cross-examination binder Motorola has included all of the

4    complaints, the patent litigation complaints from its trial

5    exhibit list.  I have a hunch Mr. Boice is planning to

6    question Mr. Detkin on all of Intellectual Ventures'

7    litigation activities.

8                As you saw from Mr. Boice's opening slides, the

9    theme is Intellectual Ventures buys and licenses or buys and

10   sues.  We don't have an objection to Mr. Boice eliciting

11   from Mr. Detkin that, yes, in fact, Intellectual Ventures

12   files lawsuits, but the number, the number of suits filed,

13   who the defendants are, are totally irrelevant to any issue

14   in this case, and we would object under 402 and 403 grounds

15   to any cross-examination and to the details of any

16   litigation that Intellectual Ventures may have with other

17   companies.

18                THE COURT:  All right.  Mr. Boice?

19                MR. BOICE:  Yes, your Honor.  In the direct

20   examination, Intellectual Ventures elicited that

21   Intellectual Ventures licenses, said nothing at all about

22   the other part of their business, which is suing.

23                What we have is a list of the lawsuits that have

24   been filed to show that not only are the lawsuits filed, but

25   like the inventors in Intellectual Ventures, they've been

1    filed against big companies like Motorola.

2              I do not intend to go into the subject matter of

3    any of those lawsuits.  I simply intend to list the number

4    of them filed, establish when they were filed, because the

5    business model changed from a licensing model to a suing

6    model later on in Intellectual Ventures' history.  I want to

7    establish that fact and I just want to establish the number

8    and generally the type of companies, the size of the

9    companies, but the number is important to show the change in

10   their business model and the level of evidence here.

11             THE COURT:  Well, first of all, I take it you

12   don't mean to admit as exhibits any of these complaints?

13             MR. BOICE:  That's correct.

14             THE COURT:  And, second of all, I take it you

15   understand that the words of a patent, whether it's valid,

16   whether it's infringed, has nothing to do with the

17   plaintiffs' business model and my fear is that I'm going to

18   have to instruct the jury as to that point if we go

19   overboard in suggesting something to the contrary.

20             So I think it is not -- well, it might be fair

21   cross-examination.  Again, I'm not sure it's relevant

22   cross-examination in terms of the detail you get into given

23   what kind of case this is.

24             MR. BOICE:  I understand, your Honor, but right

25   now the jury has heard only that IV licenses patents to

1    companies or to other people.  That's all that they have

2    heard.  And we need to be able to establish that licensing

3    is only part of their business.  They've heard half of the

4    story at this point.

5              THE COURT:  All right.  But, again, I'm just

6    telling you --

7              MR. BOICE:  Yes.

8              THE COURT:  Well, first of all, none of these

9    complaints -- I don't exactly know why they are there unless

10   to refresh someone's recollection.  They certainly are not

11   shown to the jury.  They are certainly not admitted.  And I

12   may well give the jury an instruction, if not now, certainly

13   in the final instructions, that the plaintiffs' business

14   plan has nothing to do with the issues they have to decide,

15   which is infringement and invalidity.

16             MR. BOICE:  I would like to address that at some

17   point before your Honor gives that just from the standpoint,

18   the business plan does have something to do with the

19   credibility because of their financial interest in these

20   lawsuits, and there's an issue there that we ought to

21   address.

22             So I would like to discuss the limiting

23   instruction, if your Honor gets to the point of doing that

24   at some point.

25             THE COURT:  All right.

Detkin - cross

1              MR. BOICE:  But I thoroughly understand what the

2      Court has previously instructed and we do not intend to do

3      more than what I have told you this morning.

4              THE COURT:  All right.  With that understanding,

5      and with both Ms. Day and me listening closely, I will allow

6      you to embark on this.  I think we have maybe eight minutes

7      before I said the jury would come back in, so you take your

8      eight minutes.

9              MR. BOICE:  Thank you, your Honor.

10             (Short recess taken.)

11                         -   -   -

12             (Proceedings resumed after the short recess.)

13             THE COURT:  All right.  Let's bring our jury in.

14             (The jury entered the courtroom and took their

15     seats in the box.)

16             THE COURT:  All right.  You may be seated.

17             Mr. Boice, you may proceed.

18             MR. BOICE:  Thank you, your Honor.

19                      CROSS EXAMINATION

20     BY MR. BOICE:

21     Q.   Mr. Detkin, my name is Bill Boice, as you know.  I'm

22     going to ask you some questions here this morning.

23             MR. BOICE:  Your Honor, may I publish to the

24     jury the first page of the complaint filed in this case?

25     Just a picture?

Detkin - cross

1              MS. DAY:  No objection, your Honor.

2              THE COURT:  All right.  Thank you.

3              MR. BOICE:  Would you pull up the complaint,

4     please.

5     BY MR. BOICE:

6     Q.    Mr. Detkin --

7              MR. BOICE:  And would you enlarge just the

8     caption of the complaint, please.

9     BY MR. BOICE:

10    Q.    Mr. Detkin, the plaintiffs in this lawsuit are two

11    companies, Intellectual Ventures I LLC and Intellectual

12    Ventures II LLC; correct?

13    A.    Yes.

14    Q.    Okay.  And those two companies are companies that are

15    in, that hold assets of Intellectual Ventures for the

16    purpose of filing lawsuits; is that correct?

17    A.    They are affiliates of Intellectual Ventures that hold

18    the assets in this lawsuit, yes.

19    Q.    While the purpose of those entities is to file

20    lawsuits, to hold the assets that are in lawsuits that are

21    filed by Intellectual Ventures; is that correct?

22    A.    I believe that's correct, yes.

23             MR. BOICE:  Okay.  You can take that down.

24    BY MR. BOICE:

25    Q.    Mr. Detkin, would you look at Exhibit Number 268 in

                              Detkin - cross

 1    your binder there.

 2    A.    268?

 3    Q.    Yes.

 4    A.    Is that the one on top?

 5    Q.    No.

 6    A.    Okay.

 7    Q.    It's toward the end.  They're numbered in --

 8    A.    Okay.

 9    Q.    -- in numerical order.

10    A.    It's the last one here.

11    Q.    It's not quite the last one, but it's far back there.

12    A.    Excuse me just a second.

13                (Pause.)

14    BY MR. BOICE:

15    Q.    Before anyone gets nervous, we're not going to go

16    through all of that.

17    A.    I'm nervous myself.  Okay.  Got it.

18    Q.    You've got it?  Are you familiar with that document

19    which describes the structure of Intellectual Ventures?

20    A.    I'm generally familiar with it, yes.

21    Q.    Okay.  That is what it does; isn't that correct?

22    A.    It certainly described it at a point in time.  We are

23    a complex organization.  Sometimes I wouldn't swear that's

24    exactly how we're organized today, but generally it appears

25    correct.

Detkin - cross

```
 1   Q.    Well, at your deposition earlier, well, last year,

 2   now, it was an accurate representation of the structure of

 3   Intellectual Ventures.  I think you said it was a good

 4   representation of it; is that correct?

 5   A.    At the time, that was correct, yes.

 6   Q.    All right?

 7               MR. BOICE:  Your Honor, I'd like to tender

 8   DTX-268.

 9               MS. DAY:  No objection, your Honor.

10               THE COURT:  Thank you.

11               (Defendants' Trial Exhibit No. 268 was admitted

12   into evidence.)

13               MR. BOICE:  Could you put that up there, please.

14   And would you enlarge the top part so we can see it a little

15   bit better here?

16   BY MR. BOICE:

17   Q.    Okay.  Mr. Detkin, the two companies that we just

18   talked about, Intellectual Ventures I LLC and Intellectual

19   Ventures II LLC, I think you'll find on the bottom, left and

20   right hand corners?

21               MR. BOICE:  And would you highlight, would you

22   highlight those?

23   BY MR. BOICE:

24   Q.    Those are the two entities that are the plaintiffs in

25   this case; is that correct?
```

Detkin - cross

1    A.    I believe so, yes.

2    Q.    All right.  And then there's a line going from those

3    two entities up to Invention Investment Fund I LP and

4    Invention Investment Fund II LP?

5              MR. BOICE:  Would you highlight those, please.

6              THE WITNESS:  Fund II is actually an LLC, I

7    believe.

8    BY MR. BOICE:

9    Q.    I'm sorry.  It's an LP for Fund I, an LP for Fund I,

10   limited partner, partnership.  And for Fund II, it's a

11   limited liability company; is that correct?

12   A.    That's correct.

13   Q.    Okay.  And those two entities, though, do the same

14   thing.  They are the entities that fund the investment of

15   patents that then, in this case, were sued on by

16   Intellectual Ventures 1 and II?

17   A.    The -- the Invention Investment Funds I and II are the

18   buy funds that I represented in my earlier buy/build/partner

19   slide, in the earlier slide.  Those are the buy side

20   investments.

21   Q.    Yes.  And my question was:  Those are the two funds

22   that bought the patents that are being asserted by

23   Intellectual Ventures I and II in this case?

24   A.    That's correct, I believe.

25   Q.    And those investment funds, those investment,

Detkin - cross

1    Invention Investment funds, excuse me, those are funds that

2    are funded by various types of investors that you described;

3    is that correct?

4    A.    Yes, that's correct.

5    Q.    All right.  And you described some individuals, but

6    you described some big companies as well; is that correct?

7    A.    I don't believe I mentioned individuals, but, yes, I

8    included big companies.

9    Q.    And there are some individuals, though, aren't there?

10   A.    I don't know if there are individual investors.  I

11   take it back.  I know of at least one individual investor

12   and that's -- that has invested in the IF funds.  That's

13   correct.

14   Q.    Are you an investor in Intellectual Ventures I?

15   A.    Through IV.  I don't think I'm a direct investor.

16   Q.    And how about Mr. Marigold?  Is he an investor in

17   Invention Investment Fund I and II?

18   A.    Indirectly, as am I.  Together we invest through

19   Intellectual Ventures Management, which you see at the top

20   of the chart here.

21   Q.    Okay.  So what you are saying is you use a different

22   entity, but you ultimately are an investor in Investment

23   Invention Fund I and Investment Invention Fund II?

24   A.    Yes.  Indirectly I hold an investment, yes.

25   Q.    So if Intellectual Ventures Companies that are sued

Detkin - cross

1    are successful in this lawsuit, you stand to get a

2    successful financial return on that success?

3    A.    Broadly speaking, that's true.

4    Q.    And the same is true for any of the investors in

5    Invention Investment Funds of, the buy side of your

6    business, the Invention Investment Funds that bought the

7    patents in this case?  If the lawsuit is successful, they

8    get a return?

9    A.    Yes, that's true.

10   Q.    All right.  And the reason those investors invested

11   was to get a return, that is, to get money back if

12   Intellectual Ventures either licensed or is successful in

13   litigation; is that correct?

14   A.    Yes, that's correct.

15   Q.    And their goal is to get more money back than they put

16   in or to get a substantial return on that to make it a good

17   investment; is that correct?

18   A.    Yes.

19   Q.    Okay.  Now, Invention Investment Fund I was formed --

20   let me back up a second.  When was Intellectual Ventures

21   formed?

22   A.    There was an entity formed called Intellectual

23   Ventures back in the 2000 time frame.  I believe that was

24   primarily formed by partners Nathan and Edward.  It had some

25   other activities.  It was not investing in invention the way

Detkin - cross

1    it is today.

2    Q.    All right.

3    A.    The first of our funds was the invention science fund.

4    That's the build fund.  And that came into existence in May

5    of 2003, I believe.  The first Invention Investment Fund,

6    the I IF fund, the first buy fund was a little later that

7    year.  I believe it was September of 2003.

8    Q.    August or September?

9    A.    Might have been August.  I'm sorry.  I don't remember

10   exactly.

11   Q.    All right.  And then Invention Investment Fund II,

12   that was formed in May of 2008; is that correct?

13   A.    That's correct.

14   Q.    Okay.  And the reason you have two investment funds

15   is, you have some investors who invested in the first fund,

16   and you took their money and bought patents with it or

17   patent applications.  And then at some point you had enough,

18   you use up the money in that fund or you had enough people

19   that you closed that fund and started a new fund to do the

20   same thing with more patents; is that correct?

21   A.    That's not exactly right.  The first fund, Invention

22   Investment Fund I, excuse me, has an acquisition period,

23   defined acquisition period that's set out in the documents,

24   which was five years.  And when the five years ended, we

25   then formed a second fund.  They had seen the success we had

Detkin - cross

1  in licensing in the first fund and they joined the second

2  fund.

3  Q.    That's fair.  All I want to establish was, there was a

4  limited amount of time that companies invested in Invention

5  Investment Fund I and then when that time period was up, as

6  you said, five years, then you formed a new fund, a new fund

7  and companies continued to invest in buying assets, in

8  funding the buying of assets, right, Intellectual Ventures

9  in that fund?

10  A.    I don't mean to quibble, but it's at least important

11  to me.  This is my company.  Fund I is still around and

12  people are still investing in it.  It's the acquisition

13  period that ended.

14  Q.    Okay.

15  A.    Not the fund itself.

16  Q.    Okay.  And that's fair.  We ought to be precise about

17  things and that's fine.

18  A.    It's my company.  I care.  I have to be careful.

19  Q.    Let's move on from this, but let me establish one

20  other thing, though.  The patents that are at issue in this

21  lawsuit --

22  A.    Yes?

23  Q.    -- they were bought through the, the two Reisman

24  patents, the '054 and '464 patent, they were bought through

25  Invention Investment Fund I; is that correct?

Detkin - cross

1   A.    Yes.

2   Q.    Okay.  And the Kumar patent, the '462 patent, was

3   bought through Invention Investment Fund II; is that

4   correct?

5   A.    I believe that's correct.  I'm not as confident as I

6   am about the Reisman patent.

7   Q.    Okay.

8   A.    Because I remember the Reisman deal very clearly in my

9   mind.  The Kumar patent I believe was in Fund II, but I have

10  to check some records to compare them.

11  Q.    All right.  And then the investment funds, Invention

12  Investment Fund I, Invention Investment Fund II, those are

13  the only two Intellectual Ventures entities that have, that

14  own the patents that are in suit in this lawsuit; is that

15  correct?

16  A.    That's correct.

17  Q.    Okay.  And they are the only entities up there who

18  have a financial interest in the outcome of this lawsuit?

19  A.    Well, again, our investors through those funds would

20  have an interest, but, again, going to the flow chart as

21  we've already discussed.

22  Q.    All right.  Fine.  Let's talk about a couple of other

23  entities up here that you talked about, and they are up

24  there.

25              The ISF one on the top left, would you highlight

Detkin - cross

1   that.  That is the Invention Science Fund, Mr. Detkin?

2   A.    That's correct.

3   Q.    And that's the fund that you described as part of your

4   build side; is that correct?

5   A.    That's correct.

6   Q.    And that's where you actually higher inventors who

7   invent products and you don't make any products from that,

8   but you either license or you may form some companies to

9   take those products forward; is that correct?

10  A.    I'm sorry.  I'm having a little trouble with your

11  question.  If I could just restate it in my own words?

12  Q.    Sure.

13  A.    They invent things and we take the rights to those

14  inventions and either use that as the basis for a spinoff as

15  we have done with three different companies now --

16  Q.    Okay.

17  A.    -- or we then license them to other companies.

18  Q.    Yes.  You testified to that.  I was just trying to

19  summarize that.

20        And that found now has no interest in the

21  patents in this lawsuit?

22  A.    No, it does not.

23  Q.    All right.  So they don't, they don't -- there are no

24  investors in that.  They don't have any -- they don't have

25  anything to gain out of this lawsuit?

Detkin - cross

1    A.    Well, there are investors in common between the

2    Invention Science Fund and the Invention Investment Funds.

3    Q.    But your build side has no interest in this lawsuit?

4    A.    Broadly speaking, no.

5    Q.    All right.  Let's look on the other side now, your --

6    at the top right hand, the IDF.  And that's the Invention

7    Development Fund?

8    A.    Correct.

9    Q.    Okay.  And that's a global network of inventors who

10   invent in key technology areas?

11   A.    Yes.

12   Q.    It's people you partner with to invent things; is that

13   correct?

14   A.    That's correct.

15   Q.    And that fund also has investors in it, but that fund

16   has no interest in this lawsuit; is that correct?

17   A.    That's correct.

18   Q.    Okay.  So -- and the top entity there, that's --

19             MR. BOICE:  Highlight that, if you would.

20   BY MR. BOICE:

21   Q.    A little difficult to see, but that says Intellectual

22   Ventures Management LLC.

23             That's a company that manages the structure

24   below it?

25   A.    Yes.

1   Q.    Okay.  And you're the managing director of that

2   entity; is that correct?

3   A.    I am one of the managing directors of that entity,

4   yes.

5   Q.    Which means you're the person who controls all the

6   stuff that happens below and you manage it.  Control is

7   probably too strong for you.

8   A.    There are, I believe, five people who hold the title

9   of managing director for that entity and, yes, I'm one of

10  them.

11  Q.    Are the others founders?

12  A.    Four of us are.  One is not.

13  Q.    Okay.  So you've got the four founders and one other

14  person who are managing directors who control this whole

15  structure?

16  A.    We manage the structure and we manage the 800 people

17  who work for us.

18  Q.    Okay?

19          MR. BOICE:  You can take that down.

20          Can you put up Demonstrative Exhibit 2 from the

21  plaintiffs' presentation for Mr. Detkin.

22  BY MR. BOICE:

23  Q.    Now, this is a slide we just saw; is that correct?

24  A.    Yes.

25  Q.    All right.  Where you talked about Intellectual

Detkin - cross

1   Ventures doing -- had a buy side of its business, a build

2   side and a partner side; is that correct?

3   A.    Yes.

4   Q.    The partner side we just established has nothing to do

5   with this lawsuit; is that correct?

6   A.    It does not own any of the patents-in-suit, if that's

7   what you mean.

8   Q.    Well, that's what I mean.

9   A.    Okay.

10  Q.    It doesn't have any interest in the outcome of this

11  lawsuit, it doesn't own any of the patents.  It has nothing

12  to do with this lawsuit, does it?

13  A.    Except it's part of Intellectual Ventures, but I think

14  you are correct, yes.

15  Q.    And let's talk about the build side.  That's Invention

16  Science Fund.  It has nothing to do with this lawsuit

17  either?

18  A.    Subject to the same caveat.  Yes, that is correct.

19  Q.    That's right.  It is do not own the patent, it does

20  not have an interest in them?

21  A.    That's correct.

22  Q.    The final thing is these investment funds, the buy

23  side of this business.  That's all that's involved in this

24  lawsuit?

25  A.    The Invention Investment Funds are the owners of the

Detkin - cross

1    patents-in-suit.  That's correct.

2    Q.    And that's the only, that's the entity that is

3    involved in this lawsuit, not the others that you've talked

4    about?

5    A.    That's correct.

6    Q.    Okay.  Now, the patents that are involved in this

7    lawsuit were actually purchased by Intellectual Ventures; is

8    that correct?

9    A.    They were purchased by the investment, Invention

10   Investment Fund, that's correct.

11   Q.    Okay.  And they were actually purchased through

12   separate limited liability companies for each of the

13   purchases; is that correct?

14   A.    Yes.

15   Q.    Okay.  And limited liability companies, these are

16   companies that are formed to do nothing other than to buy

17   the patents and to hold them; is that correct?

18   A.    These were acquisition entities that were formed for

19   the purpose of acquiring these assets to ensure that any

20   issues that may come with the assets affect other assets.

21   Q.    Okay.  So essentially they were shell companies that

22   you formed for the purpose of buying the patent owning that

23   asset?

24   A.    I don't agree with the phrase shell company.  It's

25   acquisition entity.

1    Q.    Okay.  But it's not doing anything other than holding

2    the patents; is that correct?

3    A.    As I understand, most LLCs hold assets and that's what

4    these LLCs do.

5    Q.    Okay.  And I think you testified that you buy patents

6    from a variety of different places.  And you listed some

7    companies and some individuals.  You also used brokers to

8    buy patents through?

9    A.    I mentioned that we, patents come to us through a

10   number of sources.  Brokers is definitely one of the ways

11   that they come to us.

12   Q.    And you bought patents out of bankruptcies?

13   A.    We have.

14   Q.    And you bought patents in auctions?

15   A.    We have.

16   Q.    And you bought patents on eBay?

17   A.    We have.

18   Q.    Okay.  So wherever you can find a patent to buy, you

19   may buy it?

20   A.    Wherever we find a patent that we want to buy.

21   Q.    All right.  Now, in your direct examination, you

22   talked about the licensing side of Intellectual Ventures'

23   business, but you didn't talk about the lawsuit side of

24   Intellectual Ventures' business.

25             Intellectual Ventures did not file any lawsuits

Detkin - cross

1   against companies for infringing in -- until 2010; isn't

2   that correct?

3   A.    I believe that's correct.  We had done a lot of

4   licensing without lawsuits until that time.

5   Q.    Okay.  So when you formed this investment fund,

6   Invention Investment Fund I in 2003 and you didn't sue

7   anyone 2004, 5, 67, 8, 9, until you got to 2010?

8   A.    We had no need to.  That's correct.

9   Q.    I'm not quibbling.  I'm not arguing with you.  I'm

10  just trying to establish the facts.  Okay?

11  A.    I'm with you.

12  Q.    All right.  And then in 2010, Intellectual Ventures

13  began filing lawsuits and filed three lawsuits in that year;

14  correct?

15              MS. DAY:  Objection.  402, 403.

16              THE COURT:  I believe the line has not been

17  crossed.  The objection is overruled.

18  BY MR. BOICE:

19  Q.    Is that correct?

20  A.    My memory is a little hazy on the dates of those

21  lawsuits.  I remember we did file three at the end of a year

22  and I will accept your representation it was 2010.

23  Q.    Just for the record, you approve all the lawsuits that

24  are approved by Intellectual Ventures, among other people?

25  A.    Yes.  I along with some others approve the lawsuits

Detkin - cross

 1   that are filed.

 2   Q.    Okay.  All right.  And then in 2011, Intellectual

 3   Ventures filed a new lawsuit?

 4   A.    I don't -- we filed additional lawsuits in 2011.  I

 5   don't know how many.

 6   Q.    Okay.  You accept that number as about right.  Sound

 7   right to you or not given your experience?

 8   A.    It's the right order of magnitude.  I'm sorry.  I just

 9   don't remember how many we filed that year.

10   Q.    In 2012, the number of lawsuits went down.  You only

11   filed two lawsuits.  Intellectual Ventures only filed two

12   lawsuits in 2012.  Sound about right?

13   A.    Again, I'm sorry.  I don't catalogue in my mind how

14   many lawsuits we file in any one year, so I really, I just

15   don't remember.

16   Q.    Well, let's, then, get more current in time.

17   A.    Okay.

18   Q.    Last year Intellectual Ventures filed 40 lawsuits; is

19   that correct?

20   A.    Again, I'm sorry.  I don't remember how many we filed

21   last year.

22   Q.    Is that order of magnitude approximately correct?

23   A.    I'm sorry.  I just don't know.  It does not -- it does

24   not necessarily strike me as being tremendously off, but I

25   just don't know how many we filed in 2013.

Detkin - cross

1    Q.    The reason you have a notebook there, Mr. Detkin, is

2    because it has a copy of the front page of the caption of

3    each of those lawsuits that were filed.

4              You can flip through it if you would like, but I

5    will represent to you that there are more than 50 lawsuits

6    in that binder and a number of those lawsuits have multiple

7    parties to them.

8              MS. DAY:  Your Honor, I'd like to renew my

9    objection.  402, 403.

10             THE COURT:  The objection remains overruled.

11   However, I suspect this is where the line would be drawn.

12             MR. BOICE:  I understand.

13   BY MR. BOICE:

14   Q.    Is that correct?

15   A.    I'm sorry.  I didn't -- perhaps you can read back the

16   question?

17   Q.    Yes.  My question was now approximately 40 lawsuits or

18   more than 40 lawsuits were filed by Intellectual Ventures in

19   2013.

20             Does that sound right?

21   A.    Again, I'm sorry.  The number do you understand like

22   it's in the right range.  I just don't know how many we

23   filed in 2013.

24   Q.    That's fine.  That's fine.

25             And you mentioned in your direct that the

Detkin - cross

1    investors in Intellectual Ventures were some big companies.

2    I think you mentioned Microsoft for one and other big

3    companies who invested; is that correct?

4    A.    Yes.  We have roughly over a dozen large companies who

5    have invested.  I believe I mentioned some I can't remember

6    off the top of my mind.

7    Q.    All right.  And am I correct that now there are also

8    some very large companies that have been sued by

9    Intellectual Ventures in the lawsuits that you have there?

10   A.    Yes.

11   Q.    Okay.  And there are some big banks that have been

12   sued?

13   A.    We have sued some banks, that's correct.

14   Q.    There are some camera companies that have been sued?

15   A.    Yes.

16   Q.    There are some other financial institutions that have

17   been sued?

18   A.    Yes.

19   Q.    A number of telecommunication companies, such as, you

20   know, providers of large telecommunications networks have

21   been sued?

22   A.    On the network side, that's correct.

23   Q.    All right.  And those are all large companies,

24   respected companies?

25   A.    I don't know how to answer that question.  Respected

Detkin - cross

1    by whom?

2    Q.    I know.  Without my telling you the names of them, and

3    I don't really want to get all of that into the record right

4    now, you have sued a lot of large respected companies?

5    A.    Again, I'm sorry.  We've sued a lot of, a number of

6    large companies.  We've sued some financial institutions and

7    banks.

8              THE COURT:  And I think the word you're looking

9    for is names that people would recognize, not respected

10   necessarily.

11   BY MR. BOICE:

12   Q.    Okay.  Well-known names?

13             MR. BOICE:  Thank you, your Honor.

14             THE WITNESS:  Thank you, your Honor.

15             I believe there are names that would be

16   familiar.

17   BY MR. BOICE:

18   Q.    Would be very familiar?

19   A.    I don't know how to answer very familiar.

20   Q.    All right.

21             (Pause while counsel conferred.)

22   BY MR. BOICE:

23   Q.    Mr. Detkin, in your direct examination you testified

24   about a sale of some patents by Motorola to Intellectual

25   Ventures; is that correct?

Detkin - cross

1   A.   Yes.

2   Q.   And --

3   A.   Yes.

4   Q.   And I believe you said that -- well, how many did you

5   say were actually sold?  A couple of hundred?

6   A.   It was over a hundred.

7   Q.   Over a hundred?

8   A.   I'm not sure of the exact number.

9   Q.   All right.  And do you know the subject matter of

10  those patents?

11  A.   Yes.  Very broadly, yes.

12  Q.   Very broadly, what was it?

13  A.   One deal, which was a larger deal in terms of number

14  of patents, related to satellite technology.  The second

15  deal was a smaller deal.  It involved communications

16  technology.

17  Q.   All right.  And the larger deal, the satellite

18  technology, that dealt with satellite systems.  Do you know

19  the name of the company that was involved in that?

20  A.   I don't know.

21  Q.   All right.  Do you know whether that business was a

22  business that Motorola was continuing to pursue?

23  A.   I don't know.

24  Q.   Do you know whether any of the patents that

25  Intellectual Ventures bought from Motorola were important in

Detkin - cross

1    any way to Motorola?

2    A.    I have no idea what was important to Motorola.

3    Q.    Okay.  And the sale, or the purchase from Motorola,

4    that actually took place in 2007 or 2008?

5    A.    I'm sorry.  I don't recall the year.

6    Q.    Well, I thought you had testified as to, you had some

7    correspondence on this, and I think you may have -- do you

8    still have the plaintiffs' binder up there?

9    A.    I gave it back to my counsel, if she wouldn't mind.

10              MS. DAY:  May I approach, your Honor?

11              THE COURT:  Yes, you may.

12              (Ms. Day handed a binder to the witness.)

13              THE WITNESS:  Thanks.  Okay.

14   BY MR. BOICE:

15   Q.    I believe you testified to this, that the date of

16   June 25th 2007 was the date of the e-mails that described at

17   least one of these purchases?

18   A.    This is the date of the e-mail describing the

19   correspondence with Motorola about the initial

20   communications in which Intellectual Ventures described the

21   acquisition process and what we were doing, and Motorola

22   conversely responding saying, hey, we're interested.  We

23   think that's interesting.  Here are some assets.

24   Q.    All right.

25   A.    This then would have led to those deals.  I don't know

1    when those deals were or even if those deals involved the

2    same assets that are referred to in this, in this -- in this

3    chain.  These deals tend to be kind of an ongoing process.

4    Patents go in, patents come out, so I don't know where those

5    deals were in terms of the events.

6    Q.    Were you personally involved in that acquisition?

7    A.    I was not.

8    Q.    Okay.  So you don't know what year it was at all?

9    A.    Off the top of my head, I don't.

10   Q.    Well, was it in the last two years?

11   A.    I don't know.

12   Q.    This correspondence is in 2007.  Was it around that

13   time period, about a year or so?

14   A.    I believe it was within a few years after this, so

15   that would exclude the last two years.

16   Q.    Okay.

17   A.    But as between 2007 to 2010, I couldn't pinpoint it

18   more precisely.

19   Q.    All right.  At 2007, of course, Intellectual Ventures

20   had not -- had not started suing companies; is that correct?

21   A.    We had not filed any lawsuits at that time, no.

22   Q.    Or 2008 or 2009?

23   A.    That's correct.

24   Q.    Okay.  And not until 2010; is that correct?

25   A.    Based on our earlier conversation, that sounds like

Detkin - cross

1     it's about right.

2     Q.    Okay.

3     A.    But I just don't have a strong recollection of dates.

4     Q.    All right.  And then you were asked about the, about a

5     notice given on the filing of this lawsuit.

6               Do you recall that?

7     A.    Yes.

8               MR. BOICE:  Can we put up DTX-118.  You read my

9     mind.

10    BY MR. BOICE:

11    Q.    This is what you testified to before about notice

12    given by Intellectual Ventures to Motorola of the lawsuit?

13    A.    It was notice of infringement, yes.

14    Q.    Notice of infringement, not of the lawsuit.  Excuse

15    me.  It was a notice saying, Motorola, you infringe.  It was

16    not a notice saying, we're going to file a lawsuit?

17    A.    It was a notice with respect to the particular patents

18    at issue in this lawsuit.

19    Q.    Okay.  And I want to draw your attention to the date

20    of this notice.

21    A.    Yes.

22    Q.    Which is October 5th --

23              MR. BOICE:  And give me the time, if you would,

24    please.

25    BY MR. BOICE:

Detkin - cross

1   Q.    October the 5th, 2011, at 9:37 p.m. Pacific Daylight

2   Time; is that correct?

3   A.    Yes.

4   Q.    That's actually October the 6th on the East Coast,

5   here in Wilmington where this lawsuit was filed; is that

6   correct?

7   A.    I guess.

8   Q.    Okay.  And that notice is from Mr. Belloli right here

9   copying Ms. Day right here (indicating) of the Feinberg Day

10  firm; is that correct?

11  A.    Yes.

12  Q.    And that, of course, is the law firm that filed this

13  lawsuit; is that correct?

14  A.    Yes.

15  Q.    Okay.  And the purpose of this notice was to give

16  Motorola notice that it -- that there were some patents that

17  Intellectual Ventures believed Motorola might be infringing;

18  is that correct?

19  A.    Well, my understanding, the specific purpose of this

20  letter was a particular process or boxes that needed to be

21  checked with respect to the litigation.  That's correct.

22  Q.    To be able to say that notice was given before the

23  litigation was filed?

24  A.    I don't believe so, but I don't know the exact

25  purpose.  You have to talk to one of the lawyers.

Detkin - cross

1    Q.    All right?

2                MR. BOICE:  Put the complaint back up there, the

3    first page of the complaint in this lawsuit.  Go to the very

4    top, where it shows when the case was filed.  If you can

5    enlarge that.

6    BY MR. BOICE:

7    Q.    This is the case that was filed actually the same day

8    this notice was filed; is that correct?  Notice was a sent;

9    correct?

10   A.    Under your analysis of the time zones, that would be

11   correct.  It's different depending on which time zone you

12   are in, apparently.

13   Q.    Right.  And would it surprise you, we saw before that

14   the notice was sent at 12:03, that this lawsuit was filed

15   at 12:16 in the morning?

16   A.    I don't see that on here.  I don't mean to argue with

17   you.  I just don't know.

18   Q.    All right.  In any event, the lawsuit was filed

19   essentially the same time notice was sent; is that correct?

20   A.    I don't know.

21   Q.    Okay?

22                MR. BOICE:  I have no further questions.  Thank

23   you, your Honor.  I appreciate your patience.

24                THE COURT:  All right.  Any redirect?

25                MS. DAY:  Just one or two questions, your Honor.

Detkin - redirect

1              THE COURT:  All right.

2                     REDIRECT EXAMINATION

3    BY MS. DAY:

4    Q.    Mr. Detkin, other than Motorola, has Intellectual

5    Ventures ever sued any other smartphone company?

6    A.    No.

7    Q.    Why not?

8    A.    Because we've done license deals with every other

9    smartphone company.

10              MR. BOICE:  Objection, your Honor.  If they're

11   going to start getting into who gets licensed, we need to as

12   well and it's part of what we discussed up here before.  We

13   may need to talk again.

14              MS. DAY:  We're not getting into licenses, your

15   Honor.  I wanted to make the point that there are other

16   companies.

17              THE COURT:  Well, we're not having a discussion

18   here.  Finish up and then we'll have a discussion.

19              MS. DAY:  Okay.  I'm finished.  Thank you,

20   Mr. Detkin.

21              THE COURT:  Do we need to have a discussion

22   before the witness leaves the stand?

23              (Pause while counsel conferred.)

24              MR. BOICE:  Your Honor, at this point I think it

25   would be fair to go into the other companies that have been

Detkin - redirect

1    sued, just the names of those companies.

2                    THE COURT:  Well --

3                    MR. BOICE:  We can talk about it first.

4                    THE COURT:  We should take a short sidebar.

5                    (Sidebar conference held out of the hearing of

6    the jury as follows.)

7                    THE COURT:  Clearly -- well, I guess I want to

8    make sure that I understand the question asked and answered.

9    Is that incorrect somehow or other?

10                   MR. BOICE:  It depends on whether you -- how you

11   define who the cellphone companies are.  There are large

12   number of companies, cellphone companies that have licensed,

13   but to say that all of them have as he did would suggest

14   then that everybody that's licensing these patents except

15   for Motorola and to show there are more people out there who

16   are not licensed.  In particular, some very big companies.

17   AT&T also is in the same business of selling cellphones,

18   Sprint, Team Mobile and others.  So right now the jury

19   thinks that we're the only ones out there who have not

20   licensed technology in this area and that's not true.

21                   MS. DAY:  Mr. Detkin will be back later this

22   week to testify about the licenses that your Honor approved

23   our experts can talk about.  I understand Motorola is going

24   to take another run at excluding those.

25                   It sounds like what Mr. Boice is after is a

                          Detkin - redirect

1     subject for cross-examination if Mr. Detkin is permitted to

2     talk about the terms of the license agreements and the

3     companies that are licensed.

4               MR. BOICE:  I would ask a curative instruction

5     at this point to disregard that question and answer at this

6     point.  If not, I need to go into it now while they're

7     thinking about it than let it sit there for a couple of days

8     or more is highly prejudicial.

9               MS. DAY:  Mr. Boice was permitted to ask

10    questions identifying the target defendants, if you will,

11    the telecommunications.  I did not ask him those questions

12    to identify those companies or who specifically licensed.  I

13    think it's on par with him --

14              THE COURT:  Well, except that I'm not sure -- I

15    mean, I don't know whether that is correct or not.  In other

16    words, that all smartphone companies have -- if all

17    smartphone companies have taken a license, that's one thing.

18    If you just simply have not sued, if IV simply hasn't sued

19    any other smartphone companies, I don't know what that

20    means.  And I don't know whether it is a misleading question

21    given all the controversy we've had.  It seems to have

22    opened more problems than solved.

23              So unless -- you know, it would have been nice

24    if we had the door closed.  So can you tell me?  I mean, is

25    it the case that there are companies that make smartphones

Kowalski - designations

1    that simply have not been sued but are not licensed?

2                    MS. DAY:  Yes.  A few small ones.

3                    THE COURT:  Well, then your question was

4    misleading.  I am going to direct them to disregard it.

5                    (End of sidebar conference.)

6                    THE COURT:  Ladies and gentlemen, we're going to

7    excuse this witness.  You are to disregard the last question

8    and answer.

9                    You may step down, sir.  Thank you very much.

10                   (Witness excused.)

11                   MR. BELLOLI:  AS its next witness, Intellectual

12   Ventures is going to call Timothy Kowalski of Motorola by

13   deposition.

14                   He's an intellectual property attorney at

15   Motorola Mobility.  His deposition was taken in February of

16   last year and he'll testify about how Motorola became aware

17   of these patents, including how Motorola was approached by

18   Mr. Kumar regarding Mr. Kumar's patent.

19                   (Videotaped deposition of Timothy Kowalski

20   played as follows.)

21                   "Question:  Can state your full name for the

22   record.

23                   "Answer:  Timothy Michael Kowalski.

24                   "Question:  By whom you employed?

25                   "Answer:  Google, Inc.

Kowalski - designations

1          "Question:  For how long have you been employed

2    by Google?

3              "Answer:  Since September of 2012.

4              "Question:  And what is your title at Google?

5              "Answer:  Senior patent counsel.

6              "Question:  Are you an attorney?

7              "Answer:  I am.

8              "Question:  Prior to September 2012, who were

9    you employed by?

10             "Answer:  Motorola Mobility.

11             "Question:  Okay.  And what was your title at

12   Motorola Mobility at that point?

13             "Answer:  Lead intellectual property counsel.

14             "Question:  And I will simply be asking when

15   Motorola first became aware of these.

16             "Answer:  Exhibit 6, the '462 patent, we became

17   aware of this in October of 2010.

18             "Question:  Why October 2010?

19             THE WITNESS:  October 2010 was the date that

20   Motorola first became aware of that patent.

21             "Mr. Feinberg:  Yes

22             "Question:  All right.  I want to make sure that

23   you and I are on the same page.

24             "You testified to the other patents that it was

25   October of 2011 when the complaint was served?

Kowalski - designations

1                "Answer:  Correct.

2                "Question:  Of the this is a year earlier?

3                "Answer:  Yes.

4                "Question:  How did you become aware of that

5     patent?

6                "The Witness:  That patent was presented to

7     Motorola or Motorola Mobility by its then owner of an

8     acquisition opportunity, so it was for sale and it was being

9     marketed.

10               "Mr. Feinberg:

11               "Question:  Okay.  We'll come back to that.

12    That is exhibit -- which one now?

13               "Answer:  Six.  And, again, that's the '462

14    patent.

15               "And then, finally, Exhibit 7, which is the '464

16    patent, we became -- or Motorola Mobility became aware of

17    that, you know, upon the filing of lawsuit in October of

18    2011.

19               "Mr. Feinberg:

20               "Question:  And then 1, Exhibit 6, the '462

21    patent, Motorola became aware of in October 2010?

22               "Answer:  Correct.

23               "Question:  Can you -- how did Motorola become

24    aware of Exhibit 6, the '462 patent in October 2010?

25               "Answer:  Its then owner was marketing the

Kowalski - designations

1    patent for sale, and we became aware of it, you know,

2    through the -- through either the owner or I don't know

3    whether -- I didn't have -- I wasn't -- I didn't have -- I

4    wasn't the individual having interaction with the person

5    selling the patent.  But it was either part or the owners'

6    or their brokers', I suppose, marketing efforts.

7              "Question:  Did you have any discussions,

8    e-mail, telephonic, or in person with Mr. Kumar?

9              "Answer:  Yeah, no, repeating my earlier

10   testimony, I didn't have any personal interaction with

11   whoever it was that was trying to sell that patent.

12             "Question:  How did you become aware that the

13   patent was for sale?

14             "Answer:  Because I was the lead IP attorney for

15   Motorola Mobility, and Motorola Mobility employees come to

16   me with IP matters.

17             "Question:  The only patent you can recall

18   looking at in October 2010 for possible acquisition by

19   Motorola was the '462 patent; right?

20             "Answer:  Correct.

21             "Question:  I take it that Motorola did not

22   ultimately purchase the '462 patent; correct?

23             "Answer:  That's my understanding."

24             (End of videotaped deposition.)

25             MR. BELLOLI:  All right.  Now, the next witness

1    you're going to hear from is Ficus Kirkpatrick and he's a

2    software engineer at Google, and he was deposed also in

3    March of 2013 and he's going to testify a little bit about

4    Google Play.

5              (Videotaped deposition of Ficus Kirkpatrick

6    played as follows.)

7              "Question:  Would you please state your name for

8    the record?

9              "Answer.  Sure.  Ficus Kirkpatrick.

10             "Question:  So are you currently employed?

11             "Answer:  Yes.

12             "Question:  Where?

13             "Answer:  Google.

14             "Question:  What is your current title?

15             "Answer:  Software engineer.

16             "Question:  How long have you been a software

17   engineer at Google?

18             "Answer:  About seven-and-a-half years.

19             "Question:  Okay.  Is it true that Google Play

20   includes both client software and server software?

21             "Answer:  Yes.

22             "Question:  What is the benefit to a user to be

23   able to download apps?

24             THE WITNESS:  I can't tell if you're asking what

25   the benefit of apps is.  Is that what you're asking?

Kirkpatrick - designations

1          "Mr. Thompson:  Yeah, what is the benefit of the

2     app environment to a user?

3          "Answer:  Well, in my opinion, the benefit of an

4     app is that it allows you to extend the capabilities of your

5     device or computer.

6          "Question:  Can you think of a modern smartphone

7     that doesn't have the ability to download apps?

8          "The Witness:  Not any market leading thing that

9     I'm aware of.

10          "By Mr. Thompson:

11          "Question:  So is it fair to say that, at least

12     from your perspective, to compete in the smartphone market

13     it's important to have an app environment?

14          "The Witness:  I think that every computing

15     device for the last 20 or 30 years has had this ability and

16     is table stakes for any computing device.

17          "Question:  So in 2012, for example, how many

18     apps would you estimate were downloaded through Google Play?

19          "Answer:  That's kind of tough to answer.  I

20     actually differentiate between an app and the download of an

21     app binary.  So I would say we served something in the low

22     tens of billions.

23          "Question:  Of what?

24          "Answer:  Of binary downloads.

25          "Question:  And how many of those were related

Kirkpatrick - designations

1    to U.S. downloads?

2                "Answer:  I don't know.

3                "Question:  Once the app developer has completed

4    the creation of the app, what steps does the developer go

5    through to make it available on Google Play?

6                "The Witness:  They -- assuming they have a

7    ready to go binary that they want to make available in our

8    store, they would sign into the Google Play developer

9    console, sign up for an account if they don't have one.

10   They have to pay a registration fee if they don't have an

11   account already.  And they can upload their app to our

12   website, enter some information for the store listing like a

13   description, title, optionally upload screen shots and then

14   they publish.

15               "Mr. Thompson:

16               "Question:  What do you mean by 'publish'?

17               "Answer:  There's a button that they can click

18   on.

19               "Question:  What happens after the app developer

20   pushes the publish button?

21               "Answer:  The app becomes available on our

22   store.

23               "Question:  Is one of the uses that the

24   PackageInfo class -- let me start again.

25               Is one of the uses for the PackageInfo class to

1    create a client list of installed apps?

2                "Answer:  No, I wouldn't describe it that way.

3                "Question:  I might have left off too much in

4    the sentence.

5                Does Finsky use the PackageInfo class?

6                "Answer:  Yes.

7                "Question:  Very generally, I know, how does

8    Finsky use it?

9                "Answer:  We use it in a variety of ways.

10               "Question:  What ways, if any, relate to

11   tracking installed packages on devices for users?

12               "Answer:  We ask the package manager for all the

13   installed packages which come back as a list of

14   PackageInfos, and we consult the PackageInfos to get the

15   information.

16               "Question:  Does Finsky use the PackageInfo

17   instances to determine whether an update is available of an

18   app on a device?

19               "Answer:  Yes, that's one of the things we can

20   solve.

21               "Question:  Okay.  And does Google Play -- does

22   the Finsky client use the list of packages installed on the

23   client?

24               "Answer:  Yes.

25               "Question:  To do what?

1              "Answer:  To evaluate what's currently

2       installed.

3              "Question:  Is the list of PackageInfo used to

4       display the applications that have been installed on a

5       device?

6              "Answer:  Yes.

7              "Question:  Are you familiar with the computer

8       source code that implements Google Play?

9              "Answer:  Yes.

10             "Question:  Does your familiarity include not

11      just the server, but also the client software?

12             "Answer:  Yes.

13             "Question:  And as part of your

14      responsibilities, do you write code for Google Play?

15             "Answer:  Yes."

16             (End of videotaped deposition.)

17             MR. BELLOLI:  The next witness, also by

18      deposition, is Rajesh Rudrardyha, who is a director of

19      software engineering at Motorola.

20             His deposition was taken in April of 2013 and he

21      will also be talking about Google Play and Motorola's use of

22      Google Play in its smart phones.

23             (Videotaped deposition of Rajesh Rudrardyha

24      played as follows.)

25             "Question:  Can you please state your full name

 1    for the record?

 2               "Answer:  It's Rajesh Rudrardyha.

 3               "Question:  And can you -- Mr. Rudrardyha, are

 4    you currently employed?

 5               "Answer:  Yes.

 6               "Question:  Who by?

 7               "Answer:  By Motorola Mobility.

 8               "Question:  Mr. Rudrardyha, what is your present

 9    title at Motorola Mobility?

10               "Answer:  Director of Software Engineering.

11               "Question:  Are you basically the top manager at

12    the applications and experiences group?

13               "Answer:  Yes.

14               "Question:  What are your primary

15    responsibilities as the director of software engineering at

16    the applications and experiences group?

17               "Answer:  It's primarily to ship applications

18    that Motorola develops and also to ship the applications

19    that we receive from Android.

20               "Question:  Are you familiar with the term GM S

21    applications as it relates to applications that Motorola

22    receives from Google?

23               "Answer:  Yes.

24               "Question:  And what is your understanding of

25    that term?

1          "Answer:  It's a short form for Google Mobile

2     Services.

3          "Question:  And is it correct that GMS

4     applications is a package of different applications that

5     Google supplies to Motorola for installation on Motorola's

6     devices?

7          "Answer:  That's correct.

8          "Question:  And is it correct that Motorola, in

9     fact, installs applications included in the Google Mobile

10    Services package on the Android-based phones that it sells

11    in the United States?

12         "Answer:  That's correct.  There's two classes

13    of GMS apps.  We only preload the mandatory ones.

14         "Question:  What are the GMS mandatory

15    applications that Google supplies to Motorola and that

16    Motorola installs on the Android-based devices that it sells

17    in the United States?

18         "Answer:  So there's about 15 of them, and I

19    don't recollect all of them.  But I can go off the major

20    ones.  So Chrome, which is a browser application, is one of

21    them.  There's You Tube.  There's G-Mail.  There's the Music

22    App.  There's the Play Store App and a few others.

23         "Question:  The Play Store App that you

24    referenced, is that also known as Google Play?

25         "Answer:  That's correct.

```
 1              "Question:  And was that previously known as

 2    Android Market?

 3              "Answer:  That's correct.

 4              "Question:  Was there ever a time when Motorola

 5    did not install on all of its devices for sale in the United

 6    States based on the Android platform either Android Market

 7    or the Google Play store?

 8              "Answer:  No.

 9              "Question:  Has -- just to close the loop on

10    this line of questions, has Motorola ever sold in the United

11    States an Android-based phone that did not include Google

12    Play or its predecessor, Android Market?

13              "Answer:  I don't think so.

14              "Question:  And with respect to what it means

15    for an application to be preloaded, can you explain what

16    that means?

17              "Answer:  Preloaded is something that we would

18    put as part of the software out of the box.

19              "Question:  The marketing initiative that you

20    discussed with Mr. Hadden, is that still ongoing?

21              "Answer:  I don't think so.

22              "Question:  Do you know when it ended?

23              "Answer:  This was, I'm trying to -- this was

24    September of last year.  It was probably 60 to 90 days, but

25    I'm not sure when it specifically ended, but it was for a
```

Rudrardyha - designations

1    short duration.

2              "Question:  So in this marketing initiative,

3    Motorola was offering its customers a $50 credit to be used

4    on Google Play store; is that correct?

5              "Answer:  If they upgraded from one of our older

6    devices to a newer device.

7              "Question:  So if a customer of Motorola is

8    upgraded from an older Motorola phone to a newer Motorola

9    phone, Motorola was offering a customer a $50 credit to be

10   used on the Google Play store application; correct?

11             "Answer:  Yes.

12             "Question:  Can you explain a little more just

13   at a basic level what a profile, what you mean by a profile

14   on Google Plus?

15             "Answer:  So Motorola Mobility has a Google Plus

16   page where we generally introduced our new products and

17   provide tips and tricks to consumers.  As a consumer, you

18   can follow the page to stay connected with the latest

19   happenings at Motorola.

20             "Question:  And what is Google place at a high

21   level?

22             "Answer:  Google Plus is a social networking

23   site similar to Facebook.

24             "Question:  And you mentioned that on this

25   profile page that Motorola maintains on Google Plus, there

Rudrardyha - designations

1   are a few items related to the Google Play Store.  Do you

2   recall that?

3                "Answer:  Yes.

4                "Question:  Can you describe what these items

5   are?

6                "Answer:  There's certain -- there's certain

7   weeks whereas part of advertising a device, we have certain

8   branding that says this phone comes with the Google Play

9   store.  So it's an icon of the Play Store along with any

10   mention of the device, is what it is.

11                "Question:  So on this page as part of the

12   Motorola's marketing campaign, Motorola would display a

13   photograph of its device side by side with the application

14   icon for the Google Play store; is that correct?

15                "Answer:  Yes, that's true.

16                "Question:  So let's pick it up from there.  So

17   Ms. Tsyumera has stored the new GMS package on the internal

18   Google-related website maintained by Motorola.  What happens

19   next?

20                "Answer:  So my team would download the package.

21   We would install it on one of our reference devices.  We

22   would run some tests to make sure that it functions

23   correctly on our device.  And then we would make that

24   available as part of our source code build process by which

25   the packages can be picked up.

Rudrardyha - designations

1     "Question: What testing is performed as part of

2     this reference device testing that you do?

3     "Answer: So we have about 20 test cases that

4     basically, that's all the apps that we install. It's mostly

5     functional tests to make sure that they function like they

6     should. That's about it.

7     "Question: Is it correct that some of these

8     tests relate to the Google Play store application?

9     "Answer: Yes.

10    "Question: What tests do you perform on the

11    Google Play store application as part of this reference

12    device testing?

13    "Answer: So as part of the -- Google also

14    provides a test suite called the GMS test suite. It's

15    called GTS. As part of Play Store validation, we have to

16    verify two things. One is they have terms of service that

17    comes up as soon as you launch the app. We need to ensure

18    that it is -- it's available and the links are functional in

19    there. That's one part of the test.

20    "And we have a few other tests that we deal with

21    downloading an application, installing an application, and

22    un-installing an application.

23    "Question: And can you describe how the tests

24    that you performed at this reference device testing stage,

25    how those are carried out, the tests with respect to

Rudrardyha - designations

1    downloading an app from the Google Play store, installing

2    it, and un-installing it?

3            "Answer:  So typically, sign in with the Google

4    account.  And you'll find an app on the Play Store.  You

5    would go about the process of downloading it.  The

6    installation is automatic.  And once you have installed the

7    app, you find the app from your app tray.  And then you

8    install it.

9            "Question:  So sometimes you would run these

10   tests over a WiFi network, and sometimes the phone would be

11   on a cellular network?

12           "Answer:  Right.

13           "Question:  And just so I get in my head how the

14   test is carried out, the test involves a Motorola engineer

15   actually opening the Google Play application on the phone;

16   correct?

17           "Answer:  That's correct.

18           "Question:  And then once they open that, they

19   sign in to the application with the -- with their Google

20   account; is that correct?

21           "Answer:  That's correct.

22           "Question:  And once they do that, there's a

23   listing of applications that they see?

24           "Answer:  That's correct.

25           "Question:  And then they would pick some

Rudrardyha - designations

 1    applications for downloading?

 2                "Answer:  Yes.

 3                "Question:  Where is this testing performed?

 4                "Answer:  It's performed in Sunnyvale.

 5                "Question:  So it's performed in California?

 6                "Answer:  That's correct.

 7                "Question:  If the -- another type of test that

 8    you referenced was application updating.  Do you recall

 9    that?

10                "Answer:  Yes.

11                "Question:  Okay.  How are those tests carried

12    out?

13                "Answer:  So as part of the GMS package, we put

14    Google maps as one of the applications.  And typically,

15    there's newer updates on the Play Store from the time they

16    release the GMS package.  So that's one app that we

17    generally -- again, there's no set criteria, but, you know,

18    from experience, there's always an update out on that app.

19    And they try to update that app as part of the testing.

20                "Question:  If there -- let's say, like you

21    said, five to ten apps are downloaded during this testing

22    process and more than one of them is indicated as having an

23    available update.  Would the testing involve updating all of

24    the applications that are indicated as having available

25    updates?

1          "Answer:  I don't necessarily recollect the

2     exact step in there, but we generally try to obtain at least

3     one or two apps before we check off the update test case.

4          "Question:  Are you aware one way or the other

5     as to testing, this kind of testing involving more than one

6     application being updated?

7          "Answer:  Yes.

8          "Question:  So sometimes that happens?

9          "Answer:  Yes.

10         "Question:  And are you aware of how the

11    applications for which updates are available are presented

12    within Google Play during that kind of testing?

13         "Answer:  Again, there's no set way to go about

14    this.  The typical way would be that you would search for

15    the app on marketplace since you know what you're trying to

16    update.  And then you would go in there and you would have

17    the option to update the app.  And that's typically one way

18    to do it.

19         The other way to do it would be on the Play

20    Store, you have an option to find all the apps that are

21    installed on your particular device.  And you could find

22    your app in there.  And you would still be choosing the

23    update option.  So those are typically two ways of getting

24    to do the update.

25         "Question:  So we've discussed two types of

474

Rudrardyha - designations

1    tests that Motorola performs using Google-supplied test

2    suites as part of the build validation process, correct?

3                "Answer:  Yes.

4                "Question:  Where are those tests performed?

5                "Answer:  Sunnyvale.

6                "Question:  Okay.  So let's say that Motorola is

7    about to introduce a new device that's going to go to

8    Verizon and AT&T.  For this testing, Motorola would take an

9    AT&T-bound phone and a Verizon-bound phone and test Google

10   Play functionality on them?

11               "Answer:  Yes.

12               "Question:  So Motorola Mobility is telling its

13   customers here to celebrate 25 billion downloads from Google

14   Play; is that correct?

15               "Answer:  Yes.

16               "Question:  And why is Motorola Mobility telling

17   its customers that?

18               "Answer:  I'm trying to recollect something

19   from -- I think the -- Google was trying to promote the

20   number of downloads that were occurring from their Play

21   Store.  So when they reference the 25 billion downloads,

22   that is from the Google Play store.  I'm not sure if this

23   is -- the apps for 25 cents, I believe that was just a

24   thing that Google was doing that is mentioned on our website

25   here.

Rudrardyha - designations

1          "I'm not entirely sure that we were offering --

2     by 'we,' I mean Motorola Mobility was offering apps for 25

3     cents.  What I recollect of this is that Google was running

4     this 25 cents promotion as part of their 25 billion

5     downloads from the Play Store.  And it means that Motorola

6     has passed on that message to existing consumers here.

7          "Question:  I'm just talking specifically about

8     the kinds of testing that Motorola engineers perform with

9     respect to Google Play application where applications are

10    downloaded or updated, you run the testing.

11         "Those, the instances of those types of

12    downloads, whether an application or an update, would run

13    into the thousands; correct?

14         "Answer:  Over a period of 2004 years, yes.

15         "Question:  I've placed in front of you what's

16    been marked as Exhibit 12.  If you take a moment to look

17    over this document, let me know if you recognize it as --

18    well, let me know if you recognize it.

19         "Answer:  I haven't personally seen this, but

20    this appears to be the user guide.

21         "Question:  And this appears to be a user guide

22    to the Motorola Electrify M phone; is that correct?

23         "Answer:  Correct.

24         "Question:  And this document was prepared by

25    Motorola Mobility; is that correct?

Rudrardyha - designations

1                "Answer:  Yes.

2                "Question:  And the intended audience for this

3      document were the purchasers of the Electrify M phone;

4      correct?

5                "Answer:  Yes.

6                "Question:  Yes.  The intended purpose of this

7      document is to teach the purchasers of users of the

8      Electrify M phone about the features and functionality of

9      the phone; correct?

10               "Answer:  Yes.

11               "Question:  Very good.  Now, do you see a

12     section on this page titled download apps?

13               "Answer:  Yes.

14               "Question:  And the purpose of this section is

15     to teach the users how to use the Google Play application to

16     download apps; correct?

17               "Answer:  Yes, in the context of an Android

18     device.

19               "Question:  In the download apps section of this

20     user guide, do you see any reference to downloading apps

21     from any app store other than Google Play?

22               "Answer:  Sure.  It's in the next section.

23               "Question:  Okay.  So there's a separate section

24     titled apps from the Web, correct?

25               "Answer:  Yes.

Rudrardyha - designations

1            "Question:  The first section that follows the

2    general heading 'download apps' is dedicated to Google Play;

3    correct?

4            "Answer:  Sure.

5            "Question:  And is it fair to conclude that

6    Google Play is the preferred way of downloading applications

7    and updates that Motorola wants its users to use?

8            "Answer:  I'm not drawing the conclusion by

9    reading what's in there.  The main reason I state that is

10   because the material around there is generic to Google Play

11   being available to Android devices.  And it also references

12   how you can get to it from the -- from the Web, from your

13   computer, from another non-Android device.

14           "Question:  Yes.  Setting aside the mention of

15   the Web, the bulk of the section titled Google Play under

16   the heading download apps in Exhibit 12 is teaching the user

17   how to use the Google Play Store supplied on the phone to

18   download applications; correct?

19           "Answer:  The Google Play supplied on an Android

20   phone, yes.

21           "Question:  Supplied on a Motorola phone,

22   correct?

23           "Answer:  This does not make the distinction

24   that it has to be a Motorola phone.

25           "Question:  Okay.

Rudrardyha - designations

1          "Answer:  And the key reason being you can

2      access that from any Android device or the Web.  And that's

3      the aspect that comes out in this section here."

4                  (End of videotaped deposition.)

5                  MR. BELLOLI:  Okay.  And in the last part of

6      that video there was an exhibit being shown to the witness

7      and that is PTX-355.  If we could put that up on the screen.

8                  THE COURT:  I take it there's no objection to

9      it?

10                 MR. BELLOLI:  No.

11                 MR. MOORE:  No objection.  Thank you, your

12     Honor.

13                 THE COURT:  All right.

14                 MR. BELLOLI:  Okay.  And then the final witness

15     that we're going to play for you by deposition is a

16     gentleman named Alvin Von Ruff.  He's a senior director of

17     platform engineering for Motorola and he was deposed in

18     April of 2013, and he'll be talking about Google Play and

19     how you can download and update applications through Google

20     Play.

21                 (Videotaped deposition of Alvin Von Ruff played

22     as follows.)

23                 "Question:  You're an employee of Motorola

24     Mobility; is that right?

25                 "Answer:  I am.

1          "Question:  How long is it that you've been with

2     Motorola?

3          "Answer:  23 years.

4          "Question:  Does Motorola test its phones before

5     submitting them to the FCC to know beforehand whether they,

6     whether you believe the phone will pass those FCC tests?

7          "Answer:  That's a very general question.  I'd

8     have to say yes.

9          "Question:  Okay.  Where does the testing take

10    place?

11         "Answer:  It would take place at Motorola.

12         "Question:  Is that Motorola in Libertyville?

13         "Answer:  Yes.

14         "Question:  Where are most of those U.S.

15    employees of the manufacturing arm?  Where are they based?

16         "Answer:  I would say Libertyville where we have

17    a small manufacturing capability and in Fort Worth, where we

18    have the distribution center.

19         "Question:  So there are different ways that a

20    third party application can get on to a phone, as you just

21    said.  Is there some benefit as to -- you think to the

22    consumer to getting an app from the Google Play store versus

23    other ways that they used to get applications on their phone

24    ?

25         "Answer:  Yes.

Von Ruff - designations

1          "Question:  What's the benefit of using the

2    Google Play Store?

3          "Answer:  Most -- most of the software delivered

4    on the devices are just in time, and in many cases the

5    version of the app that we have at launch is not necessarily

6    in its most mature state.  So it would be beneficial for the

7    user to get a fresher version of it if they're picking up

8    the device a quarter or two quarters later.

9          "Question:  So the Google Play Store is the way

10   to get the most current, up to date version of a particular

11   application?

12         "Answer:  Yes.

13         "Question:  Generally, what would you say is the

14   benefit of using an application for a user?

15         "Answer:  Well, I mean, that's the whole point

16   of the smartphone, is to basically deliver applications to

17   the user.  Each one of those is going to give the user some

18   unique experience or access to some resource that's only

19   available through that application.

20         "So if you -- if you enjoy Facebook at home, the

21   only way to get to Facebook is through the Facebook app.  If

22   you use G-Mail at home, the only way to get to G-Mail is

23   through the G-Mail app.  So the apps give you some very

24   focused experience that you can't otherwise obtain.

25         "Question:  Different software applications are

Von Ruff - designations

1    in general, it's not a -- they're not a new thing.  In the

2    past you could get applications directly from the company

3    that distributed the applications; is that right?

4                   "Answer:  This is true.

5                   "Question:  But --

6                   "Answer:  In a desktop environment.

7                   "Question:  In a desktop.  How about in a phone?

8    Could you do that in the past to go directly to the maker of

9    a software app and get it?

10                  "Answer:  I would say in general, no.  There are

11   exceptions, but in general, no.

12                  "Question:  In general it was -- at least it was

13   difficult?

14                  "Answer:  Yes.

15                  "Question:  Okay.  But now through Google Play,

16   it's a -- there's one stop to get your applications; is that

17   right?

18                  "Answer:  That's correct.

19                  "Question:  Earlier we were talking about

20   smartphones and applications or apps.  Do all Motorola

21   smartphones have the ability to download apps?

22                  "Answer:  From the Play Store, yes, all Motorola

23   Android phones.

24                  "Question:  Right.  Would you say most users get

25   the third party apps that they use -- their Motorola Android

Von Ruff - designations

1    phones that's through Google Play?

2              "Answer:  I would say yes.

3              "Question:  So then would it be correct that all

4    Android phone manufacturers provide access to Google Play on

5    their phones?

6              "Answer:  I would say Android smartphone almost

7    certainly has access to Google Play.

8              "Question:  I'd like to mark the next exhibit,

9    please.

10             "(Exhibit 5 marked as requested.)

11             "Question:  This exhibit has a page number

12   MMI-IV000534.  At the bottom and continues on until page

13   MMI-IV0005619.  Do you recognize this as a Motorola

14   document?

15             "Answer:  I do.

16             "Question:  What is this document?

17             "Answer:  Appears to be the user's guide for the

18   Atrix 4G.

19             "Question:  If I could draw your attention,

20   please, to Page 14 out of 86.  This document has a page

21   number MMI-IV0005547 the bottom.  Do you see on the

22   right-hand side where it says apps?

23             "Answer:  I do.

24             "Question:  Is this instructions then on how to

25   download apps like we were talking about earlier for things

Von Ruff - designations

1    like Facebook or Twitter?

2              "Answer:  Correct.

3              "Question:  If you could turn to the next page,

4    please.  The left-hand side there it says:  Tip, choose your

5    apps and updates carefully from trusted sites like Market.

6    Some may impact your phone's performance.  See, choose

7    carefully on page 15.

8              That market, that's what we discussed earlier,

9    that's -- used to be called market, but that's now called

10   the Google Play Store?

11             "Answer:  Yes.

12             "Question:  It says:  To read about or download

13   an app in market, touch it, and basically then tells you how

14   to download an app from the Google Play Store using Atrix 4G

15   phone; is that right?

16             "Answer:  Correct.

17             "Question:  Do you know once you've installed

18   one of these apps on your phone, were those -- would those

19   apps be updated automatically by the phone?

20             "Answer:  Only if you select it in settings to

21   automatically update the app.  Otherwise, you will get a

22   notification that a new version of the app is available.

23             "Question:  Then once you get that notification,

24   how does a user -- do you click on it or what steps do you

25   take then after that to --

1       "Answer:  So what will happen is when you unlock

2    the phone, you'll be presented with a pop up, or you will

3    have notification bar at the top with like an exclamation

4    point, which you can pull down.

5           Currently, they have like -- Google Play has a

6    little icon with an arrow pointing to the right.  So that

7    would come up in your notifications.  It would say you have

8    five apps that could be upgraded.  If you want, you could

9    just click that right now, and it would go ahead and take

10   you to Google Play, in which case then you could either

11   individually or en mass download everything that had a new

12   upgraded version.

13          "Question:  Sorry.  I guess I'm -- I was just

14   trying to follow this different steps that you said.  It was

15   a little fast for me to follow.  If you want to -- you can

16   either do it -- set your phone to update the apps

17   automatically or there are some -- there's a different way

18   where you have to instruct it to update, right?

19          "Answer:  The very first time that you get your

20   phone, some of your apps will almost certainly be out of

21   date, and you will get a notification saying the following

22   2011 apps have been updated in the Play Store.  Then you go

23   to the Play Store, and it will show all 2011 items in a

24   list.

25          "And you can select download all now, and it

Von Ruff - designations

1    also has checkboxes if you would like to automatically

2    update that particular application.  I don't think there's

3    one to update all applications all the time.

4              "Question:  Thank you.

5              "We talked about some testing earlier.  I think

6    we talked about some field testing.

7              "Does Motorola also perform interoperability

8    testing?

9              "Answer:  Interoperability with what?

10             "Question:  With different carrier

11   infrastructures.

12             "Answer:  Yes.

13             "Question:  And could you describe some of that

14   testing for us?

15             "Answer:  An operator will have in very specific

16   locations one infrastructure vendor or another, and they

17   will direct us to go to a specific location and run through

18   a test plan of their design.

19             "Question:  The test plan could differ in

20   different locations; is that right?

21             "Answer:  I don't think so.  I think it would be

22   the same test plan for that particular operator.

23             "Question:  Okay.  And would each different

24   phone have to undergo that kind of conformance testing?

25             "Answer:  Each model?

1          "Question:  I'm sorry.  Would each model of the

2     phones have to undergo that kind of interoperability

3     testing?

4          "Answer:  Yes.

5          "Question:  Who performs that testing?

6          "Answer:  There's a field test organization.

7          "Question:  Is that field test organization part

8     of Motorola?

9          "Answer:  Yes.

10         "Question:  Where are they based out of?

11         "Answer:  Libertyville.

12         "Question:  We were talking about Google Play,

13     also known as the Android Market before.  Have you used the

14     Google Play feature on Motorola phone?

15         "Answer:  Yes.

16         "Question:  Were any of those phones supported

17     by carriers other than Verizon?

18         "Answer:  Yes.

19         "Question:  How about AT&T?  Did you use the

20     Google Play Store on a phone that had AT&T as a carrier?

21         "Answer:  Yes.

22         "Question:  Through your interactions with

23     Google Play, where the server provided data to the handset,

24     after that was software loaded onto the handset as part of

25     that -- or as a result of any of that interaction?

Von Ruff - designations

1        "Answer:  Again, the only -- the only way I can

2    see software coming down would be if you selected an app and

3    said install.

4        "Question:  Have you selected any apps and

5    installed them through Google Play?

6        "Answer:  Yes.

7        "Question:  Can you name some examples of some

8    of the applications that you've downloaded to your phone?

9        "Answer:  Tune In, IMDB.

10       "Question:  Anything else?

11       "Answer:  Lots of them actually.  I test a lot

12   of the apps to make sure that they run.

13       "Question:  Is that part of your

14   responsibilities to test the apps to make sure that they

15   run?

16       "Answer:  That's part of my responsibility as a

17   user trial participant.

18       "Question:  Okay.  How do you -- could you

19   describe these user trials?  Are certain Motorola

20   employees -- take part and others don't, or do you volunteer

21   for it?  How do you become part of the user trial group?

22       "Answer:  Typically, it's through a volunteer

23   and then however many devices are available.

24       "Question:  Does the user trial group -- is that

25   mainly Motorola employees that are part of the user trial

Von Ruff - designations

1      group, or does it also include outside personnel?

2                "Answer:  It's mainly Motorola employees.

3                "Question:  We talked a little bit earlier about

4      the provisioning and the updating of apps.  Is there a

5      screen that includes a directory indicating if an update is

6      available for an app?

7                "Answer:  Yes.

8                "Question:  Does it also indicate or provide any

9      indication if there is an update available whether that

10     update has been installed or not?

11               "Answer:  It only tells you that there's an

12     update available.

13               "Question:  So if I understand it right, if

14     you're running the most crept version of the app, then there

15     would be no need to have an indication that there is an

16     update available; is that right?

17               "Answer:  Correct.

18               "Question:  And if a user selects an update or

19     to have an update made, does the handset send a

20     communication to the Google Play server indicating that?

21               "Answer:  Trivially, yes, but it's actually the

22     Google Play Store app making that recommendation, making

23     that request.

24               "Question:  Just so I understand, the Google

25     Play app is running as an application on the Android

Von Ruff - designations

1    operating system, and you're saying it's the -- it's the app

2    that sends that update to Google server; is that correct?

3                    "Answer:  Correct.

4                    "Question:  If a user selects an update --

5    answer:  Yes.

6                    "Question:  -- through the Google Play interface

7    on their phone, does the Google Play server then send the

8    updated software to the handset?

9                    "Answer:  If you select an application to

10   update, you will go to the Play Store to that application's

11   page, and you'll be presented with a prompt as to whether

12   you want to install that app or not.

13                   "Question:  If you select yes, you would like to

14   install that app, what happens then?

15                   "Answer:  It would then download that

16   application to the device."

17                   (End of videotaped deposition.)

18                   MR. BELLOLI:  Your Honor, there's one exhibit

19   from that video that we would like to admit, which is

20   PTX-122 that was referred to.

21                   MR. MOORE:  No objection, your Honor.

22                   THE COURT:  Thank you.

23                   (Plaintiffs' Trial Exhibit No. 122 was admitted

24   into evidence.)

25                   MR. BELLOLI:  Could you just publish that?

1    That's the user guide for one of the phones that the witness

2    was referring to.

3                    THE COURT:  All right.  Thank you.

4                    MR. THOMPSON:  Good afternoon, your Honor.  I'm

5    Clayton Thompson representing Intellectual Ventures.

6                    Before I go through the process of calling the

7    next witness, I noticed that it's just now after noon.

8                    THE COURT:  I'd like to go just a little bit

9    longer, so I think you should call the next witness.

10                   MR. THOMPSON:  Sure.  Mr. Reisman is an

11   entrepreneur, an inventor.  He is the founder and president

12   of a technology company in New York called Teleshuttle.  He

13   is the inventor of the of two of the patents in this case,

14   the '464 patent and the '054 patent.

15                   Your Honor, at this time, Intellectual Ventures

16   calls Richard Reisman.

17                   THE COURT:  All right.  Thank you.

18                   MR. THOMPSON:  Your Honor, may my paralegal

19   approach?

20                   THE COURT:  Surely.

21                   ... RICHARD REISMAN, having been duly

22                   sworn as a witness, was examined and testified

23                   as follows ...

24                        DIRECT EXAMINATION

25   BY MR. THOMPSON:

Reisman - direct

1    Q.    Good afternoon, Mr. Reisman.

2    A.    Good afternoon.

3    Q.    Would you please state your name for the record.

4    A.    Richard Reisman.

5    Q.    Are you an inventor on any patents issued by the

6    United States Patent and Trademark Office?

7    A.    Yes, I am.

8    Q.    Approximately how many?

9    A.    It's a total of, some several different families, a

10   total of 32 issued, five that are scheduled to issue in the

11   next few months, and many others that are pending.

12   Q.    Before we go any further, are you planning to refer to

13   slides today?

14   A.    Yes.  I have a few to illustrate some things.

15   Q.    And if I could ask that those be put up.  Do you

16   recognize that?

17   A.    Yes.

18   Q.    Sir, can you tell the jury a bit about your

19   background.

20   A.    Yes.  I've been involved --

21            MR. MOORE:  I'm sorry to interrupt, but I would

22   object to this as leading.  They've done it a couple of

23   times, the fact where they put up a slide with the witness'

24   testimony, he reads.

25            I don't have an objection if they introduce it

1    as a demonstrative after he testifies, but would object to

2    leading, the use of the slides to guide him through the

3    testimony.

4                THE COURT:  I think for this particular kind of

5    testimony, it makes it more efficient.  I will overrule your

6    objection.

7                MR. MOORE:  Thank you.

8                THE WITNESS:  So I've been involved in

9    developing applications to help make computers easier for

10   people to use for almost 50 years.

11               I first saw the power of computers when I had a

12   summer job right after high school.  I had a summer job at

13   Bell Labs, doing engineering assistance, and I learned how

14   to program their mainframe computer and was allowed to use

15   it to do the calculations that were part of the work that I

16   was doing instead of spending hours cranking away at a desk

17   calculator.  So that gave me the first appreciation of what

18   it could do.

19               Then I went to college, got my first degree from

20   Brown in 1968, studying computing there, and then went into

21   computing in IT, first at Western Electric in the Bell

22   System, and then later at Mobil Oil, now ExxonMobil, about

23   20 years.  Both of those jobs were in various parts of their

24   business figuring out how to use computers more effectively

25   to help the people get their work done.

Reisman - direct

1           The -- around late eighties, when personal

2    computers were beginning to get popular, I decided to focus

3    more specifically, and on helping end users use computers,

4    got a job first at standard and pours and then some smaller

5    companies, focused on distribution of information.

6           Then in 1994, I started my own company,

7    Teleshuttle, to develop these inventions and then have

8    stayed there doing other inventions since then.

9           I also do volunteer work for the MIT Enterprise

10   Forum of New York City, as a board member volunteer, helping

11   other entrepreneurs.

12   Q.   Mr. Reisman, can you take us back to your very first

13   experiences with computers?

14   A.   Yes.  I actually got exposed even earlier.  I was

15   maybe 10 or 12 in the late fifties twice.  Once I got

16   invited to tour the Computer Center of Prudential Insurance

17   and so it was a roomful of mainframes.

18          Another time was a program that an Army research

19   and development facility nearby had for students, where we

20   could learn how to do simple programs and actually write a

21   few lines of code and had it run on the computer to see if

22   it worked.

23   Q.   So about how old were you?

24   A.   Ten or 12, I think.

25   Q.   So how does that background that you've described give

Reisman - direct

1   you insight that led to the invention?

2   A.    Well, it helped me see the tremendous power that

3   computers can have to make life better for people.  Give

4   them more power, more fun.  But it's also very hard to use,

5   and that that was the big impediment holding back those

6   potentials.  So that was sort of the challenge that I've

7   been working on.

8   Q.    Mr. Reisman, about what year did you file the first

9   patent application that led to the patents in this case?

10  A.    1994.

11  Q.    And so using that time frame as an anchor, can you

12  take the jury back to the environment, the computing

13  environment that existed then and what the situation was

14  like for the typical user?

15  A.    Sure.  Yes.  Things were really very different then.

16  If you weren't using computers then, you have no idea how

17  bad it was, and if you were, you've probably forgotten how

18  bad it go.

19  Q.    Mr. Reisman, can I interrupt for a second?  May I

20  approach the witness and hand the control to the

21  presentation to him?

22                THE COURT:  Yes.

23                (Mr. Thompson handed a control to the witness.)

24                THE WITNESS:  So -- well, I mean, okay.  So

25  there were a lot of problems with computers at the time.

Reisman - direct

1    They were very hard to use.  You had to really know what you

2    were doing.  They didn't make it simple.

3             One of the most fundamental problems was that

4    there was a separation between what you did on your own

5    personal computer and what was available online and there

6    was almost no connection between the two.

7             So you had two different worlds of computing.

8    One was on your computer at home, you would get applications

9    on floppy disks or CDs.  The date that would also go on

10   these disks.  The computers had very limited capacity.

11            So you were constantly juggling these

12   applications, and you would be trying to get the computer to

13   do what you wanted.  But those of you who were using it long

14   ago remember the dreaded C prompt in Microsoft DOS and it

15   would just sit there boinking and wait for you to tell it

16   what to do.  You had to know these arcane commands and

17   figure out what's the exact thing that I need to tell the

18   computer to do to get my application to work, to do

19   something useful.

20            Around, shortly before '94, people were starting

21   to come out with graphical user interfaces, like Windows or

22   MAC, that made it somewhat better than DOS, but you still

23   had the problem of finding things on your computer.  You

24   would have directory structures that you had to navigate to

25   find files and find applications in different places with

1    cryptic file names, so it was still very difficult.

2    Q.    And so in the context of that environment that you

3    described, what were some of the difficulties that a typical

4    user were encounter when they tried to get online?

5    A.    Yes.  As I said, online was a totally separate

6    experience, and it was unintegrated from the local

7    computers.  And, again, it's sort of hard to imagine how

8    different it was because now we have smartphones and apps

9    that you download.

10            There are millions of apps that you download and

11   your phone or iPad or whatever is going online thousands of

12   times a day and you don't even realize it.  It's all

13   seamless.

14            At this time, getting online was a major

15   project.  And most people didn't even try it because it was

16   so difficult.

17            One of the -- there were also many different

18   networks.  The Internet was used only in academia and

19   research.  It wasn't used by consumers and not even

20   businesses very much at that time.  You were using other

21   services, such as AOL.

22                AOL was one of the easiest to use and many

23   of you may remember this.  You may remember the movie,

24   "You've Got Mail," that popularized this.  But even though

25   it sounds like a long time ago, that was December of 1998.

Reisman - direct

1    So we're talking five years earlier is the time that these

2    inventions were made.

3                    And even AOL was, you know, much more primitive

4    and not integrated with what was on your computer.

5    Q.    So drawing all of that together, Mr. Reisman, can you

6    summarize the tasks that were burdening the user?

7    A.    Yes.  It was, it was pretty much the wild west.

8    Things didn't work.  There were no direction signs.  You

9    really had to know what you were doing.  Things were

10   unreliable.  It was very frustrating.

11                   So you would really be struggling to find

12   what -- how to get online, where to find things.  If you

13   wanted to download information, you would have difficulty

14   finding it and then using it.

15   Q.    And so referring to the next slide, can you put that

16   in context?

17   A.    Yes.  Okay.  So basically the process that you had

18   was, first, you had to figure out, do I even want to go

19   online at all?  When is there something that I need online?

20                   You would have to figure out where to look among

21   these different services or within the services.  You would

22   have to know that this service had information on this topic

23   and this had it on other topics or I had the program from

24   this company.

25                   So once you figured out where to look, the

Reisman - direct

1    challenge was, how do I connect to these services, because

2    they were all different.  The process of connecting was

3    using dial-up modems that were very difficult to use.  There

4    weren't these always on connections where you just were

5    connected all the time.

6              So you would -- once you got onto a service,

7    then you would have to navigate the service.  There would be

8    different sub areas, different directories or lists of

9    things and find things you wanted.  If you were looking for

10   updates to a program, you would have to know what version of

11   the programs you had and what version of updates related to

12   that.

13             Then, once you found what you wanted, you had to

14   download it, because if you didn't download it, it wasn't

15   there anymore after you disconnected.  So you had to do a

16   separate step using different complex procedures to get a

17   file downloaded onto your computer.

18             Finally, you would disconnect and you would

19   under pressure to do this as quickly as possible, because

20   you were paying per minute and having to think, you know,

21   how do I do this step very quickly so that I don't run up a

22   lot of charges.

23             Finally, you disconnected.  You would unpack the

24   file, store it, and then install any programs.  And then you

25   would have to start the right program to view the

Reisman - direct

1    information that you downloaded.

2              So it was, you know, it was very difficult,

3    difficult to do.  Basically, you would tell the computer and

4    you lead the way without much help from the computer.

5    Q.    And so how did you picture resolving the before my

6    invention problems?

7    A.    Basically, what I wanted was to get to something where

8    you simply push a button that says update and it does it for

9    you.  It knows where to find the information, how to get it

10   and put it on your computer and make it available, or in

11   some cases, it could be completely automatic.

12   Q.    Very good.  So how did your inventions improve the

13   situation, Mr. Reisman?

14   A.    So basically what I came up with was sort of a

15   paradigm shift in how you structured the applications and

16   make them available to communicate by putting a standard

17   facility there, which is known as a smart client approach,

18   that you use the intelligence of the computer to find things

19   and do a lot of this work.

20             So the basic objective was to make it simple,

21   economical and prompt, which I think the patent application

22   says right at the beginning.

23             Simple in the sense that, make it easy for

24   anything to do.  Nowadays we joke, it's so easy, even an

25   adult can do it.  And that was sort of the idea of making

1    the computer, make it -- use the smarts of the computer to

2    make it easy.

3              Economical in the sense that it would

4    automatically connect when you needed to and only when you

5    needed to and keep it very short so the time charges were a

6    minimum.

7              And also economical in the sense that it was

8    much easier to build applications that could go online and

9    get information.

10              So now you can have these millions of apps, many

11   of which are going online constantly and seamlessly and

12   prompt in the sense you can constantly be getting up-to-date

13   information.

14   Q.    Turning to the patents, what are the patents that

15   focused on that solution?

16   A.    Well, of the family that deals with this information

17   distribution inventions, the family of inventions, two are

18   issued here.  One is the '464, and that refers to the last

19   four digits of the patent number.  That is sort of the

20   shorthand identifier.  That one is the content delivery

21   patent.

22              And then the other one is the '054, which you're

23   calling the directory patent as a convenient description.

24   Q.    Mr. Reisman, I'm going to be referring you to a binder

25   that's in front of you.  If we've done the exchange

Reisman - direct

1    properly, it will have your name on it.

2              Could you confirm that you have a binder there

3    with your name on the front of it?

4    A.    Yes.

5    Q.    All right.  And if you could please turn to Joint

6    Exhibit 7.

7    A.    Yes.

8    Q.    What is that?

9    A.    That is the '464 patent.

10             MR. THOMPSON:  Your Honor, at this time

11   Intellectual Ventures moves to admit Joint Exhibit 7.

12             MR. MOORE:  No objection.

13             THE COURT:  Thank you.

14             (Joint Trial Exhibit No. 7 was admitted into

15   evidence.)

16   BY MR. THOMPSON:

17   Q.    Could I please ask you to turn to Joint Exhibit 6 in

18   your binder.

19   A.    Yes.

20   Q.    What is that?

21   A.    That's the '054 patent, the directory patent.

22             MR. THOMPSON:  Intellectual Ventures moves to

23   admit Joint Exhibit 6.

24             MR. MOORE:  No objection.

25             (Joint Trial Exhibit No. 6 was admitted into

Reisman - direct

1    evidence.)

2              THE COURT:  And that might be a good time for

3    our afternoon lunch break.

4              MR. THOMPSON:  Thank you.

5              THE COURT:  Thank you.

6              (The jury was excused for a luncheon recess.)

7              THE COURT:  All right.  Half-an-hour.  Thank

8    you.

9              (Luncheon recess taken.)

10                        -   -   -

11             Afternoon Session, 1:00 p.m.

12             THE COURT:  All right.  Let's bring the jury in.

13             MR. THOMPSON:  Your Honor, I don't know if now

14   is an appropriate time.  I think defendant's counsel was

15   going to raise exhibits to a few slides of Dr. Nieh's

16   presentation.

17             MS. DAY:  We're going to do it at the afternoon

18   break.

19             MR. THOMPSON:  Okay.  I've been corrected, your

20   Honor.  I'm sorry.  We're ready.

21             THE COURT:  All right.  Good.

22             Just for future edification, these sorts of

23   exhibits, I mean these sorts of objections should be done in

24   the morning, not midday.  But all right.  Let's bring the

25   jury in.

Reisman - direct

1          (The jury entered the courtroom and took their

2     seats in the box.)

3          THE COURT:  All right.  Everyone may be seated.

4     And you may continue.

5     BY MR. THOMPSON:

6     Q.    Welcome back, Mr. Reisman.

7     A.    Thank you.

8     Q.    Before lunch, we were discussing and had just admitted

9     the two patents.  At this point, what I'd like to do is ask

10    you a few questions about the patents, taking each in turn,

11    the '464 content delivery patent first, and then the '054

12    directory patent second.

13          So focusing on the '464 content delivery patent,

14    what is the focus of the '464 patent?

15    A.    This gets to the basic problem that I was sort of

16    describing earlier of finding information that's available

17    on the Internet, anywhere in the world, and being able to

18    identify it.  Say I want it downloaded, have it brought to

19    your computer and set up for you to be able to view without

20    having to do a whole lot of work.

21    Q.    And so what were the advantages of that '464 content

22    delivery patent?

23    A.    It automated am of the tasks and provided a simple

24    structure where you could basically browse catalogues to

25    find what information was available and simply indicate,

Reisman - direct

1    these are things I want, and then they would be listed to

2    all at once go get them from the network, bring them down

3    efficiently, put them on your computer and prepare them so

4    that you can use them.

5    Q.    So that we can keep them straight, what is the focus

6    of the '054 directory patent?

7    A.    That is sort of the other side of the problem.  You've

8    already got some things on your computer and there may be

9    updates for the software or data updates related to that.  I

10   guess the software is specifically the focus there.

11          And it knows what you have and it knows what's

12   available out of the network and how to find it and it

13   builds the directory using the intelligence of the PC and

14   the servers to make it easy to simply select, here are

15   relevant updates, and, yes, I want them or not.

16   Q.    So how did that directly make life better for the

17   typical user?

18   A.    Well, it removed the whole challenge of determining if

19   there are updates, and which ones were appropriate.  So it

20   made it much more practical to use lots of software that

21   came from over the Internet and to keep it current and to

22   build this whole economy around applications that are

23   distributed over the Internet kept current.

24   Q.    Mr. Reisman, I'm going to ask you to flip to a page in

25   Joint Exhibit 7.  It will be page 7.  We've already admitted

1    the exhibit, so may I ask that that page be up on the

2    screen.

3              And do you have that in front of you,

4    Mr. Reisman, that page?

5    A.    Yes.

6    Q.    What is it?

7    A.    That's Figure 1 of the patent.  Actually, of the whole

8    family of patents.  And it's a schematic that's gives sort

9    of a picture of the key pieces in the invention.  The patent

10   is already thick, but most of the key ideas can be found in

11   this diagram that shows what the pre-existing portions were

12   and the portions I invented and how they interrelate.

13   Q.    And so using this figure from the patent as a

14   demonstrative, can you explain your inventions and what you

15   mean.

16   A.    Yes.  This was developed for programmers and technical

17   people, so it has a lot of details that we don't really need

18   to get into.

19              So to try and give a simple picture of the key

20   portions and how they work, first, let me sort of blur out

21   the details, and then the blue is showing the stuff that's

22   on your, your computer.  And so what you would have is

23   software and existing content and this is pretty much the

24   way things existed, what I described, where you would

25   get programs on diskette or on CD-ROM, and put them on

Reisman - direct

1    the computer with their related content and use it just

2    locally, without -- you get these from a store or through

3    the mail, typically.  Hardly anyone downloaded software at

4    that time.

5              For example, two products that were out at that

6    time that were sort of state of the art were, that came on

7    CD-ROM, so it's the Newsweek magazine had a CD.

8    Encyclopedia Britannica had a CD.  They were nice user

9    interfaces.  They worked pretty well.  The problem was they

10   became out of date.  Newsweek was a weekly magazine.  The

11   disk came out every three months.  So it was immediately

12   behind and pretty soon you were three months behind waiting

13   for the new one.  So it very much limited how you did

14   things.

15             So I wanted to provide an efficient and simple

16   way to get online.  What I added, and the heart of the

17   invention, you know, at least an important part of it was

18   this transporter software, which is the module that has the

19   functions that I described, and it is set up with an

20   interface that makes it very easy for these applications up

21   on the top to talk to the transporter and for information to

22   go back and forth, for them to tell the transporter what

23   kinds of -- who they are, what their identification was,

24   what information is related to them, where it is on the

25   network, and which of the things they want to get.

Reisman - direct

1       So that is sort of the key logic that ties them

2   together.

3       The transporter had the complex programming

4   needed to go to the communications network and out over the

5   communication network, it would go to servers to get

6   additional content, whether from one publisher or software

7   provider or from many.

8       And so that basically hid the complex part of

9   this process from both the applications and from the user

10  and just made it seamless and put it under the covers.

11  Q.   And so using that, can you demonstrate how the

12  invention worked?

13  A.   Yes.  A small animation here.  So say it would

14  automatically check periodically to see what was new and it

15  would go out and say, oh, okay.  There's a new issue of

16  Newsweek available.  So it would send back a notification

17  and tell the Newsweek program that it was out of date and it

18  would give you the option to get the new issue.

19      So you could then -- and this could be fully

20  automatic, but typically, you would say, yes, I want the new

21  issue.  And so once you said get the new issue, it would

22  automatically pull it down and integrate it and tell the

23  Newsweek program that the new issue was there, that it could

24  present for you to look at.

25  Q.   Can you explain how it would operate if there were no

Reisman - direct

1    software there originally?

2    A.    Yes.   In addition to what we just saw, it would let

3    you go online to get basically a catalogue of additional

4    information and software products that were available and

5    create a directory out of this catalogue that would say

6    what's available.   I might decide, okay.   Tetris is a game

7    that I want to play and I want to download that.   So I

8    select Tetris, and again it's the same process that it

9    automatically downloads it, installs it on the computer,

10   sets it up and opens it.   Says that now you can play Tetris

11   without having to go through any of that complex process

12   that I described before.

13   Q.    Very good.

14         What led you in coming up with your invention?

15   A.    Well, as I had said earlier, I had been working in

16   information distribution for the past several years, mostly

17   online services, also working with some CD-ROM-based local

18   products, and saw that there were some real problems here.

19         The CDs were, you know, really great for giving

20   you this nice graphical interface and powerful applications

21   like Newsweek and the Britannica, but they were out of date,

22   and getting those to go online to get the new stuff was so

23   difficult, that they just didn't try.

24         At the same time, you had the online services,

25   like AOL, but at the time it was so unreliable and complex

Reisman - direct

1    and slow, for example, getting a picture would take like a

2    minute or two, getting a video was pretty much impractical,

3    so that you could, you could get, you know, up-to-date

4    stock quotes and news stories, but they were pretty much all

5    text.

6              And so you still had these two different worlds

7    that didn't integrate.  And I saw, you know, there must be a

8    way to put them together, but it wasn't a simple thing to

9    do.  And that was sort of something that had been bothering

10   me for a while, to get the best of both of those.

11   Q.    And how did your solution come to mind?

12   A.    Well, I was relaxing one night, looking out the window

13   over Manhattan, and just sort of letting my mind wander and

14   I started thinking about these problems.  And suddenly it

15   hit me that, you know, as I said, it wasn't simply a matter

16   of mashing together the CD-ROM product and the online

17   product services.

18             What I realized was you needed an architecture

19   that created a module that did the communications in a

20   standard way so that you could write one module that knew

21   how to go online, knew how to find things if it was told the

22   name and where to find them and had an interface, an

23   application program interface, or an API you'll see

24   throughout the patent, that made it very easy for the

25   applications to simply say, I want the file that's in this

Reisman - direct

1     place and to do that with a simple data structure so that it

2     could tell the transporter how to do these things.

3                 And so I realized that this was the paradigm

4     shift in how you built applications that could jump start a

5     whole lot of things and worked on that.

6     Q.    So after that night when the solution came to mind,

7     what did you do next?

8     A.    Well, I got very excited because I saw lots of

9     potential there, so I grabbed my yellow pad and started

10    taking notes, which is how I do my brainstorming.  I have

11    notes to remember what are the important things to follow up

12    on.

13                So I wrote a page of notes then and continued

14    developing the idea.  I was developing plans to start a

15    business to build this product, to market it, and also to

16    build some related online services to work with it.  So I

17    was very excited about that process.

18    Q.    So, Mr. Reisman, could I ask you now to please turn in

19    your binder to Exhibit 491.

20    A.    Yes.

21    Q.    What is that?

22    A.    That's a set of notes that I did starting that

23    night and then continuing soon afterward to document my

24    thoughts about this business and the product that I wanted

25    to build.

1        MR. THOMPSON:  Your Honor, Intellectual Ventures

2   moves for the admission of PTX-491.

3        MR. MOORE:  No objection, your Honor.

4        THE COURT:  Thank you.

5        (Plaintiffs' Trial Exhibit No. 491 was admitted

6   into evidence.)

7   BY MR. THOMPSON:

8   Q.    What parts of that exhibit did you write?

9   A.    All of it.

10  Q.    I'd like to turn your attention, if I could, to page

11  of the document.  Mr. Reisman, what is that?

12  A.    That's the page from my yellow pad that I, that I

13  wrote that night as I was sitting, thinking through this

14  invention.

15  Q.    Is it dated?

16  A.    Yes.  Up on top.  9/30/93.  September 30th, 1993.

17  Q.    And if I could ask that the portion of the document

18  immediately to the right also be magnified so that we can

19  see it.  Very good.  Thank you.

20        Mr. Reisman, do you see the writing there that

21  says Object Store/Update?

22  A.    Yes.

23  Q.    Can you explain to the jury what that indicates.

24  A.    Yes.  That's what I saw as sort of a key part of the

25  idea, that you can think of all the stuff that, all the data

Reisman - direct

1    and all the information is an object store.  It stores

2    things as objects that you can identify.  The /update was

3    the idea that it integrates both the storage and the up

4    indicate and integrating both what's local on your computer

5    with the related stuff that's online out of the network, the

6    Internet, whatever.

7    Q.    So if I could ask that the top half of the document be

8    magnified.

9              Mr. Reisman, do you see where the document

10   says, and I will do my best to read your handwriting:  Two

11   stages?

12   A.    Two stage, I think.

13   Q.    Could you --

14   A.    Well --

15   Q.    Could you read that for us, please?

16   A.    Yes.  I think it's two stage.  Call for current

17   directory.  That line, yes.

18   Q.    And then so can you explain what that indicates to

19   you?

20   A.    Yes.  This is -- one of the important parts of the

21   structure was this idea of the two-stage process, and it's

22   what I was describing before, where one part is to get this

23   directory of new items that are available that you can look

24   at and decide if these are the things that I want to

25   download without having to know where to find them or, you

Reisman - direct

1    know, decide to look at some of them.

2    Q.    And so can you tell us what's written immediately

3    below the highlighted line?

4    A.    Yes.  The second part is, then for objects.

5    Q.    Can you explain what that indicates?

6    A.    Yes.  So that's, it's -- that's the process of

7    actually getting the objects that you've selected.  So this

8    two-stage process really can just repeat indefinitely.  You

9    keep new catalogues, you make your selections and keep

10   getting more objects, and the catalogue is just another

11   object that you get the next time.

12   Q.    Thank you.

13         Now I'm going to refer to the fifth page of that

14   exhibit, if I can.  You can see it up on the screen.

15   Mr. Reisman, what is that?

16   A.    That's a diagram that I sketched out to, and as you

17   might notice, it's pretty much the Figure 1.  This was the

18   original version of Figure 1, which I sketched out to define

19   the key pieces of the product that I had mind to build and

20   how they interrelated.

21   Q.    So can you explain how that schematic relates to the

22   '464 content delivery patent?

23   A.    Yes.  It's the same process.  And this was done to

24   help explain to a programmer to build it, so if we try to --

25   I will do a briefer version.  Oh, there it is.

Reisman - direct

1          Okay.  So, again, the blue is the part that's on

2     your computer.  The red is the software and the data that's

3     on the computer, which typically you would get through the

4     mail or in a store.

5          The purple is the transporter software and how

6     it connects.  That's the part that I invented that brings

7     the new content down and integrates it with what you have.

8          Then also there's the network and the servers,

9     pretty much the same way as before, where you can get all

10    the information out on the Internet or whatever network it's

11    on.

12    Q.    And so can you simply explain how this schematic

13    relates to the '054 directory patent?

14    A.    Yes.  That one, the directory is basically a data

15    structure and you can think of it as, it relates to these

16    arrows, that it's part of the data that flows across the

17    arrows.  Forms that are coming from the network saying

18    what's available, passing the transporter to the software.

19    The software says, these are the things I want.  It then

20    goes back to the transporter that then requests stuff over

21    the network.

22         So the directory helps organize and let the

23    smart client use that information and communicate.

24    Q.    And is that schematic dated?

25    A.    Yes.  It has a date on the bottom.

1    Q.    And what is it?

2    A.    10/12/93.  October 12th, 1993.

3    Q.    And whose handwriting is that diagram, just to be

4    sure?

5    A.    That's my handwriting.

6    Q.    So the next thing we're going to do is, we're going

7    to refer to page 14 in that same exhibit.  There it is,

8    indeed.

9              Mr. Reisman, can you tell the jury what's shown

10   there?

11   A.    Yes.  That is a flow chart that I wrote to clarify the

12   key steps in this process, both for myself and for a

13   programmer to be able to build it.  And it's showing

14   basically the -- what the transporter does to automate the

15   process.

16             I think at the time of these drawings, I was

17   calling it the fetcher sender.  Later I called it the

18   transporter.

19   Q.    And so if I could ask that the third line, the

20   rectangle there, be highlighted, I think it starts with, get

21   list.

22             Do you see that?

23   A.    Yes.

24   Q.    Can you explain what that indicates to you?

25   A.    Yes.  That's the module.  The first process basically

Reisman - direct

1    is to get the list of object sets to fetch or send from the

2    user or from the API, meaning the application program.  So

3    that's basically telling it what you want it to do to do

4    these automated operations over the network.

5    Q.    And then if we could go to the third rectangle below

6    that that begins with, exchange.

7            Mr. Reisman, can you read that?

8    A.    Yes.  Exchange objects, fetch and send.  So that is

9    the process.  Fetching is downloading things to you.

10   Sending is uploading.  And so the module has this list of

11   things and it just goes through the list and does all of the

12   fetches and sends.

13   Q.    And if I could highlight the last rectangle there.

14           Mr. Reisman -- and if we could perhaps zoom in

15   on that one, too.  Mr. Reisman, what does -- first of all,

16   can you please read that?

17   A.    Store:  Decompress and unpack objects, place in

18   designated location, report to user and/or API, and trigger

19   product's import processing, if required.

20   Q.    And can you explain what that indicates to you?

21   A.    Yes.  That's the process of integrating what you've

22   got with the stuff that's on your computer.  If it's a new

23   application, it installs it.  If it's data, it integrates it

24   with the databases that are already there.  They're indexes,

25   hyperlinks, whatever.  It ties them together, so it's smart

Reisman - direct

1    enough to know what the applications do and it cooperates

2    with the applications to set up the data you have

3    downloaded.

4    Q.    And, Mr. Reisman, is that flow chart dated as well?

5    A.    Yes.

6    Q.    And what is the date?

7    A.    10/13/93.  October 13th, 1993.

8    Q.    And we may know the answer, but can you confirm whose

9    handwriting that is?

10   A.    It's mine.

11   Q.    Moving on, what did you do after you drew those

12   diagrams?

13   A.    Well, I was doing a lot of things because I had

14   decided to start a business to build this product and get it

15   out in the market, so I was working on further developing

16   the concept, figuring out exactly what the market was and

17   where it would be most useful, what kind of companies I

18   wanted to talk to, how to market it, how to position it.

19   And at the same time, I thought that a patent would be

20   desirable, so I was working on a patent application.

21         And the main thing, of course, was to build the

22   product so that I had something, so I began working with a

23   programmer to have a prototype built and ultimately, a full

24   product.

25   Q.    So picking up where you left off, could you please

 1    turn in your binder to Exhibit 493.  This is PTX-493.

 2    A.    Yes.

 3    Q.    What is that?

 4    A.    That is a document that's called "Transporter

 5    facility, the API protocol and usage examples.  It's

 6    basically a functional specification of the programming that

 7    I wanted done.  So it's a document that explains to

 8    programmers what it is I want built, what it's supposed to

 9    do, some examples of how it's used, so that they understand

10    what the task is and how it should work.

11    Q.    So what portion of that exhibit did you write?

12    A.    All of it.

13    Q.    Okay.

14              MR. THOMPSON:  Your Honor, at this time

15    Intellectual Ventures moves for the admission of Exhibit

16    493.

17              MR. MOORE:  No objection, your Honor.

18              THE COURT:  Thank you.

19              (Plaintiffs' Trial Exhibit No. 493 was admitted

20    into evidence.)

21    BY MR. THOMPSON:

22    Q.    So if I can just back up for a minute, Mr. Reisman.

23    Can you explain what the purpose of this document is?

24    A.    To explain to a programmer what the program is

25    supposed to do, what data it needs, and what are the tasks

Reisman - direct

1     and how it interfaces with the applications so a programmer

2     can do it.

3     Q.    So I'm going to refer to the document.  If we could

4     have the first page up.

5              At a high level, Mr. Reisman, is the '464

6     content delivery invention described here?

7     A.    Yes, it is.  Actually, in the first paragraph, I

8     believe it is the last sentence, it talks about how it's

9     operated as a common service for multiple information

10    products, meaning content or software applications,

11    providing a complete network distribution service.

12    Q.    Do you see in that paragraph where the words "object

13    manifest" appear?

14    A.    Yes.

15    Q.    Can you --

16    A.    Right in the middle of it.

17    Q.    Very good.  Can you explain to the jury what those

18    words indicate to you?

19    A.    Yes.  The object manifest was a term that I used, sort

20    of like a shipping manifest.  It's the list of things you

21    want transported in one direction or the other.  So it

22    relates to the directory.  This is the internal programming

23    version of the directory that's presented to the user and

24    it's the form that's passed back and forth between the

25    application and the transporter and in some cases it can

Reisman - direct

1    also go over the network to the server.

2    Q.    And so referring to the second page, if I could have

3    the bottom half of the second page expanded there.

4               Can you explain what's beginning to be described

5    in the document?

6    A.    Yes.  This describes the transport function, which is

7    the, sort of the central function of the communication

8    module.  It says, call server and exchange data objects.  It

9    talks about how it goes through those steps.  It used to be

10   manual and it's automating based on this information from

11   the application program.

12   Q.    So before we move on past this document, could I have

13   up page 9, please.  And could I ask that, generally, the

14   middle of it be expanded.

15              Mr. Reisman, there is a mention of computer

16   software updates.

17              Do you see that?

18   A.    Yes.

19   Q.    Can you explain what that indicates to you?

20   A.    Yes.  That was just to emphasize that this can be used

21   for many, downloading many kinds of information content, et

22   cetera, and one of those is software updates.  Software is

23   just another kind of information as far as technology goes,

24   but I wanted to emphasize that that was the use of it that

25   seemed important.

1  Q.    Is this exhibit dated, Mr. Reisman?

2  A.    Yes.

3  Q.    And what is its date?

4  A.    Up on top it says 11/4/93.  November 4th of '93.

5  Q.    Now, remind us, when did you file your patent?

6  A.    May 31st of '94.

7  Q.    Sock.  So between November 4th of 1993 and May of

8  1994, what were you up to?

9  A.    Well, as I said, I was doing a lot of things, trying

10  to build this business and figure out how to, how to

11  structure that.  So that was a major piece of my time, but

12  at the same time I was moving as fast as I could to get a

13  patent filed and to work with a programmer to begin building

14  the product, building the prototype, and often with the

15  working version of the software so that we could launch the

16  product and deliver it.

17  Q.    Did that work result in any written documents?

18  A.    Yes.  There are a series of documents that were worked

19  on by me, worked on by the programmer and the two of us

20  working together.

21  Q.    So if I could refer you in your binder to PTX-530, are

22  you there?

23  A.    Yes.

24  Q.    Okay.  That was quick.

25         Can you tell us what that is?

1    A.    Yes.  This is a protocol specification document that

2    was developed to provide for me Dale on what would happen in

3    the communications between my module and the servers, and it

4    was worked out based on discussions that I was having with

5    the programmer and him writing up what he thought I meant

6    and my reviewing it and making notes until we got something

7    we were comfortable with.

8                MR. THOMPSON:  At this time, Intellectual

9    Ventures moves for the admission of PTX-530.

10               MR. MOORE:  No objection.

11               THE COURT:  Thank you.

12               (Plaintiffs' Trial Exhibit No. 530 was admitted

13   into evidence.)

14   BY MR. THOMPSON:

15   Q.    Mr. Reisman, what is the date of that document?

16   A.    Down at the bottom, it says, 1/28/94.  January 28th,

17   1994.

18   Q.    And so regarding the work that you were doing, what

19   does this document indicate to you?

20   A.    Well, that was around the middle of the period between

21   when I first had the idea and when I thought of the patent,

22   so it's showing work being done through that period as one

23   example of the process.

24   Q.    And so you referred to the patent.  Why did you decide

25   to file the patent?

Reisman - direct

1    A.    Well, I thought that this would be a major change in

2    how applications were built and that it would catch on once

3    people understood what it offered.  So I expected even

4    though I was trying to build the company to do it, that a

5    lot of other people would start competing and try to do the

6    same thing.

7              So I thought it was important to protect the

8    company by trying to get whatever patent protection I could

9    over the invention.

10   Q.    So, sir, now, if I could please ask you to turn to

11   Joint Trial Exhibit No. 9.

12   A.    Yes.

13   Q.    Can you tell us what that is?

14   A.    Yes.  This is the file history for that original

15   patent application in the Patent Office.

16   Q.    And are you familiar with that document, at least the

17   highlighting?

18   A.    Yes.

19             MR. THOMPSON:  Your Honor, at this time

20   Intellectual Ventures moves for the admission of Joint Trial

21   Exhibit No. 9.

22             MR. MOORE:  No objection.

23             THE COURT:  Thank you.

24             (Joint Trial Exhibit No. 9 was admitted into

25   evidence.)

Reisman - direct

1    BY MR. THOMPSON:

2    Q.    Okay, Mr. Reisman.  If you could please turn in that

3    exhibit to page number 3.

4    A.    Yes.

5    Q.    Can you tell us what that is at the beginning?

6    A.    I believe that's the beginning of the original patent

7    application as it was filed on May 31st, 1994.

8    Q.    All right.  So if I could ask to please turn to the

9    page that has the exhibit numbering 112 in that Joint Trial

10   Exhibit No. 9.  You can see that on the screen, too,

11   Mr. Reisman.

12   A.    Okay.

13   Q.    Can you tell us what that is?

14   A.    Yes.  That's Figure 1 as it was submitted with the

15   initial filing.  It's essentially the same as for the one

16   that we talked about before.

17   Q.    And so if I could move then just two pages later in

18   that same document, this is the page 114.

19             Focusing on the bottom figure there, can you

20   tell us what that is?

21   A.    Yes.  That, that's another view of the architecture

22   that was part of this invention and it shows how these

23   pieces work together, especially for the information

24   distribution, or the content delivery portion.  And I think

25   we have color codes.

Reisman - direct

1              Do you mind controlling that?

2    Q.    Sir, you can just ask for anything to be highlighted,

3    if you like.

4    A.    Okay.  So if you highlight the left, the boxes on the

5    left, those are the applications.  Client is another word

6    for a local application.  That's the client versus a server.

7    So there were clients from three different publishers A, B

8    and C.

9              Then, in the middle is a standard core

10   foundation.  That's software which includes my module that's

11   used by all of those applications to do things, including

12   the communications that my module did.

13             And then to the right we've got, it happens to

14   be three online services and those are I, J, K.  They don't

15   necessarily relate specifically to any one of the

16   applications.  But that's where the applications can get

17   things from online.  Down below is the local data that's on

18   your computer that corresponds to the A, B and C

19   applications.

20             And so the whole idea is that this core

21   foundation has my module, which is in the middle and it

22   knows about these pieces, so it can relate what's available

23   online with what's local on your computer, and tie all of

24   those back into the application so that they can see a

25   unified picture of both the local and the remote data.

Reisman - direct

1    Q.    And so beyond the '464 content delivery patent, does

2    this application also relate to the '054 directory

3    invention?

4    A.    Yes.   There are sections in there that describe that

5    as well.

6    Q.    All right.   So if I could point your attention to

7    pages 64 and 65.

8    A.    Those are the numbers on the top?

9    Q.    Well, Mr. Reisman, they're actually the exhibit

10   numbers.

11   A.    Exhibit, yes.

12   Q.    Just so you orient yourself.

13   A.    Okay.

14   Q.    All right?

15   A.    Got it.

16   Q.    You're all there?

17   A.    Yes.

18   Q.    It's also up on the screen --

19   A.    Yes.

20   Q.    -- in case you'd like to refer to it there.

21   A.    Yes.

22   Q.    Can you explain what that indicates to you?

23   A.    Yes.   This was a section, an example of, they call it

24   open-ended fetch and it talked about a supplementary object.

25   And so it's describing how you get this directory of

Reisman - direct

1     additional features, which is related to the directory of

2     the '054 patent.

3     Q.    So one last question before we move past this patent

4     application.  Was the Internet disclosed in this

5     application?

6     A.    Yes.  There's -- it's mentioned in several different

7     places.

8     Q.    And so can you explain?

9     A.    Yes.  The Internet is an example of the kind of

10    networks that I had in mind.  Do you want a page number?

11    Q.    No, that's okay.  I mean, I can if you have one.

12          Do you have one?

13    A.    Yes.  076 is one.  The middle says, for example,

14    Internet.  It's mentioned in three or four different places

15    directly and indirectly in several others.  And, you know, I

16    was well aware of the Internet and saw it as a, as a good

17    way for this invention to work, but it could also work on

18    various other networks as well.

19    Q.    After you received the patents on these two

20    inventions, what did you do next?

21    A.    That was -- after I had been working building my

22    company for over three years, it took a while to get the

23    patent.  So by that time, a lot had changed and I had been

24    working for over three years investing my own savings to try

25    and build the company, spending a lot of money, building the

Reisman - direct

1    application -- building the product and trying to market it

2    and get it out there.

3                 And a lot was happening at the same time.

4                 So I had built a product.  The product was a

5    success.  I had gotten attention in the trade press and

6    coverage when I launched it.  I spoke at a number of

7    industry conferences, had articles published in the trade

8    press.  Was -- had some partnerships with larger companies

9    on marketing the product, got it built into a CD-ROM product

10   and millions of copies were distributed, complete with my

11   Teleshuttle logo on the back.

12                So that part was good, but I was not getting the

13   alliances that I needed to get significant market share, and

14   during that time, the Internet was developing extremely

15   rapidly at what was called Internet speed.  And so I needed

16   to be developing new versions of my software to adapt to

17   what was changing.  And that required funding.

18                At the same time, a number of other companies

19   had jumped into the market, companies that were better

20   funded and had better connections and so competing with

21   those was getting to be a challenge.

22   Q.    Well, did you try to license your patents to them?

23   A.    Yes.  Around that time, I decided that I should pivot

24   the company to focus on licensing the inventions, and,

25   again, I knew it would take money to do that, and also that

Reisman - direct

1     it would take expertise in how do you play this game of

2     licensing patents, talking to these companies to take a

3     license and I knew that I needed help to do that, so I found

4     a partner, a company that specialized in that kind of thing,

5     had the expertise and the funding, and began to work with

6     them.

7              We had discussions with a number of large

8     companies about taking a license and eventually,

9     Intellectual Ventures approached us with an offer for a deal

10    that would provide licenses to two of these companies, and

11    would result in selling the patents to an entity that

12    Intellectual Ventures was involved with.  We would get, we

13    would share in the purchase price for the patents and have

14    the share in future revenues that Intellectual Ventures

15    might get by licensing other companies to use these

16    inventions.

17    Q.    Do you still care about the patents, Mr. Reisman?

18    A.    Yes.  Very much.  Of course, there's the financial

19    royalty interest, but I care for many reasons aside from the

20    financial ones.  This was something I spent many years on,

21    put a great deal of effort into, and I view it as one of my

22    most important contributions to society, as helping to start

23    this paradigm shift that has made computers usable to

24    billions of people now.

25              More, on a more narrow note, I recently read

1   about an inventor who said his patents had been cited 500

2   times by other patents as being relevant prior art, so I was

3   curious about my patents and I looked at the Patent Office

4   database and saw that the patents in this family had been

5   cited 1500 times by other patents.

6              So I was, you know, proud of that kind of

7   recognition that my work was important.

8              MR. THOMPSON:  Your Honor, at this time we pass

9   the witness.

10             THE COURT:  All right.  Cross-examination.

11             MR. MOORE:  May I proceed, your Honor?

12             THE COURT:  Yes, you may.

13             MR. MOORE:  Thank you.

14                       CROSS-EXAMINATION

15   BY MR. MOORE:

16   Q.   Mr. Reisman, my name is Steve Moore.  I represent

17   Motorola Mobility.  We met at your deposition.

18             MR. MOORE:  May I approach the witness to give

19   him a binder?

20             THE COURT:  Yes.

21             MR. MOORE:  Thank you.

22             Here you are, sir (handing witness binder to the

23   witness).

24             THE WITNESS:  Thank you.

25   BY MR. MOORE:

Reisman - cross

1    Q.    Now, Mr. Reisman, you said you thought of your idea

2    for the '054, '464 patents, the idea that eventually

3    resulted in those patents in the fall of 1993; is that

4    correct?

5    A.    Yes.

6    Q.    And you referenced that you had in mind then that the

7    Internet could be used as one network to deliver software

8    applications or updates to people over a network; is that

9    correct?

10   A.    Yes.

11   Q.    All right.  And I think you said also that while the

12   Internet had been around since the 1970s, it wasn't in use

13   outside of academic and research-type of settings at that

14   time; is that correct?

15   A.    Yes.  I think generally, yes.

16   Q.    All right.  But, and, in fact, the companies you

17   worked with in the early nineties didn't use the Internet

18   themselves.  You used other type of network services; is

19   that correct?

20   A.    Generally, yes.

21   Q.    All right.  But the types of networks that you used

22   were generally what were known as dial-up networks; is that

23   correct?

24   A.    Well, it was a mixture of network and other -- not all

25   of them are dial-up.

Reisman - cross

1    Q.    Okay.  But a commonly used network before the date of

2    your invention in the fall of 1993 was dial-up online

3    access; is that correct?

4    A.    Yes.

5    Q.    In fact, people had been using, before the date of

6    your invention, had been using dial-up networks to get

7    updates online; is that correct?

8    A.    Well, I think it depends on what you mean by how

9    they -- what you mean by getting them online.  They were

10   different.  What they did was very different than what I

11   described.

12   Q.    All right.  Do you not agree with me that before you

13   conceived of this invention, there were ways that you could

14   obtain more up to date information online using dial-up

15   networks?

16   A.    Yes there ways you could do it, yes.

17   Q.    All right.  And one way that existed before your

18   invention was something called file transfer protocols.  Are

19   you familiar with those type of available software or ways

20   to get software online?

21   A.    Generally.

22   Q.    That's prior art to your patent; correct?  File

23   transfer protocols had existed before your invention?

24   A.    Yes.  They were prior.

25   Q.    Okay.  And the way people used them was to transfer

Reisman - cross

1    software files between computers on a network before your

2    invention; is that correct?

3    A.    In some cases, yes.

4    Q.    All right.  And, in fact, the way that they were used

5    was users could go to these type of file transfer cites.

6    They could select from a listing a software file to be

7    obtained and they could download it to their computer;

8    correct?

9    A.    While they were online, yes, they would do that.

10   Q.    All right.  Okay.  Now, I think you said previously in

11   your testimony that these pre-Internet networks, like dial

12   up, one of the problems with them, they were slow; is that

13   correct?

14   A.    Yes.

15   Q.    They were slow at that time back in 1993, 1994?

16   A.    Yes.

17   Q.    And so that made it, I think your testimony was,

18   difficult to get software or other type of files downloaded

19   over a network because it just took a long time?

20   A.    That was one of the difficulties, yes.

21   Q.    Okay.  And that is because you had to dial up on a

22   phone line?

23   A.    That's why it was slow.

24   Q.    Right.  And you had to pay, as you said, I think you

25   paid every minute you were online?

Reisman - cross

1    A.    Yes.

2    Q.    And this is in the days when someone else in the house

3    picked up the phone and you lost your connection and the

4    file got interrupted.  These were challenges people

5    everywhere had with these dial-up networks 20 years ago; is

6    that correct?

7    A.    Yes.

8    Q.    Now, today we don't have those problems.  At least

9    most of us don't; is that correct?

10   A.    Right.

11   Q.    Right.  And one reason, of course, we don't have them

12   is the networks have gotten a heck of a lot better, haven't

13   they?

14   A.    Yes.  The networks have gotten better.

15   Q.    All right.  For example, we have Xfinity Broadband and

16   other types of broadband connections in our home that we

17   didn't have 20 years ago?

18   A.    Yes.

19   Q.    We've got WiFi networks that we can use to download

20   software and applications that we didn't have 20 years ago?

21   A.    Yes.

22   Q.    We've got cellular networks like 4G and other networks

23   that enable us to walk down the street and download

24   applications.  We didn't have those 20 years ago either, did

25   we?

Reisman - cross

1    A.     But it's not just the network that does that.  It's

2    the software as well.

3    Q.     I understand.  But the networks that allow that to be

4    done, like it is today, did not exist 20 years ago; is that

5    correct?

6    A.     Yes.

7    Q.     And now none of those networks are related to the work

8    you did in the '054 and '464 patents; is that correct?

9    A.     Not specifically.  It was anticipated that the

10   networks would improve.

11   Q.     Okay.  And they have improved?

12   A.     Yes.

13   Q.     And we're much more easily able to get software and

14   updates than we could 20 years ago, among other reasons,

15   because those networks have really gotten a lot better?

16   A.     That is one of the reasons, yes.

17   Q.     Okay.  Now, another thing that has gotten a lot better

18   in the last 20 years is the computer equipment that we use;

19   is that correct?

20   A.     In -- better in certain ways, yes.

21   Q.     All right.  I think you mentioned one of the ideas of

22   your invention was to use the intelligence of the client,

23   that is the computer that the user would use; right?

24   A.     Yes.

25   Q.     And computers have gotten a whole heck of a lot more

Reisman - cross

1    intelligent in the last 20 years, haven't they?

2    A.    Right.  Both hardware and software.

3    Q.    But processors have gotten faster, memory has gotten

4    bigger, everything has shrunk down; is that right?

5    A.    Yes, but that alone would not make that much of a

6    change.

7    Q.    Okay.  And you didn't work in those fields either.

8    That is, delivering faster, better computers that enabled

9    you to get software and other applications more quickly than

10   you could have 20 years ago; is that correct?

11   A.    Not in a significant way, no.

12   Q.    Okay.  Now, let's talk about what the specific genesis

13   was of your invention.

14          I think you talked about it a little bit and I

15   just want to go back to that.  You reminded us that back

16   20 years ago, people typically, because of these slow down

17   of dial-up networks, had to get software in CD-ROMS; is that

18   right?

19   A.    Predominantly, that was the best way to get it.

20   Q.    And if you are like me, you got an AOL CD-ROM at your

21   house every week?  And all of the other software would come

22   to your on CD-ROM?

23   A.    Yes.

24   Q.    And the reason people delivered it is you could get

25   software that had a lot of images and video on it on a

1    CD-ROM whereas it would take forever to get it downloaded

2    over a phone line; is that right?

3    A.    That was one of the reasons.

4    Q.    Okay.  And you said that, I think in your direct

5    testimony, that these CD-ROMS, while they had a lot of, you

6    know, bigger files, like images and videos, because they

7    were sent to you or you went to go pick them up at a store,

8    they would be out of date when you got them; is that

9    correct?

10   A.    Yes.

11   Q.    And so your specific idea, what I think the heart of

12   your idea was, was to embed software on a CD-ROM that would

13   then allow you to dial up a network and go get additional

14   content to bring back to your computer; is that correct?

15   A.    Well, it was not simply the dialing.  It was knowing

16   where to go on the network and how to integrate it with what

17   was on your computer.

18   Q.    Okay.  But the software that you had first in mind at

19   that time 20 years wag was this transporter software that

20   would go on the CD-ROM for the purpose of going online and

21   getting more information; is that correct?

22   A.    Well, that was only one of the delivery methods that

23   was described.  That was the dominant method at the time,

24   but downloading the software itself was also described.

25   Q.    Okay.  And don't get me wrong, I'm not trying to parse

Reisman - cross

1    your patent or pin you down on what your patent says because

2    I know they're very long and they say a lot of things.  I'm

3    asking you merely the genesis of what motivated your

4    invention was, and as you said earlier, I think it was this

5    notion of putting software embedded on a CD- that would then

6    go out and get more content; is that right?

7    A.    I never viewed a CD-ROM as being essential to it.

8    That was simply the dominant distribution method at the

9    time.

10   Q.    All right.  Let's look real quick at one thing that is

11   covered in your initial notes that you wrote in September of

12   1993?

13            MR. MOORE:  In we could pull up PTX-491, please,

14   and let's just blow up the top portion there.

15   BY MR. MOORE:

16   Q.    And that's what we saw earlier.  The first thing

17   you wrote after dating the document is CD link; is that

18   correct?

19   A.    Yes.  That was actually what I was thinking of as a

20   brand name that popped into my head for the product.

21   Q.    All right.  And one of the ways you thought that this

22   might work is that the software on the CD-ROM could, for

23   example, dial up at night when no one was using the phone,

24   log onto a server and get content and bring it back to the

25   user's computer; is that right?

Reisman - cross

1    A.    That was one of the features that I think was talked

2    about.

3    Q.    Okay.

4    A.    Yes.

5    Q.    All right.  And then I think you said, and I will get

6    into your patent in a minute.  I want to kind of go through

7    a little of the chronology of what you did in your business.

8            One of the first thing you did after you

9    documented these ideas was to hire somebody to write the

10   software code for what became your Teleshuttle product that

11   you tried to market; is that correct?

12   A.    Yes.

13   Q.    All right.  And you did that because at that point,

14   while you had done some programming in the past, you

15   weren't really much of a programmer at that point in time

16   anymore.  Hadn't been doing much programming anymore; is

17   that correct?

18   A.    Yes.

19   Q.    Okay.  You issued a press release for this Teleshuttle

20   CD-ROM update service in August of 1994.  Told the world

21   that it was available for purchase; is that correct?

22   A.    Yes.

23   Q.    Okay.  And now that original Teleshuttle software

24   program didn't use the Internet, did it?

25   A.    The first product version did not.

Reisman - cross

1    Q.    The one that came out in August of '94; is that

2    correct?

3    A.    Correct.

4    Q.    Instead it used dial up online access to dial up and

5    go get the additional information; is that correct?

6    A.    Yes, that's correct, because most people didn't have

7    service at the time.

8    Q.    Okay.  And, in fact, for a period of time after that,

9    you marketed your Teleshuttle CD-ROM update service using

10   dial up online access as a better alternative to using the

11   Internet or worldwide Web; is that correct?

12   A.    Only because there was lots of resistance to people

13   paying $10 a month for Internet service at that time.

14   Q.    Okay.  But that was one marketing angle you took,

15   right, was to offer this dial-up solution as a better

16   solution than the Web or Internet; right?

17   A.    As a way to reach customers who didn't want to use the

18   Internet.

19   Q.    All right.  If you could turn in your binder, and let

20   me see if I can help show you where, to PTX-502.  It's

21   actually the very last document.  As was the case this

22   morning, I can assure you we won't be going through all of

23   these long documents.

24          But if I could get you to take a look at PTX-502

25   and identify for us what that document is.  If you need a

Reisman - cross

1    few seconds to do it, feel free to take your time.

2    A.    Yes.  This was a brief description of, of the product

3    that I used.

4    Q.    Okay.  And you recognize PTX-502 as a document that

5    you prepared in efforts to market your Teleshuttle CD update

6    service?

7    A.    Yes.  It appears to be the one I used.

8             MR. MOORE:  All right.  Your Honor, Motorola

9    would like to offer PTX-502 into evidence, please.

10            MR. THOMPSON:  No objection, your Honor.

11            THE COURT:  Thank you.

12            (Plaintiffs' Trial Exhibit No. 502 was admitted

13   into evidence.)

14   BY MR. MOORE:

15   Q.    Let's take a look at that.  Actually, it has a number

16   of pages, but, Mr. Reisman, I want to focus you on page 7,

17   which is the last document.

18            MR. MOORE:  Could we show that?  Could you blow

19   up the title and then those first couple lines under it?

20   That's perfect.

21   BY MR. MOORE:

22   Q.    And this is one of the marketing documents you did.

23   It's titled marketing on the un-Web; is that correct?

24   A.    Yes.

25   Q.    And this is where you're marketing your direct dial

Reisman - cross

```
 1   update service as an alternative to using the Web or the

 2   Internet; is that correct?

 3   A.    Well, it was one of the product versions that I was

 4   marketing.  This was not the first, but it was a later

 5   effort.

 6   Q.    Okay.  Well, actually, let's look at the date on that,

 7   then.

 8           MR. MOORE:  Could you go back out and blow up

 9   the date on bottom right-hand corner of the document.  The

10   signature line, can you just blow up that whole line?

11   Y MR. MOORE:

12   Q.    It is a little hard to read.  Can you read that month

13   and date for us, please?

14   A.    4/95.

15   Q.    So that was April of '95?

16   A.    Yes.

17   Q.    So about eight or nine months after you first

18   introduced the CD Teleshuttle service?

19   A.    I had been marketing the original one for some time

20   and the Web was rapidly developing, so I did a, a variant

21   version of the product.

22   Q.    Okay.

23   A.    To redirect the market.

24   Q.    All right.

25           MR. MOORE:  And let's go ahead and if you can
```

Reisman - cross

1    pull up that same part again, please.

2    BY MR. MOORE:

3    Q.    All right.  And one thing you said was that your

4    Teleshuttle CD-ROM service was a marketing communications

5    vehicle that's superior to the Web.

6              Do you see that?

7    A.    Yes.

8    Q.    And you said then in the next line, you recited what

9    you called the dirty secrets of the Web.

10             Do you see those items listed?

11   A.    Yes.

12   Q.    Including that only a small minority of modem equipped

13   users have ready access to the Web?

14   A.    Yes.  This was getting at issues that were a problem

15   for marketers at the time.

16   Q.    Okay.  And then in your opinion, as of 1994, that will

17   change only over many years.

18             Do you see that?

19   A.    Yes.

20   Q.    And so you're telling people that the Web was not

21   going to grow and catch on as of 1995 or many years, so this

22   direct dial service was a better alternative than putting

23   their information on the Web.  Isn't that what you are

24   saying here?

25   A.    I didn't say it was better.  I said it was a

1    complementary option, I believe.

2    Q.    You said superior.

3    A.    Well, for wide reach.

4    Q.    Okay.

5    A.    If you want to really reach a wide market, it was a

6    superior solution.  For those who had the Web, it was not

7    necessarily superior.

8    Q.    In fact, it wasn't until May of 1995, so the month

9    after this, that you first announced that you would add

10   Internet connectivity to your Teleshuttle CD update

11   software; is that correct?

12   A.    I don't recall specifically.  Are you talking about

13   the FTP?

14   Q.    No.  I'm talking about when you announced in a press

15   release that your Teleshuttle was going to change from being

16   a dial up method to using the Internet for access.

17            Do you recall that that was around May of 1995?

18   A.    I don't recall the time.

19   Q.    Okay.  I'm sorry.  I didn't mean to cut you off.

20   A.    No.  I'm saying it might be about right.  I don't

21   recall.

22   Q.    Let me just show you a document that might refresh

23   your memory on that.  I know it has been some time.  It's in

24   your binder at DTX-80.  It's, you know, the front of the

25   binder.

1    A.    The first page?

2    Q.    Yes, sir.  Towards the bottom, there's an entry that

3    says May of 1995.

4    A.    Yes.  I believe that was to be an additional option in

5    addition to using dial up, that you could use Internet.

6    Q.    All right.  And does reading DTX-080 refresh your

7    recollection that the first time Teleshuttle, your company,

8    announced plans to use the Internet for its direct dial, in

9    addition to its direct dial support was in May of 1995?

10   A.    Yes.  That seems to be the case.

11   Q.    Okay.

12   A.    And, again, that's because the market for Internet,

13   you know, was limited and it was as rapidly developed, as

14   was almost everyone in the world.

15   Q.    You were surprised that the Internet had caught on as

16   quickly as it did in the middle of 1995; is that correct?

17   A.    The whole world was surprised.

18   Q.    Right.  Until that time, it didn't seem like it would

19   be a desirable business option for you to pursue for your

20   company; correct?

21   A.    Well, it would be desirable at some point.  I just

22   didn't think it was a priority given my limited resources.

23   Q.    Okay.  All right.  Now, you mentioned in your direct

24   testimony an actual CD-ROM release that your Teleshuttle

25   monthly update service was on.

Reisman - cross

1                       Do you recall that?

2    A.    Yes.

3    Q.    Okay.  And that was a, a CD-ROM that was distributed

4    or sold by Blockbuster Video; is that correct?

5    A.    Yes.

6    Q.    And what it was was a CD-ROM that you would load into

7    your home computer and you could see information on movies

8    that you might rent at Blockbuster; right?

9    A.    Yes.

10   Q.    All right.  And what you did was put this transporter

11   module on the CD; is that correct?

12   A.    Well, I supplied it.  Their programmers actually put

13   it on.

14   Q.    Sure.  Fair enough.  You supplied it to a company that

15   then put it on a CD-ROM that Blockbuster distributed; is

16   that correct?

17   A.    Yes.

18   Q.    All right.  And what that module did was, once a month

19   it would dial up online and get information on any

20   additional movies that had been released by Blockbuster

21   since the CD was issued; is that correct?

22   A.    Yes.

23   Q.    All right.  And that's something that Blockbuster

24   actually charged for, that monthly update service; is that

25   correct?

1    A.    Yes.

2    Q.    I think it charged about $3 a month for users that

3    wanted to have that update service?

4    A.    As I recall, yes.

5    Q.    Okay.  But you didn't have to have it?  You could get

6    it if you wanted it?  Didn't have to subscribe to it; is

7    that right?

8    A.    Right.

9    Q.    All right.  And I think, tell me if these numbers

10   sound right, but when we discussed this at your deposition,

11   I think you told me, and this is ballpark, out of the three

12   million total CD-ROMS that had been distributed, there were

13   about 3,000 people who signed up for the update service; is

14   that correct?

15   A.    I believe that's the understanding I had at the time.

16   Q.    All right.  About one in a thousand, if my math is

17   right?

18   A.    Mm-hmm.

19   Q.    All right.  And that your company, Teleshuttle, earned

20   revenue somewhere, again, ballpark numbers, ten and $30,000

21   off of that with the CD-ROM with the monthly updates?

22   A.    I don't recall exactly, but that seems about right.

23   Q.    Now, one thing I want to be clear on with that

24   software, that monthly update didn't allow the user to

25   select anything; right?  In other words, it didn't present a

Reisman - cross

1    directory of updates that the user could say, yes, I want

2    this or I don't want this?

3    A.    I don't recall whether it was simply a blind update or

4    whether there was an option that let you pick a particular

5    month's update to download.

6    Q.    You just don't recall?

7    A.    I don't recall.

8    Q.    But, in any event, that was the only product that

9    Teleshuttle released that had revenue for it, was the

10   Blockbuster CD-ROM?

11   A.    I believe it's the only one with actual revenue.

12   There was another product that was a beta test and a demo

13   mode.

14   Q.    Okay.  All right.  I want to switch gears a little bit

15   and talk about your, the patent.  You went through on direct

16   some your patent application and some of the patents that

17   are at issue here today.  And I want to walk through them a

18   little more carefully just to make sure we have the

19   chronology right.

20        First of all, I think you have them in front of

21   you in the binder that your counsel gave you.  Not that

22   they're not in our binder as well.  One thing I want to make

23   clear is that the two patents we're here to talk about here

24   at trial, the '054 and '464, they didn't come out, they

25   didn't issue out of the Patent Office until 2003; is that

1    correct?

2    A.    I believe that's right.

3    Q.    All right.  And they issued in response to a patent

4    application being filed in April of 2000; is that correct?

5    A.    Yes.  Two different applications.

6    Q.    Okay.  So these two patents that we're here in this

7    case about weren't the direct result of the 1994 patent

8    application that you testified about.  There were some other

9    patent applications in between there; is that right?

10   A.    Yes.

11   Q.    Okay.  Now let's look back, then, at that.  I think

12   you have in front of you, I believe it's in the binder your

13   counsel provided, JTX-9, which is the prosecution history

14   for the May 1994 patent application; is that right?

15   A.    Yes.

16   Q.    All right.  Now, I want, would like to ask you if you

17   have that there, if you would please turn to page 550 of

18   that exhibit.

19            First of all, just to set some context here,

20   Mr. Reisman, this exhibit contains the original application

21   that you filed in May of '94 along with all the back and

22   forth with the Patent Office that ultimately resulted in a

23   patent being issued; is that correct?

24   A.    I believe so.

25   Q.    All right.  And I would like to show, if we could go

Reisman - cross

1    ahead and publish, because I think it's already in evidence,

2    please publish page 550 of JTX-9.  Blow up the top third or

3    so of the page there, please.

4            All right.  Now, this is a copy of 550 and

5    continuing throughout the exhibit of a different U.S. patent

6    that issued to you in 1997; is that correct?

7    A.    Different from --

8    Q.    From the '054, is '464?

9    A.    Yes.

10   Q.    It's in the same family, but it's not the same as

11   those two patents; correct?

12   A.    Yes.

13   Q.    All right.  And using our convention here, we would

14   know this patent is the '546 patent, the last three numbers

15   of the patent; correct?

16   A.    Yes.

17   Q.    And this is the patent, is it not, that directly

18   issued as a result of the May 31, 1994, patent application

19   that you filed; is that correct?

20   A.    Yes.

21   Q.    All right.  Now, neither you nor IV is here today in

22   court saying that Motorola infringes this '546 patent; is

23   that correct?

24   A.    I believe so.

25   Q.    All right.  All right.  Well, let's just real quickly,

Reisman - cross

1    let's look on page, at columns 31.  It would be on page 573

2    of JTX-9.

3              Do you see there that we have the claims of the

4    '546 patent?  They begin at that page?

5    A.    Yes.

6    Q.    All right.

7              MR. MOORE:  Could we just highlight claim 1 of

8    the '546 patent, please?

9    BY MR. MOORE:

10   Q.    You see claim 1?

11   A.    Yes.

12   Q.    Let's highlight there.  It begins there.  About

13   two-thirds of the way down, left-hand column and then

14   continues almost the whole way down the next, right-hand

15   column; is that correct?

16   A.    Yes.

17   Q.    All right.  Now, fortunately, we don't have to deal

18   with that claim in this case because it's pretty long, isn't

19   it?

20   A.    Yes.

21   Q.    A lot of words.  Let's just look at three of them.

22             MR. MOORE:  Would you blow up on the highlighted

23   part on the left, maybe the first eight or ten lines.

24   Perfect.

25   BY MR. MOORE:

Reisman - cross

1   Q.    Now, what you are talking about here in the claim of

2   the '546 patent is a transport software component.

3              Do you see that language?

4   A.    Yes.

5   Q.    And it repeats itself a couple more times and just the

6   section we highlighted talks about the transport component

7   and so forth?

8   A.    Yes.

9   Q.    All right.  And that's how you described in this first

10  patent application and the patent that resulted from it,

11  that's how you described the transporter software that you

12  talked about in your direct testimony; is that correct?

13  A.    At least an embodiment of it.

14  Q.    Sure.  But that's how you talked about it in the first

15  claims that you sought from the Patent Office from your May

16  of 1994 patent application; is that correct?

17  A.    That's how it was described, yes.

18  Q.    All right.  And you received that patent in December

19  of 1997, around the time that you still had Teleshuttle as a

20  business; is that correct?

21  A.    Yes.

22  Q.    All right.  Now, let's go to another patent

23  application that you filed.  Actually, let's go back, if we

24  could, to JTX-6, which I believe is the '054 patent.

25              Do you have that in front of you?

1    A.    It's in which binder?

2    Q.    I think it's in both binders.

3    A.    Okay.

4    Q.    We lawyers like to kill trees.

5    A.    Okay.  The '054.  Yes.

6    Q.    Yes, yes, sir.

7              MR. MOORE:  Can you blow up, please, the

8    application through the related application data, the middle

9    of that left-hand column.  That's good.

10   BY MR. MOORE:

11   Q.    Okay.  So as you said before, the application that

12   directly led to the '054 and '464 was filed in April of

13   2000; is that correct?

14   A.    Yes.

15   Q.    All right.  And what I want to ask you about is

16   another patent application you filed on April 29th, 1996.

17             MR. MOORE:  Could you highlight that there in

18   the middle of the related data, about the third line down

19   there on the right-hand side?  A little bit further over.

20   Do you see where it says April 29, 1996?

21             All right.  Go to the next line down and

22   highlight continuation in part.  All right.

23   BY MR. MOORE:

24   Q.    So what I wanted to ask you, Mr. Reisman, is after you

25   filed this first 1994 application, you then filed something

Reisman - cross

1    in 1996 called a continuation in part patent application; is

2    that correct?

3    A.    Yes.

4    Q.    And could you just, I know you are not a lawyer, but I

5    know you have a lot of patents.  What's your understanding

6    of what a continuation in part is?

7    A.    It's an additional application that adds additional

8    detail or additional aspects to an invention to go beyond

9    the original filing.

10   Q.    All right.  So it adds new material compared to what

11   was in the original filing; is that right?

12   A.    Yes.

13   Q.    And it's also called a CIP by patent lawyers and

14   inventors as a shorthand?

15   A.    Yes.

16   Q.    All right.  Could you please turn in the binder that

17   we gave you to DTX-266.

18             Can you identify that document for us, please?

19   A.    It looks like the '692 patent.

20   Q.    All right.  And that's another patent that issued to

21   you among those in the family here; right?

22   A.    Yes.

23   Q.    Now, do you recognize that this '692 patent is the

24   patent that issued as a result of your filing the CIP,

25   continuation in part application in 1996?

 1    A.    Yes.  It appears to be the, the final result of that

 2    application, although I think it took some turns in the

 3    process.

 4    Q.    Sure.

 5              MR. MOORE:  Your Honor, we would offer DTX-266

 6    into evidence at this time.

 7              MR. THOMPSON:  No objection, your Honor.

 8              THE COURT:  All right.

 9              (Defendant's Trial Exhibit No. 266 was admitted

10    into evidence.)

11              MR. MOORE:  All right.  Let's go ahead and put

12    that front page up.

13    BY MR. MOORE:

14    Q.    Now, this is another patent that neither you nor IV

15    claims in this lawsuit that Motorola infringe; is that

16    correct?

17    A.    I believe so.

18    Q.    All right.  And the reason I wanted to show you this,

19    and I know it takes some setup and some detail about the

20    patent process to get here, but the reason I wanted to show

21    you this is because in this application, you added a lot of

22    new information about the Internet and the worldwide Web

23    that you didn't have in your 1994 application; isn't that

24    right?

25    A.    Yes.  It adds a lot of details on how to deal with

Reisman - cross

1    hypertext and Web servers.

2    Q.    Okay.

3    A.    They go beyond the thrust of the patents that we're

4    talking about here.

5    Q.    All right.  And I won't belabor it much further, but

6    the place where it looked like to me you started adding

7    material was around column 36, which is on page 40 of the

8    patent.  If we could go there.

9              MR. MOORE:  If you would blow up the right-hand

10   column, the middle of that.  Right there and go down.

11   BY MR. MOORE:

12   Q.    Do you see a section there that talks about Internet

13   applications in column 36?

14   A.    Yes.

15   Q.    All right.  And you continue then, and I won't go

16   through it page by page, but you continue then for, by my

17   count, 25 columns, from 36 through 62, talking about the

18   Internet and the Web in the CIP patent application; is that

19   correct?

20   A.    Yes.  There are many additional aspects related to the

21   Internet that I thought had potential value.

22   Q.    And you added all of that in 1996 in the CIP?

23   A.    I believe that's when it was filed.

24   Q.    All right.  Now, let's go back to your business and

25   where you were at that time.

Reisman - cross

1              I think by the middle of 1997 or so, the funding

2    that you had for Teleshuttle as an ongoing business had run

3    out; isn't that correct?

4    A.    Pretty much.

5    Q.    All right.  And at that point in time, I think you

6    said in your direct testimony, you shifted your business

7    model from trying to market products to the Internet and Web

8    community to trying to obtain licensing or other value off

9    of your patents and your pending applications; is that

10   correct?

11   A.    Yes.

12   Q.    All right.  And now you wrote a business plan for that

13   purpose; is that correct?

14   A.    Yes.  I believe so.

15   Q.    All right.  Let's look in your binder at DTX-264,

16   please.

17              Go ahead and take your time to get there.  Can

18   you identify DTX-264 for the record, please, sir?

19   A.    Yes.  This appears to be a version of the business

20   plan that I developed.

21   Q.    All right.  And you wrote this document; is that

22   correct?

23   A.    Yes.  I believe it's the document I wrote.

24              MR. MOORE:  All right.  We'd offer DTX-264 into

25   evidence, please.

Reisman - cross

1            MR. THOMPSON:  No objection, your Honor.

2            THE COURT:  Thank you.

3            (Defendant's Trial Exhibit No. 264 was admitted

4    into evidence.)

5            MR. MOORE:  Please publish the document.

6    BY MR. MOORE:

7    Q.    Now, let's just blow up the top part before we get to

8    the executive summary.  The name of your business is

9    development of business based on patent rights for automated

10   Internet delivery.

11           Do you see that, sir?

12   A.    Yes.

13   Q.    And if we could go down to the executive summary

14   paragraph and then the next paragraph, the approach.  Go

15   ahead and blow those up.

16           Now, this is, this document is one that you

17   wrote to memorialize what you wanted to do when you decided

18   to shift from trying to market products to trying to license

19   patents; is that correct?

20   A.    Well, it was actually intended to help find partners

21   to assist with that effort.

22   Q.    Right.  You said on direct that you needed some people

23   to help fund those efforts; right?

24   A.    Correct.

25   Q.    You wrote this document to potentially deliver to

Reisman - cross

1    partners who might be interested in that; is that right?

2    A.    Yes.

3    Q.    All right.  You write in the first paragraph under

4    business opportunity:  This business opportunity is based on

5    an allowed U.S. patent and appending CIP related to key

6    features of Internet software which have become widely known

7    and are in rapidly growing use by others.

8              Do you see that?

9    A.    Yes.

10   Q.    The allowed U.S. patent you're talking about there is

11   the '546; right?  The first one you got?

12   A.    Yes.

13   Q.    And the CIP is the one that ultimately became the

14   '692; is that correct?

15   A.    I forget the number.  The one we were just talking

16   about.

17   Q.    Yes, the one we just looked at.  Thank you, sir.

18              You didn't have the '054 for or '464 at this

19   time, did you?

20   A.    No.

21   Q.    In fact, it was still three years before you even

22   filed those applications; is that right?

23   A.    That seems right, yes.

24   Q.    Okay.  But the first sentence you wrote in the

25   business summary is the opportunity was based on the fact

Reisman - cross

1     that the Internet had become widely known and was in rapidly

2     growing use by others; is that right?

3     A.    Yes.

4     Q.    And at the end of that paragraph you said, partners

5     are sought to assist in this development, which could offer

6     very high return on a very modest controllably staged

7     investment; right?

8     A.    Yes.

9     Q.    All right.  You then talked in your direct about the

10    idea of alliances with other companies.  You identify that

11    in the approach paragraph; right?  You say the suggested

12    approach is to pursue an alliance-based strategy of

13    identifying existing players who could benefit from

14    preferential licenses in a specific market segments as a

15    competitive weapon in this highly dynamic and hotly

16    contested market.

17             Do you see that?

18    A.    Yes.

19    Q.    You're referring again to the Internet market; is that

20    right?

21    A.    Yes.

22    Q.    All right.  And then towards the bottom of that

23    paragraph, you write a sentence that says:  Finesse in

24    seeking and negotiating alliances is viewed as a key

25    requisite to maximal exploitation.

1                    Do you see that?

2     A.    Yes.   That's referring to knowing how to talk to big

3     companies to negotiate licenses.

4     Q.    Well, you're referring there to maximal exploitation

5     of your patents; is that correct?

6     A.    Yes.

7     Q.    All right.  If you could please turn to DTX-270, which

8     is, I believe, two exhibits over in your notebook.

9     A.    Yes.

10    Q.    Could you identify this document for us, please?

11    A.    It appears to be a letter I wrote in 1998.

12    Q.    Okay.  And you believe that you wrote this letter?

13    A.    Yes.  I have a vague recollection of this.

14    Q.    Is that your signature?

15    A.    Yes.

16    Q.    All right.

17                    MR. MOORE:  We'd offer DTX-270 into evidence,

18    please.

19                    MR. THOMPSON:  No objection, your Honor.

20                    THE COURT:  Thank you.

21                    (Defendant's Trial Exhibit No. 270 was admitted

22    into evidence.)

23                    MR. MOORE:  Let's go ahead and publish that,

24    please.

25    BY MR. MOORE:

Reisman - cross

1    Q.    You wrote this letter.

2              MR. MOORE:  Go ahead and blow it up.  There you

3    go.

4    BY MR. MOORE:

5    Q.    You wrote this letter to a licensing person at a

6    company named REFAC Technology Development?

7              Do you see that?

8    A.    Yes.

9    Q.    They were one of the companies that was involved in

10   licensing of patents that you approached to try to partner

11   with you?

12   A.    Yes.  I identified a number of companies and tried to

13   determine which ones made sense to work with.

14   Q.    All right.  And in this letter that you sent to REFAC,

15   you say in the second full paragraph, if we could blow that

16   up, please, the full paragraph, you say:  I believe this

17   IPR, you mean intellectual property rights; right?  Your

18   patent?

19   A.    Yes.

20   Q.    I believe this IPR may be found to have value with

21   regard to a variety of methods of offline and push

22   distribution of information over the Internet which are now

23   coming into widespread use for a broad range of

24   applications.

25             Do you see that?

Reisman - cross

1    A.    Yes.

2    Q.    You said at the end of the paragraph, I now view the

3    primary opportunity of licensing to persons who might be

4    infringing.

5              Do you see that?

6    A.    Yes.

7    Q.    Now, this process of reaching out to partners is what

8    led you to a relationship with a company named BTG; is that

9    right?

10   A.    Yes.

11   Q.    That's British Technology Group?

12   A.    Yes.

13   Q.    And that was also a company that was in the

14   businesslike IV of buying and licensing patents?

15   A.    Yes.

16   Q.    And ultimately you signed an agreement in which you

17   gave, in 1998, you gave BTG exclusive licensing rights to

18   the '546 patent and your CIP and any other applications in

19   that family; is that right?

20   A.    Yes.

21   Q.    Now, BTG didn't help you try to develop any products

22   based on that patent family, did it?

23   A.    No, I don't believe so.

24   Q.    Instead, they, one thing they did is they tried to get

25   you additional patents based on more applications that they

Reisman - cross

1   filed?

2   A.   Yes.

3   Q.   And they took over the prosecution of your patent

4   portfolio at that point in time, didn't they?

5   A.   Yes.  I did not have funding to do that and did not

6   have a whole lot of expertise in it and that's what I was

7   looking for.

8   Q.   All right.  So the people at BTG are the ones then in

9   2000 that actually filed the at patent applications that led

10  to the '054 and the '464 patents that we're here to talk

11  about today; right?

12  A.   With my support, yes.

13  Q.   Sure.  I'm not saying you're completely out of the

14  picture.  You were still involved as a consultant; right?

15  A.   Yes.

16  Q.   But they actually filed the application and wrote it;

17  is that right?

18  A.   Their outside counsel did, I believe.

19  Q.   Their lawyers did?

20  A.   Yes.

21  Q.   So their lawyers wrote the claims, for example, in the

22  '054 and '464 patents that we're here talking about in this

23  trial; right?

24  A.   Yes, just as my lawyers wrote the claims for the first

25  once.  I did not write the claims for any of these.

Reisman - cross

1    Q.    I understand and I'm not suggesting -- of course,

2    obviously, lawyers write patent claims.  My point was it was

3    BTG and their lawyers as opposed to you and your lawyers who

4    wrote the patent claims in the see '054 and '464 patents

5    that are at issue in this trial; is that correct?

6    A.    With support from me, yes.

7    Q.    Right.  And you reviewed them, for example, gave

8    feedback?

9    A.    Yes.  In most cases.

10   Q.    As a consultant; is that right?

11   A.    Yes.

12   Q.    Okay.  And in addition to filing the patent

13   application in 2000 that directly led to the patents that

14   we're here talking about, BTG actually changed the titles of

15   those patents to what they are today in 2002; isn't that

16   right?

17   A.    I don't recall if it was BTG's initiation or the

18   outside counsel, but I believe, I believe there were changes

19   to better, to more accurately describe the claims.

20   Q.    Okay.  Yes.  And whether it was BTG or its counsel,

21   the point is, the titles of the patents that have been

22   presented to us in court, in this trial for us to look at,

23   aren't the titles that you chose when you got patents in

24   '94, in '96, or filed for patents in '94 or '96.  They were

25   titles that BTG or its lawyers put in these patents that

1    they tried to get in 2000; is that correct?

2    A.    To better describe the aspects that were being

3    patented at the time.

4    Q.    To better describe the claims that BTG and its lawyers

5    had written at that time; right?

6    A.    Yes.

7    Q.    And now IV comes on the scene because it bought the

8    patents from BTG; is that right?

9    A.    Right.

10   Q.    And IV didn't also try to help you develop any

11   products on your patent portfolio, has it?

12   A.    No.

13   Q.    All right.  Now, what IV did do is pay you and your

14   wholly owned company, Teleshuttle, $7 million when it bought

15   the patents from you and BTG; is that right?

16   A.    Something like that.

17   Q.    And you also made about $400,000 from BTG during the

18   period of time in which they owned your patents; is that

19   right?

20   A.    Something like that.

21   Q.    Okay.  In addition, I think you referred to this in

22   your direct, you have an interest in any future licensing

23   royalties that IV is able to obtain using your patents;

24   right?

25   A.    Yes.

Reisman - cross

1    Q.    And because of that interest, you have already been

2    paid over $2 million in additional royalty payments by IV;

3    is that correct?

4    A.    I believe it's something like that.

5    Q.    All right.  So all told, between BTG and IV, you've

6    been paid close to $10 million for the sale of your patents

7    or licensing of your patents; is that correct?

8    A.    Yes.  These patents have proven to be valuable.

9    Q.    All right.  And you also get a 12-and-a-half percent

10   of any future licensing royalties or any future licensing

11   profits, I should say?

12   A.    I think that's the percentage.

13   Q.    Okay.  And IV gets the, and IV and its investors get

14   the other 87-and-a-half percent; right?

15   A.    Well, no BTG also gets --

16   Q.    I'm sorry.  You're correct, sir.  So BTG still has an

17   interest and then IV has the remaining interest; is that

18   right?

19   A.    Yes.  I don't know who shares in IV's interest.

20   Q.    All right.  Do you know the split between BTG and IV

21   for any future payments?

22   A.    BTG and I have an equal share.

23   Q.    So you have another 12-and-a-half percent?

24   A.    Actually, the payments go to BTG and BTG owes me a

25   portion.  It's approximately half of what they get.

Reisman - cross

1    Q.    Okay.  All right.  Fair enough.

2                  I would like to actually switch gears right now

3    and talk to you a little bit about the claims of your

4    patent.

5                  MR. MOORE:  And, your Honor, may I set up a

6    board like we used the other day in that same location?

7                  THE COURT:  Yes.

8                  MR. MOORE:  Would it make it easier to do that?

9    Thank you.

10                 (Mr. Moore placed charts on the easel.)

11                 THE COURT:  We're going to try and take a break

12   at quarter of, so I guess someone make sure that the jurors

13   can exit then.

14                 MR. BOICE:  All right.

15                 MR. MOORE:  Can you see that, sir?

16                 THE WITNESS:  Yes.

17   BY MR. MOORE:

18   Q.    All right.  All right, sir.  That's the language of

19   one of the claims of the '054 patent that's at issue here in

20   this case.

21                 Do you understand that?

22   A.    Yes.

23   Q.    All right.  And it's specifically, just for the

24   record, it's claim 151.  If you need at any time to refer to

25   the actual patent to confirm that that is the right

Reisman - cross

1   language, feel free to do that.

2            But what I want to ask you about is, this claim

3   now, it does not use the words transporter software,

4   transporter component like the '546 claims do; is that

5   correct?

6            MR. THOMPSON:  Your Honor, IV has an objection

7   to the extent that this is going to get straight into claim

8   construction again.  So I mean at this point, we'd at least

9   ask for a proffer about what they are going to ask the

10  claims --

11           THE COURT:  Well --

12           MR. THOMPSON:  -- language.

13           THE COURT:  Well, that means we need to take a

14  break now.

15           I guess we should take our break a little bit

16  early, ladies and gentlemen.  Fifteen minutes.

17           You might have --

18           MR. MOORE:  Would you like me to move that?

19           THE COURT:  You might have to move that.

20           MR. MOORE:  Yes.

21           (The jury was excused for a short recess.)

22           MR. MOORE:  Is that okay?

23           THE COURT:  That's fine.  And I will ask the

24  witness to leave the courtroom.  You can take your break, if

25  you want.

Reisman - cross

1          THE WITNESS:  Okay.

2          (The witness was excused from the courtroom.)

3          THE COURT:  And everyone else may be seated.

4          So perhaps I need to hear the objection so that

5     I can understand the response.

6          MR. THOMPSON:  Thank you, your Honor.  The basis

7     of the objection is that the existence or absence of

8     transporter software in that claim has been a thing that has

9     been discussed with regard to claim construction in this

10    case and to bring it up now with that witness and ask him

11    whether those words are in that claim or whether they're not

12    in that claim basically boils back to discussions between

13    counsel that occurred over a year ago concerning the scope

14    of this claim.  So we object based on the fact that they're

15    doing back door claim construction.

16         MR. MOORE:  Your Honor, I'm not doing back door

17    claim construction.  I was simply going to ask that

18    question, then move on to other parts of issues that relate

19    to the claim.  I'm not going to get into claim construction

20    on this issue.  I was going to ask him a series of questions

21    about the state of the art, frankly.

22         MR. THOMPSON:  Well, your Honor, even beyond

23    that, as I think Mr. Moore attempted to establish, which is

24    that these claims weren't written by Mr. Reisman and I'm not

25    sure what foundation Mr. Reisman has to read them and

Reisman - cross

```
 1    provide testimony in front of the jury regarding the scope

 2    or the state of the art or anything with regard to those

 3    claims.

 4              If he had established foundation and Mr. Reisman

 5    had said that he had written them, that would be a different

 6    scenario, but now he has established there's a disconnection

 7    in addition to the fact that I think it's still back-door

 8    claim construction.

 9              THE COURT:  Well, I guess I've not, at least it

10    has been a long time since I've had an inventor up on the

11    stand giving this level of detailed analysis.  So I guess

12    the -- I guess I need to understand the relevance of his

13    testimony in this regard when claim construction has been

14    decided and he's not an expert witness on either

15    infringement or invalidity.

16              MR. MOORE:  Yes, your Honor.  As I said, I'm

17    going to ask him about state of the art.  I want him to have

18    the claim up there just so he had a reference for what's in

19    front of us.  The jury has not seen the claim yet, but if

20    your Honor would prefer me to proceed with my questioning

21    without the claim board up there, I can do that.

22              I think it's relevant to ask an inventor about

23    the claims whether or not he wrote them.  I think he

24    testified he reviewed them.  I don't plan to ask him about

25    meanings and construction and that sort of thing.  As I say,
```

Reisman - cross

1    I plan to ask him about state of the art before he conceived

2    of his invention.  But if you prefer me to do that without

3    the board, if that eliminates the board, I'm happy to do

4    that.

5              THE COURT:  All right.  So state of the art as a

6    fact witness?

7              MR. MOORE:  Yes, ma'am.  What he knows people

8    were doing.

9              THE COURT:  And this has been vetted through

10   discovery?

11             MR. MOORE:  Yes.

12             THE COURT:  Is there an objection?

13             MR. THOMPSON:  Your Honor, may I respond to

14   that?  Yes, indeed.  I think what's being said is that

15   what's to be done is that the witness is going to be asked

16   almost in a claim chart fashion to go through each of the

17   elements of the claim.  Whether or not the language is up in

18   front of him or not and say, based on the lack of foundation

19   that the witness has about whether that claim language is in

20   the prior art.  And if that's what the line of questioning

21   is, then that's exactly -- that's exactly what's improper

22   and lacks foundation.

23             THE COURT:  Well, perhaps you need to give me a

24   better idea of what you intend to do.

25             MR. MOORE:  I intend to ask him what was already

1    known at the time of the invention with regard to some

2    specific examples that he both talked about at his

3    deposition and talked about in the patent.

4           You know, I find it a little ironic that IV is

5    arguing about us using claim language in view their survey,

6    especially with the inventor.

7           I don't intend to ask through a claim

8    chart-style analysis.  I wanted to frame the discussion and

9    that's why I have the board, so that the jury can actually

10   see for the first time what the claim relates to.  But I

11   don't intend him to say, well, this phrase means this or

12   this phrase means that.

13          THE COURT:  Well, but, if you intend to say --

14   well, give me an example.  What claim are we on?  161?

15          MR. MOORE:  Yes, ma'am.  I was going to ask him,

16   for example, about how people knew, you know, what things

17   were available as of the time of his invention to identify

18   software that was already on a computer or what things were

19   available for people to select software.  You know, what

20   things were known at that time.

21          And, again, so if the issue is we don't want it

22   with him looking at the claims at the same time, then that's

23   fine.  I just thought it was easier to guide the discussion

24   that way, so that the jury could see why I'm asking about

25   this, not just asking about these concepts that have not

Reisman - cross

1     been introduced to them yet.

2               THE COURT:  Well, I guess what I'm concerned

3     about, and I'm trying to find...

4               I guess what I'm concerned -- well, if, in fact,

5     you intend to use, whether you are pointing at it or not, if

6     you intend to say, was X in the prior art, then if X is a

7     construed term, then I find that objectionable.  So I don't

8     know what you plan to do yet.

9               If you're asking an open-ended question, which

10    you have already, then there were no objections, it has been

11    asked and answered.  But if you are pointing to phrases in

12    the patent that have been construed by the Court to say, was

13    this present in the prior art, I have difficulty with that,

14    and I will not allow it.

15              MR. MOORE:  Okay.

16              THE COURT:  I don't know where we stand.

17              MR. MOORE:  I think I can ask my questions all

18    the same.  I'm happy to do it without the board and I'm

19    happy to try to use plain language of, you know, technical

20    language he's familiar with and not too slip into claim

21    language.  I think I can do that.

22              That's really the point of these questions,

23    to ask him, somewhat similar to what I did at the beginning

24    of his cross, what people knew how to do before his

25    invention.

1                    MR. THOMPSON:  If I could respond, your Honor?

2                    THE COURT:  All right.

3                    MR. THOMPSON:  Well, that's exactly it.  If

4        counsel's intent is to ask the witness whether certain types

5        of technologies existed prior to this patent, like counsel

6        did before with respect to FTP, the file transfer protocol

7        or the Internet, you know, whether the it with invented the

8        Internet or faster network, faster processors, whatever, all

9        of those questions have been posed and they've been answered

10       and I think those are completely fair.

11                   But I think we can see where we're headed, which

12       is instead of asking about technology being in the prior

13       art, what counsel intends to do is ask whether claim

14       language was in the prior art and that's where it becomes

15       expert testimony and lacks foundation.

16                   THE COURT:  And if you intend to do that, please

17       do not, because I will have to -- well, chastise you in

18       front of the jury, which I don't want to do.  All right.

19                   MR. MOORE:  I will do that, your Honor.

20                   THE COURT:  All right.  Let's take 15 minutes.

21                   (Short recess taken.)

22                              -  -  -

23                   (Proceedings resumed after the short recess.)

24                   MR. MOORE:  Your Honor, before we begin, would

25       this be a good time to address the objection over the slide

1    for the next witness?  I apologize for not raising it this

2    morning.

3              THE COURT:  Sure.  The clock starts running

4    again, then.

5              MR. MOORE:  Yes, ma'am.

6              THE COURT:  All right.

7              MR. MOORE:  We have two objections.  One is

8    really --

9              THE COURT:  This doesn't affect this witness?

10             MR. MOORE:  No.

11             THE COURT:  All right.

12             MR. MOORE:  I don't have a problem with him

13   being here for it.

14             THE COURT:  All right.

15             MR. MOORE:  There are two objections.  One is to

16   two of the slides that they intend to use with Dr. Nieh, the

17   next witness.  I believe it's slide 213 and 219.  And I can

18   put them up.

19             Can you put up slide 213, please?

20             THE COURT:  And these are demonstratives?

21             MR. MOORE:  These are demonstratives, yes,

22   ma'am.  This is a slide off of their deck for their expert.

23   And the previous slide just has the Court's construction of

24   this term, but this is actually some of the Court's

25   reasoning from the claim construction order and it also

Reisman - cross

 1    appears on slide 219 and we do object to them showing the

 2    Court's reasoning from the order.  We obviously don't object

 3    to them showing the claim construction itself.  Obviously,

 4    that opens the door to us getting, introducing other parts

 5    of the reasoning and then the jury having to construe the

 6    Court's order.  So we don't think they ought to put a

 7    reasoning on the slide.

 8              THE COURT:  I don't recall that I generally

 9    allowed parts of my decisions to go up.

10              MR. THOMPSON:  I think this is going to be a

11    special case, your Honor, and here's the reason.

12              When your Honor provided the opinion that came

13    down, there was a section that specifically dealt with claim

14    construction and in that section, especially for this term,

15    there were two sentences.  There was the construction in

16    quotes, but the construction in quotes does not encompass

17    the ruling that was actually provided by the Judge.  It's

18    the very next sentence and so that sentence is the very

19    next sentence.  And without it, if I could, I'd like to

20    use the Elmo, because it's really easy to show what's

21    going on here.

22              Without that sentence, what will happen is that

23    the noninfringement, a noninfringement argument will be put

24    forward wherein stead of the claim not requiring that the

25    software product itself present the stored content, Motorola

Reisman - cross

1  Mobility's argument is going to be that the patent does

2  require that the software product itself present the stored

3  content.

4          And I can show this because it's kind of a

5  remarkable situation in that I have a supplemental expert

6  report from their expert after this order, two weeks after

7  this order, and it explicitly lays out that they're going to

8  go directly opposite to that statement in that slide.

9          So this is the problem.

10         THE COURT:  Well, can you give me page numbers

11 of my decision?

12         MR. THOMPSON:  Sure.  Actually, if I could, your

13 Honor, I can put it on the Elmo.

14         THE COURT:  Well --

15         MR. THOMPSON:  But the slide is slide 51.

16         THE COURT:  Well, I mean, I've got my exhibit in

17 front of me.

18         MR. MOORE:  I think I have it.

19         MR. THOMPSON:  Yes.

20         MR. MOORE:  It's the -- the claim construction

21 discussion at issue starts on 51 and goes into 52 and then

22 the infringement discussion is thereafter.  If you can

23 switch it.

24         MR. THOMPSON:  That's okay.  I think her Honor

25 has it.

Reisman - cross

1                  THE COURT:  Well, okay.  So I guess I just -- I

2       would like the supplemental report.

3                  MR. THOMPSON:  Absolutely.

4                  THE COURT:  And I would like just to be able to

5       look at this.  So tell me where I'm looking.  I'm on page

6       51.

7                  MR. THOMPSON:  So on page 51, what you see is

8       there the heading that begins, affect presentation.

9                  THE COURT:  Yes.

10                 MR. THOMPSON:  And the first sentence is the

11      quoted material.  And the point of this is that the critical

12      part of the claim construction is in that second sentence

13      right there.

14                 This is the sentence that if it's not shown, if

15      the expert is not allowed to explain that the sentence

16      exists, then Motorola Mobility will offer a noninfringement

17      position where it negates this, it nullifies the sentence.

18      Instead, they will claim that the patent does require that

19      the software product itself present the stored content.

20      They will take out the not.

21                 And so just to, because it's easy to show and

22      then I can pass it up, your Honor --

23                 THE COURT:  Well --

24                 MR. THOMPSON:  This is the supplemental expert

25      report that came two weeks after your Honor's order.  And

Reisman - cross

1   what we see is at the end of this explanation, there are two

2   sentences, and this is from their expert:  The customized

3   screens to which Dr. Nieh cites, which are the app, appear

4   only after the user initiates the downloaded app and leaving

5   Google Play.  This is the punchline.  Those screens, the

6   display, are displayed by the app, not the accused Google

7   Play product.

8          This is an argument that the Google Play product

9   must display the screens of the application itself, and that

10  is directly contrary to this sentence, which says, the

11  patent does not require that the software product itself

12  present the stored content.  It couldn't be any clearer.

13         MR. MOORE:  Your Honor, on the next page,

14  though, the Court also says in assessing infringement --

15  this is on page 52 of its order, has explained that the

16  Court has no requirement, as Motorola contends, that the

17  software product provide the customized user interface.

18  Only that the software product, Google Play, display the

19  Google interface that is customized with publishers.  I

20  think what we're getting at here, I guess we have a

21  difference of opinion about the construction.  You know, the

22  difference between allowance of display and display.  And we

23  think there is, remains at least a factual issue as to

24  whether Google Play does that.

25         We understand the Court denied summary judgment

Reisman - cross

1    on that.  I'm a little hesitant with their expert in the

2    room to get involved in my strategy on cross on that with

3    him.  That's the other witness, not Mr. Reisman.

4                   THE COURT:  All right.

5                   MR. MOORE:  But there is a basis for it.  You

6    know, we certainly don't intend to argue against the Court's

7    construction, but I think we still have a basis to argue on

8    infringement based on the construction and the analysis.

9    And we object to them putting in part of the analysis of the

10   order.

11                  THE COURT:  Well, I need to see the supplemental

12   report and think about it.  All right?

13                  MR. THOMPSON:  Your Honor, may I approach?

14                  THE COURT:  Yes.

15                  (Mr. Thompson handed documents to the Court.)

16                  THE COURT:  All right.  Let's bring the jury in.

17                  MR. MOORE:  I'm sorry, your Honor.  There's one

18   other issue on their slides.  It's not an objection.  It's

19   more of a housekeeping matter.  They've exerted some of the

20   source code for Google Play on one side and we'd prefer --

21   it's a little bit delicate.  We would prefer it not be shown

22   in open court and we have asked that the source code itself

23   on the exhibit be sealed and IV doesn't object to that, but

24   they do have some actual code excerpts in a slide.  And I

25   would hate to clear the courtroom for just one slide.

Reisman - cross

1                On the other hand, if there's nobody here but

2      the parties, I don't know if we can work something out on

3      that.  But there is one issue I feel compelled to raise,

4      because Google is subpoenaed as a third party.  This source

5      code is very proprietary.  We have an issue with that being

6      shown where everyone can see it, but we don't have an

7      objection to it otherwise.

8                    MR. THOMPSON:  Shall I respond, your Honor?

9                    THE COURT:  Yes.

10                   MR. THOMPSON:  As we said, we don't have an

11     objection to the courtroom being sealed, but we do need to

12     show it and here's why.  I would say the main argument that

13     Motorola Mobility makes against the '054 patent is that the

14     portions of the screen that Dr. Nieh points to for

15     infringement of a directory of available software that

16     doesn't have software that has already been in installed,

17     they say that's not a directory, it's not something that is

18     separate.

19               I don't know if I should just blurt this out and

20     explain what the source code is, but the source code

21     basically rebuts that.

22                   THE COURT:  Well, if you feel you need it, then

23     we need to clear the courtroom.

24                   MR. THOMPSON:  Okay.  Thank you, your Honor.

25                   MR. MOORE:  Thank you, your Honor.  That was it

Reisman - cross

1    and I apologize again for not raising it this morning.

2                    THE COURT:  All right.  Let's bring the jury in.

3                    (The jury entered the courtroom and took their

4    seats in the box.)

5                    THE COURT:  Thank you, ladies and gentlemen.

6                    You may proceed, Mr. Moore.

7                    MR. MOORE:  Thank you, your Honor.

8    BY MR. MOORE:

9    Q.    Mr. Reisman, I wanted to go back to one thing that

10   you talked about this morning, or this afternoon on your

11   direct.

12                   MR. MOORE:  Could we pull up slide 6 on the

13   plaintiffs' slides, please.

14   BY MR. MOORE:

15   Q.    This is the America Online screen shot.  I think you

16   said earlier that you referenced 1998.  You were talking

17   about then the date that the movie "You've Got Mail" was

18   released was 1998; right?

19   A.    Yes.

20   Q.    AOL had been around long, long before then?

21   A.    Yes.

22   Q.    And, in fact, as we see here it was around in

23   1990/1991; right?

24   A.    Yes.  My point was this version was very different

25   from what people think of as the long time ago in 1998.

Reisman - cross

 1   Q.    Okay.  I didn't want there to be any confusion over

 2   what happened --

 3   A.    Sure.

 4   Q.    All right.  Now, another thing that happened that I

 5   want to talk to you about before the date of your invention

 6   is, and IV talked a little bit about this on your direct

 7   testimony as well, about computers having operating systems,

 8   such as Windows.

 9              Do you recall that?

10   A.    Yes.

11   Q.    And Windows, of course, as an operating system,

12   existed before your invention?

13   A.    Early versions of it.

14   Q.    Early versions like 3.1 and earlier versions than

15   that?

16   A.    I forgets the exact timing.  I think 3.1 was prior,

17   but I'm not sure.

18   Q.    In any event, versions of Windows were before your

19   invention.  And one thing that operating systems like

20   Windows have is called a registry.  Are you familiar with

21   the registry in an operating system?

22   A.    Yes.

23   Q.    And what a registry does is it keeps track of all the

24   software applications you have on your computer; is that

25   correct?

Reisman - cross

1    A.    Yes.

2    Q.    And, in fact, any time you install or un-install an

3    application, an operating system, like Windows, keeps track

4    of that; is that right?

5    A.    I don't know if the early versions did have the

6    registry.  I'm wondering if maybe that came in in Windows

7    '95 or later.  So current operating systems do have a

8    registry.  I don't know if prior operating systems did.

9    Q.    You just don't know one way or the other?

10   A.    Right.

11   Q.    Do you know whether, in fact, Windows 3.1 had a

12   registry?

13   A.    I don't recall for sure either way.

14   Q.    All right.

15              MR. MOORE:  Your Honor, I'd like to approach the

16   witness, if I might, and refresh his recollection.

17              THE COURT:  All right.

18              MR. MOORE:  Thank you.

19              (Mr. Moore handed an exhibit to the witness.)

20   BY MR. MOORE:

21   Q.    Mr. Reisman, I will show you a document which, to make

22   sure the record is clear, is something that I got off the

23   Internet.  But the point of it was to see if I can help

24   refresh your recollection.

25              Do you see this document?  If you would please,

Reisman - cross

 1    without again reading what's in the document, take a look at

 2    the bottom of page, the last three lines, and read that to

 3    yourself.

 4    A.    Yes.

 5    Q.    All right.  Now, if you would please turn over to page

 6    2, towards the bottom of that page, and two lines up from

 7    the bottom, read the -- not the last two lines on the page,

 8    but the two lines before that.

 9    A.    Yes.

10    Q.    Does reviewing the document -- you're obviously free

11    to look at any other parts of the document, if you would

12    like, if it would help, but my question to you is, does

13    reviewing the document I just handed to you help refresh

14    your recollection that Windows 3.1 introduced the registry

15    feature?

16    A.    Yes, that's what it says, and I don't have any reason

17    to question it.

18    Q.    And it also, does it help refresh your recollection

19    that Windows 3.1 was released in 1992?

20    A.    Yes.

21    Q.    All right.  And you don't have any reason to question

22    that either?

23    A.    Right.

24    Q.    All right.  So the registry in Windows existed, at

25    least you have to reason to dispute that the registry in

Reisman - cross

1    Windows existed before you had your invention in the fall of

2    1993; is that correct?

3    A.    Yes.

4    Q.    All right.  And the registry, as we said earlier, is a

5    way to keep track of what software applications are on your

6    computer; right?

7    A.    Yes, on the local computer.

8    Q.    Right.

9    A.    For the operating system.

10   Q.    Correct.  The operating system itself knows what

11   applications are on the, are on the computer; is that

12   correct?

13   A.    Yes.

14   Q.    And so if you, if you already know what's on your

15   user's computer and you want to offer some more software to

16   somebody, since you know from the registry what's already

17   installed, it makes sense to check the available software

18   that you might want to offer and only show the user what's

19   not installed, doesn't it?

20   A.    If you're attempting to integrate online services with

21   local support in a broad way, I would say that would be a

22   sensible way to do it.

23   Q.    Right.  If you already know it's on one computer and

24   then there's other software out there on some other

25   computer, that's one way that you could do it that would

Reisman - cross

1   make sense, wouldn't it?

2   A.    Yes.   The question is whether anyone understood to do

3   that.

4   Q.    All right.   That way, you wouldn't include software

5   applications or updates that are already installed on the

6   user's computer; is that right?

7   A.    Yes.   And I think in hindsight, one would say that was

8   the way to do it, but no one did it.

9   Q.    In fact, I think you testified in your deposition,

10  didn't you, that it would be kind of silly not to go to a

11  list of available software and filter it, according to

12  what's already on the computer, to show what the user

13  doesn't have.

14          Isn't that what you said in your deposition?

15  A.    If you were building an integrated tool to do updates,

16  yes.

17  Q.    Okay.   And to do otherwise, to show them everything

18  and not just what they don't have would be confusing to the

19  user; is that right?

20  A.    Which is what systems did at the time.

21  Q.    Okay.   It would be wasteful of transmission resources;

22  is that correct?

23  A.    Yes.

24  Q.    And it would also add to the work of the system; is

25  that right?

Reisman - cross

1    A.    Yes.

2    Q.    Okay.  Now, we talked earlier this afternoon about

3    your May of 1994 application, patent application, that led

4    to the '546 patent.  And I want to go back to that for a

5    moment and ask you a few things about it.

6              Now, you read that application, of course, when

7    it was submitted; is that right?

8    A.    Yes.

9    Q.    And I think you actually signed a document with the

10   Patent Office in which you swore under oath that you had

11   read and understood the application; is that correct?

12   A.    Yes, I believe so.

13   Q.    All right.  And you also understood that as an

14   inventor, you had a duty to tell the Patent Office about any

15   prior art that you knew about that you thought might be

16   material to the invention that you were trying to get a

17   patent on; is that right?

18   A.    Yes.

19   Q.    Okay.  And you did.  I mean, you told the Patent

20   Office about the prior art that you knew about at that time;

21   is that right?

22   A.    Yes.  I made an effort to search and find things.

23   Q.    Sure.  I'm sorry.  I didn't mean to cut you off.

24   A.    Just to tell the Patent Office, yes.

25   Q.    Okay.  Now, one piece of prior art that you did talk

Reisman - cross

1   about in your patent was a piece of software card remote

2   wear.

3               Do you recall RemoteWare?

4   A.    Generally.

5   Q.    Okay.  And that was out from a company called

6   XcelleNet?

7               Do you recall that name?

8   A.    Sounds familiar.

9   Q.    Okay.  And that existed before your invention; right?

10  A.    A short time before, yes.

11  Q.    All right.  Well, let's take a look at that.

12              MR. MOORE:  If we could pull up JTX-6, please.

13  BY MR. MOORE:

14  Q.    Now, if you have it in front of you, feel free to

15  refer to the paper, but I will also show it on the screen.

16  This is the '054 patent; is that correct?

17  A.    Yes.

18  Q.    All right.  Now, one of the -- the patents have a lot

19  of different sections and one of the sections that's in

20  pretty much every patent is a background of the invention

21  section.  Are you familiar with that?

22  A.    Yes.

23  Q.    And that's where when you are trying to get a patent,

24  you are supposed to describe what other people have done

25  before you leading up your to invention, right, that might

Reisman - cross

1    be relevant to it?

2    A.    Yes.

3    Q.    Okay.  Now, you have the background of the invention

4    section here in the '054 that starts on column 1; is that

5    right?

6    A.    Yes.

7    Q.    And it continues over into, it looks like, the top of

8    column five of your invention, of your application; is that

9    right?  Of your patent?

10   A.    Yes.

11   Q.    All right.  And you talked about a number of different

12   things there, but I want to focus you, if we could turn to

13   page 19 of the exhibit, and highlight the first 25 lines or

14   so.  I'm sorry.  Just highlight about the first ten or so

15   lines of column 4, please.

16         All right.  This is where you're talking about

17   RemoteWare, correct, in the patent?

18   A.    Yes.

19   Q.    And you refer to product brochures copyrighted 1992

20   and apprise list dated August of 1993 for RemoteWare.

21         Do you see that?

22   A.    Yes.

23   Q.    That's again both before you said you were sitting in

24   your living room looking over Manhattan and came up with the

25   idea for your invention?

Reisman - cross

1    A.    Yes.

2    Q.    Right?

3    A.    Yes.

4    Q.    All right.  And in terms of RemoteWare, it says --

5    well, I don't know whether it was you or your patent

6    attorney, the two of you collaborated on this patent

7    application.  It was written here that RemoteWare was a

8    software product that provided electric electronic

9    information distribution to and from remote nodes of a

10   proprietary RemoteWare computer network.

11              Do you see that?

12   A.    Yes.

13   Q.    And so this was talking about a network computer

14   system; is that right?

15   A.    Of sorts, yes.

16   Q.    Okay.  And you talked to us earlier today in your

17   testimony about how network computer systems typically will

18   have a server computer and then some client computers?

19              Do you recall that?

20   A.    Yes.

21   Q.    And a server computer is typically, you know, the back

22   end computer that might provide information to the client

23   computers that users would actually use; is that right?

24   A.    Generally.

25   Q.    Okay.  So, for example, on the Internet, if I'm

1   sitting at home on my computer, that would be the client

2   computer, and if I go to CNN.com, they would have a server

3   computer that would then send me that Web page; is that

4   right?

5   A.    Yes.

6   Q.    And that's how computer experts like you use the term

7   client server computers; right?

8   A.    Yes.

9   Q.    Okay.  Now, what you said about RemoteWare in the

10  patent application itself talks about how it had a server

11  and then these remote nodes of the system; is that correct?

12  N-o-d-e?

13  A.    Yes, I believe so.

14  Q.    And you understand, don't you, that the remote nodes

15  would be the client computers that would be served by the

16  RemoteWare server?

17  A.    Yes.

18  Q.    Okay.  Now let's look a little bit further down.  If

19  we could highlight from around lines 25 to 35, or, I'm

20  sorry, blow up 25 to 35, and highlight -- let's see.  Here

21  we go.

22          Highlight line 31, beginning with the word --

23  let's blow it up first.  Go on down a little bit.  I want to

24  go to 25 to 35, please.

25          Okay.  That's fine.  Highlight five lines down,

Reisman - cross

1    beginning with the word "ability."

2    A.    Sorry, six lines down on the right-hand side, about

3    line 31.  The next one down, ability.

4    Q.    There you go.  Do you see that section right there,

5    Mr. Reisman?

6              MR. MOORE:  Go ahead and highlight the next two

7    lines, please.

8    BY MR. MOORE:

9    Q.    You were talking there about RemoteWare, what

10   RemoteWare could do; right?

11   A.    Yes.

12   Q.    And among the things you said that it could do was

13   that the client computers, these remote nodes, have the

14   ability to work under control of the central server to

15   survey and update system software and files.

16              Do you see that?

17   A.    Yes.

18   Q.    And what you meant by the ability to survey software

19   was that RemoteWare could identify what software was present

20   on the client user computer; is that correct?

21   A.    Yes, from the server.

22   Q.    All right.  And then it would update whatever software

23   was not on the, or was not currently -- strike that and say

24   it again.

25              Then RemoteWare, after it had determined what

Reisman - cross

1    was already on the client computer, would then send an

2    update for any software that wasn't current or up to date on

3    that client computer; is that correct?

4    A.    I don't recall the level of filtering that it did, but

5    it was a centrally controlled process, which is the complete

6    opposite of the, the invention I'm talking about, which is a

7    client controlled decentralized process.

8    Q.    Okay.

9    A.    That's suitable for consumer PCs, where you don't have

10   a central administrator.

11   Q.    All right.  And that's fine.  You can explain that, if

12   you'd like, but my question to you is, RemoteWare had the

13   ability to actually survey, that is determine what files are

14   on the client computers; right?

15   A.    Yes, sir.

16   Q.    And it then had the ability, if it found files on the

17   client computer that weren't current, to update those files;

18   is that right?

19   A.    Yes, from the central server.

20   Q.    From the central server?

21   A.    Yes.

22   Q.    Okay.  Now, in addition to describing RemoteWare in

23   the patent application, you actually submitted some

24   materials on RemoteWare to the Patent Office; is that right?

25   A.    Yes, I believe so.

Reisman - cross

1    Q.    Okay.  And we saw that at the top of column 4.  You

2    referenced product brochures from 92 and a price list from

3    '93?

4              Do you see that?

5              MR. MOORE:  If we can show it.  Can you show the

6    top again, please.

7              THE WITNESS:  Yes, mm-hmm.

8    BY MR. MOORE:

9    Q.    All right.  I would like to go back, then, because

10   when you submit things to the Patent Office to consider as

11   prior art, sometimes those materials end up in what's called

12   the file history, that is the written record with the Patent

13   Office; right?

14   A.    I believe so.

15   Q.    Okay.  Now, if we could then, let's go back to JTX-9,

16   which I believe is in the binder that your counsel provided

17   you.

18   A.    Mm-hmm.

19   Q.    Which again was the file history from the, from the

20   May 1994 patent application.

21              Do you have that in front of you?

22   A.    Yes.

23   Q.    All right.  If you would please turn with me to page

24   274 in that document.  Just let me know when you are there.

25   A.    Yes.

Reisman - cross

1              MR. MOORE:  Let's go ahead and blow up, if we

2     could, just the top part of that title.

3     BY MR. MOORE:

4     Q.     Now, that's the -- page 274, that's the August 16,

5     1993, price list for RemoteList that you mentioned in the

6     patent application; right?

7     A.     RemoteWare, yes.

8     Q.     All right.  And then if we go to the next page,

9     please, 275.  Do you see beginning on page 275 and

10    considering on for several pages is a brochure that is

11    entitled RemoteWare Server on the top left?

12    A.     Yes.

13    Q.     All right.  And that's material that you knew about

14    before your invention; right?

15    A.     Well, before the filing.  I'm not sure that I was

16    aware at the time that I conceived of it.  I was searching

17    for prior art after I had the invention.

18    Q.     Fair enough.  But RemoteWare is a computer system that

19    existed before your invention; is that correct?

20    A.     Yes.

21    Q.     And at some point in the patent application process,

22    you learned about it and then provided these brochures to

23    the Patent Office?

24    A.     Yes.

25    Q.     Via your counsel?

1    A.    Yes.

2    Q.    All right.  Fair enough.

3                A couple things that I want to talk about here

4    on RemoteWare, but the part -- and, again, you're welcome to

5    look at other parts of it if you would like, but I would

6    like to, if you would please turn with me to page 279,

7    which is the one, two, three, four, fifth page in on the

8    brochure.

9                MR. MOORE:  If we could highlight the bottom

10   left portion there.  This says electronic software

11   distribution.

12   BY MR. MOORE:

13   Q.    And do you see the section of the brochure that

14   says electronic software distribution let's you centrally

15   manage and automatically update software running at remote

16   sites.

17                Do you see that?

18   A.    Yes.

19   Q.    And that's talking about a server sending updates,

20   software applications to a remote client computer; is that

21   right?

22   A.    Yes, but the important point is it's the server

23   managing the process without control by the users, and what

24   I was inventing was the complete opposite process, where the

25   user computer had control over whether or not to accept

Reisman - cross

1    updates.

2    Q.    Okay.

3    A.    That was very important because users want to have

4    control over whether Microsoft or Apple or Motorola forces

5    software down your throat or they get to say which things

6    get installed.

7    Q.    All right.  And, Mr. Reisman, your counsel can

8    certainly redirect you and ask you those questions.  My

9    question is very simple.  This was describing a client

10   server system in which the server centrally manages and

11   automatically updates software running on these remote

12   client computers; is that correct?

13   A.    Yes, I believe so.

14   Q.    All right.  Now let's go to the next column, to the

15   second bullet down, and there's a little more information on

16   how this works in RemoteWare.

17              It says here, the RemoteWare Server prompts you

18   through the simple steps required to create ESD lists and

19   assign them to nodes or node groups.

20              Do you see that?

21   A.    Yes.  And I think the you there is a central

22   administrator, not an end user.

23   Q.    Thank you.

24              ESD again is electronic software distribution?

25   A.    Yes, I think so.

Reisman - cross

1    Q.    And so what a server did there in RemoteWare was

2    create these lists of electronic software distribution and

3    assign them to the various client computers, the user

4    computers that were spread out on the network; is that

5    right?

6    A.    I'm sorry.  Say that again.

7    Q.    Sure.  What the RemoteWare Server did that this is

8    describing is allowing whoever was running the system to

9    create these electronic software distribution lists and

10   assign those lists to the different client computers, the

11   user stations that were out there on the network talking

12   with the server; right?

13   A.    Yes.

14   Q.    All right.

15   A.    Basically, a lockdown mode.

16   Q.    Okay.  And the next sentence says:  Each time

17   RemoteWare Server communicates with the node, or the client

18   computer; right?

19          Do you see that?

20   A.    Yes.

21   Q.    Each time it communicates with the node, it checks to

22   see if all of the software on its ESD list is current.  If

23   it is not, the system automatically updates the node by

24   downloading the required files.

25          Do you see that?

1    A.    Yes.

2    Q.    Okay.  So you understood from reviewing these

3    materials and submitting them to the Patent Office that in

4    RemoteWare, that RemoteWare already had been checking to see

5    what software was on the user's computer; is that right?

6    A.    Yes.

7    Q.    And then if the software on the user's computer wasn't

8    current, RemoteWare would automatically send that software,

9    an updated version, over a network; right?

10   A.    To a user within an enterprise or within one company.

11   It wasn't designed to operate with individual end users.

12   Q.    All right.  But your answer is yes; right?

13   A.    Yes.

14   Q.    And it was a system.  When you say an enterprise, you

15   mean it was business software?

16   A.    Yes.

17   Q.    All right.  In other words, businesses could get

18   RemoteWare and they could have all these computers connected

19   by networks and the central servers would be able to tell if

20   the software on the remote computer is up to date, and if

21   it's not, it would send them the update version of the

22   software; right?

23   A.    Yes.

24   Q.    And that was all before your invention?

25   A.    I believe so.

Reisman - cross

1    Q.    Okay.  Now, what you described in -- well, let's talk

2    about it.  You raised, you know, what the scope of this is.

3              Let's go back and let's talk about on the first

4    page of the document, it's 275.  275.  JTX-275.  My bad.  I

5    think I misspoke.

6              All right.  Let's blow up that first highlighted

7    section.  You talked about this being a business software.

8              Well, in fact, it was a pretty expansive one;

9    right?  It says right here, that RemoteWare gives you the

10   ability to easily create and manage information delivery

11   networks that connect hundreds or even thousands of remote

12   computers with a central site; is that correct.

13             Do you see that?

14   A.    Yes.

15   Q.    Now, I think what you were telling me a moment ago,

16   Mr. Reisman, is that in your system, in your invention,

17   instead of the surveying, the checking for what's already on

18   the user's station coming from the server, you wanted to do

19   it from the client, from the user station end; right?

20   A.    Not the checking.  It didn't really matter to me where

21   the checking was done.  What was important was the decision

22   as to whether to go ahead --

23   Q.    Okay.

24   A.    -- and update or not.

25   Q.    And that decision -- so it didn't matter to you

Reisman - cross

1    whether the checking part, to see what's already there, was

2    done at the client computer or the server computer; right?

3    Is that what you just said?

4    A.    I believe that there were different ways to do it,

5    both of which were useful in different contexts.

6    Q.    Okay.  All right.  But in terms of your invention, you

7    didn't say, well, you've got to do it this way or got to do

8    it that way; right?

9    A.    Right.

10   Q.    But what you are saying is that you would say you're

11   different from RemoteWare because instead of just

12   automatically sending the updates to the user station, you

13   wanted to have a step in between where you asked the user

14   which updates they wanted; right?

15   A.    Well, that was one of a number of differences.  That

16   was one key difference.  Another difference was mine could

17   deal with multiple servers each distributing different kinds

18   of software as opposed to a single corporate single

19   distribution point.

20   Q.    All right.  But the point is, you say RemoteWare is

21   automatic.  It would automatically send the update, whereas

22   you wanted to give the user the ability to choose with

23   updates or which files they wanted to receive; is that

24   right?

25   A.    Yes.

Reisman - cross

1    Q.    All right.  Now -- all right.  I think we established

2    earlier that when we were talking about file transfer

3    protocol systems, we established earlier, I believe, that

4    those systems, which were before your invention, also

5    allowed computers to see what software was available and

6    then select and download the files that they wanted over a

7    network; is that correct?

8    A.    You said something about allowing the computer to

9    see?

10   Q.    I'm sorry.  Let me rephrase it so we're clear.

11              When we talk about file transfer protocol or

12   FTP-based systems that were around before your invention,

13   those systems allowed users to see a listing of files that

14   were available to download, select the files to download and

15   then receive them over a network; is that correct?

16   A.    After doing many steps.  It was not quite as simple as

17   what you are describing, but those were things you could do

18   if you found where to look for the files.

19   Q.    Okay.

20   A.    Download directory.  Then you could download a file.

21   Q.    All right.  So if you got online, you dialed up;

22   right?

23   A.    Yes.

24   Q.    You went to an FTP site?

25   A.    The right FTP site.

Reisman - cross

1    Q.    Right.  You go to the right site you want to go to?

2    A.    Yes.

3    Q.    And then you see a listing of files?

4    A.    Yes.  After you find the right listing.

5    Q.    Okay.  You find the listing, you see the listing.  You

6    pick the file; right?

7    A.    Yes.

8    Q.    You say download; right?

9    A.    Yes.  I believe there's a command.  It's kind of a

10   coded command.  I don't know that it was quite as simple as

11   just clicking download.

12   Q.    Okay.  All right.  We didn't have touch screens,

13   smartphones and all of this?  You actually had to type on

14   your computer?

15   A.    And they were weird abbreviations that were not very

16   intuitive.

17   Q.    All right.  But regardless of how you did it, you saw

18   the listing of software.  You indicated what software you

19   wanted and then the software downloaded to you over a

20   network; right?

21   A.    Basically.

22   Q.    And that's how FTP sites worked before the invention,

23   too?

24   A.    Yes, actually.

25   Q.    So people knew how, before your invention, people knew

Reisman - cross

1    how to check their computer to see what was on it; is that

2    right?

3    A.    Yes.

4    Q.    People knew how to send you updated software over a

5    network based on what was on your computer; is that right?

6    A.    Yes.   In certain cases, yes.

7    Q.    And people knew how to show you files that you might

8    want to download and let you select and download and receive

9    those files over a network; is that right?

10   A.    If you did the right amount of work to do it.   Yes.

11   Q.    Okay.   And all of that was known before your

12   invention?

13   A.    Yes.

14   Q.    One other thing that was known, of course, before your

15   invention was the Internet; right?

16   A.    Yes.

17   Q.    And you know you have some claims in your patents that

18   talk about doing this invention over the Internet; is that

19   right?

20   A.    Yes.

21   Q.    But that, of course, is not something you developed,

22   that is downloading software over the Internet, is it?

23   A.    No.

24   Q.    Okay.

25              MR. MOORE:   I don't have any further questions.

1    Thank you for your time.

2               THE COURT:  All right.  Redirect examination.

3               MR. THOMPSON:  Thank you, your Honor.

4                        REDIRECT EXAMINATION

5    BY MR. THOMPSON:

6    Q.   We dealt at length with some of the technical issues

7    during your direct and I just need to clean up and ask you a

8    question or two concerning the financial questions that

9    Mr. Moore asked you during your cross.

10              You mentioned that you received $7 million

11   during your cross-examination.  How much did Intellectual

12   Ventures pay to acquire your patent?

13   A.   Well, the total that was paid by this entity was 35

14   million.

15   Q.   You mentioned not only the $7 million, but also some

16   payments you've received since then.  I think it was $2

17   million or something.

18              Do you remember that?

19   A.   Yes.

20   Q.   What have you done with some of that money?

21   A.   Well, I've been using that to continue my work as an

22   inventor.  I've done, as I said, several different families.

23   I think I have seven families of inventions.  All of the

24   others have been after that and so that has enabled me to

25   continue developing those inventions.

Reisman - redirect

1              The one that's most recent, which is the one

2      that I'm most excited about, is one that is a new approach

3      to pricing, especially relevant to digital content, music,

4      journalism, books, TV.  And it empowers users more in the

5      process of setting prices to get a more economically

6      effective way to distribute that kind of content.  And I

7      think it's going to change how that industry works and I've

8      been working to get people interested in that.

9              I've actually been working with a business

10     school professor, to write an article that we hope to get in

11     a major business publication.  We've already done a short

12     piece that was published in the Harvard Business Review blog

13     about how this could be helpful.

14              MR. THOMPSON:  Thank you.  No further questions.

15              THE COURT:  All right.  You may step down, sir.

16     Thank you.

17              (Witness excused.)

18              THE COURT:  I need the lawyers to clear the

19     witness stand.

20              MR. MOORE:  May I approach, your Honor?

21              THE COURT:  You may.

22              MR. THOMPSON:  The next witness is Dr. Nieh.

23     Dr. Nieh holds a Bachelor of Science degree in electrical

24     engineering from MIT.  He also has a Master's degree and a

25     Ph.D. in electrical engineering from Stanford University.

                            Nieh - direct

1           Dr. Nieh is currently a Professor of Computer

2     Science at Columbia University in New York City.

3           Your Honor, at this time Intellectual Ventures

4     calls Dr. Jason Nieh.

5           THE COURT:  All right.

6               ... JASON NIEH, having been duly sworn

7               as a witness, was examined and testified as

8               follows ...

9                    DIRECT EXAMINATION

10    BY MR. THOMPSON:

11    Q.    Good afternoon, Dr. Nieh.

12    A.    Good afternoon.

13    Q.    Would you please state your name for the record.

14    A.    Jason Nieh.

15    Q.    Do you have a presentation to assist you with your

16    testimony today?

17    A.    I do.

18    Q.    And do you have that presentation maybe someplace up

19    there?

20    A.    I do not.

21    Q.    Okay.  Would you like a copy of your presentation?

22    A.    Yes, I would, please.

23    Q.    Okay.  Well, maybe during a break -- oh, well --

24          MR. THOMPSON:  Your Honor, may Mr. Bohl

25    approach?

Nieh - direct

1                    THE COURT:  Yes.

2                    MR. BOHL:  This will be the last time, your

3       Honor.

4                    THE WITNESS:  Thank you.

5                    MR. THOMPSON:  And if we could have the

6       presentation on the screen.

7       BY MR. THOMPSON:

8       Q.    Dr. Nieh, do you recognize this on the screen?

9       A.    Yes, I do.  That's my presentation.

10      Q.    And -- okay.  Very good.  Do you have a clicker on the

11      witness stand with which you can use to click through the

12      slides?

13      A.    I do and I also have a hard copy of the presentation

14      as well.

15      Q.    Very good.  Thank you.

16                   So let's get started.  Would you please describe

17      your background and qualifications.

18      A.    Sure.  If I could turn to the next slide.

19                   I have over 20 years of experience in electrical

20      engineering and computer science.  I am currently and have

21      been a professor at Columbia for the last 15 years or so.

22      I'm a Professor of Computer Science and Co-Director of the

23      Software Systems Laboratory there.

24                   In terms of my education, as Mr. Thompson

25      indicated, I received a Bachelor's of science from MIT, a

1    Master's of science from Stanford, and a Ph.D. also from

2    Stanford, all in electrical engineering.

3            At Columbia, I do, my job involves both teaching

4    students as well as doing research.  My teaching involves

5    broadly teaching about computer systems, including various

6    aspects of signing and implementing features on soft phones,

7    including Android soft phones.  For example, I teach a case

8    related to Android Operating Systems.

9            And my research also focuses briefly on computer

10   systems and that work has included work that also focuses on

11   smartphones and tablets as well as specifically Android

12   smartphones.

13           Various aspects of this work have resulted in, I

14   published over a hundred papers, including a variety of

15   papers specifically focused on Android.  A number of those

16   have one Best Paper Awards.  And, in fact, the most paper I

17   wrote was specifically on Google Play, which you've heard a

18   little bit about today.

19           Some of this work has also resulted in seven

20   issued patents.

21           In addition, I also have a variety of industry

22   experience, and that includes work at companies such as

23   AT&T, Oracle, VMware, as currently being chief scientist of

24   an Android startup company.

25   Q.    Dr. Nieh, can you briefly describe any technical

Nieh - direct

1    awards you've received?

2    A.    I received a number of technical awards for my work.

3    They include, for example, the Sigma Psi Young Investigator

4    Award, which is given to one individual in the sciences and

5    engineering once every two years.

6          My work has also been recognized by, for

7    example, Google, who has given me four research awards for

8    recognition of my work.

9          MR. THOMPSON:  Your Honor, at this time

10   Intellectual Ventures tenders Dr. Nieh as an expert in

11   computer hardware and software systems, including networks,

12   user interfaces and mobile computing.

13         MR. MOORE:  No objection.

14         THE COURT:  Thank you.

15   BY MR. THOMPSON:

16   Q.    Now, Dr. Nieh, have you been engaged to serve here as

17   an independent expert?

18   A.    I have.

19   Q.    And what have you been asked to do?

20   A.    Well, I've been asked to consider what has been

21   referred to as the Reisman patents.  Namely, patents

22   6,658,464, otherwise known as the '464 patent, which I will

23   also refer to as the content delivery patent, and 6,557,054,

24   also known as the '054 patent, which I will refer to as the

25   directory patent.  And those are shown here in part on the

Nieh - direct

1    slide.

2    Q.    And, Dr. Nieh, you can feel free to adjust the

3    microphone in any way that would feel more comfortable to

4    you, maybe.

5    A.    Thank you.

6    Q.    You're welcome.

7              With respect to those patents, what analysis

8    have you performed?

9    A.    The analysis that I performed was considering whether

10   or not the accused Motorola smartphones infringe the Reisman

11   patents, and whether or not the Reisman patents are valid.

12   Q.    And what information did you look at to reach your

13   conclusions?

14   A.    I looked at a variety of materials.  Those materials

15   included the Reisman patents themselves, their file history

16   and various prior art.  I also looked at deposition

17   testimony, including testimony by Motorola's own engineers.

18   I looked at various Motorola documents and specifications.

19   I spent quite a bit of time myself testing the accused

20   Motorola smartphones.  And I also reviewed Motorola

21   software, schematics and specifically source code.

22   Q.    After all of this natural sits, what conclusions did

23   you reach?

24   A.    Conclusions I reached were that the accused Motorola

25   smartphones infringe the Reisman patents, and that the

Nieh - direct

1    Reisman patents are valid.

2    Q.    Okay.  So let's dive right into the subject of

3    Mr. Reisman's patents.  You mentioned a moment ago that you

4    reviewed the '464 content delivery patent.

5    A.    That's correct.

6    Q.    And what does the title, what does the title of the

7    '464 patent tell us?

8    A.    Well, the title is, user station software that

9    controls transport, storage, and presentation of content

10   from a remote source.  So this is essentially content

11   delivery from a remote source, which is what I was talking

12   about earlier.

13   Q.    So were you in the courtroom when Mr. Reisman

14   testified?

15   A.    I was.

16   Q.    And did you hear his discussions of the problems that

17   a typical user would encounter in the early 1990s?

18   A.    I did.

19   Q.    And based on your experience, do you agree with the

20   perspective he had on the problem?

21   A.    I do, and if I may, I think that this slide is, this

22   next slide is fairly emblematic of, there we go, of what it

23   was like.

24         You can bring yourself back to the early 1990s,

25   the dreaded C prompt, if you will.  Computers provided very

Nieh - direct

1   little help in terms of -- software was key to the computer.

2   Obviously, that provided what the functionality that you

3   needed, but being able to get that on the computer

4   configured in the right way, installed in the right place so

5   that end users could use it was -- was a difficult problem

6   and so that was something that, a challenge that end users

7   faced definitely at that time.

8   Q.    Now, did the patent discuss the problems that you just

9   mentioned and that Mr. Reisman testified about earlier?

10   A.    Yes, they did.

11   Q.    And can you show us where?

12   A.    Sure.  If I may turn to the next slide.  This is an

13   excerpt from the beginning portion of the patent.  It talks

14   about the fact that electronic publication was an exploding

15   industry and then there's a lot of new stuff coming out at

16   the time in electronic form, including magazines, software,

17   apps, for example, games, and usually what happened was that

18   these forms of electronic information were commonly put in

19   computer-readable form on disk.

20        I think you saw from Mr. Reisman's presentation

21   a little bit earlier, lots of diskettes.  That's the way

22   software was made available.  It was packaged up, put in

23   retail stores or through direct mail sales.  Obviously,

24   those kind of marketing practices were kind of expensive and

25   there's a long time lag from, you know, when a consumer

Nieh - direct

1    wanted something to when they got it, especially if it had

2    to be mailed and took a few weeks.

3    Q.    And so what about the problems with networks?  Did the

4    patent discuss that?

5    A.    Yes.  In fact, Mr. Reisman talked about, there were

6    also networks at the time, and the patent itself talks about

7    that.  Hey, you have this network.  It seems like

8    transferring that information would be, over the network

9    would be an attractive way to do it, but in some ways that

10   made the problem harder because it wasn't that easy to get

11   on the network.  Heard earlier in the presentation, the

12   funny modem do you understand and sometimes the modem would

13   disconnect.  You had to figure out exactly how to get on,

14   and that was kind of painful.  And then even once you got

15   on, still, you had to get the software.  You still had to

16   get in the right place.  You still had to get it installed,

17   configured.  That was complicated.

18            So it was still a difficult problem in light of

19   the fact that there were networks.

20   Q.    Dr. Nieh, what's discussed in the rest of that

21   paragraph?

22   A.    Well, it talks about the fact that these issues

23   applied specifically, in particular to software updates,

24   program updates.  So software would get written but would go

25   out of date, so you would need a newer version of the

Nieh - direct

1    software, an update.  And so a problem faced in that

2    situation as well as just getting stuff is the difficulty of

3    being able to integrate that update with what you already

4    had, which is integrate new software with what you already

5    had on your computer to make it all usable in a way that was

6    easy to use for the end user.

7    Q.    How did the patent describe the solution within the

8    '464 patent?

9    A.    Well, the summary of the patent points out that the

10   solution was something that solved the problem by enabling a

11   simple, economical and prompt mass distribution of

12   electronic information products.  So that was the key idea

13   behind the invention.

14   Q.    And can you explain how those terms were tied to the

15   invention?

16   A.    Well, simple.  So simple for the end user to use so

17   they didn't have to go through all the complicated stuff

18   that only computer geeks at the time would could very well.

19           Economical.  So, for example, you wouldn't be

20   paying the permitted costs of using, say, a dial up service

21   and also it wouldn't be so expensive to have to package

22   everything up physically and mail into the mail or go down

23   to the store.

24           And prompt.  So getting information when you

25   wanted it, you know, relatively quickly so that, for

1    example, things that were time sensitive, like if you wanted

2    the latest magazine article, you could get it when you

3    wanted it instead of waiting three months for it to, say,

4    come through the mail.

5    Q.    As we begin to delve into the details of the

6    invention, could I ask you to refer to claim 1 and explain

7    how claim 1 has the '464 content delivery patent in it.

8    A.    This is claim 1 of the '464 content delivery patent,

9    and I think if we can just -- some of the key aspects are,

10   I'm going to highlight them in red here.  Hopefully, you can

11   see that on the screen.

12          So one was really enabling somebody to select

13   the content on the computer or user station that they were

14   at.  Effecting that transport of the selected content and

15   then effecting the storage.  Having the content transport

16   sent.  Having it stored, the content that you wanted, and

17   then being able to present that stored content to the user

18   altogether, having some system that did all of this and make

19   it easy for end users to use.

20   Q.    All right.  So with that, let's turn our attention to

21   the Motorola Mobility accused smartphones.

22          What Motorola Mobility smartphones did you

23   identify infringed the '464 patent?

24   A.    The ones I identified are the 16 different models that

25   are shown here on the slide.

Nieh - direct

1    Q.    And so now we get to an exciting part of my

2    examination here.  I think before you, Dr. Nieh, or to the

3    side, there are some actual phones; is that right?

4    A.    That is correct.

5    Q.    Okay.  And so what I'd like you to do, sir, if you

6    could, is pick up each of those phones and tell us what they

7    are and read off the exhibit number, if you wouldn't mind.

8    A.    Okay.  Your Honor, may I stand to do that?

9              THE COURT:  Yes, you may.

10             THE WITNESS:  Thank you.

11             Hopefully, this will work okay.  This right here

12   is the Atrix 4G.  This is PTX-48.

13             This right here is the Atrix two Motorola

14   smartphone.  This is PTX-45.

15             These right here are the Atrix HD, just three

16   physical specimens.  So there's PTX-16, PTX-13 and PTX-51.

17             This is the Electrify.  That's PTX-64.

18             This one is the Electrify 2.  That's PTX-19.

19             This is the Electrify M.  This is PTX-70.

20             This is three exhibits of the Admiral

21   smartphone.  We have PTX-1, PTX-4 and PTX-39.

22             This is three of the Motorola Photon Q 4G LTE.

23   We have PTX-7, PTX-10 and PTX-73.

24             This is the Motorola Photon 4G.  This is PTX-42.

25             This is the Motorola XPRT.  This is PTX-36.

Nieh - direct

1              This is the Motorola Titanium.  This is PTX-34.

2              This is the Motorola Milestone X, PTX-31.

3              This is the Motorola Triumph Smartphone.  This

4    is PTX-28.

5              This is the Motorola i867.  This is PTX-25.

6              This is the Motorola Defy XT.  This is PTX-22.

7              And, finally, this is the Motorola XT886.  This

8    is PTX-67.

9    BY MR. THOMPSON:

10   Q.    Thank you, Dr. Nieh.  Can you briefly describe what

11   you've done to inspect those smartphones?

12   A.    Well, I inspected all of these phones.  In fact, I

13   even purchased a bunch of them myself in New York City, at

14   various Sprint and AT&T stores.  I used all the phones,

15   including using Google Play on all the phones, so did a fair

16   amount of extensive work on these phones.

17             MR. THOMPSON:  Your Honor, at this time

18   Intellectual Ventures would like to move to have those

19   phones admitted into evidence.  I can read the list if now

20   is the right time.

21             So I guess Intellectual Ventures moves to admit

22   PTX-1, 4, 7, 10, 13, 16, 19, 22, 25, 28, 31, 34, 36, 39, 51,

23   67, 70 and 73.

24             There are other phones listed that Dr. Nieh

25   identified, but those have already been admitted.

1          MR. MOORE:  No objection.

2          THE COURT:  Thank you.

3          (Plaintiffs' Exhibit No. 1, 4, 7, 10, 13, 16,

4    19, 22, 25, 28, 31, 34, 36, 39, 51, 67, 70 and 73 were

5    admitted into evidence.)

6    BY MR. THOMPSON:

7    Q.    Dr. Nieh, what is a smartphone?

8    A.    Well, a smartphone, as shown here on the slide, it is

9    basically a phone and computer put together.  So -- and

10   since it's a computer, there's software on it, and, for

11   example, there's an operating system and there are

12   applications on it that provide various functionality that

13   users are interested in.

14   Q.    So we've heard a lot about apps and applications.

15   Can you please explain what's meant by an app or an

16   application?

17   A.    Sure.  So apps, or applications, same thing.  Apps is

18   just short for applications, are various pieces of software

19   that run on the phone that provide functionality that users

20   are interested.

21          So, for example, a Newsweek app allows a user to

22   read the latest articles in Newsweek or Angry Birds.  If

23   you've played angry birds, it's a fun game on smartphones.

24          Netflix allows you to watch on your smartphones.

25          Facebook allows you to connect with your friends

Nieh - direct

1    online.

2              And ESPN is another app that, for example, gives

3    you sports scores and who won the latest game and, you know,

4    a recap of various kind of sporting events.

5              So those are various kinds of apps that are on

6    smartphones.  There are lots and lots of them on Android

7    smartphones.

8    Q.   At a very high level, how do the apps end up on the

9    smartphone?

10   A.   So on an Android system, and Android is the operating

11   system environment on the Motorola smartphones that I

12   discussed, there's something called Google Play, also

13   referred to earlier as Android Market and then it was

14   re-branded as Google Play.  And this is basically an online

15   store.

16             So the online store has over a million apps and

17   you go to the store on your smartphone and then you can

18   select whatever apps you're interested in and download them

19   and then you get access to them.  It's a nice, convenient

20   one stop way to go shopping.

21   Q.   I think you touched upon this briefly, but can you

22   tell us again, what is Android?

23   A.   So Android is the operating system environment on the

24   phone, much as for many of your computers you might run

25   Windows.  Well, Android is essentially the comparable thing

Nieh - direct

1    to a smartphone.

2    Q.    And then what is Android Market and Google Play with

3    respect to Android?

4    A.    Those are, that's the online store for the smartphone

5    for the Android environment.

6    Q.    Dr. Nieh, you went through all the phones and I

7    appreciate that, but for the purposes of today's

8    conversation, is there a phone in particular that you think

9    would be appropriate to use as a representative product?

10   A.    Yes.  For example, we could pick this one.  This is

11   the Motorola Photon Q 4G LT that I mentioned a little bit

12   earlier.

13   Q.    Okay.  Very good.  My favorite.

14         Why did you pick that one as a representative

15   product?

16   A.    Well, all of these phones run Android and Google Play,

17   so they pretty much all work the same way for the purposes

18   of the discussion I'm going to have today.  So this one

19   works more or less the same way as all the other ones.

20   Q.    And just if you could expand further upon that, how

21   about with respect to Google Play?  Why is that phone an

22   appropriate representative product?

23   A.    Well, in terms of Google Play, it has Google Play.  It

24   does all the things that one would do with Google Play and

25   all these other phones would more or less do the same thing

Nieh - direct

1    with Google Play that this phone does.  So picking this one

2    versus the other one, they're all going to behave the same

3    way.

4    Q.    Dr. Nieh, how did you go about inspecting and testing

5    that representative phone, for example?

6    A.    Well, I used the phone extensively myself and not only

7    did I use it, I actually, and I did this with the other

8    phones as well, but I actually flew out to California, and

9    actually had my, the recording, a recording done of my usage

10   of the smartphones.

11            And that recording included using two cameras,

12   one that was on me so you could see me and what I was doing,

13   and one that was on the phone itself, so you got a clear

14   view of what the screen was doing and recorded the usage of

15   some of these Motorola smartphones.

16   Q.    And so let's turn to one of those videos, if we could,

17   Dr. Nieh.  Can I ask you to play the video that you have for

18   the Photon Q 4G LTD.

19   A.    Sure.  If you could please play the video.

20            (Videotape played.)

21            THE WITNESS:  I don't know if there's a way to

22   raise the audio a little bit?  Well, maybe if you could just

23   stop that.

24   BY MR. THOMPSON:

25   Q.    Very good.  If we could hold on right there.

1    Actually, Dr. Nieh, that video, those videos are marked

2    PTX-359 and PTX-360.  And Intellectual Ventures moves to

3    have those admitted into evidence.

4              Earlier last night, perhaps -- well, I will let

5    you speak to that.

6              MR. MOORE:  We have no objection to them being

7    played in front of the jury, but I think they're really

8    demonstrative exhibits.  They should be played, but not

9    admitted into evidence.

10             THE COURT:  Well, we can have that discussion

11   later.

12             MR. MOORE:  Thank you.

13             THE COURT:  You can certainly play them.

14             MR. THOMPSON:  Thank you.

15   BY MR. THOMPSON:

16   Q.    Dr. Nieh, I think you were about to say?

17   A.    Yes.  Actually, so I made the videos, but it's

18   actually a little long.  For example, it goes on for about

19   20, 25 minutes, so rather than having you sit through the

20   entire video, what I also did was I took some screen shots

21   of the recording of the video that showed the relevant parts

22   of the video, and I thought I could just walk through those

23   so that you could see some of the things that I did with the

24   accused devices.

25   BY MR. THOMPSON:

Nieh - direct

1   Q.    I think that would be much more efficient.  Please

2   proceed.

3   A.    Okay.  So, again, these are screen shots from one of

4   those videos.  And so this is one of these Motorola

5   smartphones and this is when you turn it on, this is what

6   you see.  This is known as the locked screen and you can

7   swipe on the screen, and from there, then you'll go to the

8   home screen of the smartphone and you can see here a variety

9   of icons.  And I don't know if the laser pointer will reach.

10  There we go.

11          So one of them right here is called Play Store,

12  so that's Google Play.  So if I go ahead and tap on the

13  screen there, then we see Google Play here.

14          And Google Play offers a variety of things.  So,

15  in fact, one of the things that it offers is these apps that

16  we talked about.  So I go ahead and tap there on apps, then

17  up come the apps, part of Google Play.  You can see, for

18  example, that these are the featured apps, if you will, or,

19  you know, things that are featured either in games or other

20  parts.

21          You can swipe back and forth on the screen to

22  see other parts of the store.  So, for example, this is a

23  listing of the top paid apps, so those are the apps that are

24  most popular among Android users that cost money.  So these

25  are the most popular paid apps.

Nieh - direct

1          So I can also see apps that are trending.  You

2    can see the apps in different ways, because there are lots

3    and lots of them, so there are many ways in which you can

4    see them.

5          So if you go to the very top, you might see

6    there these -- three little dots right there (indicating).

7    And tapping on the screen there brings up another menu, and

8    one of the things listed under that menu is something called

9    "My Apps."

10         Now, my apps appears in Google Play, but

11   depending on which version, it may appear in a slightly

12   different place.  In this one, it appears here.  So we can

13   go ahead and tap there, just like My Apps.

14         And here what we have is My Apps directory

15   that's shown right here.  And you can see here that there

16   are a bunch of apps that, for which updates are available,

17   newer versions.

18         For example, when you sign in to Google Play,

19   there's an account that you use, and so the account that's

20   currently in use here is the one that's shown here that

21   looks like an e-mail address.  And so this is the account

22   that's currently in use on this phone that I'm using with

23   Google Play.  That shows that here.

24         And we can see some other screens, for example,

25   that are shown.

Nieh - direct

1          So if you see down here on the bottom of the

2    smartphone, there's a, you refer to it as a back button, so

3    I can go back to an earlier screen.  So I might tap that.

4    Actually, let's see.  I already tapped that.  Sorry.  We go

5    back to this section of the screen and we got to the top,

6    new paid listing of apps.  And what I could do is, let's say

7    I want to buy one of these apps.  So the one I'm going to

8    buy is system monitor, which, just so you can see it, it's

9    right here (indicating).

10          System Monitor by Christian Gollner.  And I can

11    go ahead and tap right there where the screen is and up pops

12    the system monitor details page.  It's the page with the

13    various details about this app.

14          And this app is an app that provides some

15    information about how your computer is performing.  So, for

16    example, you can see on this page that there are a variety

17    of screen shots from the app, a description, what's new in

18    this particular version of the application.  And you can

19    scroll up and down, swiping on the screen to see the various

20    information associated with this application.

21          There are various reviews, so you know what

22    other people think about the application.  And you can see

23    also the top, the name of the application, system monitor,

24    and, you know, the third-party developer responsible for it,

25    Christian Gollner.  You can see apprise tag right there:

Nieh - direct

1    The price says $1.99.  If I go ahead and tap there, then up

2    pops a confirmation screen saying, okay, you really want to

3    buy this?  I say, yes.  Accept and buy.  Once I do that,

4    except it and buy it, then it goes ahead, Google Play goes

5    ahead and authorizes that payment.

6              And then you can see here, right here

7    (indicating), this progress bar area changes, then shows

8    that the app is now being downloaded on to the smartphone.

9              So it says here downloading right here.  Okay?

10   And furthermore, as it downloads, what it will show is how

11   much of the app has already been downloaded, so you get an

12   idea about how much longer you have to wait.

13             So initially obviously it starts off with

14   0 percent.  Now that changes to 15 percent of the app being

15   downloaded, 27 percent, 37 percent.  It just keeps ongoing.

16   92 percent.  And finally a hundred percent.  And so now the

17   app has been downloaded on the phone.  From there, the app

18   is installed on the phone.

19             So we have the progress bar indicating that the

20   smartphone says installing now.  There's also a little

21   information here at the top.  This is a little harder to

22   read, but it says installing system monitor, indicating that

23   the installation process is occurring.

24             And so after taking a little white to install,

25   it gives me a message that says successfully installed

1    system monitor.  And now Google Play Store gives me the

2    option, is press right here the option to open up the system

3    monitor application and display it.  And we see right here

4    that, if I go ahead and tap where that open button occurs,

5    the system monitor app displayed it.

6              And you can see here that it has its own, you

7    know, special user interface, so this one obviously looks a

8    little different from Angry Birds.  It's a kind of a geeky

9    app.  So sorry about that.  But you can see what the app is

10   doing.  It's kind of monitoring how the system is running.

11             And, in fact, I can get out of the app by going

12   back to the home screen and you can see that if I tap on the

13   top of the Motorola smartphone, which is using this button

14   right here (indicating), then this screen will pop up and I

15   can power off the phone, for example.  So power off the

16   phone.  The phone turns off.

17             The phone is off.  I can turn the phone back on,

18   so the phone now shows me that it's coming back on.  And

19   then, you know, it shows a variety of messages.

20             We come back to the locked screen, which you saw

21   at the beginning, and, for example, I can swipe on the lock

22   screen, come back to the home screen.  And then I can --

23   let's see.  If I tap right here, I can see the apps that are

24   on this smartphone and if I do that, then I can see that

25   scrolling, swiping across, I can see that system monitor

1    application, which I had just purchased, is still there on

2    the phone even after I turn it off and turn it back on, so

3    it's retained there on the phone.

4    Q.    So --

5    A.    That's my usage.

6    Q.    All right.  So can you remind us which phone that was

7    for?

8    A.    Sure.  That was for, again, the Motorola Photon

9    Q 4G LT.

10   Q.    And did you perform similar testing with respect to

11   the other phones with respect to other phones?

12   A.    Yes, I did.

13   Q.    And so can you explain what you did with some of the

14   other phones?

15   A.    Well, for the other phones, I did very similar things.

16   So, for example --

17   Q.    Maybe just explain that, Dr. Nieh.

18   A.    Yes.  So this just shows some of the -- I did

19   basically the same things with all of the phones, and this

20   just shows some of the videos that I recorded of my usage of

21   those, of those different phones.  The ones that are shown

22   here are on the left, you see the smartphone model, so this

23   one shows the Admiral, this Motorola Photon Q, the one I

24   just talked about, the Atrix HD.  Shows specifically the

25   Google Play versions that were on the phones when I tested

Nieh - direct

1    them for the purposes of these videos, PTX numbers as well

2    as the video numbers at the last column where it says

3    number.

4              MR. THOMPSON:  Intellectual Ventures moves to

5    admit PTX-356, PTX-361 and PTX-362 into evidence.

6              MR. MOORE:  Your Honor, the same issue.  We

7    don't object to them being played as demonstratives, but

8    don't think they should go into the record.

9              THE COURT:  Well, they certainly can be played.

10   We'll have a discussion later about the information.

11             MR. THOMPSON:  Thank you, your Honor.

12   BY MR. THOMPSON:

13   Q.    Dr. Nieh, now that we've walked through the

14   smartphones, let's turn our attention to comparing the claim

15   language to the smartphones.  And maybe the first thing we

16   should do is articulate which claims you have identified are

17   infringed.

18             So what claims of the '464 patent are the focus

19   of your analysis today?

20   A.    The claims that I focused on were claims 1, 8, 16 and

21   17.

22   Q.    And so let's start with obviously claim 1.  You've

23   seen clearly claim 1.

24   A.    Yes.  In fact, I show it here on the slide.

25   Q.    And so let's start with the preamble, which is the

1  very top of the claim.

2  A.    Okay.  So let me just kind of zoom in a little so it's

3  a little more clear.

4  Q.    Thank you.

5           Do the accused smartphones include, and I'm

6  quoting from the claim here, a software product for use at a

7  user station, the user station including a processor and a

8  storage device, the software product comprising computer

9  executable instructions?

10  A.    Yes, they do.

11  Q.    And how did you determine that the stated software

12  product for use at a user station was present on the accused

13  smartphones?

14  A.    Well, I used the phones myself.  I looked at various

15  documentation about the phones, including documentation,

16  statements from Motorola as well as Motorola's testimony

17  from Motorola employees.  So there's -- and I also looked at

18  the source code.

19  Q.    Okay.  Very good.

20           And so you mentioned that you had relied on

21  documents.  In your binder, would you please turn to

22  PTX-334.

23  A.    Okay.

24  Q.    Thank you.  What is it?

25  A.    This is a statement from Motorola.

Nieh - direct

1          MR. THOMPSON:  And so, your Honor, at this time,

2     Intellectual Ventures moves to admit PTX-334.

3          MR. MOORE:  No objection.

4          THE COURT:  Thank you.

5          (Plaintiffs' Trial Exhibit No. 334 was admitted

6     into evidence.)

7     BY MR. THOMPSON:

8     Q.   All right.  And so how does that support your opinion,

9     Dr. Nieh?

10    A.   Well, even before going there, if I may, I just wanted

11    to indicate that -- I mean, the Android operating system

12    with Google Play, clearly software.  The smartphone is a

13    user station.  Each of the Motorola smartphones was running

14    Android and Google Play, so to me, clearly it is a software

15    product for use at a user station.  But furthermore, this

16    document that we just referred to, the statement from

17    Motorola, just confirms what I just said, which is that

18    Motorola admits that each of the accused smartphones was

19    running Android with Google Play.  And this document, this

20    table from this document shows -- this document is from

21    Motorola and you can see here on the left column, the

22    various accused Motorola smartphone models that we

23    discussed.

24          You can see here in the third column the listing

25    of the specific versions of Android that were running on

 1   those phones and also the specific versions of Google Play

 2   on those phones.

 3              So this is just confirmation from Motorola of

 4   what I just said.

 5   Q.    Dr. Nieh, now I would like you to turn in your binder,

 6   if you could, to PTX-9.

 7              Can you tell us what that is?

 8   A.    PTX-nine is the Motorola Photon Q User Guide, a user

 9   guide for this phone (indicating).

10   Q.    Can you show us by way of example how that shows the

11   presence of Google Play on the accused smartphones?  I'm

12   sorry.

13              MR. THOMPSON:  Your Honor, at this time

14   Intellectual Ventures moves for the admission of PTX-9.

15              MR. MOORE:  No objection.

16              THE COURT:  Thank you.

17              (Plaintiffs' Trial Exhibit No. 9 was admitted

18   into evidence.)

19   BY MR. THOMPSON:

20   Q.    Now, Dr. Nieh, can you show us how that exhibit shows

21   the presence of Google Play on the accused smartphone?

22   A.    Sure.  This is the cover of that user's manual that I

23   mentioned for the Motorola Photon Q.  And within this

24   manual, you can see this next slide, one of the pages there

25   is entitled Google Play.  And Google Play is basically

Nieh - direct

1   described here in terms of, you know, this is the software

2   product and clearly shows that, you know, using, it talks

3   about telling you to download apps and games and install

4   them using Google Play.

5              So this is the software product for use at the

6   user station.

7   Q.    And did you look at other user materials that had

8   similar information?

9   A.    I did.  So this isn't the only user's manual I looked

10  at.  I looked at a bunch of them for the 16 different models

11  and they're listed here on this slide showing the accused

12  Motorola smartphones.  And the left portion of the table as

13  well as those user manuals.

14             MR. THOMPSON:  Your Honor, at this time

15  Intellectual Ventures will move to admit the user's manuals

16  that are listed there.  I don't think there's a dispute

17  about what they are.  It's 431, 47, 15, 16, 21, not 16, but

18  66.  21, 355, 3, 9, 192, 437B, 35, 33, 119, 27, 24 and 69.

19             MR. MOORE:  No objection to any of those.

20             THE COURT:  Thank you.

21             MR. THOMPSON:  Thank you.

22             (Plaintiffs' Trial Exhibit No. 431, 47, 15, 16,

23  21, 66, 21, 355, 3, 9, 192, 437B, 35, 33, 119, 27, 24 and 69

24  were admitted into evidence.)

25  BY MR. THOMPSON:

Nieh - direct

1   Q.   Dr. Nieh, what deposition testimony did you look at

2   that was provided by Motorola Mobility?

3   A.   Well, the deposition testimony I looked at included

4   some of what you saw a little earlier today from Mr.

5   Rudrardyha, who is the director of software engineering at

6   Motorola.  And as he indicated, he's the top guy for the

7   apps, stuff that Motorola does, and he talks about the fact

8   that Motorola receives GMS, that is Google Mobile Services

9   applications from Google.  Okay.  So that's what he says is

10   part of his testimony here.

11          He says, are you familiar with this term, GMS?

12   What's your understanding?  It's short for Google Mobile

13   Services.  And he goes on to say specifically that they

14   preload these applications on the accused Motorola

15   smartphones.

16          Is it correct that Motorola installs

17   applications included these Google Mobile Services apps?

18          Up and down he says, that's correct.  And he

19   says, we only preload the mandatory ones.

20          So just to explain on that a little further,

21   mandatory, he said further in his testimony, he listed a

22   bunch of the things that he considered mandatory, which you

23   heard earlier in his testimony.  It talks about, for

24   example, Chrome, which is the Web browser, and also the Play

25   Store App and also Google Play.  That's what we saw a little

1    earlier.

2             And just to make clear, he said, he also defined

3    just to explain what preloading means as part of his

4    testimony and you can see here on lines 2 and 3 that

5    preloaded is something that we would put as part of the

6    software out of the box.

7             So they preload it on the phone so that before

8    the user gets it, it's already there, and when the user

9    opens it up and opens up the box, the software is already

10   pre-preloaded there.

11            Specifically, he says, specifically confirms

12   that Google Play and Android Market, just different names

13   for the same thing, which he confirms right here:

14   Previously known as Android Market.  Previously Google Play

15   and Android Market the same?  That's correct.

16            And more specifically he says that confirms that

17   Motorola always installs a version of Google Play on the

18   accused smartphones.  So in answer to the question, was

19   there ever a time when Motorola did not install essentially

20   Android Market or Google Play?  The answer is no.  So it's

21   always on there.

22            So this just confirms what I said a little

23   earlier, that Google Play is on these smartphones.  That's

24   totally a software product for use at a user station.

25   Q.    Did you also reference deposition testimony from a

Nieh - direct

1    Google witness?

2    A.    I did.

3    Q.    And can you explain that testimony?

4    A.    Sure.  Mr. Ficus Kirkpatrick was a Google software

5    engineer who you heard from a little earlier today and he

6    also confirmed that Google Play is software.  He said, is it

7    true that Google Play includes both client software and

8    server software?  Yes.  So clearly a software product.

9           He also himself codes the software for Google

10   Play.  So, I mean, coding is software, so that's just

11   further confirmation that this is software and also

12   confirmation that, you know, it's software.

13          And if I could just add a little further because

14   the claim has another part to it, if you don't mind.

15   Q.    Please go ahead.

16   A.    It says the software product comprising computer

17   executable instructions.  Software is just computer

18   executable instructions.  It's instructions that tells the

19   computer what to do and he confirms he writes the software

20   to do that.  So this is clearly a software product

21   comprising computer executable instructions.

22   Q.    Did you also confirm that the accused smartphones have

23   a processor in a storage device, Dr. Nieh?

24   A.    I did.

25   Q.    And if I could ask you to please turn in your binder

1    to PTX-630.

2    A.    Okay.

3    Q.    And, Dr. Nieh, what is that?

4    A.    This is a spec sheet for what's known as, I guess an

5    internal spec sheet for Motorola, for the Motorola Photon Q

6    4G LT smartphone, so it provides various specifications

7    about that phone.

8             MR. THOMPSON:  Your Honor, Intellectual Ventures

9    moves for the admission of PTX-630.

10            MR. MOORE:  No objection.

11            THE COURT:  Thank you.

12            (Plaintiffs' Trial Exhibit No. 630 was admitted

13   into evidence.)

14   BY MR. THOMPSON:

15   Q.    Dr. Nieh, while we're messing with the binders, could

16   you please turn to PTX-137.  And could you tell us what that

17   is?

18   A.    This is a spec sheet as well, and this one is for the

19   Motorola Atrix 2.

20   Q.    Okay.

21            MR. THOMPSON:  Your Honor, at this time

22   Intellectual Ventures moves for the admission of PTX-137.

23            MR. MOORE:  No objection.

24            THE COURT:  Thank you.

25            (Plaintiffs' Trial Exhibit No. 137 was admitted

1    into evidence.)

2    BY MR. THOMPSON:

3    Q.    Dr. Nieh, turn your attention back from the binders.

4    Can you explain what those documents show to you?

5    A.    Well, these documents confirm that the element, the

6    user station, including a processor and storage device as

7    meant by the accused smartphones; clearly, smartphone, user

8    station.  Processor and storage device as shown on these

9    excerpts from the spec sheet.

10          So the first one is for the Photon Q that I just

11   talked about.  And so you see here that the chipset includes

12   what's called an applications, so that's the processor.

13   It's MSM8960.

14          So that's clearly a processor here.  It also

15   includes memory which is clearly storage.  And, in

16   particular, it includes what's listed here as internal ROM 8

17   gigs, so eight gigs is the size, and that's essentially

18   flash, which you heard of, so that's persistent storage on

19   the smartphone.  So that's for the Photon Q.

20          And if I could just add that also you can see

21   similar things for the other phone, the Atrix.  You can see

22   here that the chipset includes an adjunct processor this is

23   a TIOMAP4430.  It is, again, a processor, and the memory,

24   again, includes eight gigs of flash.

25   Q.    So, Dr. Nieh, with respect to the processor and the

Nieh - direct

1   storage device, what did you find with respect to the other

2   smartphones?

3   A.     Same thing is true for the other smartphones as well.

4   Q.     So to summarize, Dr. Nieh, do each of the accused

5   smartphones have a software product for use in a user

6   station, the user station including a processor and a

7   storage device, the software product comprising executable

8   construction?

9   A.     Yes, they do.

10  Q.     Very good.  Let's put a checkmark there.  And let's

11  move on to the second element of the claim.

12          The second element says, and I will quote,

13  enable a user at the user station to select content from

14  each of a plurality of independent publishers.

15          Did you find that that element was present in

16  the accused smartphones?

17  A.     I did.

18  Q.     And before we get into the proof, did you apply the

19  Court's construction of the word content?

20  A.     I did.  The Court construed content as any form of

21  electronic information.

22  Q.     And with that construction in mind, what evidence did

23  you look at to confirm the presence of this element in the

24  accused smartphones?

25  A.     Well, for example, I used the smartphones, so if I

1    could just turn to the next slide.  So these are just some

2    screen shots from recording of my usage that I talk about a

3    little earlier.

4              You can see I'm using the smartphone, so I am a

5    user.  And smartphone is a user station.  And you can see

6    clearly that the, when you have Google Play up, that there

7    is showing a -- various forms of content that you can

8    select.

9              So content is any form of electronic

10   information, so that clearly includes apps, software, for

11   example.

12             And if I can go ahead, you can see clearly on

13   this screen shot, that we have a variety of different

14   applications that are listed in this top new page.

15             So, for example, provision, Blue Iris.  Not only

16   that, you can see the respective third-party developer

17   responsible for each of these applications.  You see the

18   name and then the developer.

19             So those are all third party developers.  Those

20   are all independent publishers.  And you see a plurality of

21   them, so you're seeing here, you know, the content from a

22   plurality of publishers.

23             And, in fact, if I go ahead and, you know, go

24   back to the screen shots from the video, I can go ahead and

25   select content.  It says selecting the monitor app right

Nieh - direct

1    here.  So there's selecting content right there.

2    Q.    So focusing on the independent publisher's part of the

3    claim element, do any documents confirm that the content is

4    from independent publishers?

5    A.    Yes, they do.

6    Q.    And so if I could ask you to please turn in your

7    binder to PTX-564, and once you get there, let us know what

8    it is.

9    A.    This is the publishing overview for -- from Google.

10                  MR. THOMPSON:  At this time, Intellectual

11   Ventures moves for the admission of PTX-564.

12                  MR. MOORE:  No objection.

13                  THE COURT:  Thank you.

14                  (Plaintiffs' Trial Exhibit No. 564 was admitted

15   into evidence.)

16   BY MR. THOMPSON:

17   Q.    Dr. Nieh, what does that document show?

18   A.    Well, the document, which is shown here, is the Google

19   Play publishing overview and just to make this a little more

20   clear, let me zoom in on the top portion of that document.

21   You can see here, clearly, it's entitled publishing

22   overview.  This is the Google Play publishing overview.

23                  Publishing is the general process of making your

24   apps available to users.  So it clearly talks about what you

25   have to do to do that and refers to it as publishing.

Nieh - direct

1              And if I can turn to another page from this

2    document, on this next slide, you can see here, clearly, the

3    way it's referred to about publishing.

4              First of all, it talks about, if you want to

5    distribute your apps to the broadest possible audience,

6    releasing them through Google Play is ideal.  In fact,

7    Google Play is the premier marketplace for Android apps.

8    There are a million plus Android apps in there.

9              And it also indicates specifically that Google

10   Play is a robust publishing platform.  I think that's just

11   confirmation of publishing being done.

12   Q.   Continuing on with this language, independent

13   publishers, did you also look at deposition testimony?

14   A.   I did.

15   Q.   And can you please explain who you looked at and what

16   it meant?

17   A.   Sure.  So Mr. Kirkpatrick, who you heard testify a

18   little earlier, and I referred to a little earlier, also

19   just confirms that third party app, application developers,

20   these publishers publish their apps on Google Play.

21              So you can see here when asked about what they

22   have to do to make their apps available on Google Play, he

23   talks about that they, as you can see in this red highlight

24   right here, I'm sorry if this is a little small, but it

25   says, they can upload their app to our website, okay, and

 1    then essentially, and then they publish.  Okay?

 2                And specifically there's a publish button that's

 3    part of this whole process.  And he said, when asked, what

 4    happens after the app developer pushes the publish button?

 5    The app becomes available on our store.

 6                So that's publishing by those independent

 7    publishers.

 8    Q.    Dr. Nieh, did you also look at the underlying source

 9    code?

10    A.    I did.

11    Q.    And I think up there someplace on the witness stand or

12    in the box is a box full of paper.  Maybe yes, maybe no?

13                THE WITNESS:  Your Honor, may I stand up and

14    look?

15                THE COURT:  Yes.

16                THE WITNESS:  I don't see it right now.

17    BY MR. THOMPSON:

18    Q.    Well, I'm being told that it has been held back here

19    behind the bar.

20                MR. THOMPSON:  So, your Honor, may I grab the

21    box and bring it up to the witness?

22                THE COURT:  All right.

23                (Mr. Thompson handed a box to the witness.)

24    BY MR. THOMPSON:

25    Q.    Dr. Nieh, can you open the lid on that box and let us

Nieh - direct

1    know what is in there?

2    A.    This is some of the Google Play source code that I

3    reviewed.

4    Q.    And what is source code, Dr. Nieh?

5    A.    Well, source code is the language that a developer

6    writes in to tell the computer what to do, and eventually it

7    becomes computer executable instructions.

8              MR. THOMPSON:  Your Honor, at this time

9    Intellectual Ventures moves for the admission of PTX-576,

10   the source code that's in the box.

11             MR. MOORE:  Your Honor, we don't have any

12   objection to the admission as an exhibit.  We have discussed

13   with opposing counsel the need to keep it confidential due

14   to the fact that it's internal source code, but no objection

15   to it being in the record.

16             THE COURT:  I actually might have an objection

17   to it being admitted as an exhibit, so we need to perhaps

18   discuss this further.

19             MR. THOMPSON:  Okay.

20             THE COURT:  All right?

21             MR. THOMPSON:  We'll wrap up the source code in

22   two or three more questions with the slide and then we'll

23   move on to another topic maybe.  That will be a good time.

24             THE COURT:  All right.

25   BY MR. THOMPSON:

Nieh - direct

1    Q.    Dr. Nieh, what files in particular have you referenced

2    in the source code?

3    A.    There are a number of files that I referenced in the

4    source code and, for example, this next slide shows some of

5    those files that I looked at.  You look at the first column,

6    those are the names of the respective files.  Then there's

7    various indications of where they actually appear in this,

8    on paper.

9    Q.    And so, Dr. Nieh, can you explain the analysis that

10   you went through with respect to the source code and that

11   box in front of you?

12   A.    So there's a source code computer that was made

13   available by Motorola on which source code was provided, and

14   so as part of my analysis, for example, I went to that

15   computer, took a look at what source code was there,

16   understanding the workings of Google Play.  I also asked

17   some other folks who were in California to also go take a

18   look at that source code.

19            And then I had various parts that were, I

20   thought, pertinent, had them printed, and so there was a

21   whole process for making that available, which we identified

22   what files there were.

23            Then notified Motorola's attorneys about what we

24   wanted printed and then those files were then sent to, to

25   the Feinberg Day attorneys or the hard copies, and then

1    printed on yellow paper and then so this is what you see is

2    the end result in terms of the hard copy form.

3    Q.    And so is that hard copy form all of the source code

4    you reviewed with respect to Google Play?

5    A.    No, it is not.

6    Q.    And can you explain the difference between what's in

7    the box and what you reviewed?

8    A.    Well, on the computer, there was all of the source

9    code, but I only printed out the parts, and there's a lot of

10   source code, so I only printed out the parts that I thought

11   were particularly relevant.

12          So, in particular, when you review source code,

13   you don't usually just review, say, every single line word

14   for word.  You find the parts that are relevant and those

15   are the parts that I focused on and that's what's in here.

16   Q.    And then so from the parts that were relevant that are

17   in the box, what does this slide represent?

18   A.    This slide shows some of those specific files that are

19   in this box, such as DfeBulkDetails.java.  That's one of

20   those files that's in this box.

21          My apps installed Adapter.java and a bunch of

22   other files.  Those are the file names of the source code.

23   You put them in different files because obviously there's a

24   lot of it, so you split it up across different files and so

25   these are some of those different modules.

Nieh - direct

1   Q.    Dr. Nieh, in closing, will you just read the remainder

2   of those files?

3   A.    Sure.  The other ones are InstallPolicies.java.

4   NavigationManager.java.  DetailsSummaryAppsView Binder.java.

5   InstallTask.java and Gdiff.java.  And it's .java because

6   java was the programming language that was used.

7   Q.    So to summarize with respect to this element, do each

8   of the accused smartphones have the enable element of the

9   claim?

10  A.    They do have that element.

11              THE COURT:  All right.  We're going to recess

12  for the evening.

13              Ladies and gentlemen, I will just remind you

14  that during the evening recess, you are not to discuss the

15  case among yourselves or with anyone else.  Do not read or

16  listen to anything touching on the case.  Don't perform any

17  independent investigation on the matters pertaining to this

18  case.

19              Have a safe drive home, a pleasant evening.

20  We'll see you tomorrow morning at 9:30.  Thank you very

21  much.

22              (The jury was excused for the evening recess.)

23              THE COURT:  And the witness may certainly step

24  down.

25              And you all may be seated.  Although I have a

Nieh - direct

1    discovery conference period, I do want to discuss two issues

2    with you before we recess for the evening.

3              You may exit the courtroom, if you would,

4    please.

5              (Witness excused.)

6              THE COURT:  With respect to the issue that was

7    forecast, I am amazed, quite frankly, that I can go to the

8    trouble of issuing, you know, a 60, 70-page opinion,

9    including a claim construction with an explanation and the

10   supplemental report simply regurgitates the argument I

11   rejected on summary judgment.

12             So long as Motorola is not conceding that it

13   does infringe this element, which I assume it isn't, because

14   it hasn't conceded anything, then the explanation, it's not

15   in a footnote, it's not in a different part of the opinion.

16   It's right under my claim construction.  And if that isn't

17   clear enough to you, then the jury should read my reasoning,

18   and so I will allow that slide, not to say that every slide

19   should have that, but in this particular instance, it's

20   absolutely appropriate.

21             With respect to the source code, quite frankly,

22   I am really concerned about introducing a box of source code

23   of a third party.

24             Number one, I'm not confident how much of this

25   is in dispute.  If it's not in dispute, it should be

Nieh - direct

1    stipulated to.  We shouldn't be dealing with another party's

2    source code.

3              And if there is some part of it that's in

4    dispute, then we only should be submitting that small part

5    of the source code.

6              The jury is not going to know what to do with

7    it.  It's the facts that it's there.  So you need to talk to

8    each other about whether there's a dispute, and if there is,

9    we will talk about it tomorrow morning.

10             I have a prior commitment at 8:00 o'clock.  I

11   should be back certainly before 9:30, I hope by 9:00, so if

12   there are issues, let me know and we'll use our time before

13   9:00 o'clock to address them.

14             All right.  There is a discovery conference.

15   It's going to start momentarily or as soon as you exit.  So

16   thank you very much, counsel.

17                  (Counsel respond, "Thank you, your Honor.")

18                  (Court recessed at 4:34 p.m.)

19                       -  -  -

20

21

22

23

24

25